IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

_____

| | | |
|---|---|---|
| U.S. BANK, National Association, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:21-cv-00120 |
| | ) | |
| MICHAEL QUALIZZA, NEIL D. FREEMAN, | ) | **JURY TRIAL REQUESTED** |
| TIMOTHY DIXON, | ) | |
| | ) | |
| Defendants and Counterclaimants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DFQ MANAGEMENT LLC, and | ) | |
| 1501 WASHINGTON ST. LOUIS, LLC, | ) | |
| | ) | |
| Counterclaimants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. BANCORP COMMUNITY | ) | |
| DEVELOPMENT CORPORATION, and | ) | |
| U.S. BANK, NATIONAL ASSOCIATION, | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |
| | ) | |

_____

**ANSWER AND COUNTERCLAIMS OF DEFENDANTS AND COUNTERCLAIMANTS MICHAEL QUALIZZA, NEIL D. FREEMAN, AND TIMOTHY DIXON AND COUNTERCLAIMANTS DFQ MANAGEMENT LLC AND 1501 WASHINGTON ST. LOUIS, LLC.**

_____

COMES NOW, Defendants and Counterclaimants Michael Qualizza, Neil D. Freeman, and Timothy Dixon (hereinafter "Guarantors"), Counterclaimants DFQ Management LLC, and 1501 Washington St. Louis, LLC, (hereinafter "Developers"), pursuant to Fed. R. Civ. P. 8, 12, and 13 and file this, their Answer and Counterclaims in the above-styled cause.

1

This case concerns a single, coordinated development project (the "Transaction") where more than seventeen (17) agreements were signed on the same closing day, December 29, 2017 (the "Transaction Agreements"). In that Transaction, U.S. Bancorp Community Development Corporation (the "CDC"), U.S. Bank, National Association (the "Bank"), Guarantors, and Developers redeveloped the International Shoe Company Building into a one-of-a-kind luxury hotel. Under the terms of the Transaction, the CDC Enterprise primarily served as a tax credit equity partner. If the CDC Enterprise had primarily served only as a lender, it would have violated IRS requirements and risked forfeiting millions of dollars in tax credit benefits from the deal.

Guarantors' and Developers' Defenses and Counterclaims arise from the Bank and CDC's decisions to breach the Transaction Agreements, in part for their own financial gain, and in part for the stated purpose of harming Guarantors.

In response to the individually numbered paragraphs of the Complaint, Guarantors answer as follows:

## **THE PARTIES**

1.      Guarantors admit that the U.S. Bank, National Association is a national banking association with its principal place of business in Minneapolis, Minnesota. Guarantors deny the remaining allegations in Paragraph 1, including that the Bank is a citizen of the State of Ohio under the test articulated in *Hertz Corp. v. Friend*, 559 U.S. 77 (2010).

2.      Guarantors admit the allegations of Paragraph 2 of the Petition.

3.      Guarantors deny the allegations of Paragraph 3 of the Petition. In answer, Guarantors state that Neil D. Freeman is an individual residing in the State of Florida and is a citizen of the State of Florida.

2

4.      Guarantors admit the allegations of Paragraph 4 of the Petition.

5.      Guarantors admit the allegations of Paragraph 5 of the Petition.

6.      Guarantors admit the allegations of Paragraph 6 of the Petition.

## GENERAL ALLEGATIONS

7.      Guarantors admit that Exhibit A purports to be a true and accurate copy of the Loan Agreement. Guarantors deny that Exhibit A is the current, enforceable version of the Loan Agreement, as modified by subsequent agreements. Guarantors deny that the full amount of principal was ever disbursed to Guarantors pursuant to the Construction Loan Agreement. Guarantors deny the remaining allegations of Paragraph 7 of the Complaint. Guarantors further answer that the Loan Agreement is part of a single, contemporaneously signed agreement with—or in the alternative incorporates by reference—other Transaction Documents and agreements, and its terms must be read with reference to those Transaction Documents, as stated in Guarantors' affirmative defenses.

8.      Guarantors admit that Exhibit B purports to be a true and accurate copy of the Promissory Note dated December 29, 2017. Guarantors deny that Exhibit B is the current, enforceable version of the Promissory Note, as modified by subsequent agreements. Guarantors deny that the full amount of principal was ever disbursed to Guarantors pursuant to the Promissory Note. Guarantors deny the remaining allegations of Paragraph 8 of the Complaint. Guarantors further answer that the Promissory Note is part of a single, contemporaneously signed agreement with—or in the alternative incorporates by reference— other Transaction Documents and agreements, and its terms must be read with reference to those Transaction Documents, as stated in Guarantors' affirmative defenses.

9.      Guarantors admit that Exhibit C purports to be a true and accurate copy of the Guaranty Agreement (the "Guaranty") dated December 29, 2017. Guarantors admit that the

Complaint refers to the Loan Agreement, the Note, the Guaranty, and all other documents evidencing or securing the Loan as the "Loan Documents." Guarantors deny that Exhibit C is the current, enforceable version of the Guaranty. Guarantors deny the remaining allegations of Paragraph 9 of the Complaint. Guarantors further answer that the Promissory Note is part of a single, contemporaneously signed agreement with—or in the alternative incorporates by reference—other Transaction Documents and agreements, and its terms must be read with reference to those Transaction Documents, as stated in Guarantors' affirmative defenses.

10.    Guarantors deny the allegations of Paragraph 10 of the Petition.

11.    Guarantors deny the allegations of Paragraph 11 of the Petition.

12.    Guarantors admit that Exhibit D is a letter from the Bank to Borrower 1501 Washington, sent on December 29, 2020.  Guarantors deny the remaining allegations of Paragraph 12 of the Petition, including that the letter demanded immediate payment of the Loan.

13.    Guarantors deny the allegations of Paragraph 13 of the Petition.

14.    Guarantors deny the allegations of Paragraph 14 of the Petition.

15.    Guarantors deny the allegations of Paragraph 15 of the Petition.

## COUNT I

16.    Guarantors reallege and incorporate by reference their responses contained in Paragraphs 1-15 hereinabove as though set forth in full.

17.    Guarantors admit that the Guaranty states that "Guarantor absolutely, unconditionally and irrevocably guarantees and becomes surety" for principle and sums other than principle "but only to the extent that the same are not timely paid by Borrower." Guarantors deny the remaining allegations of Paragraph 17 of the Petition.

4

18.     Guarantors deny the allegations of Paragraph 18 of the Petition.

19.     Guarantors deny the allegations of Paragraph 19 of the Petition.

20.     Guarantors deny the allegations of Paragraph 20 of the Petition.

21.     Guarantors deny the allegations of Paragraph 21 of the Petition.

22.     Guarantors deny the allegations of Paragraph 22 of the Petition.

23.     Guarantors deny the allegations of Paragraph 23 of the Petition.

24.     Guarantors deny the allegations of Paragraph 24 of the Petition.

25.     Guarantors deny the allegations of Paragraph 25 of the Petition.

26.     Guarantors deny the allegations of Paragraph 26 of the Petition.

27.     Guarantors deny the allegations of Paragraph 27 of the Petition.

28.     Guarantors deny that the Bank is entitled to any relief sought in its *ad damnum* clause.

29.     Guarantors deny any allegations contained within any headings.

30.     Any and all allegations set forth in Plaintiff's Complaint that have not been  expressly admitted, denied, or explained in the foregoing paragraphs are hereby denied as though  done so with particularity.

## AFFIRMATIVE DEFENSES

Having fully responded to the individual allegations raised in Plaintiff's Complaint, Guarantors assert the following Affirmative Defenses to Plaintiff's Complaint:

1.     Guarantors allege and incorporate by reference their Counterclaims and supporting facts contained in Paragraphs 1-332 of these Counterclaims as though set forth in full.

2.     Plaintiff's Complaint fails to state a claim upon which any relief can be  granted.

3.      Guarantors deny that they are liable to Plaintiff under any theory of law or equity.

4.      Under the express terms of the Guarantee, Guarantors are liable for payment "only to the extent that the same [payments] are not timely paid by Borrower." ECF No. 1-3, p. 2.

5.      Borrower 1501 Washington has timely made all required payments in full.

6.      Under the Guarantee, "[i]n the event of an Event of Default which is not cured within any applicable grace or cure period, [the] Bank will have the right to enforce its rights, powers and remedies, in any order." ECF No. 1-3, p. 2.

7.      No event of default has occurred, under the express definition provided in the Guarantee.[1]

8.      The Bank has breached the contract by seeking a court order requiring repayment when Borrower has timely made all required payments, in full, and no event of default has occurred.

9.      Borrower 1501 Washington met the requirements for an extension of the Maturity Date, or to the extent it did not, its failure to do so was caused by the failures and breaches of the Bank and CDC set forth more fully in the Counterclaim below.    Further, Borrower 1501 Washington exercised its right to extend the Maturity Date under the Construction Loan Agreement at issue in this case (the "Loan Agreement"), or in the alternative, to the extent the Bank denies that it did so, any such notice of its exercise of its right to extend the Maturity Date under the Construction Loan Agreement would have been futile because the Bank would not have accepted same. *See* ECF No. 1-1, p. 30.

---

[1] The Guarantee defines "Event of Default" to arise if "(a) Guarantor fails to pay any sums as required pursuant to the terms of this Guaranty or in any other document provided in relation hereto; (b)  Guarantor fails to observe or perform any covenant, representation, warranty, obligation or agreement in this Guaranty or in any other document provided in relation hereto; and (c) any covenant, representation or warranty by Guarantor contained in this Guaranty or in any other document provided in relation hereto is now or hereafter false or incorrect when made."

10.     As a result, under the terms of the Loan Agreement, the Note has not matured and Borrower 1501 Washington is not in default thereunder.

11.     Instead of acknowledging the maturity extension, the Bank sought to add an additional criterion to the extension: a release of all claims against the Bank and its subsidiaries concerning the development project supported by the Construction Loan.

12.     The Bank's insistence on obtaining a release from legal claims does not grant the Bank the power to re-write the contract and demand payment from Guarantors when Borrower 1501 Washington continues to pay on time and are otherwise not in default.

13.     In the alternative, if any event of default, or if any criteria necessary to extend the maturity date was not fulfilled, any such default, performance, or non-performance was:

a)      Excused by the Bank's and CDC's Breach of the Transaction.

b)      Excused by the Bank's and CDC's Breach of their duties of Good Faith and Fair Dealing.

c)      Caused by the CDC Enterprises' own actions, which made Guarantors' or Developers' performance impossible.

d)      Rendered impossible by an Act of God, namely the COVID-19 pandemic, the occurrence of which was unforeseeable when the Bank, the CDC, Guarantors, and Developers executed the underlying Agreements.

e)      Rendered impracticable by an Act of God, namely the COVID-19 pandemic, the occurrence of which was unforeseeable when the Bank, the CDC, Guarantors, and Developers executed the underlying Agreements.

f)      Excused by the doctrine of commercial frustration.

g)      Excused by the Guaranty, Loan Agreement, and other Transaction Agreements'

7

force majeure provisions.

14.    Guarantors owe no payment to the Bank in part because the Bank has breached the Guarantee and other Transaction Agreements forming a single, contemporaneously signed agreement.

15.    The Guarantee was contemporaneously signed with and relates to the same subject matter as the Loan Agreement and at least fifteen other agreements including, but not limited to the following:

      a)      The Loan Documents;

      b)      The QLICI Loan Documents;

      c)      The Managing Member Loan Documents;

      d)      The Octagon Loan Documents;

      e)      The State Tax Credits Purchase Agreement; and

      f)      The Master Tenant FF&E Purchase Agreement.

16.    Additionally, Schedule 2, as incorporated by reference into the Loan Agreement, provides a list of sixteen (16) Loan Documents, each referenced and described in further detail by the Loan Agreement.

17.    Each of the documents identified in Paragraphs 15-16 of these Affirmative Defenses (collectively the "Transaction Documents") are defined by the Loan Agreement with particularity and with intent to incorporate. ECF No. 1-1 pp. 18-20, 22, 24, 35, 96.

18.    Plaintiff Bank and Counterclaim Defendant CDC worked together to breach the Guarantee, Loan Agreement, and Transaction Documents and deny Guarantors and Developers their rights under those documents.[2]

---

[2] The facts underlying these breaches are identified in Guarantors' and Developers' Counterclaims.

19.    The Bank and CDC worked together to make aspects of Guarantors' and Developers' performance impossible under the Guarantee, Loan Agreement, and Transaction Documents.

20.    A small group of Bank and/or CDC employees, sometimes occupying positions of employment simultaneously within the Bank and CDC (or acting as agents for both), conspired together and directed all the activities of the Bank and CDC with respect to the Transaction.

21.    CDC employee Fran Doherty executed the Loan Documents, purportedly on behalf of the Bank as its Vice President.

22.    The Loan itself, Loan Agreement, Loan Documents, and all Notices were in the care of the CDC pursuant to the execution page of the Loan Agreement and other official documents concerning the loan. ECF No. 1-1, p. 75.

23.    As described in Paragraphs 20-22, the CDC exercised complete domination of the finances, policy, and business practices with respect to the Loan Agreement and all other agreements and actions constituting the transaction that is the subject this lawsuit.

24.    The CDC used its domination of this transaction and the Loan Agreement to commit wrongs and perpetrate violations of its legal duties as well as dishonest and unjust acts in contravention of Guarantors' and Developers' rights and the Bank's and CDC's duties of good faith and fair dealing.

25.    The wrongs, violations, dishonest and unjust acts referenced in Paragraph 24 are discussed in greater detail in Guarantors' and Developers' Counterclaims.

26.    The conspiracy described in Paragraphs 20-24, and the wrongs described in Guarantors' and Developers' Counterclaims proximately caused the injury to Guarantors and Developers described in the same Counterclaims.

27.     Based on their breaches of the Transaction Documents and tortious actions, the Bank and CDC are guilty of unclean hands.

28.     The Bank's and CDC's breaches of the Transaction Documents excused Guarantors' and Developers' performance.

29.     The Bank's and CDC's breaches of the duty of good faith and fair dealing excused Guarantors' and Developers' performance.

30.     Based on rights arising under the Transaction Documents, the Bank's claims are or may be barred by estoppel and waiver.

31.     Guarantors assert the defenses of setoff or recoupment, including the right to reduce, set off, or recoup any amounts owed to the Bank by the claims asserted in Guarantors' and Developers' Counterclaims.

32.     Guarantors reserve the right to amend their Answer and Defenses in the event that additional information comes to their attention through further investigation or discovery.

WHEREFORE, Guarantors respectfully request that this Honorable Court dismiss Plaintiff's Complaint with prejudice forthwith, taxing court costs to Plaintiff, and awarding Guarantors their reasonable attorneys' fees incurred in the defense of this matter.

## COUNTERCLAIMS

Having fully Answered the Bank's Complaint, Guarantors and Developers assume the posture of Counter-Plaintiffs and, for their Counterclaims against the Bank and CDC state as follows:

## PARTIES

1.     Defendant and Third-Party Plaintiff Michael Qualizza ("Qualizza") is a resident of Texas, an owner-member of DFQ Management LLC ("DFQ"), and an indirect owner of 1501 Washington St. Louis, LLC ("1501 Washington"). Qualizza is a citizen of the State of Texas.

2.      Defendant and Counterclaimant Neil D. Freeman ("Freeman") is a resident of Florida, an owner-member of DFQ and an indirect owner of 1501 Washington. Freeman is a citizen of the State of Florida.

3.      Defendant and Counterclaimant Timothy Dixon ("Dixon") is a resident of Wisconsin, a former owner-member of DFQ and a former indirect owner of 1501 Washington. Dixon's financial and ownership interests in DFQ and 1501 Washington were extinguished when other members of those Developer entities purchased his interests on March 4, 2020. Dixon is a citizen of the State of Wisconsin.

4.      Counterclaimant DFQ Management LLC ("DFQ") is a limited liability company with its principal place of business in Illinois and with membership identified in a Disclosure of Organizational Interests Certificate that the undersigned is filing pursuant to Local Rule 2.09. DFQ's members include citizens of Illinois, Texas, and Missouri.

5.      Counterclaimant DFQ authorizes the filing of these answers, defenses, and counterclaims through the approval of its managers, Guarantors.

6.      Counterclaimant 1501 Washington St. Louis, LLC ("1501 Washington") is a limited liability company with its principal place of business in Missouri and with membership identified in a Disclosure of Organizational Interests Certificate that the undersigned is filing pursuant to Local Rule 2.09. 1501 Washington's members include citizens of Illinois, Texas, and Missouri.

7.      Counterclaimant 1501 Washington authorizes the filing of these answers, defenses, and counterclaims through the approval of its managers, Guarantors.

8.      Plaintiff, U.S. Bank, National Association (the "Bank"') is a national banking association with its principal place of business in Minneapolis, Minnesota. Upon information and

belief, the Bank is a citizen of the State of Minnesota.

9.      Plaintiff, U.S. Bancorp Community Development Corporation (the "CDC") is a Minnesota Corporation with its principal place of business in St. Louis, Missouri. Upon information and belief, the CDC is a citizen of the State of Missouri.

## JURISDICTION AND VENUE

10.     Venue is appropriate in this forum.

11.     This Court has personal jurisdiction over the Bank because the Bank has filed suit in this Court.

12.     This Court has personal jurisdiction over the CDC because its principal place of business is in Missouri and the acts or omissions giving rise to this suit are based in Missouri.

13.     This Court has subject-matter jurisdiction over counterclaims brought against the Bank under 28 U.S.C. § 1332 because this is an action between citizens of different states and the amount in controversy exceeds $75,000.

14.     This Court has subject-matter jurisdiction over Counterclaims against the CDC under 28 U.S.C. § 1367 because these Counterclaims arise out of the same Transaction and are so related to the claims brought by and against the Bank that they form part of the same case or controversy. Additionally, these Counterclaims are not brought by a Plaintiff within the meaning of 28 U.S.C. § 1367(b).

## FACTUAL BACKGROUND

15.     On December 29, 2017, Parties to this suit closed a Transaction to fund, develop, and operate a unique luxury hotel known as The Last Hotel (the "Hotel").

16.     In connection with the closing, the Parties gathered 267 documents supporting the transaction (the "Closing Documents") and executed and provided 42 agreements on the same day (the "Closing Agreements").

17.     At least sixteen of these Closing Documents and Agreements are identified by the Loan Agreement with particularity and with intent to incorporate, as stated in Paragraphs 15-16 of Defendants' Affirmative Defenses.

18.     Pursuant to the Transaction and the Transaction Documents, the Developers redeveloped a portion of the International Shoe Company Building located at 1501 Washington Ave., St. Louis, MO using a complex financing structure that included:

a)     $9,977,398 in Federal Historic Tax Credit (HTC) equity to be contributed by the CDC to the Last Hotel Master Tenant, LLC, the entity that operates the Hotel;

b)     $10,297,271[3] in State HTCs purchased from the Bank by the property owner and lessor to the Hotel, 1501 Washington;

c)     $3,178,500 in Federal New Market Tax Credits (NMTCs) acquired by the CDC and the St. Louis Development Corporation (SLDC) and loaned to 1501 Washington;

d)     $9,047,429 in equity contributed by DFQ to 1501 Washington;

e)     $100,000 in equity contributed by DFQ to the Last Hotel Master Tenant;

f)     $23,667,084 in Bridge and Mezzanine loans DFQ obtained from lender Octagon Credit Partners, LP (Octagon); and

g)     $12,300,000[4] in Construction Loan funding obtained from the Bank and guaranteed by Guarantors.

**The Bank and CDC Delayed Their Loan and Equity Contributions.**

19.     In this financing scheme, Developers and Guarantors took on the greatest risk as borrowers and guarantors of the largest dollar items: the Bridge and Mezzanine loans obtained

---

[3] $9,625,000 of this amount was funded, due to changes in the calculated eligible amount.
[4] $12,053,000 of this amount was funded, as the Bank refused to make the final draws.

from Octagon and the Construction Loan obtained from the Bank.

20.     When other parties, including the Bank and CDC, improperly delayed funding for this transaction—whether equity contributions, loans, or state historic tax credit purchases—DFQ and Guarantors suffered significant financial harm.

21.     In this case, because of delays in funding noted below, DFQ and Guarantors had to increase the size and duration of the $9 million Mezzanine loan borrowed at about fifteen percent (15%) interest, not to mention a $17 million dollar bridge loan from the same Octagon Partners, LP.

22.     The following delays proximately caused this harm:

23.     The CDC delayed its $9,977,398 federal HTC equity contributions, in bad faith and breach of contract.

24.     The Bank and CDC fraudulently misrepresented the timing of state HTC funding by eighteen (18) months, when stating that state certification of HTC credits would be provided within one month of submission.

25.     The Bank and CDC refused to timely fund the Construction Loan, especially in October of 2019 and December of 2019, although construction was completed on June 28, 2019.

26.     The Bank and CDC refused to consent to a lower-interest bridge loan at Midland States Bank in 2020.

27.     Delays illustrated in Paragraphs 22-26 caused Guarantors and Developers $5,215,761.59 in damages associated with excess interest.

28.     Additionally, the Bank and CDC caused Guarantors and Developers more than $2.1 million in damages when they refused to fund their loans and equity contributions until Developers settled unfounded claims brought by the construction company for the Last Hotel, Paric

Corporation.

### The Master Tenant Operating Agreement and Federal HTC Program Require the CDC to Timely Fund Equity Contributions.

29.     Federal and State HTCs are obtained through approval of the State Historic Preservation Office (SHPO), the National Park Service (NPS), and the Missouri Department of Economic Development (DED).

30.     Federal and State HTCs reduce investors' tax liability in exchange for their investments used to renovate non-residential historic buildings built before 1936 (10% credit) or buildings listed individually in the National Register of Historic Places or located in a registered historic district (20% credit).

31.     Investors in developments funded by federal HTCs must be equity investors with a risk of loss if the project fails, or the Internal Revenue Service could recapture and reallocate the HTCs. *See Historic Boardwalk Hall, LLC v. Comm'r*, 694 F.3d 425 (3d Cir. 2012).

32.     In 2014, the IRS issued a safe-harbor guidance, advising HTC investors that they could avoid the possibility of HTC recapture and reallocation under *Historic Boardwalk Hall* if they funded twenty percent (20%) of their total required capital contributions as of the date the historic building is placed in service, excluding "promissory notes or other obligations for which the Investor is the maker," and if 75% of their total funding amount was fixed in amount by the placed in service date. IRS, Rev. Proc. 2014-12, 2014-03 I.R.B. 415 (Jan. 13, 2014).

33.     The CDC and 1501 Washington agreed to follow the requirements of the HTC Safe Harbor, pursuant to the Master Tenant Operating Agreement.

34.     By signing the Master Tenant Operating Agreement, the CDC agreed to fund capital contributions as an equity partner.

35.      The Master Tenant Operating Agreement provides that "Investor Member (the

15

CDC) is intended to constitute an 'Investor' and the Company is intended to constitute a 'Partnership', as those terms are defined in the Revenue Procedure."

36.     Further, "The Members also affirm and direct that any ambiguity in the meaning of any provision of this Agreement shall be resolved in favor of an interpretation that would tend to cause the Company or its members to comply with the requirements of the Safe Harbor."

37.     To benefit from federal HTCs, the CDC created a limited liability company with DFQ, namely the Last Hotel Master Tenant, LLC ("Master Tenant").

38.     The CDC and DFQ executed an operating agreement for the Master Tenant (the "Master Tenant Operating Agreement") which, along with other Transaction Documents, requires the CDC to make timely equity contributions to the Master Tenant.

39.     The CDC did not make timely equity contributions to the Master Tenant as required by the Master Tenant Operating Agreement.

### The CDC also Funded the Hotel through New Market Tax Credits.

40.     Federal NMTCs are obtained through a competitive application where certified Community Development Entities (CDEs) propose to fund projects for Qualified Active Low-Income Community Businesses (QALICBs).

41.     The CDC owns several CDEs through a nested ownership structure, through which it funds QALICBs.

42.     One of those CDEs, USBCDE Sub-CDE 162 was used to fund 1501 Washington St. Louis, LLC, through NMTC loans.

43.     USBCDE Sub-CDE 162 is entirely owned USBCDC Investment Fund 228, LLC, which in turn is owned primarily by the CDC.

### The CDC Dominates the Finances, Policy, and Business Practices of the Transaction.

44.     The CDC is a wholly-owned subsidiary of the Bank.

45.     The CDC was created to invest in, manage, and grow a portfolio of tax credit investments, including tax credits acquired by its parent organization the Bank.

46.     As described in Paragraphs 31 through 36, the CDC was required by law to take on investment risk and participate in this tax-credit funded development primarily as a partner and not as a lender.

47.     The CDC benefits from offering deals funded in part by the Bank's state Historic Tax Credits, which in this case totaled $10,297,271, and loans made by the Bank, which in this case totaled $12,300,000.

48.     Upon information and belief, and as a course of dealing throughout the transactions described herein, CDC employees make all decisions concerning any Bank loans, tax credits, and other products that will be included in the CDC-funded tax credit deal.

49.     CDC employee Fran Doherty executed the Loan Documents for the Last Hotel, purportedly on behalf of the Bank. ECF No. 1-1, p. 75.

50.     CDC employee Pamela Smith and other CDC employees served as Guarantors' and Developers' sole point of contact for all communications concerning the Construction Loan from the Bank.

51.     The Loan, Loan Agreement, Loan Documents, and all Notices were in the care of the CDC pursuant to the execution page of the Loan Agreement and other official documents concerning the loan. ECF No. 1-1, p. 75.

52.     The CDC exercised complete domination of the finances, policy, and business practices with respect to the Loan Agreement and all other agreements and actions constituting the Transaction that is the subject this lawsuit.

**The CDC Decided to Harm Guarantors and Developers through Breaches of the Transaction Documents.**

53.     In addition to controlling lending and equity contributions, the CDC exercised control over business decisions because of its ownership of the Master Tenant.

54.     To maximize federal HTC funds, the CDC owns a ninety-nine percent (99%) share of the Master Tenant.

55.     DFQ owns a 1% share of the Master Tenant and is responsible for the day-to-day management and decisions of the Master Tenant.

56.     Under the Master Tenant Operating Agreement, the CDC's and Bank's consent was required for certain activities, including acquiring lower-interest loans and signing subleases for the Hotel.

57.     Under the Master Tenant Operating Agreement and other Transaction Documents, the CDC controlled (1) the timing and amount of equity contributions to the Master Tenant, (2) the timing and amount of lending to 1501 Washington (in the form of NMTC loans and the Construction Loan), and (3) key business decisions of the Hotel.

58.     The CDC's rights to supervise—and consent to or reject—certain decisions, created an implicit duty to exercise that consent reasonably and for the benefit of all parties to the Master Tenant Operating Agreement.

59.     In this position, the CDC had breathtaking and unique ability to harm Guarantors' and Developers' position in the project.

60.     At some date before June 2019, and most likely years earlier, CDC Executive Director Zack Boyers and his staff decided to use the CDC's leverage over the Transaction to cause harm to Guarantors individually and to their businesses.

18

61.     In a January 30, 2020, phone call, Boyers explicitly told Guarantor Mike Qualizza that the CDC had deliberately harmed Guarantors' and Developers' position as well as their company, the Urban Development Fund, LLC, and that the CDC had been deliberately harming his position for some time, because of a personal vendetta against Qualizza.

62.     Boyers called Guarantor Mike Qualizza on January 30, 2020, because Qualizza had been criticizing the CDC, and Boyers had heard about such criticism from attendees at a NMTC conference in San Diego.

63.     Other CDC employees have stated confidentially to Guarantors that the CDC had inappropriately harmed Guarantors because of a personal vendetta against Qualizza and that this stance represented a marked departure from the Bank and CDC's previous treatment of Guarantors and Developers.

64.     Upon information and belief, Boyers and his staff's personal vendetta against Qualizza extended to all major actions that Bank and CDC took with respect to the Transaction for an unknown period of time.

65.     Upon information and belief, CDC and Bank staff agreed to make it the Bank's and CDC's policy to harm Guarantors and Developers through the transaction, in bad faith and in violation of the Master Tenant Operating Agreement, the Loan Agreement, the Disbursing Agreement for the Loan (the "Disbursing Agreement"), the Guarantee, and other Transaction Agreements.

**The Bank and CDC Withheld Loans and Equity Until Developers Settled Paric's Meritless Claims.**

66.     On December 29, 2017, 1501 Washington executed a Guaranteed Maximum Price Agreement (the "Construction Contract") with Paric Corporation ("Paric") under which Paric would serve as the General Contractor for the Last Hotel Construction.

67.     Guarantors hired Paric based on representations from the CDC that construction contractor Paric had a record for fair, honest, and capable construction of similar buildings. In fact, the Bank represented Paric as a Gold Star partner of the Bank, a preferred contractor to hire.

68.     Under the Construction Contract, Paric was allowed to submit change orders for delays and cost overruns associated with certain events, like weather delays or delays in the handoff date between one contractor and another.

69.     If DFQ or its principals did not to pay change orders submitted by Paric, the Bank would refuse to fund loan draws.

70.     Throughout construction, Paric submitted at least sixteen change orders, and Guarantors and Developers authorized all but one of them.

71.     On December 21, 2018, Paric submitted Change Order 10.

72.     Change Order 10 states that because of delays from demolition contractor GenCorp, the project was 71 days behind schedule, and that to complete the project by the new completion date, Paric would require an additional $1,031,999.50.

73.     On January 2, 2019, Paric sent a letter to Developers stating that the "critical path of the project" had been delayed by 144 days.

74.     On April 9, 2019, Paric submitted a revised Change Order 10R.

75.     Change Order 10R states that because of delays from demolition contractor GenCorp, weather delays, and roof leaks, the project was 108 days behind schedule, and that to complete the project by the new completion date, Paric would require an additional $1,985,004.11.

76.     On June 7, 2019, Paric submitted a second revised Change Order 10R2.

77.     Change Order 10R2 states that because of delays from demolition contractor GenCorp, weather delays, and roof leaks, the project was 108 days behind schedule for floors LL

through L9 and up to 133 days behind schedule for floors L10, L11, and exterior work, and that to complete the project by the new completion dates, Paric would require an additional $2,075,836.55.

78.     Section 15.2.1 of the Construction Contract requires Paric to give written notice "within seven (7) days after the occurrence of [an] event giving rise to [a] claim" for an increase in the Guaranteed Maximum Price and/or for an extension in a Milestone Date.

79.     Section 15.2.1 of the Construction Contract also provided that "Claims not submitted as required "shall conclusively be deemed to have been waived by Contractor, considered null and void, and shall not be considered by Owner nor otherwise serve as the basis for any increase in the Guaranteed Maximum Price or extension of any Milestone Date."

80.     When preparing Change Order 10, 10R, and 10R2, Paric did not satisfy these requirements identified in Paragraphs 78-79.

81.     During Paric's performance under the contract, the Bank and CDC received monthly reports from Capital Consultants documenting the pace of construction, the expected delivery date, and change orders requested by Paric and subcontractors.

82.     Capital Consultants' report are inconsistent with statements made by Paric concerning delays to the project.

83.     For a Capital Consultants report finalized on or about March 8, 2019, the completion date was delayed by two months, despite only one month's passage of time between the last Capital Consultants' report.

84.     Capital Consultants' reports demonstrate that the majority of the final time delay occurred after demolition contractor Gencorp terminated its work on the project.

85.     The Bank and CDC were in possession of these reports and reviewed them regularly

to determine whether to fulfill draw requests on the Construction Loan.

86.     The Bank and CDC never shared any Capital Consultant reports with Guarantors and Developers.

87.     In late 2018, Paric employees told Guarantors that delays stated in Change Order 10 did not comport with the actual progress of construction.

88.     Guarantors and Developers notified Paric that they would not approve Change Orders 10, 10R and 10R2.

89.     On June 4, 2019, Paric pursued arbitration against 1501 Washington, seeking $2,329,674.62 on the basis that it was owed payment under Change Order 10R2.

90.     The Bank and CDC demanded that Developers settle the Paric claims, on terms favorable to Paric, despite knowing that Paric's claimed delays were inconsistent with the Capital Consultants reports.

91.     During a conference call with Guarantors in November 2019, the Bank and CDC threatened to put 1501 Washington in default if it did not pay Paric.

92.     As part of the Paric litigation, Developers served a subpoena on the Bank and CDC, seeking communications between them and Paric concerning the arbitration claims.

93.     The Bank and CDC refused to respond to the subpoena and warned of dire consequences if Guarantors and Developers further pressed for the subpoenaed materials.

94.     The Bank and CDC offered one way out: forgo the subpoena and settle with Paric to avoid a default.

95.     Guarantors and Developers asked whether the CDC would quickly provide the remaining tax credit equity or bridge financing to take out the high interest Mezzanine debt if the case was settled.

96.     In response, during a meeting with Freeman at The Last Hotel, the CDC promised Guarantors and Developers that they would work to get all tax credit money funded if there was an immediate settlement.

97.     Based on the CDC's multiple assurances, Guarantors and Developers agreed to its demands, settled Paric's claims on terms favorable to Paric, and released its counterclaims against Paric.

98.     The Bank and CDC failed to honor their promise to expedite the infusion of equity or provide bridge financing. Instead, the Bank and CDC continued to impose additional hurdles designed to delay disbursement of the Construction Loan and federal HTC capital contributions.

99.     Before settlement with Paric, title company Chicago Title offered to insure title to the Hotel, at Developer's expense, and for the benefit of the Bank and CDC.

100.    Insuring title would protect the Bank and CDC from the any lien-holders claims, providing the same benefits as lien-free completion.

101.    Chicago Title was willing to insure title to cover all potential liens from Paric or demolition subcontractor Gencorp.

102.    The Bank and CDC refused to fully fund the Construction Loan and federal Historic Tax Credits until lien-free completion of the project.

103.    The Bank and CDC refused to fully fund the Construction Loan and federal Historic Tax Credits until Guarantors and Developers settled on terms favorable to Paric.

104.    The Bank's and CDC's refusal to fund during pendency of the Paric litigation required Developers to extend the size and duration of the 15% interest Mezzanine loan from Octagon causing millions of dollars in damage to Developers and Guarantors.

105. The Bank's and CDC's refusal to fund during pendency of the Paric litigation made it impossible for Developers to pay down the debt on their Construction Loan by the initial maturity date of December 29, 2020.

106. By withholding funding and demanding settlement, the Bank and CDC caused and enabled Paric to breach the Construction Contract.

107. These actions by the Bank and CDC caused harm to Guarantors and Developers because—to comply with the Bank and CDC's demands—Developers had to release their claims against Paric, including for attorneys' fees, and pay any amount owed under the Paric Settlement Agreement.

### The CDC Delayed Federal Historic Tax Credit Equity Contributions in Violation of the Master Tenant Operating Agreement.

108. The Master Tenant Operating Agreement requires the CDC to make three capital contribution installments of federal HTCs.

109. Those required installments include the following:

a) A $2,993,219 first installment upon closing project loans, capital contributions, a title commitment, and approval from the National Park Service and related criteria;

b) A $5,986,439 second installment, with possible adjustments, upon substantial completion of the development, no uncured defaults, fully funding of reserves and escrows, fulfillment of reporting requirements, and related criteria; and

c) A $997,740 third installment, with possible adjustments, upon the creation of a stable revenue stream, DFQ's capital contribution, no defaults, and estoppel certificates, and related criteria.

110. Developers worked diligently to meet these requirements and fund the project.

111.    Developers materially satisfied all the requirements for the second installment in early fall 2019.

112.    As described in Paragraphs 99-101, Chicago Title offered to insure title to the Hotel to cover all potential liens from Paric or demolition subcontractor Gencorp.

113.    Insuring title would protect the Bank and CDC from the any lien-holders' claims, providing the same benefits as lien-free completion.

114.    The CDC did not fund the second installment of the federal HTC equity until January 2020.

115.    The CDC's failure to fund the second installment required Developers to extend the size and duration of the 15%-interest Mezzanine loan for more than four months causing millions of dollars in damage to Developers and Guarantors in bad faith and in violation of the Master Tenant Operating Agreement.

### The Bank and CDC Delayed Construction Loan Draw 26 in Violation of the Disbursing Agreement.

116.    The Bank and CDC executed a Construction and Disbursing Escrow Agreement (the "Disbursing Agreement") with DFQ, 1501 Washington, and four other parties on December 29, 2017.

117.    Under the Disbursing Agreement, the Bank and CDC had a duty to timely disburse funds when the borrower, 1501 Washington, met certain requirements.

118.    The Bank and CDC disbursed funds requested under twenty-five different draw requests that 1501 Washington made to pay construction contractors.

119.    Upon receipt of the twenty-sixth draw request in October 2019, the CDC made the decision to withhold about $2.1 million in funding due under that twenty-sixth request.

120.    Developers materially satisfied all the requirements for the twenty-sixth draw request.

121.    The Bank and CDC failed to fund the twenty-sixth draw request for that amount until January 2020.

122.    The Bank and CDC's failure to fund the twenty-sixth draw required Developers to extend the size and duration of the 15%-interest Mezzanine loan for more than four months causing millions of dollars in damage to Developers and Guarantors in bad faith and in violation of the Master Tenant Operating Agreement.

## The Bank and CDC Fraudulently Misrepresented the Timing of State Historic Tax Credit Certification.

123.    When drafting the development Transaction for the Hotel, the Bank and CDC asserted that state HTC certification could be obtained in a month of submission.

124.    Missouri is unique in offering state HTCs as a complement to federal HTCs.

125.    Guarantors had paired federal and state NMTCs in other states.

126.    Guarantors had never worked on a deal funded partially by Missouri state HTCs.

127.    The Bank and CDC had worked on multiple projects pairing Missouri state HTCs with federal HTCs over a span of many years.

128.    In fall of 2017, CDC employee Ruth Sparrow, acting as agent of the Bank and CDC, represented to Guarantors, Developers, and Cohn Reznick—independent accountant hired to review the Transaction—that state HTC certification could be received within one month of submission.

129.    Based in part on Ruth Sparrow's representation as well as other representations of the Bank and CDC, Cohn Reznick prepared an Independent Accountant's Report with month-by-month financial projects and cash flows for the Transaction (the Projections").

26

130.    Based on Ruth Sparrow's representation, the Projections showed that the Bank would contribute the state HTC funding in the amount of $10,297,271 in May of 2019, one month after receiving state certification, and two months after the original completion date of March 2019.

131.    By executing the Transaction Agreements, the Bank and CDC represented that the funding schedule identified in the Projections was an accurate and true representation of when state HTC funds could be received.

132.    The Bank and CDC failed to correct Ruth Sparrows' false representation concerning state HTC timing, as reflected in the May 2019 state HTC funding date.

133.    Based on the Bank's and CDC's representations and assurances including the Transaction Documents created by the Bank, the CDC, or their agents, Guarantors believed that Missouri's HTC certification could be obtained within one month of submission, and that state HTC funds could be received within two months of submission.

134.    The state HTC certification had slowed significantly since 2009 when new federal guidelines were created.

135.    Former Governor Eric Greitens further slowed the HTC certification process in 2016.

136.    Informed members of the state HTC industry, including the Bank, knew that, due to reasons stated in Paragraphs 134-135, it would take around twelve to eighteen (12-18) months (on average) from submission to certificate issuance in Missouri.

137.    In stating that state HTC certification would take only a month, the Bank and CDC intended for Guarantors and Developers to accept the terms of the Transaction documents relying on the Bank's Construction Loan and Octagon's expensive bridge and Mezzanine loans.

138.    Because this was the first time Guarantors and Developers had worked with Missouri state HTCs, they had no knowledge of the correct timeline.

139.    In the 20 years of business Mr. Qualizza has spent partnering with the CDC they have always made him aware of these types of issues, suggesting that these misrepresentations were intentional on the part of the Bank, the CDC, and their agents.

140.    Guarantors and Developers relied on the one-month estimate to make borrowing decisions.

141.    If Guarantors and Developers had known about the correct timeline, they would not have borrowed an $9 million Mezzanine loan at 15% interest.

142.    Guarantors and Developers had a right to rely on the one-month estimate because that representation was made in the Transaction Documents by persons who knew and affirmatively represented that they knew Missouri's HTC market.

143.    As stated in paragraphs 123 through 142, the CDC negligently misrepresented the timing of state HTC certification to Guarantors and Developers.

144.    Guarantors and Developers were injured by the misrepresentation because of the extra Mezzanine loan interest they paid under the false pretense that they would have the Mezzanine loan for a short period of time before they could obtain $9,625,000 in state HTCs.

**The CDC Harmfully Withheld Consent When Developers Sought Lower-Interest Loans and Buyouts for Other Development Projects.**

145.    When Guarantors realized that the CDC would not timely fund their capital contributions to the Master Hotel, Guarantors began searching for lower interest loans to stem the financial harm of the 15%-interest Mezzanine loan.

146.    In November of 2019, Guarantors started discussing a 5%-interest bridge loan with Midland States Bank.

147.    Midland States Bank sought consent from the Bank and CDC before making the bridge loan to 1501 Washington.

148.    CDC employee Laura Vowell initially offered in early 2020 that the CDC would gladly approve a buyout of Octagon's Bridge or Mezzanine loan.

149.    However, as loan discussion continued, the CDC failed to give any consent, prolonging the financial harm from the Mezzanine loan.

150.    Finally in late March 2020, Midland States Bank agreed to fund the 5% bridge loan without explicit consent from the CDC, reducing the harm of the Mezzanine loan, but only after four months of additional delays.

151.    The CDC's failure to consent caused direct harm to 1501 Washington because of these delays.

152.    The CDC also harmed Guarantors by setting punitive terms as Guarantors sought to find new tax credit investors for its ongoing deals with the CDC.

153.    Qualizza and Freeman, along with Chad Goodall ("ACC Owners") own Aries Community Capital the Parent and Controlling entity of the Urban Development Fund, LLC, ("UDF").

154.    ACC Owners created UDF to fund and manage their whole portfolio of NMTC allocations for funding of owner-occupied tax credit-projects in severely distressed communities.

155.    UDF is a 10-time New Market Tax Credit ("NMTC") awardee and has done over $500 million in business with the CDC.

156.    UDF had an exclusive 20-year relationship with the CDC to fund NMTC State and Federal deals.

157.   UDF has done several Historic Hotels using both Historic and NMTC credits with the CDC in the past.

158.   None of UDF's prior projects have experienced the kinds of challenges that the CDC and the Bank imposed for the Last Hotel.

159.   The events described in these Counterclaims have caused significant harm to UDF's impeccable reputation and financial profitability.

160.   Because of its impeccable reputation, UDF was able to get Wells Fargo, PNC, and Chase, National Association to replace the CDC during COVID, an almost impossible task.

161.   As of March 2020, UDF partnered with the CDC on tax credit-funded development in Maine, Illinois, and Kentucky, in addition to the Last Hotel.

162.   Before consenting to sell its tax credit investments in these projects, the CDC sought an omnibus release from liability concerning any claims arising from these projects.

163.   The CDC also forcefully unwound its investments in the Maine project, causing UDF an estimated $1,624,700 in damage.

164.   By imposing punitive conditions for unwinding and demanding an omnibus release, the CDC sought to leverage its other contracts with Guarantors and UDF to evade liability for the Last Hotel Transaction.

165.   These punitive unwind conditions were imposed during the most harmful timeframe possible, as Developers and Guarantors sought to manage the hotel during travel restrictions and historic lows for domestic and international travel.

166.   Through great effort and expense, Guarantors found other investors for these projects willing to purchase the CDC's position.

167.    In each instance, Guarantors lost a portion of the value of their tax credits, because the CDC was only willing to sell the tax credits at a less favorable rate for the purchaser.

168.    UDF's survival has occurred despite the Bank and CDC's apparent goal of destroying UDF, a highly successful company.

**The Bank and CDC Provided No Relief to Guarantors and Developers During the Pandemic, Despite Federal Programs Supporting and Providing Leniency to Lenders.**

169.    COVID-19 restrictions brought travel and hotel stays to a halt in March and April of 2020.

170.    On March 21, 2020 City of St. Louis issued its first stay at home order.

171.    When stay at home orders were lifted almost two months later, on May 18, 2021, hotel reservations in downtown St. Louis remained at historic lows due to (1) mass cancellation of entertainment events at downtown venues, (2) corporate travel bans, (3) work from home policies, (4) other states' travel bans and quarantine requirements, and (5) lack of safe travel options for those concerned about catching the virus.

172.    On March 27, 2020, to aid struggling industries, families, and organizations, Congress passed the first of several landmark spending and policy packages titled the CARES Act.

173.    CARES Act Section 4013 provided "Temporary Relief from Troubled Debt Restructurings," allowing banks to make loan modifications without reporting those modifications as Troubled Debt Restructurings, under certain conditions.

174.    If (1) loans were no more than 30 days past due as of December 31, 2019; (2) modifications to those loans were required because of COVID-19; and (3) modifications were made between March 1, 2020 and January 1, 2022; then those modifications could be made without triggering troubled debt relief accounting requirements.

175. Such modifications could include forbearance, an interest-rate reduction, a repayment plan, or other arrangements that defer or delay principal and interest payments.

176. A modification for 1501 Washington's Construction Loan would have met all requirements identified in Paragraph 174.

177. The Bank refused to make any such modifications for the Construction Loan during the pandemic, despite many requests from Guarantors.

178. Instead, the Bank and CDC have continued to seek punitive terms during unwinding agreements while contributing as little to the hotel's equity as possible.

### The Bank and CDC Have Used Loan Maturation to Demand a Release from Liability, Breaching the Loan Agreement.

179. The Loan Agreement provides thirteen criteria for extending the maturity date beyond December 29, 2020.

180. Developers substantially fulfilled these criteria.

181. In the alternative, Developers and Guarantors were excused from fulfilling these criteria by the Bank's and CDC's breaches, Acts of God— including due to the COVID 19 pandemic—or commercial frustration.

182. Instead of observing these criteria, the Bank and CDC sought to rewrite the agreement to require Developers to release the Bank and CDC from any and all claims.

183. The Bank told Developers that it would not consider any maturity request without a release from liability.

184. On December 29, 2020, the Bank sent a letter stating that the loan had matured.

185. Developers made timely payments through December 29, 2020, and have continued to make timely payments in 2021.

186.    The Bank sent this maturity letter during the height of the worst COVID case and death count numbers throughout the pandemic.

187.    Upon information and belief, the Bank has not treated any other borrower who has made timely payments in a similar manner.

188.    The Bank's December 29, 2020, letter provided no reason why Developers were not entitled to an extension of the Maturity Date.

189.    The Bank has breached the Loan Agreement and its duty of good faith and fair dealing when it refused to extend the maturity date without a release from all liability.

**COUNT I**
**CIVIL CONSPIRACY TO COMMIT THE UNLAWFUL ACTS OR LAWFUL ACTS WITH UNLAWFUL OBJECTIVES IDENTIFIED HEREIN**

190.    Guarantors and Developers reallege and incorporate by reference the allegations contained in Paragraphs 1–189 hereinabove as though set forth in full.

191.    Plaintiff Bank and Counterclaim Defendant CDC ("Counterclaim Defendants") shared the unlawful objectives of:

a)    Breaching the Master Tenant Operating Agreement, Guaranty, Loan Agreement, Disbursing Agreement, and other Transaction Documents;

b)    Denying Guarantors and Developers the expected benefits of the Transaction Agreements;

c)    Tortiously interfering with the Construction Contract;

d)    Fraudulently misrepresenting that they would fully fund the Loan and federal HTC Equity after settlement of the Paric litigation;

e)    Harming Guarantors personally; and

f)    Fraudulently misrepresenting the state certification timeline.

192.    A small group of Counterclaim Defendants' employees, sometimes occupying positions of employment simultaneously with each Counterclaim Defendants (or acting as agents for both), conspired together and directed all the activities of the Counterclaim Defendants with respect to the Transaction.

193.    The small group of Counterclaim Defendants' employees identified in Paragraph 192 reached an agreement, constituting an agreement and official policy of the Bank and CDC, to harm Guarantors and Developers through the Transaction.

194.    The actions noted in these Counterclaims—including refusing to fund the Loan and federal HTC equity, demanding settlement with Paric, misrepresenting the Loan and federal HTC equity available after settlement, and misrepresenting the timing of state HTC certification—were in furtherance of the conspiracy.

195.    Guarantors and Developers were injured by these actions because of the interest accrued on the 15%-interest Mezzanine loan.

196.    Guarantors and Developers were injured by these actions because of the payments they made and claims they released upon the settlement of the Paric litigation.

197.    Guarantors and Developers were injured by these actions because of the emotional harm and suffering sustained by the Counterclaim Defendants' tortious interference and misrepresentations.

## COUNT II
## FRAUDULENT MISREPRESENTATION TO FORCE PARIC SETTLEMENT & SIGN FORBEARANCE LETTER

198.    Guarantors and Developers reallege and incorporate by reference the allegations contained in Paragraphs 1–197 hereinabove as though set forth in full.

199.    When demanding that 1501 Washington settle Paric's claims, Counterclaim Defendants represented that they would fully fund remaining loans and equity.

200.    In a November 2019 phone call, Counterclaim Defendants' employee Eric Jones represented to Neil Freeman, that if 1501 Washington settled and signed a forbearance letter dated December 12, 2019, the Bank would fully and promptly fund Construction Loan draw 26, and the CDC would fully and promptly fund remaining federal HTC equity.

201.    Eric Jones' representations reflected the Bank and CDC's acceptance of terms previously offered by Qualizza in a December 10, 2019, 3:52 pm email to Bank and CDC employees.

202.    Eric Jones, acting as the Counterclaim Defendants' agent, knew that the Counterclaim Defendants did not intend to fully fund the remaining federal HTC equity.

203.    Instead, Jones knew that the Counterclaim Defendants planned to reduce the second federal HTC installment by an amount known as an "adjuster" and delay funding of the third HTC installment indefinitely.

204.    The Counterclaim Defendants still have not made the third HTC installment.

205.    Upon information and belief, Eric Jones, acting as the Counterclaim Defendants' agent, intended for 1501 Washington to rely on this misrepresentation when settling their claims with Paric and signing the forbearance letter.

206.    Guarantor Qualizza had determined that the forbearance letter contained multiple misrepresentations itself and would not have signed the forbearance letter if the Bank and CDC funding had not been tied to it.

207.    Upon information and belief, Eric Jones, acting as the Counterclaim Defendants' agent, knew that 1501 Washington would not settle the Paric litigation and sign the forbearance letter without a promise of full and prompt federal HTC equity.

208.    Guarantors and Developers could not have known that the Counterclaim Defendants did not intend to fully and promptly fund the remaining federal HTC equity.

209.    Guarantors and Developers had a right to rely on this statement in the good faith hope of solving a difficult disagreement between contracting parties.

210.    Guarantors and Developers relied on Eric Jones' statements, and other similar Counterclaim Defendants' employees' statements when they settled the Paric litigation and signed the December 12, 2019 forbearance letter.

211.    Guarantors and Developers were damaged by these misrepresentations, as they surrendered their legal rights by settling the Paric litigation.

212.    After the Bank and CDC failed to satisfy the promises made by Eric Jones, Qualizza identified the misrepresentations contained in the forbearance letter in an email dated December 30, 2019, 10:16 am.

213.    Guarantors and Developers seek rescission of the December 12, 2019, forbearance letter based on Counterclaim Defendants' fraud in the inducement identified in Paragraphs 197 through 212.

## COUNT III
## NEGLIGENT MISREPRESENTATION TO FORCE PARIC SETTLEMENT & SIGN FORBEARANCE LETTER

214.    Guarantors and Developers reallege and incorporate by reference the allegations contained in Paragraphs 1–213 hereinabove as though set forth in full.

215.    When demanding that 1501 Washington settle Paric's claims, Counterclaim Defendants represented that they would fully fund remaining loans and equity, respectively.

216.    In a November 2019 phone call, Eric Jones represented to Neil Freeman, that if 1501 Washington settled and signed a forbearance letter dated December 12, 2019, Counterclaim Defendants would fully and promptly fund Construction Loan draw 26, and the remaining federal HTC equity.

217.    Eric Jones, acting as the Counterclaim Defendants' agent, should have known that Counterclaim Defendants did not intend to fully fund the remaining federal HTC equity.

218.    Eric Jones, acting as the Counterclaim Defendants' agent, should have known that Counterclaim Defendants planned to reduce the second federal HTC installment by an adjuster and delay funding of the third HTC installment indefinitely.

219.    Counterclaim Defendants still have not made the third HTC installment.

220.    Upon information and belief, Eric Jones, acting as the Counterclaim Defendants' agent, intended for 1501 Washington to rely on this misrepresentation when settling their claims with Paric and signing the December 12, 2019, forbearance letter.

221.    Upon information and belief, Eric Jones, acting as the Counterclaim Defendants' agent, knew that 1501 Washington would not settle the Paric litigation and sign the forbearance letter without a promise of full and prompt federal HTC equity.

222.    Guarantors and Developers could not have known that Counterclaim Defendants did not intend to fully and promptly fund the remaining federal HTC equity.

223.    Guarantors and Developers had a right to rely on this statement in the good faith hope of solving a difficult disagreement between contracting parties.

224.    Guarantors and Developers relied on Eric Jones' statements, and other similar Counterclaim Defendants' employees' statements when they settled the Paric litigation and signed the December 12, 2019, forbearance letter.

225.    Guarantors and Developers were damaged by these misrepresentations, as they surrendered their legal rights and meritorious defenses by settling the Paric litigation.

226.    Guarantors and Developers seek rescission of the December 12, 2019, forbearance letter based on Counterclaim Defendants' fraud in the inducement identified in Paragraphs 210 through 225.

**COUNT IV**
**BREACH OF MASTER TENANT OPERATING AGREEMENT, GUARANTY, LOAN AGREEMENT, DISBURSING AGREEMENT AND OTHER TRANSACTION DOCUMENTS**

227.    Guarantors and Developers reallege and incorporate by reference the allegations contained in Paragraphs 1–226 hereinabove as though set forth in full.

228.    Guarantors, Developers, and Counterclaim Defendants executed valid, enforceable contracts for the Loan Agreement, Disbursing Agreement, Guaranty, and Master Tenant Operating Agreement.

**The Loan Agreement and Disbursing Agreement**

229.    1501 Washington and the Bank are the named parties to the Loan Agreement and the Disbursing Agreement.

230.    The Disbursing Agreement was also executed by Counterclaim Defendants.

231.    1501 Washington performed pursuant to the Loan Agreement and Disbursing Agreement, including by completing construction of the Hotel without liens, paying contractors, and paying all loan payments when due.

232.    The Bank breached the Loan Agreement and Disbursing Agreement by failing to fund loan payments in a timely manner, refusing to extend the maturity date, as specifically required to do so in the Loan Agreement, without a release from liability, and purporting to mature the loan.

233.    These breaches damaged 1501 Washington by causing it to resort to a high-interest Mezzanine loan as an alternative to the Construction loan funds that were not timely provided.

**The Guaranty**

234.    Guarantors and Counterclaim Defendants are the named parties to the Guaranty.

235.    Guarantors have performed all duties required of them by the Guaranty.

236.    Under the express terms of the Guarantee, Guarantors are liable for payment "only to the extent that the same [payments] are not timely paid by Borrower." ECF No. 1-3, p. 2.

237.    The Bank breached the Guaranty by seeking payment from Guarantors when Borrower 1501 Washington had made all payments in a timely manner.

238.    Under the Guarantee, "[i]n the event of an Event of Default which is not cured within any applicable grace or cure period, [the] Bank will have the right to enforce its rights, powers, and remedies, in any order." ECF No. 1-3, p. 2.

239.    No Event of Default has occurred, as defined in the Guaranty.

240.    Counterclaim Defendants breached the Guaranty by seeking a court order when no Event of Default existed.

241.    Guarantors have been damaged by these breaches because (1) they have had to hire legal counsel to defend them in this matter, and (2) the current litigation has harmed their reputation among hotel management companies they need to contract with.

**The Master Tenant Operating Agreement**

242.    Counterclaim Defendants and DFQ are the parties to the Master Tenant Operating Agreement.

243.    DFQ performed pursuant to the Master Tenant Operating Agreement, including by funding its capital contributions and undertaking the day-to-day and long-term management of the Master Tenant.

244.    Counterclaim Defendants breached the Master Tenant Operating Agreement by failing to fund federal HTC equity contributions in a timely manner.

245.    Counterclaim Defendants breached the Master Tenant Operating Agreement by failing to consent to low-interest loans needed to replace the Mezzanine loan.

246.    These delays and failures damaged DFQ by forcing it to extend the duration and size of the 15%-interest Mezzanine loan.

247.    Guarantors and Developers seek monetary damages to remedy the tremendous financial harm they have suffered because of these breaches.

**COUNT V**
**BREACH OF GOOD FAITH AND FAIR DEALING**

248.    Guarantors and Developers reallege and incorporate by reference the allegations contained in Paragraphs 1–247 hereinabove as though set forth in full.

249.    "There is a duty of good faith and fair dealing implied in the performance and enforcement of every contract." *HM Compounding Servs., LLC v. Express Scripts, Inc.*, No. 4:14-CV-1858 JAR, 2017 WL 2118012, at *2 (E.D. Mo. May 16, 2017).

250.    "This duty prevents a party from using contract provisions to 'evade the spirit of the transaction' or 'deny [the other party] the expected benefit of the contract.' " *Id.* (quoting *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 914 (8th Cir. 2007).

251.    "Stated differently, the parties to a contract have an implied duty to cooperate to enable performance of the expected benefits of the contract and this duty is an enforceable contract right." *Reliance Bank v. Paramont Properties, LLC*, 425 S.W.3d 202, 206 (Mo. Ct. App. 2014).

252.    Counterclaim Defendants did not cooperate to enable performance of the expected benefits of the agreements identified above, including the Master Tenant Operating Agreement, Loan Agreement, Guaranty, and Disbursing Agreement, and other agreements incorporated therein.

253.    Instead, Counterclaim Defendants used their unique leverage over these contracts—as lenders, equity investors, and owners with veto power—to deliberately harm DFQ, 1501 Washington and Guarantors.

254.    Specifically, between October 2019 and January 2020, Counterclaim Defendants refused to fund the Construction Loan and federal HTC equity until 1501 Washington settled meritless arbitration claims brought by Paric.

255.    Between November 2019 and early April 2020, Counterclaim Defendant failed to provide consent to a lower interest Bridge Loan that would have saved 1501 Washington from the ongoing harm of the 15% Mezzanine loan.

256.    Counterclaim Defendants knew that Guarantors and Developers were in a vulnerable position with the Mezzanine loan, Paric's arbitration, and delayed Construction Loan and federal HTC funding.

257.    Counterclaim Defendants created that vulnerable position by delaying funding and supporting Paric's arbitration.

258.    Counterclaim Defendants exploited that vulnerable position by demanding that 1501 Washington settle Paric's claims on terms favorable to Paric, and if 1501 Washington did not settle, the Bank threatened to put the project in default and refuse any future draw requests.

259.    Upon information and belief, Counterclaim Defendants discussed Paric's claims with Paric during the pendency of that arbitration.

260.    Upon information and belief, Counterclaim Defendants discussed with Paric how they could harm Guarantors and Developers and benefit Paric and Counterclaim Defendants.

261.    Counterclaim Defendants sought to deny Guarantors and Investors the expected benefits of the Master Tenant Operating Agreement, Loan Agreement, Guaranty, and Disbursing Agreement unless Guarantors and Investors signed releases for the Counterclaim Defendants.

262.    These actions denied Guarantors and Developers the expected benefits of the Master Tenant Operating Agreement, Loan Agreement, Guaranty, Disbursing Agreement, and other Transaction Agreements, because they required unforeseen extensions of the Mezzanine loan, both in size and duration.

263.    The expected benefits of these agreements—the Master Tenant Operating Agreement, Loan Agreement, Guaranty, Disbursing Agreement—include access to diverse funding sources and protection from harm that the Counterclaim Defendants can provide for difficult redevelopment projects that generate delays, cost overruns, and other risks for investors.

264.    The Bank did not provide the benefit of those funding sources and protection from harm, including during the COVID-19 pandemic.

265.    Instead, the Bank denied and delayed funding and intentionally caused Guarantors and Developers harm.

## COUNT VI
## DECLARATORY JUDGMENT THAT GUARANTORS OWE NO PAYMENT

266.    Guarantors and Developers reallege and incorporate by reference the allegations contained in Paragraphs 1-265 hereinabove as though set forth in full.

267.    Guarantors and Developers are interested parties with respect to the Transaction Agreements, key terms therein, and interpretations of those terms.

268.    Both Guarantors and Developers have a direct interest in whether the maturity date extension was properly exercised, whether the Construction Loan is default, and whether any payment is owed under the Construction Loan.

269.    Guarantors and Counterclaim Defendants are the named parties to the Guaranty.

270.    Guarantors have performed all duties required of them by the Guaranty

271.    Under the express terms of the Guarantee, Guarantors are liable for payment "only to the extent that the same [payments] are not timely paid by Borrower." ECF No. 1-3, p. 2.

272.    Borrower 1501 Washington had made all payments in a timely manner.

273.    Under the Guarantee, "[i]n the event of an Event of Default which is not cured within any applicable grace or cure period, [the] Bank will have the right to enforce its rights, powers and remedies, in any order." ECF No. 1-3, p. 2.

274.    No Event of Default has occurred, as defined in the Guaranty.

275.    Guarantors and Developers seek a declaration, pursuant to 28 U.S.C.A. § 2201, that:

276.    The loan has not matured.

277.    Guarantors and Developers are not in default of the Construction Loan.

278.    No payment is owed under the terms of the Construction Loan and Transaction Agreements.

43

## COUNT VII
## TORTIOUS INTEREFERENCE WITH CONSTRUCTION CONTRACT

279.    Guarantors and Developers reallege and incorporate by reference the allegations contained in Paragraphs 1–278 hereinabove as though set forth in full.

280.    In addition to violating their contracts, Counterclaim Defendants tortiously interfered with the Construction Contract between Paric and 1501 Washington.

281.    Counterclaim Defendants were intimately familiar with the Construction Contract, based on their review of the Transaction Documents before closing as well as their ongoing inspection of Capital Consultants reports.

282.    Paric breached the Construction Contract when it pursued arbitration of Change Order 10R and 10R2 without providing proper notice.

283.    Paric breached the Construction Contract when it drafted and submitted Change Order 10, 10R, and 10R2 knowing that the delays projected in these change orders were overblown compared to the actual construction schedule.

284.    Paric breached the Construction Contract when it sought settlement of its arbitration claims based on its prior breaches in drafting, submitting, and arbitrating Change Order 10R.

285.    Counterclaim Defendants intentionally caused or induced these breaches by failing to provide the Capital Consultants reports to Guarantors and Developers when Paric submitted Change Order 10, 10R, and 10R2.

286.    Counterclaim Defendants intentionally caused or induced these breaches by demanding that Guarantors and Developers settle the Paric claims on terms favorable to Paric.

287.    Counterclaim Defendants intentionally caused or induced these breaches by threatening to put Guarantors and Developers into default if they did not settle those claims.

44

288.    Upon information and belief, Counterclaim Defendants intentionally caused or induced these breaches by discussing Paric's claims with Paric during the pendency of arbitration and supporting Paric's position in the litigation while encouraging 1501 Washington to settle.

289.    Counterclaim Defendants had no justification in demanding settlement because Chicago Title had offered  to insure title to the Hotel to enable lien-free completion during arbitration.

290.    Counterclaim Defendants had no justification in demanding settlement because they knew that Paric's claimed delays were inconsistent with the Capital Consultants reports.

291.    Developers and Guarantors were damaged by these actions because they settled Paric's claims on terms favorable to Paric and released claims that they had against Paric worth more than $1 million.

## COUNT VIII
## PRIMA FACIE TORT

292.    Guarantors and Developers reallege and incorporate by reference the allegations contained in Paragraphs 1–291 hereinabove as though set forth in full.

293.    "Prima facie tort remains a tort recognized in Missouri as necessary to provide a remedy for tortious conduct that does not fit under any traditional theories." *Gary Surdyke Yamaha Inc. v. Donelson*, 743 S.W.2d 522, 525 (Mo.Ct.App.1987).

294.    As admitted by CDC Executive Director Zach Boyers, Counterclaim Defendants, at Boyers' direction, acted with intent to injure Guarantors personally and through their corporate entities, DFQ and 1501 Washington.

295.    At least some of the actions that Counterclaim Defendants took to injure Guarantors was lawful, or at least would have been lawful if they had not been taken with the intent to injure Guarantors.

45

296.     Counterclaim Defendants had no justification, or insufficient justification, to refuse consent for the Midland States Bank loan.

297.     Counterclaim Defendants had no justification, or insufficient justification, to demand settlement of Paric's claims when it knew those claims were meritless, and it knew that lien-free completion could be achieved through title insurance.

298.     Counterclaim Defendants had no justification, or insufficient justification, to refuse to modify the Construction Loan during the COVID-19 pandemic, which was allowed by CARES Act § 4013.

299.     Counterclaim Defendants had no justification, or insufficient justification, to refuse to extend the maturity date on the Construction Loan, including during the COVID-19 pandemic.

300.     In taking these actions and others identified in this complaint, Counterclaim Defendants sought to intentionally harm Guarantors and Developers because of a personal vendetta against Qualizza.

301.     Upon information and belief, Counterclaim Defendants treated no other guarantors or co-investors in this manner during the pandemic.

302.     Guarantors and Developers were severely injured by these actions, due to extensions to the 15%-interest Mezzanine loan and delays in bringing in the 5% interest Midland States Bank loan.

303.     Guarantors and Developers were severely injured by these actions, due to the emotional harm and suffering sustained as Guarantors sought to protect their families and save their businesses during the pandemic.

304.     Counterclaim Defendants acted with malice towards Guarantor Mike Qualizza, without justification, seeking to ruin his reputation in the tax credit industry, injure him personally,

and make life unbearable for him while he sought to protect his family and save his businesses during the COVID-19 pandemic.

## COUNT IX
## FRAUDULENT MISREPRESENTATION OF STATE CERTIFICATION TIMELINE

305.    Guarantors and Developers reallege and incorporate by reference the allegations contained in Paragraphs 1–304 hereinabove as though set forth in full.

306.    At the time of closing, Counterclaim Defendants represented to Guarantors and Developers that state HTC certification could be obtained within one month of submission.

307.    At the time when Counterclaim Defendants made that statement, they were aware that the Missouri state HTC certification commonly took 12-18 months.

308.    Counterclaim Defendants intended for Guarantors and Developers to execute the closing documents in reliance on representations about the timing of funding generally, including state HTC funding.

309.    Counterclaim Defendants failed to correct their false statements in the months and years following closing.

310.    The timeline of state HTC certification is material because Guarantors and Developers based borrowing decisions on expected timing of the state HTC funding.

311.    Guarantors and Developers were ignorant of the state HTC timeline because they had not previously obtained or applied for Missouri state HTC funding, and Missouri's state HTC program is the only one of its kind.

312.    Guarantors and Developers had a right to rely on this misrepresentation, because they were contracting with the Counterclaim Defendants, who are experts in the field of Missouri's state HTC funding.

313.    In reliance on this misrepresentation, Guarantors and Developers obtained, and increased the size of a 15% Mezzanine loan that they thought would provide only a short-term lending solution.

314.    If Guarantors and Developers had known that state HTC certification would take 12-18 months, they would have promptly searched for lower interest loans as soon as they understood that truth.

315.    Guarantors and Developers were injured by the interest that accumulated on the 15% Mezzanine loan while they waited for state HTC funding.

**COUNT X**
**NEGLIGENT MISREPRESENTATION OF STATE CERTIFICATION TIMELINE**

316.    Guarantors and Developers reallege and incorporate by reference the allegations contained in Paragraphs 1–315 hereinabove as though set forth in full.

317.    In the fall of 2019, Counterclaim Defendants, through their agent and employee Ruth Sparrow, represented to Guarantors, Developers, and independent accountant Cohn Reznick that state HTC certification could be obtained within one month of submission.

318.    Based in part on Ruth Sparrow's representation as well as other representations of the Bank and CDC, Cohn Reznick prepared an Independent Accountant's Report with month-by-month financial projects and cash flows for the Transaction (the Projections").

319.    Based on Ruth Sparrow's representation, the Projections showed that the Bank would contribute the state HTC funding in the amount of $10,297,271 in May of 2019, one month after receiving state certification, and two months after the original completion date of March 2019.

320.    By executing the Transaction Agreements, the Bank and CDC represented that the funding schedule identified in the Projections was an accurate and true representation of when state HTC funds could be received.

321.    The Bank and CDC failed to correct Ruth Sparrows' false representation concerning state HTC timing, as reflected in the May 2019 state HTC funding date.

322.    At the time when the Counterclaim Defendants made the representations identified in Paragraphs 317-321, Counterclaim Defendants and their employee Ruth Sparrow knew that Missouri's state HTC certification commonly took 12-18 months.

323.    Counterclaim Defendants intended for Guarantors and Developers to execute the closing documents, including the Guarantee, in reliance on representations about the timing of funding generally, including state HTC funding.

324.    Counterclaim Defendants failed to correct their false statements in the months and years following closing.

325.    The timeline of state HTC certification is material because Guarantors and Developers based borrowing decisions on expected timing of the state HTC funding.

326.    Guarantors and Developers were ignorant of the state HTC timeline because they had not previously obtained or applied for Missouri's state HTC funding, and Missouri's state HTC program is the only one of its kind.

327.    Guarantors and Developers had a right to rely on this misrepresentation, because they were contracting with Counterclaim Defendants, who are experts in the field of Missouri's state HTC funding.

328.    In reliance on this misrepresentation, Guarantors and Developers obtained, and increased the size of a 15% Mezzanine loan that they thought would provide only a short-term lending solution.

329.    If Guarantors and Developers had known that state HTC certification would take 12-18 months, they would have promptly searched for lower interest loans as soon as they understood that truth.

330.    Guarantors and Developers were injured by the interest that accumulated on the 15% Mezzanine loan while they waited for state HTC funding.

331.    If Guarantors had known that state HTC certification would take 12-18 months, they would have not signed the Guarantee.

332.    As a remedy to the Counterclaim Defendants' negligent representation, Guarantors seek a court order rescinding the Guarantee.

## DEMAND FOR RELIEF

WHEREFORE, Guarantors and Developers pray as follows:

A.    That Guarantors and Developers be awarded compensatory damages in an amount to be proven at trial, including for:

1.    $5,215,761.59 in interest payments made because of the Counterclaim Defendants funding delays;

2.    $1,495,903.00 in outstanding federal HTC equity;

3.    $252,000.00 in outstanding Construction Loan funding;

4.    Any and all amounts paid by Guarantors and Developers to satisfy the Paric settlement agreement;

5.    $530,282.00 in sales tax funds due to 1501 Washington from Paric;

6.    $850,000.00 in attorney's fees spent defending against the Paric dispute.

7.    $334,714.29 in liquidated damages; and

8.    Punitive damages in a multiplier of compensatory damages for the harm

that the Counterclaim Defendants intentionally inflicted upon Guarantors and Developers without just cause.

B.     That the court provide declaratory relief decreeing that:

     1.     The loan has not matured.

     2.     Guarantors and Developers are not in default of the Construction Loan.

     3.     No payment is owed under the terms of the Construction Loan and Transaction Agreements.

C.     That Guarantors be awarded damages for pain and suffering caused by tortious actions the Counterclaim Defendants made.

D.     That Guarantors be awarded punitive damages for actions Counterclaim Defendants made with malicious intent to injure Guarantor Mike Qualizza and his businesses.

E.     That Guarantors and Developers be awarded attorney's fees and expenses;

F.     That all costs be taxed to the Counterclaim Defendants;

G.     That the Guarantee be rescinded because of Counterclaim Defendants' negligent or fraudulent misrepresentations;

H.     That the December 12, 2019 forbearance letter be rescinded because of Counterclaim Defendants' negligent or fraudulent misrepresentations;

I.     That this Court provide Guarantors and Developers with such other legal and equitable relief as it deems proper and appropriate.

**Dowd Bennett LLP**

By: */s/ James F. Bennett*_____
     James F. Bennett
     Matt D. Ampleman
     7733 Forsyth Blvd, Suite 1900
     St. Louis, MO 63105

Phone: (314) 889-7300
Fax: (314) 863-2111
jbennett@dowdbennett.com
mampleman@dowdbennett.com

Attorneys for Defendants Michael Qualizza,
Neil D. Freeman, and Timothy Dixon and
for Counterclaimants DFQ Management,
LLC, and 1501 Washington St. Louis, LLC.

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of the foregoing has been served upon all parties and/or counsel listed below by placing it in the United States Mail, addressed to said parties with sufficient postage to carry the same to its destination, as directed below, or electronically through the Court's ECF system on this 11th day of May, 2021.

Mike W. Bartolacci
Mark V. Bossi
One U.S. Bank Plaza
St. Louis, Missouri 63101
(314) 552-6000 (Phone)
(314) 552-7000 (Fax)

Attorneys for Plaintiff U.S. Bank
National Association and Third-Party
Defendant U.S. Bancorp Community
Development Corporation

*/s/ James F. Bennett*