IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| U.S. BANK, National Association, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:21-cv-00120 |
| | ) | |
| MICHAEL QUALIZZA, NEIL D. FREEMAN, | ) | |
| TIMOTHY DIXON, | ) | |
| | ) | |
| Defendants and Counterclaimants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DFQ MANAGEMENT LLC, and | ) | |
| 1501 WASHINGTON ST. LOUIS, LLC, | ) | |
| | ) | |
| Counterclaimants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. BANCORP COMMUNITY | ) | |
| DEVELOPMENT CORPORATION, and | ) | |
| U.S. BANK, NATIONAL ASSOCIATION, | ) | |
| | ) | |
| Counterclaim/Third-Party Defendants. | ) | |
| | ) | |

**ANSWER OF U.S. BANK NATIONAL ASSOCIATION AND U.S. BANCORP COMMUNITY
DEVELOPMENT CORPORATION TO COUNTERCLAIMS AND THIRD-PARTY CLAIMS**

Plaintiff/Counter-Defendant U.S. Bank National Association (the "Bank") and Third-Party

Defendant U.S. Bancorp Community Development Corporation ("CDC" and, together with the Bank,

"Bank Parties") file the following Answer to the Counterclaims and Third-Party Claims asserted by

Defendants and Counterclaimants in the above-captioned matter (the "Counterclaims"), pursuant to Fed.

R. Civ. P. 7, 8 and 12.

## **PARTIES**

1.      Defendant and Third-Party Plaintiff Michael Qualizza ("Qualizza") is a resident of Texas,

an owner-member of DFQ Management LLC ("DFQ"), and an indirect owner of 1501 Washington St.

Louis, LLC ("1501 Washington").  Qualizza is a citizen of the State of Texas.

**ANSWER:**   **Upon information and belief, Bank Parties admit the allegations set forth in Paragraph 1 of the Counterclaims.**

2.      Defendant and Counterclaimant Neil D. Freeman ("Freeman") is a resident of Florida, an owner-member of DFQ and an indirect owner of 1501 Washington. Freeman is a citizen of the State of Florida.

**ANSWER:**   **Upon information and belief, Bank Parties admit the allegations set forth in Paragraph 2 of the Counterclaims.**

3.      Defendant and Counterclaimant Timothy Dixon ("Dixon") is a resident of Wisconsin, a former owner-member of DFQ and a former indirect owner of 1501 Washington.  Dixon's financial and ownership interests in DFQ and 1501 Washington were extinguished when other members of those Developer entities purchased his interests on March 4, 2020. Dixon is a citizen of the State of Wisconsin.

**ANSWER:**   **Upon information and belief, Bank Parties admit that Dixon is a resident of Wisconsin, is or was an owner-member of DFQ and is or was an indirect owner of 1501 Washington.  Bank Parties have insufficient knowledge or information to form a belief as to the truth of the remaining allegations set forth in Paragraph 3 of the Counterclaims and therefore deny the same.**

4.      Counterclaimant DFQ Management LLC ("DFQ") is a limited liability company with its principal place of business in Illinois and with membership identified in a Disclosure of Organizational Interests Certificate that the undersigned is filing pursuant to Local Rule 2.09.  DFQ's members include citizens of Illinois, Texas, and Missouri.

**ANSWER:**   **Upon information and belief, Bank Parties admit the allegations set forth in Paragraph 4 of the Counterclaims.**

5.      Counterclaimant DFQ authorizes the filing of these answers, defenses, and counterclaims through the approval of its managers, Guarantors.

**ANSWER:**   **Upon information and belief, Bank Parties admit the allegations set forth in Paragraph 5 of the Counterclaims.**

6.      Counterclaimant 1501 Washington St. Louis, LLC ("1501 Washington") is a limited liability company with its principal place of business in Missouri and with membership identified in a Disclosure of Organizational Interests Certificate that the undersigned is filing pursuant to Local Rule 2.09.  1501 Washington's members include citizens of Illinois, Texas, and Missouri.

**ANSWER:**   **Upon information and belief, Bank Parties admit the allegations set forth in Paragraph 6 of the Counterclaims.**

7.      Counterclaimant 1501 Washington authorizes the filing of these answers, defenses, and counterclaims through the approval of its managers, Guarantors.

**ANSWER:**   **Upon information and belief, Bank Parties admit the allegations set forth in Paragraph 7 of the Counterclaims.**

8.      Plaintiff, U.S. Bank, National Association (the "Bank"') is a national banking association with its principal place of business in Minneapolis, Minnesota.  Upon information and belief, the Bank is a citizen of the State of Minnesota.

**ANSWER:**   **Bank Parties admit that the Bank is a national banking association with its principal place of business in Minneapolis, Minnesota.  Bank Parties deny the remaining allegations set forth in Paragraph 8 of the Counterclaims.**

9.      Plaintiff, U.S. Bancorp Community Development Corporation (the "CDC") is a Minnesota Corporation with its principal place of business in St. Louis, Missouri.  Upon information and belief, the CDC is a citizen of the State of Missouri.

**ANSWER:**   **Bank Parties admit the allegations set forth in Paragraph 9 of the Counterclaims.**

**JURISDICTION AND VENUE**

10.      Venue is appropriate in this forum.

**ANSWER:**   **Bank Parties admit the allegations set forth in Paragraph 10 of the Counterclaims.**

11.      This Court has personal jurisdiction over the Bank because the Bank has filed suit in this Court.

**ANSWER:**   **Bank Parties admit the allegations set forth in Paragraph 11 of the Counterclaims.**

12.      This Court has personal jurisdiction over the CDC because its principal place of business is in Missouri and the acts or omissions giving rise to this suit are based in Missouri.

**ANSWER:**   **Bank Parties admit that the CDC is subject to personal jurisdiction in this Court, and that the allegations of the Counterclaims involve actions alleged to have occurred in St. Louis, Missouri.  The Bank Parties specifically deny any wrongdoing by the CDC, and deny each allegation set forth in Paragraph 12 of the Counterclaims which is not specifically admitted herein.**

13.     This Court has subject-matter jurisdiction over counterclaims brought against the Bank under 28 U.S.C. § 1332 because this is an action between citizens of different states and the amount in controversy exceeds $75,000.

**ANSWER:**     **Bank Parties admit the allegations set forth in Paragraph 13 of the Counterclaims.**

14.     This Court has subject-matter jurisdiction over Counterclaims against the CDC under 28 U.S.C. § 1367 because these Counterclaims arise out of the same Transaction and are so related to the claims brought by and against the Bank that they form part of the same case or controversy.  Additionally, these Counterclaims are not brought by a Plaintiff within the meaning of 28 U.S.C. § 1367(b).

**ANSWER:**     **The allegations of Paragraph 14 constitute legal conclusions which Bank Parties are not obligated to admit or deny.  To the extent an answer may be deemed necessary, the Bank Parties admit the allegations of the Counterclaims arise out of the same transaction forming the basis of the Complaint herein and that this Court may hear these matters.  The Bank parties deny any wrongdoing on the part of the CDC or U.S. Bank, and deny any allegation set forth in Paragraph 14 of the Counterclaims not specifically admitted herein.**

## FACTUAL BACKGROUND

15.     On December 29, 2017, Parties to this suit closed a Transaction to fund, develop, and operate a unique luxury hotel known as The Last Hotel (the "Hotel").

**ANSWER:**     **Bank Parties admit the allegations set forth in Paragraph 15 of the Counterclaims.**

16.     In connection with the closing, the Parties gathered 267 documents supporting the transaction (the "Closing Documents") and executed and provided 42 agreements on the same day (the "Closing Agreements").

**ANSWER:**     **Bank Parties admit the allegations set forth in Paragraph 16 of the Counterclaims.**

17.     At least sixteen of these Closing Documents and Agreements are identified by the Loan Agreement with particularity and with intent to incorporate, as stated in Paragraphs 15-16 of Defendants' Affirmative Defenses.

**ANSWER:**     **Bank Parties admit that at least sixteen of the Closing Documents and Agreements are identified in the Loan Agreement.  Bank Parties deny any allegations set forth in Paragraph 17 of the Counterclaims not specifically admitted herein.**

18.     Pursuant to the Transaction and the Transaction Documents, the Developers  redeveloped a portion of the International Shoe Company Building located at 1501 Washington Ave., St. Louis, MO using a complex financing structure that included:

a)     $9,977,398 in Federal Historic Tax Credit (HTC) equity to be contributed by the CDC to the Last Hotel Master Tenant, LLC, the entity that operates the Hotel;

b)     $10,297,271[1] in State HTCs purchased from the Bank by the property owner and lessor to the Hotel, 1501 Washington;

c)     $3,178,500 in Federal New Market Tax Credits (NMTCs) acquired by the CDC and the St. Louis Development Corporation (SLDC) and loaned to 1501 Washington;

d)     $9,047,429 in equity contributed by DFQ to 1501 Washington;

e)     $100,000 in equity contributed by DFQ to the Last Hotel Master Tenant;

f)     $23,667,084 in Bridge and Mezzanine loans DFQ obtained from lender Octagon Credit Partners, LP (Octagon); and

g)     $12,300,000[2] in Construction Loan funding obtained from the Bank and guaranteed by Guarantors.

**ANSWER:     Bank Parties admit that Developers financed the redevelopment of a portion of the International Shoe Company Building located at 1501 Washington Ave., St. Louis, MO pursuant to the Closing Documents.  The Closing Documents set forth the terms and conditions of such financing and should be referred to for an accurate and complete understanding of the transaction and the financing structure.  Bank parties deny any allegations set forth in Paragraph 18 which are inconsistent with the Closing Documents, deny that the Bank Parties failed in any way to perform their obligations thereunder, and deny each and every allegation set forth in Paragraph 18 which is not specifically admitted herein.**

19.     In this financing scheme, Developers and Guarantors took on the greatest risk as borrowers and guarantors of the largest dollar items: the Bridge and Mezzanine loans obtained from Octagon and the Construction Loan obtained from the Bank.

**ANSWER:     Bank Parties admit that the Developers and Guarantors are or were obligors on certain bridge and mezzanine loans from Octagon Credit Partners, LP and are**

---

[1] $9,625,000 of this amount was funded, due to changes in the calculated eligible amount.
[2] $12,053,000 of this amount was funded, as the Bank refused to make the final draws.

**obligors on the construction loan from U.S. Bank that is the subject of U.S. Bank's complaint.  Bank Parties deny any and all remaining allegations set forth in Paragraph 19 of the Counterclaims not specifically admitted herein.**

20.     When other parties, including the Bank and CDC, improperly delayed funding for this transaction—whether equity contributions, loans, or state historic tax credit purchases—DFQ and Guarantors suffered significant financial harm.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 20 of the Counterclaims.**

21.     In this case, because of delays in funding noted below, DFQ and Guarantors had to increase the size and duration of the $9 million Mezzanine loan borrowed at about fifteen percent (15%) interest, not to mention a $17 million dollar bridge loan from the same Octagon Partners, LP.

**ANSWER:**     **Bank Parties have insufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 21 of the Counterclaims related to loans from parties other than U.S. Bank, and therefore deny the same.  Bank Parties specifically deny that there were any improper delays in funding on the part of Bank parties, and deny any allegation set forth in Paragraph 21 not specifically admitted herein.**

22.     The following delays proximately caused this harm:

**ANSWER:**     **Bank Parties are unable to determine precisely what is being alleged in Paragraph 22, and therefore deny the allegations set forth in Paragraph 22 of the Counterclaims and the deny the allegations of those Paragraphs which follow unless expressly admitted therein.**

23.     The CDC delayed its $9,977,398 federal HTC equity contributions, in bad faith and breach of contract.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 23 of the Counterclaims.**

24.     The Bank and CDC fraudulently misrepresented the timing of state HTC funding by eighteen (18) months, when stating that state certification of HTC credits would be provided within one month of submission.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 24 of the Counterclaims.**

25.     The Bank and CDC refused to timely fund the Construction Loan, especially in October of 2019 and December of 2019, although construction was completed on June 28, 2019.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 25 of the Counterclaims.**

26.     The Bank and CDC refused to consent to a lower-interest bridge loan at Midland States Bank in 2020.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 26 of the Counterclaims.**

27.     Delays illustrated in Paragraphs 22-26 caused Guarantors and Developers $5,215,761.59 in damages associated with excess interest.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 27 of the Counterclaims.**

28.     Additionally, the Bank and CDC caused Guarantors and Developers more than $2.1 million in damages when they refused to fund their loans and equity contributions until Developers settled unfounded claims brought by the construction company for the Last Hotel, Paric Corporation.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 28 of the Counterclaims.**

29.     Federal and State HTCs are obtained through approval of the State Historic Preservation Office (SHPO), the National Park Service (NPS), and the Missouri Department of Economic Development (DED).

**ANSWER:**     **Bank Parties deny that Federal HTCs are obtained through approval of the Missouri DED, but otherwise admit the allegations set forth in Paragraph 29 of the Counterclaims.**

30.     Federal and State HTCs reduce investors' tax liability in exchange for their investments used to renovate non-residential historic buildings built before 1936 (10% credit) or buildings listed individually in the National Register of Historic Places or located in a registered historic district (20% credit).

**ANSWER:**     **Bank Parties admit the allegations set forth in Paragraph 30 of the Counterclaims.**

31.     Investors in developments funded by federal HTCs must be equity investors with a risk of loss if the project fails, or the Internal Revenue Service could recapture and reallocate the HTCs.  *See Historic Boardwalk Hall, LLC v. Comm'r*, 694 F.3d 425 (3d Cir. 2012).

**ANSWER:**     **Bank Parties admit the allegations set forth in Paragraph 31 of the Counterclaims.**

32.     In 2014, the IRS issued a safe-harbor guidance, advising HTC investors that they could avoid the possibility of HTC recapture and reallocation under *Historic Boardwalk Hall* if they funded twenty percent (20%) of their total required capital contributions as of the date the historic building is placed in service, excluding "promissory notes or other obligations for which the Investor is the maker," and if 75% of their total funding amount was fixed in amount by the placed in service date.  IRS, Rev. Proc. 2014-12, 2014-03 I.R.B. 415 (Jan. 13, 2014).

**ANSWER:**     **Bank Parties admit that the IRS issued a written guidance regarding HTC recapture.  In further response, Bank parties state that the written document speaks for itself and is the best evidence of its contents, and therefore Bank Parties deny the allegations set forth in Paragraph 32 of the Counterclaims to the extent they may be inconsistent with the document.**

33.     The CDC and 1501 Washington agreed to follow the requirements of the HTC Safe Harbor, pursuant to the Master Tenant Operating Agreement.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 33 of the Counterclaims in that 1501 Washington is not a party to the Master Tenant Operating Agreement. Answering further, Bank parties state that the terms of the Master Tenant Operating Agreement speak for themselves and are the best evidence of their contents, and Bank Parties deny the allegations of Paragraph 33 to the extent they may be inconsistent with the written Master Tenant Operating Agreement.  Bank parties deny any allegation set forth in Paragraph 33 of the Counterclaims not specifically admitted herein.**

34.     By signing the Master Tenant Operating Agreement, the CDC agreed to fund capital contributions as an equity partner.

**ANSWER:**     **Bank Parties admit that CDC, as the "Investor Member" of Last Hotel Master Tenant, LLC (the "Master Tenant"), agreed to fund certain capital contributions, pursuant to the terms and conditions of the Master Tenant Operating Agreement. Answering further, Bank parties state that the terms of the Master Tenant Operating Agreement speak for themselves and are the best evidence of their contents, and Bank Parties deny the allegations of Paragraph 34 to the extent they may be inconsistent with the written Master Tenant Operating Agreement.  Bank parties deny any allegation set forth in Paragraph 34 of the Counterclaims not specifically admitted herein.**

35.     The Master Tenant Operating Agreement provides that "Investor Member (the CDC) is intended to constitute an 'Investor' and the Company is intended to constitute a 'Partnership', as those terms are defined in the Revenue Procedure."

**ANSWER:** **In response to Paragraph 35, Bank Parties state that the terms of the Master Tenant Operating Agreement are set forth in a written instrument which speak for themselves and are the best evidence of its contents.  Bank Parties deny the allegations of Paragraph 35 of the Counterclaims to the extent they are inconsistent with the terms of the written instrument.**

36.     Further, "The Members also affirm and direct that any ambiguity in the meaning of any provision of this Agreement shall be resolved in favor of an interpretation that would tend to cause the Company or its members to comply with the requirements of the Safe Harbor."

**ANSWER:** **In response to Paragraph 36, Bank Parties state that the terms of the Master Tenant Operating Agreement are set forth in a written instrument which speak for themselves and are the best evidence of its contents.  Bank Parties deny the allegations of Paragraph 36 of the Counterclaims to the extent they are inconsistent with the terms of the written instrument.**

37.     To benefit from federal HTCs, the CDC created a limited liability company with DFQ, namely the Last Hotel Master Tenant, LLC ("Master Tenant").

**ANSWER:** **Bank Parties admit the allegations set forth in Paragraph 37 of the Counterclaims.**

38.     The CDC and DFQ executed an operating agreement for the Master Tenant (the "Master Tenant Operating Agreement") which, along with other Transaction Documents, requires the CDC to make timely equity contributions to the Master Tenant.

**ANSWER:** **Bank Parties admit that DFQ and CDC are parties to the Master Tenant Operating Agreement and that CDC, as the "Investor Member" of the Master Tenant, agreed to fund certain capital contributions, pursuant to the terms and conditions of the Master Tenant Operating Agreement.  The written Master Tenant Operating Agreement is the best evidence of the terms of that agreement, and speak for themselves.  Bank Parties deny the allegations of Paragraph 38 to the extent they may be inconsistent with the terms of the written agreement, and deny any allegations set forth in Paragraph 38 of the Counterclaims not specifically admitted herein.**

39.     The CDC did not make timely equity contributions to the Master Tenant as required by the Master Tenant Operating Agreement.

**ANSWER:** **Bank Parties deny the allegations set forth in Paragraph 39 of the Counterclaims.**

40.     Federal NMTCs are obtained through a competitive application where certified Community Development Entities (CDEs) propose to fund projects for Qualified Active Low-Income Community Businesses (QALICBs).

**ANSWER:**        **Bank Parties admit the allegations set forth in Paragraph 40 of the Counterclaims.**

41.      The CDC owns several CDEs through a nested ownership structure, through which it

funds QALICBs.

**ANSWER:**        **Bank Parties admit the allegations set forth in Paragraph 41 of the Counterclaims.**

42.      One of those CDEs, USBCDE Sub-CDE 162 was used to fund 1501 Washington St.

Louis, LLC, through NMTC loans.

**ANSWER:**        **Bank Parties admit that USBCDE Sub-CDE 162, LLC (the "Sub-CDE") has made certain loans to 1501 Washington St. Louis, LLC.  Bank Parties deny any and all remaining allegations set forth in Paragraph 42 of the Counterclaims, including the allegation that USBCDE is itself is a member of the Sub-CDE.**

43.      USBCDE Sub-CDE 162 is entirely owned USBCDC Investment Fund 228, LLC, which

in turn is owned primarily by the CDC.

**ANSWER:**        **Bank Parties deny the allegations set forth in Paragraph 43 of the Counterclaims.**

44.      The CDC is a wholly-owned subsidiary of the Bank.

**ANSWER:**        **Bank Parties admit the allegations set forth in Paragraph 44 of the Counterclaims.**

45.      The CDC was created to invest in, manage, and grow a portfolio of tax credit

investments, including tax credits acquired by its parent organization the Bank.

**ANSWER:**        **Bank Parties admit the allegations set forth in Paragraph 45 of the Counterclaims.**

46.      As described in Paragraphs 31 through 36, the CDC was required by law to take on

investment risk and participate in this tax-credit funded development primarily as a partner and not as a

lender.

**ANSWER:**        **The allegations of Paragraph 46 of the Counterclaims constitute legal conclusions which Bank parties are not required to admit or deny.  To the extent an answer may be deemed necessary, Bank Parties deny the allegations set forth in Paragraph 46 of the Counterclaims.**

47.      The CDC benefits from offering deals funded in part by the Bank's state Historic Tax

Credits, which in this case totaled $10,297,271, and loans made by the Bank, which in this case totaled

$12,300,000.

> **ANSWER:**     **Bank Parties admit that (a) U.S. Bank made loans or advances to 1501 Washington in the amount of $12,049,786.33 pursuant to the terms of a Construction Loan Agreement dated December 29, 2017, as thereafter amended, and (b) that U.S. Bank purchased Missouri Historic Preservation Tax Credits from 1501 Washington in the amount $10,085,869.50, for a purchase price of $9,480,717.33, pursuant to the terms of a Tax Credit Purchase Agreement dated December 27, 2017.  Bank Parties deny any and all remaining allegations set forth in Paragraph 47 of the Counterclaims.**

48.    Upon information and belief, and as a course of dealing throughout the transactions described herein, CDC employees make all decisions concerning any Bank loans, tax credits, and other products that will be included in the CDC-funded tax credit deal.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 48 of the Counterclaims.**

49.    CDC employee Fran Doherty executed the Loan Documents for the Last Hotel, purportedly on behalf of the Bank. ECF No. 1-1, p. 75.

**ANSWER:**     **Bank Parties admit that Frances Doherty executed the Loan Agreement by and between U.S. Bank and 1501 Washington dated December 29, 2017 and a modification thereto on behalf of U.S. Bank.   Bank Parties deny any and all remaining allegations set forth  in Paragraph 49 of the Counterclaims not specifically admitted herein.**

50.    CDC employee Pamela Smith and other CDC employees served as Guarantors' and Developers' sole point of contact for all communications concerning the Construction Loan from the Bank.

**ANSWER:**     **Bank Parties admit the allegations set forth in Paragraph 50 of the Counterclaims.**

51.    The Loan, Loan Agreement, Loan Documents, and all Notices were in the care of the CDC pursuant to the execution page of the Loan Agreement and other official documents concerning the loan.  ECF No. 1-1, p. 75.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 51 of the Counterclaims.**

52.    The CDC exercised complete domination of the finances, policy, and business practices with respect to the Loan Agreement and all other agreements and actions constituting the Transaction that is the subject this lawsuit.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 52 of the Counterclaims.**

53.     In addition to controlling lending and equity contributions, the CDC exercised control over business decisions because of its ownership of the Master Tenant.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 53 of the Counterclaims.**

54.     To maximize federal HTC funds, the CDC owns a ninety-nine percent (99%) share of the Master Tenant.

**ANSWER:**     **Bank Parties admit that CDC owns a 99% interest in the Master Tenant.  Bank Parties deny any and all remaining allegations set forth in Paragraph 54 of the Counterclaims not specifically admitted herein.**

55.     DFQ owns a 1% share of the Master Tenant and is responsible for the day-to-day management and decisions of the Master Tenant.

**ANSWER:**     **Bank Parties admit that DFQ owns a 1% share of the Master Tenant, and is also the managing member responsible for the day to day management of the Master Tenant.  Bank Parties deny the allegations contained in Paragraph 55 of the Counterclaims which are not specifically admitted herein.**

56.     Under the Master Tenant Operating Agreement, the CDC's and Bank's consent was required for certain activities, including acquiring lower-interest loans and signing subleases for the Hotel.

**ANSWER:**     **Bank Parties admit that under the Master Tenant Operating Agreement CDC's consent was required for certain activities to be undertaken by the Master Tenant, including incurring certain types of indebtedness and signing certain types of subleases for the Hotel.  Answering further, Bank Parties state that the written Master Tenant Operating Agreement is the best evidence of its terms, and therefore Bank Parties deny any allegations set forth in Paragraph 56 of the Counterclaims to the extent they may be inconsistent with the written agreement, and deny any allegation in Paragraph not specifically admitted herein.**

57.     Under the Master Tenant Operating Agreement and other Transaction Documents, the CDC controlled (1) the timing and amount of equity contributions to the Master Tenant, (2) the timing and amount of lending to 1501 Washington (in the form of NMTC loans and the Construction Loan), and (3) key business decisions of the Hotel.

**ANSWER:**     **Bank Parties admit that the Master Tenant Operating Agreement and the certain other Closing Documents (as amended) contain various conditions and requirements relating to (1) the timing and amount of equity contributions to the Master Tenant, (2) the timing and amount of loans to 1501 Washington, and (3) certain activities that would impact the Hotel.  Bank Parties deny the allegations set**

**forth in Paragraph 57 to the extent they may be inconsistent with the terms of the written agreements, and deny any allegations set forth in Paragraph 57 of the Counterclaims not specifically admitted herein.**

58.     The CDC's rights to supervise—and consent to or reject—certain decisions, created an implicit duty to exercise that consent reasonably and for the benefit of all parties to the Master Tenant Operating Agreement.

**ANSWER:     Bank Parties deny the allegations set forth in Paragraph 58 of the Counterclaims.**

59.     In this position, the CDC had breathtaking and unique ability to harm Guarantors' and Developers' position in the project.

**ANSWER:     Bank Parties deny the allegations set forth in Paragraph 59 of the Counterclaims.**

60.     At some date before June 2019, and most likely years earlier, CDC Executive Director Zack Boyers and his staff decided to use the CDC's leverage over the Transaction to cause harm to Guarantors individually and to their businesses.

**ANSWER:     Bank Parties deny the allegations set forth in Paragraph 60 of the Counterclaims.**

61.     In a January 30, 2020, phone call, Boyers explicitly told Guarantor Mike Qualizza that the CDC had deliberately harmed Guarantors' and Developers' position as well as their company, the Urban Development Fund, LLC, and that the CDC had been deliberately harming his position for some time, because of a personal vendetta against Qualizza.

**ANSWER:     Bank Parties deny the allegations set forth in Paragraph 61 of the Counterclaims.**

62.     Boyers called Guarantor Mike Qualizza on January 30, 2020, because Qualizza had been criticizing the CDC, and Boyers had heard about such criticism from attendees at a NMTC conference in San Diego.

**ANSWER:     Bank Parties deny the allegations set forth in Paragraph 62 of the Counterclaims.**

63.     Other CDC employees have stated confidentially to Guarantors that the CDC had inappropriately harmed Guarantors because of a personal vendetta against Qualizza and that this stance represented a marked departure from the Bank and CDC's previous treatment of Guarantors and Developers.

**ANSWER:**      **Bank Parties deny the allegations set forth in Paragraph 63 of the Counterclaims.**

64.      Upon information and belief, Boyers and his staff's personal vendetta against Qualizza extended to all major actions that Bank and CDC took with respect to the Transaction for an unknown period of time.

**ANSWER:**      **Bank Parties deny the allegations set forth in Paragraph 64 of the Counterclaims.**

65.      Upon information and belief, CDC and Bank staff agreed to make it the Bank's and CDC's policy to harm Guarantors and Developers through the transaction, in bad faith and in violation of the Master Tenant Operating Agreement, the Loan Agreement, the Disbursing Agreement for the Loan (the "Disbursing Agreement"), the Guarantee, and other Transaction Agreements.

**ANSWER:**      **Bank Parties deny the allegations set forth in Paragraph 65 of the Counterclaims.**

66.      On December 29, 2017, 1501 Washington executed a Guaranteed Maximum Price Agreement (the "Construction Contract") with Paric Corporation ("Paric") under which Paric would serve as the General Contractor for the Last Hotel Construction.

**ANSWER:**      **Bank Parties admit the allegations set forth in Paragraph 66 of the Counterclaims.**

67.      Guarantors hired Paric based on representations from the CDC that construction contractor Paric had a record for fair, honest, and capable construction of similar buildings.  In fact, the Bank represented Paric as a Gold Star partner of the Bank, a preferred contractor to hire.

**ANSWER:**      **Bank Parties deny the allegations set forth in Paragraph 67 of the Counterclaims.**

68.      Under the Construction Contract, Paric was allowed to submit change orders for delays and cost overruns associated with certain events, like weather delays or delays in the handoff date between one contractor and another.

**ANSWER:**      **Bank Parties generally admit the allegations set forth in Paragraph 68 of the Counterclaims, but state that the written contract with Paric is the best evidence of its terms, and Bank Parties deny the allegations set forth in Paragraph 68 to the extent they may be inconsistent with the terms of the written instrument.  Bank Parties deny any allegation in Paragraph 68 not specifically admitted herein.**

69.      If DFQ or its principals did not to pay change orders submitted by Paric, the Bank would refuse to fund loan draws.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 69 of the Counterclaims.**

70.     Throughout construction, Paric submitted at least sixteen change orders, and Guarantors and Developers authorized all but one of them.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 70 of the Counterclaims.**

71.     On December 21, 2018, Paric submitted Change Order 10.

**ANSWER:**     **Bank Parties admit that on or about December 21, 2018, Paric submitted change order 10.  Bank parties deny the allegations set forth in Paragraph 71 of the Counterclaims not specifically admitted herein.**

72.     Change Order 10 states that because of delays from demolition contractor GenCorp, the project was 71 days behind schedule, and that to complete the project by the new completion date, Paric would require an additional $1,031,999.50.

**ANSWER:**     **Bank Parties state that Change Order 10 was in writing, and constitutes the best evidence of its terms, and should be referred to for an accurate and complete summary of its terms and conditions.  Bank Parties deny any allegation of Paragraph 72 that is inconsistent with the written instrument, and deny any allegation in Paragraph 72 not specifically admitted herein.**

73.     On January 2, 2019, Paric sent a letter to Developers stating that the "critical path of the project" had been delayed by 144 days.

**ANSWER:**     **Bank Parties have insufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 73 of the Counterclaims and therefore deny the same.**

74.     On April 9, 2019, Paric submitted a revised Change Order 10R.

**ANSWER:**     **Bank Parties admit that on or about April 9, 2019. Paric submitted a revised change order 10R.  Bank Parties deny the allegations of Paragraph 74 of the Counterclaims not specifically admitted herein.**

75.     Change Order 10R states that because of delays from demolition contractor GenCorp, weather delays, and roof leaks, the project was 108 days behind schedule, and that to complete the project by the new completion date, Paric would require an additional $1,985,004.11.

**ANSWER:**     **Bank Parties state that the allegations of paragraph 75 relate to a written instrument which is the best evidence of its contents, and Bank Parties deny any allegation of Paragraph 75 to the extent it may be inconsistent with the written**

**instrument.  Bank Parties deny any allegation of Paragraph 75 not specifically admitted herein.**

76.    On June 7, 2019, Paric submitted a second revised Change Order 10R2.

**ANSWER:    Bank Parties admit that on or about June 7, 2019, Paric submitted its second revised change order 10R.  Bank parties deny the allegations of Paragraph 76 not specifically admitted herein.**

77.    Change Order 10R2 states that because of delays from demolition contractor GenCorp, weather delays, and roof leaks, the project was 108 days behind schedule for floors LL through L9 and up to 133 days behind schedule for floors L10, L11, and exterior work, and that to complete the project by the new completion dates, Paric would require an additional $2,075,836.55.

**ANSWER:    Bank Parties state that the allegations of paragraph 77 relate to a written instrument which is the best evidence of its contents, and Bank Parties deny any allegation of Paragraph 77 to the extent it may be inconsistent with the written instrument.  Bank Parties deny any allegation of Paragraph 77 not specifically admitted herein.**

78.    Section 15.2.1 of the Construction Contract requires Paric to give written notice "within seven (7) days after the occurrence of [an] event giving rise to [a] claim" for an increase in the Guaranteed Maximum Price and/or for an extension in a Milestone Date.

**ANSWER:    Bank Parties state that the terms of the Construction Contract are set forth in written instrument which constitutes the best evidence of its contents.  Bank Parties deny the allegations set forth in Paragraph 78 of the Counterclaims to the extent they may be inconsistent with the terms of the written instrument, and deny any allegation in Paragraph 78 not specifically admitted herein.**

79.    Section 15.2.1 of the Construction Contract also provided that "Claims not submitted as required "shall conclusively be deemed to have been waived by Contractor, considered null and void, and shall not be considered by Owner nor otherwise serve as the basis for any increase in the Guaranteed Maximum Price or extension of any Milestone Date."

**ANSWER:    Bank Parties state that the terms of the Construction Contract are set forth in a written instrument which constitutes the best evidence of its contents.  Bank Parties deny the allegations set forth in Paragraph 79 of the Counterclaims to the extent they may be inconsistent with the terms of the written instrument, and deny any allegation in Paragraph 79 not specifically admitted herein.**

80.     When preparing Change Order 10, 10R, and 10R2, Paric did not satisfy these

requirements identified in Paragraphs 78-79.

**ANSWER:**     **Bank Parties state that the allegations of Paragraph 80 constitute legal conclusions which Bank parties are not required to admit or deny.  To the extent an answer may be deemed necessary, Bank Parties deny the allegations set forth in Paragraph 80 of the Counterclaims and therefore deny the same.**

81.     During Paric's performance under the contract, the Bank and CDC received monthly

reports from Capital Consultants documenting the pace of construction, the expected delivery date, and

change orders requested by Paric and subcontractors.

**ANSWER:**     **Bank Parties admit the allegations set forth in Paragraph 81 of the Counterclaims.**

82.     Capital Consultants' report are inconsistent with statements made by Paric concerning

delays to the project.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 82 of the Counterclaims.**

83.     For a Capital Consultants report finalized on or about March 8, 2019, the completion date

was delayed by two months, despite only one month's passage of time between the last Capital

Consultants' report.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 83 of the Counterclaims.**

84.     Capital Consultants' reports demonstrate that the majority of the final time delay

occurred after demolition contractor Gencorp terminated its work on the project.

**ANSWER:**     **Bank Parties admit the allegations set forth in Paragraph 84 of the Counterclaims.**

85.     The Bank and CDC were in possession of these reports and reviewed them regularly to

determine whether to fulfill draw requests on the Construction Loan.

**ANSWER:**     **Bank Parties admit the allegations set forth in Paragraph 85 of the Counterclaims.**


86.     The Bank and CDC never shared any Capital Consultant reports with Guarantors and

Developers.

**ANSWER:**     **Bank Parties admit the allegations set forth in Paragraph 86 of the Counterclaims.**

87.     In late 2018, Paric employees told Guarantors that delays stated in Change Order 10 did not comport with the actual progress of construction.

**ANSWER:**     **Bank Parties have insufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 87 of the Counterclaims and therefore deny the same.**

88.     Guarantors and Developers notified Paric that they would not approve Change Orders 10, 10R and 10R2.

**ANSWER:**     **Bank Parties have insufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 88 of the Counterclaims and therefore deny the same.**

89.     On June 4, 2019, Paric pursued arbitration against 1501 Washington, seeking $2,329,674.62 on the basis that it was owed payment under Change Order 10R2.

**ANSWER:**     **Bank Parties admit that Paric pursued arbitration against 1501 Washington, seeking damages on the basis that it was owed for work on the Hotel.  Bank Parties deny any and all remaining allegations set forth in Paragraph 89 of the Counterclaims.**

90.     The Bank and CDC demanded that Developers settle the Paric claims, on terms favorable to Paric, despite knowing that Paric's claimed delays were inconsistent with the Capital Consultants reports.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 90 of the Counterclaims.**

91.     During a conference call with Guarantors in November 2019, the Bank and CDC threatened to put 1501 Washington in default if it did not pay Paric.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 91 of the Counterclaims.**

92.     As part of the Paric litigation, Developers served a subpoena on the Bank and CDC, seeking communications between them and Paric concerning the arbitration claims.

**ANSWER:**     **Bank Parties admit that Developers served a subpoena on U.S. Bancorp as part of the Paric litigation.  Bank Parties deny any and all remaining allegations set forth in Paragraph 92 of the Counterclaims not specifically admitted herein.**

93.     The Bank and CDC refused to respond to the subpoena and warned of dire consequences if Guarantors and Developers further pressed for the subpoenaed materials.

**ANSWER:**      **Bank Parties deny the allegations set forth in Paragraph 93 of the Counterclaims.**

94.     The Bank and CDC offered one way out: forgo the subpoena and settle with Paric to avoid a default.

**ANSWER:**      **Bank Parties deny the allegations set forth in Paragraph 94 of the Counterclaims.**

95.     Guarantors and Developers asked whether the CDC would quickly provide the remaining tax credit equity or bridge financing to take out the high interest Mezzanine debt if the case was settled.

**ANSWER:**      **Bank Parties deny the allegations set forth in Paragraph 94 of the Counterclaims.**

96.     In response, during a meeting with Freeman at The Last Hotel, the CDC promised Guarantors and Developers that they would work to get all tax credit money funded if there was an immediate settlement.

**ANSWER:**      **Bank Parties admit that during a meeting with Freeman at the Hotel, representatives of CDC discussed the ongoing Paric dispute as well as various defaults under the Closing Agreement (as amended).   Bank Parties deny any and all remaining allegations set forth in Paragraph 96 of the Counterclaims not specifically admitted herein.**

97.     Based on the CDC's multiple assurances, Guarantors and Developers agreed to its demands, settled Paric's claims on terms favorable to Paric, and released its counterclaims against Paric.

**ANSWER:**      **Bank Parties admit that Guarantors and Developers ultimately settled their disputes with Paric without the Bank Parties' prior knowledge or consent.  Bank Parties deny any remaining allegations set forth in Paragraph 97 of the Counterclaims not specifically admitted herein.**

98.     The Bank and CDC failed to honor their promise to expedite the infusion of equity or provide bridge financing.  Instead, the Bank and CDC continued to impose additional hurdles designed to delay disbursement of the Construction Loan and federal HTC capital contributions.

**ANSWER:**      **Bank Parties deny the allegations set forth in Paragraph 98 of the Counterclaims.**

99.     Before settlement with Paric, title company Chicago Title offered to insure title to the Hotel, at Developer's expense, and for the benefit of the Bank and CDC.

**ANSWER:**      **Bank Parties admit that at one point Chicago Title offered to insure title to the Hotel under certain terms and conditions.  Bank Parties deny and all remaining allegations set forth in Paragraph 99 of the Counterclaims not specifically admitted herein.**

100.     Insuring title would protect the Bank and CDC from the any lien-holders claims,

providing the same benefits as lien-free completion.

**ANSWER:** **Bank Parties deny the allegations set forth in Paragraph 100 of the Counterclaims.**

101.     Chicago Title was willing to insure title to cover all potential liens from Paric or

demolition subcontractor Gencorp.

**ANSWER:** **Bank Parties admit that at one point Chicago Title indicated that it was willing to insure title to the Hotel against liens asserted by Paric or Gencorp under certain terms and conditions.  Bank Parties deny and all remaining allegations set forth in Paragraph 101 of the Counterclaims not specifically admitted herein.**

102.     The Bank and CDC refused to fully fund the Construction Loan and federal Historic Tax

Credits until lien-free completion of the project.

**ANSWER:** **Bank Parties admit that U.S. Bank refused to fund the final disbursement under the Construction Loan and CDC refused to fund its final capital contribution installment under the Master Tenant Operating Agreement until they were assured that the Hotel was free of any liens and that the parties were in compliance with all other terms and conditions of the Closing Agreements (as amended).  Bank Parties deny and all remaining allegations set forth in Paragraph 102 of the Counterclaims not specifically admitted herein.**

103.     The Bank and CDC refused to fully fund the Construction Loan and federal Historic Tax

Credits until Guarantors and Developers settled on terms favorable to Paric.

**ANSWER:** **Bank Parties admit that U.S. Bank refused to fund the final disbursement under the Construction Loan and CDC refused to fund its final capital contribution installment under the Master Tenant Operating Agreement until they were assured that the Hotel was free of any liens and that the parties were in compliance with all other terms and conditions of the Closing Agreements (as amended).  Bank Parties deny and all remaining allegations set forth in Paragraph 103 of the Counterclaims not specifically admitted herein.**

104.     The Bank's and CDC's refusal to fund during pendency of the Paric litigation required

Developers to extend the size and duration of the 15% interest Mezzanine loan from Octagon causing

millions of dollars in damage to Developers and Guarantors.

**ANSWER:** **Bank Parties deny the allegations set forth in Paragraph 104 of the Counterclaims.**

105.    The Bank's and CDC's refusal to fund during pendency of the Paric litigation made it impossible for Developers to pay down the debt on their Construction Loan by the initial maturity date of December 29, 2020.

**ANSWER:**        **Bank Parties deny the allegations set forth in Paragraph 105 of the Counterclaims.**

106.    By withholding funding and demanding settlement, the Bank and CDC caused and enabled Paric to breach the Construction Contract.

**ANSWER:**        **Bank Parties deny the allegations set forth in Paragraph 106 of the Counterclaims.**

107.    These actions by the Bank and CDC caused harm to Guarantors and Developers because—to comply with the Bank and CDC's demands—Developers had to release their claims against Paric, including for attorneys' fees, and pay any amount owed under the Paric Settlement Agreement.

**ANSWER:**        **Bank Parties deny the allegations set forth in Paragraph 107 of the Counterclaims.**

108.    The Master Tenant Operating Agreement requires the CDC to make three capital contribution installments of federal HTCs.

**ANSWER:**        **Bank Parties admit generally that the Master Tenant Operating Agreement provides that CDC is to make three capital contribution installments to the Master Tenant, provided that certain terms and conditions are satisfied.  The Master Tenant Operating Agreement is a written instrument which constitutes the best evidence of its terms.  Bank Parties deny the allegations of Paragraph 108 to the extent they are inconsistent with the terms of the written instrument, and deny all allegations set forth in Paragraph 108 of the Counterclaims not specifically admitted herein.**

109.    Those required installments include the following:

a)    A $2,993,219 first installment upon closing project loans, capital contributions, a title commitment, and approval from the National Park Service and related criteria;

b)    A $5,986,439 second installment, with possible adjustments, upon substantial completion of the development, no uncured defaults, fully funding of reserves and escrows, fulfillment of reporting requirements, and related criteria; and

c)      A $997,740 third installment, with possible adjustments, upon the creation of a stable

revenue stream, DFQ's capital contribution, no defaults, and estoppel certificates, and

related criteria.

**ANSWER:**      **Bank Parties admit that CDC's obligation to make each of the capital contributions outlined in the Master Tenant Operating Agreement is subject to certain terms and conditions as more fully described in the Master Tenant Operating Agreement.  The Master Tenant Operating Agreement is a written instrument which constitutes the best evidence of its terms.  Bank Parties deny the allegations of Paragraph 109 to the extent they are inconsistent with the terms of the written instrument, and deny all allegations set forth in Paragraph 109 of the Counterclaims not specifically admitted herein.**

110.     Developers worked diligently to meet these requirements and fund the project.

**ANSWER:**      **Bank Parties deny the allegations set forth in Paragraph 110 of the Counterclaims.**

111.     Developers materially satisfied all the requirements for the second installment in early

fall 2019.

**ANSWER:**      **Bank Parties deny the allegations set forth in Paragraph 111 of the Counterclaims.**

112.     As described in Paragraphs 99-101, Chicago Title offered to insure title to the Hotel to

cover all potential liens from Paric or demolition subcontractor Gencorp.

**ANSWER:**      **Bank Parties admit that at one point Chicago Title indicated that it was willing to insure title to the Hotel against liens asserted by Paric or Gencorp under certain terms and conditions.   In further response, Bank Parties incorporate and restate their responses to Paragraphs 99-101 of the Counterclaim.  Bank parties deny and all remaining allegations set forth in Paragraph 112 of the Counterclaims not specifically admitted herein.**

113.     Insuring title would protect the Bank and CDC from the any lien-holders' claims,

providing the same benefits as lien-free completion.

**ANSWER:**      **Bank Parties deny the allegations set forth in Paragraph 113 of the Counterclaims.**

114.     The CDC did not fund the second installment of the federal HTC equity until January

2020.

**ANSWER:**      **Bank Parties admit the allegations set forth in Paragraph 114 of the Counterclaims.**

115.     The CDC's failure to fund the second installment required Developers to extend the size

and duration of the 15%-interest Mezzanine loan for more than four months causing millions of dollars in

damage to Developers and Guarantors in bad faith and in violation of the Master Tenant Operating

Agreement.

**ANSWER:**      **Bank Parties deny the allegations set forth in Paragraph 115 of the Counterclaims.**

116.    The Bank and CDC executed a Construction and Disbursing Escrow Agreement (the

"Disbursing Agreement") with DFQ, 1501 Washington, and four other parties on December 29, 2017.

**ANSWER:**      **Bank Parties admit the allegations set forth in Paragraph 116 of the Counterclaims.**

117.    Under the Disbursing Agreement, the Bank and CDC had a duty to timely disburse funds

when the borrower, 1501 Washington, met certain requirements.

**ANSWER:**      **Bank Parties admit generally that U.S. Bank, in its capacity as Disbursing Agent, had the duty to timely disburse funds under the Disbursing Agreement when 1501 Washington met certain requirements.  The terms of the Disbursing Agreement are set forth in a written agreement, which is the best evidence of its contents.  Bank Parties deny the allegations of Paragraph 117 to the extent they are inconsistent with the terms of the written agreement, and deny any allegations set forth in Paragraph 117 of the Counterclaims not specifically admitted herein.**

118.    The Bank and CDC disbursed funds requested under twenty-five different draw requests

that 1501 Washington made to pay construction contractors.

**ANSWER:**      **Bank Parties admit that U.S. Bank, in its capacity as Disbursing Agent, disbursed funds requested under twenty-five different draw requests to pay construction contractors.  Bank Parties deny any and all remaining allegations set forth in Paragraph 118 of the Counterclaims not specifically admitted herein.**

119.    Upon receipt of the twenty-sixth draw request in October 2019, the CDC made the

decision to withhold about $2.1 million in funding due under that twenty-sixth request.

**ANSWER:**      **Bank Parties admit that CDC refused to fund the twenty-sixth draw request until all conditions and requirements for the draw had been satisfied.  Bank Parties deny and all remaining allegations set forth in Paragraph 119 of the Counterclaims.**

120.    Developers materially satisfied all the requirements for the twenty-sixth draw request.

**ANSWER:**      **Bank Parties deny the allegations set forth in Paragraph 120 of the Counterclaims.**

121.    The Bank and CDC failed to fund the twenty-sixth draw request for that amount until

January 2020.

**ANSWER:**      **Bank Parties admit that U.S. Bank, in its capacity as Disbursing Agent, declined to fund the twenty-sixth draw request until January 2020.  Bank Parties deny any and**

**all remaining allegations set forth in Paragraph 121 of the Counterclaims not specifically admitted herein.**

122.    The Bank and CDC's failure to fund the twenty-sixth draw required Developers to extend the size and duration of the 15%-interest Mezzanine loan for more than four months causing millions of dollars in damage to Developers and Guarantors in bad faith and in violation of the Master Tenant Operating Agreement.

**ANSWER:     Bank Parties deny the allegations set forth in Paragraph 122 of the Counterclaims.**

123.    When drafting the development Transaction for the Hotel, the Bank and CDC asserted that state HTC certification could be obtained in a month of submission.

**ANSWER:     Bank Parties deny the allegations set forth in Paragraph 123 of the Counterclaims.**

124.    Missouri is unique in offering state HTCs as a complement to federal HTCs.

**ANSWER:     Bank Parties deny the allegations set forth in Paragraph 124 of the Counterclaims.**

125.    Guarantors had paired federal and state NMTCs in other states.

**ANSWER:     Bank Parties have insufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 125 of the Counterclaims and therefore deny the same.**

126.    Guarantors had never worked on a deal funded partially by Missouri state HTCs.

**ANSWER:     Bank Parties have insufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 126 of the Counterclaims and therefore deny the same.**

127.    The Bank and CDC had worked on multiple projects pairing Missouri state HTCs with federal HTCs over a span of many years.

**ANSWER:     Bank Parties admit the allegations set forth in Paragraph 127 of the Counterclaims.**

128.    In fall of 2017, CDC employee Ruth Sparrow, acting as agent of the Bank and CDC, represented to Guarantors, Developers, and Cohn Reznick—independent accountant hired to review the Transaction—that state HTC certification could be received within one month of submission.

**ANSWER:     Bank Parties deny the allegations set forth in Paragraph 128 of the Counterclaims.**

129.     Based in part on Ruth Sparrow's representation as well as other representations of the Bank and CDC, Cohn Reznick prepared an Independent Accountant's Report with month-by-month financial projects and cash flows for the Transaction (the Projections").

**ANSWER:     Bank Parties admit that Cohn Reznick prepared an Independent Accountant's Report with month-by-month financial projections and cash flows for the transaction.  Bank Parties deny any and all remaining allegations set forth in paragraph 129 of the Counterclaims.**

130.     Based on Ruth Sparrow's representation, the Projections showed that the Bank would contribute the state HTC funding in the amount of $10,297,271 in May of 2019, one month after receiving state certification, and two months after the original completion date of March 2019.

**ANSWER:     Bank Parties admit that the Projections showed that U.S. Bank would purchase the Missouri HTCs for $10,297,271 in May of 2019 based on a projected completion date for the Hotel in February, 2019.  Bank Parties deny any and all remaining allegations set forth in Paragraph 130 of the Counterclaims.**

131.     By executing the Transaction Agreements, the Bank and CDC represented that the funding schedule identified in the Projections was an accurate and true representation of when state HTC funds could be received.

**ANSWER:     Bank Parties deny the allegations set forth in Paragraph 131 of the Counterclaims. Further answering, Bank Parties state that, pursuant to the terms of the Closing Documents, 1501 Washington and DFQ represented and warranted to the Bank Parties that the assumptions underlying the Financial Projections were accurate and reasonable.**

132.     The Bank and CDC failed to correct Ruth Sparrows' false representation concerning state HTC timing, as reflected in the May 2019 state HTC funding date.

**ANSWER:     Bank Parties deny the allegations set forth in Paragraph 132 of the Counterclaims.**

133.     Based on the Bank's and CDC's representations and assurances including the Transaction Documents created by the Bank, the CDC, or their agents, Guarantors believed that Missouri's HTC certification could be obtained within one month of submission, and that state HTC funds could be received within two months of submission.

**ANSWER:     Bank Parties deny the allegations set forth in Paragraph 133 of the Counterclaims.**

134.    The state HTC certification had slowed significantly since 2009 when new federal guidelines were created.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 134 of the Counterclaims.**

135.    Former Governor Eric Greitens further slowed the HTC certification process in 2016.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 135 of the Counterclaims.**

136.    Informed members of the state HTC industry, including the Bank, knew that, due to reasons stated in Paragraphs 134-135, it would take around twelve to eighteen (12-18) months (on average) from submission to certificate issuance in Missouri.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 136 of the Counterclaims.**

137.    In stating that state HTC certification would take only a month, the Bank and CDC intended for Guarantors and Developers to accept the terms of the Transaction documents relying on the Bank's Construction Loan and Octagon's expensive bridge and Mezzanine loans.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 137 of the Counterclaims.**

138.    Because this was the first time Guarantors and Developers had worked with Missouri state HTCs, they had no knowledge of the correct timeline.

**ANSWER:**    **Bank Parties have insufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 138 of the Counterclaims and therefore deny the same.**

139.    In the 20 years of business Mr. Qualizza has spent partnering with the CDC they have always made him aware of these types of issues, suggesting that these misrepresentations were intentional on the part of the Bank, the CDC, and their agents.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 139 of the Counterclaims.**

140.    Guarantors and Developers relied on the one-month estimate to make borrowing decisions.

**ANSWER:**    **Bank Parties deny that they provided any such estimate.  Guarantors and Developers performed their own investigation and due diligence prior to entering into the transaction.  Bank Parties have insufficient knowledge or information to form a belief as what Guarantors and Developers may have considered material to**

> **their decision to enter into the transaction, and therefore,  deny the allegations set forth in Paragraph 140 of the Counterclaims.**

141.    If Guarantors and Developers had known about the correct timeline, they would not have borrowed an $9 million Mezzanine loan at 15% interest.

**ANSWER:**    **Bank Parties have insufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 141 of the Counterclaims and therefore deny the same.**

142.    Guarantors and Developers had a right to rely on the one-month estimate because that representation was made in the Transaction Documents by persons who knew and affirmatively represented that they knew Missouri's HTC market.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 142 of the Counterclaims.**

143.    As stated in paragraphs 123 through 142, the CDC negligently misrepresented the timing of state HTC certification to Guarantors and Developers.

**ANSWER:**    **Bank Parties- deny the allegations set forth in Paragraph 143 of the Counterclaims. In further response, Bank Parties restate and incorporate by reference their responses to Paragraphs 123-142 of the Counterclaims as if fully set forth herein.**

144.    Guarantors and Developers were injured by the misrepresentation because of the extra Mezzanine loan interest they paid under the false pretense that they would have the Mezzanine loan for a short period of time before they could obtain $9,625,000 in state HTCs.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 144 of the Counterclaims.**

145.    When Guarantors realized that the CDC would not timely fund their capital contributions to the Master Hotel, Guarantors began searching for lower interest loans to stem the financial harm of the 15%-interest Mezzanine loan.

**ANSWER:**    **Bank Parties have insufficient knowledge or information to form a belief as to any search made by the Guarantors for alternatives to the Mezzanine loan and therefore deny the same.   Bank Parties further deny any and all other allegations set forth in Paragraph 145 of the Counterclaims.**

146.    In November of 2019, Guarantors started discussing a 5%-interest bridge loan with Midland States Bank.

**ANSWER:**     **Bank Parties have insufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 146 of the Counterclaims and therefore deny the same.**

147.     Midland States Bank sought consent from the Bank and CDC before making the bridge loan to 1501 Washington.

**ANSWER:**     **Bank Parties admit that Midland States Bank approached the Bank Parties about potentially making a loan to 1501 Washington to replace Octagon's bridge loan. Bank Parties deny any and all other allegations set forth in Paragraph 147 of the Counterclaims.**

148.     CDC employee Laura Vowell initially offered in early 2020 that the CDC would gladly approve a buyout of Octagon's Bridge or Mezzanine loan.

**ANSWER:**     **Bank Parties admit that at one point Laura Vowell indicated that CDC would consider approving a new bridge loan, provided that the new lender satisfied certain terms and conditions, including the execution of an intercreditor agreement satisfactory to the Bank Parties.  Bank Parties deny any and all other allegations set forth in Paragraph 148 of the Counterclaims.**

149.     However, as loan discussion continued, the CDC failed to give any consent, prolonging the financial harm from the Mezzanine loan.

**ANSWER:**     **Bank Parties admit that the CDC never consented to a new bridge loan.  Bank Parties deny any and all other allegations set forth in Paragraph 149 of the Counterclaims.**

150.     Finally in late March 2020, Midland States Bank agreed to fund the 5% bridge loan without explicit consent from the CDC, reducing the harm of the Mezzanine loan, but only after four months of additional delays.

**ANSWER:**     **Bank Parties have insufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 150 of the Counterclaims and therefore deny the same.**

151.     The CDC's failure to consent caused direct harm to 1501 Washington because of these delays.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 151 of the Counterclaims.**

152.     The CDC also harmed Guarantors by setting punitive terms as Guarantors sought to find new tax credit investors for its ongoing deals with the CDC.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 152 of the Counterclaims.**

153.    Qualizza and Freeman, along with Chad Goodall ("ACC Owners") own Aries

Community Capital the Parent and Controlling entity of the Urban Development Fund, LLC, ("UDF").

**ANSWER:**     **Bank Parties have insufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 153 of the Counterclaims and therefore deny the same.**

154.    ACC Owners created UDF to fund and manage their whole portfolio of NMTC

allocations for funding of owner-occupied tax credit-projects in severely distressed communities.

**ANSWER:**     **Bank Parties have insufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 154 of the Counterclaims and therefore deny the same.**

155.    UDF is a 10-time New Market Tax Credit ("NMTC") awardee and has done over $500

million in business with the CDC.

**ANSWER:**     **Bank Parties have insufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 155 of the Counterclaims and therefore deny the same.**

156.    UDF had an exclusive 20-year relationship with the CDC to fund NMTC State and

Federal deals.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 156 of the Counterclaims.**

157.    UDF has done several Historic Hotels using both Historic and NMTC credits with the

CDC in the past.

**ANSWER:**     **Bank Parties admit the allegations set forth in Paragraph 157 of the Counterclaims.**

158.    None of UDF's prior projects have experienced the kinds of challenges that the CDC and

the Bank imposed for the Last Hotel.

**ANSWER:**     **Bank Parties have insufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 158 of the Counterclaims and therefore deny the same.**

159.    The events described in these Counterclaims have caused significant harm to UDF's

impeccable reputation and financial profitability.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 159 of the Counterclaims.**

160.    Because of its impeccable reputation, UDF was able to get Wells Fargo, PNC, and Chase, National Association to replace the CDC during COVID, an almost impossible task.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 160 of the Counterclaims.**

161.    As of March 2020, UDF partnered with the CDC on tax credit-funded development in Maine, Illinois, and Kentucky, in addition to the Last Hotel.

**ANSWER:**    **Bank Parties admit the allegations set forth in Paragraph 161 of the Counterclaims.**

162.    Before consenting to sell its tax credit investments in these projects, the CDC sought an omnibus release from liability concerning any claims arising from these projects.

**ANSWER:**    **Bank Parties admit the allegations set forth in Paragraph 162 of the Counterclaims.**

163.    The CDC also forcefully unwound its investments in the Maine project, causing UDF an estimated $1,624,700 in damage.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 162 of the Counterclaims.**

164.    By imposing punitive conditions for unwinding and demanding an omnibus release, the CDC sought to leverage its other contracts with Guarantors and UDF to evade liability for the Last Hotel Transaction.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 164 of the Counterclaims.**

165.    These punitive unwind conditions were imposed during the most harmful timeframe possible, as Developers and Guarantors sought to manage the hotel during travel restrictions and historic lows for domestic and international travel.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 165 of the Counterclaims.**

166.    Through great effort and expense, Guarantors found other investors for these projects willing to purchase the CDC's position.

**ANSWER:**    **Bank Parties have insufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 166 of the Counterclaims and therefore deny the same.**

167.    In each instance, Guarantors lost a portion of the value of their tax credits, because the CDC was only willing to sell the tax credits at a less favorable rate for the purchaser.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 167 of the Counterclaims.**

168.    UDF's survival has occurred despite the Bank and CDC's apparent goal of destroying UDF, a highly successful company.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 168 of the Counterclaims.**

169.    COVID-19 restrictions brought travel and hotel stays to a halt in March and April of 2020.

**ANSWER:**    **Bank Parties admit that COVID-19 restrictions significantly impacted travel and hotel stays in March and April 2020.  Bank Parties deny any and all remaining allegations set forth in Paragraph 169 of the Counterclaims not specifically admitted herein.**

170.    On March 21, 2020 City of St. Louis issued its first stay at home order.

**ANSWER:**    **Bank Parties admit the allegations set forth in Paragraph 170 of the Counterclaims.**

171.    When stay at home orders were lifted almost two months later, on May 18, 2021, hotel reservations in downtown St. Louis remained at historic lows due to (1) mass cancellation of entertainment events at downtown venues, (2) corporate travel bans, (3) work from home policies, (4) other states' travel bans and quarantine requirements, and (5) lack of safe travel options for those concerned about catching the virus.

**ANSWER:**    **Bank Parties admit that hotel reservations in downtown St. Louis were depressed due to the effects of the pandemic.  Bank Parties deny the allegations set forth in Paragraph 171 of the Counterclaims not specifically admitted herein.**

172.    On March 27, 2020, to aid struggling industries, families, and organizations, Congress passed the first of several landmark spending and policy packages titled the CARES Act.

**ANSWER:**    **Bank Parties admit the allegations set forth in Paragraph 172 of the Counterclaims.**

173.    CARES Act Section 4013 provided "Temporary Relief from Troubled Debt Restructurings," allowing banks to make loan modifications without reporting those modifications as Troubled Debt Restructurings, under certain conditions.

**ANSWER:**     **Bank Parties admit the allegations set forth in Paragraph 173 of the Counterclaims.**

174.     If (1) loans were no more than 30 days past due as of December 31, 2019; (2)

modifications to those loans were required because of COVID-19; and (3) modifications were made

between March 1, 2020 and January 1, 2022; then those modifications could be made without triggering

troubled debt relief accounting requirements.

**ANSWER:**     **Bank Parties state that the allegations of Paragraph 174 are legal conclusions which Bank parties are not required to admit or deny.  To the extent that an answer may be deemed necessary, Bank parties state that the applicable terms of the CARES Act are the best evidence of its contents, and Bank Parties therefore deny the allegations set forth in Paragraph 174 of the Counterclaims not specifically admitted herein.**

175.     Such modifications could include forbearance, an interest-rate reduction, a repayment

plan, or other arrangements that defer or delay principal and interest payments.

**ANSWER:**     **Bank Parties state that the allegations of Paragraph 175 are legal conclusions which Bank parties are not required to admit or deny.  To the extent that an answer may be deemed necessary, Bank parties state that the applicable terms of the CARES Act are the best evidence of its contents, and Bank Parties therefore deny the allegations set forth in Paragraph 175 of the Counterclaims not specifically admitted herein.**

176.     A modification for 1501 Washington's Construction Loan would have met all

requirements identified in Paragraph 174.

**ANSWER:**     **Bank Parties state that the allegations of Paragraph 176 are legal conclusions which Bank parties are not required to admit or deny.  To the extent that an answer may be deemed necessary, Bank parties state that the applicable terms of the CARES Act are the best evidence of its contents, and Bank Parties therefore deny the allegations set forth in Paragraph 176 of the Counterclaims not specifically admitted herein.**

177.     The Bank refused to make any such modifications for the Construction Loan during the

pandemic, despite many requests from Guarantors.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 177 of the Counterclaims.**

178.     Instead, the Bank and CDC have continued to seek punitive terms during unwinding

agreements while contributing as little to the hotel's equity as possible.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 178 of the Counterclaims.**

179.     The Loan Agreement provides thirteen criteria for extending the maturity date beyond December 29, 2020.

**ANSWER:**     **Bank Parties admit that the Loan Agreement provides criteria for extending the maturity date.  Answering further Bank Parties state that the written agreement is the best evidence of its terms, and therefore, Bank parties deny the allegations set forth in Paragraph 179 of the Counterclaims not specifically admitted herein.**

180.     Developers substantially fulfilled these criteria.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 180 of the Counterclaims.**

181.     In the alternative, Developers and Guarantors were excused from fulfilling these criteria by the Bank's and CDC's breaches, Acts of God— including due to the COVID 19 pandemic—or commercial frustration.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 181 of the Counterclaims.**

182.     Instead of observing these criteria, the Bank and CDC sought to rewrite the agreement to require Developers to release the Bank and CDC from any and all claims.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 182 of the Counterclaims.**

183.     The Bank told Developers that it would not consider any maturity request without a release from liability.

**ANSWER:**     **Bank Parties admit that they told Developers that Bank Parties would not enter into certain modifications of the Closing Documents without a release of liability for claims that had been asserted by the Developers against the Bank Parties.  Bank Parties deny any and all remaining allegations set forth in Paragraph 183 of the Counterclaims not specifically admitted herein.**

184.     On December 29, 2020, the Bank sent a letter stating that the loan had matured.

**ANSWER:**     **Bank Parties admit the allegations set forth in Paragraph 184 of the Counterclaims.**

185.     Developers made timely payments through December 29, 2020, and have continued to make timely payments in 2021.

**ANSWER:**     **Bank Parties admit that 1501 Washington timely made payments on the Loan until the Loan matured on December 29, 2020.  Bank Parties further admit that 1501 Washington has continued to make certain payments to U.S. Bank following the loan's maturity date.  Bank Parties deny any and all remaining allegations set forth in Paragraph 185 of the Counterclaims, including the allegation that payments**

**made by 1501 Washington following the maturity date of the Loan have complied
with the terms and conditions of the Construction Loan Agreement.**

186.    The Bank sent this maturity letter during the height of the worst COVID case and death

count numbers throughout the pandemic.

**<u>ANSWER:</u>**    **Bank Parties deny the allegations set forth in Paragraph 186 of the Counterclaims.**

187.    Upon information and belief, the Bank has not treated any other borrower who has made

timely payments in a similar manner.

**<u>ANSWER:</u>**    **Bank Parties deny the allegations set forth in Paragraph 187 of the Counterclaims.
Further, Bank Parties state that the circumstances of other borrowers of the Bank
are unique to each of those respective borrowers, and have no relevance whatsoever
to these proceedings.**

188.    The Bank's December 29, 2020, letter provided no reason why Developers were not

entitled to an extension of the Maturity Date.

**<u>ANSWER:</u>**    **Bank Parties admit the allegations set forth in Paragraph 188 of the Counterclaims,
but deny that any such explanation was necessary or required under the terms of
the Loan Agreement.**

189.    The Bank has breached the Loan Agreement and its duty of good faith and fair dealing

when it refused to extend the maturity date without a release from all liability.

**<u>ANSWER:</u>**    **Bank Parties deny the allegations set forth in Paragraph 189 of the Counterclaims.**

<u>**COUNT I**</u>

190.    Guarantors and Developers reallege and incorporate by reference the allegations

contained in Paragraphs 1–189 hereinabove as though set forth in full.

**<u>ANSWER:</u>**    **As and for their response to Paragraph 90 of Count I, Bank Parties incorporate by
reference their answers to Paragraphs 1-189 of the Counterclaims as though fully
set forth herein.**

191.    Plaintiff Bank and Counterclaim Defendant CDC ("Counterclaim Defendants") shared

the unlawful objectives of:

a)    Breaching the Master Tenant Operating Agreement, Guaranty, Loan Agreement,

Disbursing Agreement, and other Transaction Documents;

| | |
|---|---|
| b) | Denying Guarantors and Developers the expected benefits of the Transaction Agreements; |
| c) | Tortiously interfering with the Construction Contract; |
| d) | Fraudulently misrepresenting that they would fully fund the Loan and federal HTC Equity after settlement of the Paric litigation; |
| e) | Harming Guarantors personally; and |
| f) | Fraudulently misrepresenting the state certification timeline. |

**ANSWER:** **Bank Parties deny the allegations set forth in Paragraph 191 of the Counterclaims.**

192.    A small group of Counterclaim Defendants' employees, sometimes occupying positions of employment simultaneously with each Counterclaim Defendants (or acting as agents for both), conspired together and directed all the activities of the Counterclaim Defendants with respect to the Transaction.

**ANSWER:** **Bank Parties deny the allegations set forth in Paragraph 192 of the Counterclaims.**

193.    The small group of Counterclaim Defendants' employees identified in Paragraph 192 reached an agreement, constituting an agreement and official policy of the Bank and CDC, to harm Guarantors and Developers through the Transaction.

**ANSWER:** **Bank Parties deny the allegations set forth in Paragraph 193 of the Counterclaims.**

194.    The actions noted in these Counterclaims—including refusing to fund the Loan and federal HTC equity, demanding settlement with Paric, misrepresenting the Loan and federal HTC equity available after settlement, and misrepresenting the timing of state HTC certification—were in furtherance of the conspiracy.

**ANSWER:** **Bank Parties deny the allegations set forth in Paragraph 194 of the Counterclaims.**

195.    Guarantors and Developers were injured by these actions because of the interest accrued on the 15%-interest Mezzanine loan.

**ANSWER:** **Bank Parties deny the allegations set forth in Paragraph 195 of the Counterclaims.**

196.    Guarantors and Developers were injured by these actions because of the payments they made and claims they released upon the settlement of the Paric litigation.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 196 of the Counterclaims.**

197.    Guarantors and Developers were injured by these actions because of the emotional harm and suffering sustained by the Counterclaim Defendants' tortious interference and misrepresentations.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 197 of the Counterclaims.**

<u>**COUNT II**</u>

198.    Guarantors and Developers reallege and incorporate by reference the allegations contained in Paragraphs 1–197 hereinabove as though set forth in full.

**ANSWER:**    **As and for their response to Paragraph 198 of Count II, Bank Parties incorporate by reference their answers to Paragraphs 1-197 of the Counterclaims as though fully set forth herein.**

199.    When demanding that 1501 Washington settle Paric's claims, Counterclaim Defendants represented that they would fully fund remaining loans and equity.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 199 of the Counterclaims.**

200.    In a November 2019 phone call, Counterclaim Defendants' employee Eric Jones represented to Neil Freeman, that if 1501 Washington settled and signed a forbearance letter dated December 12, 2019, the Bank would fully and promptly fund Construction Loan draw 26, and the CDC would fully and promptly fund remaining federal HTC equity.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 200 of the Counterclaims.**

201.    Eric Jones' representations reflected the Bank and CDC's acceptance of terms previously offered by Qualizza in a December 10, 2019, 3:52 pm email to Bank and CDC employees.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 201 of the Counterclaims.**

202.    Eric Jones, acting as the Counterclaim Defendants' agent, knew that the Counterclaim Defendants did not intend to fully fund the remaining federal HTC equity.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 202 of the Counterclaims.**

203.     Instead, Jones knew that the Counterclaim Defendants planned to reduce the second federal HTC installment by an amount known as an "adjuster" and delay funding of the third HTC installment indefinitely.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 203 of the Counterclaims.**

204.     The Counterclaim Defendants still have not made the third HTC installment.

**ANSWER:**     **Bank Parties admit the allegations set forth in Paragraph 204 of the Counterclaims.**

205.     Upon information and belief, Eric Jones, acting as the Counterclaim Defendants' agent, intended for 1501 Washington to rely on this misrepresentation when settling their claims with Paric and signing the forbearance letter.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 205 of the  Counterclaims.**

206.     Guarantor Qualizza had determined that the forbearance letter contained multiple misrepresentations itself and would not have signed the forbearance letter if the Bank and CDC funding had not been tied to it.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 206 of the Counterclaims.**

207.     Upon information and belief, Eric Jones, acting as the Counterclaim Defendants' agent, knew that 1501 Washington would not settle the Paric litigation and sign the forbearance letter without a promise of full and prompt federal HTC equity.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 207 of the Counterclaims.**

208.     Guarantors and Developers could not have known that the Counterclaim Defendants did not intend to fully and promptly fund the remaining federal HTC equity.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 208 of the Counterclaims.**

209.     Guarantors and Developers had a right to rely on this statement in the good faith hope of solving a difficult disagreement between contracting parties.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 209 of the Counterclaims.**

210.    Guarantors and Developers relied on Eric Jones' statements, and other similar Counterclaim Defendants' employees' statements when they settled the Paric litigation and signed the December 12, 2019 forbearance letter.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 210 of the Counterclaims.**

211.    Guarantors and Developers were damaged by these misrepresentations, as they surrendered their legal rights by settling the Paric litigation.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 211 of the Counterclaims.**

212.    After the Bank and CDC failed to satisfy the promises made by Eric Jones, Qualizza identified the misrepresentations contained in the forbearance letter in an email dated December 30, 2019, 10:16 am.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 212 of the Counterclaims.**

213.    Guarantors and Developers seek rescission of the December 12, 2019, forbearance letter based on Counterclaim Defendants' fraud in the inducement identified in Paragraphs 197 through 212.

**ANSWER:**    **Paragraph 213 of the Counterclaims asserts no allegations as to which a response by Bank Parties is required.  To the extent a response is required, Bank Parties deny each and every allegation set forth in Paragraph 213, and expressly deny that Guarantors and Developers are entitled to any relief whatsoever.**

## COUNT III

214.    Guarantors and Developers reallege and incorporate by reference the allegations contained in Paragraphs 1–213 hereinabove as though set forth in full.

**ANSWER:**    **As and for their response to Paragraph 214 of Count III, Bank Parties incorporate by reference their answers to Paragraphs 1-213 of the Counterclaims as though fully set forth herein.**

215.    When demanding that 1501 Washington settle Paric's claims, Counterclaim Defendants represented that they would fully fund remaining loans and equity, respectively.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 215 of the Counterclaims.**

216.     In a November 2019 phone call, Eric Jones represented to Neil Freeman, that if 1501 Washington settled and signed a forbearance letter dated December 12, 2019, Counterclaim Defendants would fully and promptly fund Construction Loan draw 26, and the remaining federal HTC equity.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 216 of the Counterclaims.**

217.     Eric Jones, acting as the Counterclaim Defendants' agent, should have known that Counterclaim Defendants did not intend to fully fund the remaining federal HTC equity.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 217 of the Counterclaims.**

218.     Eric Jones, acting as the Counterclaim Defendants' agent, should have known that Counterclaim Defendants planned to reduce the second federal HTC installment by an adjuster and delay funding of the third HTC installment indefinitely.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 218 of the Counterclaims.**

219.     Counterclaim Defendants still have not made the third HTC installment.

**ANSWER:**     **Bank Parties admit the allegations set forth in Paragraph 219 of the Counterclaims.**

220.     Upon information and belief, Eric Jones, acting as the Counterclaim Defendants' agent, intended for 1501 Washington to rely on this misrepresentation when settling their claims with Paric and signing the December 12, 2019, forbearance letter.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 220 of the Counterclaims.**

221.     Upon information and belief, Eric Jones, acting as the Counterclaim Defendants' agent, knew that 1501 Washington would not settle the Paric litigation and sign the forbearance letter without a promise of full and prompt federal HTC equity.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 221 of the Counterclaims.**

222.     Guarantors and Developers could not have known that Counterclaim Defendants did not intend to fully and promptly fund the remaining federal HTC equity.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 222 of the Counterclaims.**

223.     Guarantors and Developers had a right to rely on this statement in the good faith hope of solving a difficult disagreement between contracting parties.

**ANSWER:**        **Bank Parties deny the allegations set forth in Paragraph 223 of the Counterclaims.**

224.    Guarantors and Developers relied on Eric Jones' statements, and other similar

Counterclaim Defendants' employees' statements when they settled the Paric litigation and signed the

December 12, 2019, forbearance letter.

**ANSWER:**        **Bank Parties deny the allegations set forth in Paragraph 224 of the Counterclaims.**

225.    Guarantors and Developers were damaged by these misrepresentations, as they

surrendered their legal rights and meritorious defenses by settling the Paric litigation.

**ANSWER:**        **Bank Parties deny the allegations set forth in Paragraph 225 of the Counterclaims.**

226.    Guarantors and Developers seek rescission of the December 12, 2019, forbearance letter

based on Counterclaim Defendants' fraud in the inducement identified in Paragraphs 210 through 225.

**ANSWER:**        **Paragraph 226 of the Counterclaims asserts no allegations as to which a response by Bank Parties is required.  To the extent a response is required, Bank Parties deny each and every allegation set forth in Paragraph 226, and expressly deny that Guarantors and Developers are entitled to any relief whatsoever.**

<u>**COUNT IV**</u>

227.    Guarantors and Developers reallege and incorporate by reference the allegations

contained in Paragraphs 1–226 hereinabove as though set forth in full.

**ANSWER:**        **As and for their response to Paragraph 227 of Count IV, Bank Parties incorporate by reference their answers to Paragraphs 1-226 of the Counterclaims as though fully set forth herein.**

228.    Guarantors, Developers, and Counterclaim Defendants executed valid, enforceable

contracts for the Loan Agreement, Disbursing Agreement, Guaranty, and Master Tenant Operating

Agreement.

**ANSWER:**        **Bank Parties admit the allegations set forth in Paragraph 228 of the Counterclaims.**

229.    1501 Washington and the Bank are the named parties to the Loan Agreement and the

Disbursing Agreement.

**ANSWER:**        **Bank Parties admit the allegations set forth in Paragraph 229 of the Counterclaims.**

230.    The Disbursing Agreement was also executed by Counterclaim Defendants.

**ANSWER:**     **Bank Parties admit the allegations set forth in Paragraph 230 of the Counterclaims.**

231.     1501 Washington performed pursuant to the Loan Agreement and Disbursing Agreement, including by completing construction of the Hotel without liens, paying contractors, and paying all loan payments when due.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 231 of the Counterclaims.**

232.     The Bank breached the Loan Agreement and Disbursing Agreement by failing to fund loan payments in a timely manner, refusing to extend the maturity date, as specifically required to do so in the Loan Agreement, without a release from liability, and purporting to mature the loan.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 232 of the Counterclaims.**

233.     These breaches damaged 1501 Washington by causing it to resort to a high-interest Mezzanine loan as an alternative to the Construction loan funds that were not timely provided.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 233 of the Counterclaims.**

234.     Guarantors and Counterclaim Defendants are the named parties to the Guaranty.

**ANSWER:**     **Bank Parties admit that the Guarantors are parties to the Guaranty and that the Bank Parties are beneficiaries of the Guaranty.  Bank Parties deny any and all remaining allegations set forth in Paragraph 234 of the Counterclaims not specifically admitted herein.**

235.     Guarantors have performed all duties required of them by the Guaranty.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 235 of the Counterclaims.**

236.     Under the express terms of the Guarantee, Guarantors are liable for payment "only to the extent that the same [payments] are not timely paid by Borrower."  ECF No. 1-3, p. 2.

**ANSWER:**     **In response to Paragraph 236, Bank Parties state that the written Guaranty is the best evidence of its terms and contents, and therefore deny the allegations set forth in Paragraph 236 of the Counterclaims to the extent they may be inconsistent with the terms of the written instrument.  Bank Parties deny any allegation in Paragraph 236 not specifically admitted herein.**

237.     The Bank breached the Guaranty by seeking payment from Guarantors when Borrower 1501 Washington had made all payments in a timely manner.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 237 of the Counterclaims.**

238.     Under the Guarantee, "[i]n the event of an Event of Default which is not cured within any applicable grace or cure period, [the] Bank will have the right to enforce its rights, powers, and remedies, in any order."  ECF No. 1-3, p. 2.

**ANSWER:**     **In response to Paragraph 238, Bank Parties state that the written Guarantee is the best evidence of its terms and contents, and therefore deny the allegations set forth in Paragraph 238 of the Counterclaims to the extent they may be inconsistent with the terms of the written instrument.  Bank Parties deny any allegation in Paragraph 238 not specifically admitted herein.**

239.     No Event of Default has occurred, as defined in the Guaranty.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 239 of the Counterclaims.**

240.     Counterclaim Defendants breached the Guaranty by seeking a court order when no Event of Default existed.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 240 of the Counterclaims.**

241.     Guarantors have been damaged by these breaches because (1) they have had to hire legal counsel to defend them in this matter, and (2) the current litigation has harmed their reputation among hotel management companies they need to contract with.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 241 of the Counterclaims.**

242.     Counterclaim Defendants and DFQ are the parties to the Master Tenant Operating Agreement.

**ANSWER:**     **Bank Parties admit the allegations set forth in Paragraph 242 of the Counterclaims.**

243.     DFQ performed pursuant to the Master Tenant Operating Agreement, including by funding its capital contributions and undertaking the day-to-day and long-term management of the Master Tenant.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 243 of the Counterclaims.**

244.     Counterclaim Defendants breached the Master Tenant Operating Agreement by failing to fund federal HTC equity contributions in a timely manner.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 244 of the Counterclaims.**

245.     Counterclaim Defendants breached the Master Tenant Operating Agreement by failing to consent to low-interest loans needed to replace the Mezzanine loan.

**ANSWER:     Bank Parties deny the allegations set forth in Paragraph 245 of the Counterclaims.**

246.     These delays and failures damaged DFQ by forcing it to extend the duration and size of the 15%-interest Mezzanine loan.

**ANSWER:     Bank Parties deny the allegations set forth in Paragraph 246 of the Counterclaims.**

247.     Guarantors and Developers seek monetary damages to remedy the tremendous financial harm they have suffered because of these breaches.

**ANSWER:     Paragraph 247 of the Counterclaims asserts no allegations as to which a response by Bank Parties is required.  To the extent a response is required, Bank Parties deny each and every allegation set forth in Paragraph 247, and expressly deny that Guarantors and Developers are entitled to any relief whatsoever.**

## COUNT V

248.     Guarantors and Developers reallege and incorporate by reference the allegations contained in Paragraphs 1–247 hereinabove as though set forth in full.

**ANSWER:     As and for their response to Paragraph 248 of Count V, Bank Parties incorporate by reference their answers to Paragraphs 1-247 of the Counterclaims as though fully set forth herein.**

249.     "There is a duty of good faith and fair dealing implied in the performance and enforcement of every contract." *HM Compounding Servs., LLC v. Express Scripts, Inc.*, No. 4:14-CV-1858 JAR, 2017 WL 2118012, at *2 (E.D. Mo. May 16, 2017).

**ANSWER:     Paragraph 249 of the Counterclaims asserts legal conclusions as to which no response is required.  To the extent an answer may be required, Bank Parties deny that the allegations of the Counterclaims assert any claim constituting a breach of any duty of good faith, or upon which relief can be granted.**

250.     "This duty prevents a party from using contract provisions to 'evade the spirit of the transaction' or 'deny [the other party] the expected benefit of the contract.' " *Id.*  (quoting *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 914 (8th Cir. 2007).

**ANSWER:     Paragraph 250 of the Counterclaims asserts legal conclusions as to which no response is required.  To the extent an answer may be required, Bank Parties deny**

**that the allegations of the Counterclaims assert any claim constituting a breach of any duty of good faith, or upon which relief can be granted.**

251.    "Stated differently, the parties to a contract have an implied duty to cooperate to enable performance of the expected benefits of the contract and this duty is an enforceable contract right." *Reliance Bank v. Paramont Properties*, LLC, 425 S.W.3d 202, 206 (Mo. Ct. App. 2014).

**ANSWER:**    **Paragraph 251 of the Counterclaims asserts legal conclusions as to which no response is required.  To the extent an answer may be required, Bank Parties deny that the allegations of the Counterclaims assert any claim constituting a breach of any duty of good faith, or upon which relief can be granted.**

252.    Counterclaim Defendants did not cooperate to enable performance of the expected benefits of the agreements identified above, including the Master Tenant Operating Agreement, Loan Agreement, Guaranty, and Disbursing Agreement, and other agreements incorporated therein.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 252 of the Counterclaims.**

253.    Instead, Counterclaim Defendants used their unique leverage over these contracts—as lenders, equity investors, and owners with veto power—to deliberately harm DFQ, 1501 Washington and Guarantors.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 253 of the Counterclaims.**

254.    Specifically, between October 2019 and January 2020, Counterclaim Defendants refused to fund the Construction Loan and federal HTC equity until 1501 Washington settled meritless arbitration claims brought by Paric.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 254 of the Counterclaims.**

255.    Between November 2019 and early April 2020, Counterclaim Defendant failed to provide consent to a lower interest Bridge Loan that would have saved 1501 Washington from the ongoing harm of the 15% Mezzanine loan.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 255 of the Counterclaims.**

256.    Counterclaim Defendants knew that Guarantors and Developers were in a vulnerable position with the Mezzanine loan, Paric's arbitration, and delayed Construction Loan and federal HTC funding.

**ANSWER:**        **Bank Parties deny the allegations set forth in Paragraph 256 of the Counterclaims**

257.    Counterclaim Defendants created that vulnerable position by delaying funding and supporting Paric's arbitration.

**ANSWER:**        **Bank Parties deny the allegations set forth in Paragraph 257 of the Counterclaims.**

258.    Counterclaim Defendants exploited that vulnerable position by demanding that 1501 Washington settle Paric's claims on terms favorable to Paric, and if 1501 Washington did not settle, the Bank threatened to put the project in default and refuse any future draw requests.

**ANSWER:**        **Bank Parties deny the allegations set forth in Paragraph 258 of the Counterclaims.**

259.    Upon information and belief, Counterclaim Defendants discussed Paric's claims with Paric during the pendency of that arbitration.

**ANSWER:**        **Bank Parties deny the allegations set forth in Paragraph 259 of the Counterclaims.**

260.    Upon information and belief, Counterclaim Defendants discussed with Paric how they could harm Guarantors and Developers and benefit Paric and Counterclaim Defendants.

**ANSWER:**        **Bank Parties deny the allegations set forth in Paragraph 260 of the Counterclaims.**

261.    Counterclaim Defendants sought to deny Guarantors and Investors the expected benefits of the Master Tenant Operating Agreement, Loan Agreement, Guaranty, and Disbursing Agreement unless Guarantors and Investors signed releases for the Counterclaim Defendants.

**ANSWER:**        **Bank Parties deny the allegations set forth in Paragraph 261 of the Counterclaims.**

262.    These actions denied Guarantors and Developers the expected benefits of the Master Tenant Operating Agreement, Loan Agreement, Guaranty, Disbursing Agreement, and other Transaction Agreements, because they required unforeseen extensions of the Mezzanine loan, both in size and duration.

**ANSWER:**        **Bank Parties deny the allegations set forth in Paragraph 262 of the Counterclaims.**

263.    The expected benefits of these agreements—the Master Tenant Operating Agreement, Loan Agreement, Guaranty, Disbursing Agreement—include access to diverse funding sources and

protection from harm that the Counterclaim Defendants can provide for difficult redevelopment projects that generate delays, cost overruns, and other risks for investors.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 263 of the Counterclaims.**

264.    The Bank did not provide the benefit of those funding sources and protection from harm, including during the COVID-19 pandemic.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 264 of the Counterclaims.**

265.    Instead, the Bank denied and delayed funding and intentionally caused Guarantors and Developers harm.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 265 of the Counterclaims.**

## COUNT VI

266.    Guarantors and Developers reallege and incorporate by reference the allegations contained in Paragraphs 1-265 hereinabove as though set forth in full.

**ANSWER:**    **As and for their response to Paragraph 266 of Count VI, Bank Parties incorporate by reference their answers to Paragraphs 1-265 of the Counterclaims as though fully set forth herein.**

267.    Guarantors and Developers are interested parties with respect to the Transaction Agreements, key terms therein, and interpretations of those terms.

**ANSWER:**    **In response to Paragraph 267, Bank parties state that it is unclear what is meant by the term "interested parties," and Bank parties therefore deny the same.  Bank Parties deny any implication that Guarantors or Developers have any legal interest in or rights with respect to agreements to which they are not parties, or that they constitute intended or third beneficiaries thereof.**

268.    Both Guarantors and Developers have a direct interest in whether the maturity date extension was properly exercised, whether the Construction Loan is default, and whether any payment is owed under the Construction Loan.

**ANSWER:**    **Bank Parties admit the allegations set forth in Paragraph 268 of the Counterclaims. However, Bank Parties deny any implication that Guarantors or Developers have any legal interest in or rights with respect to agreements to which they are not parties, or that they constitute intended or third beneficiaries thereof.**

269.    Guarantors and Counterclaim Defendants are the named parties to the Guaranty.

**ANSWER:**     **Bank Parties admit that the Guarantors are parties to the Guaranty and that the Bank Parties are beneficiaries of the Guaranty.  Bank Parties deny any and all remaining allegations set forth in Paragraph 234 of the Counterclaims**

270.   Guarantors have performed all duties required of them by the Guaranty

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 270 of the Counterclaims.**

271.   Under the express terms of the Guarantee, Guarantors are liable for payment "only to the extent that the same [payments] are not timely paid by Borrower." ECF No. 1-3, p. 2.

**ANSWER:**     **In response to Paragraph 271, Bank Parties state that the written Guarantee is the best evidence of its terms and contents, and therefore deny the allegations set forth in Paragraph 271 of the Counterclaims to the extent they may be inconsistent with the terms of the written instrument.  Bank Parties deny any allegation in Paragraph 271 not specifically admitted herein.**

272.   Borrower 1501 Washington had made all payments in a timely manner.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 272 of the Counterclaims.**

273.   Under the Guarantee, "[i]n the event of an Event of Default which is not cured within any applicable grace or cure period, [the] Bank will have the right to enforce its rights, powers and remedies, in any order." ECF No. 1-3, p. 2.

**ANSWER:**     **In response to Paragraph 273, Bank Parties state that the written Guaranty is the best evidence of its terms and contents, and therefore deny the allegations set forth in Paragraph 273 of the Counterclaims to the extent they may be inconsistent with the terms of the written instrument.  Bank Parties deny any allegation in Paragraph 273 not specifically admitted herein.**

274.   No Event of Default has occurred, as defined in the Guaranty.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 274 of the Counterclaims.**

275.   Guarantors and Developers seek a declaration, pursuant to 28 U.S.C.A. § 2201, that:

**ANSWER:**     **Paragraph 275 of the Counterclaims asserts no allegations as to which a response by Bank Parties is required.  To the extent a response is required, Bank Parties deny the same, denies the allegations of Paragraphs 276-278,  and denies that Guarantors or Developers are entitled to any relief whatsoever.**

276.   The loan has not matured.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 276 of the Counterclaims.**

277.   Guarantors and Developers are not in default of the Construction Loan.

**ANSWER:**       **Bank Parties deny the allegations set forth in Paragraph 277 of the Counterclaims.**

278.     No payment is owed under the terms of the Construction Loan and Transaction

Agreements.

**ANSWER:**       **Bank Parties deny the allegations set forth in Paragraph 278 of the Counterclaims.**

## COUNT VII

279.     Guarantors and Developers reallege and incorporate by reference the allegations

contained in Paragraphs 1–278 hereinabove as though set forth in full.

**ANSWER:**       **As and for their response to Paragraph 279 of Count VII, Bank Parties incorporate by reference their answers to Paragraphs 1-278 of the Counterclaims as though fully set forth herein.**

280.     In addition to violating their contracts, Counterclaim Defendants tortiously interfered

with the Construction Contract between Paric and 1501 Washington.

**ANSWER:**       **Bank Parties deny the allegations set forth in Paragraph 280 of the Counterclaims.**

281.     Counterclaim Defendants were intimately familiar with the Construction Contract, based

on their review of the Transaction Documents before closing as well as their ongoing inspection of

Capital Consultants reports.

**ANSWER:**       **Bank Parties admit they were familiar with the Construction Contract.   Bank Parties deny any and all remaining allegations set forth in Paragraph 274 of the Counterclaims not specifically admitted herein.**

282.     Paric breached the Construction Contract when it pursued arbitration of Change Order

10R and 10R2 without providing proper notice.

**ANSWER:**       **Paragraph 282 of the Counterclaims asserts legal contentions and conclusions as to which no response is required.   To the extent that a response is required, Bank Parties deny each and every allegation set forth in Paragraph 282.**

283.     Paric breached the Construction Contract when it drafted and submitted Change Order

10, 10R, and 10R2 knowing that the delays projected in these change orders were overblown compared to

the actual construction schedule.

**ANSWER:** **Paragraph 283 of the Counterclaims asserts legal contentions and conclusions as to which no response is required.  To the extent that a response is required, Bank Parties deny each and every allegation set forth in Paragraph 283.**

284.    Paric breached the Construction Contract when it sought settlement of its arbitration claims based on its prior breaches in drafting, submitting, and arbitrating Change Order 10R.

**ANSWER:** **Paragraph 284 of the Counterclaims asserts legal contentions and conclusions as to which no response is required.  To the extent that a response is required, Bank Parties deny each and every allegation set forth in Paragraph 284.**

285.    Counterclaim Defendants intentionally caused or induced these breaches by failing to provide the Capital Consultants reports to Guarantors and Developers when Paric submitted Change Order 10, 10R, and 10R2.

**ANSWER:** **Bank Parties deny the allegations set forth in Paragraph 285 of the Counterclaims.**

286.    Counterclaim Defendants intentionally caused or induced these breaches by demanding that Guarantors and Developers settle the Paric claims on terms favorable to Paric.

**ANSWER:** **Bank Parties deny the allegations set forth in Paragraph 286 of the Counterclaims.**

287.    Counterclaim Defendants intentionally caused or induced these breaches by threatening to put Guarantors and Developers into default if they did not settle those claims.

**ANSWER:** **Bank Parties deny the allegations set forth in Paragraph 287 of the Counterclaims.**

288.    Upon information and belief, Counterclaim Defendants intentionally caused or induced these breaches by discussing Paric's claims with Paric during the pendency of arbitration and supporting Paric's position in the litigation while encouraging 1501 Washington to settle.

**ANSWER:** **Bank Parties deny the allegations set forth in Paragraph 288 of the Counterclaims.**

289.    Counterclaim Defendants had no justification in demanding settlement because Chicago Title had offered to insure title to the Hotel to enable lien-free completion during arbitration.

**ANSWER:** **Bank Parties deny the allegations set forth in Paragraph 289 of the Counterclaims.**

290.    Counterclaim Defendants had no justification in demanding settlement because they knew that Paric's claimed delays were inconsistent with the Capital Consultants reports.

**ANSWER:** **Bank Parties deny the allegations set forth in Paragraph 290 of the Counterclaims.**

291.    Developers and Guarantors were damaged by these actions because they settled Paric's claims on terms favorable to Paric and released claims that they had against Paric worth more than $1 million.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 291 of the Counterclaims.**

**COUNT VIII**

292.    Guarantors and Developers reallege and incorporate by reference the allegations contained in Paragraphs 1–291 hereinabove as though set forth in full.

**ANSWER:**    **As and for their response to Paragraph 292 of Count VII, Bank Parties incorporate by reference their answers to Paragraphs 1-291 of the Counterclaims as though fully set forth herein.**

293.    "Prima facie tort remains a tort recognized in Missouri as necessary to provide a remedy for tortious conduct that does not fit under any traditional theories." Gary Surdyke Yamaha Inc. v. Donelson, 743 S.W.2d 522, 525 (Mo.Ct.App.1987).

**ANSWER:**    **Paragraph 293 of the Counterclaims asserts legal conclusions as to which no response is required.  To the extent a response may be required, Bank parties deny that the facts alleged in the Counterclaims give rise to any claim for prima facie tort, or that Counterclaimants are entitled to any relief whatsoever.**

294.    As admitted by CDC Executive Director Zach Boyers, Counterclaim Defendants, at Boyers' direction, acted with intent to injure Guarantors personally and through their corporate entities, DFQ and 1501 Washington.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 294 of the Counterclaims.**

295.    At least some of the actions that Counterclaim Defendants took to injure Guarantors was lawful, or at least would have been lawful if they had not been taken with the intent to injure Guarantors.

**ANSWER:**    **In response to Paragraph 295, Bank parties state that, at all times their actions were lawful.  Bank Parties deny any allegation that any action by Bank parties was at any time done with the intent of injuring Guarantors, and deny every allegation set forth in Paragraph 295 of the Counterclaims not specifically admitted herein.**

296.     Counterclaim Defendants had no justification, or insufficient justification, to refuse consent for the Midland States Bank loan.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 296 of the Counterclaims.**

297.     Counterclaim Defendants had no justification, or insufficient justification, to demand settlement of Paric's claims when it knew those claims were meritless, and it knew that lien-free completion could be achieved through title insurance.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 297 of the Counterclaims.**

298.     Counterclaim Defendants had no justification, or insufficient justification, to refuse to modify the Construction Loan during the COVID-19 pandemic, which was allowed by CARES Act § 4013.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 298 of the Counterclaims.**

299.     Counterclaim Defendants had no justification, or insufficient justification, to refuse to extend the maturity date on the Construction Loan, including during the COVID-19 pandemic.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 299 of the Counterclaims.**

300.     In taking these actions and others identified in this complaint, Counterclaim Defendants sought to intentionally harm Guarantors and Developers because of a personal vendetta against Qualizza.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 300 of the Counterclaims.**

301.     Upon information and belief, Counterclaim Defendants treated no other guarantors or co-investors in this manner during the pandemic.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 301 of the Counterclaims. Answering further, Bank Parties state that the circumstances of other borrowers or guarantors are unique to those borrowers or guarantors, and have no relevance to these matters whatsoever.**

302.     Guarantors and Developers were severely injured by these actions, due to extensions to the 15%-interest Mezzanine loan and delays in bringing in the 5% interest Midland States Bank loan.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 302 of the Counterclaims.**

303.     Guarantors and Developers were severely injured by these actions, due to the emotional harm and suffering sustained as Guarantors sought to protect their families and save their businesses during the pandemic.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 303 of the Counterclaims.**

304.     Counterclaim Defendants acted with malice towards Guarantor Mike Qualizza, without justification, seeking to ruin his reputation in the tax credit industry, injure him personally, and make life unbearable for him while he sought to protect his family and save his businesses during the COVID-19 pandemic.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 304 of the Counterclaims.**

### COUNT IX

305.     Guarantors and Developers reallege and incorporate by reference the allegations contained in Paragraphs 1–304 hereinabove as though set forth in full.

**ANSWER:**     **As and for their response to Paragraph 305 of Count IX, Bank Parties incorporate by reference their answers to Paragraphs 1-304 of the Counterclaims as though fully set forth herein.**

306.     At the time of closing, Counterclaim Defendants represented to Guarantors and Developers that state HTC certification could be obtained within one month of submission.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 306 of the Counterclaims.**

307.     At the time when Counterclaim Defendants made that statement, they were aware that the Missouri state HTC certification commonly took 12-18 months.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 307 of the Counterclaims.**

308.     Counterclaim Defendants intended for Guarantors and Developers to execute the closing documents in reliance on representations about the timing of funding generally, including state HTC funding.

**ANSWER:**     **Bank Parties deny the allegations set forth in Paragraph 308 of the Counterclaims.**

309.     Counterclaim Defendants failed to correct their false statements in the months and years following closing.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 309 of the Counterclaims.**

310.    The timeline of state HTC certification is material because Guarantors and Developers based borrowing decisions on expected timing of the state HTC funding.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 310 of the Counterclaims.**

311.    Guarantors and Developers were ignorant of the state HTC timeline because they had not previously obtained or applied for Missouri state HTC funding, and Missouri's state HTC program is the only one of its kind.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 311 of the Counterclaims.**

312.    Guarantors and Developers had a right to rely on this misrepresentation, because they were contracting with the Counterclaim Defendants, who are experts in the field of Missouri's state HTC funding.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 312 of the Counterclaims.**

313.    In reliance on this misrepresentation, Guarantors and Developers obtained, and increased the size of a 15% Mezzanine loan that they thought would provide only a short-term lending solution.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 313 of the Counterclaims.**

314.    If Guarantors and Developers had known that state HTC certification would take 12-18 months, they would have promptly searched for lower interest loans as soon as they understood that truth.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 314 of the Counterclaims.**

315.    Guarantors and Developers were injured by the interest that accumulated on the 15% Mezzanine loan while they waited for state HTC funding.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 315 of the Counterclaims.**

**COUNT X**

316.    Guarantors and Developers reallege and incorporate by reference the allegations contained in Paragraphs 1–315 hereinabove as though set forth in full.

**ANSWER:**    **As and for their response to Paragraph 316 of Count X, Bank Parties incorporate by reference their answers to Paragraphs 1-315 of the Counterclaims as though fully set forth herein.**

317.    In the fall of 2019, Counterclaim Defendants, through their agent and employee Ruth Sparrow, represented to Guarantors, Developers, and independent accountant Cohn Reznick that state HTC certification could be obtained within one month of submission.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 317 of the Counterclaims.**

318.    Based in part on Ruth Sparrow's representation as well as other representations of the Bank and CDC, Cohn Reznick prepared an Independent Accountant's Report with month-by-month financial projects and cash flows for the Transaction (the Projections").

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 318 of the Counterclaims.**

319.    Based on Ruth Sparrow's representation, the Projections showed that the Bank would contribute the state HTC funding in the amount of $10,297,271 in May of 2019, one month after receiving state certification, and two months after the original completion date of March 2019.

**ANSWER:**    **Bank Parties admit that the Projections showed that U.S. Bank would purchase the Missouri HTCs for $10,297,271 in May of 2019 based on a projected completion date for the Hotel in February, 2019.  Bank Parties deny any and all remaining allegations set forth in Paragraph 319 of the Counterclaims not specifically admitted herein.**

320.    By executing the Transaction Agreements, the Bank and CDC represented that the funding schedule identified in the Projections was an accurate and true representation of when state HTC funds could be received.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 320 of the Counterclaims.**

321.    The Bank and CDC failed to correct Ruth Sparrows' false representation concerning state HTC timing, as reflected in the May 2019 state HTC funding date.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 321 of the Counterclaims.**

322.    At the time when the Counterclaim Defendants made the representations identified in Paragraphs 317-321, Counterclaim Defendants and their employee Ruth Sparrow knew that Missouri's state HTC certification commonly took 12-18 months.

**ANSWER:**      **Bank Parties deny the allegations set forth in Paragraph 322 of the Counterclaims, and restate and incorporate by reference their responses to Paragraphs 317-321 as if fully set forth herein.**

323.     Counterclaim Defendants intended for Guarantors and Developers to execute the closing documents, including the Guarantee, in reliance on representations about the timing of funding generally, including state HTC funding.

**ANSWER:**      **Bank Parties deny the allegations set forth in Paragraph 323 of the Counterclaims.**

324.     Counterclaim Defendants failed to correct their false statements in the months and years following closing.

**ANSWER:**      **Bank Parties deny the allegations set forth in Paragraph 324 of the Counterclaims.**

325.     The timeline of state HTC certification is material because Guarantors and Developers based borrowing decisions on expected timing of the state HTC funding.

**ANSWER:**      **Bank Parties deny the allegations set forth in Paragraph 325 of the Counterclaims.**

326.     Guarantors and Developers were ignorant of the state HTC timeline because they had not previously obtained or applied for Missouri's state HTC funding, and Missouri's state HTC program is the only one of its kind.

**ANSWER:**      **Bank Parties deny the allegations set forth in Paragraph 326 of the Counterclaims.**

327.     Guarantors and Developers had a right to rely on this misrepresentation, because they were contracting with Counterclaim Defendants, who are experts in the field of Missouri's state HTC funding.

**ANSWER:**      **Bank Parties deny the allegations set forth in Paragraph 327 of the Counterclaims.**

328.     In reliance on this misrepresentation, Guarantors and Developers obtained, and increased the size of a 15% Mezzanine loan that they thought would provide only a short-term lending solution.

**ANSWER:**      **Bank Parties deny the allegations set forth in Paragraph 328 of the Counterclaims.**

329.     If Guarantors and Developers had known that state HTC certification would take 12-18 months, they would have promptly searched for lower interest loans as soon as they understood that truth.

**ANSWER:**      **Bank Parties deny the allegations set forth in Paragraph 329 of the Counterclaims.**

330.    Guarantors and Developers were injured by the interest that accumulated on the 15% Mezzanine loan while they waited for state HTC funding.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 330 of the Counterclaims.**

331.    If Guarantors had known that state HTC certification would take 12-18 months, they would have not signed the Guarantee.

**ANSWER:**    **Bank Parties deny the allegations set forth in Paragraph 331 of the Counterclaims.**

332.    As a remedy to the Counterclaim Defendants' negligent representation, Guarantors seek a court order rescinding the Guarantee.

**ANSWER:**    **Paragraph 332 of the Counterclaims asserts no allegations as to which a response by Bank Parties is required.  To the extent a response is required, Bank Parties deny the same, and deny that Guarantors are entitled to any relief whatsoever.**

## FIRST DEFENSE

Answering further, and by way of defense, Bank Parties state that the Counterclaims fail to state any claim upon which relief may be granted.

## SECOND DEFENSE

Answering further, and by way of defense, Bank Parties state any claims related to Counterclaimants' disputes with Paric are barred by the doctrines of arbitration and award, collateral estoppel, and compromise and settlement by virtue of Counterclaimants' voluntary decisions to settle those claims.

## THIRD DEFENSE

Answering further, and by way of defense, Bank Parties state that any claims related to alleged misrepresentations by Bank Parties, which Bank Parties expressly deny, are barred by laches and estoppel due to Counterclaimants' unreasonable delay in asserting such claims.

## FOURTH DEFENSE

Answering further, and by way of defense, Bank Parties state that Counterclaimants were not entitled to rely on any alleged misrepresentations alleged in the Counterclaims, which misrepresentations Bank Parties deny, and that such alleged reliance was unreasonable under the circumstances.

## FIFTH DEFENSE

Answering further, and by way of defense, Bank Parties state that any losses allegedly sustained by Counterclaimants, which Bank Parties deny, were caused in whole or in part by Counterclaimants' own actions.

## SIXTH DEFENSE

Answering further, and by of defense, Bank Parties state that any claims based on alleged misrepresentations by Bank parties, which Bank Parties expressly deny, are barred by the doctrine of ratification as Counterclaimants elected to accept the benefits of the transaction in question.

## SEVENTH DEFENSE

Answering further, and by way of defense, any claims based on alleged promises or representations not set forth in the written agreements of the parties are barred by the parol evidence rule and by the applicable statues of fraud.

## EIGHTH DEFENSE

Answering further, and by way of defense, Bank parties state that Bank Parties have fully performed all of their duties and obligations pursuant to the terms of the documents and agreements governing the transactions at issue.

## NINTH DEFENSE

Answering further, and by way of defense, Bank Parties state that any claims for damages based on any theory other than breach of contract, are barred by the economic loss doctrine.

## TENTH DEFENSE

Answering further, and by way of defense, Bank Parties state that at all times Bank Parties' actions were justified and privileged in protection of Bank Parties' economic interests.

## ELEVENTH DEFENSE

Answering further, and by way of defense, Bank parties state that in a letter agreement dated January 3, 2020, 1501 Washington, for itself, its officers, directors, shareholders, employees, affiliates, representatives, agents, successors, assigns, sureties and insurers, fully released, discharged, and exonerated U.S. Bank National Association, USBCDE SUB-CDE 162, LLC and Last Hotel Master Tenant LLC, and their respective officers, directors, shareholders, employees, affiliates, representatives, agents, successors, assigns, sureties and insurers (collectively, "Indemnified Parties") of and from any and all claims, demands, causes of action and/or suit of any nature or kind which it (or any of its officers, directors, shareholders, employees, affiliates, representatives, agents, successors, assigns, sureties and insurers) against the Indemnified Parties, in return for U.S. Bank funding the final disbursement under the Construction Loan Agreement.  As a result, the Counterclaims have been waived and released by Counterclaimants.

## TWELFTH DEFENSE

Answering further, and by way of defense, Bank Parties state that they were not responsible for the assumptions underlying the financial projections prepared by CohnReznick LLP or the timing of any portion of the financing for the Hotel project.  The financial projections prepared by CohnReznick LLP relied on assumptions provided by Counterclaimants (rather than Bank Parties) and cautioned all parties that "there will usually be differences between projected and actual results because events and circumstances frequently do not occur as expected and those differences may be material."

## THIRTEENTH DEFENSE

Answering further, and by way of defense, Bank Parties state that Counterclaimants failed to satisfy all of the requirements and conditions necessary to obtain USBCDC's final capital contribution installment under the Master Tenant Operating Agreement.

## FOURTEENTH DEFENSE

Answering further, and by way of defense, Bank Parties state that Counterclaimants have failed to take reasonable steps to mitigate their damages that have been occasioned by parties other than Bank Parties.

## FIFTEENTH DEFENSE

Answering further, and by way of defense, Bank Parties state that that Count I fails to state any claim because "civil conspiracy" is not a recognized separate and independent cause of action upon which relief may be granted.

## SIXTEENTH DEFENSE

Answering further, and by way of defense, Bank Parties state that Count V fails to state a claim for relief because "breach of the duty of good faith" is not a recognized separate, independent cause of action upon which relief may be granted.

## SEVENTEENTH DEFENSE

Answering further, and by way of defense, Bank parties state that to the extent Counterclaimants seek recission of any of the agreement to which they are a party, they are not entitled to such relief as they have failed to return the benefits of the transaction which they received.

## EIGHTEENTH DEFENSE

Answering further, and by way of defense, Bank Parties state that Counterclaimants are not entitled to a jury trial on any of the claims asserted in the Counterclaims by reason of voluntary jury trial waivers set forth in the applicable transaction documents, including the Construction Loan Agreement (Section 9.5); Promissory Note (Section 8); and Guaranties (Section 24).

## NINETEENTH DEFENSE

Answering further, and by way of defense, Bank Parties state that any claims against Bank Parties based on allegations that Counterclaimants relied on advice from Bank Parties was specifically disavowed and barred by the applicable transaction documents, including the Construction Loan Agreement (Section

9.19) in which the parties acknowledged that the borrowers had conducted their own investigation, and were not relying on advice from Bank Parties.

## TWENTIETH DEFENSE

Answering further, and by way of defense, Bank Parties state that all claims for indirect, consequential or punitive damages by Counterclaimants are barred by the applicable transaction documents, including the Construction Loan Agreement (Section 9.19).

WHEREFORE, having fully answered the allegations of the Counterclaims, and set forth their defenses thereto, U.S. Bank National Association and U.S. Bancorp Community Development Corporation respectfully pray the Counterclaims be dismissed with prejudice, that they be awarded their cost and expenses incurred herein, including attorney's fees, and for such other and further relief as the Court deems just and proper.

By   */s/ Mike W. Bartolacci*
Mike W. Bartolacci, #35441MO
Mark V. Bossi, #37008MO
One U.S. Bank Plaza
St. Louis, Missouri 63101
(314) 552-6000 (Phone)
(314) 552-7000 (Fax)

Attorneys for U.S. Bank National Association and
U.S. Bancorp Community Development Corporation

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2021, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system to all counsel of record.

*/s/ Mike W. Bartolacci*