# EXHIBIT E

_____

**LAST HOTEL MASTER TENANT LLC,**
**A MISSOURI LIMITED LIABILITY COMPANY**

**OPERATING AGREEMENT**

_____

**DATED AS OF DECEMBER 29, 2017**

#8370189 Operating Agreement
Last Hotel Master Tenant LLC

Project No. 24586

Confidential

USBCDC00048375

## Table of Contents

Page

ARTICLE I. FORMATION & RELATED MATTERS ............................................................2

    1.01   Continuation..........................................................................................2
    1.02   Name....................................................................................................2
    1.03   Principal Executive Offices; Agent for Service of Process ......................2
    1.04   Term....................................................................................................2
    1.05   Recording of Articles...........................................................................2
    1.06   Title to the Property.............................................................................2
    1.07   Admission of Members.........................................................................2

ARTICLE II. DEFINED TERMS.........................................................................................3

ARTICLE III. PURPOSE AND BUSINESS OF THE Company .............................................19

    3.01   Purpose of the Company .....................................................................19
    3.02   Authority of the Company ...................................................................19
    3.03   Separate New Markets Tax Credits Investment......................................20
    3.04   Project Loans ....................................................................................20

ARTICLE IV. REPRESENTATIONS, WARRANTIES AND COVENANTS; DUTIES AND
OBLIGATIONS.............................................................................................................21

    4.01   Representations, Warranties and Covenants Relating to the Property and the
          Company ...........................................................................................21
    4.02   Duties and Obligations Relating to the Property and the LLC ................26

ARTICLE V. MEMBERS, Company INTERESTS AND CAPITAL ........................................31

    5.01   Members, Managing Member, Capital Contributions and LLC Interests ...........31
    5.02   Return of Capital Contributions...........................................................36
    5.03   Downward Adjustments to Investor Member Capital Contributions .................37
    5.04   Withholding of Capital Contribution Upon Default ...............................38
    5.05   Member Loans ...................................................................................38

ARTICLE VI. CHANGES IN MANAGING MEMBER..........................................................40

    6.01   Resignation of a Managing Member......................................................40
    6.02   Admission and Appointment of a Successor or Additional Managing Member ...40
    6.03   Effect of Bankruptcy, Death, Withdrawal, Dissolution or Incompetence of a
          Managing Member..............................................................................41

ARTICLE VII. ASSIGNMENT TO THE Company................................................................43

ARTICLE VIII. RIGHTS, OBLIGATIONS AND POWERS OF THE MANAGING MEMBER44

    8.01   Management of the Company ...............................................................44
    8.02   Limitations Upon the Authority of the Managing Member......................44
    8.03   Management Purposes ........................................................................47
    8.04   Delegation of Authority ......................................................................47
    8.05   Developer Entity Dealings with the Company ........................................48
    8.06   Other Activities .................................................................................48

Confidential

8.07    Liability for Acts and Omissions .................................................48
8.08    LLC Taxable as Partnership.........................................................50
8.09    Net Interim Income ....................................................................51
8.10    Withholding of Fee Payments .....................................................51
8.11    Removal of the Managing Member ..............................................51
8.12    Reserves ....................................................................................54
8.13    Loans to the Company ...............................................................54
8.14    Property Management ................................................................54
8.15    Termination of Property Management Agreement .......................55

ARTICLE IX. TRANSFERS OF, AND RESTRICTIONS ON TRANSFERS OF INTERESTS
OF INVESTOR MEMBER ...............................................................................57

9.01    Purchase for Investment .............................................................57
9.02    Restrictions on Transfer of Investor Member's Interest ................57
9.03    Admission of Substitute Investor Member ...................................58
9.04    Rights of Assignee of LLC Interest .............................................59

ARTICLE X. RIGHTS AND OBLIGATIONS OF INVESTOR MEMBER ..............................60

10.01   Management of the Company .....................................................60
10.02   Limitation on Liability of Investor Member ..................................60
10.03   Other Activities .........................................................................60

ARTICLE XI. Profits, Losses, DISTRIBUTIONS..............................................................61

11.01   Allocation of Profits, Losses, Credits and Cash Distributions............61
11.02   Determination of Profits or Losses .............................................62
11.03   Allocation of Profits or Losses from a Capital Transaction ............62
11.04   Distribution of Proceeds from a Capital Transaction ...................63
11.05   Capital Accounts.......................................................................64
11.06   Authority of Managing Member to Vary Allocations to Preserve and Protect
        Members' Intent ........................................................................64
11.07   Designation of Tax Matters Member ..........................................65
11.08   Authority of Tax Matters Member...............................................66
11.09   Expenses of Tax Matters Member ..............................................67
11.10   Special Allocations ...................................................................68

ARTICLE XII. SALE, DISSOLUTION AND LIQUIDATION.................................................69

12.01   Dissolution of the Company .......................................................69
12.02   Winding Up and Distribution......................................................70

ARTICLE XIII. BOOKS AND RECORDS, ACCOUNTING TAX ELECTIONS, ETC. ...........71

13.01   Books and Records; Accounting Method .....................................71
13.02   Bank Accounts ..........................................................................71
13.03   Accountants ..............................................................................71
13.04   Reports to Members ..................................................................72
13.05   Section 754 Elections ................................................................76
13.06   LLC Fiscal Year .........................................................................76
13.07   Investor Member Inspection ......................................................76

13.08    Communications ........................................................................................76

ARTICLE XIV. AMENDMENTS, CONSENTS AND APPROVALS ......................................78

14.01    Proposal and Adoption of Amendments ...............................................78
14.02    Method of Giving Consent ....................................................................78
14.03    Submissions to Investor Member...........................................................78

ARTICLE XV. OPTION CONCERNING INVESTOR MEMBER ...........................................79

15.01    Option 79

ARTICLE XVI. GENERAL PROVISIONS ........................................................................81

16.01    Burden and Benefit ................................................................................81
16.02    Applicable Law ......................................................................................81
16.03    Counterparts ...........................................................................................81
16.04    Separability of Provisions ......................................................................81
16.05    Entire Agreement ...................................................................................81
16.06    Liability of the Investor Member ..........................................................81
16.07    Notices ...................................................................................................81
16.08    Legal Fees ..............................................................................................82
***16.09***    ***RIGHTS AND REMEDIES*** ..................................................................82
16.10    Compliance with Safe Harbor ...............................................................83
16.11    Survival of Obligations .........................................................................83
16.12    Environmental Protection ......................................................................84
16.13    Amendment and Restatement ..............................**Error! Bookmark not defined.**

### List of Schedules

A      Members, Capital Contributions and Company Interests
B      Referenced Information

### List of Exhibits

A      Payment Notice
B      Contribution Certificate
C      Projections
D      Architect's Certificate
E      Disclosure of Change Order Certification
F      Form of Amendment
G      Form of Preliminary Cost Certification
H      Form of Annual Investor Member Report
I      Form of Syndication Assignment and Assumption Agreement
J      Form of Syndication Operating Agreement Amendment
K      Form of Working Capital Reserve Withdrawal Request

# LAST HOTEL MASTER TENANT LLC

## OPERATING AGREEMENT

This Operating Agreement (the "Agreement") is made and entered into as of December 29, 2017 by and between DFQ Management LLC, a Delaware limited liability company (the "Managing Member"), and U.S. Bancorp Community Development Corporation, a Minnesota corporation ("USBCDC").

## RECITALS

WHEREAS, Last Hotel Master Tenant LLC (the "Company" or "Master Tenant") was formed in accordance with the Act (as hereinafter defined) as more particularly described in Article I herein;

WHEREAS, 1501 Washington St. Louis, LLC, a Delaware limited liability company (together with any successor thereto, "Master Landlord"), owns the building commonly known as the International Shoe building located at 1501 Washington Avenue, St. Louis, Missouri (the "Building"), and the land upon which the Building is located (the "Land" and, together with the Building, other improvements on the Land and rights appurtenant thereto, the "Property");

WHEREAS, Master Landlord is rehabilitating the Building into a boutique hotel project that will qualify for Federal Historic Tax Credits, State Historic Tax Credits and New Markets Tax Credits (each as hereinafter defined) (the "Project");

WHEREAS, the Company and Master Landlord have entered into the Master Lease (as hereinafter defined) pursuant to which Master Landlord will elect under Section 50(d) of the Internal Revenue Code to pass-through to the Company the Federal Historic Tax Credits to which Master Landlord is otherwise entitled as a result of the rehabilitation of the Building;

WHEREAS, Master Landlord has obtained financing for the Project as more particularly described in Article III herein; and

WHEREAS, the parties hereto desire to enter into this Agreement to (i) admit USBCDC as the Investor Member (as hereinafter defined) of the Company; (ii) admit and appoint DFQ Management LLC, a Delaware limited liability company, as the Managing Member of the Company; (iii) assign Interests (as hereinafter defined) in the Company; (iv) provide for the contribution of capital to the Company by the Managing Member and the Investor Member; and (v) set forth all of the provisions governing the Company.

NOW, THEREFORE, in consideration of the foregoing, of mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereby agree to continue the Company pursuant to the Act, as set forth in this Agreement, which reads in its entirety as follows:

#8370189 Operating Agreement
Last Hotel Master Tenant LLC

Project No. 24586

Confidential

USBCDC00048379

## ARTICLE I.
## FORMATION & RELATED MATTERS

1.01    <u>Formation</u>.  Last Hotel Master Tenant LLC was formed in accordance with the Act as more particularly described in Schedule B.  The Managing Member and the Investor Member, constituting all of the Members (as hereinafter defined) of the Company, hereby enter into this Agreement to govern the Company and continue the Company under the Act (as hereinafter defined). The Managing Member has filed, or shall cause to be filed with the Office of the Secretary of State of the Formation State (as hereinafter defined), any amendments to the Articles as may be required under the Act.

1.02    <u>Name</u>.  The name of the Company is "Last Hotel Master Tenant LLC".

1.03    <u>Principal Executive Offices; Agent for Service of Process</u>.  The principal office of the Company is set forth on Schedule B.  The Company may change the location of its principal executive office to such other place or places as may hereafter be determined by the Managing Member.  The Managing Member shall promptly notify all other Members of any change in the principal office.  The Company may maintain such other offices at such other place or places as the Managing Member may from time to time deem advisable.

The name and address of the Agent for service of process is set forth on Schedule B.

1.04    <u>Term</u>.  The term of the Company commenced upon the filing of the Articles (as defined below) and shall continue until Company is dissolved by law or in accordance with the provisions of this Agreement.

1.05    <u>Filings</u>.  The Managing Member shall take all necessary action required by law to perfect and maintain the Company as a limited liability company under the laws of the Formation State and shall register the Company under any assumed or fictitious name statute or similar law in force and effect in the State or the Formation State, as required.

1.06    <u>Title to the Property</u>.  Legal leasehold title to the Property shall be in the name of the Company, and no Member, individually, shall have any ownership of such leasehold interest in and to the Property.

1.07    <u>Admission of Members</u>.

(a)    As of the Admission Date, the Investor Member is hereby admitted as the sole investor member. As of the Admission Date, the Managing Member is hereby admitted as the Managing Member.

(b)    As of the Admission Date, the Investor Member represents that it has not acquired its interest in the Company with the intent of abandoning the interest after the completion the Rehabilitation.

- 2 -

## ARTICLE II.
## DEFINED TERMS

In addition to the defined terms set forth in the Recitals to this Agreement, the following defined terms used in this Agreement shall have the meanings specified below:

"50(d) Income" means income included by the Investor Member with regard to the Project as the "ultimate credit claimant" within the meaning of Treasury Regulation Section 1.50-1T(b)(3)(ii), including any successor or replacement Treasury Regulations.

"Accountants" means the Accountants identified in Schedule B or such other firm of independent certified public accountants as may be engaged by the Managing Member with the Consent of the Investor Member.

"Act" has the meaning set forth in Schedule B.

"Actual Federal Historic Tax Credits" means, for a particular year or in the aggregate, as the context may require, the total amount of Federal Historic Tax Credits properly passed through to the Company by Master Landlord and properly allocable to the Investor Member under the terms of this Agreement as reflected in the Final Cost Certification and the Company's tax returns (including Schedule K-1), as applicable as subsequently adjusted, if applicable, as otherwise provided for herein. Such amount shall not include Federal Historic Tax Credits generated in connection with the QREs incurred after the Cut-Off Date.

"Adjusted Capital Account Deficit" has the meaning set forth in Section 11.10(d).

"Admission Date" means the date upon which this Agreement is executed and delivered by all Members.

"Affiliate" means, with respect to a specified Person, (i) any Person directly or indirectly controlling, controlled by or under common control with the Person specified, (ii) any Person owning or controlling 10% or more of the outstanding voting securities or beneficial interests of the Person specified, (iii) any officer, director, partner, trustee or member of the immediate family of the Person specified, (iv) if the Person specified is an officer, director, general partner, manager, managing member or trustee, any corporation, partnership or trust for which that Person acts in that capacity or (v) any Person who is an officer, director, general partner, manager, managing member, trustee or holder of 10% or more of outstanding voting securities or beneficial interests of any Person described in clauses (i) through (iv).  The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding the foregoing, Investor Member shall not be deemed an Affiliate of any Developer Entity and vice-versa.

"Affiliate Transferee" has the meaning set forth in Section 9.02(a).

"After-Tax Basis" means, with respect to any payment to be received by the Investor Member, the amount of such payment supplemented by a further payment or payments so that,

- 3 -

Confidential

after deducting from such payments the amount of all taxes imposed on the Investor Member by any governmental authority or other taxing authority with respect to such payments, the balance of such payments shall be equal to the original payment to be received. For the purposes of this definition, and for purposes of any payment to be made to the Investor Member on an After-Tax Basis, it shall be assumed that taxes are payable by the Investor Member at the Applicable Tax Rate.

"Aggregate Expected Capital Contribution" has the meaning set forth in Section 5.01(c).

"Agreement" means this Operating Agreement, as amended from time to time.

"Allocated Company Income" means in any Company Fiscal Year, the amount of taxable income and/or taxable gain that is recognized by an Investor Member on account of its interest in the Company, whether on the Company's tax return, or after audit by the IRS (or, if applicable, any state or local taxing authority).

"Anticipated Second Installment Date" has the meaning set forth in Section 5.01(c)(ii).

"Applicable Laws" means any provision of any federal, state, municipal or local laws, ordinances, rules, regulations, requirements, including without limitation Environmental Laws, or any order, judgment, decree, determination, or award of any court binding on the Company or any Developer Entity, or their assets including the Property. For avoidance of doubt, any provision in this Agreement requiring compliance with "Applicable Laws" shall not be deemed to have been violated by an IRS challenge to the income tax treatment and tax structure of the Investor Member's membership interest in the Company.

"Applicable Securities Laws" has the meaning set forth in Section 4.01(l).

"Applicable Tax Rate" means the combined effective federal, state, and local income tax rate of a taxpayer applicable in any given Company Fiscal Year assuming in each case the maximum tax rate applicable to the taxpayer without regard to actual taxable income.

"Architect" shall have the meaning set forth in the Master Lease.

"Architect's Certificate" means the certificate executed by the Architect in the form attached hereto as Exhibit D.

"Articles" means the Articles of Organization of the Company, or any articles of organization or any other instrument or document which is required under the laws of the Formation State to perfect or maintain the Company as a limited liability company under the laws of the Formation State, to effect the admission, withdrawal or substitution of any Member of the Company, or to protect the limited liability of the Investor Member under the laws of the Formation State.

"Bad Acts" means gross negligence, willful misconduct, malfeasance, fraud or any breach of fiduciary duty by the Managing Member or any other Developer Entity.

Confidential

"Bankruptcy" or "Bankrupt" as to any Person means the filing of a petition for relief as to any such Person as debtor or bankrupt under the Bankruptcy Code of 1978, as amended, or like provision of law (except if such petition is contested by such Person and has been dismissed within sixty (60) days); insolvency of such Person as finally determined by a court proceeding; filing by such Person of a petition or application to accomplish the same or for the appointment of a receiver or a trustee for such Person or a substantial part of its assets; commencement of any proceedings relating to such Person under any other reorganization, arrangement, insolvency, adjustment of debt or liquidation law of any jurisdiction, whether now in existence or hereinafter in effect, either by such Person or by another, provided that if such proceeding is commenced by another, such Person indicates its approval of such proceeding, consents thereto or acquiesces therein, or such proceeding is contested by such Person and has not been finally dismissed within sixty (60) days.

"Bankruptcy Code" has the meaning set forth in Section 6.03(f).

"Budget" has the meaning set forth in Section 13.04(d).

"Building" has the meaning set forth in the Recitals.

"Business Day" has the meaning set forth in Schedule B.

"Capital Account" means the capital account of a Member as described in Section 11.05.

"Capital Contribution" means with respect to any Member the total amount of money or the fair market value of other property (net of liabilities thereon) contributed or agreed to be contributed, as the context requires, to the Company by such Member pursuant to the terms of this Agreement.  Any reference to the Capital Contribution of a Member shall include the Capital Contribution made by a predecessor holder of the Interest of such Member.

"Capital Transaction" means (i) a sale, assignment, or other disposition of Company assets other than in the ordinary course of its business; (ii) a contribution, borrowing or refinancing; (iii) a casualty (where the proceeds are not to be used for reconstruction), condemnation or similar event of any part of the Leasehold Interest; (iv) the termination of the Master Lease prior to the expiration of its term; (v) a title defect giving rise to payments to the Company under the Title Policy; (vi) any of the foregoing that occurs in connection with Master Landlord but only to the extent of the Company's share, if any, of any distributions, fees, loan repayments, or other amounts arising therefrom, or (vii) any other transaction generating cash proceeds to the Company that are not includable in determining Net Cash Flow.

"CDE" shall have the meaning set forth in the Master Lease.

"CDEs" shall have the meaning set forth in the Master Lease.

"CDE Loan" shall have the meaning set forth in the Master Lease.

"CDE Loan Documents" shall have the meaning set forth in the Master Lease.

Confidential

USBCDC00048383

"Certification Application" means for the Property, the Part 1 and Part 2 Historic Preservation Certification Applications, and any amendments thereto, provided for in Title 36 of the Code of Federal Regulations, Part 67.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provision or provisions of prior or succeeding law.

"Commercial Sublease" shall have the meaning set forth in the Master Lease.

"Company" has the meaning set forth in the Recitals.

"Company Fiscal Year" means the fiscal and tax year of the Investor Member as provided in Section 13.06.

"Consent" means the prior unanimous written consent or approval of each Member representing 100% of the Investor Member Interest, and/or any other Member, as the context may require, to do the act or thing for which the consent or approval is solicited, which consent or approval may not be unreasonably withheld, conditioned or delayed.

"Construction Consultant" has the meaning set forth in Schedule B.

"Construction Contract" shall have the meaning set forth in the Master Lease.

"Contractor" shall have the meaning set forth in the Master Lease.

"Contribution Certificate" means the certificate in the form attached hereto as Exhibit B, updated to reflect the status of events described therein and signed by the Managing Member and such other parties as may be required by the Investor Member.

"Contribution Per Credit" means $1.15; provided that if the entire Building is not Placed in Service on or prior to April 30, 2019, then the Contribution Per Credit for the portions of the Project not Placed in Service on or prior to April 30, 2019 shall be reduced by $0.05 on May 1, 2019 and shall be further reduced $0.02 on August 1, 2019.  The Contribution Per Credit for Federal Historic Tax Credits claimable by the Investor Member in connection with the Rehabilitation after the Cut-Off Date shall be $0.

"Controlling Interest" means the power to direct the management of any Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"Counsel" or "Counsel for the Company" means such attorneys or law firm or firms upon which the Investor Member and the Managing Member shall agree, except that if any section of this Agreement either (i) designates particular counsel for the purpose described therein, or (ii) provides that counsel for the purpose described therein shall be chosen by another method or by another Person, then such designation or provision shall prevail over this general definition.

"Credit Adjustment" has the meaning set forth in Section 5.03(a).

"Credit Determination" has the meaning set forth in Section 5.03(a).

- 6 -

"Credit Recovery Loan" means a constructive interest-bearing advance by the Investor Member, as more fully described in Section 5.03(d). Credit Recovery Loans and interest thereon shall not be treated as loans or interest, respectively, for accounting, tax or liability purposes but rather as a method of calculating required distributions. For the purposes of Article XI, the term "Credit Recovery Loan" shall not include any portion of such an advance which shall have theretofore been repaid to the Investor Member.

"Critical Event" has the meaning set forth in Section 8.07.

"Cut-Off Date" has the meaning set forth in Schedule B.

"Debt Service" means all payments of principal, interest, or other charges or any combination thereof, due on any loan the payment of which is not provided for in Section 11.01(a).

"Debt Service Coverage Ratio" means the ratio, as of any date as calculated by Investor Member in its reasonable discretion, of (a) Net Operating Income to (b) Master Landlord Debt Service.

"Depreciation" means, for each Company Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Company Fiscal Year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Company Fiscal Year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Company Fiscal Year or other period bears to such beginning adjusted tax basis and further, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Company Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Managing Member.

"Designated Prime Rate" means the prime commercial rate of interest as published from time to time in The Wall Street Journal, or such other source as the parties may agree, adjusted as such rate adjusts.

"Developer" shall have the meaning set forth in the Master Lease.

"Developer Entity" shall have the meaning set forth in the Master Lease.

"Development Agreement" shall have the meaning set forth in the Master Lease.

"Development Fee" shall have the meaning set forth in the Master Lease.

"Direct Lender" shall have the meaning set forth in the Master Lease.

"Direct Loan" shall have the meaning set forth in the Master Lease.

"Direct Loan Documents" shall have the meaning set forth in the Master Lease.

- 7 -

"Disbursing Agreement" shall have the meaning set forth in the Master Lease.

"Election" shall have the meaning set forth in the Master Lease.

"Environmental Laws" shall have the meaning set forth in the Master Lease.

"Environmental Reports" shall have the meaning set forth in the Master Lease.

"Excluded Event" means (a) any direct or indirect sale, transfer, conversion or other disposition or deemed disposition of the Interests of Investor Member in the Company, or any direct or indirect interest therein, or redemption or repurchase of any such direct or indirect interest, (b) any challenge by the IRS of all or a portion of the transactional structure of the Partnership including without limitation (i) the failure of the Election to pass through to the Company the Federal Historic Tax Credits unless such failure is the result of a Manager Breach, or (ii) a Final Determination that any of the transactions or the Interests contemplated by this Agreement lack economic substance or a valid business purpose or are properly recharacterized for federal income tax purposes, and, as a result of any of the foregoing set forth in this clause (ii), all or any portion of such transactions or the Interests are disregarded or recharacterized for federal income tax purposes, unless such Final Determination is the result of a Manager Breach, or (c) any change in the Code or any U.S. Department of the Treasury regulations, or any issuance of binding guidance by the U.S. Department of Treasury or the IRS after the Admission Date.

"F&B Lessee" means Last Hotel F&B LLC, a Missouri limited liability company.

"F&B Sublease" shall have the meaning set forth in the Master Lease.

"Federal Historic Tax Credits" shall have the meaning set forth in the Master Lease.

"FF&E" shall have the meaning set forth in Section 5.01.

"Final Closing" means the date upon which the Company and the Investor Member have received from Master Landlord evidence of each of the following:  (i) Placement in Service; (ii) Final Completion; and (iii) receipt of any required final approvals by the Lenders as prerequisites to the disbursement of any remaining Project Loan proceeds except for reserves pursuant to the Projections.

"Final Completion" means lien-free construction completion of the Rehabilitation with no outstanding punch list items, and receipt of each of the following: (i) the Application and Certificate for Payment (AIA G702) covering 100% of the contract sum, certified by the Architect; (ii) General Contractor's Affidavit of Payment and Debts and Claims (AIA G706); (iii) General Contractor's Affidavit of Release of Liens (AIA G706A); (iv) final unconditional lien waivers; and (v) as-built drawings for the Property.

"Final Cost Certification" shall have the meaning set forth in the Master Lease.

- 8 -

Confidential

"Final Determination" means the earliest to occur of (i) the date on which a decision, judgment, decree or other order has been issued by any court of competent jurisdiction, which decision, judgment, decree or other order has become final (*i.e.*, all allowable appeals requested by the parties to the action have been exhausted or the deadline for filing any appeal has passed), (ii) the date on which the IRS (or, if applicable, any state or local taxing authority) has entered into a binding agreement with the Company with respect to such issue or on which the IRS (or such state or local taxing authority) has reached a final administrative or judicial determination with respect to such issue which, whether by law or agreement, is not subject to appeal, (iii) the date on which the time for instituting a claim for refund has expired, or if a claim was filed the time for instituting suit with respect thereto has expired with no such suit having been filed, or (iv) the date on which the applicable statute of limitations for raising an issue regarding a federal (or, if applicable, a state or local) income tax matter with respect to the Company has expired with such issue not having been raised.

"First Installment" has the meaning set forth in Section 5.01(c)(i).

"Fixed Contribution" means 75% of the Aggregate Expected Capital Contribution.

"Flip Date" means the Business Day immediately following the latest of (i) the expiration of the Recapture Period, (ii) the date on which all accrued and unpaid Subordinated Loans, IM Loans, Credit Recovery Loans, Priority Return accrued through the Recapture Period, Special Tax Distributions accrued through the Recapture Period, Indemnity Payments, and any other amounts due and owing to the Investor Member have been paid to the Investor Member and there are no defaults under the Project Documents, or (iii) the date on which the Development Fee has been paid in full and reasonably satisfactory evidence thereof has been provided to Investor Member.

"Formation State" has the meaning set forth in Schedule B.

"GAAP" has the meaning set forth in Section 13.01.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Company;

(ii)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Managing Member, as of the following times:  (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an interest in the Company; and (c) the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations. Adjustments pursuant to clauses (a) and (b) above shall be made only if the Managing Member reasonably determines that such adjustments are necessary or

- 9 -

Confidential

appropriate to reflect the relative economic interests of the Members in the Company;

(iii)    The Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution; and

(iv)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Treasury Regulations and Section 11.05 hereof.  Gross Asset Values shall not be adjusted pursuant to this clause (iv) to the extent the Managing Member determines that an adjustment pursuant to clause (ii) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to Section (i), (ii) or (iv) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits or Losses.

"Guarantor" shall have the meaning set forth in the Master Lease.

"Guaranty" shall have the meaning set forth in the Master Lease.

"Hazardous Substance" shall have the meaning set forth in the Master Lease.

"Historic Tax Credits" shall have the meaning set forth in the Master Lease.

"IM Loans" means any loans to the Company that the Investor Member, in its sole discretion, may elect to make, pursuant to Section 5.05(c) of this Agreement.

"Indemnity Payment" shall have the meaning set forth in Section 8.07.

"Initial Closing" means the date of the initial funding of the Investor Member's Capital Contribution.  Initial Closing is expected to occur on the date hereof.

"Initial Operating Period" means the period commencing on the Admission Date and ending on the six month anniversary of the end of the Recapture Period.

"Installment(s)" means, as the context requires, one or more of the installments of the Investor Member's Capital Contribution or the Managing Member's Capital Contribution paid or payable to the Company pursuant to Section 5.01, or as otherwise provided herein.

"Interest" or "Company Interest" means the ownership interest of a Member of the Company at any particular time, including the right of such Member to any and all benefits to which such Member may be entitled as a Member of the Company as provided in this Agreement and in the Act, together with the obligations of such Member to comply with all the terms and provisions of this Agreement and of said Act.  Such Interest of each Member shall, except as

- 10 -

Confidential

USBCDC00048388

otherwise specifically provided herein, be that percentage of the aggregate of such benefit or obligation specified by Section 5.01 as such Member's Percentage Interest.  In the case of a non-member manager of the Company, the term "Interest" means all rights and obligations of such Person with respect to the Company in such Person's capacity as a manager of the Company.

"Investment Fund" means and refers to the Investment Fund identified in Schedule B.

"Investor Member" means U.S. Bancorp Community Development Corporation, a Minnesota corporation, and its successors and assigns, and in the event of more than one Investor Member, Investor Member means, collectively, all such Investor Members.

"Investor Member Capital Contribution Cap" has the meaning set forth in Section 5.01(c).

"IRS" means the Internal Revenue Service.

"Land" has the meaning set forth in the Recitals.

"Leasehold Interest" means the Company's interest in the Property under the Master Lease.

"Leasehold Lender" shall have the meaning set forth in the Master Lease.

"Leasehold Loan" shall have the meaning set forth in the Master Lease.

"Leasehold Mortgage" shall have the meaning set forth in the Master Lease.

"Lenders" shall have the meaning set forth in the Master Lease.

"Lender's Estoppel Certificate" has the meaning set forth in Section 5.01(c)(ii).

"Leverage Loan" has the meaning set forth in Section 3.03.

"Liquidator" means the Managing Member or, if there are none at the time in question, such other Person who may be appointed in accordance with applicable law and who shall be responsible for taking all action necessary or appropriate to wind up the affairs of, and distribute the assets of, the Company upon its dissolution.

"Manager Breach" means (i) Bad Acts; and/or (ii) breach of or default, after expiration of all applicable notice and cure periods, under this Agreement or any other Project Document by the Managing Member or any other Developer Entity.

"Managing Member" means DFQ Management LLC, a Delaware limited liability company, and its successor(s) pursuant to this Agreement, including particularly the provisions of Sections 6.03 and 8.11.

"Master Landlord" has the meaning set forth in the Recitals.

"Master Landlord Debt Service" means the sum of all principal and interest payments that would be due and payable by Master Landlord (i) in any period with respect to a loan in the principal amount equal to the aggregate Master Landlord USBNA Commitment, assuming (a) a 30 year amortization period and (b) an interest rate per annum equal to the greater of (i) 6.50%, (ii) the then current 10 year Treasury Rate plus 3.0%), or (iii) the dollar weighted average actual interest rate for the outstanding advances of the Direct Loan with USBNA then in effect, plus (ii) in any period with respect to the CDE Loan.

"Master Landlord Operating Agreement" has the meaning set forth in Schedule B.

"Master Landlord USBNA Commitment" means an amount not to exceed $12,300,000. Such Master Landlord USBNA Commitment will be reduced by any principal payments made by or on behalf of Master Landlord and any principal reductions otherwise required under and pursuant to the Direct Loan Documents with USBNA.

"Master Lease" has the meaning set forth in the Recitals.

"Master Lease Payment" means any rent, additional rent or other sums payable by the Company pursuant to the Master Lease.

"Member" means any or each Person who is a member of the Company as the context shall require.

"Mortgage" shall have the meaning set forth in the Master Lease.

"MT Loan" has the meaning set forth in Schedule B.

"MT Loan Documents" has the meaning set forth in Schedule B.

"Net Cash Flow" means for each Company Fiscal Year the sum of (i) Operating Income and (ii) any other funds deemed available for distribution by the Managing Member with the approval of the Lenders, if required (excluding loans, condemnation and casualty proceeds, Capital Transaction proceeds, and tenant security deposits, and interest thereon, unless forfeited to the Company), less the sum of all Operating Expenses and all other cash expenditures (whether or not such expenditures are deducted, amortized or capitalized for tax purposes). Net Cash Flow shall be determined separately for each Company Fiscal Year, commencing on the day after Final Closing and shall not be cumulative.

"Net Interim Income" means the amount by which the Operating Income attributable to the Property Development Period, even if actually received after such period, exceeds the sum of any Operating Expense attributable to the Property Development Period.

"Net Operating Income" means for each Company Fiscal Year Operating Income less the sum of all Operating Expenses and all other cash expenditures (whether or not such expenditures are deducted, amortized or capitalized for tax purposes), except for expenditures funded out of either the Replacement Reserve or the Working Capital Reserve.

"New Markets Tax Credits" shall have the meaning set forth in the Master Lease.

- 12 -

Confidential

"NMTC Transaction" has the meaning set forth in Section 3.03.

"Notice" means a writing containing the information required by this Agreement to be communicated and given in the manner required in Section 16.07.

"Operating Deficit" means for any period, the amount by which Operating Income for such period of time is exceeded by Operating Expenses.  For purposes of this definition, all expenses shall be deemed payable on a sixty (60) day current basis.

"Operating Expenses" mean all expenses of the Company for the operation of the Property and the Company, as incurred by the Company in the reasonable discretion of the Managing Member, including without limitation, Debt Service, the Master Lease Payment (excluding any payments of Supplemental Rent), fees paid under a Property Management Agreement to a party other than a Developer Entity, audit and tax return expenses, costs of utilities, maintenance, repairs and necessary replacements, real estate taxes, insurance premiums, professional and management fees, miscellaneous expenses, and any deposit to cash reserves for working capital, capital expenditures, repairs, replacements and anticipated expenditures (including any Reserve funding required pursuant to the Master Lease), in such amounts as may be required under the Master Lease or may be determined from time to time by the Managing Member, with the approval of the Investor Member to be advisable for the operation of the Company but excluding depreciation, amortization deductions and other non-cash items.  For purposes of this definition, all expenses shall be deemed paid on the earlier of the stated due date or on a sixty (60) day current basis.

"Operating Income" means all cash received from operation of the Property and the Company in the ordinary course of business and recognizable by the Company for income tax reporting purposes, including rents, withdrawals from reserves to the extent otherwise permitted hereunder, and all other sources.  Operating Income shall exclude the proceeds of any loans to the Company, proceeds from Capital Transactions and interest earned on Reserves (unless withdrawn as aforesaid).

"Operating Profits" or "Operating Losses" means, for any Company Fiscal Year, the Profits or Losses, as the case may be, of the Company for that year as determined for federal income tax purposes by the Accountants with the adjustments described in the definition of "Profits or Losses," excluding Profits or Losses from a Capital Transaction and determined without regard to any adjustments to basis pursuant to Sections 734 or 743 of the Code.

"Ordinary Income Amount" has the meaning set forth in Section 11.03(d).

"Outside Stabilized Operations Date" shall be the date set forth in Schedule B as the Outside Stabilized Operations Date.

"Outside Substantial Completion Date" shall be the date set forth in Schedule B as the Outside Substantial Completion Date.

"Part 1 Approval" shall have the meaning set forth in the Master Lease.

"Part 2 Approval" shall have the meaning set forth in the Master Lease.

- 13 -

Confidential

USBCDC00048391

"Part 3 Approval" shall have the meaning set forth in the Master Lease.

"Percentage Interest" means the Company Interest of each Member as set forth in Schedule A.

"Permitted Encumbrances" shall have the meaning set forth in the Master Lease.

"Person" shall have the meaning set forth in the Master Lease.

"Placement in Service" or "Placed in Service" shall have the meaning set forth in the Master Lease.

"Plans and Specifications" shall have the meaning set forth in the Master Lease.

"Preliminary Cost Certification" shall have the meaning set forth in the Master Lease.

"Priority Return" has the meaning set forth in Schedule B.  Any Priority Return not distributed shall accrue and remain payable until paid in accordance with Article XI hereof.

"Profits" or "Losses" means, for each Company Fiscal Year or other period, an amount equal to the Company's taxable income or loss, as the case may be, for such Company Fiscal Year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(i)     Any items described in Sections 705(a)(1)(B) and 705(a)(1)(C) of the Code which are not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss.

(ii)    Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account in computing Profits or Losses, shall be subtracted from such taxable income or loss.

(iii)   Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value.

(iv)    In the event of a distribution of Company assets to a Member (whether in connection with a liquidation or otherwise), or in the event the Gross Asset Value of any Company asset is adjusted upon the acquisition of an additional interest in the Company, unrealized income, gain, loss and deduction inherent in such distributed or adjusted assets (not previously reflected in Capital Accounts) shall be allocated pursuant to Section 11.01 hereof as if there had been a taxable disposition of such distributed or adjusted assets at fair market value.

- 14 -

(v)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Company Fiscal Year or other period, computed in accordance with the definition of "Depreciation" set forth herein.

(vi)    Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 11.10 hereof shall be taken into account in computing Profits or Losses only if required under the applicable provisions of the Code and Treasury Regulations.

"Profits or Losses from a Capital Transaction" means the Profits or Losses, if any, recognized by the Company as a result of a Capital Transaction, as determined for federal income tax purposes by the Accountants with the adjustments described in the definition of "Profits or Losses," but without regard to any adjustments to basis pursuant to Section 734 and 743 of the Code.

"Project" has the meaning set forth in the Recitals.

"Project Documents" shall have the meaning set forth in the Master Lease.

"Project Loan" shall have the meaning set forth in the Master Lease.

"Project Loan Agreement" shall have the meaning set forth in the Master Lease.

"Project Loan Documents" shall have the meaning set forth in the Master Lease.

"Project Preservation Consultant" means the Project Preservation Consultant identified in Schedule B or such other firm as may be engaged by Master Landlord with the Consent of the Investor Member to provide preservation consulting services in connection with the Rehabilitation.

"Project Preservation Consultant's Certificate" means the certificate executed by the Project Preservation Consultant in the form required by the Investor Member.

"Projected Federal Historic Tax Credits" means Federal Historic Tax Credits in the amount set forth on Schedule B with respect to the Building, which the Accountants have projected in the Projections (and which have been reviewed and accepted by the Managing Member on the date hereof) to be the total anticipated amount of Federal Historic Tax Credits to be available to the Investor Member in connection with the Rehabilitation.

"Projections" means the financial projections prepared by the Accountants and attached hereto as Exhibit C.

"Property" has the meaning set forth in the Recitals.

"Property Development Period" means the period commencing upon formation of the Company and terminating upon Final Closing.

- 15 -

Confidential

USBCDC00048393

"Property Management Agreement" shall have the meaning set forth in the Master Lease.

"Property Management Agreement Requirements" has the meaning set forth in Section 8.14(b).

"Property Management Termination Event" has the meaning set forth in Section 8.15(b).

"Property Manager" means a person, firm, or company selected by the Managing Member subject to Section 8.14 to manage the operation of the Property in accordance with this Agreement.

"QRE Diligence Items" has the meaning set forth in Section 5.01(e)(i).

"QREs" shall have the meaning set forth in the Master Lease.

"Qualified Equity Investment" or "QEI" shall have the meaning ascribed to it in Section 45D(b)(1) of the Code.

"Recapture/Disallowance Adjustment Amount" means an amount equal to any increase in taxes payable by Investor Member as a result of any Recapture/Disallowance Event plus any interest and/or penalties due to the IRS (and, if applicable, any state or local taxing authority) in connection therewith all calculated on an After-Tax Basis.

"Recapture/Disallowance Adjustment Differential" has the meaning set forth in Section 8.07.

"Recapture/Disallowance Event" means any Manager Breach or other act or omission of the Managing Member or any Developer Entity that results in the recapture, disallowance or other loss of Federal Historic Tax Credits under the Code (other than a recapture, disallowance or other loss arising as a result of an Excluded Event).

"Recapture Period" have the meaning set forth in the Master Lease.

"Rehabilitation" shall have the meaning set forth in the Master Lease.

"Reserves" means any and all reserves and escrow accounts maintained or required to be maintained by or for the benefit of the Company, including those reserved identified Section 8.12; Reserves not identified in Section 8.12 shall only be established and maintained with the Consent of the Investor Member.

"Revenue Procedure" means Revenue Procedure 2014-12, 2014-3 IRB 415, as amended from time to time.

"Revised Partnership Audit Code" means Code sections effective after December 31, 2017 pursuant to Section 1101(g) of the Bipartisan Budget Act of 2015.

"Safe Harbor" has the meaning set forth in Section 16.10 of this Agreement.

"Second Installment" has the meaning set forth in Section 5.01(c)(ii).

- 16 -

Confidential

"Second Installment Conditions Precedent" has the meaning set forth in Section 5.01(c)(ii).

"Secretary" means the Secretary of the U.S. Department of the Interior or any authorized representative thereof, including the National Park Service.

"Secretary's Standards" means the standards for rehabilitation set forth in Title 36 of the Code of Federal Regulations, Part 67.7, or any successor provisions, as amended from time to time.

"SNDA" shall have the meaning set forth in the Master Lease.

"Special Tax Distribution" means in any Company Fiscal Year in which taxable income and/or taxable gain is recognized by an Investor Member on account of its interest in the Company, whether on the Company's tax return or after audit by the IRS (or, if applicable, any state or local taxing authority), a distribution from Net Cash Flow in an amount equal to the product of (i) the sum of (X) Allocated Company Income and (Y) 50(d) Income, and (ii) the Applicable Tax Rate, which amount shall be paid on an After-Tax Basis, payable in all years. Any Special Tax Distribution not distributed shall accrue and remain payable until paid in accordance with Article XI hereof.

"Stabilized Operations" means the date upon which the Company, for ninety (90) consecutive days after Placement in Service, has maintained Operating Income for such period equal to or exceeding Operating Expenses for such period.

"State" means the State of Missouri.

"State Historic Tax Credits" shall have the meaning set forth in the Master Lease.

"State HTC Act" shall have the meaning set forth in the Master Lease.

"Subordinated Loan" means any loan made by a Member to the Company pursuant to Section 5.05.

"Substantial Completion" shall have the meaning set forth in the Master Lease.

"Substitute Investor Member" means any Person admitted to the Company as an Investor Member pursuant to Section 9.03.

"Supplemental Rent" shall have the meaning set forth in the Master Lease.

"Survey" shall have the meaning set forth in the Master Lease.

"Tax Matters Member" shall mean the Member designated in Section 11.07 to be the Tax Matters Partner as provided for in the Code

"Third Installment" has the meaning set forth in Section 5.01(c)(iii).

Confidential

"<u>Title Policy</u>" shall have the meaning set forth in the Master Lease.

"<u>Total Revenue</u>" has the meaning set forth in Schedule B.

"<u>Transfer Documents</u>" has the meaning set forth in Section 9.02(a).

"<u>Treasury Regulations</u>" or "<u>Treasury Reg.</u>" means the final and temporary regulations promulgated from time to time under the Code.

"<u>Updated Title Policy Requirement</u>" has the meaning set forth in Section 5.01(c)(ii).

"<u>USBCDC</u>" has the meaning set forth in the first paragraph to this Agreement.

"<u>USBNA</u>" means U.S. Bank National Association, a national banking association.

"<u>Withdrawal Event</u>" means the occurrence of any of the following events: (a) the withdrawal or removal of any Managing Member or the sale, assignment, transfer or encumbrance by a Managing Member of any portion of such Managing Member's rights hereunder; (b) the death or adjudication of incompetency of any individual Managing Member; (c) the voluntary or involuntary dissolution of a Managing Member which is not a natural person; (d) the sale, assignment, transfer or encumbrance of a Controlling Interest in a corporate Managing Member, of a partner interest in a Managing Member which is a partnership or of a member interest in a Managing Member which is a limited liability company; (e) a Bankruptcy with respect to any Managing Member or with respect to the holder of any Controlling Interest in any Managing Member; or (f) without limitation of the foregoing, any event occurring as to a Guarantor, or a partner of a Managing Member which is a partnership or as to a member of a Managing Member which is a limited liability company which would constitute a Withdrawal Event as provided above, if such Person were a Managing Member.

"<u>Working Capital Reserve</u>" shall have the meaning set forth in Schedule B.

#8370189 Operating Agreement
Last Hotel Master Tenant LLC

Project No. 24586

Confidential

USBCDC00048396

## ARTICLE III.
## PURPOSE AND BUSINESS OF THE COMPANY

3.01    Purpose of the Company.  The Company has been organized exclusively to lease the rehabilitated Property and to maintain, operate, lease and sell or otherwise dispose of the Leasehold Interest in compliance with Section 45D, Section 47 and Section 50 of the Code, as amended, and for such other purposes specified in this Article III.  Notwithstanding anything contained herein to the contrary, except as set forth in the preceding sentence, the Company shall not engage in any business, and it shall have no purpose, unrelated to the Property and the other purposes identified in this Article III and shall not acquire any real property or own assets other than those related to the Property and/or otherwise in furtherance of the purposes of the Company.

3.02    Authority of the Company.  In order to carry out its purpose, the Company is empowered and authorized to do any and all acts and things necessary, appropriate, proper, advisable, incidental to or convenient for the furtherance and accomplishment of its purpose, and for the protection and benefit of the Company, including but not limited to the following:

(a)    enter into the Master Lease and acquire the Leasehold Interest;

(b)    make the MT Loan to Managing Member and enter into and perform such documents and instruments as are necessary or desirable to effectuate such investment;

(c)    enter into contracts on the date hereof in furtherance of the purposes of the Company identified in this Article III and approved by the Investor Member;

(d)    operate, maintain, improve, buy, own, sell, convey, assign, mortgage, rent or lease any real estate and any personal property necessary to the operation of the Property;

(e)    operate the Property consistent with the requirements of the Project Documents;

(f)    enter into any kind of activity, and perform and carry out contracts of any kind necessary to, or in connection with, or incidental to, the accomplishment of the purposes of the Company;

(g)    borrow money and issue evidences of indebtedness in furtherance of the Company's business and secure any such indebtedness by mortgage, pledge, or other lien;

(h)    maintain and operate the Property;

(i)    subject to the approval of the Lenders, if required, and to other limitations expressly set forth elsewhere in this Agreement, negotiate for and conclude agreements for the sale, exchange, assignment or other disposition of all or substantially all of the property of the Company, or for the refinancing of any loan secured by a Leasehold Mortgage;

(j)    enter into and perform the Project Documents to which it is a party;

- 19 -

Confidential                                                                    USBCDC00048397

(k)     enter into the Commercial Subleases as approved by the Investor Member; and

(l)     do any and all other acts and things necessary or proper in furtherance of the Company's business.

3.03    <u>Separate New Markets Tax Credits Investment</u>.  USBCDC is simultaneously entering into a separately negotiated, distinct and separate arm's length economic arrangement with Master Landlord to share in allocations of New Markets Tax Credits as described herein (the "<u>NMTC Transaction</u>"). In its capacity as the new markets tax credit investor, USBCDC is making a capital contribution to the Investment Fund.  The Investment Fund will obtain a loan from Managing Member (the "<u>Leverage Loan</u>") (Managing Member, in its capacity as the party making the Leverage Loan, being the "<u>Leverage Lender</u>") in the amount of $5,326,135.  The Investment Fund utilizing the proceeds of USBCDC's capital contributions to it and the proceeds of the Leverage Loan will make a capital contribution to each CDE which has obtained an allocation of New Markets Tax Credit investment authority under the Code. The capital contribution by the Investment Fund in each CDE is expected to constitute a "qualified equity investment" (as that term is defined in Section 45D of the Code) (a "<u>QEI</u>") eligible for New Markets Tax Credits.  Each CDE will use the proceeds of the QEI to make the CDE Loans described in Schedule B, each of which is intended to constitute a "qualified low income community investment" as defined in Section 45D of the Code.

The Investor Member and the Managing Member each acknowledge and represent that (i) the NMTC Transaction a separately negotiated, distinct and separate arm's length economic arrangement permitting the Investor Member to share in allocations of New Markets Tax Credits and (ii) the proceeds of the Leverage Loan are being used exclusively with respect to investment by Investor Member in the NMTC Transaction; and (iii) none of Master Landlord, the Company, the Managing Member nor any Affiliate of the Managing Member including the Leverage Lender, directly or indirectly, have loaned or will loan the Investor Member the funds to acquire any part of the Investor Member's interest in the Company or have guaranteed or otherwise insured or will guarantee or otherwise insure any indebtedness incurred or created in connection with the Investor Member's acquisition of its interest in the Company.

3.04    <u>Project Loans</u>.  Master Landlord has obtained Project Loans from the Lenders, the proceeds of which will be used to pay for the Rehabilitation.

#8370189 Operating Agreement
Last Hotel Master Tenant LLC

Project No. 24586

Confidential

USBCDC00048398

**ARTICLE IV.**
**REPRESENTATIONS, WARRANTIES AND COVENANTS;**
**DUTIES AND OBLIGATIONS**

4.01   <u>Representations, Warranties and Covenants Relating to the Property and the Company</u>.  As of the date hereof, the Managing Member hereby represents, warrants and covenants to the Company and to the Members as follows:

(a)   the Property is properly zoned for the uses contemplated herein and by the date of Placement in Service, the Company has or will have all permits, consents, permissions and licenses required by all applicable governmental entities for the operation of the Property, and the Property conforms and will conform to all applicable federal, state and local land use, zoning, building, environmental and other governmental laws and regulations;

(b)   all improvements rehabilitated or to be rehabilitated on the Project have been or will be constructed and equipped in compliance with the requirements of all governmental authorities having jurisdiction over the Project, the Project Documents and, as applicable, in full compliance with all requirements and approvals of the Secretary and the State in connection with the historic rehabilitation and environmental remediation of the Project; and neither the Company nor the Managing Member has received any notice, or has any knowledge, of any violation with respect to the Project of any law, rule, regulation, order, or decree of any governmental authority having jurisdiction that would have a material adverse effect on the Project or the rehabilitation, use, occupancy or operation thereof. The completion of any improvements, alteration or rehabilitation on or of the Project or any portion thereof will not require the dedication of any portion of the Project to any applicable governmental entities;

(c)   all appropriate public utilities, including sanitary and storm sewers, water, gas and electricity, are currently or will be available to the Property and will be operating properly for the Property at the time of first occupancy of the Property.  The Property has direct access to a public street or highway and will have adequate parking to comply with Applicable Laws and make it viable;

(d)   there are no unpaid and past due fees or taxes with respect to the Project or any portion thereof;

(e)   upon execution of the Master Lease, the Leasehold Interest will be held solely by the Company, free and clear of any liens, charges or encumbrances other than the matters set forth in the Title Policy, the Permitted Encumbrances, and mechanics' or other liens which have been bonded or insured against in such manner to preclude the holder of such lien or such surety or insurer from having any recourse to the Leasehold Interest, the Property or the Company for payment of any debt secured thereby.  None of the liens, charges, encumbrances or exceptions set forth in the Title Policy has or will have a material adverse effect upon the construction or operation of the Property;

(f)   there is and shall be no direct or indirect personal liability (including guarantees, letters of credit and stop-loss agreements provided to the Lenders) of the Company

- 21 -

Confidential

for the repayment of the principal of or payment of interest on the Project Loans other than the Leasehold Loan; the Company currently has no Leasehold Loan;

(g)     no default by any Developer Entity has occurred or is continuing (nor has there occurred any continuing event which, with the giving of notice or the passage of time or both, would constitute such a default) under any of the Project Documents, and the Project Documents are in full force and effect (except to the extent fully performed in accordance with their respective terms);

(h)     the execution and delivery of this Agreement, the incurrence of the obligations set forth in this Agreement, and the consummation of the transactions contemplated by this Agreement do not violate or conflict with any provision of any federal, state, municipal or local laws, ordinances, rules, regulations, requirements, or any order, judgment, decree, determination, or award of any court binding on any Developer Entity, or its assets (including the Leasehold Interest) nor do they conflict with, result in a breach of, constitute a default under, result in the acceleration of, or create in any party the right to accelerate, terminate, modify, or cancel, or require any notice (which notice has not been furnished) under any agreement, contract, lease, license, instrument, or other arrangement to which any Developer Entity is a party, or by which it is bound or to which any of its assets is subject;

(i)     neither the Company nor any Developer Entity has incurred any financial responsibility with respect to the Leasehold Interest or the Property prior to the date of execution of this Agreement, other than that disclosed in writing to the Investor Member;

(j)     the Company is and will continue to be a limited liability company, duly organized and validly existing under the laws of the Formation State and had, has and shall continue to have full power and authority to hold, operate and maintain the Property in accordance with the terms of this Agreement and Applicable Law, and has taken and shall continue to take all action under the laws of the Formation State and any other applicable jurisdiction including without limitation, the filing of all certificates and the payment of all fees, taxes, and other sums necessary for the Company, to protect the limited liability of the Investor Member and to enable the Company to lawfully engage in its business;

(k)     no event has occurred that has caused, and the Managing Member has not acted in any manner that will cause: (i) the Company to be treated for federal income tax purposes as an association taxable as a corporation; (ii) the Company to fail to qualify as a limited liability company under the Act; or (iii) the Investor Member to be liable for Company obligations;

(l)     it will indemnify and hold the Company, the Investor Member and the members thereof, their Affiliates and agents, free and harmless from any injury, loss or damage (including, but not by way of limitation, reasonable attorneys' fees, court costs, and amounts paid in settlement of any claims, which settlement has been mutually agreed to by it and the party against whom such claim has been made) resulting from the claims of any Person with respect to any liability arising under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, or the securities laws or regulations of any state or other jurisdiction (collectively, the "Applicable Securities Laws"), which claims are based upon alleged fraud, deceit, or untrue statement or alleged untrue statement of a material fact, or the

- 22 -

Confidential

omission or alleged omission to state a material fact required to be stated or necessary to make the statements not misleading, with respect to or based upon information furnished or statements made by it to the Investor Member or any members thereof, their Affiliates or agent(s), in connection with the acquisition by the Investor Member of its Interest in the Company or the offer or sale of interests in the Company or in the Investor Member;

(m)     no restrictions on the sale or refinancing of the Leasehold Interest, other than the restrictions set forth in the Master Lease, exist as of the date hereof, and no such restrictions shall (except as may be set forth in the Master Lease), at any time while the Investor Member is a Member, be placed upon the sale or refinancing of the Leasehold Interest; neither Master Landlord nor any of the Lenders has or shall have the discretion under any of the Project Documents to elect not to rebuild the Property (or a portion thereof) to the extent that insurance proceeds realized from a casualty are sufficient therefor;

(n)     the Federal Historic Tax Credits projected to be passed through to the Company by Master Landlord with respect to the Rehabilitation of the Building(s) and allocated to the Investor Member are identified in Schedule B as the Projected Federal Historic Tax Credits;

(o)     neither Managing Member nor any of its members is a "tax-exempt entity" or "tax-exempt controlled entity" as those terms are used in Section 168(h) of the Code that has not made the election to be treated as taxable under Section 168(h) of the Code;

(p)     neither Master Landlord nor any of its members is a "tax-exempt entity" or "tax-exempt controlled entity" as those terms are used in Section 168(h) of the Code that has not made the election to be treated as taxable under Section 168(h) of the Code;

(q)     the Managing Member shall take such actions as may be necessary to avoid characterization of the Project as tax-exempt use property under Section 168(h) of the Code, including, if applicable, making a timely election in accordance with Section 168(h)(6) of the Code;

(r)     no portion of the Building constituting QREs was Placed in Service by Master Landlord prior to the Admission Date;

(s)     the Project will meet all requirements to qualify for Federal Historic Tax Credits as a "certified historic structure", as set forth in Section 47(a)(2) of the Code and the rehabilitation of the Project will be in strict accordance with all of the requirements imposed by the Part 1 Approval, Part 2 Approval and Part 3 Approval, the historic standards and guidelines of the Secretary, or pursuant to applicable state law and to the best knowledge and belief of the Managing Member, all such requirements are contained within the Project Documents;

(t)     the Managing Member is duly and validly organized and is validly existing in good standing as a limited liability company under the laws of the Formation State, with full power and authority to enter into and perform its obligations hereunder;

(u)     the Property shall be operated in a manner that (i) complies with the Applicable Laws and (ii) satisfies and shall continue to satisfy, all restrictions applicable to the

- 23 -

Confidential                                                                                        USBCDC00048401

Property and projects generating Federal Historic Tax Credits and which shall be in conformity with the description of the Property set forth in Part 2 of the Certification Application and in any equivalent documentation relating to the State Historic Tax Credits;

(v)     subject to Section 13.06, the Company's fiscal year is and shall be the calendar year;

(w)     the QREs incurred in connection with the Rehabilitation of the Building would under the Code constitute "new section 38 property" to the Company if the Company had actually purchased such QREs;

(x)     each Developer Entity has complied with all Applicable Laws relating to the Company or the Property, and no action, suit, proceeding, hearing, government investigation, charge, complaint, claim, demand, or notice has been filed or commenced against any Developer Entity alleging any failure so to comply;

(y)     to the best of the Managing Member's knowledge, upon due inquiry, the assumptions underlying the Projections are reasonable and the facts therein relating to the Developer Entities and the Project are accurate;

(z)     the Managing Member is solvent, is able to pay its debts as they mature, and has capital sufficient to carry on the business in which it is engaged, and the present fair saleable value of its assets is greater than the amount of its liabilities;

(aa)    Master Landlord has disclosed to the Managing Member all material actions taken by Master Landlord prior to the date hereof, and the Managing Member has disclosed to the Investor Member in writing all material actions (i) taken by Master Landlord prior to the date hereof and (ii) with respect to the Company, taken by the Managing Member prior to the date hereof;

(bb)    a copy of all material documents relating to the Company and the Property have been delivered to the Investor Member and there are no other restrictions, circumstances or obligations which would have a material adverse impact on Master Landlord's ability to carry out the Project;

(cc)    as of the date hereof, no certificates of occupancy or temporary certificates of occupancy have been issued or are available to be issued with respect to the Building, or any portion thereof;

(dd)    there is no default, claim, demand, litigation, proceedings or governmental investigation pending or, to the best of its knowledge, threatened against it, except for those which are fully covered by insurance or, if adversely determined, would not materially impair its ability to pay when due any amounts that may become payable under this Agreement;

(ee)    no event of Bankruptcy has occurred and is continuing, and no event has occurred that, with the passage of time, could become an event of Bankruptcy, with respect to the Managing Member or any other Developer Entity;

- 24 -

Confidential

(ff)    the execution, delivery and performance by it of this Agreement will not contravene or conflict with any law, order, rule, regulation, writ, injunction or decree now in effect of any government, governmental instrumentality or court or tribunal having jurisdiction over it, or any contractual restriction binding on or affecting it;

(gg)    all consents or approvals of any governmental authority, or any other Person, necessary in connection with the transactions contemplated by this Agreement or necessary to admit the Investor Member to the Company, have been obtained by the Managing Member and the Company has taken all action under the laws of the Formation State and any other applicable jurisdiction and has complied with all filing requirements necessary under the Act for the preservation of the limited liability of the Investor Member;

(hh)    this Agreement has been duly authorized, executed and delivered on behalf of the Managing Member and is fully enforceable against the Managing Member and the Company, respectively, in accordance with its terms, except to the extent enforceability is limited by bankruptcy and other similar laws affecting creditors' rights generally;

(ii)    Company and Master Landlord have each complied (to the extent applicable) and covenant to comply in the future with all aspects of the Master Lease;

(jj)    other than the types of financing referenced in Section 8.02(b)(vi), no additional financing for or in connection with the Project, whether for completion of construction, operations or otherwise, will be obtained without the prior written Consent of Investor Member;

(kk)    except for deeds of trust entered into in connection with the Direct Loan with USBNA and the CDE Loan, neither the Property nor any membership interest in any of the Developer Entities and/or the Company serves or will serve as collateral for any financing without the prior written consent of Investor Member;

(ll)    insurance shall be maintained in form and amounts satisfactory to Investor Member, all as more fully specified in this paragraph and in <u>Exhibit C</u> to the Master Lease. Insurance coverage must be provided to the Investor Member and be evidenced by certificates of insurance and properly endorsed policies certified as true and correct by the insurance agent.  All evidence of insurance must satisfy the following requirements: (a) the Company (rather than the Managing Member or Master Landlord) should be the named insured where indicated; (b) policies must be written with an A.M. Best rated company of "A-" or better and a financial size category rating by A.M. Best of IX or higher; (c) all binders and policies should contain a cancellation clause stating that the policy will not be canceled or non-renewed without at least thirty (30) calendar days' prior written notice to the Company and the Investor Member except for non-payment of premium where ten (10) days' notice will be given; (d) certificates must document the amount of all deductibles; and (e) all binders and policies must be accompanied by evidence of premium payment; and

(mm)    Company anticipates the Building to achieve Substantial Completion by February 28, 2019.

- 25 -

Confidential

USBCDC00048403

The Managing Member shall be solely responsible for the representations, warranties and covenants hereunder, and shall not assert as a defense in any action by the Company or the Investor Member the fact that the Managing Member may have relied on other parties in connection with matters addressed therein.

Legal counsel to Investor Member and Managing Member are hereby permitted to rely on the foregoing representations, warranties and covenants in the issuance of federal income tax opinions to Investor Member with respect to the transactions contemplated by this Agreement.

4.02    <u>Duties and Obligations Relating to the Property and the Company</u>.  The Managing Member shall have the following duties and obligations with respect to the Property and the Company:

(a)    it shall cause to be met all requirements applicable to the Company, if any, which are necessary to obtain, achieve and maintain (i) issuance of all necessary certificates of occupancy, including all governmental approvals required to permit occupancy of the Property, and (ii) compliance with all provisions of the Project Documents;

(b)    while conducting the business of the Company, it shall not act in any manner which it knows or should have known after due inquiry will (i) cause the termination of the Company for federal income tax purposes without the Consent of the Investor Member, (ii) cause the Company to be treated for federal income tax purposes as an association taxable as a corporation; or (iii) cause any Investor Member to lose its limited liability protection;

(c)    it shall not permit or allow the Company to act in any manner that will cause (i) Master Landlord to be anything other than a partnership for federal income tax purposes, including, but not limited to, treated as an association taxable as a corporation, (ii) Master Landlord to fail to qualify as a limited liability company under the Act, or (iii) the Company to be liable for obligations of Master Landlord;

(d)    it shall not change Managing Member's organizational structure and shall not make any changes or amendments to its organizational documents and authorizing resolutions which would impair its ability to act as Managing Member in accordance with this Agreement without the Consent of the Investor Member;

(e)    it shall prepare and submit to the Secretary, the Secretary of the Treasury or the IRS (or any other governmental authority designated for such purpose), on a timely basis, the Election (to the extent required to be signed by the Company) and any and all annual reports, information returns and other certifications and information required (i) to ensure the Election is properly filed and that the Investor Member will qualify for the Federal Historic Tax Credits, (ii) to ensure the Federal Historic Tax Credits are properly documented and claimed in the Company's tax returns, and (iii) to avoid any Recapture/Disallowance Event or the imposition of penalties or interest on the Company or the Investor Member for failure to comply with the requirements of the Code or any other Applicable Laws relating to the Federal Historic Tax Credits;

- 26 -

Confidential

(f)     it shall exercise good faith in all activities relating to the conduct of the business of the Company, including the operation and maintenance of the Property, and it shall take no action with respect to the business and property of the Company which is not reasonably related to the achievement of the purpose of the Company;

(g)     all of (i) the fixtures, maintenance supplies, tools, equipment and the like now and to be owned by the Company or to be appurtenant to, or to be used in the operation of the Property, as well as (ii) the rents, revenues and profits earned from the operation of the Leasehold Interest, will be free and clear of all security interests and encumbrances except for any Leasehold Mortgage;

(h)     it will execute on behalf of the Company all documents necessary to elect, pursuant to Sections 732, 734, 743 and 754 of the Code, to adjust the basis of the Company's property upon the request of the Investor Member, if, in the sole opinion of the Investor Member, such election would be advantageous to the Investor Member or any of its members;

(i)     it shall, during and after the period in which it is a Managing Member, provide the Company with such information and sign such documents as are necessary for the Company and the Investor Member to make timely, accurate and complete submissions of (i) federal and state income tax returns, (ii) reports to governmental agencies, and (iii) any other reports required to be delivered to the members of the Investor Member or their members;

(j)     it shall comply and cause the Company to comply with the provisions of all  Applicable Laws, including, without limitation, state and local zoning laws, building codes, health and safety codes and all other applicable governmental and contractual obligations;

(k)     it shall use commercially reasonable efforts consistent with sound management practice and with the terms of the Project Documents to maximize Net Cash Flow available for distribution to the Members;

(l)     it shall be personally responsible for the payment of any fines or penalties imposed by Master Landlord, Secretary or the Lenders pursuant to the Project Documents and any documents executed in connection with obtaining Federal Historic Tax Credits attributable to any negligent action or inaction of it or its Affiliates;

(m)     it shall provide the Investor Member with Notice of any written or oral notice of any (i) default or event of default or failure of compliance with respect to the Project Loans or any other financial, contractual or governmental obligation of Master Landlord, Company or the Managing Member; (ii) IRS proceeding regarding the Property or the Company or any intention on the part of the Secretary to revoke, cancel or amend Part 1 Approval, Part 2 Approval or Part 3 Approval; (iii) litigation, criminal action or administrative proceeding against Master Landlord, Managing Member, the Company, the Guarantor or any Affiliate of any of them; or (iv) communication from the Lenders or the Secretary or any other Person or governmental authority which is not in the ordinary course of business;

(n)     in operating the Property, it shall use commercially reasonable efforts to obtain all contracts, materials, supplies, utilities and services required by the Project on commercially reasonable terms.  Except as otherwise approved by the Consent of the Investor

- 27 -

Confidential                                                                                    USBCDC00048405

Member, the Managing Member shall secure and credit to the Company, and not receive or retain for itself, its agents, employees or Affiliates, any discounts, compensation, rebates or commissions obtainable with respect to any and all purchases, service contracts, and all other transactions affecting the Project, including without limitation, any compensation received from the assignment or transfer of any contracts affecting the Property;

(o)     it shall not cause or allow through its actions or inactions the (i) revocation of any Part 3 Approval or (ii) failure of the Building to achieve or maintain the status of a "certified historic structure" as provided for in Section 47(c)(3)(A)(ii) of the Code;

(p)     it shall operate or cause the Property to be operated in a manner that satisfies, and shall continue to satisfy, all restrictions and requirements, including without limitation, the Secretary's Standards and all other National Park Service and similar requirements, applicable to the Property and the Leasehold Interest and projects generating Historic Tax Credits and which shall be in conformity with the description of the Property set forth in Part 2 of Master Landlord's Certification Application;

(q)     it shall not enter into any Commercial Sublease without the Consent of the Investor Member as to the form and content of the proposed Commercial Sublease and the suitability of the proposed subtenant thereunder, including the financial viability of the proposed subtenant to discharge its obligations under the Commercial Sublease throughout its term.  Each sublease or other rental agreement entered into by the Company shall comply with all applicable governmental requirements and contractual obligations of the Company.  In addition, each Commercial Sublease shall require the subtenant to bear any Operating Expenses allocable to the space demised thereunder consistent with the Projections, and, unless otherwise Consented to by the Investor Member, shall have a term that ends no sooner than the termination of the Recapture Period;

(r)     it shall not make, or suffer to be made, any sublease (including any Commercial Sublease) which is not in conformity with the requirements of this Agreement or the Master Lease; modify any Commercial Sublease (other than modifications typically made in the usual and ordinary course of arm's length negotiations of leases of similar space in improvements comparable to the Property and which are otherwise consistent with the requirements of this Agreement); or cancel any Commercial Sublease.  Subtenants shall not include any business engaged in the following:  the operation of any private or commercial golf course, country club, massage parlor, hot tub facility, suntan facility, racetrack, or other facility used for gambling, such as off track betting (provided that state sponsored lottery tickets shall not be prohibited), or a store the principal business of which is the sale of alcoholic beverages for consumption off-premises, shooting gallery; adult bookstore or facility selling or displaying pornographic books, literature, or videotapes (materials shall be considered "adult" or "pornographic" for such purpose if the same are not available for sale or rental to children under 18 years old because they explicitly deal with or depict human sexuality);  bingo or similar games of chance, but lottery tickets and other items commonly sold in retail establishments may be sold as an incidental part of business; or video game or amusement arcade, except as an incidental part of another primary business.  Each Commercial Sublease shall include representations and covenants that the sublessee and any sub-sublessee is and shall continue to comply with the foregoing restrictions with respect to business activities, and the Company shall

- 28 -

Confidential

USBCDC00048406

have the right to terminate the Commercial Sublease for any breach of such representations and or covenants;

(s)     it shall cause the Company to conduct, and will conduct its own business, as applicable, and that business has been and will be conducted solely in the name of the Company and in such a way as to not mislead others as to the identity of the entity with which they are dealing.  In that regard, all written communications by the Company or the Managing Member, including, without limitation, letters, invoices, purchase order and contracts, have been and will be made solely in the name of the Company or the Managing Member, as appropriate. The Company has described and will always describe itself as a separate legal entity and not as a division or department of any Developer Entity.  The Company has and will have its own stationery, invoices, checks and other business forms, separate from those of any Developer Entity.  The Managing Member has and will have as its only office the registered office of the Company.  Each of the Company and any Developer Entity will pay its own expenses and liabilities from its own funds.  Invoices and other statements of account from creditors of the Company will be addressed and mailed directly to the Company.

(t)     it shall keep itself and the Company in good standing in accordance with the requirements of the State and the Formation State;

(u)     it shall furnish to the Investor Member such other approvals, opinions, certificates, documents or agreements as Investor Member may reasonably request, in form and substance reasonably acceptable to Investor Member;

(v)     it agrees to provide notice to the Investor Member of any change in the financial condition of the Managing Member or Guarantor that could have a material adverse effect on the ability of the Managing Member or Guarantor to satisfy their respective obligations under the Project Documents or this Agreement;

(w)     it shall at all times maintain insurance in form and amounts satisfactory to the Investor Member, as specified in Section 4.01(ll) and Exhibit C to the Master Lease;

(x)     it shall cause the Building to achieve Substantial Completion by the Outside Substantial Completion Date;

(y)     it shall cause the Property to receive Part 3 Approval within six (6) months of Placement in Service, or such later date as may be Consented to by the Investor Member;

(z)     it shall cause Final Closing to occur within six (6) months of Placement in Service of the Building or such other date as may be agreed to or required by the Lenders and the Investor Member;

(aa)     it shall cause any event of default described in clauses (a), (b) or (c) of Section 5.04, occurring prior to Final Closing, to be cured within thirty (30) days of the Managing Member's receipt of Notice of such default;

(bb)     it shall prevent an event of Bankruptcy from occurring with respect to any Developer Entity;

- 29 -

Confidential                                                                                                   USBCDC00048407

(cc)     it shall not allow the Company to enter into any lease (other than the Master Lease) for any portion of the Project with any Developer Entity or any Affiliate of a Developer Entity;

(dd)     it shall not allow the Company to enter into any agreements, contracts or other arrangements creating rights or obligations that fail to meet the requirements of Section 4.02(2)(c) of the Revenue Procedure (including, without limitation, (1) entering into a sublease that is the same or greater duration than the Master Lease or (2) terminating the Master Lease at any time Investor Member is a Member of Company) or that are not on arm's length terms; and

(ee)     it shall cause the Property to achieve Stabilized Operations by the Outside Stabilized Operations Date.

Legal counsel to Investor Member and Managing Member are hereby permitted to rely on the foregoing covenants in the issuance of federal income tax opinions to Investor Member with respect to the transactions contemplated by this Agreement.

- 30 -

## ARTICLE V.
## MEMBERS, COMPANY INTERESTS AND CAPITAL

5.01    Members, Managing Member, Capital Contributions and Company Interests.

(a)     The Managing Member, its principal address or place of business, its Capital Contribution and its Percentage Interest are set forth in Schedule A attached hereto. On or about the date hereof, the Managing Member shall make a capital contribution to the Company in the amount of $100,000.  The Managing Member shall be obligated (and does hereby covenant and agree) to make an additional capital contribution to the Company in proportion (based on its Percentage Interest) to the aggregate amount of all Installments made by the Investor Member at the time the Third Installment is contributed to the Company by the Investor Member.

(b)     The Investor Member, its principal office or place of business, its Capital Contribution and its Percentage Interest are set forth in Schedule A attached hereto.

(c)     Subject to the provisions of this Agreement, including without limitation the provisions of Sections 5.01(e), 5.02 and 5.03, the Investor Member shall be obligated to make a Capital Contribution to the Company in the aggregate amount set forth on Schedule A, as the same may be adjusted herein (the "Aggregate Expected Capital Contribution") in three (3) Installments, which Installments shall be due and payable in cash by the Investor Member, as follows:

(i)     $2,993,219 (the "First Installment") upon the latest of

(A) the Admission Date;

(B) receipt of evidence of Part 1 Approval and Part 2 Approval and National Park Service approval of all amendments thereto;

(C)  receipt by the Investor Member of a title commitment to issue the Title Policy following the Initial Closing and a Survey;

(D) receipt of evidence of the Managing Member's Capital Contribution satisfactory to the Investor Member;

(E) receipt and approval by the Investor Member of the Architect's Certificate and the Project Preservation Consultant's Certificate that the Plans and Specifications are consistent with the Part 2 Approval and any amendments thereto;

(F) closing of the Project Loans and receipt of copies of all Project Loan Documents;

(G) receipt of a bona-fide third party MAI appraisal;

- 31 -

Confidential

(H) evidence of receipt by Master Landlord of all capital contributions required to be made to Master Landlord at Initial Closing as provided in the Projections;

(I) receipt and approval by Investor Member of construction documentation and the Construction Consultant's pre-closing report; and

(J) the satisfaction of any requirements set forth in this Agreement as prerequisites to the payment of the First Installment, including but not limited to the receipt by the Investor Member of legal and tax opinions satisfactory to Investor Member, but in all events, the First Installment shall be due and payable on the day prior to the first Placement in Service of QREs associated with the Rehabilitation.

(ii) An Installment in an amount equal to ninety percent (90%) of the product of the (a) Actual Federal Historic Tax Credits times (b) the Contribution Per Credit less the amount of the First Installment and any Special Capital Contribution Installment paid pursuant to Section 5.01(e), which Installment is anticipated to be $5,986,439 (the "Second Installment"), and which Installment shall be paid within fifteen (15) days of receipt by Investor Member of all of the following (collectively, the "Second Installment Conditions Precedent"):

(A) the QRE Diligence Items;

(B) evidence satisfactory to the Investor Member that no uncured default exists or event which with the passage of time would constitute a default exists with respect to any loans, including , without limitation, the Project Loans, in form and substance reasonably acceptable to the Investor Member (each a "Lender's Estoppel Certificate" );

(C) evidence that the sources and uses of funds are in balance;

(D) Placement in Service of all QREs evidenced by receipt of a certificate of occupancy, temporary certificate of occupancy, or final inspections for all portions of the Building and any other documents necessary to establish Placement in Service of QREs;

(E) Substantial Completion evidenced by receipt of the Certificate of Substantial Completion from the Architect (*i.e.* AIA G704);

(F) receipt of and approval by the Investor Member of the Final Cost Certification for the Building and, if required by Investor Member, a cost segregation analysis;

(G) evidence satisfactory to the Investor Member of Final Completion;

Confidential

(H) satisfactory review of the Project by the Construction Consultant, including receipt by Investor Member of the Construction Consultants construction report which, among other things, addresses compliance with the Part 2 Approval and any amendments thereto;

(I) receipt and approval by the Investor Member of the Architect's and Project Preservation Consultant's certifications of the Project's compliance with the Part 2 Approval and any amendments thereto;

(J) no defaults under the Project Documents;

(K) the term of the Master Lease shall have commenced;

(L) receipt by the Investor Member of copies of all insurance policies on the Project reasonably acceptable to the Investor Member and in accordance with this Agreement;

(M) receipt of executed Contribution Certificate;

(N) evidence of submittal of the request for Part 3 Approval to the State Historic Preservation Office of the State of Missouri and the Secretary and payment of the fee(s) associated therewith;

(O) satisfaction of the requirements for the payment by the Investor Member of the First Installment;

(P) delivery to the Investor Member of evidence that all reserves and escrows required under this Agreement have been fully funded (or will be fully funded upon payment of this Second Installment);

(Q) evidence of receipt by Investor Member of all outstanding required reporting requirements as listed in Section 13.04 which, among other things, includes the Company's tax return and K-1;

(R) receipt of evidence of the Managing Member's Capital Contribution in the amount required under Section 5.01(a) for such Installment;

(S) ratification of the Guaranty;

(T) receipt by the Investor Member of all amendment applications and approvals to the Part 2 Approval, if any, and

(U) payment of the Investor Member's costs and expenses, including, without limitation, attorneys' fees and expenses, in reviewing the items required as a condition to the Second Installment.

- 33 -

Confidential

Upon the satisfaction of the Second Installment Conditions Precedent, Investor Member shall notify the Managing Member as to the anticipated date of the Second Installment (the "Anticipated Second Installment Date").  Managing Member shall cause to be delivered to Investor Member an updated Title Policy report in form and substance reasonably satisfactory to the Investor Member and dated no earlier than three (3) days prior to the Anticipated Second Installment Date (the "Updated Title Policy Requirement").  Notwithstanding anything in this Section 5.01(c)(ii) to the contrary, to the extent the Updated Title Policy Requirement is not satisfied (due to failure of delivery of the updated Title Policy report, an updated Title Policy report dated more than three (3) days earlier than the Anticipated Second Installment Date or otherwise), the applicable (15) day period for Investor Member's payment of the Second Installment shall be extended until the date that is three (3) days after Investor Member receives an updated Title Policy report in form and substance reasonably satisfactory to the Investor Member.

(iii)     An Installment in an amount equal to one hundred percent (100%) of the product of the (a) Actual Federal Historic Tax Credits times (b) the Contribution Per Credit less the amount of all Installments previously paid, which Installment is anticipated to be $997,740 (the "Third Installment"), and which Installment shall be paid within fifteen (15) days of receipt by Investor Member of all of the following:

(A) receipt of evidence of Part 3 Approval;

(B) receipt of a Lender's Estoppel Certificate from each Lender in form and substance reasonably acceptable to the Investor Member;

(C) receipt of an executed Contribution Certificate;

(D) no defaults under the Project Documents;

(E) receipt by Investor Member of any outstanding reporting requirements as outlined in Section 13.04;

(F) receipt of evidence of the Managing Member's Capital Contribution in the amount required under Section 5.01(a) for such Installment;

(G) ratification of the Guaranty;

(H) satisfaction of the requirements for the payment by the Investor Member of the Second Installment;

(I) evidence of the amount of the Development Fee that has been paid to Developer by Master Landlord or its assignee;

(J) stabilization of the Project as evidenced by a 1.20 Debt Service Coverage Ratio, measured on a trailing twelve (12) month basis, for six consecutive months; and

- 34 -

(K) payment of the Investor Member's costs and expenses, including, without limitation, attorneys' fees and expenses, in reviewing the items required as a condition to the Third Installment.

Notwithstanding anything to the contrary in this Agreement, (i) the aggregate amount of all Installments to be made by the Investor Member shall not exceed $11,474,007 (the "Investor Member Capital Contribution Cap"), and (ii) if at the time the Final Installment is due and payable, the aggregate amount of all Installments, including the Final Installment, is less than the Fixed Contribution, then the Investor Member shall, with the Final Installment, contribute the difference between the Fixed Contribution and the aggregate amount of all Installments, including the Final Installment, and the difference shall be deemed a Credit Recovery Loan.

No Installment shall be due or payable prior to receipt by the Investor Member of an executed Contribution Certificate and of a written payment notice in the form set forth in Exhibit A from the Managing Member at least ten (10) Business Days and not more than thirty (30) calendar days prior to the due date of the Installment specifying the amount of such Installment.

(d)     Subject to the preceding rights of the Investor Member, the Installments shall be used as follows:

(i)     The First Installment shall be used to make the first advance of the MT Loan to Managing Member pursuant to the terms and conditions set forth in the MT Loan Documents;

(ii)     The Second Installment shall be used to make the second advance of the MT Loan to Managing Member in an amount not to exceed $2,332,916, and purchase furniture, fixtures, and equipment ("FF&E") pursuant to that certain Purchase and Sale Agreement, between Master Landlord and Company dated of even date herewith (the "FF&E Purchase Agreement"); and

(iii)     The Third Installment shall be used to purchase FF&E pursuant to the FF&E Purchase Agreement.

(e)     In addition to the preceding agreements concerning Installments:

(i)     Promptly upon the earlier of sixty (60) days prior to Placement in Service of any Rehabilitation in the Building or seventy-five percent (75%) completion of the Rehabilitation, the Managing Member shall provide (i) written notice to the Investor Member either that the Rehabilitation is seventy-five percent (75%) complete or that the first portion of any Rehabilitation will be Placed in Service sixty (60) days after such date, and (ii) the following items (the "QRE Diligence Items"), to the extent requested by Investor Member, (A) a Preliminary Cost Certification or such other QRE support as may be reasonably requested by the Investor Member, (B) the most current form AIA G702 and form AIA G703 with respect to the Project, (C) an estimate from Master Landlord of the remainder of the costs of the Project through Final Completion as well as the amount of the projected available Federal Historic Tax Credits related thereto, based on all of the QREs related to such remaining costs and the anticipated Placement in Service dates

- 35 -

Confidential

thereof, and (D) a certification in the form attached hereto as <u>Exhibit E</u>, from Master Landlord, Contractor, Architect, or other professional reasonably acceptable to the Investor Member, that there have been no change orders other than those previously disclosed to the Investor Member, that the current construction budget is sufficient to complete the Project in accordance with the current plans and specifications, and that includes a schedule of the remaining construction budget (and work not otherwise included in such Preliminary Cost Certification).

        (ii)     Upon receipt and review of the QRE Diligence Items, to the extent there is a material change in projected QREs, as determined by the Investor Member, Investor Member shall notify Managing Member that an amendment to this Agreement is required to adjust the Aggregate Expected Capital Contribution amount, which notification shall include a draft of the amendment in the form attached hereto as <u>Exhibit F</u>. Managing Member shall execute a copy of the amendment within five (5) Business Days of receipt thereof. If Investor Member determines that twenty percent (20%) of the new Aggregate Expected Capital Contribution is greater than the First Installment, the Investor Member in its sole discretion may make a special capital contribution (the "<u>Special Capital Contribution Installment</u>") in the amount necessary to increase the Investor Member's Capital Contribution to twenty percent (20%) of the Aggregate Expected Capital Contribution. In the event Investor Member elects to make a Special Capital Contribution Installment, Managing Member acknowledges and agrees that it shall make an additional capital contribution in accordance with its obligations under Section 5.01(a). Notwithstanding anything to contrary contained herein, including but not limited to Section 5.03(a), if Investor Member requires Managing Member to deliver the items to Investor Member pursuant to Section 5.01(e)(i) and any QREs in connection with the Rehabilitation of the Building (or any portion thereof) are Placed in Service prior to receipt and approval by the Investor Member of the items required pursuant to Section 5.01(e)(i) of this Agreement and/or prior to the execution by the Managing Member of an amendment in the form attached hereto as <u>Exhibit G</u>, Investor Member's Aggregate Expected Capital Contribution obligations as set forth on <u>Schedule A</u> shall be reduced by twenty-five percent (25%) and shall not be subject to further positive adjustments or upward modifications. If the preceding sentence is applicable, the amount of such reduced Capital Contribution obligations of Investor Member shall be Investor Member's Aggregate Expected Capital Contribution.

        (f)     The Managing Member shall deliver to the Investor Member within five (5) days of the Company's receipt of each Installment, written confirmation of the deposit of such Installment into the bank account of the Company.

        (g)     Notwithstanding any provision of this Agreement, or any Project Documents, to the contrary, the Investor Member shall have no obligation to make any Capital Contribution for any QREs that were Placed in Service after the Cut-Off Date.

        5.02   <u>Return of Capital Contribution</u>. Except as provided in this Agreement, no Member shall be entitled to demand or receive the return of any portion of its Capital Contribution. Any other provision of this Agreement to the contrary notwithstanding, the net paid-in Capital Contribution of Investor Member must equal no less than twenty percent (20%)

- 36 -

Confidential                                             USBCDC00048414

of the "Projected Capital Contribution" of Investor Member (*i.e.* the First Installment and the Special Capital Contribution Installment, as adjusted pursuant to Section 5.03 hereof) throughout the duration of its ownership of its Interest in the Company.

      5.03    Downward Adjustments to Investor Member Capital Contributions.

      (a)    If, as a result of a reduction in QREs, a reallocation of Profits or Losses or for any other reason (other than an event described in clause (a) of the definition of Excluded Event), either the Accountants shall determine in preparing the Company's tax returns (or an amended return) or the Final Cost Certification(s), the Investor Member determines in good faith based upon advice from tax counsel or its accountants or there shall be a Final Determination, that the Actual Federal Historic Tax Credits are less than the aggregate Federal Historic Tax Credits relating to Installments which have been paid by the Investor Member as evidenced by the Final Cost Certification(s) and other materials received in connection with the Installments (such determination being referred to herein as the "Credit Determination"), the Accountants shall calculate the difference between the Actual Federal Historic Tax Credits and the aggregate Federal Historic Tax Credits relating to Installments which have been paid by the Investor Member. Such difference shall be multiplied by the Contribution Per Credit and the product shall be referred to herein as the "Credit Adjustment", and the amount of the next succeeding Installment (and any Installment(s) thereafter if necessary) to be paid by the Investor Member after the Credit Determination has been made shall be reduced by the amount of the Credit Adjustment. Notwithstanding the foregoing, any reduction in the Investor Member's Capital Contribution due to a Credit Adjustment shall be limited so that the Investor Member's Capital Contribution is not reduced below the Fixed Contribution. If the Credit Adjustment exceeds the amount of all remaining Installment(s) or would cause Investor Member's Capital Contribution to be less than the Fixed Contribution amount, then the difference shall be deemed a Credit Recovery Loan.

      (b)    If a Recapture/Disallowance Event occurs prior to the time the Investor Member has paid in its Capital Contribution in full, the amount of the next succeeding Installment (and any Installment(s) thereafter if necessary) of the Investor Member shall be reduced by the Recapture/Disallowance Adjustment Amount, but not below the Fixed Contribution. If no further Installment remains, or if the Recapture/Disallowance Adjustment Amount is greater than the aggregate amount of the remaining Installment(s) or would cause Investor Member's Capital Contribution to be less than the Fixed Contribution, then the difference shall be deemed a Credit Recovery Loan.

      (c)    Anything to the contrary herein notwithstanding, the cumulative adjustments under this Section 5.03 due to a negative Credit Adjustment shall be limited so that the Investor Member's Capital Contribution is not reduced below the Fixed Contribution and any balance shall be deemed a Credit Recovery Loan.

      (d)    In the event any Credit Adjustment exceeds the amount of all remaining Installment(s) or is limited so that the Investor Member's Capital Contribution is not reduced below the Fixed Contribution, the Investor Member shall be treated as having made a Credit Recovery Loan equal to the sum of (i) the Installments or portions thereof that would otherwise have been reduced which shall be deemed to have been made on that date the Installments or

- 37 -

Confidential

USBCDC00048415

portions thereof that would otherwise have been reduced were paid plus (ii) the amount of any interest or penalties payable by the Investor Member as a result of the disallowed Federal Historic Tax Credits.  In addition if any Recapture/Disallowance Adjustment Amount pursuant to Section 8.07 is not paid when due by the Managing Member or Guarantor or the Investor Member is assessed any amount which would constitute a Recapture/Disallowance Adjustment Amount but for the fact that it results from an Excluded Event (other than an event described in clause (a) of the definition of Excluded Event) or does not result from a Manager Breach, then the Investor Member shall be treated as having made a Credit Recovery Loan in such amount on such date.  Credit Recovery Loans shall be deemed to bear interest from the respective dates on which such constructive advances shall have been deemed to have been made at an annual interest rate equal to the Designated Prime Rate plus two percent (2%), compounded annually. Credit Recovery Loans shall be payable by the Company as provided in Article XI.  Subsequent to the making of a Credit Recovery Loan, any Recapture/Disallowance Adjustment Amount paid by the Managing Member or Guarantor pursuant to Section 8.07 shall be credited against the outstanding Credit Recovery Loans on the date received.

(e)     Nothing in this Section 5.03, including any of the limitations on the reductions that may be made to the Capital Contribution of the Investor Member as the result of any Credit Adjustment or Excluded Event, shall be deemed to limit any remedy of the Investor Member for loss, liability expense or damages to the Investor Member caused by a Manager Breach or any other act or omission of the Managing Member or any Developer Entity.

5.04   <u>Withholding of Capital Contribution Upon Default</u>.  In the event that: (a) the Managing Member has not substantially complied with any provisions of this Agreement, or (b) any financing commitment of the Lenders or any other lender, or any agreement entered into by Master Landlord for financing related to the Property, has terminated or is in default, (c) any events described in Section 8.11 herein has occurred, (d) foreclosure proceedings have been commenced against the Leasehold Interest or the Property or any portion thereof, (e) the members of the Master Landlord have not made their capital contribution to Master Landlord as required by the Master Landlord Operating Agreement and pursuant to the Projections, or (f) any default exists after expiration of all applicable notice and cure periods under any of the Project Documents, then the Company and the Managing Member shall be in default of this Agreement, and the Investor Member, at its sole election, may withhold payment of any Installment otherwise payable to the Company, except that if a payment of all or any portion of the then due Installment will cure the event justifying the withholding, then the Investor Member may pay such Installment otherwise payable if it is applied to cure such event.  At the sole election of the Investor Member, it may directly apply all or any part of any unpaid Installment to cure the event justifying the withholding, including but not limited to the failure of the Managing Member to make payments required under Sections 5.05 and 8.07.

Unless applied as set forth above, all amounts so withheld by the Investor Member under this Section 5.04 shall be promptly released to the Company only after the Managing Member or the Company has cured the default justifying the withholding, as demonstrated by evidence reasonably acceptable to the Investor Member.

5.05   <u>Member Loans</u>.

- 38 -

(a)      Subject to Section 8.13, the Managing Member shall have the right, but not the obligation, after funding all other obligations under this Agreement, to make Subordinated Loans pursuant to this Section 5.05(a) to fund Operating Deficits of the Company or to fund other reasonable and necessary obligations of the Company.   Notwithstanding anything in the foregoing to the contrary, in the event that an Operating Deficit exists during the Initial Operating Period, the Managing Member shall provide such funds to the Company as shall be necessary to pay such Operating Deficit(s) in the form of Subordinated Loans.   The Managing Member shall make Subordinated Loans in such amounts and at such intervals so as to allow the Company to cover accrued accounts payable on a 60-day current basis. A Subordinated Loan made to fund Operating Deficits during the Initial Operating Period shall be treated as if it were a Subordinated Loan in accordance with the provisions of Section 5.05(b), except that such Subordinated Loan shall bear no interest, and shall be repaid only if the Managing Member is not in default with respect to its obligations under this Agreement.

(b)      At the request of a Member, which request may be made quarterly, any Subordinated Loan shall be evidenced by a non-negotiable promissory note or notes reflecting any such Subordinated Loans made during the preceding calendar quarter. Subordinated Loans shall be on the following terms:   (i) subject to Section 5.05(a), interest shall accrue on Subordinated Loans at an annual interest rate equal to the Designated Prime Rate, compounded annually; and (ii) Subordinated Loans shall be repayable solely as set forth in Sections 11.01 and 11.04 of this Agreement.   Subordinated Loans shall be unsecured loans.   Subordinated Loans shall not be considered a part of a Member's Capital Contribution and shall not increase such Member's Capital Account.

(c)      Without limiting any of the Investor Member's rights hereunder and under applicable law, the Investor Member shall also have the right, but not the obligation, to make IM Loans pursuant to this Section 5.05(c) to fund Operating Deficits of the Company in the event that the Managing Member and the Guarantor fail to make Subordinated Loans as required pursuant to Section 5.05(a) of this Agreement and the Guaranty.   IM Loans shall be on the following terms:   (i) interest shall accrue on IM Loans at an annual interest rate equal to Designated Prime Rate plus two percent (2%), compounded annually; and (ii) IM Loans shall be repayable as set forth in Section 11.01, and pursuant to Sections 11.04 and 12.02 and Article XV of this Agreement.   By making an IM Loan, the Investor Member does not waive any claim of, or remedies with respect to, a default, if any, by the Managing Member in its obligations under this Agreement.   Interest shall be payable as provided above, or if such rate is in excess of the highest interest rate allowed by law, then interest shall be payable at the highest rate allowable by law.

#8370189 Operating Agreement
Last Hotel Master Tenant LLC

Project No. 24586

Confidential

USBCDC00048417

## ARTICLE VI.
## CHANGES IN MANAGING MEMBER

6.01    Resignation of a Managing Member.

(a)    A Managing Member may resign from the Company or sell, transfer or assign its Interest as Managing Member (or a Controlling Interest in the Managing Member) only with the Consent of the Investor Member, and if required, of the Lenders, and only after being given written approval by the necessary parties as provided in Section 6.02 of the Managing Member(s) to be substituted for it or to receive all or part of its Interest as Managing Member.

(b)    In the event that a Managing Member resigns from the Company or sells, transfers or assigns its entire Interest in compliance with Section 6.01(a), it shall be and shall remain liable for all obligations and liabilities incurred by it as Managing Member before such resignation, sale, transfer or assignment shall have become effective, but shall be free of any obligation or liability incurred on account of the activities of the Company from and after the time such resignation, sale, transfer or assignment shall have become effective.

6.02    Admission and Appointment of a Successor or Additional Managing Member.  A Person shall be admitted and appointed as a Managing Member of the Company only if the following terms and conditions are satisfied:

(a)    the admission and appointment of such Person shall have been Consented to by the Managing Member or its successors and the Investor Member, and consented to, if required, by the Lenders;

(b)    the successor or additional Person shall have accepted and agreed to be bound by (i) all the terms and provisions of this Agreement, by executing a counterpart thereof, (ii) all the terms and provisions of the Project Documents, to the extent applicable, by executing a counterpart thereof, and (iii) all the terms and provisions of such other documents or instruments as may be required or appropriate in order to effect the admission and appointment of such Person as a Managing Member, and an appropriate document evidencing the admission and appointment of such Person as a Managing Member shall have been filed, if required, and all other actions required by Section 1.05 in connection with such admission and appointment shall have been performed;

(c)    if the successor or additional Person is a limited liability company or corporation, it shall have provided the Company with evidence satisfactory to counsel for the Company of its authority to become a Managing Member, to do business in the State and to be bound by the terms and provisions of this Agreement; and

(d)    Counsel, upon request of the Investor Member, shall have rendered an opinion that the admission and appointment of the successor or additional Person is in conformity with the Act and that none of the actions taken in connection with the admission and/or appointment of such Person will cause the termination or dissolution of the Company or will cause it to be treated for federal income tax purposes as an association taxable as a corporation.

- 40 -

Confidential

6.03    Effect of Bankruptcy, Death, Withdrawal, Dissolution or Incompetence of a Managing Member.

(a)    In the event of the Bankruptcy of the Managing Member, the termination, resignation, death or dissolution of the Managing Member or the adjudication that a Managing Member is incompetent (which term shall include, but not be limited to, insanity), the business of the Company shall be continued by the other Members unless the Company is terminated as otherwise provided for herein.

(b)    Upon the Bankruptcy, death, dissolution or adjudication of incompetence of a Managing Member, such Person shall immediately cease to be a Managing Member and its Interest if applicable shall, without further action, be converted to a Member's Interest until such time as the appointment and admission of a successor Managing Member hereunder, at which time such Interest (i) will be assigned to such replacement Managing Member and (ii) shall be ratably reduced to the extent necessary to insure that the remaining or substitute Managing Member holds a Percentage Interest equal to one percent (1%).  Promptly thereafter, the Investor Member may appoint a successor Managing Member in the same manner as provided for in the event of termination of a Managing Member as described herein.   The successor Managing Member shall have all rights and responsibilities of the Managing Member under this Agreement which arise following the date of appointment of such successor Managing Member. Until the Investor Member has appointed a successor Managing Member, the Investor Member shall have all rights and responsibilities of the Managing Member under this Agreement.

(c)    A Managing Member that ceases to be a Managing Member in accordance with the provisions of this Section 6.03 shall cease to have any further rights under this Agreement, except as expressly set forth in this Section.  A Managing Member that ceases to be a Managing Member in accordance with the provisions of this Section 6.03 shall (i) be entitled to reimbursement of expenses or any fees or compensation provided for in this Agreement arising or earned before ceasing to be a Managing Member, and (ii) remain liable for all of its obligations and liabilities as Managing Member that accrued before the date which the Managing Member ceased to be a Managing Member.   Any amounts payable by the Company to a Managing Member that ceases to be a Managing Member in accordance with the provisions of this Section 6.03 whether as reimbursements, payments on Subordinated Loans, or otherwise, may be applied by the Company to meet the Managing Member's obligations and liabilities (including any liability under any indemnification, but only obligations and liabilities incurred in its capacity as Managing Member) to the Company or the other Members, shall be deemed paid to the Managing Member, and such application shall serve to reduce any such obligations or liabilities of the Managing Member.

(d)    If, at the time of termination, resignation, Bankruptcy, death, adjudication that a Managing Member is incompetent or dissolution of the Managing Member, the Managing Member was not the sole Managing Member, then the remaining Managing Member(s) shall immediately (i) give Notice to the Investor Member of such termination, resignation, Bankruptcy, or dissolution and (ii) make such amendments to this Agreement and execute and file for recordation such amendments or documents or other instruments necessary to reflect that such Managing Member is no longer a Managing Member.

- 41 -

Confidential

(e)     All parties hereto hereby agree to take all actions and to execute all documents as shall be necessary or appropriate to effect the foregoing provisions of this Section 6.03.

(f)     The Managing Member, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, agrees that in the event the Managing Member should make application for or seek protection or relief under any of the Sections or Chapters of the United States Bankruptcy Code (the "Bankruptcy Code"), or in the event that any involuntary petition is filed against the Managing Member, then, in such event, any other Member shall thereupon be entitled to immediate relief from any automatic stay imposed by Section 362 of the Bankruptcy Code, or otherwise, on or against the exercise of the rights and remedies available to such Member pursuant to this Agreement, or otherwise.  The foregoing shall in no way preclude, restrict or prevent the Managing Member from filing for protection under the Bankruptcy Code.

(g)     The Members acknowledge and agree that this Agreement is a contract under which the Investor Member is excused from accepting performance from the Managing Member, its assignee or trustee, in the event that the Managing Member makes application for or seeks protection under any of the Sections or Chapters of the Bankruptcy Code, or in the event that an involuntary petition is filed against such Managing Member.  The effect of this Paragraph shall be that this Agreement is hereby deemed to be subject to the exceptions to assumption and assignment of contracts set forth in Sections 365(c)(1) and 365(e)(2)(A) of the Bankruptcy Code and that the Investor Member, by its refusal to consent to an assumption or assignment of this Agreement by the Managing Member after the filing of a petition in bankruptcy by or against such Managing Member, shall be able to prevent such assumption or assignment.

(h)     In the event that the Managing Member makes application for or seeks relief or protection under any of the Sections or Chapters of the Bankruptcy Code, or in the event that any involuntary petition is filed against said Managing Member, then, in such event, any Member may apply or move to the bankruptcy court in which such petition is filed for a change of venue to the bankruptcy court where the Company has its principal place of business, and the Managing Member hereby agrees not to oppose or object to such application or motion in any way.

Confidential

## ARTICLE VII.
## ASSIGNMENT TO THE COMPANY

The Managing Member acknowledges that in consideration for its appointment as the Managing Member, it hereby transfers and assigns to, or shall cause the Master Landlord to transfer and assign to, the Company any and all of its rights, title and interest it may have in and to the Leasehold Interest, including without limitation the following:

        (a)    all contracts with respect to the operation of the Property;

        (b)    all governmental approvals obtained in connection with the operations of the Property;

        (c)    any Project Documents and other work product related to the Leasehold Interest; and

        (d)    the foregoing rights, title and interest are deemed to have no value for purposes hereof.

- 43 -

Confidential

USBCDC00048421

## ARTICLE VIII.
## RIGHTS, OBLIGATIONS AND POWERS OF THE MANAGING MEMBER

8.01     Management of the Company.

(a)     Except as otherwise set forth in this Agreement, the Managing Member, within the authority granted to it under this Agreement, shall have full, complete and exclusive discretion to manage and control the business of the Company for the purposes stated in Article III, shall make all decisions affecting the business of the Company and shall manage and control the affairs of the Company to the best of its ability and use its best efforts to carry out the purpose of the Company.  In so doing, the Managing Member shall take all actions necessary or appropriate to protect the interests of the Investor Member and of the Company.  The Managing Member shall devote such of its time as is necessary to the affairs of the Company.

(b)     Except as otherwise set forth in this Agreement and subject to the applicable requirements of the Lenders and the provisions of the Project Documents, the Managing Member (acting for and on behalf of the Company), in extension and not in limitation of the rights and powers given by law or by the other provisions of this Agreement, shall, in its sole discretion, have the full and entire right, power and authority in the management of the Company business to do any and all acts and things necessary, proper, convenient or advisable to effectuate the purpose of the Company.  In furtherance and not in limitation of the foregoing provisions, the Managing Member is specifically authorized and empowered to execute and deliver, on behalf of the Company, the Project Documents and any bank resolution and signature card, release, discharge, or any other document or instrument in any way related thereto or necessary or appropriate in connection therewith.  All decisions made for and on behalf of the Company by the Managing Member shall be binding upon the Company.  No person dealing with the Managing Member within the authority granted under this Agreement shall be required to determine its authority to make any undertaking on behalf of the Company, nor to determine any facts or circumstances bearing upon the existence of such authority.  The Managing Member shall take all actions on behalf of the Company which pertain to the acquisition of the Leasehold Interest, the admission of the Investor Member to the Company, the obtaining of the Master Lease and the Company's loan to the Managing Member.

8.02     Limitations Upon the Authority of the Managing Member.

(a)     The Managing Member shall not have any authority to:

(i)     perform any act in violation of any Applicable Laws;

(ii)     perform any act in violation of the provisions of any of the Project Documents;

(iii)     do any act required to be approved or ratified in writing by the Investor Member under the Act unless the right to do so is expressly given in this Agreement;

(iv)     borrow from the Company or commingle Company funds with funds of any other Person; or

- 44 -

Confidential

(v)     enter into any sublease that has a term that extends past the term of the Master Lease.

(b)     The Managing Member shall not, without the Consent of the Investor Member, have any authority to:

(i)     sell, finance or otherwise dispose of all or substantially all of the assets of the Company, including the Leasehold Interest and the MT Loan;

(ii)     grant or refinance any mortgage (including any Leasehold Mortgage, which shall also require the consent of the Lenders in accordance with the relevant Project Loan Documents) or other indebtedness of the Company;

(iii)     permit a disposition of the Leasehold Interest within the meaning of Section 50 of the Code, or take any action that would cause a recapture, reallocation, loss or disallowance, or claimed recapture, reallocation, loss or disallowance of the Federal Historic Tax Credits;

(iv)     supplement, replace, renew, cancel or amend any of the Project Documents (including but not limited to any change in the Master Lease Payment);

(v)     enter into a Leasehold Loan;

(vi)     incur debt in excess of $10,000 in the aggregate at any one time outstanding on the general credit of the Company, except borrowings constituting Subordinated Loans and/or IM Loans other than customary unsecured trade payables incurred in the ordinary course of operating the Project, provided the same do not exceed, in the aggregate, at any time a maximum amount of $50,000 and are paid within sixty (60) calendar days of the date incurred;

(vii)     undertake any rehabilitation, repairs or other work on the Building inconsistent with the Secretary's Standards;

(viii)     construct any new or replacement capital improvements on the Property which substantially alter the Property or its use or which are at a cost in excess of $10,000 in a single Company Fiscal Year;

(ix)     acquire any real property interest in addition to the Leasehold Interest;

(x)     make any filing to begin Bankruptcy proceedings on behalf of the Company or confess a judgment on behalf of the Company;

(xi)     make application(s) for or accept any grant funds on behalf of the Company regardless of the source of the grant;

(xii)     pledge or assign any of the assets of the Company, including the right to receive the Investor Member's Capital Contribution or the proceeds thereof;

- 45 -

(xiii)   cause the Company to settle, compromise, mediate or otherwise relinquish any claim (actual or prospective), or to release, waive or diminish any material Company rights in any litigation or arbitration matter involving a claim in excess of $15,000;

(xiv)   change the nature of the Company's business;

(xv)   dissolve and wind up the Company;

(xvi)   permit the merger or termination of the Company;

(xvii)   enter into any sublease with any "tax-exempt entity" as that term is defined in Section 168(h) of the Code, including the United States, any state or political subdivision thereof, or any agency or instrumentality of any of the foregoing; any organization exempt from federal income tax; or any foreign person or entity, if such sublease results in any portion of the Property being treated as "tax-exempt use property" as that term is used in Section 168(h) of the Code;

(xviii) take any action or fail to take any action that causes or is likely to cause the Building to be certified as noncontributing to the historic district in which it is located, as applicable, or revocation of the Part 3 Approval;

(xix)   grant or request on behalf of the Company any approval, removal or consent provided for in the Project Documents;

(xx)   take any action or fail to take any action that would prevent the Federal Historic Tax Credits from being passed through to the Company pursuant to the Master Lease, including without limitation, any action which would be required to maintain compliance with the Safe Harbor.

(xxi)   guarantee the indebtedness of any Person; or

(xxii)   confess any judgment against the Company, or commence litigation on behalf of the Company, except for tenant eviction matters in the normal course of business or compromise any claim or liability owed by the Company or consent to a settlement with respect to any claim, lawsuit or other legal or administrative proceeding involving the Company as a party;

(xxiii) engage in transactions in which the Managing Member or an Affiliate of the Managing Member has an actual or potential conflict of interest with either the Investor Member or the Company and which could have a material adverse effect on the Company or its leasehold interest in and to the Project;

(xxiv) except as otherwise set forth in MT Loan Documents and the F&B Sublease, cause or permit the Company to enter into any  contract or agreement with the Managing Member or any Affiliate of any Managing Member;

- 46 -

Confidential

(xxv) make any unbudgeted expenditure (or series of unbudgeted expenditures) except as permitted hereunder;

(xxvi) change any accounting method or practice of the Company in any manner that would materially adversely impact the Investor Member or the Company or replace the Accountants;

(xxvii) give any approval for or consent to Master Landlord borrowing any loans or otherwise obtaining financing that is not contemplated in this Agreement, the Project Loan Documents, or the Master Landlord Operating Agreement, including, without limitation, any refinancing or replacement of the Project Loan;

(xxviii) cause or permit the Company to become, in the opinion of counsel to the Investor Member, subject to any economic risk of loss within the meaning of Treasury Regulation Section 1.752-2, or any successor provision, with respect to any Company debt;

(xxix) take any action which would cause the Company to make, or be obligated to make, an equity investment in (i) Master Landlord or (ii) any other Person;

(xxx) take any action which would cause the termination of the Company for federal income tax purposes or dissolution of the Company for state law purposes;

(xxxi) sublease as an entirety the Property or enter into subleases of the Property without the Consent of the Investor Member;

(xxxii) admit any Person as a Member, except as otherwise provided in this Agreement;

(xxxiii) enter into any sublease with an Affiliate of the Managing Member or any other Developer Entity;

(xxxiv) exercise any rights or remedies with respect to the MT Loan; or

(xxxv) take any action for which the Consent of the Investor Member is required under any other provision of this Agreement without obtaining such Consent in each such instance.

8.03   <u>Management Purposes</u>.   In conducting the business of the Company, the Managing Member shall be bound by the Company's purpose(s) set forth in Article III.

8.04   <u>Delegation of Authority</u>.  The Managing Member may delegate all or any of its powers, rights and obligations hereunder, and may appoint, employ, contract or otherwise deal with any Person for the transaction of the business of the Company, which Person may, under supervision of the Managing Member, perform any acts or services for the Company as the Managing Member may approve.  No such delegation or other action described herein shall (i) relieve the Managing Member of its obligations and responsibilities to ensure the proper

- 47 -

Confidential

USBCDC00048425

management of the Company and the Project or (ii) relieve the Managing Member of its obligations under this Agreement.

8.05    Developer Entity Dealings with the Company.

(a)    Subject to Section 8.14, a Developer Entity may act as Developer or a Property Manager on terms and conditions permitted by the Investor Member and each of the Lenders, if applicable, on such terms and conditions and may receive compensation in each case meeting the standards set forth in Section 8.05(b).

(b)    Neither the Company nor the Managing Member shall enter into any agreement with any Developer Entity for the sale of goods or services to the Company not specifically provided for in this Agreement unless (i) the compensation paid for such goods or services is reasonable (*i.e.*, at fair market value) and is paid only for goods or services actually furnished to the Company, (ii) the goods or services to be furnished are reasonable for and necessary to the Company, (iii) the fees, terms and conditions of such transaction are at least as favorable to the Company as would be obtainable in an arm's-length transaction, and (iv) no agent, attorney, accountant or other independent consultant or contractor who also is employed on a full-time basis by any Developer Entity shall be compensated by the Company for his or her services.  At the Investor Member's option, a report from a qualified, independent third party as to whether the terms of any such agreements, contracts or other arrangements are arms' length may be required.

Any contract covering such transactions shall be in writing and shall be terminable without penalty on ninety (90) days' Notice.  Any payment made to a Developer Entity for such goods or services shall be fully disclosed to the Investor Member in the reports required under Section 13.04.  The Company shall not, by the making of lump-sum payments to any Person for disbursement by such Person, circumvent the provisions of this Section 8.05(b).

Notwithstanding the foregoing, the Investor Member hereby consents to the Master Lease, the MT Loan Documents, the Property Management Agreement, the SNDA, and the Development Agreement in the forms executed at Initial Closing.

8.06    Other Activities.  The Investor Member, its members and Affiliates may engage in or possess interests in other business ventures of every kind and description for their own account, including, without limitation, serving as a member of other limited liability companies which own, either directly or through interests in other limited liability companies, projects similar to the Property.  Neither the Company nor any other Member shall have any rights by virtue of this Agreement in or to such other business ventures or to the income or profits derived therefrom.

8.07    Liability for Acts and Omissions.  No Managing Member shall be liable, responsible or accountable in damages or otherwise to any of the Members for any act or omission performed or omitted by it in good faith on behalf of the Company and in a manner reasonably believed by it to be within the scope of the authority granted to it by this Agreement and in the best interest of the Company, except that the Managing Member shall be liable for, and shall indemnify, defend, and hold harmless the Company and the Investor  Member from

- 48 -

Confidential

USBCDC00048426

and against any loss, liability, damage, cost or expense (including reasonable attorneys' fees) arising out of, its actions and/or omissions to the extent they are attributable to a Manager Breach or actions performed outside the scope of its authority, and further provided that this will not affect the Managing Member's guaranties and obligations hereunder, which remain in full force and effect, unaffected by this provision.  Any loss or damage incurred by the Managing Member by reason of any act or omission performed or omitted by it in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority granted to it by this Agreement and in the best interests of the Company (but not, in any event, any loss or damage incurred by any Managing Member by reason of a Manager Breach) shall be paid from Company assets to the extent available (but the Investor Member shall not have any personal liability to the Managing Member under any circumstances on account of any such loss or damage incurred by the Managing Member or on account of the payment thereof).

The Managing Member shall indemnify, defend and hold harmless the Investor Member and the Company (and the Company shall indemnify, defend and hold harmless the Investor Member) from and against any actual loss, liability, damage, cost or expense (including reasonable attorneys' fees) to the extent that the Managing Member's (including its employees and/or agents) acts and/or omissions constituted a Manager Breach and such breach had a material adverse effect on the Company or the Investor Member.  In connection therewith and not in way of limitation of the above, the Managing Member shall be obligated to pay damages to Investor Member at the time provided in the following sentence if, (i) Managing Member fails to satisfy its duties and obligations with respect to Section 4.02(y), (ii) Managing Member fails to satisfy its duties and obligations with respect to Section 4.02(z), (iii) any Developer Entity fails to obtain and maintain casualty insurance as required by the Project Documents, (iv) an Event of Bankruptcy has occurred with respect to any Guarantor or an Affiliate prior to the Final Closing, (v) unless the Managing Member or the Guarantors have funded Operating Deficits when and as required herein, the Project fails to achieve Stabilized Operations by the Outside Stabilized Operations Date, or (vi) any Developer Entity fails to properly and accurately certify QREs (each a "Critical Event"); provided, that Investor Member shall have the sole and exclusive right to extend any date that triggers a Critical Event. Upon the occurrence of any of the Critical Events, the Managing Member shall, within ten (10) calendar days thereafter, give Notice to the Investor Member of the occurrence of such Critical Event and of the Managing Member's obligation to pay damages to Investor Member. The Investor Member may by Notice to the Managing Member at any time after becoming aware of the events specified herein, regardless of whether the Managing Member has complied with the ten (10) calendar day Notice requirement described herein, elect to require the Managing Member to pay damages to the Investor Member (an "Indemnity Payment")  in an amount equal to 100% of the Investor Member's Capital Contributions paid to such date plus costs and expenses incurred by the Investor Member related to such events. The Managing Member shall make the Indemnity Payment to the Investor Member as required above within ten (10) calendar days after receipt of Notice from the Investor Member of the occurrence of one of the events described in this Section 8.07 and shall indemnify the Investor Member, and hold it harmless from and against, any and all claims or other liability arising respecting the occurrence of the Critical Events.

Without limiting the generality of the foregoing the Managing Member shall indemnify, defend and hold harmless the Investor Member and the Company (and the Company shall indemnify, defend and hold harmless the Investor Member) from and against any actual loss,

- 49 -

Confidential

liability, damage, cost or expense (including reasonable attorneys' fees) from a Recapture/Disallowance Event. If a Recapture/Disallowance Event occurs prior to the time the Investor Member has paid in its Capital Contribution in full, the amount of the next succeeding Installment (and any Installment(s) thereafter if necessary) of the Investor Member shall be reduced by the Recapture/Disallowance Adjustment Amount but not below the Fixed Contribution. If no further Installment remains, or if the Recapture/Disallowance Adjustment Amount is greater than the aggregate amount of the remaining Installment(s) or would cause the Investor Member's Capital Contribution to be reduced below the Fixed Contribution, then the difference between the Recapture/Disallowance Adjustment Amount and the amount by which such Installment(s) were reduced, (the "Recapture/Disallowance Adjustment Differential"), shall (i) be treated as a Credit Recovery Loan and (ii) Managing Member shall be obligated to make an indemnification payment to Investor Member in the amount of the Recapture/Disallowance Adjustment Differential and Guarantor under the Guaranty, shall guarantee the payment of the Recapture/Disallowance Adjustment Differential to Investor Member. Payment of such Recapture/Disallowance Adjustment Differential shall not relieve Managing Member from the payment of any other indemnification obligation that it may have to Investor Member under this Section 8.07. Any amounts not paid within thirty (30) days of written demand shall bear interest at an annual interest rate equal to the Designated Prime Rate plus four percent (4%), compounded annually, until paid in full, except that if such rate is in excess of the highest interest rate allowed by law, then interest shall be payable at the highest rate allowable by law. Nothing herein is intended to provide a duplicative remedy for the same harm.

The Managing Member shall indemnify, defend and hold harmless the Investor Member from and against any loss, liability, damage, cost or expense (including reasonable attorneys' fees) for any Transfer Taxes (as hereinafter defined) incurred by the Investor Member as a result of the Investor Member's admission to, or becoming a Member of, the Company or the exercise of the Investor Member's rights under Section 15.01 below. As used herein, "Transfer Taxes" means any real property transfer taxes assessed by or within the State or the city or county in which the Property is located, including, without limitation, any such taxes imposed on the transfer of an interest in an entity that owns real property.

The indemnification rights contained in this Section 8.07 shall (i) be joint and several recourse obligations of the Managing Members (if more than one); (ii) survive dissolution of the Company, the withdrawal, removal, incompetence, bankruptcy or insolvency of the Managing Member and the withdrawal, insolvency, dissolution or bankruptcy of the Investor Member; and (iii) be cumulative of and in addition to any and all rights, remedies and recourses to which the Investor Member shall be entitled, whether pursuant to the provisions of this Agreement, at law or in equity.

8.08    Company Taxable as Partnership.

(a)    The Managing Member shall take such steps and comply with such other requirements as may from time to time be necessary to assure that all provisions of the Code (as now or hereafter interpreted by the IRS or the courts) are met that are necessary to assure that the Company is classified as a partnership for federal income tax purposes.

- 50 -

(b)     Upon request, the Managing Member shall deliver to the Investor Member financial statements or other evidence reasonably satisfactory to the Investor Member of compliance with the requirements with Section 8.08(a).  If the Managing Member is unable to comply with the requirements of Section 8.08(a) then, at the request of the Investor Member, and subject to Section 6.02, an additional or substitute Managing Member shall be admitted who shall cause the Managing Member to be in compliance with Section 8.08(a).

8.09    Net Interim Income.  Any Net Interim Income will be used to pay the Priority Return during the Property Development Period and, with the Consent of the Investor Member, any remaining Net Interim Income shall be added to Net Cash Flow for the first Company Fiscal Year in which Net Cash Flow is to be determined.

8.10    Withholding of Fee Payments.  Without limitation on any other provision in this Agreement, upon the occurrence of any of the events described in Section 5.04, then the Managing Member shall be in default of this Agreement, and the Company shall withhold payment of any amounts otherwise payable to it hereunder until such time as such default shall have been cured, except that if a payment of all or any portion of such amounts then otherwise due would cure the event justifying the withholding, then the Company shall pay such amounts otherwise payable if it is applied to cure such event.

8.11    Removal of the Managing Member.

(a)     The Investor Member shall have the right to remove the Managing Member subject to Section 8.11(b):

(i)      for any Manager Breach; or

(ii)     upon the occurrence of any of the following:

(A)     the Managing Member shall have conducted its own affairs or the affairs of the Company in such manner as would:

(1)     cause the Company to fail to qualify as a limited liability company under the Act;

(2)     cause the termination of the Company for federal income tax purposes;

(3)     cause the Company to be treated for federal income tax purposes as an association taxable as a corporation;

(4)     cause a recapture, reallocation, loss or disallowance, or claimed recapture, reallocation, loss or disallowance, of the Federal Historic Tax Credits; or

(5)     cause non-compliance with the Safe Harbor.

- 51 -

Confidential

(B)     an event of Bankruptcy shall have occurred with respect to the Company or any Developer Entity; or there shall have occurred the liquidation or dissolution of any corporate Guarantor; or the death of the individual Guarantor, but then only if the personal representative of such Guarantor shall have failed to timely reach a binding agreement with the Company as provided for in the Guaranty;

(C)     any of the events specified in subparagraphs (A) and/or (B) immediately above have occurred with respect to any Developer Entity in which any Affiliate of the Investor Member is an investor;

(D)     the Managing Member shall have been removed as the managing member of Master Landlord;

(E)     failure of the Managing Member to comply with its obligations under the Master Landlord Operating Agreement, and such failure shall not have been cured within any applicable cure period;

(F)     unless the Managing Member or the Guarantors have funded Operating Deficits when and as required herein, if net operating income for any Fiscal Year is less than seventy five percent (75%) of the projected net operating income for such year (as set forth in the Budget) for two (2) consecutive years;

(G)     any other event under the Act which permits removal of the Managing Member;

(H)     the Master Lease shall have terminated prior to the expiration of its term for any reason; or

(I)     any event of default by any Guarantor pursuant to the terms of the Guaranty, unless otherwise satisfied as provided for therein.

(b)     The Investor Member shall give Notice to all Members of its determination that the Managing Member shall be removed.  The Managing Member shall have the lesser of (1) thirty (30) days after receipt of such Notice or (2) the cure period applicable to the event of default as determined by the operative document, to cure any default or other reason for such removal (if susceptible to cure), except that if, upon the expiration of said thirty (30) day period, the Managing Member shall not have cured such default and, if in the reasonable judgment of the Investor Member, (x) the Managing Member has made reasonable progress towards cure, and (y) the default was not capable of being cured within said thirty (30) day period, then unless and to the extent the nature of the default is such that there is a likelihood of material loss, liability or prejudice to the Investor Member its members or Affiliates from any such delay in removal, the Managing Member shall have thirty (30) additional days in which to cure any such default, in which event it shall remain as Managing Member; provided, further, that (i) the foregoing initial thirty (30) day cure period shall not apply in the case of Bad Acts or an event under Section 8.11(a)(ii)(A), or Section 8.11(a)(ii)(G), or in the event of any failure or violation that constitutes an event of default as defined in the Master Lease and as to which no

- 52 -

Confidential

USBCDC00048430

cure period is provided to the Company or if the cure period is shorter than thirty (30) days; and (ii) the aforesaid cure period shall commence as provided above, but in any event shall be deemed to commence simultaneously with the cure period provided in any Project Loan Document and to terminate in one-half of the time for cure set forth in such Project Loan Document.  If the default or other cause for removal shall not be susceptible to cure or shall not have been cured within any applicable cure period, the then Managing Member shall cease to be a Managing Member, and the powers and authorities conferred on it as Managing Member under this Agreement shall cease, and the Interest of such Managing Member and its rights and obligations shall be transferred to a Person designated by the Investor Member.   Upon its appointment as Managing Member to the Company, such Person shall become a Managing Member.

(c)      (i)      In the event that the Managing Member is removed as aforesaid prior to Final Closing, it shall be and shall remain liable for all obligations and liabilities incurred by it as Managing Member of the Company before such removal became effective, except that if amounts otherwise payable to the Managing Member as fees are applied to meet the Managing Member's obligations stated in Sections 5.04 and 8.11 of this Agreement, such application shall serve to reduce any such liabilities of the Managing Member or any successor, except for any liability incurred as the result of its Bad Acts as Managing Member of the Company.

If the Managing Member is removed prior to Final Closing as aforesaid, it shall not be entitled to payment of any further installments of any fees which otherwise would have been due and payable, including any fees due and payable, under any arrangements or agreements described in this Article VIII.

(ii)      In the event that the Managing Member is removed as aforesaid after Final Closing, it shall be and shall remain liable for all obligations and liabilities incurred by it as Managing Member of the Company before such removal became effective, including but not limited to the Managing Member's obligations and liabilities under Section 5.05 of this Agreement; provided however, that if amounts otherwise payable to the Managing Member as fees are applied by the Company at the request of the Investor Member to pay Operating Deficits, such application shall serve to reduce any such liabilities after Final Closing, except for any liability incurred as the result of its Bad Act as Managing Member of the Company.

(d)      In the event that the Managing Member has been removed pursuant to this Agreement, the Investor Member shall have the right to designate a successor Managing Member and continue the business of the Company.  In addition to the preceding rights, the Investor Member shall have the right to amend the Company's Articles and this Agreement and take such other action as may be necessary to permit the Company to be manager managed.

(e)      Upon the occurrence of an event described in Section 8.11(a)(ii)(B), Managing Member shall immediately cease to be a Managing Member of the Company, the remaining or successor Managing Member shall cause the Company to redeem the bankrupt Managing Member's Interest for One Hundred Dollars ($100) and such Managing Member shall thereafter cease to have any interest in the capital, profits, losses, distributions, and all other

- 53 -

Confidential                                                                                                    USBCDC00048431

economic incidents of ownership of the Company, and all agreements between the Company and any Affiliates of such Managing Member may, at the election of the Investor Member, be terminated without penalty to the Company, whereupon the Company shall have no further obligation under any such agreements.  The Investor Member hereby is granted an irrevocable power of attorney, coupled with an interest, to execute any and all documents on behalf of the Members and the Company as shall be legally necessary and sufficient to effect all of the foregoing provisions of this Section 8.11.  The election by the Investor Member to remove the Managing Member under this Section shall not limit or restrict the availability and use of any other remedy which the Investor Member or any other Member might have with respect to the Managing Member in connection with their undertakings and responsibilities under this Agreement.  Nothing in this Section 8.11 shall reduce or otherwise limit the rights, remedies or other actions available to the Investor Member against the removed Managing Member.

8.12    <u>Reserves</u>.  The Managing Member shall cause the Company to establish and maintain all Reserves identified in Schedule B or required to be maintained by the Company pursuant to the Project Documents.

8.13    <u>Loans to the Company</u>.  The Company is authorized to receive Subordinated Loans and/or IM Loans on the terms set forth in this Agreement with the Consent of the Investor Member.  In addition, if (i) additional funds are required by the Company for any purpose relating to the business of the Company or for any of its obligations, expenses, costs or expenditures, and (ii) the Company has not received a Subordinated Loan and/or IM Loan to pay such amounts, then the Company may borrow such funds as are needed from a Person or organization, other than a Developer Entity, in accordance with the terms of this Section 8.13, for such period of time and on such terms as the Managing Member and the Investor Member may agree, except that no such additional loans shall be secured by any mortgage or other encumbrance on the property of the Company without the Consent of the Investor Member except that such Consent shall not be required in the case of purchase money security interests with respect to property purchased by the Company and not included in the security agreements executed by the Company at the time of Admission Date.  Nothing in this Section 8.13 shall modify or affect the obligation of the Managing Member to perform its obligations when and as required by this Agreement.

8.14    <u>Property Management</u> .

(a)    The Company may engage, and if requested by the Investor Member, shall engage, a Property Manager subject to the Property Management Agreement Requirements below and the rights of the Investor Member set forth in Section 8.15(a) below.

(b)    Each Property Management Agreement shall be subject to the following requirements (the "<u>Property Management Agreement Requirements</u>": (i) the fees paid under any such agreement shall be no greater than that which would be charged by an unrelated third party in an arm's-length transaction for the services to be provided to the Company and the Project pursuant to such agreement, and, unless otherwise approved in writing by the Investor Member, such fees, together with any other fees to be paid pursuant to any existing Property Management Agreements, will not exceed either the amounts anticipated to be paid for such services in the Projections or in any approved Budget for the period covered by such Budget, (ii) such

- 54 -

Confidential

USBCDC00048432

agreement, the economic terms thereof and any property management plan produced in connection therewith shall have been approved by the Lenders if required pursuant to the terms of any Project Loan Documents and by any other party holding approval rights with respect thereto, (iii) unless otherwise approved in writing by the Investor Member, such agreement shall be cancellable upon thirty (30) days prior written notice without payment of a fee or penalty or such Agreement shall contain termination rights for each of the Property Management Termination Events set forth in Section 8.15 below, such cancellation or termination to be exercisable by the Managing Member or the Investor Member on behalf of the Company, (iv) if the property manager under such agreement is or becomes an Affiliate of the Managing Member or any Developer Entity, then (A) unless otherwise approved in writing by the Investor Member, the agreement must require a subordination of fees, with such subordinated fees to be payable from Net Cash Flow consistent with the definition of and calculation of Net Cash Flow and the distribution of Net Cash Flow pursuant to Section 11.01(a) herein, and (B) the fees payable under such proposed property management agreement shall have been confirmed in writing by a qualified, independent third party at arms' length, which written report shall be subject to the approval of the Investor Member in its sole discretion, (v) the proposed property manager shall be subject to the prior written approval of the Investor Member, provided that if the proposed property manager is an Affiliate of the Managing Member or any Developer Entity, such approval may be withheld by the Investor Member in its sole discretion, and (vi) subject to the other requirements in this paragraph, the form and substance of such agreement shall be subject to prior written approval of the Investor Member.

(c)     With respect to any Property Management Agreement which exists on the date hereof, and upon the execution of any Property Management Agreement by the Company after the date hereof, the Managing Member shall be deemed to have represented and warranted to the Investor Member that (a) the Company has received all necessary approvals with respect to the entry into such Property Management Agreement by the Company, and (b) the fees payable under such Property Management Agreement are no greater than that which would be charged by an unrelated third party in an arm's-length transaction for the services to be provided to the Company and the Project pursuant to such agreement.

(d)     On the date hereof, the Investor Member has approved the Property Management Agreement identified in the Master Lease and any exceptions to the Property Management Agreement Requirements.

8.15   <u>Termination of Property Management Agreement.</u>

(a)     The Managing Member (i) upon receiving the prior written approval of the Investor Member and any required approval of the Lenders, may terminate a Property Management Agreement, and (ii) at the request of the Investor Member, shall terminate a Property Management Agreement if a Property Management Agreement Termination Event has occurred.  If the Managing Member fails to terminate any Property Management Agreement requested by the Investor Member following the occurrence of a Property Management Termination Event, the Investor Member, at its sole election, shall have the right on behalf of the Company to terminate such Property Management Agreement and, at its sole election, enter into a property management agreement with an Affiliate of the Investor Member or other Person acceptable to the Investor Member (subject to the approval of the Lenders, if required).

- 55 -

(b)      As used herein, a "Property Management Termination Event" shall exist upon the occurrence of any of the following:  (i) the Property Manager is declared Bankrupt, is dissolved, or makes an assignment for the benefit of its creditors; (ii) the Property Manager commits any fraud, gross negligence or any intentional misconduct; (iii) the Property Manager fails to exercise reasonable care in the discharge of its duties and obligations as Property Manager, including, without limitation, any action or failure to take any action by the Property Manager which: (A) violates in any material respect any provision of the Property Management Agreement, or any material requirement of any of the Project Documents or Master Landlord-approved management plan for the Property, if any, which violation has not been cured within any applicable notice and cure period; (B) violates in any material respect any Applicable Laws; (C) causes the Property to be operated in a manner which if continued would give rise to a Recapture/Disallowance Event; or (D) violates any provision of Section 13.04 of this Agreement, which violation has not been cured within any applicable notice and cure period; (iv) the Managing Member fails or refuses to fund Operating Deficits when and as required herein; or (v) the Managing Member is removed as Managing Member pursuant to this Agreement.

- 56 -

Confidential                                                                                                                   USBCDC00048434

## ARTICLE IX.
## TRANSFERS OF, AND RESTRICTIONS ON TRANSFERS
## OF INTERESTS OF INVESTOR MEMBER

9.01    Purchase for Investment.

(a)    The Investor Member hereby represents and warrants to the Managing Member, to the Company and to any other Investor Member that the acquisition of its Interest is made as principal for its account for investment purposes only and not with a view to the resale or distribution of such Interest, except insofar as Applicable Securities Laws permit such acquisitions to be made for the account of others or with a view to the resale or distribution of such Interest without requiring that such Interest, or the acquisition, resale or distribution thereof, be registered under Applicable Securities Laws.

(b)    Except for any transfer pursuant to Section 15.01 of this Agreement, the Investor Member agrees that it will not sell, assign or otherwise transfer its Interest or any fraction thereof to any Person who does not similarly represent and warrant and similarly agree not to sell, assign or transfer such Interest or fraction thereof to any Person who does not similarly represent and warrant and agree.

9.02    Restrictions on Transfer of Investor Member's Interest.

(a)    The offer, sale, transfer, assignment, hypothecation or pledge of any Interest of the Investor Member to any Affiliate of the Investor Member or to any Person in which the Investor Member or an Affiliate of U.S. Bancorp is the manager, managing member, or general partner (an "Affiliate Transferee") is hereby expressly consented to by the Managing Member, shall be permitted without any further Consent from the Managing Member, and Managing Member hereby agrees to execute an Assignment and Assumption Agreement in the form of Exhibit I and an amendment to this Agreement in the form of Exhibit J (collectively, the "Transfer Documents") in connection with any such offer, sale, transfer, assignment, hypothecation or pledge. Any other offer, sale, transfer, assignment, hypothecation or pledge of any Interest of Investor Member, or any offer, sale, transfer, assignment, hypothecation or pledge of any Interest by any other Investor  Member shall be subject to the Consent of Managing Member in its reasonable discretion.

(b)    The Investor Member whose Interest is being transferred hereby agrees to pay the Managing Member's reasonable legal fees and costs incurred as a direct result of the transfer of the Interest upon Investor Member's receipt of evidence of such fees and costs, which evidence may include but it not limited to invoices for such fees and costs.

(c)    Nothing in this Section 9.02 shall limit the authority of any member of the Investor Member to offer, sell, transfer or assign any interests within such member of the Investor Member in such member's sole discretion.

(d)    Notwithstanding anything to the contrary set forth herein, nothing in this Agreement shall prevent or otherwise restrict any Person holding an equity interest in Investor Member from selling, transferring, assigning, hypothecating and/or pledging the interests of such Person.

- 57 -

Confidential

9.03    Admission of Substitute Investor Member.

(a)    Subject to the other provisions of this Article IX, an assignee of all or a portion of the Interest of an Investor Member (which shall be understood to include any purchaser, transferee, donee, or other recipient of any disposition of such Interest) shall be deemed admitted as a Substitute Investor Member of the Company only upon the satisfactory completion of the following:

(i)    each assignee shall have accepted and agreed to be bound by the terms and provisions of this Agreement by executing the Transfer Documents;

(ii)    if any assignee is a corporation, the assignee shall have provided the Managing Member with evidence satisfactory to Counsel of its authority to become an Investor Member under the terms and provisions of this Agreement; and

(iii)    the Consent, not to be unreasonably withheld, conditioned or delayed, of the Managing Member shall have been obtained if required pursuant to Section 9.02.

(b)    For the purpose of allocation of Profits or Losses and credits, and for the purpose of distributing Net Cash Flow of the Company, a Substitute Investor Member shall be treated as having become, and as appearing in, the records of the Company as a Member following satisfaction of the requirements of Section 9.02(a) and upon its signing of an amendment to this Agreement, agreeing to be bound hereby.

(c)    The Managing Member represents and agrees that it will take all actions reasonably necessary (or requested by the Investor Member) to cooperate with the Investor Member to facilitate the Investor Member's disposition or transfer of its Interest and/or the receipt of such consents, including, but not limited to, delivering an updated legal opinion, providing financial statements, information and reports with respect to the Managing Member, Guarantor, and or the Company and reaffirming the accuracy of the representations and covenants set forth in this Agreement. If the approval of any lender, U.S. Department of Housing and Urban Development, or governmental authority is required pursuant to the terms of the Project Documents, the Managing Member represents and agrees that it will take all actions requested by the Investor Member to cooperate with the Investor Member to obtain and deliver such approvals to the Investor Member. The Investor Member and its members are authorized to update UCC, judgment and tax lien searches with respect to the Master Landlord, the Company and its members and to disclose such information to potential transferees and to initiate contact (and take any other actions needed to obtain required consents) with any lender or third-party whose consent to such disposition is required.

(d)    The Managing Member shall cooperate with each Person seeking to become a Substitute Investor Member by preparing the documentation required by this Section and making any official filings and publications.  The Managing Member shall cause the Company to take all such action, including the filing of any amended Agreement and/or Articles evidencing the admission of any Person as an Investor Member, if required, and the making of any other official filings and publications, if required, as promptly as practicable after the

- 58 -

Confidential

satisfaction by the assignee of the Interest of an Investor Member of the conditions contained in this Article IX to the admission of each such Person as an Investor Member of the Company. Any cost or expense incurred in connection with such admission shall be borne by each Substitute Investor Member.

(e)     Notwithstanding anything to the contrary set forth in Article XIV hereof, but subject to this Section 9.03:

(i)     Managing Member hereby expressly consents to the admission of an Affiliate Transferee as a Substitute Investor Member;

(ii)     Such Affiliate Transferee shall become a Substitute Investor Member upon full execution of an amendment to this Agreement, evidencing such admission, under terms and provisions acceptable to the Affiliate Transferee; and

(iii)     In the event Managing Member fails to do so, the Managing Member hereby grants the Affiliate Transferee an unconditional, irrevocable power of attorney to execute any and all documents necessary or appropriate to effectuate the admission of a Substitute Investor Member pursuant to Section 9.03(d), including, without limitation, the Transfer Documents, which power of attorney is coupled with an interest and is irrevocable.

9.04     <u>Rights of Assignee of Company Interest</u>.

(a)     Following any transfer of its entire interest in the Company by an Investor Member, if the assignee(s) shall become a Substitute Investor Member(s), the assignor, in respect of the interest assigned, shall no longer be deemed to be an Investor Member hereunder (in all other situations, the Investor Member shall continue to exercise the rights of an Investor Member hereunder until such time as such assignee(s) is/are duly admitted as Investor Members)

(b)     Except as provided in this Article and as required by operation of law, the Company shall not be obligated for any purpose whatsoever to recognize the assignment by any Investor Member of its Interest until the Company has received actual Notice thereof.

(c)     Any Person who is the assignee of all or any portion of an Investor Member's Interest, but does not become a Substitute Investor Member and desires to make a further assignment of such Interest, shall be subject to all the provisions of this Article IX to the same extent and in the same manner as any Investor Member desiring to make an assignment of its Interest.

#8370189 Operating Agreement
Last Hotel Master Tenant LLC

Project No. 24586

Confidential

USBCDC00048437

## ARTICLE X.
## RIGHTS AND OBLIGATIONS OF INVESTOR MEMBER

10.01   <u>Management of the Company</u>.   The Investor Member shall not take part in the management or control of the business of the Company nor transact any business in the name of the Company.   Except as otherwise expressly provided in this Agreement, the Investor Member shall not have the power or authority to bind the Company or to sign any agreement or document in the name of the Company.   The Investor Member shall not have any power or authority with respect to the Company except insofar as the Consent of the Investor Member shall be expressly required and except as otherwise expressly provided in this Agreement.

10.02   <u>Limitation on Liability of Investor Member</u>.   The liability of the Investor Member shall be limited to its Capital Contribution as and when payable under the provisions of this Agreement.   The Investor Member shall not have any other liability to contribute money to, or in respect of the liabilities or obligations of, the Company, nor shall the Investor Member be personally liable for any obligations of the Company.   The Investor Member shall not be obligated to make loans to the Company. No vote, Consent or other action of the Investor Member shall ever be construed to make the Investor Member liable as a Managing Member or cause the Investor Member to be liable for Company obligations.

10.03   <u>Other Activities</u>.   The Investor Member may engage in or possess interests in other business ventures of every kind and description for its own account, including without limitation, serving as a member of other limited liability companies which own, either directly or through interests in other limited liability companies, projects similar to the Property.   Neither the Company nor any of the Members shall have any right by virtue of this Agreement in or to such other business ventures or to the income or profits derived therefrom.

#8370189 Operating Agreement
Last Hotel Master Tenant LLC

Project No. 24586

Confidential

USBCDC00048438

## ARTICLE XI.
## PROFITS, LOSSES, DISTRIBUTIONS

11.01   Allocation of Profits, Losses, Credits and Cash Distributions.

(a)   After application of Section 11.10, all Operating Profits and Operating Losses, except those gains and losses referred to in Section 11.03, and all credits shall be allocated among the Members in accordance with their Company Interests as set forth in Schedule A.   All Net Cash Flow shall be distributed by April 1 of each year (if not sooner required by the terms of this Agreement) as follows:

(i)   to the Investor Member in the amount of any outstanding Credit Recovery Loans and interest thereon;

(ii)   to the Investor Member in the amount of any outstanding Priority Return for the Company Fiscal Year plus any outstanding Priority Return for any prior Company Fiscal Year;

(iii)   to the Investor Member in the amount of any outstanding Special Tax Distribution;

(iv)   to fund the Replacement Reserve;

(v)   to the repayment of any IM Loans (and accrued interest thereon);

(vi)   to the repayment pari passu of any Subordinated Loans (and accrued interest thereon, if any);

(vii)   to pay any Supplemental Rent then due and payable under the Master Lease; and

(viii)   the balance to the Members in accordance with their Percentage Interests.

(b)   In any year in which a Member sells, assigns or transfers all or any portion of an Interest to any Person who during such year is admitted as a substitute Member, the share of all Profits or Losses allocated to, and of all Net Cash Flow and of all cash proceeds distributable under Section 11.04 distributed to, all Members which is attributable to the Interest sold, assigned or transferred shall be allocated and distributed to the assignee from and after the first day of the calendar month following the month in which the assignee executes this Agreement.  The assignor and the assignee may, by agreement, make special provisions for the allocation of items of Profits or Losses, deduction or credit as may from time to time be permitted under the Code, and for the distributions of Net Cash Flow and the proceeds of Capital Transactions, but such allocation shall be binding as to the Company only after it shall have received Notice thereof from the assignor and assignee.

(c)   With the exception of Priority Return, which shall be distributed as otherwise required by the definition of Priority Return under this Agreement, the Company shall

- 61 -

Confidential

USBCDC00048439

distribute Net Cash Flow annually for the prior calendar year no later than April 15 of the following year, in the manner provided in this Agreement, except that no amounts shall be paid or distributed to the Managing Member or any Developer Entity until after the reports specified in Sections 13.04(a)-(c) have been received and approved by the Investor Member.

(d)     In the event that there is a determination that there is any original issue discount, imputed interest or stated interest attributable to the Capital Contribution of any Member, or any loan between a Member and the Company, any income or deduction of the Company attributable to such imputed interest, stated interest or original issue discount on such Capital Contribution or loan (whether stated or unstated) shall be allocated solely to such Member.

(e)     If any Member's Interest in the Company is reduced but not eliminated because of the admission of new Members or otherwise, or if any Member is treated as receiving any items of property described in Section 751(a) of the Code, the Member's Interest in such items of Section 751(a) property that was property of the Company while such Person was a Member shall not be reduced, but shall be retained by the Member so long as the Member has an Interest in the Company and so long as the Company has an Interest in such property.

(f)     In accordance with Section 704(c) of the Code (relating to allocations with respect to appreciated contributed property) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall be allocated, solely for tax purposes, among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value.  Any elections or other decisions relating to such allocations shall be made by the Managing Member in any manner that reasonably reflects the purpose and intention of this Agreement.

(g)     No distributions or return of Capital Contributions shall be made and paid from Company assets if, after the distribution or return of contribution is made, either:  (i) the Company would be insolvent, or (ii) the net assets of the Company would be less than zero.

11.02   Determination of Profits or Losses.

Profits or Losses for all purposes of this Agreement shall be determined in accordance with the accrual method of accounting for federal income tax purposes.

11.03   Allocation of Profits or Losses from a Capital Transaction.

After application of Section 11.10, Profits or Losses from a Capital Transaction recognized by the Company shall be allocated in the following manner:

(a)     All Profits shall be allocated (i) first, to the Members with negative Capital Account balances, in proportion to such balances, that portion of gains (including any Profits treated as ordinary income for federal income tax purposes) which is equal in amount to such Members' negative Capital Accounts in the Company; (ii) second, Profits in excess of the amount allocated under (i) shall be allocated to the Members in the amount and to the extent

- 62 -

Confidential

USBCDC00048440

necessary to increase their Capital Accounts so that the proceeds if then distributed under Section 11.04 would be distributed in accordance with the Members' respective Capital Accounts.

(b)     Losses shall be allocated (i) first, to the extent of and in such proportions to the Members' positive Capital Accounts; and (ii) second, the amount of any Losses that remain after the allocations in subparagraph (b)(i) to the Members in accordance with the manner in which they bear the economic risk of loss associated with such Losses.  In the event that no Member bears an economic risk of loss, then all Members shall be allocated Losses in excess of the amounts allocated under (i) and (ii) in accordance with their Percentage Interests.

(c)     If, at the end of the year for which Profits or Losses are allocated under this Section 11.03, there is any minimum gain attributable to nonrecourse liabilities or Member nonrecourse debt, then for (and solely for) purposes of applying the foregoing provisions of this Section 11.03, each Member's Capital Account shall be increased by the amount of such Member's share of such minimum gain.

(d)     Any portion of the gains treated as ordinary income for federal income tax purposes under Sections 1245 and 1250 of the Code ("Ordinary Income Amount") shall be allocated on a dollar for dollar basis to those Members to whom the items of Company deduction or loss giving rise to the Ordinary Income Amount had been previously allocated.

11.04   <u>Distribution of Proceeds from a Capital Transaction</u>.

Except as may be required under Section 12.02(b), the proceeds resulting from the liquidation of the Company assets pursuant to Section 12.02, and the net proceeds resulting from any Capital Transaction, as the case may be, shall be distributed and applied in the following order of priority:

(a)     to the payment of all matured debts and liabilities of the Company and all expenses of the Company incident to any Capital Transaction, excluding (i) debts and liabilities of the Company to Members or any Affiliates, and (ii) all unpaid fees owing to any Developer Entity under this Agreement;

(b)     to the setting up of any reserves which the Liquidator (or the Managing Member if the distribution is not pursuant to the liquidation of the Company) deems reasonably necessary for contingent, unmatured or unforeseen liabilities or obligations of the Company;

(c)     to the payment to the Investor Member of any unpaid Credit Recovery Loans and IM Loans and interest thereon;

(d)     to the Investor Member in the amount of any outstanding Priority Return;

(e)     to the payment of any unpaid Special Tax Distribution plus an amount equal, on an After-Tax Basis, to the local, state and federal taxes projected (at the Applicable Tax Rate) to be imposed on the members of the Investor Member as a result of the Capital Transaction;

#8370189 Operating Agreement
Last Hotel Master Tenant LLC

Project No. 24586

Confidential

USBCDC00048441

(f)     to the repayment of any unpaid debts and liabilities (including unpaid fees) owed to the Members or any Affiliates by the Company for Company obligations, including any loans made pursuant to Section 5.05; and

(g)     the balance to the Members in accordance with their Percentage Interests.

Notwithstanding the foregoing, no proceeds resulting from a Capital Transaction shall be distributed to the extent that, after the distribution is made, either:  (i) the Company would be insolvent, or (ii) the net assets of the Company would be less than zero.

If there is more than one Managing Member, any distribution to the Managing Member shall be made pro rata in accordance with their Percentage Interests.

11.05   Capital Accounts.

A separate Capital Account shall be maintained and adjusted for each Member.  There shall be credited to each Member's Capital Account the amount of its Capital Contribution, the fair market value of any property contributed to the Company (net of any liabilities secured by such property) and such Member's distributive share of the Profits for tax purposes of the Company; and there shall be charged against each Member's Capital Account the amount of all Net Cash Flow distributed to such Member, the fair market value of any property distributed to such Member (net of any liabilities secured by such property), the net proceeds resulting from the liquidation of the Company's assets or from any Capital Transaction distributed to such Member, and such Member's distributive share of the Losses for tax purposes of the Company. Each Member's Capital Account shall be maintained and adjusted in accordance with the Code and the Treasury Regulations thereunder.  The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Reg. §1.704-1(b), and shall be interpreted and applied in a manner consistent with such regulations.  It is the intention of the Members that the Capital Accounts maintained under this Agreement be determined and maintained throughout the full term of this Agreement in accordance with Section 704(b) of the Code and the accounting rules of Treasury Reg. §1.704-1(b)(2)(iv).

Except as otherwise provided in this Agreement, no Member shall be required to restore any deficit in such Member's Capital Account or bring such Member's Capital Account into parity with the Capital Account of other Members.  In the event that the Company is liquidated within the meaning of Treasury Reg. § 1.704-1(b)(2)(ii)(g), if the Managing Member's Capital Account has a deficit balance (after giving effect to all contributions, distributions and allocations), the Managing Member shall increase its Capital Contribution by the amount of such deficit in compliance with Treasury Reg. § 1.704-1(b)(2)(ii)(b)(3).

11.06   Authority of Managing Member to Vary Allocations to Preserve and Protect Members' Intent.

It is the intent of the Members that each Member's distributive share of income, gain, loss, deduction, or credit (or item thereof) shall be determined and allocated in accordance with this Article XI to the fullest extent permitted by Section 704(b) of the Code.  Subject to the Consent of the Investor Member, the Managing Member hereby is authorized and directed to

- 64 -

Confidential

USBCDC00048442

allocate income, gain, loss, deduction, or credit (or item thereof) arising in any year differently than otherwise provided for in this Article XI to the extent that allocating income, gain, loss, deduction or credit (or item thereof) in the manner provided for in Article XI would, in the opinion of the tax advisor to the Company (tax counsel or the Accountants) cause the determinations and allocations of each Member's distributive share of income, gain, loss, deduction, or credit (or item thereof) not to be permitted by Section 704(b) of the Code and Treasury Regulations promulgated thereunder.  Any allocation made pursuant to this Section 11.06 shall be deemed to be a complete substitute for any allocation otherwise provided for in this Article XI and no amendment of this Agreement or approval of any Member shall be required.

11.07   <u>Designation of Tax Matters Member</u>.

The Managing Member hereby is designated as Tax Matters Member of the Company, and shall engage in such undertakings as are required of the Tax Matters Member of the Company, as provided in Treasury Regulations pursuant to Section 6231 of the Code (as in effect on the day prior to enactment of the Bipartisan Budget Act of 2015); the term "Tax Matters Member" shall also mean the "partnership representative" as defined in Code Section 6223 pursuant to Section 1101 of the Bipartisan Budget Act of 2015.  Each Member, by the execution of this Agreement, Consents to such designation of the Tax Matters Member and agrees to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such Consent.  In the event of a withdrawal or removal of the Managing Member pursuant to Article VI or Section 8.11 hereof, the Company shall designate a successor Tax Matters Member and file a timely notice of such designation with the IRS.

Notwithstanding any other provision of this Agreement, the Investor Member hereby is granted authority at any time to be admitted as a Managing Member by converting all or portion of its Investor Member Interest to a Managing Member Interest for the sole purpose of acting as the Tax Matters Member with all the authority and powers given to the Managing Member as Tax Matters Member of the Company under the Code and under this Agreement.  Unless otherwise specifically provided or agreed, the new Tax Matters Member Managing Member in these circumstances will not be responsible for or have the right to conduct any operational or managerial functions of the Company besides those required to discharge its responsibilities as Tax Matters Member.  The Investor Member may exercise its right to assume the Tax Matters Member responsibilities for the Company, as provided herewith, upon ten (10) calendar days' Notice to the then existing Tax Matters Member Managing Member and may continue as Tax Matters Member indefinitely.  In the event that the Investor Member exercises its right to become a Managing Member and to assume duties of the Tax Matters Member, the pre-existing Tax Matters Member will resign in accordance with Treasury Reg. § 301.6231(a)(7)-1(i) and will redesignate the new Managing Member as Tax Matters Member in accordance with Treasury Reg. § 301.6231(a)(7)-1(e).  Each Member, by its execution of this Agreement, Consents to such admission and designation and agrees to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to evidence such Consent.  The Investor Member shall, upon such admission, replace the Managing Member as Tax Matters Member and shall have thereafter all the authority and

- 65 -

Confidential

powers given to the Managing Member as Tax Matters Member of the Company under the Code and under this Agreement.

11.08   Authority of Tax Matters Member.

(a)   The Tax Matters Member shall have and perform all of the duties required under the Code, including the following duties:

(i)   furnish the name, address, Profits interest, and taxpayer identification number of each Member to the IRS; and

(ii)   within five calendar days after the receipt of any correspondence or communication relating to the Company or a Member from the IRS, the Tax Matters Member shall forward to each Member a photocopy of all such correspondence or communication(s).  The Tax Matters Member shall, within five calendar days thereafter, advise each Member in writing of the substance and form of any conversation or communication held with any representative of the IRS.

(b)   The Tax Matters Member shall, upon request by the Investor Member, permit the Investor Member to include its attorney in the power of attorney (Form 2848) for the Company for any taxable years under a tax audit or in a tax administrative appeals process.

(c)   The Tax Matters Member shall not, without the Consent of the Investor Member:

(i)   extend the statute of limitations for assessing or computing any tax liability against the Company (or the amount or character of any Company tax items) or select the forum for judicial review;

(ii)   settle any audit with the IRS concerning the adjustment or readjustment of any partnership items (within the meaning of Section 6231(a)(3) of the Code);

(iii)   file a request for an administrative adjustment with the IRS or other taxing authority at any time or file a petition for judicial review with respect to any such request;

(iv)   initiate or settle any judicial review or action concerning the amount or character of any partnership tax item(s) (within the meaning of Section 6231(a)(3) of the Code);

(v)   intervene in any action brought by any other Member for judicial review of a final adjustment;

(vi)   take any other action which would have the effect of finally resolving a tax matter affecting the rights of the Company and/or the Members;

- 66 -

Confidential

USBCDC00048444

(vii)   take any action or fail to take any action which adversely affects the amount or timing of recognition of the Federal Historic Tax Credits; or

(viii)   take any other action not expressly permitted by this Article XI on behalf of the Company or any Member in connection with any administrative or judicial tax proceeding.

(d)   The Managing Member shall keep the other Members advised of any dispute the Company may have with any federal, state or local taxing authority (a "Tax Dispute"), and shall afford the other Members the opportunity to participate directly in the negotiation of the Tax Dispute, to the extent permitted by law.  Reasonable legal fees incurred in connection with any Tax Dispute (including any Tax Dispute arising at the Investor Member level, to the extent that such Tax Dispute is the result of a Tax Dispute of the Company) shall be paid solely from the assets of the Company, except that if the Company lacks sufficient funds to undertake or prosecute any litigation relating to such Tax Dispute (including, without limitation, any appeal) and either the Managing Member or Investor Member in good faith does not reasonably consent to a settlement or resolution of such tax dispute, then the legal fees and other costs and expenses associated with such litigation shall be funded by the Member(s) refusing to consent to such settlement or resolution, through one or more Member Loans to the Company.

(e)   In the event of any Company-level proceeding instituted by the IRS pursuant to the Code, the Tax Matters Member shall consult with the Investor Member regarding the nature and content of all actions to be taken and defenses to be raised by the Company in response to such proceeding.  The Tax Matters Member also shall consult with the Investor Member regarding the nature and content of any proceeding pursuant to the Code instituted by or on behalf of the Company (including the decision to institute proceedings, whether administrative or judicial, and whether in response to a previous IRS proceeding against the Company or otherwise).  Upon the Investor Member's request to do so, the Managing Member (i) shall make the election under Section 6221(b) of the Revised Partnership Audit Code, if available, and (ii) shall make the election under, and furnish to each Member the appropriate information required by, Section 6226 of the Revised Partnership Audit Code, if available.  The Managing Member shall not make the election under Section 6221(b) of the Revised Partnership Audit Code, if available, or the election under Section 6226 of the Revised Partnership Audit Code, if available, without the Investor Member's Consent to do so.

(f)   Any Member who enters into a settlement agreement with respect to any Company items (within the meaning of Section 6231(a) (3) of the Code)) shall notify the other Members of such settlement agreement and its terms within thirty (30) calendar days from the date of settlement.

11.09   Expenses of Tax Matters Member.

The Company shall indemnify and reimburse the Tax Matters Member and the Investor Member for all expenses, including legal and accounting fees, claims, liabilities, losses and damages incurred in connection with any administrative or judicial proceeding with respect to the tax liabilities of the Members.  The payment of all such expenses shall be made before any distributions are made from Net Cash Flow or any discretionary reserves are set aside by the

- 67 -

Confidential

USBCDC00048445

Managing Member. The taking of any action and the incurring of any expense by the Tax Matters Member in connection with any such proceeding, except to the extent required by law, is a matter in the sole discretion of the Tax Matters Member and the provisions on limitations of liability of the Managing Member and indemnification set forth in Section 8.07 of this Agreement shall be fully applicable to the Tax Matters Member in its capacity as such.

11.10    Special Allocations.

(a)      Notwithstanding any other provision of this Agreement, if there is a net decrease in the Company's minimum gain attributable to nonrecourse liabilities during any taxable year, each Member shall be specifically allocated a pro rata portion of each of the Company's items of income and gain for such year (and, if necessary for subsequent years) in proportion to, and to the extent of, an amount equal to such Member's share of the net decrease in such minimum gain during such taxable year as determined in accordance with the provisions of Treasury Reg. §§ 1.704-2(f), 1.704-2(g)(2).

(b)      Notwithstanding any other provision of this Agreement, if there is a net decrease in the amount of the Company's minimum gain during any taxable year with respect to a Member nonrecourse debt, the Member bearing the economic risk of loss with respect to such Member nonrecourse debt shall be specially allocated a pro rata portion of each of the Company's items of income and gain for such taxable year (and, if necessary, for subsequent years) in proportion to, and to the extent of the amount of such Member's share of the net decrease in such minimum gain during such taxable year as determined in accordance with the provisions of Treasury Reg. §§1.704-2(i)(4), 1.704-2(j)(2)(ii).

(c)      If in any taxable year there is a net increase in the amount of Company minimum gain attributable to a Member nonrecourse debt, the Member bearing the economic risk of loss attributable to such Member nonrecourse debt shall be specially allocated items of Company deduction and loss in proportion to and to the extent of the excess of:

(i)      the amount of such net increase, over

(ii)      the aggregate amount of any distributions during such taxable year to such Member of the proceeds of such Member nonrecourse debt that are allocable to such increase in Company minimum gain.  Items to be so allocated shall be determined in accordance with Treasury Reg. §1.704-2(j)(l).

The allocations provided for in this Section 11.10(c) are intended to comply with the allocations required by Treasury Reg. §1.704-2(i) and shall be applied consistently therewith. The Company's minimum gain shall be determined in accordance with Treasury Reg. § 1.704-2(d).

(d)      In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Reg. §§1.704-1(b)(2)(ii)(d)(4), (5) or (6) which cause or increase an Adjusted Capital Account Deficit (as defined below) of such Member, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate (to the extent required by the Treasury Regulations under Code Section 704(b)) such Member's Adjusted Capital Account Deficit as quickly as possible.

- 68 -

Confidential                                                                                          USBCDC00048446

For purposes of this Section 11.10, the term "Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Company Fiscal Year, after giving effect to the following adjustments:

(i)      Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is otherwise treated as being obligated to restore under Treasury Reg. §1.704-1(b)(2)(ii)(c) or is deemed to be obligated to restore pursuant to the penultimate sentence of Treasury Reg. §§1.704-2(g)(1) and 1.704-2(i)(5); and

(ii)      Debit to such Capital Account the items described in Treasury Reg. §1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Reg. §1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(e)      Notwithstanding any other provision of this Section 11.10, in no event shall Losses of the Company be allocated to any Investor Member if such allocation would result in such Member having an Adjusted Capital Account Deficit at the end of any taxable year.  All Losses in excess of the limitation set forth in this Section 11.10(e) shall be allocated to each other Member that does not have an Adjusted Capital Account Deficit.

(f)      In the event that income, loss or items thereof are allocated to one or more Members pursuant to Sections 11.10(a), (b), (c), (d) or (e), subsequent income, loss or items thereof shall be allocated (subject to the provisions of Section 11.10(a), (b), (c), (d) or (e)) to the Members so that, to the extent possible in the judgment of the Managing Member and permitted by Treasury Regulations, the net  amount of allocations shall be equal to the amount that would have been allocated had Section 11.10 not been applied.

(g)      Any taxable income of the Company resulting from its receipt of debt forgiveness, donations, grants, subsidies or other similar items shall be allocated 100% to the Managing Member.

## ARTICLE XII.
## SALE, DISSOLUTION AND LIQUIDATION

12.01   Dissolution of the Company.  The Company shall be dissolved upon:

(a)      the sale or other disposition of all or substantially all of the assets of the Company;

(b)      any other event causing the dissolution of the Company under the laws of the Formation State;

(c)      the agreement of the Investor Member and the Managing Member; or

(d)      at the election of the Investor Member:

- 69 -

Confidential

(i)      on the date which is one year after the expiration of the Recapture Period;

(ii)     upon Master Landlord's failure to achieve Placement in Service on or before September 30, 2019; or

(iii)    upon Master Landlord's failure to obtain the Part 3 Approval for the Rehabilitation of the Building on or before March 31, 2020.

12.02   Winding Up and Distribution.

(a)     Upon the dissolution of the Company pursuant to Section 12.01, (i) a Certificate of Dissolution shall be filed in such offices within the Formation State as may be required or appropriate, and (ii) the Company business shall be wound up and its assets liquidated as provided in this Section 12.02 and the net proceeds of such liquidation shall be distributed in accordance with Section 12.02(b).

(b)     It is the intent of the Members that, upon liquidation of the Company, any liquidation proceeds available for distribution to the Members shall be distributed in accordance with the Member's respective Capital Account balance.  In the event that, upon liquidation, there is any conflict between a distribution pursuant to the Member's Capital Account balance and the intent of the Members with respect to distribution of proceeds under Section 11.04, the Liquidator shall, notwithstanding the provisions of Sections 11.01, 11.02 and 11.03, allocate the Company's Profits or Losses in a manner that will cause the distribution of liquidation proceeds to the Members to be in accordance with the Members' respective Capital Account balances.

(c)     The Liquidator shall file all certificates and notices of the dissolution of the Company required by law.  The Liquidator shall proceed without any unnecessary delay to sell and otherwise liquidate the Company's property and assets; provided however, that if the Liquidator shall determine that an immediate sale of part or all of the Company property would cause undue loss to the Members, then in order to avoid such loss, the Liquidator may, except to the extent provided by the Act, defer the liquidation as may be necessary to satisfy the debts and liabilities of the Company to Persons other than the Members.  Upon the complete liquidation and distribution of the Company assets, the Member shall cease to be the Member of the Company and the Managing Member shall cease to be Managing Member, and the Liquidator shall execute, acknowledge and cause to be filed all certificates and notices required by the law to terminate the Company.

(d)     Upon the dissolution of the Company pursuant to Section 12.01, the accountants for the Company shall promptly prepare, and the Liquidator shall furnish to each Member, a statement setting forth the assets and liabilities of the Company upon its dissolution. Promptly following the complete liquidation and distribution of the Company property and assets, the Company accountants shall prepare, and the Liquidator shall furnish to each Member, a statement showing the manner in which the Company assets were liquidated and distributed.

Confidential

USBCDC00048448

## ARTICLE XIII.
## BOOKS AND RECORDS, ACCOUNTING TAX ELECTIONS, ETC.

13.01   <u>Books and Records; Accounting Method</u>.  The books and records of the Company shall be maintained on an accrual basis in accordance with generally-accepted accounting principles ("<u>GAAP</u>"), and retained for such period required by law or if longer, such period recommended by the Accountants.  These and all other records and financial statements of the Company, including information relating to the status of the Property and information with respect to the sale by any Developer Entity of goods or services to the Company, shall be kept at the principal office of the Company and shall be available for examination there by any Member or by any member of the Investor Member, or its duly authorized representative, at any and all reasonable times.  Any Member, or its duly authorized representative, upon paying the costs of collection, duplication and mailing, shall be entitled to a copy of the list of names and addresses of Investor Member.  The Managing Member agrees to cooperate with the Investor Member to provide information in a timely manner to facilitate audits conducted by independent auditors selected by the Investor Member in its sole discretion.

13.02   <u>Bank Accounts</u>.  All funds of the Company not otherwise invested shall be deposited in one or more federally insured accounts maintained with U.S. Bank National Association, a national banking association, and withdrawals shall be made only in the regular course of Company business on such signature or signatures as the Managing Member may, from time to time, determine, except for withdrawals from Reserves, which shall be made in accordance with Section 8.12 and Schedule B.  No funds of the Company shall be deposited in any financial institution in which any Developer Entity is an officer, director or holder of a propriety interest.

13.03   <u>Accountants</u>.  With the Consent of the Investor Member, the Managing Member shall hire the Accountants and provide them with such information in its possession and sign such documents as are necessary for the Company to make timely, accurate and complete submissions of federal and state income tax returns (and in all events such returns shall be filed with respect to the year of the Investor Member's admission to the Company and each year thereafter).  The Accountants shall be the accountants for the Company for the purposes of preparing income tax returns, the audit of the Company and the other relevant matters set forth in this Article XIII.  The Managing Member and the Company hereby agree, authorize and direct the Accountants to provide contemporaneous copies to the Investor Member of all tax returns, audits and any other information that the Accountants deliver to the Managing Member or to the Company.

Prior to the end of each Company Fiscal Year, the Managing Member shall (i) engage the Accountants to prepare tax returns and audits for such Company Fiscal Year and (ii) deliver evidence in such form as shall be reasonably acceptable to the Investor Member that the Accountants have been so retained.  If the selected accountants fail to timely deliver any tax returns (including K-1s) or audited financial statements required to be delivered pursuant to this Agreement, then the Investor Member shall have the right upon delivery of written notice to the Managing Member to require the Managing Member to replace the Accountant with alternate independent certified public accountants selected by the Investor Member, from time to time, that shall prepare all future tax returns and audited financial statements for the Company.

- 71 -

Confidential

USBCDC00048449

The Accountants shall annually prepare for execution by the Managing Member any tax returns of the Company, and shall certify, in accordance with GAAP, a balance sheet, a profits and losses statement, a cash flow statement and a statement calculating Net Cash Flow. The Accountants shall annually audit the books of the Company. With respect to each Company Fiscal Year during the Company's operations, at such time as the Accountants shall have prepared the proposed tax return for such year, the Managing Member shall cause the Accountants to provide copies of such proposed tax return to the Investor Member and its accountants for their review and comment. Any changes in such proposed tax return recommended by the Investor Member's accountants shall be made by the Accountants prior to the completion of such tax return for execution by the Managing Member. A full detailed statement shall be furnished to all Members, showing such assets, properties, and net worth and the profits and losses of the Company for the preceding Company Fiscal Year. All Members shall have the right and power to examine and copy, at any and all reasonable times, the books, records and accounts of the Company.

13.04   <u>Reports to Members</u>.  The Managing Member shall, at Company expense, cause to be prepared and delivered to the Investor Member all such reports requested by the Investor Member as shall be necessary for the Investor Member to comply with its Federal Historic Tax Credit requirements in connection with the Company, in addition to the following:

(a)   Within thirty (30) days of the end of each calendar quarter:

(i)   unaudited financial statements for the Company and Master Landlord, which may be prepared and certified by the Managing Member, and which should include a balance sheet, statement of income or loss and statement of cash sources and applications in addition to the following items, upon request:

A.   a schedule of any Operating Deficits or anticipated Operating Deficits of the Company and/or Master Landlord and the manner in which Operating Deficits will be funded;

B.   a schedule detailing any reduction or termination of any reserve by application of funds therein for purposes materially different from those for which such reserve was established;

C.   a schedule detailing any notice of a material fact which may substantially affect distributions pursuant to this Agreement;

D.   a schedule detailing any fees, distributions, commissions, compensation, and other remuneration and reimbursed expenses paid by the Company to any Developer Entity and the services and/or goods provided to the Company;

E.   a schedule of the activities and investments of the Company during the quarter including a description of all transactions between the Company and any Developer Entity; and

- 72 -

Confidential

USBCDC00048450

F.  a schedule detailing any Subordinated Loans and/or IM Loans made during such year and repayments thereof.

(b)     Upon request, confirmation of payment of each Capital Contribution of the Managing Member to the Company, either in the form of a wire confirmation or cancelled check.

(c)     As soon as available and in any event not later than seventy-five (75) calendar days after the end of each Company Fiscal Year with respect to drafts and ninety (90) calendar days after the end of each Company Fiscal Year with respect to final versions:

(i)     a copy of the federal "Partnership Return" of the Company, including a Form K-1(or other comparable form subsequently required by the IRS), and any state or local partnership tax return required to be filed by the Company, including, in connection with the first tax return prepared, a table comparing the actual total depreciable basis with the depreciable basis indicated in the Projections;

(ii)     for each Company Fiscal Year in which the Federal Historic Tax Credits are claimed, a copy of the federal "Partnership Return" and any state or local partnership tax return required to be filed by the Master Landlord; and

(iii)     audited financial statements for the Company and Master Landlord prepared by the Accountants, including: a balance sheet, a statement of operations, a statement of cash flows, a statement calculating Net Cash Flow, a schedule of real estate tax payments or if real estate taxes are exempt, an expiration date of exemption, a statement summarizing the calculation of tax credits and depreciation; a statement of changes in Members' capital accounts; and a reconciliation of the differences between the tax basis and GAAP basis statements.

(d)     Upon request, prior to September 1 of each calendar year:

(i)     a report in the form attached hereto as <u>Exhibit H</u> reflecting an estimate of the Investor Member's share of Federal Historic Tax Credits, Net Cash Flow, distributions and Profits or Losses of the Company for federal income tax purposes for the current Company Fiscal Year.  Such estimate shall be prepared by the Managing Member or the Accountants.

(e)     Upon request, at least sixty (60) days prior to the end of the current Fiscal Year of the Company and the Master Landlord, the annual operating budget and the capital budget for the upcoming fiscal year of the Company and the Master Landlord (collectively, the "<u>Budget</u>") as prepared by the Managing Member.

(f)     Within sixty (60) days after the expiration of each calendar year, proof of payment of property taxes for the recently-expired calendar year.

(g)     Promptly:

- 73 -

Confidential

(i)     upon the occurrence of any natural disaster and/or incident and/or widespread property damage having an adverse impact on the Property, a report of the extent of the damage to the Property, any expected delay in the Rehabilitation, and the effect such damage might have on the operations or marketing and lease-up activity of the Property;

(ii)     upon the occurrence of any pledge or collateralization of any asset of the Company, a report detailing such pledge or collateralization;

(iii)     upon the occurrence of any material default by the Company under any Project Documents or in payment of any mortgage, taxes, interest or other obligation on secured or unsecured debt, a report of such material default;

(iv)     upon the occurrence of a Withdrawal Event, notice of such Withdrawal Event;

(v)     in the event of an material adverse change in any Guarantor's financial position or circumstances reasonably likely to result in such a change, notice of such change, including an explanation of the circumstances;

(vi)     upon learning of a condition or circumstance which is expected to reduce below the projected levels the amount of Federal Historic Tax Credits available to the Company, a detailed statement describing such matters; and

(vii)     upon learning of any violation of any health, safety, building code, or other statute or regulation by the Company, a detailed statement describing such matters along with any written notices thereof received by the Company from any federal, state, or local governmental entity.

(h)     Upon the request of Investor Member, each Guarantor will provide Investor Member with annual financial statements, including audited financial statements if such Guarantor has such audited financial statements prepared for such annual period ended (provided that such audited financial statements, if any, will be provided to Investor Member no later than one hundred eighty (180) days after the end of each fiscal year of such Guarantor and such unaudited financial statements will be provided to Investor Member no later than one hundred twenty (120) days after the end of each fiscal year of such Guarantor), certified as true, correct and complete, and (ii) such other financial information or reports reasonably requested by Investor Member or that such Guarantor is otherwise obligated to provide.

(i)     Promptly upon request of the Investor Member:

(i)     copies of monthly bank statements for the Company operating account and the Master Landlord operating account;

(ii)     information on the state of the business, financial condition, and affairs of the Company or the Property or such other information regarding the state of the business, financial condition and affairs of the Company, Master Landlord and/or the Project as the Investor Member, from time to time, may reasonably request, including,

- 74 -

but not limited to, a certification by the Managing Member that to the best of the Managing Member's knowledge after due inquiry (A) there is no default under any provision of the Project Loan Documents or Project Documents, or if there is any default, a description thereof, and (B) there is no building, health or fire code violation or, to the best of its knowledge, similar violation of a governmental law, ordinance or regulation against the Project or, if there is such violation, a description thereof; and

(iii)    a report of such other information as may be deemed by the Company to be material to the existence or operation of the Master Landlord, the Company or their respective businesses or of the Property.

(j)    Within five (5) Business Days after receipt by the Company:

(i)    copies of all reports, notices, filings or correspondence sent or received regarding the occurrence of any event which has or may have a material adverse effect on the Company or the Property (including, without limitation, any reports, notices, filings or correspondence with any governmental agency regarding the Federal Historic Tax Credits; default notices, notices of reductions or elimination of benefits under any federal, state, or local program previously enjoyed by the Company; any default or failure of compliance with respect to the Project Loans or any other financial, contractual or governmental obligation of Master Landlord, Company or the Managing Member; notice of any IRS or Secretary proceeding involving the Company; notice of any demand for payment or draw under any construction completion guarantee, performance bond, or letter of credit regarding Master Landlord or Company; any notice or request for approval or consent or notice of default given pursuant to the Master Lease; and notices regarding the Property's compliance with any regulatory restrictions imposed thereon); and

(ii)    copies of all legal process, pleadings, demands, other notices relating to lawsuits (including any notice of condemnation) or legal proceedings or alleged violations of law, and notices of all actions taken, or proposed to be taken, affecting a Developer Entity.

(k)    Within five (5) Business Days of execution, a copy of all amendments or changes to the articles, bylaws, certificate, partnership agreement, operating agreement or other organizational documents of the Managing Member, the Company, Master Landlord or any Guarantor (without implying the consent of Member to any such amendment or change to any such organizational document).  In addition, it shall promptly respond to any reasonable requests or inquiries made in writing by the Investor Member regarding matters affecting the Property or the Company.

(l)    The Investor Member reserves the right, in its sole discretion, to waive the obligation of the Managing Member to provide any of the reports or information otherwise requested in this Section 13.04 during one or more reporting periods.

(m)    In the event that the reports or information provided for in Sections 13.04(a)-(c) above are, at any time, not provided within the time period(s) specified in such Sections, the Managing Member shall be obligated to pay to the Investor Member the sum of

- 75 -

Confidential

$200 per day beginning on the date of delinquency (if upon written notice the Managing Member fails to cure within ten (10) days), as liquidated damages, for each day from the date upon which such reports or information is (are) due pursuant to the provisions of the aforesaid Sections until the date upon which such reports or information is (are) provided.

(n)     Each party hereby agrees and acknowledges that the Investor Member may share with any of its Affiliates any information provided to the Investor Member relating to the Company, the Project, the Managing Member, Master Landlord, or the Guarantor (or any Affiliates thereof), but only to the extent commercially reasonable and necessary with respect to its investment in the Company. The Investor Member is also authorized to disclose the terms and nature of its investment in the Company to the Investor Member's auditors, attorneys, accountants and regulators, but only to the extent commercially reasonable and necessary, and as otherwise required by applicable law. Notwithstanding the foregoing, the Investor Member may disclose the terms and nature of its investment in the Company to potential transferees and provide information relating to the Company, the Project, the Managing Member, Master Landlord, or the Guarantor (or any Affiliates thereof) to potential transferees in connection with a transfer of its Membership Interest pursuant to Section 9.02 so long as such potential transferee has entered into a nondisclosure agreement in a form and substance acceptable to the Investor Member.

13.05   Section 754 Elections.  In the event of a transfer of all or any part of the Interest of a Managing Member or of an Investor Member (or a member or partner thereof), the Company shall elect, pursuant to Sections 743 and 754 of the Code (or any corresponding provision of succeeding law), to adjust the basis of the Company property if, in the opinion of the Investor Member, based upon the advice of the Accountants, such election would be most advantageous to the Investor Member.  Each Member agrees to furnish the Company with all information necessary to give effect to such election.  The Managing Member shall not make other elections required or permitted under the Code unless it has received the direction or prior Consent of the Investor Member.

13.06   Company Fiscal Year.  Except as the Code may otherwise require, Company Fiscal Year shall be the fiscal year of the Investor Member until the Flip Date, and thereafter, the Fiscal Year of the Member with the majority interest in the Company. The fiscal year of the Investor Member is currently the calendar year.  The Investor Member will inform the Managing Member of any change in its fiscal year.

13.07   Investor Member Inspection.  The Investor Member, the Construction Consultant and /or any other agent of the Investor Member shall have the right to physically inspect the interior and exterior of the Property and the Company's books, records and any sublease documents during normal business hours with reasonable advance notice.  The Managing Member shall correct any deficiencies of which it receives written notice from the Investor Member to the Investor Member's reasonable satisfaction within thirty (30) days from receipt of written notice.

13.08   Communications.  The Managing Member agrees to cooperate with the Investor Member by providing such other incidental information as may be reasonably requested by the Investor Member for purposes of its communications and publicity regarding the Property,

- 76 -

Confidential

USBCDC00048454

provided that the failure to provide information under this Section shall not result in the imposition of any penalties on the Managing Member.

#8370189 Operating Agreement
Last Hotel Master Tenant LLC

Project No. 24586

Confidential

USBCDC00048455

## ARTICLE XIV.
## AMENDMENTS, CONSENTS AND APPROVALS

14.01  Proposal and Adoption of Amendments.

(a)  This Agreement may be amended by the written consent of all of the Members.

(b)  The Company shall bear the expense, including attorneys' fees and filing expenses, of amendments to this Agreement provided however, that if the Company does not have sufficient Operating Income to bear such expenses the Managing Member shall bear the expenses thereof.

14.02  Method of Giving Consent.  Any Consent required by this Agreement may be given by a written Consent of the consenting Member and received by the Managing Member at or prior to the doing of the act or thing for which the Consent is solicited.  The Member requesting Consent shall reimburse the Consenting Member for reasonable legal or accounting costs incurred by it in connection with the matter requiring Consent.

14.03  Submissions to Investor Member.  The Managing Member shall give the Investor Member Notice of any proposal or other matter required by any provision of this Agreement or by law to be submitted for consideration and approval of such Investor Member.  Such Notice shall include any information required by the relevant provision or by law.

- 78 -

**ARTICLE XV.**
**OPTION CONCERNING INVESTOR MEMBER**

15.01  Option.  Notwithstanding any other provision of this Agreement to the contrary, from and after the first day following the date that is the later of (a) the expiration of the Recapture Period and (b) the Flip Date (such date being referred to herein as the "Investor Member Put Option Commencement Date"), the Investor Member shall have the right and option to require the Managing Member to purchase all (but not less than all) of its Interest (the "Investor Member Put").  The Managing Member shall deliver Notice to Investor Member, not earlier than the Investor Member Put Option Commencement Date, advising the Investor Member of the availability of the Investor Member Put (the "Put Availability Notice"); provided, that, whether or not the Managing Member gives the Put Availability Notice of the availability of the Investor Member Put, the Investor Member shall have the right to exercise this option at any time from and after the Investor Member Put Option Commencement Date and continuing through the later of (i) the date which is one hundred eighty (180) calendar days after the later of the Flip Date and the termination of the Recapture Period, (ii) the date which is one hundred eighty (180) calendar days after receipt of the Put Availability Notice from Managing Member, and (iii) the date all accrued and unpaid Special Tax Distributions and Priority Return payments are fully paid (the later of such dates being the "Put Exercise Period"), by delivery of Notice of exercise to the Managing Member, except that, and notwithstanding the preceding, the Put Exercise Period shall expire, in all events, on the date that is the fifth (5th) anniversary of the Investor Member Put Option Commencement Date.  If exercised, the Investor Member shall be obligated to sell, and the Managing Member shall be obligated to purchase, all of the Interest then owned by the Investor Member.  In addition, the Managing Member shall provide reasonably satisfactory evidence to the Investor Member of payment in full of the Development Fee and if the Development Fee has not been fully paid, the Managing Member shall cause the Development Fee to be paid in full prior to the conveyance of the Interest by the Investor Member.  The purchase price for such Interest shall be the lesser of (i) the fair market, appraised value of such Interest (as determined by an appraisal of an independent appraiser having not less than 5 years' experience appraising similar property in the state in which the Project is situated, and reasonably acceptable to the parties, said appraisal to be as of the last day of the month preceding the month within which the Investor Member Put is exercised), and (ii) sum of (A) twenty percent (20%) of the aggregate amount of Investor Member's Capital Contributions which have been actually paid as of the date the Investor Member Put is exercised, plus (B) an amount equal to the Investor Member's state and local transfer taxes in connection with the Investor Member Put transaction, as reasonably determined by the Investor Member, plus (C) the amount of all outstanding and unpaid Credit Recovery Loans, IM Loans and any other amounts payable to the Investor Member under this Agreement, including, without limitation, any accrued and unpaid Special Tax Distributions and Priority Return payments (the "Investor Member Put Price").  A determination of the fair market value of the Investor Member's Interest in the Company may take into account only those contracts or other arrangements creating rights or obligations that meet the requirements of Section 4.02(2)(c) of Revenue Procedure 2014-12 and that are on arm's length terms. Unless otherwise agreed to by Investor Member, Managing Member shall procure and pay for a valuation of the Interest of the Investor Member, which valuation shall in be form and content reasonably satisfactory to the Investor Member. The Investor Member Put Price for such Interest shall be paid by the Managing Member to the Investor Member in cash on the Investor Member Put Closing Date, at which time the Investor

- 79 -

Confidential

USBCDC00048457

Member will execute an amendment to this Agreement withdrawing as a Member, in form and substance reasonably acceptable to the Managing Member.  The date of the Investor Member Put closing (the "Investor Member Put Closing Date") will be the sixty (60) calendar days following the notice of exercise of the Investor Member Put, or such earlier date as the parties shall agree in writing.  Managing Member agrees to pay all of Investor Member's reasonable attorneys' fees and expenses in connection with the transactions contemplated under this Article XV.

- 80 -

Confidential

## ARTICLE XVI.
## GENERAL PROVISIONS

16.01   <u>Burden and Benefit</u>.   The covenants and agreements contained herein shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors and assigns of the respective parties hereto.

16.02   <u>Applicable Law</u>.   This Agreement shall be construed and enforced in accordance with the laws of the Formation State.

16.03   <u>Counterparts</u>.   This Agreement may be executed in several counterparts, each of which shall be deemed to be an original copy and all of which together shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties shall not have signed the same counterpart. Faxed, scanned or photocopied signatures shall be deemed equivalent to original signatures.

16.04   <u>Separability of Provisions</u>.   Each provision of this Agreement shall be considered separable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those provisions of this Agreement which are valid.

16.05   <u>Entire Agreement</u>.   This Agreement and the documents referred to herein set forth all (and is intended by all parties to be an integration of all) of the representations, promises, agreements and understandings among the parties hereto with respect to the Company, the Company business and the property of the Company, and there are no representations, promises, agreements or understandings, oral or written, express or implied, among them other than as set forth or incorporated herein or therein.

16.06   <u>Liability of the Investor Member</u>.   Notwithstanding anything to the contrary contained herein, neither the Investor Member nor any of its shareholders, officers, directors, partners, general or limited, or members shall have any personal liability to any of the parties to this Agreement with regard to the representations and covenants extended, or the obligations undertaken, by the Investor Member under this Agreement.   In the event that the Investor Member shall be in default under any of the terms of this Agreement, the sole recourse of any party hereto for any indebtedness due hereunder, or for any damages resulting from any such default by the Investor Member, shall be against the capital contributions of the Investor Member allocated to, and remaining for investment in, the Company; provided however, that under no circumstances shall the liability of the Investor Member for any such default be in excess of the amount of the Investor Member's Capital Contribution that is unpaid at the time of such default.

16.07   <u>Notices</u>.   Any and all notices, consents, approvals and other communications required or permitted under this Agreement shall be deemed adequately given only if in writing delivered either in hand, by mail or by expedited commercial carrier which provides evidence of delivery or refusal, addressed to the recipient, postage prepaid and certified or registered with return receipt requested, if by mail, or with all freight charges prepaid, if by commercial carrier. All notices and other communications shall be deemed to have been given for all purposes of this

- 81 -

Confidential

Agreement upon the date of receipt or refusal. All such notices and other communications shall be addressed to the Members at their respective addresses set forth in Schedule B or at such other addresses as any of them may designate by notice to the other Members. Upon a transfer of any Investor Member's Interest pursuant to Section 9.02 hereof, the Managing Member shall cause the Company to provide updated notice names and addresses of any Substitute Investor Member as may be required under the Project Documents.

16.08 <u>Legal Fees</u>. All legal fees incurred by Investor Member, including, without limitation, those in the preparation and/or amendment of this Agreement and all other Project Documents and legal fees incurred by the Investor Member with respect to each Installment and/or any consent requested of the Investor Member, shall be paid or caused to be paid by the Managing Member without reimbursement. In the event an action, suit or proceeding is commenced by one Member against the other in connection with this Agreement and/or the transaction contemplated hereby, the non-prevailing Member shall be required to reimburse the prevailing Member for all legal fees, costs and expenses incurred by the prevailing Member in connection therewith.

16.09 ***RIGHTS AND REMEDIES.***

*(A)* *UNLESS OTHERWISE SPECIFICALLY PROVIDED HEREIN, THE RIGHTS AND REMEDIES OF ANY OF THE PARTIES HEREUNDER SHALL NOT BE MUTUALLY EXCLUSIVE, AND THE EXERCISE OF ONE OR MORE OF THE PROVISIONS HEREOF SHALL NOT PRECLUDE THE EXERCISE OF ANY OTHER PROVISIONS HEREOF. EACH OF THE PARTIES CONFIRMS THAT DAMAGES AT LAW MAY BE AN INADEQUATE REMEDY FOR BREACH OR THREAT OF BREACH OF ANY PROVISIONS HEREOF. THE RESPECTIVE RIGHTS AND OBLIGATIONS HEREUNDER SHALL BE ENFORCEABLE BY SPECIFIC PERFORMANCE, INJUNCTION, OR OTHER EQUITABLE REMEDY, BUT NOTHING HEREIN CONTAINED IS INTENDED TO LIMIT OR AFFECT ANY RIGHTS AT LAW OR BY STATUTE OR OTHERWISE OF ANY PARTY AGGRIEVED AS AGAINST THE OTHER PARTIES FOR A BREACH OR THREAT OF BREACH OF ANY PROVISION HEREOF, IT BEING THE INTENTION BY THIS PARAGRAPH TO MAKE CLEAR THAT UNDER THIS AGREEMENT THE RESPECTIVE RIGHTS AND OBLIGATIONS OF THE MEMBERS SHALL BE ENFORCEABLE IN EQUITY AS WELL AS AT LAW OR OTHERWISE.*

*(B)* *TO THE EXTENT PERMITTED BY LAW, EACH MEMBER HEREBY IRREVOCABLY:*

*(I)* *CONSENTS TO ANY SUIT, ACTION, OR PROCEEDING WITH RESPECT TO THIS AGREEMENT BEING, IF BROUGHT BY THE INVESTOR MEMBER, BROUGHT IN ANY COURT OF COMPETENT JURISDICTION LOCATED IN THE STATE, AS THE INVESTOR MEMBER MAY ELECT AND, IF BROUGHT BY THE MANAGING MEMBER, BROUGHT IN ANY COURT OF COMPETENT JURISDICTION LOCATED IN THE STATE AS THE MANAGING MEMBER MAY ELECT;*

- 82 -

Confidential

*(II)    WAIVES ANY OBJECTION THAT IT MAY HAVE NOW OR HEREAFTER TO THE VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY SUCH COURT AND ANY CLAIM THAT ANY OF THE FOREGOING HAVE BEEN BROUGHT IN ANY INCONVENIENT FORUM;*

*(III)    (A) ACKNOWLEDGES THE COMPETENCE OF ANY SUCH COURT, (B) SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF ANY SUCH COURT IN ANY SUCH SUIT, ACTION OR PROCEEDING, AND (C) AGREES THAT THE FINAL JUDGMENT IN ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT SHALL BE CONCLUSIVE AND BINDING UPON IT AND MAY BE ENFORCED IN ANY COURT TO THE JURISDICTION OF WHICH IT IS OR MAY BE SUBJECT BY A SUIT UPON SUCH JUDGMENT, A CERTIFIED COPY OF WHICH SHALL BE CONCLUSIVE EVIDENCE OF ITS LIABILITY;*

*(IV)    AGREES THAT SERVICE OF PROCESS IN ANY SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT MAY BE MADE AT ITS ADDRESS SET FORTH IN SECTION 16.07, OR SUCH OTHER ADDRESS DESIGNATED BY IT PURSUANT TO THE TERMS OF SECTION 16.07;*

*(V)    WAIVES ALL CLAIMS OF ERROR BY REASON OF ANY SERVICE EFFECTED IN ACCORDANCE WITH THE PROVISIONS OF SUBPARAGRAPH (IV) ABOVE AND AGREES THAT SUCH SERVICE SHALL IN EVERY RESPECT EFFECT SERVICE UPON IT IN ANY SUIT, ACTION OR PROCEEDING AND SHALL BE TAKEN AND HELD TO BE VALID PERSONAL SERVICE UPON OR PERSONAL DELIVERY TO IT, TO THE FULLEST EXTENT PERMITTED BY LAW; AND*

*(VI)    WAIVES TRIAL BY JURY IN ANY ACTION RELATED TO THIS AGREEMENT.*

16.10    <u>Compliance with Safe Harbor</u>.  The members acknowledge that IRS Revenue Procedure 2014-12 establishes a so called safe harbor (the "<u>Safe Harbor</u>") under which the IRS will not challenge a partnership's allocations of validly claimed Federal Historic Tax Credits provided the partnership and its partners satisfy all the requirements of the Safe Harbor.  The Members agree and acknowledge that each intends that each of the requirements of the Safe Harbor will be satisfied and that in that regard, Investor Member is intended to constitute an 'Investor' and the Company is intended to constitute a 'Partnership', and more specifically a 'Master Tenant Partnership,' as those terms are defined in the Revenue Procedure.   The Members also affirm and direct that any ambiguity in the meaning of any provision of this Agreement shall be resolved in favor of an interpretation that would tend to cause the Company or its members to comply with the requirements of the Safe Harbor.

16.11    <u>Survival of Obligations</u>.

All monetary obligations of the Company or the Managing Member to the Investor Member hereunder shall survive the sale by the Investor Member of its Interest or the

- 83 -

Confidential

termination of the Company until satisfied by the Company, the Managing Member or a Guarantor, as the case may be.

16.12   Environmental Protection.

The Managing Member represents, warrants and covenants as follows:

(a)      Except as described in the Environmental Reports, (i) no Developer Entity has ever received notification from any federal, state or other governmental authority of (x) any potential, known, or threat of release of any Hazardous Substance from the Property or (y) the incurrence of any expense or loss by any such governmental authority or by any other Person in connection with the assessment, containment or removal of any release or threat of release of any Hazardous Substances from the Property, (ii) to Managing Member's knowledge, no Hazardous Substance was, prior to Master Landlord's ownership of the Property, ever stored on, transported, or disposed of on the Property except to the extent any such storage, transport or disposition was at all times in compliance with all laws, ordinances, and regulations pertaining thereto, and (iii) subsequent to Master Landlord's ownership of the Property, no Hazardous Substance was ever or is now stored on, transported, or disposed of on the Property except to the extent any such storage, transport or disposition was at all times in compliance with all laws, ordinances, and regulations pertaining thereto;

(b)      Except as disclosed in the Environmental Reports, (i) it has no knowledge of any deposit, storage, disposal, burial, discharge, spillage, uncontrolled loss, seepage or filtration of any Hazardous Substances at, upon, under or within the Land or any contiguous real estate, and (ii) it has not caused nor permitted to occur, and it shall not permit to exist, any condition which may cause a discharge of any Hazardous Substances at, upon, under or within the Land or on any contiguous real estate;

(c)      (i) Neither it nor the Company has been, nor will be involved in operations at or, pursuant to its best efforts, near the Land, which operations could lead to (A) the imposition of liability under the Environmental Laws on the Company or on any other subsequent or former owner of the Property or (B) the creation of a lien on the Property under the Environmental Laws or under any similar laws or regulations; and (ii) neither it nor the Company has permitted, and will not permit, any subtenant or occupant of the Property to engage in any activity that could impose liability under the Environmental Laws on such subtenant or occupant, on the Land or on the Company;

(d)      It shall comply and cause the Company to comply in all respects with the requirements of the Environmental Laws and related regulations and with all similar laws and regulations in regard to the Property.  Further, the Managing Member shall deliver to the Investor Member a copy of any notice it may receive that a violation of such laws or regulations exist;

(e)      it shall take or cause to be taken any actions recommended to be taken which were contained in the Environmental Reports or any other environmental assessment reports prepared in conjunction with the development of the Property, and all such actions shall

- 84 -

Confidential

be appropriately completed in a manner that fully complies with such recommendations and all laws, regulations, ordinances, orders or decrees pertaining thereto.

(f)       it shall provide the Investor Member with prompt written notice (i) upon any Managing Member or Affiliate thereof obtaining knowledge of any potential or known release, or threat of release, of any Hazardous Material in violation of Applicable Laws at or from the Property or any other property owned, occupied or operated by any Managing Member, any Affiliate of a Managing Member or any Person for whose conduct any Managing Member or Affiliate of a Managing Member is or was responsible and whose liability may result in a lien on the Property (or the Leasehold Interest), (ii) upon any Managing Member or Affiliate thereof receiving any notice to such effect from any federal, state, or other governmental authority, or (iii) upon any Managing Member or Affiliate thereof obtaining knowledge of any incurrence of any expense or loss by any such governmental authority in connection with the assessment, containment, or removal of any hazardous material for which expense or loss a lien may be imposed on the Property (or the Leasehold Interest); and

(g)       it shall at all times indemnify and hold harmless the Investor Member and its members and their Affiliates against and from any and all claims, suits, actions, debts, damages, costs, charges, losses, obligations, judgments, and expenses, of any nature whatsoever, suffered or incurred by the Investor Member or its members or their Affiliates, under or on account of the Environmental Laws or any similar laws or regulations in regard to the Property, including the assertion of any lien thereunder.  The foregoing indemnification shall be a recourse obligation of the Managing Member and shall survive the dissolution of the Company and/or the death, retirement, incompetency, insolvency, Bankruptcy or withdrawal of the Managing Member.

*Signature Pages Follow*

- 85 -

Confidential

USBCDC00048463

IN WITNESS WHEREOF, the parties have set their signatures to this Operating Agreement as of the date first written above.

**MANAGING MEMBER:**

**DFQ MANAGEMENT LLC**,
a Delaware limited liability company

By: _____
       Michael S. Qualizza
       Authorized Signatory

**INVESTOR MEMBER:**

**U.S. BANCORP COMMUNITY DEVELOPMENT CORPORATION**,
a Minnesota corporation

By: _____
       Shanna Kennedy, Assistant Vice President

Signature Page

IN WITNESS WHEREOF, the parties have set their signatures to this Operating Agreement as of the date first written above.

**MANAGING MEMBER:**

**DFQ MANAGEMENT LLC,**
a Delaware limited liability company

By: _____
      Michael S. Qualizza
      Authorized Signatory

**INVESTOR MEMBER:**

**U.S. BANCORP COMMUNITY DEVELOPMENT CORPORATION,**
a Minnesota corporation

By: _____
      Shanna Kennedy, Assistant Vice President

Signature Page

#8370189 Operating Agreement
Last Hotel Master Tenant LLC

Project No. 24586

SCHEDULE A

<u>Members, Capital Contributions and Company Interests</u>

|  | <u>Capital Contribution</u> | <u>Company Interest</u> |
|---|---|---|
| <u>Investor Member</u><br><br>U.S. Bancorp Community Development Corporation<br>1307 Washington Avenue, Suite 300<br>St. Louis, Missouri 63103<br>Project Reference:  24586<br>Attn: Director of Asset Management – HTC<br>Facsimile:  (314) 335-2601 | $9,977,398* | 99.00% (until the Flip Date)<br><br>20.00% (from and after the Flip Date) |
| <u>Managing Member</u><br><br>DFQ Management LLC<br>216 W Ohio Street, Floor 5<br>Chicago, IL 60654<br>Attn: Michael S. Qualizza | $100,000* | 1.00% (until the Flip Date)<br><br>80.00% (from and after the Flip Date) |

*Payable as and when provided in this Agreement, subject to adjustment as provided for in this Agreement.

Confidential

SCHEDULE B

Referenced Information

**Article I:**

Formation:   On September 6, 2017, an individual as authorized person executed the Articles pursuant to the Act for the formation of Last Hotel Master Tenant LLC, which Articles were subsequently filed in the Office of the Secretary of State of the Formation State on September 6, 2017, pursuant to said Act.

Principal Office:  Subject to Section 1.03, on the date hereof, the principal office of the Company is at 216 W. Ohio Street, Floor 5, Chicago, Illinois 60654.

Name and Address of Registered Agent:  Subject to Section 1.03, on the date hereof, the name and address of the Agent for service of process is Cogency Global, Inc. at 222 East Dunklin, Suite 102, Jefferson City, Missouri 65101.

**Article II:**

"Accountants" means, subject to Article II, CohnReznick LLP.

"Act" means the Missouri Limited Liability Company Act set forth in Sections 347.010 to 347.187 of the Revised Statutes of Missouri, as the same may be amended from time to time.

"Business Day" means a day during which commercial banks in St. Louis, Missouri are open for business of the nature required for the implementation or administration of this Agreement.

"Construction Consultant" means Capital Consultants, Inc., a Missouri corporation, or any successor consultant retained by the Investor Member at the sole expense of the Managing Member.

"Cut-Off Date": September 30, 2019.

"Formation State" means the State of Missouri.

"Investment Fund" means and refers to the following USBCDC Investment Fund 228, LLC, a Missouri limited liability company.

"Master Landlord Operating Agreement" means that certain Amended and Restated Operating Agreement of 1501 Washington St. Louis, LLC dated as of the date hereof, by and between RMZ-1501 St. Louis, LLC, a Texas limited liability company, Last Hotel Investor, LLC, a Delaware limited liability company, ARQ-1501 St. Louis, LLC, a Delaware limited liability company, and DFQ Management LLC, a Delaware limited liability company, as members, as amended, restated or otherwise modified from time to time.

Schedule B

"MT Loan" means a loan from the Company to the Managing Member in an aggregate amount not to exceed $5,326,135.

"MT Loan Documents" means and refers to any and all documents executed by Managing Member or any guarantors, as applicable, in connection with the MT Loan, including, without limitation, any of the following:  loan agreement, promissory notes, mortgages, deeds of trust, security agreements, financing statements and all other documentation entered into in connection with the MT Loan.

"Outside Stabilized Operations Date" means September 30, 2021.

"Outside Substantial Completion Date" means September 30, 2019.

"Project Preservation Consultant" means, subject to Article II, MacRostie Historic Advisors LLC.

"Priority Return" means a cumulative, annual distribution to the Investor Member (pro-rated for periods of less than a full year) of an amount equal to two percent (2%) of its paid-in Capital Contribution, which shall accrue on the date hereof for each Company Fiscal Year ending on December 31, and be payable in arrears on or before each January 31 for the previous year from Net Cash Flow with the first payment due on or before January 31, 2018, or the proceeds of a Capital Transaction in the manner set forth in Article XI. Any Priority Return not distributed shall accrue and remain payable until paid in accordance with Article XI hereof.

"Projected Federal Historic Tax Credits" are $8,675,998.


## Article VIII:

The Managing Member shall cause the Company to establish and maintain the following Reserves:

(a)    The Managing Member shall cause the Company to establish and maintain a working capital reserve (the "Working Capital Reserve").  The Managing Member shall cause the Company to fund the Working Capital Reserve from Managing Member Capital Contribution on the date hereof.  Subject to the consent of Investor Member in its reasonable discretion, the Managing Member may cause the Working Capital Reserve to be further funded beyond the initial deposit on the date hereof; provided that in no even shall the amount held in the Working Capital Reserve exceed an amount equal to the actual operating expenses of the Company from the preceding twelve (12) months.  The funds in the Working Capital Reserve shall be held in a segregated, interest bearing account with a federally insured depository institution.  All earnings on Working Capital Reserve balances shall accrue to the benefit of the Working Capital Reserve. Withdrawals from the Working Capital Reserve shall only be made with the Consent of Investor Member, which withdrawals shall be requested using the form attached hereto as Exhibit K. Working Capital Reserve funds shall only be used to pay Operating Expenses.

Schedule B

Confidential

USBCDC00048468

(b)     The Managing Member shall cause the Company to establish a reserve fund for replacements (the "Replacement Reserve").  The funds in the Replacement Reserve shall be held in a segregated, interest bearing account with a federally insured depository institution.  All earnings on the Replacement Reserve balances shall accrue to the benefit of the Replacement Reserve.  Annual deposits shall be made into the Replacement Reserve beginning upon Placement in Service from Net Cash Flow in accordance with Section 11.01(a) herein; provided that the amounts funded in the Replacement Reserve under Section 11.01(a) will be determined in accordance with the following calculation: for the first twelve (12) months, two percent (2%) of all revenues from the operations of the operation of the hotel on the Property (including any revenue from the operations of the F&B Lessee (collectively, "Total Revenue"), for the subsequent twelve (12) months, three percent (3%) of Total Revenue, and for each succeeding twelve (12) month period thereafter, four percent (4%) of Total Revenue.  The funds in the Replacement Reserve shall be used exclusively for replacement expenditures for the Property approved by the Investor Member.

**Article XVI:**

Notices and other communications shall be addressed to the Members at their respective addresses set forth in Schedule B or at such other addresses as any of them may designate by notice to the other Members.

Any Notice required by the provisions of this Agreement to be given to the Investor Member shall be addressed as follows:

U.S. Bancorp Community Development Corporation
1307 Washington Avenue, Suite 300
St. Louis, Missouri 63103
Project Reference:  24586
Attn: Director of Asset Management – HTC
Facsimile:  (314) 335-2601

With copies to:

Husch Blackwell LLP
190 Carondelet Plaza, Suite 600
St. Louis, Missouri 63105
Attention: Edward J. Lieberman
Facsimile: (314) 480-1505

Any Notice required by the provisions of this Agreement to be given to the Company or the Managing Member shall be addressed as follows:

DFQ Management LLC
216 W Ohio Street, Floor 5
Chicago, IL 60654
Attn: Michael S. Qualizza

With a copy to:

Schedule B

Confidential

USBCDC00048469

Ginsberg Jacobs LLC
300 South Wacker Drive, Suite 2750
Chicago, Illinois 60606
Attention:  Darryl Jacobs
Facsimile:  (312) 660-9612

Schedule B

#8370189 Operating Agreement
Last Hotel Master Tenant LLC

Project No. 24586

Confidential

EXHIBIT A

FORM OF PAYMENT NOTICE

Exhibit A

PAYMENT NOTICE

[_____], 201[___]


U.S. Bancorp Community Development Corporation
1307 Washington Avenue, Suite 300
St. Louis, Missouri 63103
Project Reference: 24586
Attn: Director of Asset Management – HTC
Facsimile:  (314) 335-2601

Re:  Capital Contribution as per the Operating Agreement (the "Agreement") dated December 29, 2017 by and between the undersigned and the addressee hereof ("Investor Member")

To whom it may concern:

The undersigned on behalf of Last Hotel Master Tenant LLC confirms that all of the requirements for the payment of the [_____] Installment have been satisfied and requests, subject to the terms and conditions of the Agreement, that the Investor Member contribute $[_____] constituting the [_____] Installment and in accordance with the Agreement, on [_____], 201[___].

Terms not otherwise defined herein shall have the meanings given them in the Agreement.

**DFQ MANAGEMENT LLC**,
a Delaware limited liability company



By: _____
        Michael S. Qualizza, Authorized Signatory

#8370189 Form of Payment Notice                                                              Project No. 24586
Last Hotel Master Tenant LLC

EXHIBIT B

FORM OF CONTRIBUTION CERTIFICATE

#8370189 Operating Agreement
Last Hotel Master Tenant LLC

Project No. 24586

Confidential

USBCDC00048473

CONTRIBUTION CERTIFICATE

[_____], 201[__]

U.S. Bancorp Community Development Corporation
1307 Washington Avenue, Suite 300
St. Louis, Missouri  63103
Attn:  Director of Asset Management – HTC
Reference:  24586

Dear Director:

The undersigned hereby certify that the following representations and warranties remain true and correct in all material respects and not misleading on and as of the due date for the [Second/Third] Installment of the Investor Member's Capital Contribution pursuant to Section 5.01 of the Operating Agreement of Last Hotel Master Tenant LLC dated as of December 29, 2017 (the "Operating Agreement").  Capitalized terms used herein, but not defined herein, shall have the respective meanings ascribed to such terms in the Operating Agreement.

(i)    *Placement In Service; Substantial Completion*.  The rehabilitation work to the following portions of the Building and related QREs have been completed and Placed in Service with such Placement in Service occurring on the date(s) set forth below and the date of Substantial Completion is also set forth below:

| Portions of Building Placed in Service | Date of Placement In Service | Substantial Completion Date |
|---|---|---|
| _____ | _____ | _____ |

(ii)    *No Defaults; Documents in Force; No Jeopardizing Events*. No default (or event that, with the giving of notice or the passage of time or both, would constitute a default) has occurred and is continuing under any of the Project Documents; all the Project Documents are in full force and effect; and no event has occurred and is continuing that materially jeopardizes or is likely to materially jeopardize the ability of the Company to continue to operate the Project as a project eligible for the Federal Historic Tax Credits.

(iii)    *No Liens*. The Company owns a leasehold interest in and to the Property and the Property is free and clear of any liens (including mechanics' liens), charges, or encumbrances other than matters set forth in the Title Policy.

- 1 -

(iv)     *No Bankruptcies*. No event of Bankruptcy has occurred and is continuing, and no event has occurred that, with the passage of time, could become an event of Bankruptcy, with respect to the Managing Member or any other Developer Entity.

(v)     *No Breach*. The Managing Member is not in breach in any material respect of any provision of the Operating Agreement to be observed or performed by it including, but not limited to, all representations, warranties, and covenants given by the Managing Member, pursuant to the Operating Agreement and all representations and warranties herein remain true and correct in all material respects.

(vi)     *Environmental*. Except for any matters set forth in the Environmental Reports, the Property contains no, and is not adversely affected by the presence of, any Hazardous Substances in violation of Environmental Laws, nor is it in violation of any federal, state, or local law, regulation, rule, or ordinance, and no violation of any Environmental Law has occurred or is continuing.  Neither the Managing Member nor Master Landlord has received any notice from any source whatsoever of the existence of any Hazardous Substances in violation of Environmental Laws or of a violation of any federal, state, or local law, regulation, rule or ordinance with respect to the Property.  If any Hazardous Substances (including lead-based paint and asbestos) was found to exist or be present in violation of Environmental Laws, it has been either removed from the Property and disposed of or encapsulated and/or otherwise corrected, contained and made safe and inaccessible, all in strict accordance with federal, state, and local statutes, laws, rules and regulations, any recommendations, and any requirements in any Project Loan Documents. With regard to contaminated soils not being disturbed in connection with the renovation of the Building, the Managing Member has corrected or caused to be corrected such soil conditions if and only to the extent required by federal, state and local statutes, laws (including any Environmental Laws), regulations, rules and ordinances or as otherwise agreed to with any state governmental authorities.

(vii)     *Document Compliance*.   True, correct and complete copies of all documents required by Section 13.04 of the Operating Agreement to be provided to the Investor Member as of the date hereof have been delivered to the Investor Member.

(viii)     *No Audit*. There is no Notice from, or ongoing audit by, the IRS in which the IRS is asserting, by means of a notice, thirty day letter, or otherwise, that the Federal Historic Tax Credits available to the Company for any taxable year is less than the amount of Credits claimed by the Company for that year or that all or any portion of the Federal Historic Tax Credits claimed with respect to any prior taxable year(s) must be recaptured pursuant to Section 47 or other relevant sections of the Code, or is unavailable to the Company.

(ix)     *Conformity with Laws*. The Project and the Property conforms in all material respects with Applicable Laws.  Each Developer Entity has complied with all Applicable Laws and no action, suit, proceeding, hearing, government investigation, charge, complaint, claim, demand, or notice has been filed or commenced against any Developer Entity alleging any failure so to comply, or if there are any of the foregoing, the Managing Member has disclosed them in writing to the Investor Member.

- 2 -

Confidential

USBCDC00048475

(x)     *Prior Qualification*. The Company qualified for, and subject to adjustment as provided in the Agreement, has received all prior Capital Contribution Installments.

(xi)     *All Prerequisites Satisfied*.  The preconditions to payment of the [First/Second/Third] Installment described in Section 5.01(c) of the Operating Agreement have occurred and/or been satisfied

(xii)     *Insurance*.  The insurance on the Project and the Property meets all requirements set forth in the Operating Agreement and the Master Lease, and is in full force and effect.

(xiii)     *Credit Adjustments and Lease-up*.   There are no existing Credit Adjustments (and no Credit Adjustments are anticipated), and there has been no change in the anticipated lease-up of the Building as contemplated in the Projections, other than the following: [_____].

(xiv)     *Confirmation of Guaranty*.   The undersigned hereby acknowledge and agree that the Guaranty remains in full force and effect without impairment and without modification (except as specifically provided herein), and that no rights or remedies of Investor Member under the Guaranty have been waived.

[SIGNATURES BEGIN ON THE FOLLOWING PAGE]

**MANAGING MEMBER**

**DFQ MANAGEMENT LLC**, a Delaware limited liability company

By: _____
      Name:
      Title:

**MASTER LANDLORD MANAGER:**

**DFQ MANAGEMENT LLC**, a Delaware limited liability company

By: _____
      Name:
      Title:

- 4 -

IN WITNESS WHEREOF, the undersigned Guarantors have executed this Notice as of this _____ day of _____, _____ solely for the purpose of confirming and ratifying the Guaranty as set forth in Paragraph xiv hereof.

By: _____
Name:
Title:

By: _____
Name:
Title:

By: _____
Name:
Title:

Exhibit B

#8370189 Form of Contribution Certificate
Last Hotel Master Tenant LLC

Project No. 24586

USBCDC00048478

EXHIBIT C

PROJECTIONS

Exhibit C

Confidential

USBCDC00048479

**St. Louis Hotel**

**Financial Projection Schedules –
Income Tax Basis and
Independent Accountant's Compilation Report**

**As of December 29, 2017
For the Period December 29, 2017
Through December 31, 2050**





CohnReznick LLP
**cohnreznick.com**

Independent Accountant's Report

To the Members of
USBCDC Investment Fund 228, LLC
USBCDE Sub-CDE 162, LLC
St. Louis New Markets Tax Credit Fund 49, LLC
1501 Washington St. Louis, LLC
Last Hotel Master Tenant, LLC


Re: St. Louis Hotel (the "Project")


Management is responsible for the accompanying financial projection of the Project, which comprise Projected Sources and Uses, Projected Cash Flows, Projected Taxable Income (Loss) and Projected Value of Tax Credits, Cash Flows, and Tax Loss Amounts to the Investor, and other projected data as of December 29, 2017 for the period December 29, 2017 through December 31, 2050 (the "Projection") in accordance with the tax basis of accounting, and for determining that the tax basis of accounting is an acceptable financial reporting framework. We have performed a compilation engagement in accordance with Statements on Standards for Accounting and Review Services promulgated by the Accounting and Review Services Committee of AICPA. We did not audit or review the Projection nor were we required to perform any procedures to verify the accuracy or completeness of the information provided by management.  Accordingly, we do not express an opinion, a conclusion, nor provide any form of assurance on the accompanying Projection.

The Projection is prepared in accordance with the tax basis of accounting, which is a basis of accounting other than accounting principles generally accepted in the United States of America. The accompanying projection was prepared for analyzing the potential value of the syndication of the project with a corporate investor.

Management has elected to omit the summary of significant accounting policies required by the guidelines for presentation of a projection established by the American Institute of Certified Public Accountants. If the omitted disclosures were included in the projection, they might influence the user's conclusions about the Project's financial position, results of operations, and cash flows for the projected period. Accordingly, this projection is not designed for those who are not informed about such matters.

The projected results may not be achieved. Events and circumstances frequently do not occur as expected, and those differences may be material. We have no responsibility to update this report for events and circumstances occurring after the date of this report.

The accompanying Projection and this report are intended solely for the information and use of the Members of the Project and are not intended to be and should not be used by anyone other than these specified parties.

*CohnReznick LLP*

Charlotte, North Carolina
December 29, 2017

USBCDC00048481

**1501 Washington**

## TABLE OF CONTENTS

| TITLE | PAGE |
|---|---|
| NMTC DIAGRAM | 2 - 3 |
| SUMMARY OF SIGNIFICANT ASSUMPTIONS | 4 |
| **USBCDC INVESTMENT FUND 228, LLC LEVEL** | |
| USBCDC INVESTMENT FUND 228, LLC GENERAL INFORMATION | 5 |
| USBCDC INVESTMENT FUND 228, LLC FLOW OF FUNDS | 6 |
| USBCDC INVESTMENT FUND 228, LLC RESERVE | 7 |
| USBCDC INVESTMENT FUND 228, LLC LOAN ASSUMPTIONS | 8 |
| USBCDC INVESTMENT FUND 228, LLC LOAN AMORTIZATION SCHEDULE | |
| Leverage Loan | 9 |
| USBCDC INVESTMENT FUND 228, LLC PROJECTED OPERATING CASH FLOW STATEMENT | 10 |
| USBCDC INVESTMENT FUND 228, LLC PROJECTED TAXABLE INCOME (LOSS) | 11 |
| USBCDC TAX CREDIT FLOW | 12 |
| USBCDC BENEFITS SCHEDULE - TAX CREDITS, TAX LOSSES AND CASH FLOW | 13 |
| USBCDC CAPITAL ACCOUNT ANALYSIS | 14 |
| USBCDC INTERNAL RATE OF RETURN | 15 - 16 |
| USBCDC INTERNAL RATE OF RETURN - ASSUMING THE PUT IS EXERCISED | 17 - 19 |
| USBCDC EXIT TAX CALCULATION - ASSUMING THE PUT IS EXERCISED | 20 |
| **USBCDE SUB-CDE 162, LLC LEVEL** | |
| USBCDE SUB-CDE 162, LLC GENERAL ASSUMPTIONS | 21 |
| USBCDE SUB-CDE 162, LLC FLOW OF FUNDS | 22 |
| USBCDE SUB-CDE 162, LLC LEVEL LOAN ASSUMPTIONS | 23 |
| USBCDE SUB-CDE 162, LLC 85% TEST | 24 |
| USBCDE SUB-CDE 162, LLC OPERATING RESERVES | 25 |
| USBCDE SUB-CDE 162, LLC PROJECTED OPERATING CASH FLOW STATEMENT | 26 |
| USBCDE SUB-CDE 162, LLC PROJECTED TAXABLE INCOME (LOSS) | 27 |
| USBCDE SUB-CDE 162, LLC OPERATING INCOME CALCULATION | 28 |
| USBCDE SUB-CDE 162, LLC PROJECTED DID SCHEDULE | 29 |
| **ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC LEVEL** | |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC GENERAL ASSUMPTIONS | 30 |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC FLOW OF FUNDS | 31 |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC LEVEL LOAN ASSUMPTIONS | 32 |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC 85% TEST | 33 |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC OPERATING RESERVES | 34 |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC PROJECTED OPERATING CASHFLOW STATEMENT | 35 |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC PROJECTED TAXABLE INCOME (LOSS) | 36 |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC OPERATING INCOME CALCULATION | 37 |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC PROJECTED DID SCHEDULE | 38 |
| **1501 WASHINGTON ST. LOUIS, LLC LEVEL** | |
| 1501 WASHINGTON ST. LOUIS, LLC GENERAL INFORMATION | 39 |
| 1501 WASHINGTON ST. LOUIS, LLC SOURCES AND USES OF FUNDS | 40 - 41 |
| 1501 WASHINGTON ST. LOUIS, LLC FLOW OF FUNDS | 42 - 45 |
| 1501 WASHINGTON ST. LOUIS, LLC AT RISK ANALYSIS | 46 - 47 |
| 1501 WASHINGTON ST. LOUIS, LLC PROJECTED CASH FLOW | 48 |
| 1501 WASHINGTON ST. LOUIS, LLC PROJECTED TAXABLE INCOME (LOSS) | 49 |
| 1501 WASHINGTON ST. LOUIS, LLC ACQUISITION/US LOAN INTEREST RESERVE | 50 |
| 1501 WASHINGTON ST. LOUIS, LLC REPLACEMENT RESERVE | 51 |
| 1501 WASHINGTON ST. LOUIS, LLC NON QUALIFIED FINANCIAL PROPERTY AND COLLECTIBLES TEST | 52 |
| 1501 WASHINGTON ST. LOUIS, LLC FINANCING ASSUMPTIONS | 53 |
| 1501 WASHINGTON ST. LOUIS, LLC DEBT SERVICE SUMMARY | 54 |
| First Mortgage | 55 |
| Mezz Loan Extended Term  via DFQ Equity | 56 |
| Refinanced Loan (First Mortgage) | 57 |
| USBCDE SUB-CDE 162, LLC Loan A | 58 |
| USBCDE SUB-CDE 162, LLC Loan B | 59 |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan A | 60 |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan B | 61 |
| 1501 WASHINGTON ST. LOUIS, LLC DEPRECIATION SCHEDULE | 62 |
| 1501 WASHINGTON ST. LOUIS, LLC DEPRECIATION SCHEDULE - REPLACEMENT RESERVES | 63 |
| 1501 WASHINGTON ST. LOUIS, LLC FUNDED EXPENSES | 64 |
| LAST HOTEL INVESTOR, LLC ASSUMPTION OF THE DEFERRED DEVELOPER FEE | 65 |
| **LAST HOTEL MASTER TENANT, LLC LEVEL** | |
| Last Hotel Master Tenant, LLC GENERAL INFORMATION | 66 |
| Last Hotel Master Tenant, LLC SOURCES AND USES OF FUNDS | 67 |
| Last Hotel Master Tenant, LLC LOAN AMORTIZATION SCHEDULE | 68 |
| Last Hotel Master Tenant, LLC OPERATING ASSUMPTIONS | 69 - 72 |
| Last Hotel Master Tenant, LLC LEASE PAYMENT TO LANDLORD | 73 |
| Last Hotel Master Tenant, LLC PRIORITY RETURN TO INVESTOR | 74 |
| Last Hotel Master Tenant, LLC PROJECTED CASH FLOW | 75 |
| Last Hotel Master Tenant, LLC PROJECTED TAXABLE INCOME (LOSS) | 76 |
| SPECIAL TAX DISTRIBUTION CALCULATION | 77 |
| Last Hotel Master Tenant, LLC REPLACEMENT RESERVE | 78 |
| Last Hotel Master Tenant, LLC DEPRECIATION SCHEDULE - REPLACEMENT RESERVES | 79 |
| Last Hotel Master Tenant, LLC DEPRECIATION | 80 |
| Last Hotel Master Tenant, LLC TAX CREDIT AMORTIZATION | 81 |
| Last Hotel Master Tenant, LLC CAPITAL ACCOUNT ANALYSIS | 82 |
| Last Hotel Master Tenant, LLC INVESTOR BENEFITS SCHEDULE - TAX CREDITS, TAX LOSSES AND CASH FLOW | 83 |
| INVESTOR CASH ON CASH INTERNAL RATE OF RETURN | 84 |
| CALCULATION OF HISTORIC TAX CREDITS | 85 |
| LAST HOTEL F&B, LLC PROJECTED CASH FLOW | 86 |
| DFQ MANAGEMENT, LLC SOURCES AND USES OF FUNDS | 87 |
| DFQ MANAGEMENT, LLC PROJECTED CASH FLOW | 88 |

Confidential
USBCDC00048482

1501 Washington

NMTC AND HTC DIAGRAM - CLOSING

US BANK DEAL NO. 24586



See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048483



Confidential

USBCDC00048484

**1501 Washington**

**SUMMARY OF SIGNIFICANT ASSUMPTIONS**

The projected schedules are based on the following assumptions which are presented on pages 5-88.

USBCDC INVESTMENT FUND 228, LLC LEVEL
  USBCDC INVESTMENT FUND 228, LLC GENERAL INFORMATION    5
  USBCDC INVESTMENT FUND 228, LLC LOAN ASSUMPTIONS    8
  USBCDC INVESTMENT FUND 228, LLC PROJECTED OPERATING CASH FLOW STATEMENT    10
  USBCDC INTERNAL RATE OF RETURN - ASSUMING THE PUT IS EXERCISED    19
  INVESTOR EXIT TAX CALCULATION    20

USBCDE SUB-CDE 162, LLC LEVEL
  USBCDE SUB-CDE 162, LLC GENERAL ASSUMPTIONS    21
  USBCDE SUB-CDE 162, LLC LEVEL LOAN ASSUMPTIONS    23

ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC LEVEL
  ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC GENERAL ASSUMPTIONS    30
  ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC LEVEL LOAN ASSUMPTIONS    32

1501 WASHINGTON ST. LOUIS, LLC
  1501 WASHINGTON ST. LOUIS, LLC GENERAL INFORMATION    39
  1501 WASHINGTON ST. LOUIS, LLC SOURCES AND USES OF FUNDS    41
  1501 WASHINGTON ST. LOUIS, LLC FLOW OF FUNDS    45
  1501 WASHINGTON ST. LOUIS, LLC OPERATING ASSUMPTIONS    47
  1501 WASHINGTON ST. LOUIS, LLC PROJECTED CASH FLOW    48
  1501 WASHINGTON ST. LOUIS, LLC PROJECTED TAXABLE INCOME (LOSS)    49
  1501 WASHINGTON ST. LOUIS, LLC NON QUALIFIED FINANCIAL PROPERTY AND COLLECTIBLES TEST    52
  1501 WASHINGTON ST. LOUIS, LLC FINANCING ASSUMPTIONS    53
  1501 WASHINGTON ST. LOUIS, LLC REFINANCE ANALYSIS    66

Last Hotel Master Tenant, LLC
  Last Hotel Master Tenant, LLC GENERAL INFORMATION    66
  Last Hotel Master Tenant, LLC SOURCES AND USES OF FUNDS    67
  Last Hotel Master Tenant, LLC OPERATING ASSUMPTIONS    72
  Last Hotel Master Tenant, LLC LEASE PAYMENT TO LANDLORD    73
  Last Hotel Master Tenant, LLC PROJECTED CASH FLOW    75
  INVESTOR CASH ON CASH INTERNAL RATE OF RETURN    84

Note: This financial projection is presented on the income tax basis of accounting, which is a comprehensive basis of accounting other than accounting principles generally accepted in the United States of America.

The projected schedules were prepared to assist the owners in analyzing the potential value of syndication of the project with a corporate investor. Accordingly, the projected schedules should not be used for other purposes. The assumptions contained herein are those that management believes are significant to the projections and are based on management's judgment at the time this projection was prepared. Management believes that the corporate investor will consummate the transaction. Furthermore, even if the corporate investor consummates the transaction, there will usually be differences between projected and actual results because events and circumstances frequently do not occur as expected and those differences may be material.

Confidential

USBCDC00048485

**1501 Washington**

**USBCDC INVESTMENT FUND 228, LLC GENERAL INFORMATION**

GENERAL INFORMATION:

| Projection Period | December 29, 2017 to | December 31, 2050 |
|---|---|---|
| Total Available For Investment In CDE | | 8,150,000 |
| | | |
| Gross Capital Contribution To Investment Fund | 34.69% | 2,828,865 |
| Gross Loan Proceeds To Investment Fund | 65.31% | 5,326,135 |
| Total Gross Capital To Investment Fund | 100.00% | 8,155,000 |
| | | |
| Annual Fund Management Fee | | 5,000 |
| Expense Escalation | | 0.00% |
| | | - |
| Reserve | | - |
| Interest Rate On Reserves | | 0.00% |
| | | |
| Contribution Rate Per NMTC | | 0.890 |
| Put Proceeds* | | 1,000 |
| | | |
| Tax Rate-2017 | | 38.00% |
| Tax Rate-2018 & Thereafter | | 24.00% |
| Ownership Interest | | 100.00% |

| CAPITAL CONTRIBUTION | PAYMENT DATE | CAPITAL |
|---|---|---|
| Capital Contribution | December 29, 2017 | 2,828,865 |
| | | |
| | TOTAL | 2,828,865 |

| LOAN PROCEEDS | PAYMENT DATE | CAPITAL |
|---|---|---|
| Leverage Loan | December 29, 2017 | 5,326,135 |
| | TOTAL | 5,326,135 |

* The exercise of the put by the investor is being modeled for hypothetical purposes only and is exercisable at the sole discretion of the investor.

12/29/2017

See Summary of Significant Assumptions and Accountant's Report

Page  5

USBCDC00048486

## 1501 Washington

### USBCDC INVESTMENT FUND 228, LLC FLOW OF FUNDS

|  | 12/29/2017 | TOTAL |
|---|---|---|
| Leverage Loan | 5,326,135 | 5,326,135 |
| Investment Fund Capital Contribution | 2,828,865 | 2,828,865 |
| Total Sources | 8,155,000 | 8,155,000 |
| Initial Year Fund Management Fee | 5,000 | 5,000 |
| USBCDE Sub-CDE 162, LLC QEI | 1,650,000 | 1,650,000 |
| St. Louis New Markets Tax Credit Fund 49, LLC QEI | 6,500,000 | 6,500,000 |
| Total Uses | 8,155,000 | 8,155,000 |

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048487

**1501 Washington**

## USBCDC INVESTMENT FUND 228, LLC LOAN ASSUMPTIONS

| Loan Advance | Leverage Loan | |
|---|---|---|
| Principal | 5,326,135 | |
| Interest Only Period | 84.07 | Months |
| Interest Rate - Int Only | 2.700% | |
| Interest Rate - Amort | 2.700% | |
| Amortization | 255.00 | Months |
| Term of Loans | 339.07 | Months |
| | | |
| Commencement | 12/29/2017 | |
| First Interest Only Payment | 12/29/2017 | |
| | | |
| Amortization Begins | 1/1/2025 | |
| First Amortization Payment | 3/10/2025 | |
| | | |
| Maturity | 3/31/2046 | |
| | | |
| Days in Year for Calculating Interest | 360 | |
| Interest Calculation Methodology | 30-Day Months | |
| Payments Made | Quarterly in Arrears/Advance | |
| Payment Dates | 3/10, 6/10, 9/10, 12/10 | |

Note: Payments are made quarterly partially in arrears and partially in advance
for the period from the beginning through the end of each calendar quarter.

See Summary of Significant Assumptions and Accountant's Report

**1501 Washington**

**USBCDC INVESTMENT FUND 228, LLC RESERVE**

| Year | Reserve from Initial Capital | Deposit / (Withdrawal) | Net Reserves | Cumulative Reserve Balance |
|---|---|---|---|---|
| 2017 | - | 33 | 33 | 33 |
| 2018 | - | 1,001 | 1,001 | 1,035 |
| 2019 | - | 1,001 | 1,001 | 2,036 |
| 2020 | - | 1,001 | 1,001 | 3,038 |
| 2021 | - | 1,001 | 1,001 | 4,039 |
| 2022 | - | 1,001 | 1,001 | 5,041 |
| 2023 | - | 1,001 | 1,001 | 6,042 |
| 2024 | - | 1,001 | 1,001 | 7,044 |
| 2025 | - | - | - | 7,044 |
| 2026 | - | - | - | 7,044 |
| 2027 | - | - | - | 7,044 |
| 2028 | - | - | - | 7,044 |
| 2029 | - | - | - | 7,044 |
| 2030 | - | - | - | 7,044 |
| 2031 | - | - | - | 7,044 |
| 2032 | - | - | - | 7,044 |
| 2033 | - | - | - | 7,044 |
| 2034 | - | - | - | 7,044 |
| 2035 | - | - | - | 7,044 |
| 2036 | - | - | - | 7,044 |
| 2037 | - | - | - | 7,044 |
| 2038 | - | - | - | 7,044 |
| 2039 | - | - | - | 7,044 |
| 2040 | - | - | - | 7,044 |
| 2041 | - | - | - | 7,044 |
| 2042 | - | - | - | 7,044 |
| 2043 | - | - | - | 7,044 |
| 2044 | - | - | - | 7,044 |
| 2045 | - | - | - | 7,044 |
| 2046 | - | - | - | 7,044 |
| 2047 | - | - | - | 7,044 |
| 2048 | - | - | - | 7,044 |
| 2049 | - | - | - | 7,044 |
| 2050 | - | (7,044) | (7,044) | - |
| Total | | - | - | |

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048489

**1501 Washington**

**USBCDC INVESTMENT FUND 228, LLC LOAN AMORTIZATION SCHEDULE**

Leverage Loan

| | |
|---|---|
| Principal | 5,326,135 |
| Interest Only Rate | 2.700% |
| Amortizing Rate | 2.700% |
| Commencement | 12/29/2017 |
| Amortization Begins | 1/1/2025 |
| Interest Only Period | 84.07 |
| Amortization | 255.00 |
| Term in Months | 339.07 |
| | |
| Quarterly Payment (Amortizing) | 82,551.25 |
| Annual Payment (Amortizing) | 330,204.99 |
| Payments Made | Quarterly in Arrears/Advance |
| | |
| Days in Year for Calculating Interest | 360 |
| Interest Calculation Methodology | 30-Day Months |

Note: Payments are made on 3/10, 6/10, 9/10 and 12/10 for interest from the first day of the immediately preceding calendar quarter through the last day of the immediately preceding calendar quarter.

| Year | Payment | Principal | Interest | Repayment | Balance |
|---|---|---|---|---|---|
| 2017 | 799 | - | 799 | - | 5,326,135 |
| 2018 | 143,806 | - | 143,806 | - | 5,326,135 |
| 2019 | 143,806 | - | 143,806 | - | 5,326,135 |
| 2020 | 143,806 | - | 143,806 | - | 5,326,135 |
| 2021 | 143,806 | - | 143,806 | - | 5,326,135 |
| 2022 | 143,806 | - | 143,806 | - | 5,326,135 |
| 2023 | 143,806 | - | 143,806 | - | 5,326,135 |
| 2024 | 143,806 | - | 143,806 | - | 5,326,135 |
| 2025 | 330,205 | 188,295 | 141,910 | - | 5,137,840 |
| 2026 | 330,205 | 193,431 | 136,774 | - | 4,944,409 |
| 2027 | 330,205 | 198,707 | 131,498 | - | 4,745,702 |
| 2028 | 330,205 | 204,126 | 126,079 | - | 4,541,576 |
| 2029 | 330,205 | 209,694 | 120,511 | - | 4,331,883 |
| 2030 | 330,205 | 215,413 | 114,792 | - | 4,116,470 |
| 2031 | 330,205 | 221,288 | 108,917 | - | 3,895,181 |
| 2032 | 330,205 | 227,324 | 102,881 | - | 3,667,857 |
| 2033 | 330,205 | 233,524 | 96,681 | - | 3,434,333 |
| 2034 | 330,205 | 239,893 | 90,312 | - | 3,194,440 |
| 2035 | 330,205 | 246,436 | 83,769 | - | 2,948,004 |
| 2036 | 330,205 | 253,158 | 77,047 | - | 2,694,846 |
| 2037 | 330,205 | 260,063 | 70,142 | - | 2,434,784 |
| 2038 | 330,205 | 267,156 | 63,049 | - | 2,167,628 |
| 2039 | 330,205 | 274,442 | 55,763 | - | 1,893,186 |
| 2040 | 330,205 | 281,927 | 48,278 | - | 1,611,258 |
| 2041 | 330,205 | 289,617 | 40,588 | - | 1,321,641 |
| 2042 | 330,205 | 297,516 | 32,689 | - | 1,024,125 |
| 2043 | 330,205 | 305,631 | 24,574 | - | 718,495 |
| 2044 | 330,205 | 313,967 | 16,238 | - | 404,528 |
| 2045 | 330,205 | 322,530 | 7,675 | - | 81,998 |
| 2046 | 82,551 | 81,998 | 553 | (0) | - |
| 2047 | - | - | - | - | - |
| 2048 | - | - | - | - | - |
| 2049 | - | - | - | - | - |
| 2050 | - | - | - | - | - |
| | 8,024,294 | 5,326,135 | 2,698,159 | (0) | |

Confidential                                                                                    USBCDC00048490

**1501 Washington**

**USBCDC INVESTMENT FUND 228, LLC PROJECTED OPERATING CASH FLOW STATEMENT**

| Year | Distribution From USBCDE Sub-CDE 162, LLC Investment | Distribution From St. Louis New Markets Tax Credit Fund 49, LLC Investment | Annual Fund Management Fee | Initial Year Fund Management Fee (Paid at Closing) | (Deposit to) / Release from Reserve | Net Cash Flow | Investment Fund Loan | Cash Flow Available for Distribution |
|------|------|------|------|------|------|------|------|------|
| 2017 | 212 | 620 | (5,000) | 5,000 | (33) | 799 | (799) | - |
| 2018 | 38,124 | 111,683 | (5,000) | | (1,001) | 143,806 | (143,806) | - |
| 2019 | 38,124 | 111,683 | (5,000) | | (1,001) | 143,806 | (143,806) | - |
| 2020 | 38,124 | 111,683 | (5,000) | | (1,001) | 143,806 | (143,806) | - |
| 2021 | 38,124 | 111,683 | (5,000) | | (1,001) | 143,806 | (143,806) | - |
| 2022 | 38,124 | 111,683 | (5,000) | | (1,001) | 143,806 | (143,806) | - |
| 2023 | 38,124 | 111,683 | (5,000) | | (1,001) | 143,806 | (143,806) | - |
| 2024 | 38,124 | 111,683 | (5,000) | | (1,001) | 143,806 | (143,806) | - |
| 2025 | 84,593 | 287,417 | - | | - | 372,009 | (330,205) | 41,804 |
| 2026 | 84,593 | 287,417 | - | | - | 372,009 | (330,205) | 41,804 |
| 2027 | 84,593 | 287,417 | - | | - | 372,009 | (330,205) | 41,804 |
| 2028 | 84,593 | 287,417 | - | | - | 372,009 | (330,205) | 41,804 |
| 2029 | 84,593 | 287,417 | - | | - | 372,009 | (330,205) | 41,804 |
| 2030 | 84,593 | 287,417 | - | | - | 372,009 | (330,205) | 41,804 |
| 2031 | 84,593 | 287,417 | - | | - | 372,009 | (330,205) | 41,804 |
| 2032 | 84,593 | 287,417 | - | | - | 372,009 | (330,205) | 41,804 |
| 2033 | 84,593 | 287,417 | - | | - | 372,009 | (330,205) | 41,804 |
| 2034 | 84,593 | 287,417 | - | | - | 372,009 | (330,205) | 41,804 |
| 2035 | 84,593 | 287,417 | - | | - | 372,009 | (330,205) | 41,804 |
| 2036 | 84,593 | 287,417 | - | | - | 372,009 | (330,205) | 41,804 |
| 2037 | 84,593 | 287,417 | - | | - | 372,009 | (330,205) | 41,804 |
| 2038 | 84,593 | 287,417 | - | | - | 372,009 | (330,205) | 41,804 |
| 2039 | 84,593 | 287,417 | - | | - | 372,009 | (330,205) | 41,804 |
| 2040 | 84,593 | 287,417 | - | | - | 372,009 | (330,205) | 41,804 |
| 2041 | 84,593 | 287,417 | - | | - | 372,009 | (330,205) | 41,804 |
| 2042 | 84,593 | 287,417 | - | | - | 372,009 | (330,205) | 41,804 |
| 2043 | 84,593 | 287,417 | - | | - | 372,009 | (330,205) | 41,804 |
| 2044 | 84,593 | 287,417 | - | | - | 372,009 | (330,205) | 41,804 |
| 2045 | 84,593 | 287,417 | - | | - | 372,009 | (330,205) | 41,804 |
| 2046 | 84,593 | 287,417 | - | | - | 372,009 | (82,551) | 289,458 |
| 2047 | 84,593 | 287,417 | - | | - | 372,009 | - | 372,009 |
| 2048 | 84,593 | 287,417 | - | | - | 372,009 | - | 372,009 |
| 2049 | 84,593 | 287,417 | - | | - | 372,009 | - | 372,009 |
| 2050 | 84,758 | 288,067 | - | | 7,044 | 379,868 | - | 379,868 |
| Total | 2,466,653 | 8,255,885 | (40,000) | 5,000 | - | 10,687,537 | (8,024,294) | 2,663,243 |

Net Present Value Calculation

Discount Rate*     10.00%     596,445

\* Discount rate is an assumption as no analysis has been performed to determine an appropriate rate.

12/29/2017

Confidential

USBCDC00048491

**1501 Washington**

**USBCDC INVESTMENT FUND 228, LLC PROJECTED TAXABLE INCOME (LOSS)**

| Year | USBCDE Sub-CDE 162, LLC Pass-Through Income | St. Louis New Markets Tax Credit Fund 49, LLC Pass-Through Income | Income Allocation - Basis Limitation | Interest Expense | Annual Fund Management Fee | Net Taxable Income / (Loss) |
|------|------|------|------|------|------|------|
| 2017 | 212 | 315 | - | (799) | (5,000) | (5,272) |
| 2018 | 38,124 | 74,544 | - | (143,806) | (5,000) | (36,138) |
| 2019 | 38,124 | 74,544 | - | (143,806) | (5,000) | (36,138) |
| 2020 | 38,124 | 74,544 | - | (143,806) | (5,000) | (36,138) |
| 2021 | 38,124 | 74,544 | - | (143,806) | (5,000) | (36,138) |
| 2022 | 38,124 | 74,544 | - | (143,806) | (5,000) | (36,138) |
| 2023 | 38,124 | 74,544 | - | (143,806) | (5,000) | (36,138) |
| 2024 | 38,124 | 74,849 | - | (143,806) | (5,000) | (35,832) |
| 2025 | 37,720 | 110,154 | - | (141,910) | - | 5,964 |
| 2026 | 36,628 | 106,022 | - | (136,774) | - | 5,876 |
| 2027 | 35,510 | 101,794 | - | (131,498) | - | 5,805 |
| 2028 | 34,366 | 97,467 | - | (126,079) | - | 5,754 |
| 2029 | 33,195 | 93,040 | - | (120,511) | - | 5,723 |
| 2030 | 31,997 | 88,509 | - | (114,792) | - | 5,714 |
| 2031 | 30,771 | 83,873 | - | (108,917) | - | 5,727 |
| 2032 | 29,516 | 79,128 | - | (102,881) | - | 5,764 |
| 2033 | 28,232 | 74,273 | - | (96,681) | - | 5,825 |
| 2034 | 26,919 | 69,305 | - | (90,312) | - | 5,912 |
| 2035 | 25,574 | 64,221 | - | (83,769) | - | 6,027 |
| 2036 | 24,199 | 59,019 | - | (77,047) | - | 6,170 |
| 2037 | 22,791 | 53,695 | - | (70,142) | - | 6,344 |
| 2038 | 21,351 | 48,247 | - | (63,049) | - | 6,548 |
| 2039 | 19,876 | 42,672 | - | (55,763) | - | 6,786 |
| 2040 | 18,368 | 36,968 | - | (48,278) | - | 7,058 |
| 2041 | 16,824 | 31,130 | - | (40,588) | - | 7,366 |
| 2042 | 15,245 | 25,156 | 223,839 | (32,689) | - | 231,551 |
| 2043 | 13,628 | 19,043 | 339,338 | (24,574) | - | 347,435 |
| 2044 | 11,974 | 12,788 | 347,247 | (16,238) | - | 355,771 |
| 2045 | 10,282 | 6,386 | 355,341 | (7,675) | - | 364,334 |
| 2046 | 8,549 | (164) | 363,624 | (553) | - | 371,456 |
| 2047 | 6,777 | (6,867) | 372,100 | - | - | 372,009 |
| 2048 | 4,963 | (13,727) | 380,773 | - | - | 372,009 |
| 2049 | 3,107 | (20,746) | 389,648 | - | - | 372,009 |
| 2050 | 1,208 | (27,929) | 406,590 | - | - | 379,868 |
| Total | 816,653 | 1,755,885 | 3,178,500 | (2,698,159) | (40,000) | 3,012,878 |

Note: The investment Fund is a disregarded entity for federal income tax purposes.  Schedule is for presentation purposes only.

Note 2: The model assumes USBCDC will have enough interest income to offset interest expense as it relates to the excess business interest limitation of Section 13301 of the 2017 Tax Act.

See Summary of Significant Assumptions and Accountant's Report

Confidential

**1501 Washington**

**USBCDC TAX CREDIT FLOW**

**USBCDE SUB-CDE 162, LLC**

| | | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| AGGREGATE QUALIFIED EQUITY INVESTMENT | | 1,650,000 | - | - | - | - | - | - | 1,650,000 |
| APPLICABLE PERCENTAGE: | | | | | | | | | |
| YEAR 1 | 5.00% | 82,500 | - | - | - | - | - | - | 82,500 |
| YEAR 2 | 5.00% | - | 82,500 | - | - | - | - | - | 82,500 |
| YEAR 3 | 5.00% | - | - | 82,500 | - | - | - | - | 82,500 |
| YEAR 4 | 6.00% | - | - | - | 99,000 | - | - | - | 99,000 |
| YEAR 5 | 6.00% | - | - | - | - | 99,000 | - | - | 99,000 |
| YEAR 6 | 6.00% | - | - | - | - | - | 99,000 | - | 99,000 |
| YEAR 7 | 6.00% | - | - | - | - | - | - | 99,000 | 99,000 |
| NEW MARKETS TAX CREDIT | | 82,500 | 82,500 | 82,500 | 99,000 | 99,000 | 99,000 | 99,000 | 643,500 |

**ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC**

| | | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| AGGREGATE QUALIFIED EQUITY INVESTMENT | | 6,500,000 | - | - | - | - | - | - | 6,500,000 |
| APPLICABLE PERCENTAGE: | | | | | | | | | |
| YEAR 1 | 5.00% | 325,000 | - | - | - | - | - | - | 325,000 |
| YEAR 2 | 5.00% | - | 325,000 | - | - | - | - | - | 325,000 |
| YEAR 3 | 5.00% | - | - | 325,000 | - | - | - | - | 325,000 |
| YEAR 4 | 6.00% | - | - | - | 390,000 | - | - | - | 390,000 |
| YEAR 5 | 6.00% | - | - | - | - | 390,000 | - | - | 390,000 |
| YEAR 6 | 6.00% | - | - | - | - | - | 390,000 | - | 390,000 |
| YEAR 7 | 6.00% | - | - | - | - | - | - | 390,000 | 390,000 |
| NEW MARKETS TAX CREDIT | | 325,000 | 325,000 | 325,000 | 390,000 | 390,000 | 390,000 | 390,000 | 2,535,000 |
| TOTAL NEW MARKETS TAX CREDIT | | 407,500 | 407,500 | 407,500 | 489,000 | 489,000 | 489,000 | 489,000 | 3,178,500 |

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048493

**1501 Washington**

**USBCDC BENEFITS SCHEDULE - TAX CREDITS, TAX LOSSES AND CASH FLOW**

| Year | Capital Contributions | Taxable Income / (Loss) | Tax Saving / (Expense) | New Markets Tax Credits | Cash Flow | Annual Benefit | Cumulative Benefit | Cumulative Net Investment |
|------|----------------------|-------------------------|------------------------|-------------------------|-----------|----------------|--------------------|---------------------------|
| 2017 | 2,828,865 | (5,272) | 2,003 | 407,500 | - | 409,503 | 409,503 | (2,419,362) |
| 2018 | - | (36,138) | 8,673 | 407,500 | - | 416,173 | 825,676 | (2,003,189) |
| 2019 | - | (36,138) | 8,673 | 407,500 | - | 416,173 | 1,241,849 | (1,587,016) |
| 2020 | - | (36,138) | 8,673 | 489,000 | - | 497,673 | 1,739,522 | (1,089,343) |
| 2021 | - | (36,138) | 8,673 | 489,000 | - | 497,673 | 2,237,195 | (591,670) |
| 2022 | - | (36,138) | 8,673 | 489,000 | - | 497,673 | 2,734,869 | (93,996) |
| 2023 | - | (36,138) | 8,673 | 489,000 | - | 497,673 | 3,232,542 | 403,677 |
| 2024 | - | (35,832) | 8,600 | - | - | 8,600 | 3,241,141 | 412,276 |
| 2025 | - | 5,964 | (1,431) | - | 41,804 | 40,373 | 3,281,514 | 452,649 |
| 2026 | - | 5,876 | (1,410) | - | 41,804 | 40,394 | 3,321,908 | 493,043 |
| 2027 | - | 5,805 | (1,393) | - | 41,804 | 40,411 | 3,362,319 | 533,454 |
| 2028 | - | 5,754 | (1,381) | - | 41,804 | 40,423 | 3,402,742 | 573,877 |
| 2029 | - | 5,723 | (1,374) | - | 41,804 | 40,431 | 3,443,173 | 614,308 |
| 2030 | - | 5,714 | (1,371) | - | 41,804 | 40,433 | 3,483,606 | 654,741 |
| 2031 | - | 5,727 | (1,374) | - | 41,804 | 40,430 | 3,524,036 | 695,171 |
| 2032 | - | 5,764 | (1,383) | - | 41,804 | 40,421 | 3,564,457 | 735,592 |
| 2033 | - | 5,825 | (1,398) | - | 41,804 | 40,406 | 3,604,863 | 775,998 |
| 2034 | - | 5,912 | (1,419) | - | 41,804 | 40,385 | 3,645,248 | 816,383 |
| 2035 | - | 6,027 | (1,446) | - | 41,804 | 40,358 | 3,685,606 | 856,741 |
| 2036 | - | 6,170 | (1,481) | - | 41,804 | 40,323 | 3,725,929 | 897,064 |
| 2037 | - | 6,344 | (1,522) | - | 41,804 | 40,282 | 3,766,211 | 937,346 |
| 2038 | - | 6,548 | (1,572) | - | 41,804 | 40,233 | 3,806,444 | 977,579 |
| 2039 | - | 6,786 | (1,629) | - | 41,804 | 40,176 | 3,846,619 | 1,017,754 |
| 2040 | - | 7,058 | (1,694) | - | 41,804 | 40,110 | 3,886,730 | 1,057,865 |
| 2041 | - | 7,366 | (1,768) | - | 41,804 | 40,036 | 3,926,766 | 1,097,901 |
| 2042 | - | 231,551 | (55,572) | - | 41,804 | (13,768) | 3,912,998 | 1,084,133 |
| 2043 | - | 347,435 | (83,384) | - | 41,804 | (41,580) | 3,871,418 | 1,042,553 |
| 2044 | - | 355,771 | (85,385) | - | 41,804 | (43,581) | 3,827,837 | 998,972 |
| 2045 | - | 364,334 | (87,440) | - | 41,804 | (45,636) | 3,782,201 | 953,336 |
| 2046 | - | 371,456 | (89,149) | - | 289,458 | 200,309 | 3,982,510 | 1,153,645 |
| 2047 | - | 372,009 | (89,282) | - | 372,009 | 282,727 | 4,265,237 | 1,436,372 |
| 2048 | - | 372,009 | (89,282) | - | 372,009 | 282,727 | 4,547,964 | 1,719,099 |
| 2049 | - | 372,009 | (89,282) | - | 372,009 | 282,727 | 4,830,691 | 2,001,826 |
| 2050 | - | 379,868 | (91,168) | - | 379,868 | 288,700 | 5,119,390 | 2,290,525 |
| Total | 2,828,865 | 3,012,878 | (722,353) | 3,178,500 | 2,663,243 | 5,119,390 | | |

Note: The investment Fund is a disregarded entity for federal income tax purposes.  Schedule is for presentation purposes only.

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048494

**1501 Washington**

**USBCDC CAPITAL ACCOUNT ANALYSIS**

| Year | Taxable Income / (Loss) | Cash Flow | Capital Contributions | Taxable Income / (Loss) | Cash Flow | Tax Credits | Capital Account Balance | Cumulative Cap Acct Balance |
|------|------|------|------|------|------|------|------|------|
| 2017 | (5,272) | - | 2,828,865 | (5,272) | - | (407,500) | 2,416,093 | 2,416,093 |
| 2018 | (36,138) | - | - | (36,138) | - | (443,638) | (443,638) | 1,972,455 |
| 2019 | (36,138) | - | - | (36,138) | - | (407,500) | (443,638) | 1,528,818 |
| 2020 | (36,138) | - | - | (36,138) | - | (489,000) | (525,138) | 1,003,680 |
| 2021 | (36,138) | - | - | (36,138) | - | (489,000) | (525,138) | 478,542 |
| 2022 | (36,138) | - | - | (36,138) | - | (489,000) | (525,138) | (46,595) |
| 2023 | (36,138) | - | - | (36,138) | - | (489,000) | (525,138) | (571,733) |
| 2024 | (35,832) | - | - | (35,832) | - | - | (35,832) | (607,565) |
| 2025 | 5,964 | 41,804 | - | 5,964 | (41,804) | - | (35,840) | (643,405) |
| 2026 | 5,876 | 41,804 | - | 5,876 | (41,804) | - | (35,929) | (679,334) |
| 2027 | 5,805 | 41,804 | - | 5,805 | (41,804) | - | (35,999) | (715,333) |
| 2028 | 5,754 | 41,804 | - | 5,754 | (41,804) | - | (36,050) | (751,383) |
| 2029 | 5,723 | 41,804 | - | 5,723 | (41,804) | - | (36,081) | (787,464) |
| 2030 | 5,714 | 41,804 | - | 5,714 | (41,804) | - | (36,090) | (823,554) |
| 2031 | 5,727 | 41,804 | - | 5,727 | (41,804) | - | (36,077) | (859,631) |
| 2032 | 5,764 | 41,804 | - | 5,764 | (41,804) | - | (36,041) | (895,672) |
| 2033 | 5,825 | 41,804 | - | 5,825 | (41,804) | - | (35,979) | (931,651) |
| 2034 | 5,912 | 41,804 | - | 5,912 | (41,804) | - | (35,892) | (967,543) |
| 2035 | 6,027 | 41,804 | - | 6,027 | (41,804) | - | (35,777) | (1,003,320) |
| 2036 | 6,170 | 41,804 | - | 6,170 | (41,804) | - | (35,634) | (1,038,954) |
| 2037 | 6,344 | 41,804 | - | 6,344 | (41,804) | - | (35,461) | (1,074,415) |
| 2038 | 6,548 | 41,804 | - | 6,548 | (41,804) | - | (35,256) | (1,109,670) |
| 2039 | 6,786 | 41,804 | - | 6,786 | (41,804) | - | (35,018) | (1,144,688) |
| 2040 | 7,058 | 41,804 | - | 7,058 | (41,804) | - | (34,746) | (1,179,434) |
| 2041 | 7,366 | 41,804 | - | 7,366 | (41,804) | - | (34,438) | (1,213,872) |
| 2042 | 231,551 | 41,804 | - | 231,551 | (41,804) | - | 189,747 | (1,024,125) |
| 2043 | 347,435 | 41,804 | - | 347,435 | (41,804) | - | 305,631 | (718,495) |
| 2044 | 355,771 | 41,804 | - | 355,771 | (41,804) | - | 313,967 | (404,528) |
| 2045 | 364,334 | 41,804 | - | 364,334 | (41,804) | - | 322,530 | (81,998) |
| 2046 | 371,456 | 289,458 | - | 371,456 | (289,458) | - | 81,998 | 0 |
| 2047 | 372,009 | 372,009 | - | 372,009 | (372,009) | - | 0 | 0 |
| 2048 | 372,009 | 372,009 | - | 372,009 | (372,009) | - | - | 0 |
| 2049 | 372,009 | 372,009 | - | 372,009 | (372,009) | - | - | 0 |
| 2050 | 379,868 | 379,868 | - | 379,868 | (379,868) | - | - | 0 |
| Total | 3,012,878 | 2,663,243 | 2,828,865 | 3,012,878 | (2,663,243) | (3,178,500) | 0 | |

Note: The investment Fund is a disregarded entity for federal income tax purposes.  Schedule is for presentation purposes only.

See Summary of Significant Assumptions and Accountant's Report

12/29/2017

Confidential

USBCDC00048495

1501 Washington

**USBCDC INTERNAL RATE OF RETURN**

| | Quarter | Capital Contributions | Tax Benefit / (Cost) | Cash Distributions | New Markets Tax Credits | Total Benefit / (Cost) |
|---|---|---|---|---|---|---|
| 2017 | 1 | - | - | - | | - |
| | 2 | - | - | - | | - |
| | 3 | - | - | - | | - |
| | 4 | (2,828,865) | 2,003 | - | 407,500 | (2,419,362) |
| 2018 | 1 | - | 2,168 | - | 101,875 | 104,043 |
| | 2 | - | 2,168 | - | 101,875 | 104,043 |
| | 3 | - | 2,168 | - | 101,875 | 104,043 |
| 2019 | 1 | - | 2,168 | - | 101,875 | 104,043 |
| | 2 | - | 2,168 | - | 101,875 | 104,043 |
| | 3 | - | 2,168 | - | 101,875 | 104,043 |
| | 4 | - | 2,168 | - | 101,875 | 104,043 |
| 2020 | 1 | - | 2,168 | - | 122,250 | 124,418 |
| | 2 | - | 2,168 | - | 122,250 | 124,418 |
| | 3 | - | 2,168 | - | 122,250 | 124,418 |
| | 4 | - | 2,168 | - | 122,250 | 124,418 |
| 2021 | 1 | - | 2,168 | - | 122,250 | 124,418 |
| | 2 | - | 2,168 | - | 122,250 | 124,418 |
| | 3 | - | 2,168 | - | 122,250 | 124,418 |
| | 4 | - | 2,168 | - | 122,250 | 124,418 |
| 2022 | 1 | - | 2,168 | - | 122,250 | 124,418 |
| | 2 | - | 2,168 | - | 122,250 | 124,418 |
| | 3 | - | 2,168 | - | 122,250 | 124,418 |
| | 4 | - | 2,168 | - | 122,250 | 124,418 |
| 2023 | 1 | - | 2,168 | - | 122,250 | 124,418 |
| | 2 | - | 2,168 | - | 122,250 | 124,418 |
| | 3 | - | 2,168 | - | 122,250 | 124,418 |
| | 4 | - | 2,168 | - | 122,250 | 124,418 |
| 2024 | 1 | - | 2,150 | - | - | 2,150 |
| | 2 | - | 2,150 | - | - | 2,150 |
| | 3 | - | 2,150 | - | - | 2,150 |
| | 4 | - | 2,150 | - | | 2,150 |
| 2025 | 1 | - | (358) | 10,451 | - | 10,093 |
| | 2 | - | (358) | 10,451 | - | 10,093 |
| | 3 | - | (358) | 10,451 | - | 10,093 |
| | 4 | - | (358) | 10,451 | - | 10,093 |
| 2026 | 1 | - | (353) | 10,451 | - | 10,099 |
| | 2 | - | (353) | 10,451 | - | 10,099 |
| | 3 | - | (353) | 10,451 | - | 10,099 |
| | 4 | - | (353) | 10,451 | - | 10,099 |
| 2027 | 1 | - | (348) | 10,451 | - | 10,103 |
| | 2 | - | (348) | 10,451 | - | 10,103 |
| | 3 | - | (348) | 10,451 | - | 10,103 |
| | 4 | - | (348) | 10,451 | - | 10,103 |
| 2028 | 1 | - | (345) | 10,451 | - | 10,106 |
| | 2 | - | (345) | 10,451 | - | 10,106 |
| | 3 | - | (345) | 10,451 | - | 10,106 |
| | 4 | - | (345) | 10,451 | - | 10,106 |
| 2029 | 1 | - | (343) | 10,451 | - | 10,108 |
| | 2 | - | (343) | 10,451 | - | 10,108 |
| | 3 | - | (343) | 10,451 | - | 10,108 |
| | 4 | - | (343) | 10,451 | - | 10,108 |
| 2030 | 1 | - | (343) | 10,451 | - | 10,108 |
| | 2 | - | (343) | 10,451 | - | 10,108 |
| | 3 | - | (343) | 10,451 | - | 10,108 |
| | 4 | - | (343) | 10,451 | - | 10,108 |
| 2031 | 1 | - | (344) | 10,451 | - | 10,107 |
| | 2 | - | (344) | 10,451 | - | 10,107 |
| | 3 | - | (344) | 10,451 | - | 10,107 |
| | 4 | - | (344) | 10,451 | - | 10,107 |
| 2032 | 1 | - | (346) | 10,451 | - | 10,105 |
| | 2 | - | (346) | 10,451 | - | 10,105 |
| | 3 | - | (346) | 10,451 | - | 10,105 |
| | 4 | - | (346) | 10,451 | - | 10,105 |
| 2033 | 1 | - | (349) | 10,451 | - | 10,102 |
| | 2 | - | (349) | 10,451 | - | 10,102 |
| | 3 | - | (349) | 10,451 | - | 10,102 |
| | 4 | - | (349) | 10,451 | - | 10,102 |
| 2034 | 1 | - | (355) | 10,451 | - | 10,096 |
| | 2 | - | (355) | 10,451 | - | 10,096 |
| | 3 | - | (355) | 10,451 | - | 10,096 |
| | 4 | - | (355) | 10,451 | - | 10,096 |

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048496

| Year | Quarter | Capital Contributions | Tax Benefit / (Cost) | Cash Distributions | New Markets Tax Credits | Total Benefit / (Cost) |
|------|---------|----------------------|---------------------|-------------------|------------------------|-----------------------|
| 2035 | 1 | - | (362) | 10,451 | - | 10,089 |
|      | 2 | - | (362) | 10,451 | - | 10,089 |
|      | 3 | - | (362) | 10,451 | - | 10,089 |
|      | 4 | - | (362) | 10,451 | - | 10,089 |
| 2036 | 1 | - | (370) | 10,451 | - | 10,081 |
|      | 2 | - | (370) | 10,451 | - | 10,081 |
|      | 3 | - | (370) | 10,451 | - | 10,081 |
|      | 4 | - | (370) | 10,451 | - | 10,081 |
| 2037 | 1 | - | (381) | 10,451 | - | 10,070 |
|      | 2 | - | (381) | 10,451 | - | 10,070 |
|      | 3 | - | (381) | 10,451 | - | 10,070 |
|      | 4 | - | (381) | 10,451 | - | 10,070 |
| 2038 | 1 | - | (393) | 10,451 | - | 10,058 |
|      | 2 | - | (393) | 10,451 | - | 10,058 |
|      | 3 | - | (393) | 10,451 | - | 10,058 |
|      | 4 | - | (393) | 10,451 | - | 10,058 |
| 2039 | 1 | - | (407) | 10,451 | - | 10,044 |
|      | 2 | - | (407) | 10,451 | - | 10,044 |
|      | 3 | - | (407) | 10,451 | - | 10,044 |
|      | 4 | - | (407) | 10,451 | - | 10,044 |
| 2040 | 1 | - | (423) | 10,451 | - | 10,028 |
|      | 2 | - | (423) | 10,451 | - | 10,028 |
|      | 3 | - | (423) | 10,451 | - | 10,028 |
|      | 4 | - | (423) | 10,451 | - | 10,028 |
| 2041 | 1 | - | (442) | 10,451 | - | 10,009 |
|      | 2 | - | (442) | 10,451 | - | 10,009 |
|      | 3 | - | (442) | 10,451 | - | 10,009 |
|      | 4 | - | (442) | 10,451 | - | 10,009 |
| 2042 | 1 | - | (13,893) | 10,451 | - | (3,442) |
|      | 2 | - | (13,893) | 10,451 | - | (3,442) |
|      | 3 | - | (13,893) | 10,451 | - | (3,442) |
|      | 4 | - | (13,893) | 10,451 | - | (3,442) |
| 2043 | 1 | - | (20,846) | 10,451 | - | (10,395) |
|      | 2 | - | (20,846) | 10,451 | - | (10,395) |
|      | 3 | - | (20,846) | 10,451 | - | (10,395) |
|      | 4 | - | (20,846) | 10,451 | - | (10,395) |
| 2044 | 1 | - | (21,346) | 10,451 | - | (10,895) |
|      | 2 | - | (21,346) | 10,451 | - | (10,895) |
|      | 3 | - | (21,346) | 10,451 | - | (10,895) |
|      | 4 | - | (21,346) | 10,451 | - | (10,895) |
| 2045 | 1 | - | (21,860) | 10,451 | - | (11,409) |
|      | 2 | - | (21,860) | 10,451 | - | (11,409) |
|      | 3 | - | (21,860) | 10,451 | - | (11,409) |
|      | 4 | - | (21,860) | 10,451 | - | (11,409) |
| 2046 | 1 | - | (22,287) | 72,364 | - | 50,077 |
|      | 2 | - | (22,287) | 72,364 | - | 50,077 |
|      | 3 | - | (22,287) | 72,364 | - | 50,077 |
|      | 4 | - | (22,287) | 72,364 | - | 50,077 |
| 2047 | 1 | - | (22,321) | 93,002 | - | 70,682 |
|      | 2 | - | (22,321) | 93,002 | - | 70,682 |
|      | 3 | - | (22,321) | 93,002 | - | 70,682 |
|      | 4 | - | (22,321) | 93,002 | - | 70,682 |
| 2048 | 1 | - | (22,321) | 93,002 | - | 70,682 |
|      | 2 | - | (22,321) | 93,002 | - | 70,682 |
|      | 3 | - | (22,321) | 93,002 | - | 70,682 |
|      | 4 | - | (22,321) | 93,002 | - | 70,682 |
| 2049 | 1 | - | (22,321) | 93,002 | - | 70,682 |
|      | 2 | - | (22,321) | 93,002 | - | 70,682 |
|      | 3 | - | (22,321) | 93,002 | - | 70,682 |
|      | 4 | - | (22,321) | 93,002 | - | 70,682 |
| 2050 | 1 | - | (22,782) | 94,967 | - | 72,175 |
|      | 2 | - | (22,782) | 94,967 | - | 72,175 |
|      | 3 | - | (22,782) | 94,967 | - | 72,175 |
|      | 4 | - | (22,782) | 94,967 | - | 72,175 |
|      |   | (2,828,865) | (722,353) | 2,663,243 | 3,178,500 | 2,290,525 |

**After-Tax Quarterly Compounded Annual Internal Rate of Return**    9.18%

Confidential

USBCDC00048497

**1501 Washington**

**USBCDC INTERNAL RATE OF RETURN - ASSUMING THE PUT IS EXERCISED**

| | Quarter | Capital Contributions | Tax Benefit / (Cost) | Cash Distributions | New Markets Tax Credits | Put Proceeds* | Capital Gains Tax | Total Benefit / (Cost) |
|---|---|---|---|---|---|---|---|---|
| 2017 | 1 | - | - | - | - | - | - | - |
| | 2 | - | - | - | - | - | - | - |
| | 3 | - | - | - | - | - | - | - |
| | 4 | (2,828,865) | 2,003 | - | 407,500 | - | - | (2,419,362) |
| 2018 | 1 | - | 2,168 | - | 101,875 | - | - | 104,043 |
| | 2 | - | 2,168 | - | 101,875 | - | - | 104,043 |
| | 3 | - | 2,168 | - | 101,875 | - | - | 104,043 |
| | 4 | - | 2,168 | - | 101,875 | - | - | 104,043 |
| 2019 | 1 | - | 2,168 | - | 101,875 | - | - | 104,043 |
| | 2 | - | 2,168 | - | 101,875 | - | - | 104,043 |
| | 3 | - | 2,168 | - | 101,875 | - | - | 104,043 |
| | 4 | - | 2,168 | - | 101,875 | - | - | 104,043 |
| 2020 | 1 | - | 2,168 | - | 122,250 | - | - | 124,418 |
| | 2 | - | 2,168 | - | 122,250 | - | - | 124,418 |
| | 3 | - | 2,168 | - | 122,250 | - | - | 124,418 |
| | 4 | - | 2,168 | - | 122,250 | - | - | 124,418 |
| 2021 | 1 | - | 2,168 | - | 122,250 | - | - | 124,418 |
| | 2 | - | 2,168 | - | 122,250 | - | - | 124,418 |
| | 3 | - | 2,168 | - | 122,250 | - | - | 124,418 |
| | 4 | - | 2,168 | - | 122,250 | - | - | 124,418 |
| 2022 | 1 | - | 2,168 | - | 122,250 | - | - | 124,418 |
| | 2 | - | 2,168 | - | 122,250 | - | - | 124,418 |
| | 3 | - | 2,168 | - | 122,250 | - | - | 124,418 |
| | 4 | - | 2,168 | - | 122,250 | - | - | 124,418 |
| 2023 | 1 | - | 2,168 | - | 122,250 | - | - | 124,418 |
| | 2 | - | 2,168 | - | 122,250 | - | - | 124,418 |
| | 3 | - | 2,168 | - | 122,250 | - | - | 124,418 |
| | 4 | - | 2,168 | - | 122,250 | - | - | 124,418 |
| 2024 | 1 | - | 2,151 | - | - | - | - | 2,151 |
| | 2 | - | 2,151 | - | - | - | - | 2,151 |
| | 3 | - | 2,151 | - | - | - | - | 2,151 |
| | 4 | - | 2,103 | - | - | 1,000 | (146,056) | (142,952) |
| | | (2,828,865) | 62,598 | - | 3,178,500 | 1,000 | (146,056) | 267,177 |

| | |
|---|---|
| **After-Tax Quarterly Compounded Annual Internal Rate of Return** | **3.54%** |

\* The exercise of the put by the investor is being modeled for hypothetical purposes only and is exercisable at the sole discretion of the investor.

See Summary of Significant Assumptions and Accountant's Report

12/29/2017

Confidential

USBCDC00048498

**1501 Washington**

**USBCDC INTERNAL RATE OF RETURN - ASSUMING THE PUT IS EXERCISED (USBCDE ONLY)**

| | Quarter | Capital Contributions | CDE Tax Benefit / (Cost) | Allocation of Fund Benefit from Fund Deductions | Cash Distributions | Tax Credits | Put Proceeds* | Total Benefit / (Cost) |
|---|---|---|---|---|---|---|---|---|
| 2017 | 1 | - | - | - | - | - | - | - |
| | 2 | - | - | - | - | - | - | - |
| | 3 | - | - | - | - | - | - | - |
| | 4 | (572,715) | (51) | 282 | - | 82,500 | - | (489,984) |
| 2018 | 1 | - | (2,287) | 1,808 | - | 20,625 | - | 20,145 |
| | 2 | - | (2,287) | 1,808 | - | 20,625 | - | 20,145 |
| | 3 | - | (2,287) | 1,808 | - | 20,625 | - | 20,145 |
| | 4 | - | (2,287) | 1,808 | - | 20,625 | - | 20,145 |
| 2019 | 1 | - | (2,287) | 1,808 | - | 20,625 | - | 20,145 |
| | 2 | - | (2,287) | 1,808 | - | 20,625 | - | 20,145 |
| | 3 | - | (2,287) | 1,808 | - | 20,625 | - | 20,145 |
| | 4 | - | (2,287) | 1,808 | - | 20,625 | - | 20,145 |
| 2020 | 1 | - | (2,287) | 1,808 | - | 24,750 | - | 24,270 |
| | 2 | - | (2,287) | 1,808 | - | 24,750 | - | 24,270 |
| | 3 | - | (2,287) | 1,808 | - | 24,750 | - | 24,270 |
| | 4 | - | (2,287) | 1,808 | - | 24,750 | - | 24,270 |
| 2021 | 1 | - | (2,287) | 1,808 | - | 24,750 | - | 24,270 |
| | 2 | - | (2,287) | 1,808 | - | 24,750 | - | 24,270 |
| | 3 | - | (2,287) | 1,808 | - | 24,750 | - | 24,270 |
| | 4 | - | (2,287) | 1,808 | - | 24,750 | - | 24,270 |
| 2022 | 1 | - | (2,287) | 1,808 | - | 24,750 | - | 24,270 |
| | 2 | - | (2,287) | 1,808 | - | 24,750 | - | 24,270 |
| | 3 | - | (2,287) | 1,808 | - | 24,750 | - | 24,270 |
| | 4 | - | (2,287) | 1,808 | - | 24,750 | - | 24,270 |
| 2023 | 1 | - | (2,287) | 1,808 | - | 24,750 | - | 24,270 |
| | 2 | - | (2,287) | 1,808 | - | 24,750 | - | 24,270 |
| | 3 | - | (2,287) | 1,808 | - | 24,750 | - | 24,270 |
| | 4 | - | (2,287) | 1,808 | - | 24,750 | - | 24,270 |
| 2024 | 1 | - | (2,300) | 1,818 | - | - | - | (483) |
| | 2 | - | (2,300) | 1,818 | - | - | - | (483) |
| | 3 | - | (2,300) | 1,818 | - | - | - | (483) |
| | 4 | - | (2,249) | 1,777 | - | - | 500 | 28 |
| | | (572,715) | (64,100) | 50,894 | - | 643,500 | 500 | 58,079 |

**After-Tax Quarterly Compounded Annual Internal Rate of Return**    **3.58%**

\* The exercise of the put by the investor is being modeled for hypothetical purposes only and is exercisable at the sole discretion of the investor. For purposes of this schedule, one half of the put is reflected.

See Summary of Significant Assumptions and Accountant's Report

12/29/2017

Confidential

USBCDC00048499

**1501 Washington**

**USBCDC INTERNAL RATE OF RETURN - ASSUMING THE PUT IS EXERCISED (SLDC CDE ONLY)**

| | Quarter | Capital Contributions | CDE Tax Benefit / (Cost) | Allocation of Fund Benefit from Fund Deductions | Cash Distributions | Tax Credits | Put Proceeds* | Total Benefit / (Cost) |
|---|---|---|---|---|---|---|---|---|
| 2017 | 1 | - | - | - | - | - | - | - |
| | 2 | - | - | - | - | - | - | - |
| | 3 | - | - | - | - | - | - | - |
| | 4 | (2,256,150) | (76) | 1,757 | - | 325,000 | - | (1,929,468) |
| 2018 | 1 | - | (4,473) | 7,121 | - | 81,250 | - | 83,898 |
| | 2 | - | (4,473) | 7,121 | - | 81,250 | - | 83,898 |
| | 3 | - | (4,473) | 7,121 | - | 81,250 | - | 83,898 |
| | 4 | - | (4,473) | 7,121 | - | 81,250 | - | 83,898 |
| 2019 | 1 | - | (4,473) | 7,121 | - | 81,250 | - | 83,898 |
| | 2 | - | (4,473) | 7,121 | - | 81,250 | - | 83,898 |
| | 3 | - | (4,473) | 7,121 | - | 81,250 | - | 83,898 |
| | 4 | - | (4,473) | 7,121 | - | 81,250 | - | 83,898 |
| 2020 | 1 | - | (4,473) | 7,121 | - | 97,500 | - | 100,148 |
| | 2 | - | (4,473) | 7,121 | - | 97,500 | - | 100,148 |
| | 3 | - | (4,473) | 7,121 | - | 97,500 | - | 100,148 |
| | 4 | - | (4,473) | 7,121 | - | 97,500 | - | 100,148 |
| 2021 | 1 | - | (4,473) | 7,121 | - | 97,500 | - | 100,148 |
| | 2 | - | (4,473) | 7,121 | - | 97,500 | - | 100,148 |
| | 3 | - | (4,473) | 7,121 | - | 97,500 | - | 100,148 |
| | 4 | - | (4,473) | 7,121 | - | 97,500 | - | 100,148 |
| 2022 | 1 | - | (4,473) | 7,121 | - | 97,500 | - | 100,148 |
| | 2 | - | (4,473) | 7,121 | - | 97,500 | - | 100,148 |
| | 3 | - | (4,473) | 7,121 | - | 97,500 | - | 100,148 |
| | 4 | - | (4,473) | 7,121 | - | 97,500 | - | 100,148 |
| 2023 | 1 | - | (4,473) | 7,121 | - | 97,500 | - | 100,148 |
| | 2 | - | (4,473) | 7,121 | - | 97,500 | - | 100,148 |
| | 3 | - | (4,473) | 7,121 | - | 97,500 | - | 100,148 |
| | 4 | - | (4,473) | 7,121 | - | 97,500 | - | 100,148 |
| 2024 | 1 | - | (4,527) | 7,161 | - | - | - | 2,634 |
| | 2 | - | (4,527) | 7,161 | - | - | - | 2,634 |
| | 3 | - | (4,527) | 7,161 | - | - | - | 2,634 |
| | 4 | - | (4,426) | 7,001 | - | - | 500 | 3,075 |
| | | (2,256,150) | (125,426) | 201,139 | - | 2,535,000 | 500 | 355,063 |

**After-Tax Quarterly Compounded Annual Internal Rate of Return**          **5.46%**

\* The exercise of the put by the investor is being modeled for hypothetical purposes only and is exercisable at the sole discretion of the investor. For purposes of this schedule, one half of the put is reflected.

See Summary of Significant Assumptions and Accountant's Report

Confidential

**1501 Washington**

## USBCDC EXIT TAX CALCULATION - ASSUMING THE PUT IS EXERCISED

| | |
|---|---:|
| Amount Realized from Sale of Sub-CDEs | |
| Cash Proceeds from the Put* | 1,000 |
| Fund Debt Assumed by Purchaser ** | 5,326,135 |
| Total Amount Realized | 5,327,135 |
| | |
| Adjusted Basis of Sub-CDEs | |
| Capital Contribution | 8,150,000 |
| Cumulative Income/(Loss) | 789,689 |
| Cumulative Cash Flow | (1,049,663) |
| Tax Credits Basis Adjustment | (3,178,500) |
| Balance of Reserve | 7,044 |
| Adjusted Basis | 4,718,570 |
| | |
| Taxable Capital (Gain) Loss | (608,565) |
| | |
| Tax Benefit (Liability) | (146,056) |

\* The exercise of the put by the investor is being modeled for hypothetical purposes only and is exercisable at the sole discretion of the investor.

\*\* Amount includes accrued interest receivable of: (0)

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048501

**1501 Washington**

## USBCDE SUB-CDE 162, LLC GENERAL ASSUMPTIONS

Projection Period                    December 29, 2017    to    December 31, 2050

**CAPITAL INFORMATION:**

| Total Capital Contributions | 1,650,000 |
|---|---|

**OPERATING ASSUMPTIONS:**

| LEGAL FEES | |
|---|---|
| Initial Year | - |
| Subsequent Year | - |
| OPERATING EXPENSES | |
| Initial Year | 2,000 |
| Subsequent Years | 2,000 |
| EXPENSE ESCALATION | 0.00% |

**RESERVES:**

| Interest Rate on Investment Reserve | 0.00% |
|---|---|
| Interest Rate on Principal Reserve | 0.00% |
| Interest Rate on Loan Loss Reserve | 0.00% |

**OTHER ASSUMPTIONS:**

| Percent Of Excess Reserve To Investors | 0.00% |
|---|---|
| Tax Rate-2017 | 38.00% |
| Tax Rate-2018 & Thereafter | 24.00% |
| Investor Ownership | 99.99% |
| Managing Member Ownership | 0.01% |
| Tax Credit Begins | 2017 |

* Managing Member Capital Contribution:                    $165

**OVERHEAD:**

| Organization Costs And Fees | Percentage | Source | Amount | Life (Months) |
|---|---|---|---|---|
| Organization Fees and Costs | 0.00% | GROSS CAPITAL | - | 180 |
| Syndication Fees and Costs | 0.00% | GROSS CAPITAL | - | N/A |
| Placement Fees | 0.00% | GROSS CAPITAL | - | 396 |
| Sponsor Fee | 0.00% | GROSS CAPITAL | - | 84 |
| Loan Loss Reserve | 0.00% | GROSS CAPITAL | - | N/A |
| Operating Reserve | 0.00% | GROSS CAPITAL | - | N/A |
| Asset Management Fee | 0.00% | SURPLUS CASH FLOW | - | As Incurred |
| CDE Incentive Management Fee | 0.00% | SURPLUS CASH FLOW | - | As Incurred |
| Loan Servicing Fee | 0.00% | SURPLUS CASH FLOW | - | As Incurred |
| Success Fee | 0.00% | LOAN REPAYMENT | - | |

**CAPITAL CONTRIBUTIONS*:**

| Investor Equity Payment | Payment Date | Capital Amounts |
|---|---|---|
| Capital Contribution | December 29, 2017 | 1,650,000 |
| | TOTAL | 1,650,000 |

**LOANS TO PROJECT:**

| Loan | Payment Date | Loan Amounts |
|---|---|---|
| Loan A | December 29, 2017 | 1,079,785 |
| Loan B | December 29, 2017 | 570,215 |
| | TOTAL | 1,650,000 |

See Summary of Significant Assumptions and Accountant's Report

Confidential                                                                                          USBCDC00048502

## 1501 Washington

### USBCDE SUB-CDE 162, LLC FLOW OF FUNDS

|  | 12/29/2017 | TOTAL |
|---|---|---|
| Investor Member Capital Contribution | 1,650,000 | 1,650,000 |
| Managing Member Capital Contribution | 165 | 165 |
| Total Sources | 1,650,165 | 1,650,165 |
| | | |
| Loans to Project | 1,650,000 | 1,650,000 |
| Operating Reserve | 165 | 165 |
| Total Uses | 1,650,165 | 1,650,165 |

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048503

**1501 Washington**

## USBCDE SUB-CDE 162, LLC LEVEL LOAN ASSUMPTIONS

| Loan | | A | B |
|---|---|---|---|
| Principal | | 1,079,785 | 570,215 |
| Interest Only Period | | 84.07 Months | 84.07 Months |
| Interest Rate - Int Only | | 2.3108% | 2.3108% |
| Interest Rate - Amort | | 2.3108% | 2.3108% |
| Amortization | | 312.00 Months | 312.00 Months |
| Term of Loans to Project | | 396.07 Months | 396.07 Months |
| | | | |
| Commencement | | 12/29/2017 | 12/29/2017 |
| First Interest Only Payment | | 12/29/2017 | 12/29/2017 |
| | | | |
| Amortization Begins | | 1/1/2025 | 1/1/2025 |
| First Amortization Payment | | 3/1/2025 | 3/1/2025 |
| | | | |
| Maturity | | 12/31/2050 | 12/31/2050 |
| | | | |
| Days in Year for Calculating Interest | | 360 | 360 |
| Interest Calculation Methodology | | 30-Day Months | 30-Day Months |
| Payments Made | | Quarterly in Arrears/Advance | Quarterly in Arrears/Advance |
| Payment Dates | | 3/1, 6/1, 9/1, 12/1 | 3/1, 6/1, 9/1, 12/1 |

Note: Payments are made quarterly partially in arrears and partially in advance for the period from the beginning through the end of each calendar quarter.

See Summary of Significant Assumptions and Accountant's Report

Confidential

**1501 Washington**

## USBCDE SUB-CDE 162, LLC 85% TEST

| Year | Quarter | Total Invested Amount | Loans to Projects | Return of Capital in yr 7 | Total Investment | Repayment of Principal | Net Loans to Projects | Semiannual Percent of Total Invested | Annual Percent of Total Invested |
|------|---------|----------------------|-------------------|---------------------------|------------------|------------------------|----------------------|--------------------------------------|----------------------------------|
| 2017 | 1 | - | - | - | - | - | - | | |
|      | 2 | - | - | - | - | - | - | | |
|      | 3 | - | - | - | - | - | - | | |
|      | 4 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | 100.00% | |
| 2018 | 1 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | | |
|      | 2 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | 100.00% | |
|      | 3 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | | |
|      | 4 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | 100.00% | 100.00% |
| 2019 | 1 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | | |
|      | 2 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | 100.00% | |
|      | 3 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | | |
|      | 4 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | 100.00% | 100.00% |
| 2020 | 1 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | | |
|      | 2 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | 100.00% | |
|      | 3 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | | |
|      | 4 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | 100.00% | 100.00% |
| 2021 | 1 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | | |
|      | 2 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | 100.00% | |
|      | 3 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | | |
|      | 4 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | 100.00% | 100.00% |
| 2022 | 1 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | | |
|      | 2 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | 100.00% | |
|      | 3 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | | |
|      | 4 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | 100.00% | 100.00% |
| 2023 | 1 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | | |
|      | 2 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | 100.00% | |
|      | 3 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | | |
|      | 4 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | 100.00% | 100.00% |
| 2024 | 1 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | | |
|      | 2 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | 100.00% | |
|      | 3 | 1,650,000 | 1,650,000 | - | 1,650,000 | - | 1,650,000 | | |

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048505

**1501 Washington**

**USBCDE SUB-CDE 162, LLC OPERATING RESERVES**

| Year | Reserve from Initial Capital | Deposit to / (Release from) Operating Reserve | Cumulative Reserve Balance |
|------|------|------|------|
| 2017 | 165 | - | 165 |
| 2018 | - | - | 165 |
| 2019 | - | - | 165 |
| 2020 | - | - | 165 |
| 2021 | - | - | 165 |
| 2022 | - | - | 165 |
| 2023 | - | - | 165 |
| 2024 | - | - | 165 |
| 2025 | - | - | 165 |
| 2026 | - | - | 165 |
| 2027 | - | - | 165 |
| 2028 | - | - | 165 |
| 2029 | - | - | 165 |
| 2030 | - | - | 165 |
| 2031 | - | - | 165 |
| 2032 | - | - | 165 |
| 2033 | - | - | 165 |
| 2034 | - | - | 165 |
| 2035 | - | - | 165 |
| 2036 | - | - | 165 |
| 2037 | - | - | 165 |
| 2038 | - | - | 165 |
| 2039 | - | - | 165 |
| 2040 | - | - | 165 |
| 2041 | - | - | 165 |
| 2042 | - | - | 165 |
| 2043 | - | - | 165 |
| 2044 | - | - | 165 |
| 2045 | - | - | 165 |
| 2046 | - | - | 165 |
| 2047 | - | - | 165 |
| 2048 | - | - | 165 |
| 2049 | - | - | 165 |
| 2050 | - | (165) | - |
| | 165 | (165) | |

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048506

**1501 Washington**

**USBCDE SUB-CDE 162, LLC PROJECTED OPERATING CASH FLOW STATEMENT**

| Year | Debt Service Project Loans | Operating Expense Reimbursement | Operating Expenses | Net Cash Flow | (Deposit to) / Release from Operating Reserve | Cash Flow Available for Distribution | Investor Member Distribution | Managing Member Distribution |
|------|------|------|------|------|------|------|------|------|
| 2017 | 212 | 2,000 | (2,000) | 212 | - | 212 | 212 | 0 |
| 2018 | 38,128 | 2,000 | (2,000) | 38,128 | - | 38,128 | 38,124 | 4 |
| 2019 | 38,128 | 2,000 | (2,000) | 38,128 | - | 38,128 | 38,124 | 4 |
| 2020 | 38,128 | 2,000 | (2,000) | 38,128 | - | 38,128 | 38,124 | 4 |
| 2021 | 38,128 | 2,000 | (2,000) | 38,128 | - | 38,128 | 38,124 | 4 |
| 2022 | 38,128 | 2,000 | (2,000) | 38,128 | - | 38,128 | 38,124 | 4 |
| 2023 | 38,128 | 2,000 | (2,000) | 38,128 | - | 38,128 | 38,124 | 4 |
| 2024 | 38,128 | 2,000 | (2,000) | 38,128 | - | 38,128 | 38,124 | 4 |
| 2025 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2026 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2027 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2028 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2029 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2030 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2031 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2032 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2033 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2034 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2035 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2036 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2037 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2038 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2039 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2040 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2041 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2042 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2043 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2044 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2045 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2046 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2047 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2048 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2049 | 84,601 | 2,000 | (2,000) | 84,601 | - | 84,601 | 84,593 | 8 |
| 2050 | 84,601 | 2,000 | (2,000) | 84,601 | 165 | 84,766 | 84,758 | 8 |
| Total | 2,466,734 | 68,000 | (68,000) | 2,466,734 | 165 | 2,466,899 | 2,466,653 | 247 |

See Summary of Significant Assumptions and Accountant's Report

12/29/2017

Confidential

USBCDC00048507

**1501 Washington**

### USBCDE SUB-CDE 162, LLC PROJECTED TAXABLE INCOME (LOSS)

| Year | Interest Income on Project Loans | Operating Expense Reimbursement | Operating Expenses | Net Taxable Income/(Loss) | Investor Member Taxable Income / (Loss) | Managing Member Taxable Income / (Loss) |
|------|------|------|------|------|------|------|
| 2017 | 212 | 2,000 | (2,000) | 212 | 212 | 0 |
| 2018 | 38,128 | 2,000 | (2,000) | 38,128 | 38,124 | 4 |
| 2019 | 38,128 | 2,000 | (2,000) | 38,128 | 38,124 | 4 |
| 2020 | 38,128 | 2,000 | (2,000) | 38,128 | 38,124 | 4 |
| 2021 | 38,128 | 2,000 | (2,000) | 38,128 | 38,124 | 4 |
| 2022 | 38,128 | 2,000 | (2,000) | 38,128 | 38,124 | 4 |
| 2023 | 38,128 | 2,000 | (2,000) | 38,128 | 38,124 | 4 |
| 2024 | 38,128 | 2,000 | (2,000) | 38,128 | 38,124 | 4 |
| 2025 | 37,724 | 2,000 | (2,000) | 37,724 | 37,720 | 4 |
| 2026 | 36,631 | 2,000 | (2,000) | 36,631 | 36,628 | 4 |
| 2027 | 35,513 | 2,000 | (2,000) | 35,513 | 35,510 | 4 |
| 2028 | 34,369 | 2,000 | (2,000) | 34,369 | 34,366 | 3 |
| 2029 | 33,198 | 2,000 | (2,000) | 33,198 | 33,195 | 3 |
| 2030 | 32,000 | 2,000 | (2,000) | 32,000 | 31,997 | 3 |
| 2031 | 30,774 | 2,000 | (2,000) | 30,774 | 30,771 | 3 |
| 2032 | 29,519 | 2,000 | (2,000) | 29,519 | 29,516 | 3 |
| 2033 | 28,235 | 2,000 | (2,000) | 28,235 | 28,232 | 3 |
| 2034 | 26,921 | 2,000 | (2,000) | 26,921 | 26,919 | 3 |
| 2035 | 25,577 | 2,000 | (2,000) | 25,577 | 25,574 | 3 |
| 2036 | 24,201 | 2,000 | (2,000) | 24,201 | 24,199 | 2 |
| 2037 | 22,793 | 2,000 | (2,000) | 22,793 | 22,791 | 2 |
| 2038 | 21,353 | 2,000 | (2,000) | 21,353 | 21,351 | 2 |
| 2039 | 19,878 | 2,000 | (2,000) | 19,878 | 19,876 | 2 |
| 2040 | 18,370 | 2,000 | (2,000) | 18,370 | 18,368 | 2 |
| 2041 | 16,826 | 2,000 | (2,000) | 16,826 | 16,824 | 2 |
| 2042 | 15,246 | 2,000 | (2,000) | 15,246 | 15,245 | 2 |
| 2043 | 13,630 | 2,000 | (2,000) | 13,630 | 13,628 | 1 |
| 2044 | 11,975 | 2,000 | (2,000) | 11,975 | 11,974 | 1 |
| 2045 | 10,283 | 2,000 | (2,000) | 10,283 | 10,282 | 1 |
| 2046 | 8,550 | 2,000 | (2,000) | 8,550 | 8,549 | 1 |
| 2047 | 6,778 | 2,000 | (2,000) | 6,778 | 6,777 | 1 |
| 2048 | 4,964 | 2,000 | (2,000) | 4,964 | 4,963 | 0 |
| 2049 | 3,107 | 2,000 | (2,000) | 3,107 | 3,107 | 0 |
| 2050 | 1,208 | 2,000 | (2,000) | 1,208 | 1,208 | 0 |
| Total | 816,734 | 68,000 | (68,000) | 816,734 | 816,653 | 82 |

See Summary of Significant Assumptions and Accountant's Report

Confidential

**1501 Washington**

## USBCDE SUB-CDE 162, LLC OPERATING INCOME CALCULATION

| Year | Taxable Income | Operating Income | Cash Flow | Operating Income Greater Than or Equal Cash Distribution? |
|------|---------------|------------------|-----------|-----------------------------------------------------------|
| 2017 | 212 | 212 | 212 | Yes |
| 2018 | 38,128 | 38,128 | 38,128 | Yes |
| 2019 | 38,128 | 38,128 | 38,128 | Yes |
| 2020 | 38,128 | 38,128 | 38,128 | Yes |
| 2021 | 38,128 | 38,128 | 38,128 | Yes |
| 2022 | 38,128 | 38,128 | 38,128 | Yes |
| 2023 | 38,128 | 38,128 | 38,128 | Yes |
| 2024 | 38,128 | 38,128 | 38,128 | N/A |
| Total | 267,109 | 267,109 | 267,109 | |

Note: Schedule reflects an 84 month horizon in order to be coterminous with the NMTC compliance period and therefore the last year reflected is not a full calendar year.

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048509

1501 Washington

**USBCDE SUB-CDE 162, LLC PROJECTED OID SCHEDULE**

CDE Loan A and B OID Schedule

| | Loan A | Loan B |
|---|---|---|
| Principal | 1,079,785 | 570,215 |
| Interest Rate | 2.31080% | 2.31080% |
| Amortizing Rate | 2.31080% | 2.31080% |
| Commencement | 12/29/2017 | 12/29/2017 |
| Amortization Begins | 1/1/2025 | 1/1/2025 |
| Interest Only Period | 84.07 | 84.07 |
| Amortization | 312.00 | 312.00 |
| Term in Months | 396.07 | 396.07 |
| | | |
| Quarterly Payment (Amortizing) | 13,841.04 | 7,309.20 |
| Annual Payment (Amortizing) | 55,364.15 | 29,236.81 |
| Payments Made | Quarterly in Arrears/Advance | Quarterly in Arrears/Advance |
| | | |
| Days in Year for Calculating Interest | 360 | 360 |
| Interest Calculation Methodology | 30-Day Months | 30-Day Months |
| | | |
| Single Fixed Rate | 2.43201% | |
| Yield to Maturity | 2.48527% | |

OID

| Year | Payment | YTM (g) | Balance | Outstanding Loan Balance (a) | QSI (b) | OID (c) | Principal Payments (d) | # of Complete Years (e) | Weighted Average Maturity (f) |
|---|---|---|---|---|---|---|---|---|---|
| | | | 1,650,000 | 1,650,000 | | | | | |
| 2017 | 2,212 | 228 | 1,648,016 | 1,650,000 | 223 | 5 | - | 0.000 | 0.00 |
| 2018 | 40,128 | 40,984 | 1,648,872 | 1,650,000 | 40,128 | 856 | - | 1.000 | 0.00 |
| 2019 | 40,128 | 41,006 | 1,649,749 | 1,650,000 | 40,128 | 877 | - | 2.000 | 0.00 |
| 2020 | 40,128 | 41,028 | 1,650,648 | 1,650,000 | 40,128 | 899 | - | 3.000 | 0.00 |
| 2021 | 40,128 | 41,050 | 1,651,570 | 1,650,000 | 40,128 | 922 | - | 4.000 | 0.00 |
| 2022 | 40,128 | 41,073 | 1,652,515 | 1,650,000 | 40,128 | 945 | - | 5.000 | 0.00 |
| 2023 | 40,128 | 41,097 | 1,653,484 | 1,650,000 | 40,128 | 969 | - | 6.000 | 0.00 |
| 2024 | 40,128 | 41,121 | 1,654,477 | 1,650,000 | 40,128 | 993 | - | 7.000 | 0.00 |
| 2025 | 86,601 | 40,711 | 1,608,587 | 1,603,123 | 39,703 | 1,008 | 46,877 | 8.000 | 0.22 |
| 2026 | 86,601 | 39,560 | 1,561,546 | 1,555,153 | 38,553 | 1,007 | 47,970 | 9.000 | 0.25 |
| 2027 | 86,601 | 38,380 | 1,513,525 | 1,506,065 | 37,376 | 1,004 | 49,088 | 10.000 | 0.29 |
| 2028 | 86,601 | 37,170 | 1,463,895 | 1,455,833 | 36,172 | 999 | 50,232 | 11.000 | 0.33 |
| 2029 | 86,601 | 35,930 | 1,413,224 | 1,404,431 | 34,940 | 991 | 51,403 | 12.000 | 0.36 |
| 2030 | 86,601 | 34,659 | 1,361,283 | 1,351,830 | 33,679 | 981 | 52,601 | 13.000 | 0.40 |
| 2031 | 86,601 | 33,356 | 1,308,038 | 1,298,003 | 32,388 | 968 | 53,827 | 14.000 | 0.45 |
| 2032 | 86,601 | 32,021 | 1,253,458 | 1,242,921 | 31,068 | 953 | 55,082 | 15.000 | 0.49 |
| 2033 | 86,601 | 30,652 | 1,197,508 | 1,186,555 | 29,716 | 935 | 56,366 | 16.000 | 0.53 |
| 2034 | 86,601 | 29,248 | 1,140,156 | 1,128,876 | 28,334 | 914 | 57,679 | 17.000 | 0.58 |
| 2035 | 86,601 | 27,809 | 1,081,364 | 1,069,852 | 26,919 | 891 | 59,024 | 18.000 | 0.63 |
| 2036 | 86,601 | 26,335 | 1,021,097 | 1,009,452 | 25,471 | 864 | 60,400 | 19.000 | 0.68 |
| 2037 | 86,601 | 24,823 | 959,319 | 947,644 | 23,989 | 834 | 61,808 | 20.000 | 0.73 |
| 2038 | 86,601 | 23,273 | 895,991 | 884,396 | 22,473 | 800 | 63,248 | 21.000 | 0.79 |
| 2039 | 86,601 | 21,684 | 831,075 | 819,674 | 20,921 | 763 | 64,722 | 22.000 | 0.85 |
| 2040 | 86,601 | 20,056 | 764,530 | 753,443 | 19,333 | 723 | 66,231 | 23.000 | 0.90 |
| 2041 | 86,601 | 18,387 | 696,315 | 685,868 | 17,709 | 678 | 67,775 | 24.000 | 0.97 |
| 2042 | 86,601 | 16,676 | 626,390 | 616,313 | 16,046 | 629 | 69,355 | 25.000 | 1.03 |
| 2043 | 86,601 | 14,921 | 554,710 | 545,342 | 14,345 | 577 | 70,971 | 26.000 | 1.09 |
| 2044 | 86,601 | 13,123 | 481,233 | 472,716 | 12,604 | 520 | 72,626 | 27.000 | 1.16 |
| 2045 | 86,601 | 11,280 | 405,912 | 398,398 | 10,822 | 458 | 74,318 | 28.000 | 1.23 |
| 2046 | 86,601 | 9,391 | 328,702 | 322,347 | 8,999 | 392 | 76,051 | 29.000 | 1.31 |
| 2047 | 86,601 | 7,454 | 249,554 | 244,854 | 7,133 | 321 | 77,823 | 30.000 | 1.38 |
| 2048 | 86,601 | 5,468 | 168,422 | 164,887 | 5,224 | 244 | 79,637 | 31.000 | 1.46 |
| 2049 | 86,601 | 3,433 | 85,254 | 83,393 | 3,270 | 163 | 81,494 | 32.000 | 1.54 |
| 2050 | 86,601 | 1,347 | (0) | - | 1,271 | 76 | 83,393 | 33.000 | 1.63 |
| Totals | 2,534,734 | 884,734 | | 25,159 | 859,576 | 25,159 | 1,650,000 | | 21.31 |
| | | | c | | | | | | |

| | |
|---|---|
| Stated Redemption Price at maturity = sum of all of all payments less QSI | 1,675,159 |
| Weighted Average Maturity | 21.3054 |
| 1/4 Percent | 0.0025 |
| | |
| De minimis threshold | 89,225 |
| OID | 25,159 |
| | |
| Do we have OID? | **NO** |

(a) Actual outstanding loan balances and not based on YTM calculation.
(b) Outstanding loan balance (a) times single fixed rate
(c) Stated interest (g) minus qualified stated interest (b)
(d) Actual principal payments made
(e) Number of years from issuance date to today
(f) Sum OID plus principal payment divided by stated redemption price at maturity times # of complete years [((c) + (d))/SRP times (e)]
(g) Yield to maturity

12/29/2017

Confidential

**1501 Washington**

## ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC GENERAL ASSUMPTIONS

| Projection Period | December 29, 2017 | to | December 31, 2050 |
|---|---|---|---|

**CAPITAL INFORMATION:**

| Total Capital Contributions | 6,500,000 |
|---|---|

**OPERATING ASSUMPTIONS:**

| LEGAL FEES | |
|---|---|
| Initial Year | - |
| Subsequent Year | - |
| OPERATING EXPENSES | |
| Initial Year | 8,000 |
| Subsequent Years | 8,000 |
| EXPENSE ESCALATION | 0.00% |

**RESERVES:**

| Interest Rate on Investment Reserve | 0.00% |
|---|---|
| Interest Rate on Principal Reserve | 0.00% |
| Interest Rate on Loan Loss Reserve | 0.00% |

**OTHER ASSUMPTIONS:**

| Percent Of Excess Reserve To Investors | 0.00% |
|---|---|
| Tax Rate-2017 | 38.00% |
| Tax Rate-2018 & Thereafter | 24.00% |
| Investor Ownership | 99.99% |
| Managing Member Ownership | 0.01% |
| Tax Credit Begins | 2017 |

*Managing Member Capital Contribution: $650

**OVERHEAD:**

| Organization Costs And Fees | Percentage | Source | Amount | Life (Months) |
|---|---|---|---|---|
| Organization Fees and Costs | 0.00% | GROSS CAPITAL | - | 180 |
| Syndication Fees and Costs | 0.00% | GROSS CAPITAL | - | N/A |
| Placement Fees | 0.00% | GROSS CAPITAL | - | 396 |
| Suballocation Fee | 4.00% | GROSS CAPITAL | 260,000 | 84.00 |
| Loan Loss Reserve | 0.00% | GROSS CAPITAL | - | N/A |
| Operating Reserve | 0.00% | GROSS CAPITAL | - | N/A |
| Asset Management Fee | 0.50% | SURPLUS CASH FLOW | 32,500 | As Incurred |
| CDE Incentive Management Fee | 0.00% | SURPLUS CASH FLOW | - | As Incurred |
| Loan Servicing Fee | 0.00% | SURPLUS CASH FLOW | - | As Incurred |
| Success Fee | 0.00% | LOAN REPAYMENT | - | |

**CAPITAL CONTRIBUTIONS*:**

| Investor Equity Payment | Payment Date | Capital Amounts |
|---|---|---|
| Capital Contribution | December 29, 2017 | 6,500,000 |
| TOTAL | | 6,500,000 |

**LOANS TO PROJECT:**

| Loan | Payment Date | Loan Amounts |
|---|---|---|
| Loan A | December 29, 2017 | 4,246,350 |
| Loan B | December 29, 2017 | 1,993,650 |
| TOTAL | | 6,240,000 |

12/29/2017

See Summary of Significant Assumptions and Accountant's Report

Page 30

Confidential

**1501 Washington**

## ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC FLOW OF FUNDS

|  | 12/29/2017 | TOTAL |
|---|---|---|
| Investor Capital Contribution | 6,500,000 | 6,500,000 |
| Managing Member Capital Contribution | 650 | 650 |
| Total Sources | 6,500,650 | 6,500,650 |
|  |  |  |
| Loans to Project | 6,240,000 | 6,240,000 |
| Suballocation Fee | 260,000 | 260,000 |
| Operating Reserve | 650 | 650 |
| Total Uses | 6,500,650 | 6,500,650 |

See Summary of Significant Assumptions and Accountant's Report

Confidential

**1501 Washington**

## ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC LEVEL LOAN ASSUMPTIONS

| Loan | A | B |
|---|---|---|
| Principal | 4,246,350 | 1,993,650 |
| Interest Only Period | 84.07   Months | 84.07   Months |
| Interest Rate - Int Only | 2.3108% | 2.3108% |
| Interest Rate - Amort | 2.3108% | 2.3108% |
| Amortization | 312.00   Months | 312.00   Months |
| Term of Loans to Project | 396.07   Months | 396.07   Months |
| | | |
| Commencement | 12/29/2017 | 12/29/2017 |
| First Interest Only Payment | 12/29/2017 | 12/29/2017 |
| | | |
| Amortization Begins | 1/1/2025 | 1/1/2025 |
| First Amortization Payment | 3/1/2025 | 3/1/2025 |
| | | |
| Maturity | 12/31/2050 | 12/31/2050 |
| | | |
| Days in Year for Calculating Interest | 360 | 360 |
| Interest Calculation Methodology | 30-Day Months | 30-Day Months |
| Payments Made | Quarterly in Arrears/Advance | Quarterly in Arrears/Advance |
| Payment Dates | 3/1, 6/1, 9/1, 12/1 | 3/1, 6/1, 9/1, 12/1 |

Note: Payments are made quarterly partially in arrears and partially in advance for the period from the beginning through the end of each calendar quarter.

See Summary of Significant Assumptions and Accountant's Report

Confidential

**1501 Washington**

ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC 85% TEST

| Year | Quarter | Total Invested Amount | Loans to Projects | Return of Capital in yr 7 | Total Investment | Repayment of Principal | Net Loans to Projects | Semiannual Percent of Total Invested | Annual Percent of Total Invested |
|------|---------|-----------------------|-------------------|---------------------------|------------------|------------------------|-----------------------|--------------------------------------|----------------------------------|
| 2017 | 1 | - | - | - | - | - | - | | |
|      | 2 | - | - | - | - | - | - | 0.00% | |
|      | 3 | - | - | - | - | - | - | | |
|      | 4 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | 96.00% | |
| 2018 | 1 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | | |
|      | 2 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | 96.00% | |
|      | 3 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | | |
|      | 4 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | 96.00% | 96.00% |
| 2019 | 1 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | | |
|      | 2 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | 96.00% | |
|      | 3 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | | |
|      | 4 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | 96.00% | 96.00% |
| 2020 | 1 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | | |
|      | 2 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | 96.00% | |
|      | 3 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | | |
|      | 4 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | 96.00% | 96.00% |
| 2021 | 1 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | | |
|      | 2 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | 96.00% | |
|      | 3 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | | |
|      | 4 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | 96.00% | 96.00% |
| 2022 | 1 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | | |
|      | 2 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | 96.00% | |
|      | 3 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | | |
|      | 4 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | 96.00% | 96.00% |
| 2023 | 1 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | | |
|      | 2 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | 96.00% | |
|      | 3 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | | |
|      | 4 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | 96.00% | 96.00% |
| 2024 | 1 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | | |
|      | 2 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | 96.00% | |
|      | 3 | 6,500,000 | 6,240,000 | - | 6,240,000 | - | 6,240,000 | | |

See Summary of Significant Assumptions and Accountant's Report

12/29/2017

Confidential

USBCDC00048514

**1501 Washington**

**ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC OPERATING RESERVES**

| Year | Reserve from Initial Capital | Deposit to / (Release from) Operating Reserve | Cumulative Reserve Balance |
|---|---|---|---|
| 2017 | 650 | - | 650 |
| 2018 | - | - | 650 |
| 2019 | - | - | 650 |
| 2020 | - | - | 650 |
| 2021 | - | - | 650 |
| 2022 | - | - | 650 |
| 2023 | - | - | 650 |
| 2024 | - | - | 650 |
| 2025 | - | - | 650 |
| 2026 | - | - | 650 |
| 2027 | - | - | 650 |
| 2028 | - | - | 650 |
| 2029 | - | - | 650 |
| 2030 | - | - | 650 |
| 2031 | - | - | 650 |
| 2032 | - | - | 650 |
| 2033 | - | - | 650 |
| 2034 | - | - | 650 |
| 2035 | - | - | 650 |
| 2036 | - | - | 650 |
| 2037 | - | - | 650 |
| 2038 | - | - | 650 |
| 2039 | - | - | 650 |
| 2040 | - | - | 650 |
| 2041 | - | - | 650 |
| 2042 | - | - | 650 |
| 2043 | - | - | 650 |
| 2044 | - | - | 650 |
| 2045 | - | - | 650 |
| 2046 | - | - | 650 |
| 2047 | - | - | 650 |
| 2048 | - | - | 650 |
| 2049 | - | - | 650 |
| 2050 | - | (650) | - |
| | 650 | (650) | |

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048515

**1501 Washington**

**ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC PROJECTED OPERATING CASH FLOW STATEMENT**

| Year | Debt Service Project Loans | Audit & Tax Reimbursement | Operating Expenses | Asset Management Fee | Net Cash Flow | (Deposit to) / Release from Operating Reserve | Cash Flow Available for Distribution | Investor Member Distribution | Managing Member Distribution |
|------|---------|---------|----------|-----------|---------|------|---------|---------|-----|
| 2017 | 801 | 8,000 | (8,000) | (181) | 621 | - | 621 | 620 | 0 |
| 2018 | 144,194 | 8,000 | (8,000) | (32,500) | 111,694 | - | 111,694 | 111,683 | 11 |
| 2019 | 144,194 | 8,000 | (8,000) | (32,500) | 111,694 | - | 111,694 | 111,683 | 11 |
| 2020 | 144,194 | 8,000 | (8,000) | (32,500) | 111,694 | - | 111,694 | 111,683 | 11 |
| 2021 | 144,194 | 8,000 | (8,000) | (32,500) | 111,694 | - | 111,694 | 111,683 | 11 |
| 2022 | 144,194 | 8,000 | (8,000) | (32,500) | 111,694 | - | 111,694 | 111,683 | 11 |
| 2023 | 144,194 | 8,000 | (8,000) | (32,500) | 111,694 | - | 111,694 | 111,683 | 11 |
| 2024 | 144,194 | 8,000 | (8,000) | (32,500) | 111,694 | - | 111,694 | 111,683 | 11 |
| 2025 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2026 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2027 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2028 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2029 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2030 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2031 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2032 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2033 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2034 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2035 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2036 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2037 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2038 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2039 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2040 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2041 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2042 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2043 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2044 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2045 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2046 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2047 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2048 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2049 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | - | 287,445 | 287,417 | 29 |
| 2050 | 319,945 | 8,000 | (8,000) | (32,500) | 287,445 | 650 | 288,096 | 288,067 | 29 |
| Total | 9,328,741 | 272,000 | (272,000) | (1,072,681) | 8,256,060 | 650 | 8,256,710 | 8,255,885 | 826 |

See Summary of Significant Assumptions and Accountant's Report

12/29/2017

Confidential

USBCDC00048516

**1501 Washington**

### ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC PROJECTED TAXABLE INCOME (LOSS)

| Year | Interest Income on Project Loans | Audit & Tax Reimbursement | Operating Expenses | Suballocation Fee Amount Amortization Expense | Asset Management Fee | Net Taxable Income/(Loss) | Investor Member Taxable Income / (Loss) | Managing Member Taxable Income / (Loss) |
|---|---|---|---|---|---|---|---|---|
| 2017 | 801 | 8,000 | (8,000) | (305) | (181) | 315 | 315 | 0 |
| 2018 | 144,194 | 8,000 | (8,000) | (37,143) | (32,500) | 74,551 | 74,544 | 7 |
| 2019 | 144,194 | 8,000 | (8,000) | (37,143) | (32,500) | 74,551 | 74,544 | 7 |
| 2020 | 144,194 | 8,000 | (8,000) | (37,143) | (32,500) | 74,551 | 74,544 | 7 |
| 2021 | 144,194 | 8,000 | (8,000) | (37,143) | (32,500) | 74,551 | 74,544 | 7 |
| 2022 | 144,194 | 8,000 | (8,000) | (37,143) | (32,500) | 74,551 | 74,544 | 7 |
| 2023 | 144,194 | 8,000 | (8,000) | (37,143) | (32,500) | 74,551 | 74,544 | 7 |
| 2024 | 144,194 | 8,000 | (8,000) | (36,838) | (32,500) | 74,856 | 74,849 | 7 |
| 2025 | 142,665 | 8,000 | (8,000) | - | (32,500) | 110,165 | 110,154 | 11 |
| 2026 | 138,533 | 8,000 | (8,000) | - | (32,500) | 106,033 | 106,022 | 11 |
| 2027 | 134,304 | 8,000 | (8,000) | - | (32,500) | 101,804 | 101,794 | 10 |
| 2028 | 129,977 | 8,000 | (8,000) | - | (32,500) | 97,477 | 97,467 | 10 |
| 2029 | 125,549 | 8,000 | (8,000) | - | (32,500) | 93,049 | 93,040 | 9 |
| 2030 | 121,018 | 8,000 | (8,000) | - | (32,500) | 88,518 | 88,509 | 9 |
| 2031 | 116,381 | 8,000 | (8,000) | - | (32,500) | 83,881 | 83,873 | 8 |
| 2032 | 111,636 | 8,000 | (8,000) | - | (32,500) | 79,136 | 79,128 | 8 |
| 2033 | 106,781 | 8,000 | (8,000) | - | (32,500) | 74,281 | 74,273 | 7 |
| 2034 | 101,812 | 8,000 | (8,000) | - | (32,500) | 69,312 | 69,305 | 7 |
| 2035 | 96,728 | 8,000 | (8,000) | - | (32,500) | 64,228 | 64,221 | 6 |
| 2036 | 91,525 | 8,000 | (8,000) | - | (32,500) | 59,025 | 59,019 | 6 |
| 2037 | 86,200 | 8,000 | (8,000) | - | (32,500) | 53,700 | 53,695 | 5 |
| 2038 | 80,752 | 8,000 | (8,000) | - | (32,500) | 48,252 | 48,247 | 5 |
| 2039 | 75,177 | 8,000 | (8,000) | - | (32,500) | 42,677 | 42,672 | 4 |
| 2040 | 69,471 | 8,000 | (8,000) | - | (32,500) | 36,971 | 36,968 | 4 |
| 2041 | 63,633 | 8,000 | (8,000) | - | (32,500) | 31,133 | 31,130 | 3 |
| 2042 | 57,659 | 8,000 | (8,000) | - | (32,500) | 25,159 | 25,156 | 3 |
| 2043 | 51,545 | 8,000 | (8,000) | - | (32,500) | 19,045 | 19,043 | 2 |
| 2044 | 45,289 | 8,000 | (8,000) | - | (32,500) | 12,789 | 12,788 | 1 |
| 2045 | 38,887 | 8,000 | (8,000) | - | (32,500) | 6,387 | 6,386 | 1 |
| 2046 | 32,336 | 8,000 | (8,000) | - | (32,500) | (164) | (164) | (0) |
| 2047 | 25,632 | 8,000 | (8,000) | - | (32,500) | (6,868) | (6,867) | (1) |
| 2048 | 18,772 | 8,000 | (8,000) | - | (32,500) | (13,728) | (13,727) | (1) |
| 2049 | 11,752 | 8,000 | (8,000) | - | (32,500) | (20,748) | (20,746) | (2) |
| 2050 | 4,568 | 8,000 | (8,000) | - | (32,500) | (27,932) | (27,929) | (3) |
| Total | 3,088,741 | 272,000 | (272,000) | (260,000) | (1,072,681) | 1,756,060 | 1,755,885 | 176 |

See Summary of Significant Assumptions and Accountant's Report

Confidential

**1501 Washington**

ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC OPERATING INCOME CALCULATION

| Year | Taxable Income | Add Back of All Amortizable Expenses Suballocation Fee Amount Amortization Expense | Operating Income | Cash Flow | Operating Income Greater Than or Equal Cash Distribution? |
|------|------|------|------|------|------|
| 2017 | 315 | 305 | 621 | 621 | Yes |
| 2018 | 74,551 | 37,143 | 111,694 | 111,694 | Yes |
| 2019 | 74,551 | 37,143 | 111,694 | 111,694 | Yes |
| 2020 | 74,551 | 37,143 | 111,694 | 111,694 | Yes |
| 2021 | 74,551 | 37,143 | 111,694 | 111,694 | Yes |
| 2022 | 74,551 | 37,143 | 111,694 | 111,694 | Yes |
| 2023 | 74,551 | 37,143 | 111,694 | 111,694 | Yes |
| 2024 | 75,037 | 36,838 | 111,874 | 111,874 | N/A |
| Total | 522,659 | 260,000 | 782,659 | 782,659 | |

Note: Schedule reflects an 84 month horizon in order to be coterminous with the NMTC compliance period and therefore the last year reflected is not a full calendar year.

See Summary of Significant Assumptions and Accountant's Report

12/29/2017

Confidential

1501 Washington

**ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC PROJECTED OID SCHEDULE**

CDE Loan A and B OID Schedule

| | Loan A | Loan B |
|---|---|---|
| Principal | 4,246,350 | 1,993,650 |
| Interest Rate | 2.31080% | 2.31080% |
| Amortizing Rate | 2.31080% | 2.31080% |
| Commencement | 12/29/2017 | 12/29/2017 |
| Amortization Begins | 1/1/2025 | 1/1/2025 |
| Interest Only Period | 84.07 | 84.07 |
| Amortization | 312.00 | 312.00 |
| Term in Months | 396.07 | 396.07 |
| | | |
| Quarterly Payment (Amortizing) | 54,431.11 | 25,555.26 |
| Annual Payment (Amortizing) | 217,724.43 | 102,221.04 |
| Payments Made | Quarterly in Arrears/Advance | Quarterly in Arrears/Advance |
| | | |
| Days in Year for Calculating Interest | 360 | 360 |
| Interest Calculation Methodology | 30-Day Months | 30-Day Months |
| | | |
| Single Fixed Rate | 2.43901% | |
| Yield to Maturity | 2.49529% | |

OID

| Year | Loan Advance | Payment | YTM (g) | Balance | Outstanding Loan Balance (a) | QSI (b) | OID (c) | Principal Payments (d) | # of Complete Years (e) | Weighted Average Maturity (f) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | 6,240,000 | 6,240,000 | | | | | |
| 2017 | | 8,801 | 865 | 6,232,064 | 6,240,000 | 846 | 20 | - | 0.000 | 0.00 |
| 2018 | | 152,194 | 155,614 | 6,235,484 | 6,240,000 | 152,194 | 3,420 | - | 1.000 | 0.00 |
| 2019 | | 152,194 | 155,700 | 6,238,991 | 6,240,000 | 152,194 | 3,508 | - | 2.000 | 0.00 |
| 2020 | | 152,194 | 155,789 | 6,242,586 | 6,240,000 | 152,194 | 3,595 | - | 3.000 | 0.00 |
| 2021 | | 152,194 | 155,879 | 6,246,271 | 6,240,000 | 152,194 | 3,685 | - | 4.000 | 0.00 |
| 2022 | | 152,194 | 155,972 | 6,250,049 | 6,240,000 | 152,194 | 3,778 | - | 5.000 | 0.00 |
| 2023 | | 152,194 | 156,067 | 6,253,922 | 6,240,000 | 152,194 | 3,873 | - | 6.000 | 0.00 |
| 2024 | | 152,194 | 156,165 | 6,257,893 | 6,240,000 | 152,194 | 3,971 | - | 7.000 | 0.00 |
| 2025 | | 327,945 | 154,613 | 6,084,561 | 6,082,720 | 150,580 | 4,033 | 177,280 | 8.000 | 0.22 |
| 2026 | | 327,945 | 150,248 | 5,906,863 | 5,881,307 | 146,219 | 4,029 | 181,413 | 9.000 | 0.25 |
| 2027 | | 327,945 | 145,772 | 5,724,690 | 5,695,666 | 141,756 | 4,016 | 185,641 | 10.000 | 0.29 |
| 2028 | | 327,945 | 141,183 | 5,537,928 | 5,505,697 | 137,188 | 3,995 | 189,968 | 11.000 | 0.33 |
| 2029 | | 327,945 | 136,479 | 5,346,462 | 5,311,301 | 132,515 | 3,965 | 194,398 | 12.000 | 0.36 |
| 2030 | | 327,945 | 131,657 | 5,150,173 | 5,112,374 | 127,732 | 3,925 | 198,927 | 13.000 | 0.40 |
| 2031 | | 327,945 | 126,713 | 4,948,940 | 4,908,610 | 122,838 | 3,875 | 203,564 | 14.000 | 0.45 |
| 2032 | | 327,945 | 121,644 | 4,742,639 | 4,700,500 | 117,830 | 3,814 | 208,309 | 15.000 | 0.49 |
| 2033 | | 327,945 | 116,448 | 4,531,142 | 4,487,336 | 112,705 | 3,743 | 213,165 | 16.000 | 0.53 |
| 2034 | | 327,945 | 111,121 | 4,314,317 | 4,269,202 | 107,461 | 3,660 | 218,133 | 17.000 | 0.58 |
| 2035 | | 327,945 | 105,660 | 4,092,032 | 4,045,985 | 102,094 | 3,566 | 223,218 | 18.000 | 0.63 |
| 2036 | | 327,945 | 100,061 | 3,864,148 | 3,817,564 | 96,603 | 3,458 | 228,421 | 19.000 | 0.68 |
| 2037 | | 327,945 | 94,321 | 3,630,523 | 3,583,819 | 90,983 | 3,338 | 233,745 | 20.000 | 0.73 |
| 2038 | | 327,945 | 88,437 | 3,391,015 | 3,344,626 | 85,232 | 3,205 | 239,193 | 21.000 | 0.79 |
| 2039 | | 327,945 | 82,404 | 3,145,474 | 3,099,857 | 79,348 | 3,057 | 244,769 | 22.000 | 0.85 |
| 2040 | | 327,945 | 76,220 | 2,893,748 | 2,849,383 | 73,326 | 2,894 | 250,474 | 23.000 | 0.90 |
| 2041 | | 327,945 | 69,880 | 2,635,682 | 2,593,071 | 67,164 | 2,716 | 256,312 | 24.000 | 0.97 |
| 2042 | | 327,945 | 63,380 | 2,371,118 | 2,330,784 | 60,858 | 2,522 | 262,287 | 25.000 | 1.03 |
| 2043 | | 327,945 | 56,716 | 2,099,886 | 2,062,383 | 54,405 | 2,311 | 268,400 | 26.000 | 1.09 |
| 2044 | | 327,945 | 49,884 | 1,821,825 | 1,787,727 | 47,802 | 2,083 | 274,657 | 27.000 | 1.16 |
| 2045 | | 327,945 | 42,881 | 1,536,760 | 1,508,668 | 41,044 | 1,836 | 281,059 | 28.000 | 1.23 |
| 2046 | | 327,945 | 35,701 | 1,244,516 | 1,219,059 | 34,130 | 1,571 | 287,610 | 29.000 | 1.31 |
| 2047 | | 327,945 | 28,340 | 944,910 | 924,745 | 27,054 | 1,286 | 294,314 | 30.000 | 1.38 |
| 2048 | | 327,945 | 20,793 | 637,758 | 623,571 | 19,813 | 980 | 301,174 | 31.000 | 1.46 |
| 2049 | | 327,945 | 13,057 | 322,869 | 315,378 | 12,404 | 653 | 308,194 | 32.000 | 1.54 |
| 2050 | | 327,945 | 5,076 | (0) | - | 4,821 | 255 | 315,378 | 33.000 | 1.62 |
| Totals | | 9,800,741 | 3,360,741 | | 100,634 | 3,260,107 | 100,634 | 6,240,000 | | 21.30 |

| | |
|---|---|
| Stated Redemption Price at maturity = sum of all of all payments less QSI | 6,340,634 |
| Weighted Average Maturity | 21.2989 |
| 1/4 Percent | 0.0025 |
| | |
| De minimis threshold | 337,621 |
| OID | 100,634 |
| | |
| Do we have OID? | **NO** |

(a) Actual outstanding loan balances and not based on YTM calculation.
(b) Outstanding loan balance (a) times single fixed rate
(c) Stated interest (g) minus qualified stated interest (b)
(d) Actual principal payments made
(e) Number of years from issuance date to today
(f) Sum OID plus principal payment divided by stated redemption price at maturity times # of complete years [((c) + (d))/SRP times (e)]
(g) Yield to maturity

Confidential

USBCDC00048519

1501 Washington

**1501 WASHINGTON ST. LOUIS, LLC GENERAL INFORMATION**

| General Information | | Capital Contribution/ Purchase Price | | |
|---|---|---|---|---|

**General Information**

| | |
|---|---|
| Projections Start Date | 12/29/17 |
| | |
| Projections Start | 12/29/17 |
| Construction Completed | Feb-19 |
| Hotel Opening Date | Feb-19 |
| Construction Period | 14.00 Months |
| | |
| Depreciation | |
| Non-Residential Rental Property | 39.0 |
| Site Improvements | 15.0 |
| Non-Residential Personal Property | 5.0 |
| | |
| Credit Rate | |
| Federal Credits | 1.15 |
| State Credits | 0.94 |
| | |
| Accounting Expenses | 20,000 |
| Escalation | 4.00% |

**Loan-To-Value - At Closing**

| | |
|---|---|
| Valuation "as-is" per Appraisal | 4,500,000 |
| | |
| Loans at Closing: | |
| HTC Bridge (via DFQ Management, LLC)** | 2,897,853 |
| Mezz Loan (via DFQ Management, LLC)** | 2,769,231 |
| USBCDE SUB-CDE 162, LLC Loan A | 1,079,785 |
| USBCDE SUB-CDE 162, LLC Loan B | 570,215 |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan A | 4,246,350 |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan B | 1,993,650 |
| Total Loan Balances at Closing | 13,557,084 |
| | |
| LTV | 301.27% |

**Loan-To-Value - At Stabilization**

| | |
|---|---|
| Valuation "Upon Stabilization" per Appraisal | 35,400,000 |
| Loans at Stabilization: | |
| Refinanced Loan (First Mortgage) | 21,297,026 |
| USBCDE SUB-CDE 162, LLC Loan A | 1,079,785 |
| USBCDE SUB-CDE 162, LLC Loan B | 570,215 |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan A | 4,246,350 |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan B | 1,993,650 |
| Total Loan Balances at Closing | 29,187,026 |
| | |
| LTV | 82.45% |

**Capital Contribution/ Purchase Price**

**Last Hotel Investor, LLC**

| Date | | Amount |
|---|---|---|
| Dec-17 | Closing | 532,202 |
| Total | | 532,202 |
| Feb-19 | Assumption of DDF | 4,195,721 |

**ARQ-1501 St. Louis, LLC**

| Date | | Amount |
|---|---|---|
| Dec-17 | Closing | 532,202 |
| | | 532,202 |

**RMZ-101 St. Louis, LLC**

| Date | | Amount |
|---|---|---|
| Dec-17 | Closing | 532,202 |
| | | 532,202 |

**DFQ Management, LLC**

| Date | | Amount |
|---|---|---|
| Dec-17 | Closing | 9,047,429 |
| | | 9,047,429 |

| US Bank | Capital Contribution | State HTC Purchase Price |
|---|---|---|
| Dec-17 | - | - |
| Nov-18 | - | - |
| May-19 | - | 10,297,271 |
| Total | - | 10,297,271 |

**Allocation Percentages**

| Profit | |
|---|---|
| RMZ-101 St. Louis, LLC | 5.00% |
| ARQ-1501 St. Louis, LLC | 5.00% |
| Last Hotel Investor, LLC | 5.00% |
| DFQ Management, LLC | 85.00% |
| **Losses** | |
| RMZ-101 St. Louis, LLC | 5.00% |
| ARQ-1501 St. Louis, LLC | 5.00% |
| Last Hotel Investor, LLC | 5.00% |
| DFQ Management, LLC | 85.00% |
| **Cash Flow** | |
| RMZ-101 St. Louis, LLC | 5.00% |
| ARQ-1501 St. Louis, LLC | 5.00% |
| Last Hotel Investor, LLC | 5.00% |
| DFQ Management, LLC | 85.00% |
| **Capital Gains/ Capital Loss** | |
| RMZ-101 St. Louis, LLC | 5.00% |
| ARQ-1501 St. Louis, LLC | 5.00% |
| Last Hotel Investor, LLC | 5.00% |
| DFQ Management, LLC | 85.00% |

Confidential                                                                                                    USBCDC00048520

1801 Washington

**1801 WASHINGTON ST. LOUIS, LLC SOURCES AND USES OF FUNDS**

| Description | Total | Acquisition Basis | QRE Cond/Rehab Basis | Non-Eligible Basis | Site Improvements | Personal Property | Funded Expense | Other | MO State QRE Cond/Rehab Basis | Qualified Improvement Expenditures |
|---|---|---|---|---|---|---|---|---|---|---|
| RMZ-1501 St. Louis, LLC Contribution | 532,202 | | | | | | | | | |
| Last Hotel Investor, LLC Contribution | 532,202 | | | | | | | | | |
| ARG-1501 St. Louis, LLC Contribution | 532,202 | | | | | | | | | |
| DFQ Management LLC Contribution | 9,347,429 | | | | | | | | | |
| Mezz Loan Extended Term – (via DFQ Equity) | 9,000,000 | | | | | | | | | |
| US Bank (Purchase Price - State Historic Credit) | 10,297,271 | | | | | | | | | |
| First Mortgage | 12,300,000 | | | | | | | | | |
| MT FF&E Purchase | 4,664,263 | | | | | | | | | |
| USBCDE SUB-CDE 502, LLC Loan A | 3,578,785 | | | | | | | | | |
| USBCDE SUB-CDE 502, LLC Loan B | 570,215 | | | | | | | | | |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan A | 4,266,350 | | | | | | | | | |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan B | 1,993,650 | | | | | | | | | |
| Last Hotel Investor, LLC Assumption of DDF | 4,195,721 | | | | | | | | | |
| **Total Sources** | 58,978,289 | | | | | | | | | |
| | | | | | | | | | | |
| **Acquisition Costs** | | | | | | | | | | |
| Land / Building | 4,450,000 | 3,560,000 | - | - | - | - | - | 890,000 | | |
| **Hard Costs** | | | | | | | | | | |
| General Contract | 26,254,380 | | 26,254,380 | - | - | - | - | - | 26,254,380 | 20,478,424 |
| Contractor Overhead | 394,681 | | 394,681 | | | | | | 394,681 | 307,851 |
| Contractor Profit | 732,960 | | 732,960 | | | | | | 732,960 | 571,724 |
| General Requirements | 1,966,579 | | 1,966,579 | | | | | | 1,966,579 | 1,533,302 |
| Pre-Construction Services | 58,000 | | 58,000 | - | - | - | - | - | 58,000 | 45,240 |
| Engineering | 83,210 | | 83,210 | | | | | | 83,210 | 64,904 |
| Allowance | 58,000 | | 58,000 | | | | | | 58,000 | 45,240 |
| Repairs & Maintenance | 4,302 | | 4,302 | | | | | | 4,302 | 3,356 |
| **FF&E:** | | | | | | | | | | |
| Model Room Furnishings | 31,942 | | 3,194 | - | - | 28,748 | - | - | 3,194 | 2,492 |
| FF&E Guestrooms | 1,675,494 | | 167,549 | - | - | 1,507,945 | - | - | 167,549 | 130,689 |
| FF&E Pubic Spaces | 1,000,000 | | 100,000 | - | - | 900,000 | - | - | 100,000 | 78,000 |
| Purchasing Fee | 160,000 | | 16,000 | - | - | 144,000 | - | - | 16,000 | 12,480 |
| Install, Warehouse, Freight | 352,667 | | 35,267 | - | - | 317,400 | - | - | 35,267 | 27,508 |
| FF&E Tax | 217,453 | | 21,745 | - | - | 195,708 | - | - | 21,745 | 16,961 |
| Presidential Suite | 100,000 | | 10,000 | - | - | 90,000 | - | - | 10,000 | 7,800 |
| Contingency | 150,000 | | 15,000 | - | - | 135,000 | - | - | 15,000 | 11,700 |
| Restaurant & Bar Equipment | 999,122 | | 99,912 | - | - | 899,210 | - | - | 99,912 | 77,932 |
| **Pre-Opening Expense Reserve** | | | | | | | | | | |
| A&G and F&B | 198,725 | | | | | | 198,725 | | | |
| Salaries & Wages | 608,888 | | | | | | 608,888 | | | |
| Sales & Marketing | 419,383 | | | | | | 419,383 | | | |
| Licenses & Permits | 20,000 | | | | | | 20,000 | | | |
| Opening Operating Cash | 159,050 | | | | | | 159,050 | | | |
| Exterior Signage | 118,050 | | | | | | 118,050 | | | |
| **OS&E** | | | | | | | | | | |
| Uniforms | 48,927 | | | | | | 48,927 | | | |
| Linen-Rooms | 195,204 | | | | | | 195,204 | | | |
| China/Glass/Silver | 345,980 | | | | | | 345,980 | | | |
| Operating Supplies & Equipment | 610,019 | | | | | | 610,019 | | | |
| **IT** | 1,610,532 | | 161,053 | - | 1,449,479 | - | - | - | 161,053 | 125,621 |
| **Fees** | | | | | | | | | | |
| Procurement Fee | 160,000 | | 160,000 | | | | | | 160,000 | 124,800 |
| Tax | 101,383 | | 101,383 | | | | | | 101,383 | 79,079 |
| Shipping & Transportation | 61,002 | | 61,002 | | | | | | 61,002 | 47,581 |
| **Soft Costs** | | | | | | | | | | |
| Legal Closing/Accounting Costs | 698,329 | | 369,729 | - | - | 328,600 | - | - | 369,729 | 288,389 |
| Disbursement Fees | 94,000 | | 94,000 | - | - | - | - | - | 94,000 | 73,320 |
| Title Insurance & Closing Costs | 110,000 | | 110,000 | - | - | - | - | - | 110,000 | 85,800 |
| US Bank Loan Fee | 123,000 | | - | - | - | - | 123,000 | - | | |
| Bridge/Mezz Loan Interest Reserve | 3,020,000 | | 2,426,667 | - | - | 680,333 | - | - | 2,426,667 | 1,892,800 |
| First Mortgage Interest | 132,598 | | 132,598 | - | - | - | - | - | 132,598 | 103,426 |
| USBCDE SUB-CDE 502, LLC Loan A Interest | 16,328 | | 16,328 | - | - | - | - | - | 16,328 | 12,736 |
| USBCDE SUB-CDE 502, LLC Loan B Interest | 16,544 | | 16,544 | - | - | - | - | - | 16,544 | 12,904 |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan A Interest | 123,201 | | 123,201 | - | - | - | - | - | 123,201 | 96,097 |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan B Interest | 57,843 | | 57,843 | - | - | - | - | - | 57,843 | 45,117 |
| Acquisition/LBA Loan Interest Reserve | 929,363 | | 590,913 | - | - | - | 338,250 | - | 590,913 | 460,924 |
| Construction Management Fee | 152,025 | | 152,025 | | | | | | 152,025 | 119,048 |
| **Overhead, Reimbursables & Related** | | | | | | | | | | |
| Travel | 127,000 | | - | - | - | 127,000 | - | - | | |
| Accounting | 7,275 | | 7,275 | - | - | - | - | - | 7,275 | 5,675 |
| Snow Removal | 2,000 | | - | - | - | 2,000 | - | - | | |
| Rent | 24,000 | | 24,000 | - | - | - | - | - | 24,000 | 18,720 |
| Annual Filing Fees | 11,650 | | 11,650 | - | - | - | - | - | 11,650 | 9,087 |
| Parking | 20,000 | | 20,000 | - | - | - | - | - | 20,000 | 15,600 |
| Misc. | 65,000 | | 65,000 | - | - | - | - | - | 65,000 | 50,700 |
| Insurance | 263,211 | | 263,211 | - | - | - | - | - | 263,211 | 205,305 |
| **Architecture & Engineering and Interior Design** | | | | | | | | | | |
| Due Diligence | 59,474 | | 59,474 | - | - | - | - | - | 59,474 | 46,390 |
| Architectural & Interior Design Services | 991,910 | | 991,910 | - | - | - | - | - | 991,910 | 773,690 |
| Structural Engineering | 147,500 | | 147,500 | - | - | - | - | - | 147,500 | 115,050 |
| MEP Engineering | 63,742 | | 63,742 | - | - | - | - | - | 63,742 | 49,719 |
| Civil Survey | 39,500 | | 39,500 | - | - | - | - | - | 39,500 | 30,810 |
| Lighting Design | 29,000 | | 29,000 | - | - | - | - | - | 29,000 | 22,620 |
| Acoustical Design | 4,380 | | 4,380 | - | - | - | - | - | 4,380 | 3,416 |
| **Other Consultants and Technical Services** | | | | | | | | | | |
| Kitchen Design | 54,740 | | 54,740 | - | - | - | - | - | 54,740 | 42,697 |
| Technical Services | 125,000 | | 125,000 | - | - | - | - | - | 125,000 | 97,500 |
| HFC Consultant | 146,482 | | 146,482 | - | - | - | - | - | 146,482 | 114,256 |
| Brownfields Consultant | 12,500 | | 12,500 | - | - | - | - | - | 12,500 | 9,750 |
| City Enhancements Council | 28,615 | | 28,615 | - | - | - | - | - | 28,615 | 22,320 |
| **Testing, Surveys, and Studies** | | | | | | | | | | |
| Land Study | 1,600 | | 1,600 | - | - | - | - | - | 1,600 | 1,248 |
| Traffic Study | 7,540 | | 7,540 | - | - | - | - | - | 7,540 | 5,881 |
| Environmental | 15,861 | | 15,861 | - | - | - | - | - | 15,861 | 12,372 |
| Appraisal | 23,171 | | 23,171 | - | - | - | - | - | 23,171 | 18,073 |
| Controlled Inspections | 40,600 | | 40,600 | - | - | - | - | - | 40,600 | 31,668 |
| Lenders Inspecting Architect | 29,000 | | 29,000 | - | - | - | - | - | 29,000 | 22,620 |
| Cost Certification | 15,000 | | 15,000 | - | - | - | - | - | 15,000 | 11,700 |
| Capital Consultants | 26,000 | | 26,000 | - | - | - | - | - | 26,000 | 20,280 |
| Novogradac Consulting, LLC - Reasonableness Opinion | 13,500 | | - | - | - | - | 13,500 | - | | |
| Trustee and Tong - Investor Insurance Review | 1,700 | | 1,700 | - | - | - | - | - | 1,700 | 1,326 |
| Real Estate Taxes | 75,862 | | 75,862 | - | - | - | - | - | 75,862 | 59,172 |
| Bridge Loan Origination Fee | 520,000 | | 404,444 | - | - | - | 115,556 | - | 404,444 | 315,467 |
| QAKDB Initial Year Accounting Fees | 20,000 | | - | - | - | - | 20,000 | - | | |
| USBCDE SUB-CDE 502, LLC    Initial Year Audit & Tax Fee | 2,000 | | - | - | - | - | 2,000 | - | | |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC    Initial Year Audit & Tax Fee | 8,000 | | - | - | - | - | 8,000 | - | | |
| **Reserves** | | | | | | | | | | |
| Hard Cost Contingency | 1,910,290 | | 1,910,290 | - | - | - | - | - | 1,910,290 | 1,490,273 |
| Project Soft Cost Contingency | 421,611 | | 73,611 | - | - | - | 348,000 | - | 73,611 | 57,416 |
| **Other Costs** | | | | | | | | | | |
| Utility Costs | 110,000 | | - | - | - | - | 110,000 | - | | |
| Building Maintenance | 23,200 | | - | - | - | - | 23,200 | - | | |
| **Developer Fee** | | | | | | | | | | |
| Developer Fee | 4,669,912 | | 4,669,912 | - | - | - | - | - | 4,669,912 | 3,636,294 |
| | | | | | | | | | | |
| **Total Uses** | 58,978,289 | 3,560,000 | 43,818,174 | - | - | 5,667,490 | 4,704,375 | 1,228,250 | 43,818,174 | 34,178,176 |

Reconciliation to Development Budget 10.20.17

| | |
|---|---|
| Client Budget | 55,010,635 |
| CR Budget | 58,976,289 |
| | (3,966,654) |
| | |
| Loan Fee (Octagon and USB) | (603,000) |
| Loan Fee - First Mortgage | 123,000 |
| Loan Fee - Bridge | 520,000 |
| QAKDB Initial Year Accounting Fees | 20,000 |
| USBCDE SUB-CDE 502, LLC    Initial Year Audit & Tax Fee | 2,000 |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC    Initial Year Audit & Tax Fee | 8,000 |
| Cost Certification | 15,000 |
| Capital Consultants | 26,000 |
| Novogradac Consulting, LLC - Reasonableness Opinion | 13,500 |
| Trustee and Tong - Investor Insurance Review | 1,700 |
| Opening Operating Cash Moved to MT | (159,050) |
| Increased Reserve | 50,000 |
| Soft Cost Contingency Increase | 9,307 |
| Increase in FF&E | 80,902 |
| Budget Increase in GC Contract | 440,630 |
| CR CPI | 3,349,916 |
| | 0 |

Substantial Rehab Test

| | |
|---|---|
| Adjusted Basis | 6,116,137 |
| QRE: From 12/29/2017 to 12/29/2019 | 43,818,174 |
| Substantial Rehab Test (Pass/Fail) | **Pass** |

Note 1: Qualified Improvement Expenditures are estimated to equal 78% of Project QRE

Note 2: 4,664,263 of FF&E/OS&E will be purchased by the Master Tenant and 1,266,227 will be held at the Landlord. Useful lives of all non-QRE FF&E expected to be 7 years

Confidential

USBCDC00048521

**1501 Washington**

## 1501 WASHINGTON ST. LOUIS, LLC SCHEDULE OF VALUES

| Hard Costs: | Cost | Notes |
|---|---:|---|
| Permit Fees | 264,262 | |
| Demolition | 733,238 | |
| Concrete, Reinf. Stl., Struc. Conc., Beam Rpr. | 705,697 | |
| Asphalt Patch and Seal w/plumbing | - | w/plumbing |
| Site Furnishings | 960 | |
| Masonry and Masonry Repairs | 1,799,624 | |
| Structural Steel | 2,002,340 | |
| Rough Carpentry | 668,088 | |
| Millwork | 670,039 | |
| Manufacturing Roofing and Siding | 486,099 | |
| Dampproofing, Waterproofing | 21,678 | |
| Flashing and Sheet Metal | 227,618 | |
| Caulk & Seal.,Sprayed Ins., Weath. Barriers | 7,566 | |
| H.M. Doors & Frames, Wood Doors | 412,842 | |
| Operable Partitions | 31,620 | |
| Glass & Glazing (Storefronts, Entries, Etc.) | 843,384 | |
| Gypsum Board | 2,201,753 | |
| Plaster Rpr., Direct Ext. Sys., Fireproofng | 149,700 | |
| Acoustical Ceilings | 27,707 | |
| Carpet/VCT/Stone/Cer. Tile/ Terrazo/Wood Flrs. | 1,121,353 | |
| Painting/Wallcovering | 579,384 | |
| Toilet Partitions and Accessories | 210,361 | |
| Interior Signage | 1,650 | |
| Exterior Signage (By Owner) | - | NIC |
| Laundry Specialties/Lockers | - | NIC |
| Furnishings/Window Coverings | - | NIC |
| Pre-Engineered Structures | 381,054 | |
| Kitchen Equipment (By Owner) | - | NIC |
| Elevators | 965,939 | |
| Buckhoist | 588,550 | |
| Plumbing | 2,494,869 | |
| Fire Protection | 654,735 | |
| HVAC (includes Kitch. Exh. and MUA) | 3,289,407 | |
| Electrical, Fire Alarm | 3,240,010 | |
| Builders Risk | - | By Owner |
| Subtotal | 24,781,527 | |
| GENCORP Contract | 1,472,863 | |
| Subtotal | 26,254,390 | |
| Overhead | 394,681 | |
| Profit | 732,980 | |
| General Conditions, Insurance | 1,966,579 | |
| Subtotal | 29,348,630 | |
| Total | 29,348,630 | |

*See Summary of Significant Assumptions and Accountant's Report*

12/29/2017

Confidential

USBCDC00048522

**1501 Washington**

**1501 WASHINGTON ST. LOUIS, LLC FLOW OF FUNDS**

| Description | Total / Closing | Incurred to Date | Closing | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 |
|---|---|---|---|---|---|---|---|---|---|---|
| RIND 1501 St. Louis, LLC Contribution | 532,262 | 305,897 | 226,365 | - | - | - | - | - | - | - |
| Lead Hotel Investor, LLC Contribution | 532,262 | 305,897 | 226,365 | - | - | - | - | - | - | - |
| ARG 1501 St. Louis, LLC Contribution | 532,262 | 305,897 | 226,365 | - | - | - | - | - | - | - |
| DFG Management, LLC Contribution | 9,947,430 | 5,988,716 | 3,948,712 | - | - | - | - | - | - | - |
| Mezz Loan DFG Management, LLC* | 8,000,000 | - | - | - | - | - | - | - | - | - |
| US Bank (Purchase Price - State Historic Credit) | 16,287,271 | - | - | - | - | - | - | - | - | - |
| HTC Bridge Use DFG Management, LLC** | - | - | 2,897,853 | 1,961,538 | 1,961,538 | 1,961,538 | 1,961,538 | 1,961,538 | 1,961,538 | - |
| Mezz Loan Use DFG Management, LLC** | - | - | 2,766,231 | 1,538,462 | 1,538,462 | 1,538,462 | 1,538,462 | 1,538,462 | 1,538,462 | - |
| HTC Bridge Loan Repayment | - | - | - | - | - | - | - | - | - | - |
| Mezz Loan Repayment | - | - | - | - | - | - | - | - | - | - |
| First Mortgage | 12,500,000 | - | - | - | - | - | - | - | - | - |
| MT FF&E Purchase | 4,451,263 | - | - | - | - | - | - | - | - | - |
| USBCDE SUB-CDE HZ, LLC Loan A | 1,678,785 | - | 1,678,785 | - | - | - | - | - | - | - |
| USBCDE SUB-CDE HZ, LLC Loan B | 570,215 | - | 570,215 | - | - | - | - | - | - | - |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan A | 4,346,200 | - | 4,346,200 | - | - | - | - | - | - | - |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan B | 1,993,400 | - | 1,993,650 | - | - | - | - | - | - | - |
| Lead Hotel Investor, LLC Assumption of DDF | 4,185,721 | - | - | - | - | - | - | - | - | - |
| Excess (Shortfall) | - | - | - | 13,467,968 | 13,592,135 | 14,497,763 | 14,662,579 | 14,506,775 | 13,977,721 | 13,303,690 |
| **Total Sources** | 58,979,289 | 6,116,137 | 16,697,968 | 16,592,135 | 14,497,763 | 14,662,579 | 14,506,775 | 13,977,721 | 13,303,690 |

*Deferred Developer Fee assumed by Lead Hotel Investor, LLC as of date of placement in service. Financial projections show 449,990 paid from 2019 cash flow

**DI Lapan Finance, LLC is providing the HTC Bridge/Mezz Loan to which MD-style proceeds are being paid in steps

*** Landfill setting Line Item includes paydown of acquisition loan of $2,305,000 and Interest Reserve Line Item includes accrued interest on acquisition loan

Confidential

USBCDC00048523

1511 Washington

1511 WASHINGTON ST. LOUIS, LLC FLOW OF FUNDS

Confidential

USBCDC00048524

1501 Washington

1501 WASHINGTON ST. LOUIS, LLC FLOW OF FUNDS

| CONSTRUCTION PERIOD-INTEREST | First Mortgage | Closing | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Jul-18 |
|---|---|---|---|---|---|---|---|---|---|
| Loan | 12,300,000 | | | | | | | | |
| Loan Amount | | | - | - | - | - | - | - | - |
| Draw | | | | | | | | | |
| Interest Expense on Construction Draws | 5.5906% | | | | | | | | |
| | West Loan Extended Term - (via DFG Equity) | | | | | | | | |
| Loan | 6,000,000 | | | | | | | | |
| Loan Amount | | | | | | | | | |
| Draw | | | - | - | - | - | - | - | - |
| Interest Expense on Construction Draws | 8.0000% | | | | | | | | |
| | West Loan (via DFG Management, LLC) | | | | | | | | |
| Loan | 6,000,000 | | | | | | | | |
| Loan Amount | | 6,000,000 | | | | | | | |
| Draw | | | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| Interest Expense on Construction Draws | 8.0000% | | | | | | | | |
| | NTC Bridge (via DFG Management, LLC) | | | | | | | | |
| Loan | 17,000,000 | | | | | | | | |
| Loan Amount | | 17,000,000 | | | | | | | |
| Draw | | | 113,333 | 113,333 | 113,333 | 113,333 | 113,333 | 113,333 | 113,333 |
| Interest Expense on Construction Draws | 8.0000% | | | | | | | | |
| | USBCDE SUB-CDE 164, LLC Loan A | | | | | | | | |
| Loan | 1,679,785 | | | | | | | | |
| Loan Amount | | 1,679,785 | | | | | | | |
| Draw | | | 139 | - | - | 6,238 | - | 6,238 | - |
| Interest Expense on Construction Draws | 2.3158% | | | | | | | | |
| | USBCDE SUB-CDE 164, LLC Loan B | | | | | | | | |
| Loan | 570,215 | | | | | | | | |
| Loan Amount | | 570,215 | | | | | | | |
| Draw | | | 72 | - | - | 3,264 | - | 3,264 | - |
| Interest Expense on Construction Draws | 2.3158% | | | | | | | | |
| | ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan A | | | | | | | | |
| Loan | 4,246,350 | | | | | | | | |
| Loan Amount | | 4,246,350 | | | | | | | |
| Draw | | | 545 | - | - | 24,531 | - | 24,531 | - |
| Interest Expense on Construction Draws | 2.3158% | | | | | | | | |
| | ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan B | | | | | | | | |
| Loan | 1,992,650 | | | | | | | | |
| Loan Amount | | 1,992,650 | | | | | | | |
| Draw | | | 256 | - | - | 11,517 | - | 11,517 | - |
| Interest Expense on Construction Draws | 2.3158% | | | | | | | | |
| | Total | | 173,333 | 173,333 | 249,914 | 173,333 | 173,333 | 249,914 | 173,333 |

Confidential

USBCDC00048525

15th Washington

15th Washington

**15TH WASHINGTON ST. LOUIS, LLC FLOW OF FUNDS**

| CONSTRUCTION PERIOD INTEREST | | Aug-18 | Sep-18 | Oct-18 | Nov-18 | Dec-18 | Jan-19 | Feb-19 | Mar-19 | Apr-19 | May-19 | Jun-19 | Feb-20 | Thereafter | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Loan | First Mortgage | | | | | | | | | | | | | | |
| Loan Amount | 12,200,000 | | | | | | | | | | | | | | 12,200,000 |
| Draw | | - | - | 1,417,882 | 2,634,372 | 2,953,746 | 2,540,907 | 2,882,146 | 601,315 | 655,714 | 274,283 | | | - | 12,200,000 |
| Interest Expense on Construction Draws | 5.000% | | | 6,713 | 15,775 | 25,791 | 37,826 | 49,484 | 54,323 | 53,118 | 58,254 | | | | 301,283 |
| Loan | Mezz Loan Extended Term - (via BFG Equity) | | | | | | | | | | | | | | |
| Loan Amount | 6,000,000 | | | | | | | | | | | 6,000,000 | | | 6,000,000 |
| Interest Expense on Construction Draws | 8.000% | | | | | | | | | | | 60,000 | | - | 490,000 |
| Loan | Mezz Loan (via BFG Management, LLC) | | | | | | | | | | | | | | |
| Loan Amount | 6,000,000 | | | | | | | | | | | | | | 0 |
| Draw | | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | (6,000,000) | | | 0 |
| Interest Expense on Construction Draws | 8.000% | | | | | | | | | | | | | | 1,620,000 |
| Loan | HTC Bridge (via BFG Management, LLC) | | | | | | | | | | | | | | |
| Loan Amount | 17,600,000 | | | | | | | | | | | | | | 0 |
| Interest Expense on Construction Draws | 8.000% | 113,333 | 113,333 | 113,333 | 113,333 | 113,333 | 113,333 | 113,333 | 113,333 | 113,333 | (16,102,280) | 6,652 | (6) | (697,746) | 1,016,685 |
| Loan | USBCDE SUB-CDE 164, LLC Loan A | | | | | | | | | | | | | | |
| Loan Amount | 1,679,785 | | | | | | | | | | | | | | 1,679,785 |
| Draw | | - | 6,238 | - | - | 6,238 | - | - | 6,238 | - | - | | | | 31,128 |
| Interest Expense on Construction Draws | 2.1/8% | | | | | | | | | | | | | | |
| Loan | USBCDE SUB-CDE 164, LLC Loan B | | | | | | | | | | | | | | |
| Loan Amount | 575,215 | | | | | | | | | | | | | | 575,215 |
| Draw | | - | 2,264 | - | - | 2,264 | - | - | 2,264 | - | - | | | | 16,544 |
| Interest Expense on Construction Draws | 2.1/8% | | | | | | | | | | | | | | |
| Loan | ST. LOUIS NEW MARKETS TAX CREDIT FUND-49, LLC Loan A | | | | | | | | | | | | | | |
| Loan Amount | 4,246,550 | | | | | | | | | | | | | | 4,246,550 |
| Draw | | - | 24,521 | - | - | 24,521 | - | - | 24,521 | - | - | | | | 123,281 |
| Interest Expense on Construction Draws | 2.1/8% | | | | | | | | | | | | | | |
| Loan | ST. LOUIS NEW MARKETS TAX CREDIT FUND-49, LLC Loan B | | | | | | | | | | | | | | |
| Loan Amount | 1,893,650 | | | | | | | | | | | | | | 1,893,650 |
| Draw | | - | 11,517 | - | - | 11,517 | - | - | 11,517 | - | - | | | | 57,341 |
| Interest Expense on Construction Draws | 2.1/8% | | | | | | | | | | | | | | |
| **Total** | | 173,333 | 218,914 | 180,047 | 188,168 | 244,705 | 211,159 | 219,827 | 273,217 | 228,451 | 124,906 | 60,000 | | | 3,856,181 |

Confidential

USBCDC00048526

**1501 Washington**

**1501 WASHINGTON ST. LOUIS, LLC AT RISK ANALYSIS**

As of   12/31/2019

| | 1501 WASHINGTON ST. LOUIS, LLC 100.00% |
|---|---|
| Qualified Non Recourse Debt: | |
| First Mortgage | 12,300,000 |
| USBCDE SUB-CDE 162, LLC Loan A | 1,079,785 |
| USBCDE SUB-CDE 162, LLC Loan B | 570,215 |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan A | 4,246,350 |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan B | 1,993,650 |
| Total Financing Available for Rehab | 20,190,000 |
| Less: | |
| Recourse Debt | - |
| Net Financing Available for Rehab | 20,190,000 |
| Total Project Applications | 58,978,289 |
| Less: FF&E | (4,651,263) |
| Net Project Applications | 54,327,026 |
| Total Eligible Const/Rehab Basis | 43,818,174 |
| Eligible Const/Rehab Basis as % of Net Applications | 80.66% |
| Total Non Recourse Financing allocated to Rehab Basis | 16,284,509 |
| % of Non Recourse Financing to Total Rehab Basis | 37.16% |
| Section 49(a) Limitation | 80.00% |

See Summary of Significant Assumptions and Accountant's Report

12/29/2017

Page  46

USBCDC00048527

**1501 Washington**

## 1501 WASHINGTON ST. LOUIS, LLC AT RISK ANALYSIS

As of  12/31/2020

| | 1501 WASHINGTON ST. LOUIS, LLC 100.00% |
|---|---|
| Qualified Non Recourse Debt: | |
| Refinanced Loan (First Mortgage) | 21,300,000 |
| USBCDE SUB-CDE 162, LLC Loan A | 1,079,785 |
| USBCDE SUB-CDE 162, LLC Loan B | 570,215 |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan A | 4,246,350 |
| ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan B | 1,993,650 |
| Total Financing Available for Rehab | 29,190,000 |
| Less: | |
| Recourse Debt | - |
| Net Financing Available for Rehab | 29,190,000 |
| Total Project Applications | 58,978,289 |
| Less: FF&E | (4,651,263) |
| Net Project Applications | 54,327,026 |
| Total Eligible Const/Rehab Basis | 43,818,174 |
| Eligible Const/Rehab Basis as % of Net Applications | 80.66% |
| Total Non Recourse Financing allocated to Rehab Basis | 23,543,577 |
| % of Non Recourse Financing to Total Rehab Basis | 53.73% |
| Section 49(a) Limitation | 80.00% |

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048528

**1501 Washington**

1501 WASHINGTON ST. LOUIS, LLC PROJECTED CASH FLOW

| Year | Master Tenant Lease Payments | Supplemental Lease Payments | Release from Interest Reserves | Project Debt Service | Refinance Proceeds | Repayment of Mezz Loan | Repayment of First Mortgage | Repayment of Mezz Loan - Extended Term | Priority Return to DFQ Management, LLC for Payment of Mezz Extended Term Debt | Reimbursement To ODE's | Replacement Reserve Deposits | Accounting Expense | Net Cash Flow | Additional Capital Contribution by Last Hotel Investor, LLC | Special Distribution of Cash to Last Hotel Investor, LLC | Distributable Cash Flow | RMZ-101 St. Louis, LLC | Last Hotel Investor, LLC | DFQ Management, LLC | ARQ-1501 St Louis, LLC | DSCR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2019 | 1,200,000 | 406,778 | - | (718,613) | | | | | (372,039) | (10,000) | (28,152) | (20,800) | 457,213 | | (448,069) | 9,144 | 457 | 457 | 7,773 | 457 | 2.24 |
| 2020 | 1,650,000 | 663,595 | - | (923,245) | | | | | | (10,000) | (50,812) | (21,032) | 740,106 | | (725,303) | 14,802 | 740 | 740 | 12,582 | 740 | 2.01 |
| 2021 | 1,650,000 | 754,335 | - | (1,829,157) | 21,300,000 | (12,300,000) | (9,000,000) | | | (10,000) | (73,418) | (22,497) | 780,263 | | (753,878) | 15,385 | 769 | 769 | 13,077 | 769 | 1.48 |
| 2022 | 1,650,000 | 770,635 | - | (1,829,157) | | | | | (656,000) | (10,000) | (77,398) | (23,397) | 790,663 | | (765,070) | 15,614 | 781 | 781 | 13,272 | 781 | 1.49 |
| 2023 | 1,650,000 | 784,283 | - | (1,829,157) | | | | | | (10,000) | (79,720) | (24,333) | 791,073 | | (775,252) | 15,821 | 791 | 791 | 13,448 | 791 | 1.49 |
| 2024 | 1,650,000 | 828,344 | - | (1,829,157) | | | | | | (10,000) | (82,111) | (25,305) | 831,769 | 278,804 | (1,093,930) | 16,635 | 832 | 832 | 14,140 | 832 | 1.52 |
| 2025 | 1,950,488 | 853,194 | - | (2,051,381) | | | | | | (10,000) | (84,575) | (26,319) | 631,407 | | | 631,407 | 31,570 | 31,570 | 536,698 | 31,570 | 1.37 |
| 2026 | 1,950,975 | 878,790 | - | (2,051,381) | | | | | | (10,000) | (87,112) | (27,371) | 653,901 | | | 653,901 | 32,695 | 32,695 | 555,516 | 32,695 | 1.38 |
| 2027 | 1,951,463 | 905,154 | - | (2,051,381) | | | | | | (10,000) | (89,725) | (28,466) | 677,044 | | | 677,044 | 33,852 | 33,852 | 575,487 | 33,852 | 1.39 |
| 2028 | 1,951,951 | 932,308 | - | (2,051,381) | | | | | | (10,000) | (92,417) | (29,605) | 700,856 | | | 700,856 | 35,043 | 35,043 | 595,728 | 35,043 | 1.41 |
| 2029 | 1,952,439 | 960,278 | - | (2,051,381) | | | | | | (10,000) | (95,190) | (30,789) | 725,357 | | | 725,357 | 36,268 | 36,268 | 616,553 | 36,268 | 1.42 |
| 2030 | 1,952,927 | 989,086 | - | (2,051,381) | | | | | | (10,000) | (98,045) | (32,021) | 750,566 | | | 750,566 | 37,528 | 37,528 | 637,981 | 37,528 | 1.45 |
| 2031 | 1,953,415 | 1,018,759 | - | (2,051,381) | | | | | | (10,000) | (100,987) | (33,301) | 776,504 | | | 776,504 | 38,825 | 38,825 | 660,029 | 38,825 | 1.46 |
| 2032 | 1,953,903 | 1,049,321 | - | (2,051,381) | | | | | | (10,000) | (104,016) | (34,634) | 803,194 | | | 803,194 | 40,160 | 40,160 | 682,715 | 40,160 | 1.48 |
| 2033 | 1,954,392 | 1,080,801 | - | (2,051,381) | | | | | | (10,000) | (107,137) | (36,019) | 830,656 | | | 830,656 | 41,533 | 41,533 | 706,058 | 41,533 | 1.48 |
| 2034 | 1,954,880 | 1,100,000 | - | (2,051,381) | | | | | | (10,000) | (110,351) | (37,460) | 845,689 | | | 845,689 | 42,284 | 42,284 | 718,836 | 42,284 | 1.49 |
| 2035 | 1,955,369 | 1,100,000 | - | (2,051,381) | | | | | | (10,000) | (113,661) | (38,958) | 841,369 | | | 841,369 | 42,068 | 42,068 | 715,163 | 42,068 | 1.49 |
| 2036 | 1,955,858 | 1,100,000 | - | (2,051,381) | | | | | | (10,000) | (117,071) | (40,516) | 836,889 | | | 836,889 | 41,844 | 41,844 | 711,356 | 41,844 | 1.49 |
| 2037 | 1,956,347 | 1,100,000 | - | (2,051,381) | | | | | | (10,000) | (120,583) | (42,137) | 832,246 | | | 832,246 | 41,612 | 41,612 | 707,409 | 41,612 | 1.49 |
| 2038 | 1,956,836 | 1,100,000 | - | (2,051,381) | | | | | | (10,000) | (124,201) | (43,822) | 827,432 | | | 827,432 | 41,372 | 41,372 | 703,317 | 41,372 | 1.49 |
| 2039 | 1,957,325 | 1,100,000 | - | (2,051,381) | | | | | | (10,000) | (127,927) | (45,575) | 822,442 | | | 822,442 | 41,122 | 41,122 | 699,076 | 41,122 | 1.49 |
| 2040 | 1,957,815 | 1,100,000 | - | (2,051,381) | | | | | | (10,000) | (131,765) | (47,398) | 817,270 | | | 817,270 | 40,864 | 40,864 | 694,680 | 40,864 | 1.49 |
| 2041 | 1,958,304 | 1,100,000 | - | (2,051,381) | | | | | | (10,000) | (135,718) | (49,294) | 811,911 | | | 811,911 | 40,596 | 40,596 | 690,124 | 40,596 | 1.49 |
| 2042 | 1,958,794 | 1,100,000 | - | (2,051,381) | | | | | | (10,000) | (139,789) | (51,266) | 806,357 | | | 806,357 | 40,318 | 40,318 | 685,404 | 40,318 | 1.49 |
| 2043 | 1,959,283 | 1,100,000 | - | (2,051,381) | | | | | | (10,000) | (143,983) | (53,317) | 800,603 | | | 800,603 | 40,030 | 40,030 | 680,512 | 40,030 | 1.49 |
| 2044 | 1,959,773 | 1,100,000 | 308,250 | (2,051,381) | | | | | | (10,000) | (148,302) | (55,449) | 794,640 | | | 794,640 | 39,732 | 39,732 | 675,444 | 39,732 | 1.49 |
| 2045 | 1,960,263 | 1,100,000 | - | (2,036,040) | | | | | | (10,000) | (152,752) | (57,667) | 1,140,054 | | | 1,140,054 | 57,003 | 57,003 | 969,046 | 57,003 | 1.50 |
| 2046 | 1,960,753 | 1,100,000 | - | (404,545) | | | | | | (10,000) | (157,334) | (59,974) | 2,428,899 | | | 2,428,899 | 121,445 | 121,445 | 2,064,564 | 121,445 | 7.57 |
| 2047 | 1,961,243 | 1,100,000 | - | (404,545) | | | | | | (10,000) | (162,054) | (62,373) | 2,422,270 | | | 2,422,270 | 121,114 | 121,114 | 2,058,930 | 121,114 | 7.57 |
| 2048 | 1,961,734 | 1,100,000 | - | (404,545) | | | | | | (10,000) | (166,916) | (64,868) | 2,415,404 | | | 2,415,404 | 120,770 | 120,770 | 2,053,093 | 120,770 | 7.57 |
| 2049 | 1,962,224 | 1,100,000 | - | (404,545) | | | | | | (10,000) | (171,923) | (67,463) | 2,408,292 | | | 2,408,292 | 120,415 | 120,415 | 2,047,048 | 120,415 | 7.57 |
| 2050 | 1,962,715 | 1,100,000 | - | (404,545) | | | | | | (10,000) | (177,081) | (70,161) | 2,400,927 | | | 2,400,927 | 120,046 | 120,046 | 2,040,788 | 120,046 | 7.57 |
| Total | 61,521,470 | 31,575,661 | 308,250 | (53,046,870) | 21,300,000 | (12,300,000) | (9,000,000) | | (1,040,000) | (320,000) | (3,052,021) | (1,304,101) | 33,172,287 | 278,804 | (4,581,509) | 28,889,582 | 1,444,479 | 1,444,479 | 24,556,144 | 1,444,479 | 7.57 |

Confidential

USBCDC00048529

**1501 Washington**

**1501 WASHINGTON ST. LOUIS, LLC PROJECTED TAXABLE INCOME (LOSS)**

| Year | Master Tenant Lease Payments | Supplemental Lease Payments | MO State Historic Tax Credit (Sale) | Interest Expense | DDF Interest | Reimbursement To CDE's | Accounting Expenses | Depreciation | Amortization | Net Income (Loss) | ARQ-1501 St. Louis, LLC | Last Hotel Investor, LLC | RMZ-101 St. Louis, LLC | DFQ Management, LLC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2019 | 1,200,000 | 406,778 | 10,297,271 | (718,613) | (92,306) | (10,000) | (20,800) | (2,638,877) | (2,753,160) | 5,670,293 | 283,515 | 283,515 | 283,515 | 4,819,749 |
| 2020 | 1,650,000 | 663,595 | - | (820,270) | (84,479) | (10,000) | (21,632) | (2,834,784) | (173,483) | (1,631,053) | (81,553) | (81,553) | (81,553) | (1,386,395) |
| 2021 | 1,950,000 | 754,335 | - | (1,449,825) | (70,361) | (10,000) | (22,497) | (2,772,591) | (173,483) | (1,794,441) | (89,722) | (89,722) | (89,722) | (1,525,275) |
| 2022 | 1,950,000 | 770,635 | - | (1,426,428) | (55,344) | (10,000) | (23,397) | (2,728,060) | (135,899) | (1,658,514) | (82,926) | (82,926) | (82,926) | (1,409,737) |
| 2023 | 1,950,000 | 784,283 | - | (1,401,589) | (39,730) | (10,000) | (24,333) | (2,705,926) | (132,483) | (1,579,778) | (78,989) | (78,989) | (78,989) | (1,342,811) |
| 2024 | 1,950,000 | 828,344 | - | (1,375,218) | (23,549) | (10,000) | (25,306) | (2,783,150) | (132,483) | (1,571,361) | (78,568) | (78,568) | (78,568) | (1,335,657) |
| 2025 | 1,950,488 | 853,194 | - | (1,345,287) | - | (10,000) | (26,319) | (2,772,209) | (132,483) | (1,482,615) | (74,131) | (74,131) | (74,131) | (1,260,223) |
| 2026 | 1,950,975 | 878,790 | - | (1,310,337) | - | (10,000) | (27,371) | (2,675,437) | (132,483) | (1,325,863) | (66,293) | (66,293) | (66,293) | (1,126,983) |
| 2027 | 1,951,463 | 905,154 | - | (1,273,432) | - | (10,000) | (28,466) | (2,650,813) | (132,483) | (1,236,577) | (61,929) | (61,929) | (61,929) | (1,052,791) |
| 2028 | 1,951,951 | 932,308 | - | (1,234,456) | - | (10,000) | (29,605) | (2,644,070) | (132,483) | (1,166,355) | (58,318) | (58,318) | (58,318) | (991,402) |
| 2029 | 1,952,439 | 960,278 | - | (1,193,286) | - | (10,000) | (30,789) | (2,644,039) | (132,483) | (1,097,881) | (54,894) | (54,894) | (54,894) | (933,199) |
| 2030 | 1,952,927 | 989,086 | - | (1,149,792) | - | (10,000) | (32,021) | (2,776,853) | (132,483) | (1,159,135) | (57,957) | (57,957) | (57,957) | (985,265) |
| 2031 | 1,953,415 | 1,018,759 | - | (1,103,835) | - | (10,000) | (33,301) | (2,734,199) | (132,483) | (1,041,644) | (52,082) | (52,082) | (52,082) | (885,398) |
| 2032 | 1,953,903 | 1,049,321 | - | (1,055,268) | - | (10,000) | (34,634) | (2,698,323) | (132,483) | (927,482) | (46,374) | (46,374) | (46,374) | (788,360) |
| 2033 | 1,954,392 | 1,080,801 | - | (1,003,936) | - | (10,000) | (36,019) | (2,675,059) | (132,483) | (822,304) | (41,115) | (41,115) | (41,115) | (698,958) |
| 2034 | 1,954,880 | 1,100,000 | - | (949,673) | - | (10,000) | (37,460) | (574,814) | (11,040) | 1,471,893 | 73,595 | 73,595 | 73,595 | 1,251,109 |
| 2035 | 1,955,369 | 1,100,000 | - | (692,305) | - | (10,000) | (38,958) | (384,882) | - | 1,729,224 | 86,461 | 86,461 | 86,461 | 1,469,841 |
| 2036 | 1,955,858 | 1,100,000 | - | (831,645) | - | (10,000) | (40,516) | (543,485) | - | 1,630,212 | 81,511 | 81,511 | 81,511 | 1,385,680 |
| 2037 | 1,956,347 | 1,100,000 | - | (767,496) | - | (10,000) | (42,137) | (480,159) | - | 1,756,555 | 87,828 | 87,828 | 87,828 | 1,493,072 |
| 2038 | 1,956,836 | 1,100,000 | - | (699,649) | - | (10,000) | (43,822) | (435,557) | - | 1,867,808 | 93,390 | 93,390 | 93,390 | 1,587,637 |
| 2039 | 1,957,325 | 1,100,000 | - | (627,881) | - | (10,000) | (45,575) | (407,779) | - | 1,966,090 | 98,304 | 98,304 | 98,304 | 1,671,176 |
| 2040 | 1,957,815 | 1,100,000 | - | (551,957) | - | (10,000) | (47,398) | (393,954) | - | 2,054,505 | 102,725 | 102,725 | 102,725 | 1,746,329 |
| 2041 | 1,958,304 | 1,100,000 | - | (471,628) | - | (10,000) | (49,294) | (393,890) | - | 2,133,491 | 106,675 | 106,675 | 106,675 | 1,813,468 |
| 2042 | 1,958,794 | 1,100,000 | - | (386,627) | - | (10,000) | (51,266) | (583,270) | - | 2,027,630 | 101,382 | 101,382 | 101,382 | 1,723,486 |
| 2043 | 1,959,283 | 1,100,000 | - | (296,673) | - | (10,000) | (53,317) | (507,656) | - | 2,191,637 | 109,582 | 109,582 | 109,582 | 1,862,892 |
| 2044 | 1,959,773 | 1,100,000 | - | (201,468) | - | (10,000) | (55,449) | (454,399) | - | 2,338,457 | 116,923 | 116,923 | 116,923 | 1,987,688 |
| 2045 | 1,960,263 | 1,100,000 | - | (100,635) | - | (10,000) | (57,667) | (421,231) | - | 2,470,731 | 123,537 | 123,537 | 123,537 | 2,100,121 |
| 2046 | 1,960,753 | 1,100,000 | - | (40,886) | - | (10,000) | (59,974) | (404,722) | - | 2,545,171 | 127,259 | 127,259 | 127,259 | 2,163,395 |
| 2047 | 1,961,243 | 1,100,000 | - | (32,410) | - | (10,000) | (62,373) | (404,846) | - | 2,551,814 | 127,591 | 127,591 | 127,591 | 2,169,042 |
| 2048 | 1,961,734 | 1,100,000 | - | (23,735) | - | (10,000) | (64,868) | (630,776) | - | 2,332,355 | 116,618 | 116,618 | 116,618 | 1,982,501 |
| 2049 | 1,962,224 | 1,100,000 | - | (14,859) | - | (10,000) | (67,463) | (540,489) | - | 2,429,414 | 121,471 | 121,471 | 121,471 | 2,065,002 |
| 2050 | 1,962,715 | 1,100,000 | - | (5,776) | - | (10,000) | (70,161) | (476,897) | - | 2,499,881 | 124,994 | 124,994 | 124,994 | 2,124,899 |
| Total | 61,521,470 | 31,575,661 | 10,297,271 | (24,756,872) | (365,788) | (320,000) | (1,304,191) | (48,773,017) | (4,704,375) | 23,170,158 | 1,158,508 | 1,158,508 | 1,158,508 | 19,694,634 |

*2018 reimbursements and accounting expenses paid from development budget

Note: The model assumes QALICB will have enough interest income to offset interest expense as it relates to the excess business interest limitation of Section 13301 of the 2017 Tax Act.

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048530

**1501 Washington**

## 1501 WASHINGTON ST. LOUIS, LLC ACQUISITION/USB LOAN INTEREST RESERVE

| Year | Beginning Balance | Deposits | Construction Withdrawals | Withdrawals | Ending Balance |
|------|-------------------|----------|--------------------------|-------------|----------------|
| 2017 | - | 590,813 | (590,813) | - | - |
| 2018 | - | 338,250 | - | - | 338,250 |
| 2019 | 338,250 | - | - | - | 338,250 |
| 2020 | 338,250 | - | - | - | 338,250 |
| 2021 | 338,250 | - | - | - | 338,250 |
| 2022 | 338,250 | - | - | - | 338,250 |
| 2023 | 338,250 | - | - | - | 338,250 |
| 2024 | 338,250 | - | - | - | 338,250 |
| 2025 | 338,250 | - | - | - | 338,250 |
| 2026 | 338,250 | - | - | - | 338,250 |
| 2027 | 338,250 | - | - | - | 338,250 |
| 2028 | 338,250 | - | - | - | 338,250 |
| 2029 | 338,250 | - | - | - | 338,250 |
| 2030 | 338,250 | - | - | - | 338,250 |
| 2031 | 338,250 | - | - | - | 338,250 |
| 2032 | 338,250 | - | - | - | 338,250 |
| 2033 | 338,250 | - | - | - | 338,250 |
| 2034 | 338,250 | - | - | - | 338,250 |
| 2035 | 338,250 | - | - | - | 338,250 |
| 2036 | 338,250 | - | - | - | 338,250 |
| 2037 | 338,250 | - | - | - | 338,250 |
| 2038 | 338,250 | - | - | - | 338,250 |
| 2039 | 338,250 | - | - | - | 338,250 |
| 2040 | 338,250 | - | - | - | 338,250 |
| 2041 | 338,250 | - | - | - | 338,250 |
| 2042 | 338,250 | - | - | - | 338,250 |
| 2043 | 338,250 | - | - | - | 338,250 |
| 2044 | 338,250 | - | - | - | 338,250 |
| 2045 | 338,250 | - | - | (338,250) | - |
| 2046 | - | - | - | - | - |
| 2047 | - | - | - | - | - |
| 2048 | - | - | - | - | - |
| 2049 | - | - | - | - | - |
| 2050 | - | - | - | - | - |
| Total | | 929,063 | (590,813) | (338,250) | |

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048531

**1501 Washington**

**1501 WASHINGTON ST. LOUIS, LLC REPLACEMENT RESERVE**

| Year | Beginning Balance | Deposits* | Withdrawals* | Interest Earnings On Reserves | Ending Balance |
|---|---|---|---|---|---|
| 2019 | - | 28,152 | - | - | 28,152 |
| 2020 | 28,152 | 50,612 | - | - | 78,764 |
| 2021 | 78,764 | 73,418 | - | - | 152,182 |
| 2022 | 152,182 | 77,398 | - | - | 229,579 |
| 2023 | 229,579 | 79,720 | - | - | 309,299 |
| 2024 | 309,299 | 82,111 | (309,299) | - | 82,111 |
| 2025 | 82,111 | 84,575 | - | - | 166,686 |
| 2026 | 166,686 | 87,112 | - | - | 253,798 |
| 2027 | 253,798 | 89,725 | - | - | 343,524 |
| 2028 | 343,524 | 92,417 | - | - | 435,941 |
| 2029 | 435,941 | 95,190 | - | - | 531,131 |
| 2030 | 531,131 | 98,045 | (531,131) | - | 98,045 |
| 2031 | 98,045 | 100,987 | - | - | 199,032 |
| 2032 | 199,032 | 104,016 | - | - | 303,048 |
| 2033 | 303,048 | 107,137 | - | - | 410,185 |
| 2034 | 410,185 | 110,351 | - | - | 520,536 |
| 2035 | 520,536 | 113,661 | - | - | 634,198 |
| 2036 | 634,198 | 117,071 | (634,198) | - | 117,071 |
| 2037 | 117,071 | 120,583 | - | - | 237,655 |
| 2038 | 237,655 | 124,201 | - | - | 361,856 |
| 2039 | 361,856 | 127,927 | - | - | 489,783 |
| 2040 | 489,783 | 131,765 | - | - | 621,547 |
| 2041 | 621,547 | 135,718 | - | - | 757,265 |
| 2042 | 757,265 | 139,789 | (757,265) | - | 139,789 |
| 2043 | 139,789 | 143,983 | - | - | 283,772 |
| 2044 | 283,772 | 148,302 | - | - | 432,075 |
| 2045 | 432,075 | 152,752 | - | - | 584,826 |
| 2046 | 584,826 | 157,334 | - | - | 742,160 |
| 2047 | 742,160 | 162,054 | - | - | 904,214 |
| 2048 | 904,214 | 166,916 | (904,214) | - | 166,916 |
| 2049 | 166,916 | 171,923 | - | - | 338,839 |
| 2050 | 338,839 | 177,081 | - | - | 515,920 |
| Total | | 3,652,027 | (3,136,107) | - | |

*Replacement Reserves held at 1501 Washington St. Louis, LLC reflect 17.93% of total Replacement Reserves consistent with the percentage of total FF&E held at 1501 Washington St. Louis, LLC

**Withdrawals projected to occur every 6 years to replace FF&E before the end of its useful life.

***FF&E Reserves are funded partially at Landlord Entity.  Total FF&E reserveis equal to 2% gross Master Tenant/Subtenant revenues in year 2019, 3% in year 2020, and 4% thereafter.

See Summary of Significant Assumptions and Accountant's Report

Confidential

1501 Washington

**1501 WASHINGTON ST. LOUIS, LLC NON QUALIFIED FINANCIAL PROPERTY AND COLLECTIBLES TEST**

| | | | | | | | | | | Non Qualified Financial Property Test | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Reserves | Fixed Assets | Replacement Reserve Assets | Land | Construction in Process | Construction Disbursement Amount | Financing/ Closing Costs | Aggregate Unadjusted Bases | Average Aggregate Unadjusted Bases | Interest Reserves* | Replacement Reserve | Amount Considered NQFP | Percentage |
| 2017 | - | 3,560,000 | - | 890,000 | 10,142,337 | 13,467,968 | | 28,060,305 | 15,530,153 | | | | 0.00% |
| 2018 | 338,250 | 3,560,000 | - | 890,000 | 47,055,889 | | | 51,844,139 | 39,952,222 | 338,250 | | 338,250 | 0.85% |
| 2019 | 366,402 | 48,394,401 | - | 890,000 | | | 4,704,375 | 54,355,178 | 53,099,658 | 338,250 | 28,152 | 366,402 | 0.69% |
| 2020 | 417,014 | 48,394,401 | - | 890,000 | | | 4,704,375 | 54,405,790 | 54,380,484 | 338,250 | 78,764 | 417,014 | 0.77% |
| 2021 | 490,432 | 48,394,401 | - | 890,000 | | | 4,704,375 | 54,479,207 | 54,442,498 | 338,250 | 152,182 | 490,432 | 0.90% |
| 2022 | 567,829 | 48,394,401 | - | 890,000 | | | 4,704,375 | 54,556,605 | 54,517,906 | 338,250 | 229,579 | 567,829 | 1.04% |
| 2023 | 647,549 | 48,394,401 | - | 890,000 | | | 4,704,375 | 54,636,325 | 54,596,465 | 338,250 | 309,299 | 647,549 | 1.19% |
| 2024 | 420,361 | 48,394,401 | 309,299 | 890,000 | | | 4,704,375 | 54,718,437 | 54,677,381 | 338,250 | 82,111 | 420,361 | 0.77% |
| 2025 | 504,936 | 48,394,401 | 309,299 | 890,000 | | | 4,704,375 | 54,803,011 | 54,760,724 | 338,250 | 166,686 | 504,936 | 0.92% |
| 2026 | 592,048 | 48,394,401 | 309,299 | 890,000 | | | 4,704,375 | 54,890,123 | 54,846,567 | 338,250 | 253,798 | 592,048 | 1.08% |
| 2027 | 681,774 | 48,394,401 | 309,299 | 890,000 | | | 4,704,375 | 54,979,849 | 54,934,986 | 338,250 | 343,524 | 681,774 | 1.24% |
| 2028 | 774,191 | 48,394,401 | 309,299 | 890,000 | | | 4,704,375 | 55,072,266 | 55,026,057 | 338,250 | 435,941 | 774,191 | 1.41% |
| 2029 | 869,381 | 48,394,401 | 309,299 | 890,000 | | | 4,704,375 | 55,167,456 | 55,119,861 | 338,250 | 531,131 | 869,381 | 1.58% |
| 2030 | 436,295 | 48,394,401 | 840,430 | 890,000 | | | 4,704,375 | 55,265,501 | 55,216,478 | 338,250 | 98,045 | 436,295 | 0.79% |
| 2031 | 537,282 | 48,394,401 | 840,430 | 890,000 | | | 4,704,375 | 55,366,488 | 55,315,994 | 338,250 | 199,032 | 537,282 | 0.97% |
| 2032 | 641,298 | 48,394,401 | 840,430 | 890,000 | | | 4,704,375 | 55,470,504 | 55,418,496 | 338,250 | 303,048 | 641,298 | 1.16% |
| 2033 | 748,435 | 48,394,401 | 840,430 | 890,000 | | | 4,704,375 | 55,577,641 | 55,524,073 | 338,250 | 410,185 | 748,435 | 1.35% |
| 2034 | 858,786 | 48,394,401 | 840,430 | 890,000 | | | 4,704,375 | 55,687,992 | 55,632,816 | 338,250 | 520,536 | 858,786 | 1.54% |
| 2035 | 972,448 | 48,394,401 | 840,430 | 890,000 | | | 4,704,375 | 55,801,653 | 55,744,823 | 338,250 | 634,198 | 972,448 | 1.74% |
| 2036 | 455,321 | 48,394,401 | 1,474,628 | 890,000 | | | 4,704,375 | 55,918,725 | 55,860,189 | 338,250 | 117,071 | 455,321 | 0.82% |
| 2037 | 575,905 | 48,394,401 | 1,474,628 | 890,000 | | | 4,704,375 | 56,039,308 | 55,979,016 | 338,250 | 237,655 | 575,905 | 1.03% |
| 2038 | 700,106 | 48,394,401 | 1,474,628 | 890,000 | | | 4,704,375 | 56,163,509 | 56,101,409 | 338,250 | 361,856 | 700,106 | 1.25% |
| 2039 | 828,033 | 48,394,401 | 1,474,628 | 890,000 | | | 4,704,375 | 56,291,436 | 56,227,473 | 338,250 | 489,783 | 828,033 | 1.47% |
| 2040 | 959,797 | 48,394,401 | 1,474,628 | 890,000 | | | 4,704,375 | 56,423,201 | 56,357,318 | 338,250 | 621,547 | 959,797 | 1.70% |
| 2041 | 1,095,515 | 48,394,401 | 1,474,628 | 890,000 | | | 4,704,375 | 56,558,919 | 56,491,060 | 338,250 | 757,265 | 1,095,515 | 1.94% |
| 2042 | 478,039 | 48,394,401 | 2,231,893 | 890,000 | | | 4,704,375 | 56,698,708 | 56,628,813 | 338,250 | 139,789 | 478,039 | 0.84% |
| 2043 | 622,022 | 48,394,401 | 2,231,893 | 890,000 | | | 4,704,375 | 56,842,691 | 56,770,699 | 338,250 | 283,772 | 622,022 | 1.10% |
| 2044 | 770,325 | 48,394,401 | 2,231,893 | 890,000 | | | 4,704,375 | 56,990,993 | 56,916,842 | 338,250 | 432,075 | 770,325 | 1.35% |
| 2045 | 584,826 | 48,394,401 | 2,231,893 | 890,000 | | | 4,704,375 | 56,805,495 | 56,898,244 | - | 584,826 | 584,826 | 1.03% |
| 2046 | 742,160 | 48,394,401 | 2,231,893 | 890,000 | | | 4,704,375 | 56,962,829 | 56,884,162 | - | 742,160 | 742,160 | 1.30% |
| 2047 | 904,214 | 48,394,401 | 2,231,893 | 890,000 | | | 4,704,375 | 57,124,883 | 57,043,856 | - | 904,214 | 904,214 | 1.59% |
| 2048 | 166,916 | 48,394,401 | 3,136,107 | 890,000 | | | 4,704,375 | 57,291,799 | 57,208,341 | - | 166,916 | 166,916 | 0.29% |
| 2049 | 338,839 | 48,394,401 | 3,136,107 | 890,000 | | | 4,704,375 | 57,463,722 | 57,377,760 | - | 338,839 | 338,839 | 0.59% |
| 2050 | 515,920 | 48,394,401 | 3,136,107 | 890,000 | | | 4,704,375 | 57,640,803 | 57,552,262 | - | 515,920 | 515,920 | 0.90% |

Note: QLICI loans used within 12 months are reasonable working capital; interest reserve held to pay construction period interest  is assumed to be reasonable working capital
* Interest Reserve held post-completion is included in NQFP

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048533

**1501 Washington**

**1501 WASHINGTON ST. LOUIS, LLC**

| | First Mortgage | | USBCDE SUB-CDE 162, LLC Loan A | | USBCDE SUB-CDE 162, LLC Loan B | | Bridge/Mezz Loan* | |
|---|---|---|---|---|---|---|---|---|
| Principal | 12,300,000 | | 1,079,785 | | 570,215 | | 26,000,000 | |
| Interest Only Period | 36.00 | Months | 84.07 | Months | 84.07 | Months | 18.00 | Months |
| Interest Rate - Interest Only | 5.5000% | | 2.3108% | | 2.3108% | | 8.0000% | |
| Interest Rate - Amortization | 5.5000% | | 2.3108% | | 2.3108% | | 8.0000% | |
| Amortization | 300.00 | Months | 312.00 | Months | 312.00 | Months | - | Months |
| Term | 36.00 | Months | 396.07 | Months | 396.07 | Months | 18.00 | Months |
| | | | | | | | | |
| Commencement | 12/29/2017 | | 12/29/2017 | | 12/29/2017 | | 12/29/2017 | |
| First Interest Only Payment | 12/29/2017 | | 12/29/2017 | | 12/29/2017 | | 12/29/2017 | |
| | | | | | | | | |
| Amortization Begins | 12/29/2020 | | 1/1/2025 | | 1/1/2025 | | | |
| First Amortization Payment | 1/1/2021 | | 3/1/2025 | | 3/1/2025 | | | |
| | | | | | | | | |
| Days in Year for Calculating Interest | 360 | | 360 | | 360 | | 360 | |
| Interest Calculation Methodology | Actual Days Incurred | | 30-Day Months | | 30-Day Months | | Actual Days Incurred | |

| | ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan A | | ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan B | | Refinanced Loan (First Mortgage) | | Mezz Loan Extended Term | |
|---|---|---|---|---|---|---|---|---|
| Principal | 4,246,350 | | 1,993,650 | | 21,300,000 | | 9,000,000 | |
| Interest Only Period | 84.07 | Months | 84.07 | Months | - | Months | 18.00 | Months |
| Interest Rate - Interest Only | 2.3108% | | 2.3108% | | - | | 8.0000% | |
| Interest Rate - Amortization | 2.3108% | | 2.3108% | | 6.000% | | 8.0000% | |
| Amortization | 312.00 | Months | 312.00 | Months | 300.00 | Months | - | Months |
| Term | 396.07 | Months | 396.07 | Months | 300.00 | Months | 18.00 | Months |
| | | | | | | | | |
| Commencement | 12/29/2017 | | 12/29/2017 | | 12/29/2020 | | 6/29/2019 | |
| First Interest Only Payment | 12/29/2017 | | 12/29/2017 | | - | | 6/29/2019 | |
| | | | | | | | | |
| Amortization Begins | 1/1/2025 | | 1/1/2025 | | 12/29/2020 | | | |
| First Amortization Payment | 3/1/2025 | | 3/1/2025 | | 1/1/2021 | | | |
| | | | | | | | | |
| Days in Year for Calculating Interest | 360 | | 360 | | 360 | | 360 | |
| Interest Calculation Methodology | 30-Day Months | | 30-Day Months | | 30-Day Months | | Actual Days Incurred | |

*Rates Increases to 13% if at least $17 Million is not prepaid before the 16th month.

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048534

**1501 Washington**

1501 WASHINGTON ST. LOUIS, LLC DEBT SERVICE SUMMARY

### Debt Service (Cash)

| Year | First Mortgage | HTC Mezz Loan | HTC Bridge Loan | USBCDE SUB-CDE 162, LLC Loan A | USBCDE SUB-CDE 162, LLC Loan B | ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan A | ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan B | Refinanced Loan (First Mortgage) | Interest During Construction | Total Project Debt Service |
|---|---|---|---|---|---|---|---|---|---|---|
| 2017 | - | - | - | 139 | 73 | 545 | 256 | - | (1,013) | - |
| 2018 | 60,313 | 720,000 | 1,360,000 | 24,952 | 13,177 | 98,125 | 46,069 | - | (2,322,635) | 718,013 |
| 2019 | 654,156 | 360,000 | 680,000 | 24,952 | 13,177 | 98,125 | 46,069 | - | (1,157,865) | 718,013 |
| 2020 | 627,642 | - | - | 24,952 | 13,177 | 98,125 | 46,069 | 13,281 | - | 823,245 |
| 2021 | - | - | - | 24,952 | 13,177 | 98,125 | 46,069 | 1,646,834 | - | 1,829,157 |
| 2022 | - | - | - | 24,952 | 13,177 | 98,125 | 46,069 | 1,646,834 | - | 1,829,157 |
| 2023 | - | - | - | 24,952 | 13,177 | 98,125 | 46,069 | 1,646,834 | - | 1,829,157 |
| 2024 | - | - | - | 24,952 | 13,177 | 98,125 | 46,069 | 1,646,834 | - | 1,829,157 |
| 2025 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | 1,646,834 | - | 2,051,381 |
| 2026 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | 1,646,834 | - | 2,051,381 |
| 2027 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | 1,646,834 | - | 2,051,381 |
| 2028 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | 1,646,834 | - | 2,051,381 |
| 2029 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | 1,646,834 | - | 2,051,381 |
| 2030 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | 1,646,834 | - | 2,051,381 |
| 2031 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | 1,646,834 | - | 2,051,381 |
| 2032 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | 1,646,834 | - | 2,051,381 |
| 2033 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | 1,646,834 | - | 2,051,381 |
| 2034 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | 1,646,834 | - | 2,051,381 |
| 2035 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | 1,646,834 | - | 2,051,381 |
| 2036 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | 1,646,834 | - | 2,051,381 |
| 2037 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | 1,646,834 | - | 2,051,381 |
| 2038 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | 1,646,834 | - | 2,051,381 |
| 2039 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | 1,646,834 | - | 2,051,381 |
| 2040 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | 1,646,834 | - | 2,051,381 |
| 2041 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | 1,646,834 | - | 2,051,381 |
| 2042 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | 1,646,834 | - | 2,051,381 |
| 2043 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | 1,646,834 | - | 2,051,381 |
| 2044 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | 1,646,834 | - | 2,051,381 |
| 2045 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | 1,633,484 | - | 2,038,040 |
| 2046 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | - | - | 404,546 |
| 2047 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | - | - | 404,546 |
| 2048 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | - | - | 404,546 |
| 2049 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | - | - | 404,546 |
| 2050 | - | - | - | 55,364 | 29,237 | 217,724 | 102,221 | - | - | 404,546 |
| | 1,342,111 | 1,080,000 | 2,040,000 | 1,614,268 | 852,466 | 6,348,253 | 2,980,408 | 41,170,800 | (3,481,513) | 53,946,872 |

### Interest (Tax)

| Year | First Mortgage | HTC Mezz Loan | HTC Bridge Loan | USBCDE SUB-CDE 162, LLC Loan A | USBCDE SUB-CDE 162, LLC Loan B | ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan A | ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan B | Refinanced Loan (First Mortgage) | Interest During Construction | Total Interest |
|---|---|---|---|---|---|---|---|---|---|---|
| 2017 | - | - | - | 139 | 73 | 545 | 256 | - | (1,013) | - |
| 2018 | 60,313 | 720,000 | 1,360,000 | 24,952 | 13,177 | 98,125 | 46,069 | - | (2,322,635) | 718,013 |
| 2019 | 654,156 | 360,000 | 680,000 | 24,952 | 13,177 | 98,125 | 46,069 | - | (1,157,865) | 718,013 |
| 2020 | 627,642 | - | - | 24,952 | 13,177 | 98,125 | 46,069 | 10,300 | - | 820,270 |
| 2021 | - | - | - | 24,952 | 13,177 | 98,125 | 46,069 | 1,267,503 | - | 1,449,825 |
| 2022 | - | - | - | 24,952 | 13,177 | 98,125 | 46,069 | 1,244,105 | - | 1,426,428 |
| 2023 | - | - | - | 24,952 | 13,177 | 98,125 | 46,069 | 1,219,267 | - | 1,401,590 |
| 2024 | - | - | - | 24,952 | 13,177 | 98,125 | 46,069 | 1,192,895 | - | 1,375,218 |
| 2025 | - | - | - | 24,087 | 13,037 | 97,084 | 45,681 | 1,164,898 | - | 1,345,287 |
| 2026 | - | - | - | 23,972 | 12,659 | 94,272 | 44,261 | 1,135,173 | - | 1,310,337 |
| 2027 | - | - | - | 23,240 | 12,273 | 91,395 | 42,910 | 1,103,614 | - | 1,273,432 |
| 2028 | - | - | - | 22,492 | 11,877 | 88,450 | 41,527 | 1,070,110 | - | 1,234,456 |
| 2029 | - | - | - | 21,725 | 11,473 | 85,437 | 40,112 | 1,034,539 | - | 1,193,286 |
| 2030 | - | - | - | 20,941 | 11,059 | 82,353 | 38,665 | 996,774 | - | 1,149,792 |
| 2031 | - | - | - | 20,139 | 10,635 | 79,198 | 37,183 | 956,679 | - | 1,103,826 |
| 2032 | - | - | - | 19,318 | 10,201 | 75,969 | 35,667 | 914,112 | - | 1,055,268 |
| 2033 | - | - | - | 18,478 | 9,758 | 72,665 | 34,116 | 868,919 | - | 1,003,936 |
| 2034 | - | - | - | 17,618 | 9,304 | 69,284 | 32,529 | 820,936 | - | 949,673 |
| 2035 | - | - | - | 16,738 | 8,839 | 65,824 | 30,904 | 770,000 | - | 892,305 |
| 2036 | - | - | - | 15,838 | 8,364 | 62,283 | 29,242 | 715,919 | - | 831,645 |
| 2037 | - | - | - | 14,915 | 7,877 | 58,660 | 27,541 | 658,502 | - | 767,496 |
| 2038 | - | - | - | 13,974 | 7,379 | 54,952 | 25,800 | 597,544 | - | 699,649 |
| 2039 | - | - | - | 13,009 | 6,870 | 51,158 | 24,019 | 532,826 | - | 627,881 |
| 2040 | - | - | - | 12,022 | 6,348 | 47,276 | 22,196 | 464,110 | - | 551,957 |
| 2041 | - | - | - | 11,011 | 5,815 | 43,303 | 20,330 | 391,169 | - | 471,628 |
| 2042 | - | - | - | 9,977 | 5,269 | 39,237 | 18,422 | 313,722 | - | 386,627 |
| 2043 | - | - | - | 8,919 | 4,710 | 35,077 | 16,468 | 231,489 | - | 296,673 |
| 2044 | - | - | - | 7,837 | 4,139 | 30,819 | 14,470 | 144,204 | - | 201,468 |
| 2045 | - | - | - | 6,729 | 3,554 | 26,460 | 12,424 | 51,465 | - | 100,635 |
| 2046 | - | - | - | 5,595 | 2,955 | 22,005 | 10,331 | - | - | 40,886 |
| 2047 | - | - | - | 4,435 | 2,342 | 17,443 | 8,189 | - | - | 32,410 |
| 2048 | - | - | - | 3,248 | 1,715 | 12,774 | 5,997 | - | - | 23,734 |
| 2049 | - | - | - | 2,034 | 1,074 | 7,997 | 3,755 | - | - | 14,859 |
| 2050 | - | - | - | 790 | 417 | 3,109 | 1,459 | - | - | 5,776 |
| | 1,342,111 | 1,080,000 | 2,040,000 | 534,403 | 282,251 | 2,101,903 | 986,838 | 19,870,800 | (3,481,513) | 24,756,872 |

Confidential
USBCDC00048535

## 1501 Washington

**1501 WASHINGTON ST. LOUIS, LLC LOAN AMORTIZATION SCHEDULE**

First Mortgage

| | |
|---|---|
| Principal | 12,300,000 |
| Interest Only Rate | 5.50000% |
| Amortizing Rate | 5.50000% |
| Commencement | 12/29/2017 |
| Amortization Begins | 12/29/2020 |
| Interest Only Period | 36.00   Months |
| Term in Months | 36.00   Months |
| | |
| Days in Year for Calculating Interest | 360 |
| Interest Calculation Methodology | Actual Days Incurred |

\* Rate will float at 30 day LIBOR + 400 bp.  Rate reflected is for illustrative purposes only.

| Year | Payment | Principal | Interest | Repayment/ Refinance | Balance |
|---|---|---|---|---|---|
| | | | | | - |
| 2017 | - | - | - | - | - |
| 2018 | 60,313 | - | 60,313 | - | 7,986,520 |
| 2019 | 654,156 | - | 654,156 | - | 12,300,000 |
| 2020 | 627,642 | - | 627,642 | 12,300,000 | - |
| 2021 | - | - | - | - | - |
| 2022 | - | - | - | - | - |
| 2023 | - | - | - | - | - |
| 2024 | - | - | - | - | - |
| | 1,342,111 | - | 1,342,111 | 12,300,000 | |

See Summary of Significant Assumptions and Accountant's Report

12/29/2017

Confidential

USBCDC00048536

**1501 Washington**

**1501 WASHINGTON ST. LOUIS, LLC LOAN AMORTIZATION SCHEDULE**
Mezz Loan Extended Term  via DFQ Equity

| | | |
|---|---|---|
| Principal | 9,000,000 | |
| Interest Only Rate | 8.00000% | |
| Commencement | 6/29/2019 | |
| Interest Only Period | 18.00 | Months |
| Term in Months | 18.00 | Months |
| | | |
| Days in Year for Calculating Interest | 360 | |
| Interest Calculation Methodology | Actual Days Incurred | |

| Year | Payment | Principal | Interest | Refinance | Balance |
|---|---|---|---|---|---|
| 2019 | 372,000 | - | 372,000 | - | - |
| 2020 | 668,000 | - | 668,000 | 9,000,000 | 9,000,000 |
| 2021 | - | - | - | - | - |
| 2022 | - | - | - | - | - |
| 2023 | - | - | - | - | - |
| 2024 | - | - | - | - | - |
| 2025 | - | - | - | - | - |
| 2026 | - | - | - | - | - |
| 2027 | - | - | - | - | - |
| 2028 | - | - | - | - | - |
| 2029 | - | - | - | - | - |
| 2030 | - | - | - | - | - |
| 2031 | - | - | - | - | - |
| 2032 | - | - | - | - | - |
| 2033 | - | - | - | - | - |
| 2034 | - | - | - | - | - |
| 2035 | - | - | - | - | - |
| 2036 | - | - | - | - | - |
| 2037 | - | - | - | - | - |
| 2038 | - | - | - | - | - |
| 2039 | - | - | - | - | - |
| 2040 | - | - | - | - | - |
| 2041 | - | - | - | - | - |
| 2042 | - | - | - | - | - |
| 2043 | - | - | - | - | - |
| 2044 | - | - | - | - | - |
| 2045 | - | - | - | - | - |
| 2046 | - | - | - | - | - |
| 2047 | - | - | - | - | - |
| 2048 | - | - | - | - | - |
| 2049 | - | - | - | - | - |
| 2050 | - | - | - | - | - |
| | 1,040,000 | - | 1,040,000 | 9,000,000 | |

Note:  A deposit of $1,080,000 associated with the Extended Term of the Mezzanine Financing, if necessary, will be handled via capital contribution from sponsor

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048537

**1501 Washington**

**1501 WASHINGTON ST. LOUIS, LLC LOAN AMORTIZATION SCHEDULE**

Refinanced Loan (First Mortgage)

| | | |
|---|---|---|
| Principal | 21,300,000 | |
| Amortizing Rate | 6.000% * | |
| Commencement | 12/29/2020 | |
| Amortization Begins | 12/29/2020 First Amortizing Payment | 1/1/2021 |
| Amortization | 300 Months * | |
| Term in Months | 300 Months * | |
| | | |
| Monthly Payment (Amortizing) | 137,236.20 | |
| Annual Payment (Amortizing) | 1,646,834.38 | |
| | | |
| Days in Year for Calculating Interest | 360 | |
| Interest Calculation Methodology | 30-Day Months | |
| Refinance Fee | 0.00% * | |
| * Interest rate, terms and fee are an assumption. | | |

| Refinance Analysis | |
|---|---|
| 2020 MT NOI | 2,727,245 |
| Cap Rate | 7.50% |
| Valuation | 36,363,270 |
| Refi Principal | 21,300,000 |
| LTV | 58.58% |

| Year | Payment | Principal | Interest | Refinance | Balance |
|---|---|---|---|---|---|
| | | | | | 21,300,000 |
| 2020 | 13,281 | 2,974 | 10,306 | - | 21,297,026 |
| 2021 | 1,646,834 | 379,332 | 1,267,503 | - | 20,917,694 |
| 2022 | 1,646,834 | 402,728 | 1,244,106 | - | 20,514,966 |
| 2023 | 1,646,834 | 427,567 | 1,219,267 | - | 20,087,398 |
| 2024 | 1,646,834 | 453,939 | 1,192,895 | - | 19,633,459 |
| 2025 | 1,646,834 | 481,937 | 1,164,898 | - | 19,151,522 |
| 2026 | 1,646,834 | 511,662 | 1,135,173 | - | 18,639,861 |
| 2027 | 1,646,834 | 543,220 | 1,103,615 | - | 18,096,641 |
| 2028 | 1,646,834 | 576,724 | 1,070,110 | - | 17,519,916 |
| 2029 | 1,646,834 | 612,296 | 1,034,539 | - | 16,907,621 |
| 2030 | 1,646,834 | 650,061 | 996,774 | - | 16,257,560 |
| 2031 | 1,646,834 | 690,155 | 956,679 | - | 15,567,405 |
| 2032 | 1,646,834 | 732,722 | 914,112 | - | 14,834,683 |
| 2033 | 1,646,834 | 777,915 | 868,919 | - | 14,056,768 |
| 2034 | 1,646,834 | 825,895 | 820,939 | - | 13,230,873 |
| 2035 | 1,646,834 | 876,834 | 770,000 | - | 12,354,039 |
| 2036 | 1,646,834 | 930,916 | 715,919 | - | 11,423,123 |
| 2037 | 1,646,834 | 988,332 | 658,502 | - | 10,434,791 |
| 2038 | 1,646,834 | 1,049,291 | 597,544 | - | 9,385,500 |
| 2039 | 1,646,834 | 1,114,009 | 532,826 | - | 8,271,491 |
| 2040 | 1,646,834 | 1,182,718 | 464,116 | - | 7,088,773 |
| 2041 | 1,646,834 | 1,255,666 | 391,169 | - | 5,833,108 |
| 2042 | 1,646,834 | 1,333,112 | 313,722 | - | 4,499,995 |
| 2043 | 1,646,834 | 1,415,336 | 231,499 | - | 3,084,659 |
| 2044 | 1,646,834 | 1,502,631 | 144,204 | - | 1,582,029 |
| 2045 | 1,633,494 | 1,582,029 | 51,465 | - | - |
| 2046 | - | - | - | - | - |
| | 41,170,800 | 21,300,000 | 19,870,800 | - | |

See Summary of Significant Assumptions and Accountant's Report

12/29/2017

Confidential

**1501 Washington**

**1501 WASHINGTON ST. LOUIS, LLC LOAN AMORTIZATION SCHEDULE**

USBCDE SUB-CDE 162, LLC Loan A

| | |
|---|---|
| Principal | 1,079,785 |
| Interest Only Rate | 2.3108% |
| Amortizing Rate | 2.3108% |
| Commencement | 12/29/2017 |
| Amortization Begins | 1/1/2025 |
| Interest Only Period | 84.07 |
| Amortization | 312.00 |
| Term in Months | 396.07 |
| | |
| Quarterly Payment (Amortizing) | 13,841.04 |
| Annual Payment (Amortizing) | 55,364.15 |
| | |
| Payments Made | Quarterly in Arrears/Advance |
| | |
| Days in Year for Calculating Interest | 360 |
| Interest Calculation Methodology | 30-Day Months |

Note: Payments are made quarterly partially in arrears and partially in advance for the period from the beginning through the end of each calendar quarter.

| Year | Payment | Principal | Interest | Refinance | Balance |
|------|---------|-----------|----------|-----------|---------|
| | | | | | 1,079,785 |
| 2017 | 139 | - | 139 | - | 1,079,785 |
| 2018 | 24,952 | - | 24,952 | - | 1,079,785 |
| 2019 | 24,952 | - | 24,952 | - | 1,079,785 |
| 2020 | 24,952 | - | 24,952 | - | 1,079,785 |
| 2021 | 24,952 | - | 24,952 | - | 1,079,785 |
| 2022 | 24,952 | - | 24,952 | - | 1,079,785 |
| 2023 | 24,952 | - | 24,952 | - | 1,079,785 |
| 2024 | 24,952 | - | 24,952 | - | 1,079,785 |
| 2025 | 55,364 | 30,677 | 24,687 | - | 1,049,108 |
| 2026 | 55,364 | 31,392 | 23,972 | - | 1,017,716 |
| 2027 | 55,364 | 32,124 | 23,240 | - | 985,592 |
| 2028 | 55,364 | 32,873 | 22,492 | - | 952,719 |
| 2029 | 55,364 | 33,639 | 21,725 | - | 919,081 |
| 2030 | 55,364 | 34,423 | 20,941 | - | 884,658 |
| 2031 | 55,364 | 35,225 | 20,139 | - | 849,433 |
| 2032 | 55,364 | 36,046 | 19,318 | - | 813,386 |
| 2033 | 55,364 | 36,887 | 18,478 | - | 776,500 |
| 2034 | 55,364 | 37,746 | 17,618 | - | 738,753 |
| 2035 | 55,364 | 38,626 | 16,738 | - | 700,127 |
| 2036 | 55,364 | 39,526 | 15,838 | - | 660,601 |
| 2037 | 55,364 | 40,448 | 14,916 | - | 620,153 |
| 2038 | 55,364 | 41,391 | 13,974 | - | 578,762 |
| 2039 | 55,364 | 42,355 | 13,009 | - | 536,407 |
| 2040 | 55,364 | 43,343 | 12,022 | - | 493,064 |
| 2041 | 55,364 | 44,353 | 11,011 | - | 448,711 |
| 2042 | 55,364 | 45,387 | 9,977 | - | 403,325 |
| 2043 | 55,364 | 46,445 | 8,919 | - | 356,880 |
| 2044 | 55,364 | 47,527 | 7,837 | - | 309,353 |
| 2045 | 55,364 | 48,635 | 6,729 | - | 260,718 |
| 2046 | 55,364 | 49,769 | 5,595 | - | 210,949 |
| 2047 | 55,364 | 50,929 | 4,435 | - | 160,020 |
| 2048 | 55,364 | 52,116 | 3,248 | - | 107,904 |
| 2049 | 55,364 | 53,331 | 2,034 | - | 54,574 |
| 2050 | 55,364 | 54,574 | 790 | (0) | - |
| | 1,614,268 | 1,079,785 | 534,483 | (0) | |

See Summary of Significant Assumptions and Accountant's Report

Confidential

**1501 Washington**

**1501 WASHINGTON ST. LOUIS, LLC LOAN AMORTIZATION SCHEDULE**

USBCDE SUB-CDE 162, LLC Loan B

| | |
|---|---|
| Principal | 570,215 |
| Interest Only Rate | 2.3108% |
| Amortizing Rate | 2.3108% |
| Commencement | 12/29/2017 |
| Amortization Begins | 1/1/2025 |
| Interest Only Period | 84.07 |
| Amortization | 312.00 |
| Term in Months | 396.07 |
| | |
| Quarterly Payment (Amortizing) | 7,309.20 |
| Annual Payment (Amortizing) | 29,236.81 |
| | |
| Payments Made | Quarterly in Arrears/Advance |
| | |
| Days in Year for Calculating Interest | 360 |
| Interest Calculation Methodology | 30-Day Months |

Note: Payments are made quarterly partially in arrears and partially in advance for the period from the beginning through the end of each calendar quarter.

| Year | Payment | Principal | Interest | Refinance | Balance |
|---|---|---|---|---|---|
| | | | | | 570,215 |
| 2017 | 73 | - | 73 | - | 570,215 |
| 2018 | 13,177 | - | 13,177 | - | 570,215 |
| 2019 | 13,177 | - | 13,177 | - | 570,215 |
| 2020 | 13,177 | - | 13,177 | - | 570,215 |
| 2021 | 13,177 | - | 13,177 | - | 570,215 |
| 2022 | 13,177 | - | 13,177 | - | 570,215 |
| 2023 | 13,177 | - | 13,177 | - | 570,215 |
| 2024 | 13,177 | - | 13,177 | - | 570,215 |
| 2025 | 29,237 | 16,200 | 13,037 | - | 554,015 |
| 2026 | 29,237 | 16,578 | 12,659 | - | 537,437 |
| 2027 | 29,237 | 16,964 | 12,273 | - | 520,473 |
| 2028 | 29,237 | 17,359 | 11,877 | - | 503,114 |
| 2029 | 29,237 | 17,764 | 11,473 | - | 485,350 |
| 2030 | 29,237 | 18,178 | 11,059 | - | 467,172 |
| 2031 | 29,237 | 18,602 | 10,635 | - | 448,570 |
| 2032 | 29,237 | 19,035 | 10,201 | - | 429,535 |
| 2033 | 29,237 | 19,479 | 9,758 | - | 410,055 |
| 2034 | 29,237 | 19,933 | 9,304 | - | 390,122 |
| 2035 | 29,237 | 20,398 | 8,839 | - | 369,725 |
| 2036 | 29,237 | 20,873 | 8,364 | - | 348,851 |
| 2037 | 29,237 | 21,360 | 7,877 | - | 327,492 |
| 2038 | 29,237 | 21,858 | 7,379 | - | 305,634 |
| 2039 | 29,237 | 22,367 | 6,870 | - | 283,267 |
| 2040 | 29,237 | 22,888 | 6,348 | - | 260,378 |
| 2041 | 29,237 | 23,422 | 5,815 | - | 236,956 |
| 2042 | 29,237 | 23,968 | 5,269 | - | 212,988 |
| 2043 | 29,237 | 24,527 | 4,710 | - | 188,462 |
| 2044 | 29,237 | 25,098 | 4,139 | - | 163,364 |
| 2045 | 29,237 | 25,683 | 3,554 | - | 137,680 |
| 2046 | 29,237 | 26,282 | 2,955 | - | 111,398 |
| 2047 | 29,237 | 26,895 | 2,342 | - | 84,504 |
| 2048 | 29,237 | 27,521 | 1,715 | - | 56,982 |
| 2049 | 29,237 | 28,163 | 1,074 | - | 28,819 |
| 2050 | 29,237 | 28,819 | 417 | 0 | - |
| | 852,466 | 570,215 | 282,251 | 0 | |

See Summary of Significant Assumptions and Accountant's Report

Confidential

**1501 Washington**

**1501 WASHINGTON ST. LOUIS, LLC LOAN AMORTIZATION SCHEDULE**

ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan A

| | |
|---|---|
| Principal | 4,246,350 |
| Interest Only Rate | 2.3108% |
| Amortizing Rate | 2.3108% |
| Commencement | 12/29/2017 |
| Amortization Begins | 1/1/2025 |
| Interest Only Period | 84.07 |
| Amortization | 312.00 |
| Term in Months | 396.07 |
| | |
| Quarterly Payment (Amortizing) | 54,431.11 |
| Annual Payment (Amortizing) | 217,724.43 |
| | |
| Payments Made | Quarterly in Arrears/Advance |
| | |
| Days in Year for Calculating Interest | 360 |
| Interest Calculation Methodology | 30-Day Months |

Note: Payments are made quarterly partially in arrears and partially in advance for the period from the beginning through the end of each calendar quarter.

| Year | Payment | Principal | Interest | Refinance | Balance |
|------|---------|-----------|----------|-----------|---------|
| | | | | | 4,246,350 |
| 2017 | 545 | - | 545 | - | 4,246,350 |
| 2018 | 98,125 | - | 98,125 | - | 4,246,350 |
| 2019 | 98,125 | - | 98,125 | - | 4,246,350 |
| 2020 | 98,125 | - | 98,125 | - | 4,246,350 |
| 2021 | 98,125 | - | 98,125 | - | 4,246,350 |
| 2022 | 98,125 | - | 98,125 | - | 4,246,350 |
| 2023 | 98,125 | - | 98,125 | - | 4,246,350 |
| 2024 | 98,125 | - | 98,125 | - | 4,246,350 |
| 2025 | 217,724 | 120,640 | 97,084 | - | 4,125,710 |
| 2026 | 217,724 | 123,452 | 94,272 | - | 4,002,258 |
| 2027 | 217,724 | 126,330 | 91,395 | - | 3,875,928 |
| 2028 | 217,724 | 129,274 | 88,450 | - | 3,746,654 |
| 2029 | 217,724 | 132,288 | 85,437 | - | 3,614,366 |
| 2030 | 217,724 | 135,371 | 82,353 | - | 3,478,995 |
| 2031 | 217,724 | 138,526 | 79,198 | - | 3,340,468 |
| 2032 | 217,724 | 141,755 | 75,969 | - | 3,198,713 |
| 2033 | 217,724 | 145,060 | 72,665 | - | 3,053,654 |
| 2034 | 217,724 | 148,441 | 69,284 | - | 2,905,213 |
| 2035 | 217,724 | 151,901 | 65,824 | - | 2,753,312 |
| 2036 | 217,724 | 155,441 | 62,283 | - | 2,597,871 |
| 2037 | 217,724 | 159,065 | 58,660 | - | 2,438,806 |
| 2038 | 217,724 | 162,772 | 54,952 | - | 2,276,034 |
| 2039 | 217,724 | 166,566 | 51,158 | - | 2,109,468 |
| 2040 | 217,724 | 170,449 | 47,276 | - | 1,939,019 |
| 2041 | 217,724 | 174,422 | 43,303 | - | 1,764,597 |
| 2042 | 217,724 | 178,487 | 39,237 | - | 1,586,110 |
| 2043 | 217,724 | 182,648 | 35,077 | - | 1,403,462 |
| 2044 | 217,724 | 186,905 | 30,819 | - | 1,216,557 |
| 2045 | 217,724 | 191,262 | 26,463 | - | 1,025,295 |
| 2046 | 217,724 | 195,720 | 22,005 | - | 829,575 |
| 2047 | 217,724 | 200,282 | 17,443 | - | 629,293 |
| 2048 | 217,724 | 204,950 | 12,774 | - | 424,343 |
| 2049 | 217,724 | 209,727 | 7,997 | - | 214,616 |
| 2050 | 217,724 | 214,616 | 3,109 | 0 | - |
| | 6,348,253 | 4,246,350 | 2,101,903 | 0 | |

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048541

**1501 Washington**

**1501 WASHINGTON ST. LOUIS, LLC LOAN AMORTIZATION SCHEDULE**

ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Loan B

| | |
|---|---|
| Principal | 1,993,650 |
| Interest Only Rate | 2.3108% |
| Amortizing Rate | 2.3108% |
| Commencement | 12/29/2017 |
| Amortization Begins | 1/1/2025 |
| Interest Only Period | 84.07 |
| Amortization | 312.00 |
| Term in Months | 396.07 |
| | |
| Quarterly Payment (Amortizing) | 25,555.26 |
| Annual Payment (Amortizing) | 102,221.04 |
| | |
| Payments Made | Quarterly in Arrears/Advance |
| | |
| Days in Year for Calculating Interest | 360 |
| Interest Calculation Methodology | 30-Day Months |

Note: Payments are made quarterly partially in arrears and partially in advance for the period
from the beginning through the end of each calendar quarter.

| Year | Payment | Principal | Interest | Refinance | Balance |
|---|---|---|---|---|---|
| 2017 | 256 | - | 256 | - | 1,993,650 |
| 2018 | 46,069 | - | 46,069 | - | 1,993,650 |
| 2019 | 46,069 | - | 46,069 | - | 1,993,650 |
| 2020 | 46,069 | - | 46,069 | - | 1,993,650 |
| 2021 | 46,069 | - | 46,069 | - | 1,993,650 |
| 2022 | 46,069 | - | 46,069 | - | 1,993,650 |
| 2023 | 46,069 | - | 46,069 | - | 1,993,650 |
| 2024 | 46,069 | - | 46,069 | - | 1,993,650 |
| 2025 | 102,221 | 56,640 | 45,581 | - | 1,937,010 |
| 2026 | 102,221 | 57,960 | 44,261 | - | 1,879,049 |
| 2027 | 102,221 | 59,311 | 42,910 | - | 1,819,738 |
| 2028 | 102,221 | 60,694 | 41,527 | - | 1,759,044 |
| 2029 | 102,221 | 62,109 | 40,112 | - | 1,696,935 |
| 2030 | 102,221 | 63,556 | 38,665 | - | 1,633,379 |
| 2031 | 102,221 | 65,038 | 37,183 | - | 1,568,341 |
| 2032 | 102,221 | 66,554 | 35,667 | - | 1,501,787 |
| 2033 | 102,221 | 68,105 | 34,116 | - | 1,433,682 |
| 2034 | 102,221 | 69,693 | 32,529 | - | 1,363,990 |
| 2035 | 102,221 | 71,317 | 30,904 | - | 1,292,673 |
| 2036 | 102,221 | 72,979 | 29,242 | - | 1,219,693 |
| 2037 | 102,221 | 74,680 | 27,541 | - | 1,145,013 |
| 2038 | 102,221 | 76,421 | 25,800 | - | 1,068,592 |
| 2039 | 102,221 | 78,202 | 24,019 | - | 990,389 |
| 2040 | 102,221 | 80,025 | 22,196 | - | 910,364 |
| 2041 | 102,221 | 81,891 | 20,330 | - | 828,474 |
| 2042 | 102,221 | 83,799 | 18,422 | - | 744,674 |
| 2043 | 102,221 | 85,753 | 16,468 | - | 658,922 |
| 2044 | 102,221 | 87,751 | 14,470 | - | 571,170 |
| 2045 | 102,221 | 89,797 | 12,424 | - | 481,373 |
| 2046 | 102,221 | 91,890 | 10,331 | - | 389,483 |
| 2047 | 102,221 | 94,032 | 8,189 | - | 295,452 |
| 2048 | 102,221 | 96,224 | 5,997 | - | 199,228 |
| 2049 | 102,221 | 98,466 | 3,755 | - | 100,762 |
| 2050 | 102,221 | 100,762 | 1,459 | 0 | - |
| | 2,980,488 | 1,993,650 | 986,838 | 0 | |

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048542

**1501 Washington**

## 1501 WASHINGTON ST. LOUIS, LLC DEPRECIATION SCHEDULE

| Depreciation Start Date | Acquisition Basis Feb-19 | Rehab Expense Feb-19 | QIP Feb-19 | Personal Property Feb-19 | Total |
|---|---|---|---|---|---|
| Total Capitalized Costs | 3,560,000 | 9,639,998 | 34,178,176 | 1,016,227 | 48,394,401 |
| Total Basis | 3,560,000 | 9,639,998 | 34,178,176 | 1,016,227 | 48,394,401 |

| Year | Acquisition Basis 39.00 | Rehab Expense 39.00 | QIP 15.00 | Personal Property 7.00 | Total |
|---|---|---|---|---|---|
| 2019 | 79,872 | 216,282 | 2,088,666 | 254,057 | 2,638,877 |
| 2020 | 91,282 | 247,179 | 2,278,545 | 217,777 | 2,834,784 |
| 2021 | 91,282 | 247,179 | 2,278,545 | 155,584 | 2,772,591 |
| 2022 | 91,282 | 247,179 | 2,278,545 | 111,074 | 2,728,080 |
| 2023 | 91,282 | 247,179 | 2,278,545 | 88,920 | 2,705,926 |
| 2024 | 91,282 | 247,179 | 2,278,545 | 88,818 | 2,705,825 |
| 2025 | 91,282 | 247,179 | 2,278,545 | 88,920 | 2,705,926 |
| 2026 | 91,282 | 247,179 | 2,278,545 | 11,077 | 2,628,083 |
| 2027 | 91,282 | 247,179 | 2,278,545 | - | 2,617,007 |
| 2028 | 91,282 | 247,179 | 2,278,545 | - | 2,617,007 |
| 2029 | 91,282 | 247,179 | 2,278,545 | - | 2,617,007 |
| 2030 | 91,282 | 247,179 | 2,278,545 | - | 2,617,007 |
| 2031 | 91,282 | 247,179 | 2,278,545 | - | 2,617,007 |
| 2032 | 91,282 | 247,179 | 2,278,545 | - | 2,617,007 |
| 2033 | 91,282 | 247,179 | 2,278,545 | - | 2,617,007 |
| 2034 | 91,282 | 247,179 | 189,879 | - | 528,340 |
| 2035 | 91,282 | 247,179 | - | - | 338,461 |
| 2036 | 91,282 | 247,179 | - | - | 338,461 |
| 2037 | 91,282 | 247,179 | - | - | 338,461 |
| 2038 | 91,282 | 247,179 | - | - | 338,461 |
| 2039 | 91,282 | 247,179 | - | - | 338,461 |
| 2040 | 91,282 | 247,179 | - | - | 338,461 |
| 2041 | 91,282 | 247,179 | - | - | 338,461 |
| 2042 | 91,282 | 247,179 | - | - | 338,461 |
| 2043 | 91,282 | 247,179 | - | - | 338,461 |
| 2044 | 91,282 | 247,179 | - | - | 338,461 |
| 2045 | 91,282 | 247,179 | - | - | 338,461 |
| 2046 | 91,282 | 247,179 | - | - | 338,461 |
| 2047 | 91,282 | 247,179 | - | - | 338,461 |
| 2048 | 91,282 | 247,179 | - | - | 338,461 |
| 2049 | 91,282 | 247,179 | - | - | 338,461 |
| 2050 | 91,282 | 247,179 | - | - | 338,461 |
| Total | 2,909,615 | 7,878,845 | 34,178,176 | 1,016,227 | 45,982,863 |

The model has allocated costs to Qualified Improvement Property in accordance with Section 13204 of the 2017 Tax Act. The 2017 Tax Act is subject to further amendments and interpretation.

The model assumes that Qualified Improvement Property is depreciated straight line over 15 years and that the QALICB will elect out of bonus depreciation.

Confidential

USBCDC00048543

**1501 Washington**

**1501 WASHINGTON ST. LOUIS, LLC DEPRECIATION SCHEDULE - REPLACEMENT RESERVES**

|  | 2024 | 2030 | 2036 | 2042 | 2048 | Total |
|---|---|---|---|---|---|---|
| Replacement Reserves | 309,299 | 531,131 | 634,198 | 757,265 | 904,214 | 3,136,107 |

| Year | 2024 Replacement Reserves | 2030 Replacement Reserves | 2036 Replacement Reserves | 2042 Replacement Reserves | 2048 Replacement Reserves | Total |
|---|---|---|---|---|---|---|
| 2019 | - | - | - | - | - | - |
| 2020 | - | - | - | - | - | - |
| 2021 | - | - | - | - | - | - |
| 2022 | - | - | - | - | - | - |
| 2023 | - | - | - | - | - | - |
| 2024 | 77,325 | - | - | - | - | 77,325 |
| 2025 | 66,283 | - | - | - | - | 66,283 |
| 2026 | 47,354 | - | - | - | - | 47,354 |
| 2027 | 33,806 | - | - | - | - | 33,806 |
| 2028 | 27,064 | - | - | - | - | 27,064 |
| 2029 | 27,033 | - | - | - | - | 27,033 |
| 2030 | 27,064 | 132,783 | - | - | - | 159,846 |
| 2031 | 3,371 | 113,821 | - | - | - | 117,193 |
| 2032 | - | 81,316 | - | - | - | 81,316 |
| 2033 | - | 58,053 | - | - | - | 58,053 |
| 2034 | - | 46,474 | - | - | - | 46,474 |
| 2035 | - | 46,421 | - | - | - | 46,421 |
| 2036 | - | 46,474 | 158,549 | - | - | 205,023 |
| 2037 | - | 5,789 | 135,909 | - | - | 141,698 |
| 2038 | - | - | 97,096 | - | - | 97,096 |
| 2039 | - | - | 69,318 | - | - | 69,318 |
| 2040 | - | - | 55,492 | - | - | 55,492 |
| 2041 | - | - | 55,429 | - | - | 55,429 |
| 2042 | - | - | 55,492 | 189,316 | - | 244,809 |
| 2043 | - | - | 6,913 | 162,282 | - | 169,195 |
| 2044 | - | - | - | 115,937 | - | 115,937 |
| 2045 | - | - | - | 82,769 | - | 82,769 |
| 2046 | - | - | - | 66,261 | - | 66,261 |
| 2047 | - | - | - | 66,185 | - | 66,185 |
| 2048 | - | - | - | 66,261 | 226,054 | 292,314 |
| 2049 | - | - | - | 8,254 | 193,773 | 202,027 |
| 2050 | - | - | - | - | 138,435 | 138,435 |
|  | 309,299 | 531,131 | 634,198 | 757,265 | 558,262 | 2,790,155 |

Note: The model assumes that the Landlord has elected not to take bonus depreciation.

See Summary of Significant Assumptions and Accountant's Report

12/29/2017

Confidential

USBCDC00048544

**1501 Washington**

**1501 WASHINGTON ST. LOUIS, LLC FUNDED EXPENSES**

| | Year | Pre-Opening Expense Reserve | OS&E | Legal Closing/Accounting Costs | US Bank Loan Fee | Bridge/Mezz Loan Interest Reserve | Overhead, Reimbursables & Related | Novogradac Consulting, LLC - Reasonableness Opinion | Bridge Loan Origination Fee | QALICB Initial Year Accounting Fees | USBCDE SUB-CDE 162, LLC Initial Year Audit & Tax Fee | ST. LOUIS NEW MARKETS TAX CREDIT FUND 49, LLC Initial Year Audit & Tax Fee | Project Soft Cost Contingency | Utility Costs | Building Maintenance | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Amount | | 1,616,046 | 1,168,140 | 328,600 | 123,000 | 693,333 | 129,000 | 13,500 | 115,556 | 20,000 | 2,000 | 8,000 | 348,000 | 116,000 | 23,200 | 4,704,375 |
| Term | | As Incurred | 180 | 180 | 36 | 4 | 180 | 180 | As Incurred | As Incurred | As Incurred | As Incurred | 180 | As Incurred | As Incurred | |
| Months in First Year | | 11 | 11 | 11 | 11 | 11 | 11 | 11 | | 11 | 11 | 11 | 11 | 11 | 11 | 7 |
| | 2019 | 1,616,046 | 71,386 | 20,081 | 37,583 | 693,333 | 7,883 | 825 | 115,556 | 20,000 | 2,000 | 8,000 | 21,267 | 116,000 | 23,200 | 2,753,160 |
| | 2020 | - | 77,876 | 21,907 | 41,000 | - | 8,600 | 900 | - | - | - | - | 23,200 | - | - | 173,483 |
| | 2021 | - | 77,876 | 21,907 | 41,000 | - | 8,600 | 900 | - | - | - | - | 23,200 | - | - | 173,483 |
| | 2022 | - | 77,876 | 21,907 | 3,417 | - | 8,600 | 900 | - | - | - | - | 23,200 | - | - | 135,899 |
| | 2023 | - | 77,876 | 21,907 | - | - | 8,600 | 900 | - | - | - | - | 23,200 | - | - | 132,483 |
| | 2024 | - | 77,876 | 21,907 | - | - | 8,600 | 900 | - | - | - | - | 23,200 | - | - | 132,483 |
| | 2025 | - | 77,876 | 21,907 | - | - | 8,600 | 900 | - | - | - | - | 23,200 | - | - | 132,483 |
| | 2026 | - | 77,876 | 21,907 | - | - | 8,600 | 900 | - | - | - | - | 23,200 | - | - | 132,483 |
| | 2027 | - | 77,876 | 21,907 | - | - | 8,600 | 900 | - | - | - | - | 23,200 | - | - | 132,483 |
| | 2028 | - | 77,876 | 21,907 | - | - | 8,600 | 900 | - | - | - | - | 23,200 | - | - | 132,483 |
| | 2029 | - | 77,876 | 21,907 | - | - | 8,600 | 900 | - | - | - | - | 23,200 | - | - | 132,483 |
| | 2030 | - | 77,876 | 21,907 | - | - | 8,600 | 900 | - | - | - | - | 23,200 | - | - | 132,483 |
| | 2031 | - | 77,876 | 21,907 | - | - | 8,600 | 900 | - | - | - | - | 23,200 | - | - | 132,483 |
| | 2032 | - | 77,876 | 21,907 | - | - | 8,600 | 900 | - | - | - | - | 23,200 | - | - | 132,483 |
| | 2033 | - | 77,876 | 21,907 | - | - | 8,600 | 900 | - | - | - | - | 23,200 | - | - | 132,483 |
| | 2034 | - | 6,490 | 1,826 | - | - | 717 | 75 | - | - | - | - | 1,933 | - | - | 11,040 |
| | 2035 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 2036 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 2037 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 2038 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 2039 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 2040 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 2041 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 2042 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 2043 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 2044 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 2045 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 2046 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 2047 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 2048 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 2049 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | 2050 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total | | 1,616,046 | 1,168,140 | 328,600 | 123,000 | 693,333 | 129,000 | 13,500 | 115,556 | 20,000 | 2,000 | 8,000 | 348,000 | 116,000 | 23,200 | 4,704,375 |

Confidential

USBCDC00048545

**1501 Washington**

### LAST HOTEL INVESTOR, LLC  ASSUMPTION OF THE DEFERRED DEVELOPER FEE

Amount                                4,195,721
Rate                                   2.20%

| Year | Payment | Additional Capital Contribution by Last Hotel Investor, LLC | Total Payment | Principal | Interest | Balance |
|------|---------|----------------------|---------------|-----------|----------|---------|
|      |         |                      |               |           |          | 4,195,721 |
| 2019 | 448,069 | - | 448,069 | 355,763 | 92,306 | 3,839,958 |
| 2020 | 725,303 | - | 725,303 | 640,824 | 84,479 | 3,199,133 |
| 2021 | 753,878 | - | 753,878 | 683,497 | 70,381 | 2,515,636 |
| 2022 | 765,070 | - | 765,070 | 709,726 | 55,344 | 1,805,911 |
| 2023 | 775,252 | - | 775,252 | 735,522 | 39,730 | 1,070,389 |
| 2024 | 815,134 | 278,804 | 1,093,938 | 791,585 | 23,549 | - |
| 2025 | - | - | - | - | - | - |
| 2026 | - | - | - | - | - | - |
| 2027 | - | - | - | - | - | - |
| 2028 | - | - | - | - | - | - |
| 2029 | - | - | - | - | - | - |
| Total | 4,282,705 | 278,804 | 4,561,509 | 3,916,917 | 365,788 | |

Note: Payment amount will be set equal to           98.00%
of available cash flow.

See Summary of Significant Assumptions and Accountant's Report

12/29/2017

Confidential

USBCDC00048546

**1501 Washington**

Last Hotel Master Tenant, LLC GENERAL INFORMATION

| General Information | | Capital Contributions | | | |
|---|---|---|---|---|---|

| | | **U.S. Bancorp Community Development Corporation** | | | |
| Projections Start Date | 12/29/17 | | **Date** | | **Amount** |
| | | Partnership Closing | Dec-17 | 30.00% | 2,993,219 |
| Projections Start Date | 12/29/17 | Final Cost Certification | May-19 | 60.00% | 5,986,439 |
| Construction Completed | 02/01/19 | Part 3/Stabilization* | Feb-20 | 10.00% | 997,740 |
| Placed in Service | 02/01/19 | | | | |
| Hotel Opening Date | 02/01/19 | | | | |
| Projections Sale Date | 12/31/51 | Total Capital | | 100.00% | 9,977,398 |
| Tax Rate-2017 | 38.00% | | | | |
| Tax Rate-2018 & Thereafter | 24.00% | *The third installment of federal HTC Equity is contributed at stabilization which is occurs based on a minimum 1.2 DSCR for 6 consecutive months (measured on a trailing 12 month basis).  See Section 5.01(c)(iii) of the Master Tenant Operating Agreement. | | | |
| Depreciation | | | | | |
| Non-Residential Rental Property | 39.0 | | | | |
| Non-Residential Personal Property | 5.0 | | | | |
| Site Improvements | 15.0 | | | | |
| | | | | | |
| Credit Rate | | **DFQ Management, LLC** | | | |
| Federal Credits | 1.150 | | **Date** | | **Amount** |
| State Credits | 0.940 | | Dec-17 | 100.00% | 100,000 |
| | | | May-19 | 0.00% | - |
| Accounting Expenses | 10,000 | | Feb-20 | 0.00% | - |
| Escalation | 4.00% | | | | |
| Priority Return to U.S. Bancorp Community Development Corporation | 2.00% | Total Capital | | 100.00% | 100,000 |
| Investor Optional Put Percentage | Lesser of FMV and 20% of the Capital Contributions | | | | |

| Allocation Percentages | Until 02/01/24 | Thereafter |
|---|---|---|
| **Profit** | | |
| U.S. Bancorp Community Development Corporation | 99.00% | 20.00% |
| DFQ Management, LLC | 1.00% | 80.00% |
| **Loss** | | |
| U.S. Bancorp Community Development Corporation | 99.00% | 20.00% |
| DFQ Management, LLC | 1.00% | 80.00% |
| **Cash Flow** | | |
| U.S. Bancorp Community Development Corporation | 99.00% | 20.00% |
| DFQ Management, LLC | 1.00% | 80.00% |

Note 1: The flip will occur on the later of the 5-year anniversary of PIS of the last QRE's and distribution of priority return and special tax distributionsto USBCDC accrued through such date.

Note 2: Special tax distributions are 38.00% of taxable income.

Projections assume Replacement Reserve balance will be withdrawn and spent every 6 years.  Revenues for purposes of calculation of the replacement reserve depositsis based on total hotel revenues, including F&B operations.

FF&E Reserves are funded partially at Landlord Entity.  Total FF&E reserve is equal to 2% gross Master Tenant/Subtenant revenues in year 2019, 3% in year 2020, and 4% thereafter.

See Summary of Significant Assumptions and Accountant's Report

Confidential

**1501 Washington**

**Last Hotel Master Tenant, LLC SOURCES AND USES OF FUNDS**

| Description | Dec-17 Closing | May-19 | Feb-20 | Total |
|---|---|---|---|---|
| U.S. Bancorp Community Development Corporation* | 2,993,219 | 5,986,439 | 997,740 | 9,977,398 |
| DFQ Management, LLC | 100,000 | - | - | 100,000 |
| Total Sources: | 3,093,219 | 5,986,439 | 997,740 | 10,077,398 |
| FF&E Purchase | - | 3,653,523 | 997,740 | 4,651,263 |
| MT Loan to DFQ Management, LLC | 2,993,219 | 2,332,916 | - | 5,326,135 |
| Working Capital | 100,000 | - | - | - |
| Total Uses: | 3,093,219 | 5,986,439 | 997,740 | 9,977,398 |

*The third installment of federal HTC Equity is contributed at stabilization which is occurs based on a minimum 1.2 DSCR for 6 consecutive months (measured on a trailing 12 month basis).   See Section 5.01(c )(iii) of the Master

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048548

**1501 Washington**

**Last Hotel Master Tenant, LLC LOAN AMORTIZATION SCHEDULE**

LOAN TO DFQ Management, LLC

| | |
|---|---|
| Principal | 5,326,135 |
| Interest Only Rate | 2.7000% |
| Amortizing Rate | 2.7000% |
| Commencement | 12/29/2017 |
| Amortization Begins | 1/1/2025 |
| Interest Only Period | 84.07 |
| Amortization | 255.00 |
| Term in Months | 339.07 |
| | |
| Quarterly Payment (Amortizing) | 82,551.25 |
| Annual Payment (Amortizing) | 330,204.99 |
| Payments Made | Quarterly in Arrears/Advance |
| | |
| Days in Year for Calculating Interest | 360 |
| Interest Calculation Methodology | 30-Day Months |
| | |
| Payment Dates | 3/15, 6/15, 9/15, 12/15 |

| Year | Payment | Principal | Interest | Repayment | Balance |
|---|---|---|---|---|---|
| | | | | | 0 |
| 2017 | - | - | - | - | 2,993,219 |
| 2018 | 80,817 | - | 80,817 | - | 2,993,219 |
| 2019 | 117,560 | - | 117,560 | - | 5,326,135 |
| 2020 | 143,806 | - | 143,806 | - | 5,326,135 |
| 2021 | 143,806 | - | 143,806 | - | 5,326,135 |
| 2022 | 143,806 | - | 143,806 | - | 5,326,135 |
| 2023 | 143,806 | - | 143,806 | - | 5,326,135 |
| 2024 | 143,806 | - | 143,806 | - | 5,326,135 |
| 2025 | 330,205 | 188,295 | 141,910 | - | 5,137,840 |
| 2026 | 330,205 | 193,431 | 136,774 | - | 4,944,409 |
| 2027 | 330,205 | 198,707 | 131,498 | - | 4,745,702 |
| 2028 | 330,205 | 204,126 | 126,079 | - | 4,541,576 |
| 2029 | 330,205 | 209,694 | 120,511 | - | 4,331,883 |
| 2030 | 330,205 | 215,413 | 114,792 | - | 4,116,470 |
| 2031 | 330,205 | 221,288 | 108,917 | - | 3,895,181 |
| 2032 | 330,205 | 227,324 | 102,881 | - | 3,667,857 |
| 2033 | 330,205 | 233,524 | 96,681 | - | 3,434,333 |
| 2034 | 330,205 | 239,893 | 90,312 | - | 3,194,440 |
| 2035 | 330,205 | 246,436 | 83,769 | - | 2,948,004 |
| 2036 | 330,205 | 253,158 | 77,047 | - | 2,694,846 |
| 2037 | 330,205 | 260,063 | 70,142 | - | 2,434,784 |
| 2038 | 330,205 | 267,156 | 63,049 | - | 2,167,628 |
| 2039 | 330,205 | 274,442 | 55,763 | - | 1,893,186 |
| 2040 | 330,205 | 281,927 | 48,278 | - | 1,611,258 |
| 2041 | 330,205 | 289,617 | 40,588 | - | 1,321,641 |
| 2042 | 330,205 | 297,516 | 32,689 | - | 1,024,125 |
| 2043 | 330,205 | 305,631 | 24,574 | - | 718,495 |
| 2044 | 330,205 | 313,967 | 16,238 | - | 404,528 |
| 2045 | 330,205 | 322,530 | 7,675 | - | 81,998 |
| 2046 | 82,551 | 81,998 | 553 | (0) | - |
| | 7,934,261 | 5,326,135 | 2,608,126 | (0) | |

See Summary of Significant Assumptions and Accountant's Report

Confidential

**1501 Washington**

Last Hotel Master Tenant, LLC CALENDAR YEAR OPERATING ASSUMPTIONS

| Revenue Assumptions | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Rooms | 142 | 142 | 142 | 142 | 142 | 142 | 142 | 142 | 142 | 142 | 142 |
| Available Rooms | 51,830 | 51,830 | 51,830 | 51,830 | 51,830 | 51,830 | 51,830 | 51,830 | 51,830 | 51,830 | 51,830 |
| Occupied Rooms | 30,407 | 35,244 | 36,281 | 36,281 | 36,281 | 36,281 | 36,281 | 36,281 | 36,281 | 36,281 | 36,281 |
| Occupancy | 64.00% | 68.00% | 70.00% | 70.00% | 70.00% | 70.00% | 70.00% | 70.00% | 70.00% | 70.00% | 70.00% |
| Average Daily Rate | 163.17 | 175.18 | 185.89 | 192.29 | 198.06 | 204.00 | 210.12 | 216.42 | 222.92 | 229.60 | 236.49 |
| RevPAR | 95.73 | 119.13 | 130.12 | 134.60 | 138.64 | 142.80 | 147.08 | 151.50 | 156.04 | 160.72 | 165.54 |

| Revenues | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Rooms | 4,961,499 | 6,174,286 | 6,744,210 | 6,976,444 | 7,185,737 | 7,401,309 | 7,623,348 | 7,852,049 | 8,087,610 | 8,330,238 | 8,580,146 |
| F/B  Sub Lease Revenue | 225,000 | 335,000 | 430,000 | 450,000 | 465,000 | 478,950 | 493,319 | 508,118 | 523,362 | 539,062 | 555,234 |
| F/B Revenue - Post-Lease Term | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other | 608,139 | 720,817 | 766,162 | 790,980 | 814,709 | 839,151 | 864,325 | 890,255 | 916,963 | 944,472 | 972,806 |
| Total Revenues | 5,794,638 | 7,230,103 | 7,940,372 | 8,217,424 | 8,465,446 | 8,719,410 | 8,980,992 | 9,250,420 | 9,527,934 | 9,813,772 | 10,108,186 |

| Departmental Expenses | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Rooms | 1,268,969 | 1,438,059 | 1,490,689 | 1,536,142 | 1,582,227 | 1,629,693 | 1,678,584 | 1,728,942 | 1,780,810 | 1,834,234 | 1,889,261 |
| F/B Expense - Post-Lease Term | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other | 364,883 | 415,852 | 422,902 | 435,039 | 448,090 | 461,533 | 475,379 | 489,640 | 504,329 | 519,459 | 535,043 |
| Total Departmental Expenses | 1,633,852 | 1,853,911 | 1,913,590 | 1,971,181 | 2,030,317 | 2,091,226 | 2,153,963 | 2,218,582 | 2,285,139 | 2,353,694 | 2,424,304 |

| Gross Operating Income | 4,160,786 | 5,376,192 | 6,026,782 | 6,246,242 | 6,435,130 | 6,628,183 | 6,827,029 | 7,031,840 | 7,242,795 | 7,460,079 | 7,683,881 |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Adjusted Gross Operating Income | 4,160,786 | 5,376,192 | 6,026,782 | 6,246,242 | 6,435,130 | 6,628,183 | 6,827,029 | 7,031,840 | 7,242,795 | 7,460,079 | 7,683,881 |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Undistributed Operating Expenses | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Administrative & General | 911,167 | 1,041,005 | 1,083,917 | 1,117,334 | 1,150,854 | 1,185,380 | 1,220,941 | 1,257,570 | 1,295,297 | 1,334,156 | 1,374,180 |
| Marketing Expenses | 585,750 | 669,217 | 696,804 | 718,286 | 739,835 | 762,030 | 784,891 | 808,437 | 832,691 | 857,671 | 883,401 |
| Repairs & Maintenance | 256,918 | 291,114 | 301,744 | 310,943 | 320,271 | 329,880 | 339,776 | 349,969 | 360,468 | 371,282 | 382,421 |
| Utility Expenses | 257,790 | 290,471 | 300,101 | 309,175 | 318,450 | 328,003 | 337,844 | 347,979 | 358,418 | 369,171 | 380,246 |
| Total Undistributed Operating Expenses | 2,011,624 | 2,291,806 | 2,382,566 | 2,455,738 | 2,529,411 | 2,605,293 | 2,683,452 | 2,763,955 | 2,846,874 | 2,932,280 | 3,020,248 |

| Gross Operating Profit | 2,149,162 | 3,084,386 | 3,644,216 | 3,790,504 | 3,905,719 | 4,022,891 | 4,143,577 | 4,267,885 | 4,395,921 | 4,527,799 | 4,663,633 |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Fixed Expenses | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Management Fee | 196,254 | 241,166 | 260,982 | 269,780 | 277,873 | 286,209 | 294,796 | 303,640 | 312,749 | 322,131 | 331,795 |
| Insurance | 78,502 | 96,466 | 104,393 | 107,912 | 111,149 | 114,484 | 117,918 | 121,456 | 125,100 | 128,853 | 132,718 |
| Property Taxes | 17,643 | 19,509 | 19,803 | 20,373 | 20,984 | 21,614 | 22,262 | 22,930 | 23,618 | 24,327 | 100,337 |
| Total Fixed Expenses | 292,399 | 357,141 | 385,178 | 398,065 | 410,007 | 422,307 | 434,976 | 448,026 | 461,467 | 475,311 | 564,851 |

| Net Operating Income | 1,856,763 | 2,727,245 | 3,259,038 | 3,392,439 | 3,495,712 | 3,600,583 | 3,708,601 | 3,819,859 | 3,934,455 | 4,052,488 | 4,098,782 |
|---|---|---|---|---|---|---|---|---|---|---|---|

| FF&E Reserve-Paid at Master Tenant | 128,851 | 231,650 | 336,032 | 354,250 | 364,877 | 375,824 | 387,098 | 398,711 | 410,673 | 422,993 | 435,683 |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Free Cash Flow | 1,727,912 | 2,495,595 | 2,923,006 | 3,038,189 | 3,130,835 | 3,224,760 | 3,321,502 | 3,421,148 | 3,523,782 | 3,629,495 | 3,663,100 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 0 | (0) | (0) | 0 | (0) | (0) | (0) | 0 | 0 | 0 |

| FF&E Reserve-Paid at Landlord | 28,152 | 50,612 | 73,418 | 77,398 | 79,720 | 82,111 | 84,575 | 87,112 | 89,725 | 92,417 | 95,190 |
|---|---|---|---|---|---|---|---|---|---|---|---|

*Prior to Commencing Operations, a $50,000 fee is paid in advance for the first 6 months, then $7,500 is paid monthly for 10 months up to $75,000.  After opening, the management fee is equal to 2.5% of gross revenues plus an incentive fee of 10% of cash flow in excess of $3.5 million through 5th year ($4,000,000, years 6-10, capped at $100,000).

**FF&E Reserves are funded partially at Landlord Entity.  Total FF&E reserve is equal to 2% gross Master Tenant/Subtenant revenues in year 2019, 3% in year 2020, and 4% thereafter.

Note: Beginning in year 5 escalation of revenue and expenses is equal to 3.00%

Confidential

USBCDC00048550

1501 Washington

**Last Hotel Master Tenant, LLC CALENDAR YEAR OPERATING ASSUMPTIONS**

| Revenue Assumptions | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 | 2040 | 2041 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Rooms | 142 | 142 | 142 | 142 | 142 | 142 | 142 | 142 | 142 | 142 | 142 | 142 |
| Available Rooms | 51,830 | 51,830 | 51,830 | 51,830 | 51,830 | 51,830 | 51,830 | 51,830 | 51,830 | 51,830 | 51,830 | 51,830 |
| Occupied Rooms | 36,281 | 36,281 | 36,281 | 36,281 | 36,281 | 36,281 | 36,281 | 36,281 | 36,281 | 36,281 | 36,281 | 36,281 |
| Occupancy | 70.00% | 70.00% | 70.00% | 70.00% | 70.00% | 70.00% | 70.00% | 70.00% | 70.00% | 70.00% | 70.00% | 70.00% |
| Average Daily Rate | 243.59 | 250.89 | 258.42 | 266.17 | 274.16 | 282.38 | 290.85 | 299.58 | 308.57 | 317.82 | 327.36 | 337.18 |
| RevPAR | 170.51 | 175.63 | 180.89 | 186.32 | 191.91 | 197.67 | 203.60 | 209.71 | 216.00 | 222.48 | 229.15 | 236.03 |
| **Revenues** | | | | | | | | | | | | |
| Rooms | 8,837,550 | 9,102,677 | 9,375,757 | 9,657,030 | 9,946,740 | 10,245,143 | 10,552,497 | 10,869,072 | 11,195,144 | 11,530,998 | 11,876,928 | 12,233,236 |
| F/B  Sub-Lease Revenue | 571,891 | 589,048 | 606,720 | 624,921 | 643,669 | 662,979 | 682,868 | 703,354 | 724,455 | 0 | 0 | 0 |
| F/B Revenue - Post-Lease Term | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,997,833 | 5,147,768 | 5,302,201 |
| Other | 1,001,990 | 1,032,050 | 1,063,011 | 1,094,901 | 1,127,748 | 1,161,581 | 1,196,428 | 1,232,321 | 1,269,291 | 1,307,369 | 1,346,591 | 1,386,988 |
| Total Revenues | 10,411,431 | 10,723,774 | 11,045,487 | 11,376,852 | 11,718,158 | 12,069,702 | 12,431,793 | 12,804,747 | 13,188,890 | 17,836,201 | 18,371,287 | 18,922,425 |
| **Departmental Expenses** | | | | | | | | | | | | |
| Rooms | 1,945,939 | 2,004,317 | 2,064,447 | 2,126,380 | 2,190,172 | 2,255,877 | 2,323,553 | 2,393,260 | 2,465,057 | 2,539,009 | 2,615,179 | 2,693,635 |
| F/B Expense - Post-Lease Term | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4,248,157 | 4,375,602 | 4,506,870 |
| Other | 551,094 | 567,627 | 584,656 | 602,196 | 620,262 | 638,869 | 658,036 | 677,777 | 698,110 | 719,053 | 740,625 | 762,844 |
| Total Departmental Expenses | 2,497,034 | 2,571,945 | 2,649,103 | 2,728,576 | 2,810,433 | 2,894,746 | 2,981,589 | 3,071,036 | 3,163,167 | 7,506,220 | 7,731,406 | 7,963,348 |
| **Gross Operating Income** | 7,914,398 | 8,151,830 | 8,396,384 | 8,648,276 | 8,907,724 | 9,174,956 | 9,450,205 | 9,733,711 | 10,025,722 | 10,329,981 | 10,639,881 | 10,959,077 |
| **Adjusted Gross Operating Income** | 7,914,398 | 8,151,830 | 8,396,384 | 8,648,276 | 8,907,724 | 9,174,956 | 9,450,205 | 9,733,711 | 10,025,722 | 10,329,981 | 10,639,881 | 10,959,077 |
| **Undistributed Operating Expenses** | | | | | | | | | | | | |
| Administrative & General | 1,415,406 | 1,457,868 | 1,501,604 | 1,546,652 | 1,593,052 | 1,640,843 | 1,690,068 | 1,740,770 | 1,792,994 | 1,846,783 | 1,902,187 | 1,959,253 |
| Marketing Expenses | 909,903 | 937,201 | 965,317 | 994,276 | 1,024,104 | 1,054,828 | 1,086,472 | 1,119,067 | 1,152,638 | 1,187,218 | 1,222,834 | 1,259,519 |
| Repairs & Maintenance | 393,893 | 405,710 | 417,881 | 430,418 | 443,330 | 456,630 | 470,329 | 484,439 | 498,972 | 513,942 | 529,360 | 545,241 |
| Utility Expenses | 391,653 | 403,403 | 415,505 | 427,970 | 440,809 | 454,034 | 467,655 | 481,684 | 496,135 | 511,019 | 526,349 | 542,140 |
| Total Undistributed Operating Expenses | 3,110,856 | 3,204,182 | 3,300,307 | 3,399,316 | 3,501,296 | 3,606,335 | 3,714,525 | 3,825,960 | 3,940,739 | 4,058,961 | 4,180,730 | 4,306,152 |
| **Gross Operating Profit** | 4,803,542 | 4,947,648 | 5,096,077 | 5,248,960 | 5,406,429 | 5,568,621 | 5,735,680 | 5,907,751 | 6,084,983 | 6,271,020 | 6,459,151 | 6,652,925 |
| **Fixed Expenses** | | | | | | | | | | | | |
| Management Fee | 341,749 | 352,002 | 362,562 | 373,438 | 384,642 | 396,181 | 408,066 | 420,308 | 432,917 | 445,905 | 459,282 | 473,061 |
| Insurance | 136,700 | 140,801 | 145,025 | 149,375 | 153,857 | 158,472 | 163,227 | 168,123 | 173,167 | 178,362 | 183,713 | 189,224 |
| Property Taxes | 110,191 | 113,497 | 116,902 | 120,409 | 616,180 | 679,407 | 699,789 | 720,782 | 742,406 | 764,678 | 787,618 | 811,247 |
| Total Fixed Expenses | 588,640 | 606,299 | 624,488 | 643,223 | 1,154,678 | 1,234,060 | 1,271,082 | 1,309,214 | 1,348,490 | 1,388,945 | 1,430,614 | 1,473,532 |
| **Net Operating Income** | 4,214,902 | 4,341,349 | 4,471,589 | 4,605,737 | 4,251,751 | 4,334,562 | 4,464,599 | 4,598,536 | 4,736,493 | 4,882,075 | 5,028,537 | 5,179,393 |
| **FF&E Reserve-Paid at Master Tenant** | 448,753 | 462,216 | 476,082 | 490,365 | 505,076 | 520,228 | 535,835 | 551,910 | 568,467 | 585,521 | 603,087 | 621,179 |
| **Free Cash Flow** | 3,766,149 | 3,879,133 | 3,995,507 | 4,115,373 | 3,746,675 | 3,814,334 | 3,928,764 | 4,046,627 | 4,168,026 | 4,296,554 | 4,425,450 | 4,558,214 |
| | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) |
| FF&E Reserve-Paid at Landlord | 98,045 | 100,987 | 104,016 | 107,137 | 110,351 | 113,661 | 117,071 | 120,583 | 124,201 | 127,927 | 131,765 | 135,718 |

*Prior to Commencing Operations, a $50,000 fee is paid in advance for the first 6 months, then $7,500 is paid monthly for 10 months up to $75,000.  After opening, the management fee is equal to 2.5% of gross revenues plus an incentive fee of 10% of cash flow in excess of $3.5 million through 5th year ($4,000,000, years 6-10, capped at $100,000).

**FF&E Reserves are funded partially at Landlord Entity.  Total FF&E reserve is equal to 2% gross Master Tenant/Subtenant revenues in year 2019, 3% in year 2020 and 4% thereafter.

Note: Beginning in year 5 escalation of revenue and expenses is equal to 3.00%

Confidential

1501 Washington

**Last Hotel Master Tenant, LLC CALENDAR YEAR OPERATING ASSUMPTIONS**

| Revenue Assumptions | 2042 | 2043 | 2044 | 2045 | 2046 | 2047 | 2048 | 2049 | 2050 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Number of Rooms | 142 | 142 | 142 | 142 | 142 | 142 | 142 | 142 | 142 | |
| Available Rooms | 51,830 | 51,830 | 51,830 | 51,830 | 51,830 | 51,830 | 51,830 | 51,830 | 51,830 | |
| Occupied Rooms | 36,281 | 36,281 | 36,281 | 36,281 | 36,281 | 36,281 | 36,281 | 36,281 | 36,281 | |
| Occupancy | 70.00% | 70.00% | 70.00% | 70.00% | 70.00% | 70.00% | 70.00% | 70.00% | 70.00% | |
| Average Daily Rate | 347.30 | 357.71 | 368.45 | 379.50 | 390.88 | 402.61 | 414.69 | 427.13 | 439.94 | |
| RevPAR | 243.11 | 250.40 | 257.91 | 265.65 | 273.62 | 281.83 | 290.28 | 298.99 | 307.96 | |
| | | | | | | | | | | |
| **Revenues** | | | | | | | | | | |
| Rooms | 12,600,233 | 12,978,240 | 13,367,587 | 13,768,615 | 14,181,673 | 14,607,124 | 15,045,337 | 15,496,697 | 15,961,598 | 333,346,753 |
| F/B  Sub Lease Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10,812,950 |
| F/B Revenue - Post-Lease Term | 5,461,267 | 5,625,105 | 5,793,858 | 5,967,674 | 6,146,704 | 6,331,105 | 6,521,039 | 6,716,670 | 6,918,170 | 70,929,394 |
| Other | 1,428,598 | 1,471,456 | 1,515,600 | 1,561,068 | 1,607,900 | 1,656,137 | 1,705,821 | 1,756,995 | 1,809,705 | 37,862,326 |
| Total Revenues | 19,490,098 | 20,074,801 | 20,677,045 | 21,297,357 | 21,936,277 | 22,594,366 | 23,272,196 | 23,970,362 | 24,689,473 | 452,951,423 |
| | | | | | | | | | | |
| **Departmental Expenses** | | | | | | | | | | |
| Rooms | 2,774,444 | 2,857,677 | 2,943,407 | 3,031,710 | 3,122,661 | 3,216,341 | 3,312,831 | 3,412,216 | 3,514,582 | 73,660,305 |
| F/B Expense - Post-Lease Term | 4,642,076 | 4,781,338 | 4,924,778 | 5,072,522 | 5,224,697 | 5,381,438 | 5,542,882 | 5,709,168 | 5,880,443 | 60,289,972 |
| Other | 785,729 | 809,301 | 833,580 | 858,587 | 884,345 | 910,875 | 938,201 | 966,347 | 995,338 | 20,875,601 |
| Total Departmental Expenses | 8,202,249 | 8,448,316 | 8,701,766 | 8,962,819 | 9,231,703 | 9,508,654 | 9,793,914 | 10,087,731 | 10,390,363 | 154,825,878 |
| | | | | | | | | | | |
| **Gross Operating Income** | 11,287,849 | 11,626,485 | 11,975,279 | 12,334,538 | 12,704,574 | 13,085,711 | 13,478,283 | 13,882,631 | 14,299,110 | 298,125,545 |
| | | | | | | | | | | |
| **Adjusted Gross Operating Income** | 11,287,849 | 11,626,485 | 11,975,279 | 12,334,538 | 12,704,574 | 13,085,711 | 13,478,283 | 13,882,631 | 14,299,110 | 298,125,545 |
| | | | | | | | | | | |
| **Undistributed Operating Expenses** | | | | | | | | | | |
| Administrative & General | 2,018,030 | 2,078,571 | 2,140,928 | 2,205,156 | 2,271,311 | 2,339,450 | 2,409,633 | 2,481,922 | 2,556,380 | 53,560,662 |
| Marketing Expenses | 1,297,305 | 1,336,224 | 1,376,311 | 1,417,600 | 1,460,128 | 1,503,932 | 1,549,050 | 1,595,521 | 1,643,387 | 34,431,847 |
| Repairs & Maintenance | 561,598 | 578,446 | 595,799 | 613,673 | 632,083 | 651,046 | 670,577 | 690,694 | 711,415 | 14,910,264 |
| Utility Expenses | 558,404 | 575,156 | 592,411 | 610,183 | 628,489 | 647,343 | 666,764 | 686,766 | 707,369 | 14,828,888 |
| Total Undistributed Operating Expenses | 4,435,337 | 4,568,397 | 4,705,449 | 4,846,612 | 4,992,010 | 5,141,771 | 5,296,024 | 5,454,905 | 5,618,552 | 117,731,661 |
| | | | | | | | | | | |
| **Gross Operating Profit** | 6,852,513 | 7,058,088 | 7,269,831 | 7,487,926 | 7,712,564 | 7,943,940 | 8,182,259 | 8,427,726 | 8,680,558 | 180,393,883 |
| | | | | | | | | | | |
| **Fixed Expenses** | | | | | | | | | | |
| Management Fee | 487,252 | 501,870 | 516,926 | 532,434 | 548,407 | 564,859 | 581,805 | 599,259 | 617,237 | 12,897,537 |
| Insurance | 194,901 | 200,748 | 206,770 | 212,974 | 219,363 | 225,944 | 232,722 | 239,704 | 246,895 | 5,159,015 |
| Property Taxes | 835,584 | 860,652 | 886,472 | 913,066 | 940,458 | 968,671 | 997,732 | 1,027,663 | 1,058,493 | 15,085,300 |
| Total Fixed Expenses | 1,517,738 | 1,563,270 | 1,610,168 | 1,658,473 | 1,708,227 | 1,759,474 | 1,812,258 | 1,866,626 | 1,922,625 | 33,141,851 |
| | | | | | | | | | | |
| **Net Operating Income** | 5,334,775 | 5,494,818 | 5,659,663 | 5,829,453 | 6,004,336 | 6,184,466 | 6,370,000 | 6,561,100 | 6,757,933 | 147,252,032 |
| | | | | | | | | | | |
| FF&E Reserve-Paid at Master Tenant | 639,815 | 659,009 | 678,779 | 699,143 | 720,117 | 741,721 | 763,972 | 786,891 | 810,498 | 16,715,305 |
| | | | | | | | | | | |
| **Free Cash Flow** | 4,694,960 | 4,835,809 | 4,980,883 | 5,130,310 | 5,284,219 | 5,442,746 | 5,606,028 | 5,774,209 | 5,947,435 | 96,437,404 |
| | (0) | (0) | (0) | (0) | (0) | 0 | (0) | - | (0) | |
| FF&E Reserve-Paid at Landlord | 139,789 | 143,983 | 148,302 | 152,752 | 157,334 | 162,054 | 166,916 | 171,923 | 177,081 | |

*Prior to Commencing Operations, a $50,000 fee is paid in advance for the first 6 months, then $7,500 is paid monthly for 10 months up to $75,000.  After opening, the management fee is equal to 2.5% of gross revenues plus an incentive fee of 10% of cash flow in excess of $3.5 million through 5th year ($4,000,000, years 6-10, capped at $100,000).
**FF&E Reserves are funded partially at Landlord Entity.  Total FF&E reserve is equal to 2% gross Master Tenant/Subtenant revenues in year 2019, 3% in year 2020, and 4% thereafter.
Note: Beginning in year 5 escalation of revenue and expenses is equal to 3.00%

Confidential

USBCDC00048552

**1501 Washington**

**Last Hotel Master Tenant, LLC LEASE PAYMENT TO LANDLORD**

|  |  |  |  |  |  | 9.50% |  | 85.00% | 1,100,000 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Year | Lease Payments | Supplemental Lease Payment | Total Annual Lease Payment |  | MT Gross Revenue | Supplemental Lease (1) | MT Net Cash Flow | Supplemental Lease (2) | Supplemental Lease (3) |
| 2019 | 1,200,000 | 406,778 | 1,606,778 |  | 5,794,638 | 550,491 | 478,562 | 406,778 | 1,100,000 |
| 2020 | 1,650,000 | 663,595 | 2,313,595 |  | 7,230,103 | 686,860 | 780,699 | 663,595 | 1,100,000 |
| 2021 | 1,950,000 | 754,335 | 2,704,335 |  | 7,940,372 | 754,335 | 892,942 | 759,001 | 1,100,000 |
| 2022 | 1,950,000 | 770,635 | 2,720,635 |  | 8,217,424 | 780,655 | 906,630 | 770,635 | 1,100,000 |
| 2023 | 1,950,000 | 784,283 | 2,734,283 |  | 8,465,446 | 804,217 | 922,686 | 784,283 | 1,100,000 |
| 2024 | 1,950,000 | 828,344 | 2,778,344 |  | 8,719,410 | 828,344 | 1,006,526 | 855,547 | 1,100,000 |
| 2025 | 1,950,488 | 853,194 | 2,803,682 |  | 8,980,992 | 853,194 | 1,350,018 | 1,147,515 | 1,100,000 |
| 2026 | 1,950,975 | 878,790 | 2,829,765 |  | 9,250,422 | 878,790 | 1,445,862 | 1,228,983 | 1,100,000 |
| 2027 | 1,951,463 | 905,154 | 2,856,617 |  | 9,527,934 | 905,154 | 1,524,021 | 1,295,418 | 1,100,000 |
| 2028 | 1,951,951 | 932,308 | 2,884,259 |  | 9,813,772 | 932,308 | 1,620,516 | 1,377,439 | 1,100,000 |
| 2029 | 1,952,439 | 960,278 | 2,912,716 |  | 10,108,186 | 960,278 | 1,648,984 | 1,401,636 | 1,100,000 |
| 2030 | 1,952,927 | 989,086 | 2,942,013 |  | 10,411,431 | 989,086 | 1,766,562 | 1,501,578 | 1,100,000 |
| 2031 | 1,953,415 | 1,018,759 | 2,972,174 |  | 10,723,774 | 1,018,759 | 1,883,856 | 1,601,277 | 1,100,000 |
| 2032 | 1,953,903 | 1,049,321 | 3,003,225 |  | 11,045,487 | 1,049,321 | 1,984,587 | 1,686,899 | 1,100,000 |
| 2033 | 1,954,392 | 1,080,801 | 3,035,193 |  | 11,376,852 | 1,080,801 | 2,093,167 | 1,779,192 | 1,100,000 |
| 2034 | 1,954,880 | 1,100,000 | 3,054,880 |  | 11,718,158 | 1,113,225 | 1,714,654 | 1,457,456 | 1,100,000 |
| 2035 | 1,955,369 | 1,100,000 | 3,055,369 |  | 12,069,702 | 1,146,622 | 1,907,616 | 1,621,474 | 1,100,000 |
| 2036 | 1,955,858 | 1,100,000 | 3,055,858 |  | 12,431,793 | 1,181,020 | 2,036,519 | 1,731,041 | 1,100,000 |
| 2037 | 1,956,347 | 1,100,000 | 3,056,347 |  | 12,804,747 | 1,216,451 | 2,155,958 | 1,832,564 | 1,100,000 |
| 2038 | 1,956,836 | 1,100,000 | 3,056,836 |  | 13,188,890 | 1,252,945 | 2,255,468 | 1,917,148 | 1,100,000 |
| 2039 | 1,957,325 | 1,100,000 | 3,057,325 |  | 12,838,368 | 1,219,645 | 2,369,649 | 2,014,202 | 1,100,000 |
| 2040 | 1,957,815 | 1,100,000 | 3,057,815 |  | 13,223,519 | 1,256,234 | 2,485,757 | 2,112,893 | 1,100,000 |
| 2041 | 1,958,304 | 1,100,000 | 3,058,304 |  | 13,620,224 | 1,293,921 | 2,610,465 | 2,218,896 | 1,100,000 |
| 2042 | 1,958,794 | 1,100,000 | 3,058,794 |  | 14,028,831 | 1,332,739 | 2,762,028 | 2,347,724 | 1,100,000 |
| 2043 | 1,959,283 | 1,100,000 | 3,059,283 |  | 14,449,696 | 1,372,721 | 2,904,783 | 2,469,065 | 1,100,000 |
| 2044 | 1,959,773 | 1,100,000 | 3,059,773 |  | 14,883,187 | 1,413,903 | 3,023,741 | 2,570,180 | 1,100,000 |
| 2045 | 1,960,263 | 1,100,000 | 3,060,263 |  | 15,329,682 | 1,456,320 | 3,156,055 | 2,682,647 | 1,100,000 |
| 2046 | 1,960,753 | 1,100,000 | 3,060,753 |  | 15,789,573 | 1,500,009 | 3,047,255 | 2,590,166 | 1,100,000 |
| 2047 | 1,961,243 | 1,100,000 | 3,061,243 |  | 16,263,260 | 1,545,010 | 3,113,550 | 2,646,518 | 1,100,000 |
| 2048 | 1,961,734 | 1,100,000 | 3,061,734 |  | 16,751,158 | 1,591,360 | 3,294,133 | 2,800,013 | 1,100,000 |
| 2049 | 1,962,224 | 1,100,000 | 3,062,224 |  | 17,253,693 | 1,639,101 | 3,464,156 | 2,944,533 | 1,100,000 |
| 2050 | 1,962,715 | 1,100,000 | 3,062,715 |  | 17,771,303 | 1,688,274 | 3,605,751 | 3,064,889 | 1,100,000 |
| Total | 61,521,470 | 31,575,661 | 93,097,131 |  | 382,022,028 |  | 66,213,156 |  |  |

Supplemental Lease is Equal to Lesser of 9.50% Of MT Gross Revenue, 85.00% Of MT Net Cash Flow, and 1,100,000

Confidential                                                                                    USBCDC00048553

**1501 Washington**

**Last Hotel Master Tenant, LLC PRIORITY RETURN TO INVESTOR**

Base Amount       199,548

| Year | Preference Earned | Preference Paid | Unpaid Preference | Balance |
|------|-------------------|-----------------|-------------------|---------|
| 2017 | 2,494 | - | 2,494 | 2,494 |
| 2018 | 59,864 | 62,359 | - | - |
| 2019 | 139,684 | 139,684 | - | - |
| 2020 | 197,885 | 197,885 | - | - |
| 2021 | 199,548 | 199,548 | - | - |
| 2022 | 199,548 | 199,548 | - | - |
| 2023 | 199,548 | 199,548 | - | - |
| 2024 | 199,548 | 199,548 | - | - |
| 2025 | 199,548 | 199,548 | - | - |
| 2026 | 199,548 | 199,548 | - | - |
| 2027 | 199,548 | 199,548 | - | - |
| 2028 | 199,548 | 199,548 | - | - |
| 2029 | 199,548 | 199,548 | - | - |
| 2030 | 199,548 | 199,548 | - | - |
| 2031 | 199,548 | 199,548 | - | - |
| 2032 | 199,548 | 199,548 | - | - |
| 2033 | 199,548 | 199,548 | - | - |
| 2034 | 199,548 | 199,548 | - | - |
| 2035 | 199,548 | 199,548 | - | - |
| 2036 | 199,548 | 199,548 | - | - |
| 2037 | 199,548 | 199,548 | - | - |
| 2038 | 199,548 | 199,548 | - | - |
| 2039 | 199,548 | 199,548 | - | - |
| 2040 | 199,548 | 199,548 | - | - |
| 2041 | 199,548 | 199,548 | - | - |
| 2042 | 199,548 | 199,548 | - | - |
| 2043 | 199,548 | 199,548 | - | - |
| 2044 | 199,548 | 199,548 | - | - |
| 2045 | 199,548 | 199,548 | - | - |
| 2046 | 199,548 | 199,548 | - | - |
| 2047 | 199,548 | 199,548 | - | - |
| 2048 | 199,548 | 199,548 | - | - |
| 2049 | 199,548 | 199,548 | - | - |
| 2050 | 199,548 | 199,548 | - | - |
|      | 6,386,366 | 6,386,366 | | |

See Summary of Significant Assumptions and Accountant's Report

Confidential

1501 Washington

**Last Hotel Master Tenant, LLC PROJECTED CASH FLOW**

| Year | Hotel Revenues | Food & Beverage Sublease Revenue | Food & Beverage Revenue Post-Lease | Total Departmental Expenses | Total Undistributed Operating Expenses | Total Fixed Expenses | Food & Beverage Expense Post-Lease | Net Operating Income (from operations) | Debt Service Receipts | FF &E Reserve Deposits | Accounting Expenses | Lease Payments | (Deposit to) / Release from Reserve | Priority Return to U.S. Bancorp Community Development Corporation* | Special Tax Distribution* | Cash Flow | Supplemental Rent | MM Advance | Distributable Cash Flow | U.S. Bancorp Community Development Corporation Cash Flow | DFO Management, LLC Cash Flow |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | 5,560,636 | 225,000 | - | (1,833,852) | (2,211,024) | (252,386) | - | 80,817 | 117,560 | (129,851) | (10,000) | (1,200,000) | - | (92,353) | 8,458 | 8,458 | - | - | 8,458 | 8,374 | 85 |
| 2019 | 8,696,103 | 335,000 | - | (1,853,011) | (2,291,800) | (357,141) | - | 1,956,769 | 143,608 | (231,650) | (10,818) | (1,850,000) | - | (197,685) | 479,582 | 479,582 | - | (408,778) | 71,784 | 71,067 | 718 |
| 2020 | 7,510,372 | 400,000 | - | (1,913,590) | (2,362,569) | (365,176) | - | 2,727,245 | 143,608 | (336,032) | (11,249) | (1,850,000) | - | (195,946) | 760,899 | 860,595 | - | (654,855) | 117,105 | 115,934 | 1,171 |
| 2021 | 7,797,424 | 450,000 | - | (1,971,161) | (2,455,729) | (369,065) | - | 3,259,038 | 143,608 | (336,032) | (11,696) | (1,850,000) | - | (195,946) | 852,942 | 852,942 | - | (754,336) | 138,607 | 137,221 | 1,386 |
| 2022 | 8,030,446 | 485,000 | - | (2,030,317) | (2,529,411) | (410,207) | - | 3,392,430 | 143,608 | (364,923) | (12,167) | (1,850,000) | - | (195,946) | 566,830 | 770,835 | - | - | 135,604 | 134,535 | 1,350 |
| 2023 | 8,240,480 | 485,000 | - | (2,091,226) | (2,605,293) | (422,307) | - | 3,495,712 | 143,608 | (364,407) | (12,187) | (1,850,000) | - | (195,946) | 622,586 | 622,586 | - | (798,283) | 138,419 | 137,019 | 1,384 |
| 2024 | 8,245,480 | 478,950 | - | (2,091,226) | (2,626,293) | (422,307) | - | 3,600,563 | 143,608 | (375,604) | (12,658) | (1,850,000) | - | (193,836) | 1,025,528 | (829,344) | - | - | 178,162 | 47,367 | 130,815 |
| 2025 | 8,497,874 | 493,319 | - | (2,153,963) | (2,693,452) | (434,976) | - | 3,706,601 | 330,205 | (367,096) | (13,133) | (1,850,488) | - | (136,405) | 1,350,018 | (853,134) | - | - | 496,924 | 99,385 | 397,459 |
| 2026 | 8,742,304 | 508,118 | - | (2,218,582) | (2,763,955) | (448,026) | - | 3,816,959 | 330,205 | (398,711) | (13,666) | (1,850,975) | - | (195,946) | (141,262) | 1,445,662 | - | - | 597,072 | 113,414 | 453,658 |
| 2027 | 9,004,573 | 523,362 | - | (2,285,139) | (2,846,874) | (461,467) | - | 3,934,455 | 330,205 | (410,673) | (14,239) | (1,851,483) | - | (195,946) | (184,722) | 1,524,121 | - | (305,154) | 819,867 | 123,773 | 495,054 |
| 2028 | 9,274,710 | 539,062 | - | (2,353,694) | (2,932,280) | (475,311) | - | 4,052,486 | 330,205 | (422,993) | (14,802) | (1,851,951) | - | (195,946) | (172,883) | 1,620,516 | - | (392,308) | 696,209 | 139,742 | 550,568 |
| 2029 | 9,552,951 | 555,234 | - | (2,424,304) | (3,020,248) | (584,951) | - | 4,096,782 | 330,205 | (435,683) | (15,305) | (1,852,436) | - | (195,946) | (170,842) | 1,649,944 | - | (580,278) | 686,708 | 137,741 | 550,985 |
| 2030 | 9,839,543 | 571,891 | - | (2,497,034) | (3,110,856) | (598,940) | - | 4,214,302 | 330,205 | (449,753) | (16,012) | (1,852,937) | - | (195,946) | (181,308) | 1,768,562 | - | (989,060) | 777,417 | 155,405 | 621,981 |
| 2031 | 10,134,728 | 589,048 | - | (2,571,945) | (3,204,182) | (605,260) | - | 4,341,349 | 330,205 | (476,203) | (16,851) | (1,853,415) | - | (195,946) | (191,309) | 1,860,656 | (1,018,759) | - | 865,097 | 173,019 | 692,078 |
| 2032 | 10,438,769 | 606,720 | - | (2,649,103) | (3,300,307) | (624,896) | - | 4,471,589 | 330,205 | (476,092) | (17,317) | (1,853,900) | - | (195,946) | (170,357) | 1,894,864 | (1,240,321) | - | 935,265 | 187,053 | 748,212 |
| 2033 | 10,751,931 | 624,921 | - | (2,728,576) | (3,399,316) | (643,222) | - | 4,605,737 | 330,205 | (490,365) | (18,006) | (1,854,392) | - | (180,461) | 2,003,167 | (1,080,861) | - | 1,012,388 | 202,473 | 809,903 |
| 2034 | 11,074,489 | 643,669 | - | (2,810,433) | (3,501,296) | (1,154,676) | - | 4,251,751 | 330,205 | (505,076) | (18,720) | (1,854,882) | - | (195,946) | 1,414,654 | (1,100,000) | - | 614,654 | 122,931 | 491,723 |
| 2035 | 11,406,723 | 662,979 | - | (2,894,746) | (3,606,335) | (1,234,060) | - | 4,384,582 | 330,205 | (520,228) | (19,479) | (1,855,369) | - | (92,526) | 1,847,314 | (1,100,000) | - | 807,518 | 161,523 | 646,093 |
| 2036 | 11,748,925 | 682,868 | - | (2,981,589) | (3,714,525) | (1,271,082) | - | 4,464,596 | 330,205 | (535,856) | (20,256) | (1,855,854) | - | (60,796) | 2,038,515 | (1,100,000) | - | 936,519 | 187,304 | 749,215 |
| 2037 | 12,101,393 | 703,354 | - | (3,071,036) | (3,825,960) | (1,303,214) | - | 4,598,536 | 330,205 | (551,930) | (21,068) | (1,856,347) | - | (49,311) | 2,155,958 | (1,100,000) | - | 1,055,958 | 211,192 | 844,766 |
| 2038 | 12,464,435 | 724,455 | - | (3,163,167) | (3,940,739) | (1,348,460) | - | 4,736,493 | 330,205 | (568,467) | (21,911) | (1,856,839) | - | (64,467) | 2,255,498 | (1,100,000) | - | 1,155,498 | 231,094 | 924,374 |
| 2039 | 12,838,368 | - | 4,907,833 | (3,256,062) | (4,058,961) | (1,366,945) | (4,246,157) | 4,892,075 | 330,205 | (585,521) | (22,786) | (1,857,329) | - | (77,044) | 2,360,949 | (1,100,000) | - | 1,260,949 | 253,030 | 1,015,719 |
| 2040 | 13,223,519 | - | 5,147,786 | (3,355,604) | (4,180,730) | (1,430,814) | (4,375,602) | 5,039,537 | 330,205 | (603,067) | (23,699) | (1,857,816) | - | (98,837) | 2,485,757 | (1,100,000) | - | 1,385,757 | 277,151 | 1,108,605 |
| 2041 | 13,620,224 | - | 5,302,201 | (3,456,479) | (4,305,152) | (1,473,532) | (4,506,870) | 5,170,303 | 330,205 | (621,170) | (24,647) | (1,858,304) | - | (95,454) | 2,610,408 | (1,100,000) | - | 1,510,405 | 302,009 | 1,208,372 |
| 2042 | 14,028,831 | - | 5,461,267 | (3,560,173) | (4,435,307) | (1,517,738) | (4,642,076) | 5,334,775 | 330,205 | (639,615) | (25,633) | (1,858,794) | - | (79,162) | 2,702,229 | (1,100,000) | - | 1,602,229 | 320,458 | 1,281,771 |
| 2043 | 14,449,696 | - | 5,625,105 | (3,666,978) | (4,569,367) | (1,563,270) | (4,781,338) | 5,494,448 | 330,205 | (658,658) | (26,656) | (1,859,283) | - | (75,742) | 2,904,783 | (1,100,000) | - | 1,804,783 | 360,957 | 1,443,826 |
| 2044 | 14,983,187 | - | 5,793,858 | (3,776,987) | (4,706,449) | (1,610,168) | (4,924,779) | 5,658,069 | 330,205 | (678,515) | (27,725) | (1,859,773) | - | (102,301) | 3,023,741 | (1,100,000) | - | 1,923,741 | 384,748 | 1,538,993 |
| 2045 | 15,326,082 | - | 5,967,674 | (3,890,297) | (4,846,612) | (1,658,473) | (5,072,522) | 5,826,453 | 330,205 | (698,135) | (28,850) | (1,860,283) | - | (115,415) | 3,150,055 | (1,100,000) | - | 2,050,055 | 411,211 | 1,644,844 |
| 2046 | 15,785,573 | - | 6,146,704 | (4,007,006) | (4,992,010) | (1,708,227) | (5,224,697) | 6,004,336 | 92,551 | (720,117) | (29,947) | (1,860,793) | - | (137,217) | 3,247,259 | (1,100,000) | - | 1,047,259 | 389,451 | 1,557,804 |
| 2047 | 16,253,283 | - | 6,331,105 | (4,127,216) | (5,141,771) | (1,759,474) | (5,381,438) | 6,184,489 | - | (741,721) | (31,187) | (1,861,343) | - | (137,217) | 3,113,550 | (1,100,000) | - | 2,013,550 | 402,710 | 1,610,840 |
| 2048 | 16,751,158 | - | 6,521,038 | (4,251,032) | (5,296,024) | (1,812,258) | (5,542,882) | 6,370,000 | - | (763,972) | (32,434) | (1,861,730) | - | (109,346) | 2,191,133 | - | - | 2,191,133 | 438,227 | 1,752,906 |
| 2049 | 17,253,693 | - | 6,716,670 | (4,378,563) | (5,454,905) | (1,866,626) | (5,709,186) | 6,561,150 | - | (786,891) | (33,731) | (1,862,224) | - | (114,549) | 3,464,156 | (1,100,000) | - | 2,364,156 | 472,831 | 1,891,325 |
| 2050 | 17,771,303 | - | 6,918,170 | (4,509,920) | (5,618,552) | (1,922,625) | (5,880,443) | 6,757,933 | - | (810,498) | (35,081) | (1,862,715) | - | (140,241) | 3,805,751 | (1,100,000) | - | 2,505,751 | 501,150 | 2,004,601 |
| **Total** | 371,203,079 | 10,812,350 | 73,029,364 | (94,535,008) | (117,731,861) | (33,141,851) | (60,269,072) | 147,252,032 | 7,934,261 | (16,715,305) | (892,095) | (59,521,470) | - | (8,366,360) | (3,673,443) | 60,221,914 | (31,575,661) | - | 34,045,953 | 7,423,099 | 27,222,855 |

Note: Cash Flow Waterfall as follows:
1. Annual Operating Expenses
2. Master Lease Base Rent
3. Priority Return to USBCDC
4. Tax Equivalency Distribution to USBCDC
5. Replacement Reserve Deposits
6. Supplemental Rent
7. Remaining cash to be distributed Pro-Rata

*Priority Returns for each year will be paid during January of the following year.  Cash distributions and special tax distributions will be paid during April of the following year.

Confidential

USBCDC00048555

**1501 Washington**

Last Hotel Master Tenant, LLC PROJECTED TAXABLE INCOME (LOSS)

| Year | Net Operating Income (from operations) | Pre-Opening Expenses (paid from development) | Interest Income | Accounting Expenses | Reserve Depreciation | FF&E Depreciation | Lease Payments | Supplemental Rent | Net Income (Loss) | Allocated Income (Loss) to U.S. Bancorp Community Development Corporation | Reallocation of Income (Loss) to U.S. Bancorp Community Development Corporation | Adjusted Income (Loss) to U.S. Bancorp Community Development Corporation | Allocated Income (Loss) to DFQ Management, LLC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | - | - | 80,817 | (10,000) | - | - | - | - | 70,817 | 70,109 | - | 70,109 | 708 |
| 2019 | 1,856,763 | - | 117,560 | (10,400) | - | (1,162,816) | (1,200,000) | (406,778) | (805,671) | (797,614) | - | (797,614) | (8,057) |
| 2020 | 2,727,245 | - | 143,806 | (10,816) | - | (996,766) | (1,650,000) | (663,595) | (450,125) | (445,624) | - | (445,624) | (4,501) |
| 2021 | 3,259,038 | - | 143,806 | (11,249) | - | (712,108) | (1,950,000) | (754,335) | (24,849) | (24,600) | - | (24,600) | (248) |
| 2022 | 3,392,439 | - | 143,806 | (11,699) | - | (508,383) | (1,950,000) | (770,635) | 295,528 | 292,572 | - | 292,572 | 2,955 |
| 2023 | 3,495,712 | - | 143,806 | (12,167) | (150,157) | (406,986) | (1,950,000) | (784,283) | 335,925 | 332,566 | - | 332,566 | 3,359 |
| 2024 | 3,600,583 | - | 143,806 | (12,653) | (257,337) | (406,520) | (1,950,000) | (828,344) | 289,535 | 76,968 | - | 76,968 | 212,567 |
| 2025 | 3,708,601 | - | 141,910 | (13,159) | (183,782) | (406,986) | (1,950,488) | (853,194) | 442,902 | 88,580 | - | 88,580 | 354,322 |
| 2026 | 3,819,859 | - | 136,774 | (13,686) | (131,243) | (50,699) | (1,950,975) | (878,790) | 931,241 | 186,248 | - | 186,248 | 744,992 |
| 2027 | 3,934,455 | - | 131,498 | (14,233) | (93,835) | - | (1,951,463) | (905,154) | 1,101,268 | 220,254 | - | 220,254 | 681,015 |
| 2028 | 4,052,488 | - | 126,079 | (14,802) | (93,730) | - | (1,951,951) | (932,308) | 1,185,776 | 237,155 | - | 237,155 | 948,620 |
| 2029 | 4,098,782 | - | 120,511 | (15,395) | (431,104) | - | (1,952,439) | (960,278) | 860,078 | 172,016 | - | 172,016 | 688,063 |
| 2030 | 4,214,902 | - | 114,792 | (16,010) | (624,872) | - | (1,952,927) | (989,086) | 746,799 | 149,360 | - | 149,360 | 597,439 |
| 2031 | 4,341,349 | - | 108,917 | (16,651) | (412,795) | - | (1,953,415) | (1,018,759) | 1,048,647 | 209,729 | - | 209,729 | 838,917 |
| 2032 | 4,471,589 | - | 102,881 | (17,317) | (294,766) | - | (1,953,903) | (1,049,321) | 1,259,143 | 251,829 | - | 251,829 | 1,007,314 |
| 2033 | 4,605,737 | - | 96,681 | (18,009) | (210,764) | - | (1,954,392) | (1,080,801) | 1,438,452 | 287,690 | - | 287,690 | 1,150,762 |
| 2034 | 4,251,751 | - | 90,312 | (18,730) | (210,528) | - | (1,954,880) | (1,100,000) | 1,057,924 | 211,585 | - | 211,585 | 846,340 |
| 2035 | 4,334,562 | - | 83,769 | (19,479) | (613,481) | - | (1,955,369) | (1,100,000) | 730,001 | 146,000 | - | 146,000 | 584,001 |
| 2036 | 4,464,599 | - | 77,047 | (20,258) | (795,435) | - | (1,955,858) | (1,100,000) | 670,095 | 134,019 | - | 134,019 | 536,076 |
| 2037 | 4,598,536 | - | 70,142 | (21,068) | (492,899) | - | (1,956,347) | (1,100,000) | 1,098,365 | 219,673 | - | 219,673 | 878,692 |
| 2038 | 4,736,493 | - | 63,049 | (21,911) | (351,990) | - | (1,956,836) | (1,100,000) | 1,368,605 | 273,761 | - | 273,761 | 1,095,044 |
| 2039 | 4,882,075 | - | 55,763 | (22,788) | (251,663) | - | (1,957,325) | (1,100,000) | 1,606,062 | 321,212 | - | 321,212 | 1,284,849 |
| 2040 | 5,028,537 | - | 48,278 | (23,699) | (251,381) | - | (1,957,815) | (1,100,000) | 1,743,920 | 348,784 | - | 348,784 | 1,395,136 |
| 2041 | 5,179,393 | - | 40,588 | (24,647) | (732,528) | - | (1,958,304) | (1,100,000) | 1,404,502 | 280,900 | - | 280,900 | 1,123,601 |
| 2042 | 5,334,775 | - | 32,689 | (25,633) | (949,791) | - | (1,958,794) | (1,100,000) | 1,333,246 | 266,649 | - | 266,649 | 1,066,597 |
| 2043 | 5,494,818 | - | 24,574 | (26,658) | (588,547) | - | (1,959,283) | (1,100,000) | 1,844,904 | 368,981 | - | 368,981 | 1,475,923 |
| 2044 | 5,659,663 | - | 16,238 | (27,725) | (420,294) | - | (1,959,773) | (1,100,000) | 2,168,109 | 433,622 | - | 433,622 | 1,734,487 |
| 2045 | 5,829,453 | - | 7,675 | (28,834) | (300,499) | - | (1,960,263) | (1,100,000) | 2,447,532 | 489,506 | - | 489,506 | 1,958,026 |
| 2046 | 6,004,336 | - | 553 | (29,987) | (300,162) | - | (1,960,753) | (1,100,000) | 2,613,987 | 522,797 | - | 522,797 | 2,091,190 |
| 2047 | 6,184,466 | - | - | (31,187) | (874,677) | - | (1,961,243) | (1,100,000) | 2,217,359 | 443,472 | - | 443,472 | 1,773,888 |
| 2048 | 6,370,000 | - | - | (32,434) | (1,134,100) | - | (1,961,734) | (1,100,000) | 2,141,733 | 428,347 | - | 428,347 | 1,713,386 |
| 2049 | 6,561,100 | - | - | (33,731) | (702,756) | - | (1,962,224) | (1,100,000) | 2,762,389 | 552,478 | - | 552,478 | 2,209,911 |
| 2050 | 6,757,933 | - | - | (35,081) | (501,853) | - | (1,962,715) | (1,100,000) | 3,158,284 | 631,657 | 130,828 | 762,485 | 2,395,800 |
| Total | 147,252,032 | - | 2,608,126 | (662,095) | (12,356,987) | (4,651,263) | (61,521,470) | (31,575,661) | 39,092,683 | 7,380,682 | 130,828 | 7,511,510 | 31,581,173 |

See Summary of Significant Assumptions and Accountant's Report

12/29/2017

Page 75

USBCDC00048556

**1501 Washington**

**MT ENTITY INTEREST EARNINGS ON WORKING CAPITAL RESERVES**

| Year | Beginning Balance | Deposits | Withdrawals | Ending Balance |
|------|------------------:|---------:|------------:|---------------:|
| 2017 | 100,000 | - | - | 100,000 |
| 2018 | - | - | - | 100,000 |
| 2019 | - | - | - | 100,000 |
| 2020 | - | - | - | 100,000 |
| 2021 | - | - | - | 100,000 |
| 2022 | - | - | - | 100,000 |
| 2023 | - | - | - | 100,000 |
| 2024 | - | - | - | 100,000 |
| 2025 | - | - | - | 100,000 |
| 2026 | - | - | - | 100,000 |
| 2027 | - | - | - | 100,000 |
| 2028 | - | - | - | 100,000 |
| 2029 | - | - | - | 100,000 |
| 2030 | - | - | - | 100,000 |
| 2031 | - | - | - | 100,000 |
| 2032 | - | - | - | 100,000 |
| 2033 | - | - | - | 100,000 |
| 2034 | - | - | - | 100,000 |
| 2035 | - | - | - | 100,000 |
| 2036 | - | - | - | 100,000 |
| 2037 | - | - | - | 100,000 |
| 2038 | - | - | - | 100,000 |
| 2039 | - | - | - | 100,000 |
| 2040 | - | - | - | 100,000 |
| 2041 | - | - | - | 100,000 |
| Total | | - | - | |

See summary of Significant Assumptions and Accountant's Report

12/29/2017

Confidential

USBCDC00048557

**1501 Washington**

Special Tax Distribution Calculation

| | Taxable Income (Loss) | Tax Credit Amortization* | Total Income | Tax Liability | Special Tax Distribution Due** |
|---|---|---|---|---|---|
| 2017 | - | - | - | - | - |
| 2018 | 70,109 | - | 70,109 | 16,826 | (16,826) |
| 2019 | (797,614) | 500,093 | (297,520) | (71,405) | - |
| 2020 | (445,624) | 500,093 | 54,469 | 13,073 | (13,073) |
| 2021 | (24,600) | 500,093 | 475,493 | 114,118 | (114,118) |
| 2022 | 292,572 | 500,093 | 792,666 | 190,240 | (190,240) |
| 2023 | 332,566 | 500,093 | 832,660 | 199,838 | (199,838) |
| 2024 | 76,968 | 500,093 | 577,061 | 138,495 | (138,495) |
| 2025 | 88,580 | 500,093 | 588,674 | 141,282 | (141,282) |
| 2026 | 186,248 | 500,093 | 686,342 | 164,722 | (164,722) |
| 2027 | 220,254 | 500,093 | 720,347 | 172,883 | (172,883) |
| 2028 | 237,155 | 500,093 | 737,249 | 176,940 | (176,940) |
| 2029 | 172,016 | 500,093 | 672,109 | 161,306 | (161,306) |
| 2030 | 149,360 | 500,093 | 649,453 | 155,869 | (155,869) |
| 2031 | 209,729 | 500,093 | 709,823 | 170,357 | (170,357) |
| 2032 | 251,829 | 500,093 | 751,922 | 180,461 | (180,461) |
| 2033 | 287,690 | 500,093 | 787,784 | 189,068 | (189,068) |
| 2034 | 211,585 | 48,942 | 260,526 | 62,526 | (62,526) |
| 2035 | 146,000 | 48,942 | 194,942 | 46,786 | (46,786) |
| 2036 | 134,019 | 48,942 | 182,961 | 43,911 | (43,911) |
| 2037 | 219,673 | 48,942 | 268,614 | 64,467 | (64,467) |
| 2038 | 273,761 | 48,942 | 322,702 | 77,449 | (77,449) |
| 2039 | 321,212 | 48,942 | 370,154 | 88,837 | (88,837) |
| 2040 | 348,784 | 48,942 | 397,725 | 95,454 | (95,454) |
| 2041 | 280,900 | 48,942 | 329,842 | 79,162 | (79,162) |
| 2042 | 266,649 | 48,942 | 315,591 | 75,742 | (75,742) |
| 2043 | 368,981 | 48,942 | 417,922 | 100,301 | (100,301) |
| 2044 | 433,622 | 48,942 | 482,563 | 115,815 | (115,815) |
| 2045 | 489,506 | 48,942 | 538,448 | 129,228 | (129,228) |
| 2046 | 522,797 | 48,942 | 571,739 | 137,217 | (137,217) |
| 2047 | 443,472 | 48,942 | 492,413 | 118,179 | (118,179) |
| 2048 | 428,347 | 48,942 | 477,288 | 114,549 | (114,549) |
| 2049 | 552,478 | 48,942 | 601,419 | 144,341 | (144,341) |
| 2050 | 762,485 | 48,942 | 811,426 | 194,742 | (194,742) |
| | 7,511,510 | 8,333,408 | 15,844,917 | 3,802,780 | (3,874,185) |

*50(d) income is included for purposes of this schedule only as 50(d) is a partner item.

**Special Tax Distribution is paid in the year in which tax is due.

See Summary of Significant Assumptions and Accountant's Report

Confidential

**1501 Washington**

**Last Hotel Master Tenant, LLC REPLACEMENT RESERVE**

| Year | Deposit to Reserve | Withdrawals | Interest Earnings | Ending Balance |
|------|------|------|------|------|
| 2019 | 128,851 | - | - | 128,851 |
| 2020 | 231,650 | - | - | 360,502 |
| 2021 | 336,032 | - | - | 696,534 |
| 2022 | 354,250 | - | - | 1,050,784 |
| 2023 | 364,877 | (1,050,784) | - | 364,877 |
| 2024 | 375,824 | - | - | 740,701 |
| 2025 | 387,098 | - | - | 1,127,799 |
| 2026 | 398,711 | - | - | 1,526,511 |
| 2027 | 410,673 | - | - | 1,937,183 |
| 2028 | 422,993 | - | - | 2,360,176 |
| 2029 | 435,683 | (2,360,176) | - | 435,683 |
| 2030 | 448,753 | - | - | 884,436 |
| 2031 | 462,216 | - | - | 1,346,651 |
| 2032 | 476,082 | - | - | 1,822,734 |
| 2033 | 490,365 | - | - | 2,313,098 |
| 2034 | 505,076 | - | - | 2,818,174 |
| 2035 | 520,228 | (2,818,174) | - | 520,228 |
| 2036 | 535,835 | - | - | 1,056,063 |
| 2037 | 551,910 | - | - | 1,607,972 |
| 2038 | 568,467 | - | - | 2,176,439 |
| 2039 | 585,521 | - | - | 2,761,960 |
| 2040 | 603,087 | - | - | 3,365,047 |
| 2041 | 621,179 | (3,365,047) | - | 621,179 |
| 2042 | 639,815 | - | - | 1,260,994 |
| 2043 | 659,009 | - | - | 1,920,003 |
| 2044 | 678,779 | - | - | 2,598,782 |
| 2045 | 699,143 | - | - | 3,297,925 |
| 2046 | 720,117 | - | - | 4,018,042 |
| 2047 | 741,721 | (4,018,042) | - | 741,721 |
| 2048 | 763,972 | - | - | 1,505,693 |
| 2049 | 786,891 | - | - | 2,292,584 |
| 2050 | 810,498 | - | - | 3,103,082 |
| Total | 16,715,305 | (13,612,223) | - | |

Note: Assumes Replacement Reserve balance will be withdrawn and spent every 6 years

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048559

**1501 Washington**

## Last Hotel Master Tenant, LLC DEPRECIATION SCHEDULE - REPLACEMENT RESERVES

|  | 2023 | 2029 | 2035 | 2041 | 2047 | Total |
|---|---|---|---|---|---|---|
| Replacement Reserves | 1,050,784 | 2,360,176 | 2,818,174 | 3,365,047 | 4,018,042 | 13,612,223 |

| Year | 2023 Replacement Reserves | 2029 Replacement Reserves | 2035 Replacement Reserves | 2041 Replacement Reserves | 2047 Replacement Reserves | Total |
|---|---|---|---|---|---|---|
| 2019 | - | - | - | - | - | - |
| 2020 | - | - | - | - | - | - |
| 2021 | - | - | - | - | - | - |
| 2022 | - | - | - | - | - | - |
| 2023 | 150,157 | - | - | - | - | 150,157 |
| 2024 | 257,337 | - | - | - | - | 257,337 |
| 2025 | 183,782 | - | - | - | - | 183,782 |
| 2026 | 131,243 | - | - | - | - | 131,243 |
| 2027 | 93,835 | - | - | - | - | 93,835 |
| 2028 | 93,730 | - | - | - | - | 93,730 |
| 2029 | 93,835 | 337,269 | - | - | - | 431,104 |
| 2030 | 46,865 | 578,007 | - | - | - | 624,872 |
| 2031 | - | 412,795 | - | - | - | 412,795 |
| 2032 | - | 294,786 | - | - | - | 294,786 |
| 2033 | - | 210,764 | - | - | - | 210,764 |
| 2034 | - | 210,528 | - | - | - | 210,528 |
| 2035 | - | 210,764 | 402,717 | - | - | 613,481 |
| 2036 | - | 105,264 | 690,171 | - | - | 795,435 |
| 2037 | - | - | 492,899 | - | - | 492,899 |
| 2038 | - | - | 351,990 | - | - | 351,990 |
| 2039 | - | - | 251,663 | - | - | 251,663 |
| 2040 | - | - | 251,381 | - | - | 251,381 |
| 2041 | - | - | 251,663 | 480,865 | - | 732,528 |
| 2042 | - | - | 125,691 | 824,100 | - | 949,791 |
| 2043 | - | - | - | 588,547 | - | 588,547 |
| 2044 | - | - | - | 420,294 | - | 420,294 |
| 2045 | - | - | - | 300,499 | - | 300,499 |
| 2046 | - | - | - | 300,162 | - | 300,162 |
| 2047 | - | - | - | 300,499 | 574,178 | 874,677 |
| 2048 | - | - | - | 150,081 | 984,019 | 1,134,100 |
| 2049 | - | - | - | - | 702,756 | 702,756 |
| 2050 | - | - | - | - | 501,853 | 501,853 |
|  | 1,050,784 | 2,360,176 | 2,818,174 | 3,365,047 | 2,762,806 | 12,356,987 |

Note: This model assumes that the Master Tenant has not elected to take bonus depreciation.

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048560

**1501 Washington**

**Last Hotel Master Tenant, LLC DEPRECIATION**

| Depreciation Start Date | Feb-19 | Total |
|---|---|---|
| Total Capitalized Costs | 4,651,263 | 4,651,263 |
| Total Basis | 4,651,263 | 4,651,263 |

| Year | 7.00 | Total |
|---|---|---|
| 2019 | 1,162,816 | 1,162,816 |
| 2020 | 996,766 | 996,766 |
| 2021 | 712,108 | 712,108 |
| 2022 | 508,383 | 508,383 |
| 2023 | 406,986 | 406,986 |
| 2024 | 406,520 | 406,520 |
| 2025 | 406,986 | 406,986 |
| 2026 | 50,699 | 50,699 |
| 2027 | - | - |
| 2028 | - | - |
| 2029 | - | - |
| 2030 | - | - |
| 2031 | - | - |
| 2032 | - | - |
| 2033 | - | - |
| 2034 | - | - |
| 2035 | - | - |
| 2036 | - | - |
| 2037 | - | - |
| 2038 | - | - |
| 2039 | - | - |
| 2040 | - | - |
| 2041 | - | - |
| 2042 | - | - |
| 2043 | - | - |
| 2044 | - | - |
| 2045 | - | - |
| 2046 | - | - |
| 2047 | - | - |
| 2048 | - | - |
| 2049 | - | - |
| 2050 | - | - |
| Total | 4,651,263 | 4,651,263 |

Note: This model assumes that the Master Tenant has not elected to take bonus depreciation.

See summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048561

**1501 Washington**

**Last Hotel Master Tenant, LLC TAX CREDIT AMORTIZATION**

| | | | |
|---|---|---|---|
| Federal Tax Credits | | 8,763,635 | |
| | | | |
| QIP Amortization Period | | 15.0 | years |
| Amortization Period | | 39.0 | years |

| Year | QIP Amortization | Base Amortization | Unamortized Credits |
|---|---|---|---|
| 2019 | 455,709 | 49,436 | 8,258,490 |
| 2020 | 455,709 | 49,436 | 7,753,345 |
| 2021 | 455,709 | 49,436 | 7,248,200 |
| 2022 | 455,709 | 49,436 | 6,743,055 |
| 2023 | 455,709 | 49,436 | 6,237,910 |
| 2024 | 455,709 | 49,436 | 5,732,765 |
| 2025 | 455,709 | 49,436 | 5,227,621 |
| 2026 | 455,709 | 49,436 | 4,722,476 |
| 2027 | 455,709 | 49,436 | 4,217,331 |
| 2028 | 455,709 | 49,436 | 3,712,186 |
| 2029 | 455,709 | 49,436 | 3,207,041 |
| 2030 | 455,709 | 49,436 | 2,701,896 |
| 2031 | 455,709 | 49,436 | 2,196,751 |
| 2032 | 455,709 | 49,436 | 1,691,606 |
| 2033 | 455,709 | 49,436 | 1,186,461 |
| 2034 | 0 | 49,436 | 1,137,025 |
| 2035 | - | 49,436 | 1,087,590 |
| 2036 | - | 49,436 | 1,038,154 |
| 2037 | - | 49,436 | 988,718 |
| 2038 | - | 49,436 | 939,282 |
| 2039 | - | 49,436 | 889,846 |
| 2040 | - | 49,436 | 840,410 |
| 2041 | - | 49,436 | 790,974 |
| 2042 | - | 49,436 | 741,538 |
| 2043 | - | 49,436 | 692,102 |
| 2044 | - | 49,436 | 642,667 |
| 2045 | - | 49,436 | 593,231 |
| 2046 | - | 49,436 | 543,795 |
| 2047 | - | 49,436 | 494,359 |
| 2048 | - | 49,436 | 444,923 |
| 2049 | - | 49,436 | 395,487 |
| 2050 | - | 49,436 | 346,051 |
| | 6,835,635 | 1,581,948 | |

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048562

**1501 Washington**

Last Hotel Master Tenant, LLC CAPITAL ACCOUNT ANALYSIS

| Year | Taxable Income (Loss) | Cash Flow | U.S. Bancorp Community Development Corporation | | | | | | DFQ Management, LLC | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Capital Contributions | Taxable Income (Loss) | Cash Flow | Capital Account Balance | Reallocation of Income (Loss) | Adjusted Capital Account | Capital Contributions | Taxable Income (Loss) | Cash Flow | Capital Account Balance | Reallocation of Income (Loss) | Adjusted Capital Account |
| 2017 | - | - | 2,993,219 | - | - | 2,993,219 | - | 2,993,219 | 100,000 | - | - | 100,000 | - | 100,000 |
| 2018 | 70,817 | 8,458 | - | 70,109 | (70,732) | 2,992,596 | - | 2,992,596 | - | 708 | (85) | 100,624 | - | 100,624 |
| 2019 | (805,671) | 71,784 | 5,986,439 | (797,614) | (227,576) | 7,953,845 | - | 7,953,845 | - | (8,057) | (718) | 91,849 | - | 91,849 |
| 2020 | (450,125) | 117,105 | 997,740 | (445,624) | (313,819) | 8,192,142 | - | 8,192,142 | - | (4,501) | (1,171) | 86,177 | - | 86,177 |
| 2021 | (24,849) | 138,607 | - | (24,600) | (349,841) | 7,817,700 | - | 7,817,700 | - | (248) | (1,386) | 84,542 | - | 84,542 |
| 2022 | 295,528 | 135,994 | - | 292,572 | (448,301) | 7,661,972 | - | 7,661,972 | - | 2,955 | (1,360) | 86,138 | - | 86,138 |
| 2023 | 335,925 | 138,403 | - | 332,566 | (526,807) | 7,467,731 | - | 7,467,731 | - | 3,359 | (1,384) | 88,113 | - | 88,113 |
| 2024 | 289,535 | 178,182 | - | 76,968 | (448,753) | 7,097,946 | - | 7,097,946 | - | 212,567 | (130,815) | 169,864 | - | 169,864 |
| 2025 | 442,902 | 496,624 | - | 88,580 | (437,407) | 6,749,119 | - | 6,749,119 | - | 354,322 | (397,459) | 126,727 | - | 126,727 |
| 2026 | 931,241 | 567,072 | - | 186,248 | (454,244) | 6,481,123 | - | 6,481,123 | - | 744,992 | (453,658) | 418,062 | - | 418,062 |
| 2027 | 1,101,268 | 618,867 | - | 220,254 | (488,043) | 6,213,333 | - | 6,213,333 | - | 881,015 | (495,094) | 803,962 | - | 803,962 |
| 2028 | 1,185,776 | 688,208 | - | 237,155 | (510,073) | 5,940,416 | - | 5,940,416 | - | 948,620 | (550,566) | 1,202,037 | - | 1,202,037 |
| 2029 | 860,078 | 688,706 | - | 172,016 | (514,229) | 5,598,202 | - | 5,598,202 | - | 688,063 | (550,965) | 1,339,135 | - | 1,339,135 |
| 2030 | 746,799 | 777,477 | - | 149,360 | (516,349) | 5,231,213 | - | 5,231,213 | - | 597,439 | (621,981) | 1,314,593 | - | 1,314,593 |
| 2031 | 1,048,847 | 865,097 | - | 209,729 | (528,436) | 4,912,506 | - | 4,912,506 | - | 838,917 | (692,078) | 1,461,432 | - | 1,461,432 |
| 2032 | 1,259,143 | 935,265 | - | 251,829 | (556,959) | 4,607,376 | - | 4,607,376 | - | 1,007,314 | (748,212) | 1,720,534 | - | 1,720,534 |
| 2033 | 1,438,452 | 1,012,366 | - | 287,690 | (582,482) | 4,312,584 | - | 4,312,584 | - | 1,150,762 | (809,893) | 2,061,403 | - | 2,061,403 |
| 2034 | 1,057,924 | 614,654 | - | 211,585 | (511,547) | 4,012,622 | - | 4,012,622 | - | 846,340 | (491,723) | 2,416,020 | - | 2,416,020 |
| 2035 | 730,001 | 807,616 | - | 146,000 | (423,598) | 3,735,025 | - | 3,735,025 | - | 584,001 | (646,093) | 2,353,928 | - | 2,353,928 |
| 2036 | 670,095 | 936,519 | - | 134,019 | (433,636) | 3,435,406 | - | 3,435,406 | - | 536,076 | (749,215) | 2,140,789 | - | 2,140,789 |
| 2037 | 1,098,365 | 1,055,958 | - | 219,673 | (454,850) | 3,200,429 | - | 3,200,429 | - | 878,692 | (844,766) | 2,174,714 | - | 2,174,714 |
| 2038 | 1,368,805 | 1,155,468 | - | 273,761 | (495,109) | 2,979,081 | - | 2,979,081 | - | 1,095,044 | (924,374) | 2,345,384 | - | 2,345,384 |
| 2039 | 1,606,062 | 1,289,649 | - | 321,212 | (530,926) | 2,769,367 | - | 2,769,367 | - | 1,284,849 | (1,015,719) | 2,614,514 | - | 2,614,514 |
| 2040 | 1,743,920 | 1,385,757 | - | 348,784 | (565,536) | 2,552,615 | - | 2,552,615 | - | 1,395,136 | (1,108,605) | 2,901,044 | - | 2,901,044 |
| 2041 | 1,404,502 | 1,510,465 | - | 280,900 | (597,095) | 2,236,420 | - | 2,236,420 | - | 1,123,601 | (1,208,372) | 2,816,273 | - | 2,816,273 |
| 2042 | 1,333,246 | 1,662,028 | - | 266,649 | (611,116) | 1,891,953 | - | 1,891,953 | - | 1,066,597 | (1,329,623) | 2,553,248 | - | 2,553,248 |
| 2043 | 1,844,904 | 1,804,783 | - | 368,981 | (636,246) | 1,624,688 | - | 1,624,688 | - | 1,475,923 | (1,443,826) | 2,585,345 | - | 2,585,345 |
| 2044 | 2,168,109 | 1,923,741 | - | 433,622 | (684,598) | 1,373,712 | - | 1,373,712 | - | 1,734,487 | (1,538,993) | 2,780,839 | - | 2,780,839 |
| 2045 | 2,447,532 | 2,056,055 | - | 489,506 | (726,574) | 1,136,644 | - | 1,136,644 | - | 1,958,026 | (1,644,844) | 3,094,021 | - | 3,094,021 |
| 2046 | 2,613,987 | 1,947,255 | - | 522,797 | (718,226) | 941,215 | - | 941,215 | - | 2,091,190 | (1,557,804) | 3,627,407 | - | 3,627,407 |
| 2047 | 2,217,359 | 2,013,550 | - | 443,472 | (739,475) | 645,212 | - | 645,212 | - | 1,773,888 | (1,610,840) | 3,790,454 | - | 3,790,454 |
| 2048 | 2,141,733 | 2,194,133 | - | 428,347 | (756,554) | 317,005 | - | 317,005 | - | 1,713,386 | (1,755,307) | 3,748,534 | - | 3,748,534 |
| 2049 | 2,762,389 | 2,364,156 | - | 552,478 | (786,926) | 82,554 | - | 82,554 | - | 2,209,911 | (1,891,325) | 4,067,120 | - | 4,067,120 |
| 2050 | 3,158,284 | 2,505,751 | - | 631,657 | (845,039) | (130,828) | 130,828 | 0 | - | 2,526,628 | (2,004,601) | 4,589,146 | (130,828) | 4,458,318 |

Confidential

USBCDC00048563

**1501 Washington**

**Last Hotel Master Tenant, LLC INVESTOR BENEFITS SCHEDULE - TAX CREDITS, TAX LOSSES AND CASH FLOW**

| Year | Capital Contributions | Tax Credit Amortization | Taxable Income (Loss) | Tax Savings (Expense) | Tax Credit | Cash Flow | Annual Benefits | Cumulative Annual Benefit | Net Annual Benefit |
|---|---|---|---|---|---|---|---|---|---|
| 2017 | (2,993,219) | - | - | - | - | - | - | - | (2,993,219) |
| 2018 | - | 70,109 | 70,110 | (16,826) | - | 70,732 | 53,906 | 53,906 | 53,906 |
| 2019 | (5,986,439) | 500,093 | (797,614) | 191,427 | 8,675,998 | 227,576 | 9,095,002 | 9,148,908 | 3,108,563 |
| 2020 | (997,740) | 500,093 | (445,624) | 106,950 | - | 313,819 | 420,769 | 9,569,676 | (576,971) |
| 2021 | - | 500,093 | (24,600) | 5,904 | - | 349,841 | 355,745 | 9,925,422 | 355,745 |
| 2022 | - | 500,093 | 292,572 | (70,217) | - | 448,301 | 378,083 | 10,303,505 | 378,083 |
| 2023 | - | 500,093 | 332,566 | (79,816) | - | 526,807 | 446,991 | 10,750,496 | 446,991 |
| 2024 | - | 500,093 | 76,968 | (18,472) | - | 446,753 | 428,281 | 11,178,777 | 428,281 |
| 2025 | - | 500,093 | 88,580 | (21,259) | - | 437,407 | 416,148 | 11,594,925 | 416,148 |
| 2026 | - | 500,093 | 186,248 | (44,700) | - | 454,244 | 409,545 | 12,004,469 | 409,545 |
| 2027 | - | 500,093 | 220,254 | (52,861) | - | 488,043 | 435,183 | 12,439,652 | 435,183 |
| 2028 | - | 500,093 | 237,155 | (56,917) | - | 510,073 | 453,156 | 12,892,808 | 453,156 |
| 2029 | - | 500,093 | 172,016 | (41,284) | - | 514,229 | 472,945 | 13,365,753 | 472,945 |
| 2030 | - | 500,093 | 149,360 | (35,846) | - | 516,349 | 480,503 | 13,846,256 | 480,503 |
| 2031 | - | 500,093 | 209,729 | (50,335) | - | 528,436 | 478,101 | 14,324,357 | 478,101 |
| 2032 | - | 500,093 | 251,829 | (60,439) | - | 556,959 | 496,520 | 14,820,876 | 496,520 |
| 2033 | - | 500,093 | 287,690 | (69,046) | - | 582,482 | 513,437 | 15,334,313 | 513,437 |
| 2034 | - | 48,942 | 211,585 | (50,780) | - | 511,547 | 460,766 | 15,795,080 | 460,766 |
| 2035 | - | 48,942 | 146,000 | (35,040) | - | 423,598 | 388,557 | 16,183,637 | 388,557 |
| 2036 | - | 48,942 | 134,019 | (32,165) | - | 433,638 | 401,473 | 16,585,110 | 401,473 |
| 2037 | - | 48,942 | 219,673 | (52,722) | - | 454,650 | 401,929 | 16,987,039 | 401,929 |
| 2038 | - | 48,942 | 273,761 | (65,703) | - | 495,109 | 429,406 | 17,416,445 | 429,406 |
| 2039 | - | 48,942 | 321,212 | (77,091) | - | 530,926 | 453,835 | 17,870,281 | 453,835 |
| 2040 | - | 48,942 | 348,784 | (83,708) | - | 565,536 | 481,828 | 18,352,109 | 481,828 |
| 2041 | - | 48,942 | 280,900 | (67,416) | - | 597,095 | 529,679 | 18,881,788 | 529,679 |
| 2042 | - | 48,942 | 266,649 | (63,996) | - | 611,116 | 547,120 | 19,428,908 | 547,120 |
| 2043 | - | 48,942 | 368,981 | (88,555) | - | 636,246 | 547,691 | 19,976,599 | 547,691 |
| 2044 | - | 48,942 | 433,622 | (104,069) | - | 684,598 | 580,528 | 20,557,127 | 580,528 |
| 2045 | - | 48,942 | 489,506 | (117,482) | - | 726,574 | 609,093 | 21,166,220 | 609,093 |
| 2046 | - | 48,942 | 522,797 | (125,471) | - | 718,226 | 592,755 | 21,758,975 | 592,755 |
| 2047 | - | 48,942 | 443,472 | (106,433) | - | 739,475 | 633,042 | 22,392,017 | 633,042 |
| 2048 | - | 48,942 | 428,347 | (102,803) | - | 756,554 | 653,751 | 23,045,767 | 653,751 |
| 2049 | - | 48,942 | 552,478 | (132,595) | - | 786,928 | 654,334 | 23,700,101 | 654,334 |
| 2050 | - | 48,942 | 762,485 | (182,996) | - | 845,039 | 662,042 | 24,362,144 | 662,042 |
|  | (9,977,398) | 8,333,408 | 7,511,510 | (1,802,762) | 8,675,998 | 17,488,908 | 24,362,144 | | |

Note: The HTCs will be earned in the year the project is place in service under the transition rule in Section 13402 of the 2017 Tax Act.

12/29/2017

Confidential

USBCDC00048564

**1501 Washington**

**INVESTOR CASH ON CASH INTERNAL RATE OF RETURN**

| Year | Investment | Special Tax Distribution* | Priority Return to U.S. Bancorp Community Development | Cash Flow | Total | Annual Cash on Cash Return |
|------|-----------|------------|------------|-----------|-------|------------|
| 2017 | (2,993,219) | - | - | - | (2,993,219) | 0.00% |
| 2018 | - | - | 62,359 | 8,374 | 70,732 | 2.36% |
| 2019 | (5,986,439) | 16,826 | 139,684 | 71,067 | (5,758,863) | 2.53% |
| 2020 | (997,740) | - | 197,885 | 115,934 | (683,921) | 3.15% |
| 2021 | - | 13,073 | 199,548 | 137,221 | 349,841 | 3.51% |
| 2022 | - | 114,118 | 199,548 | 134,635 | 448,301 | 4.49% |
| 2023 | - | 190,240 | 199,548 | 137,019 | 526,807 | 5.28% |
| 2024 | - | 199,838 | 199,548 | 47,367 | 446,753 | 4.48% |
| 2025 | - | 138,495 | 199,548 | 99,365 | 437,407 | 4.38% |
| 2026 | - | 141,282 | 199,548 | 113,414 | 454,244 | 4.55% |
| 2027 | - | 164,722 | 199,548 | 123,773 | 488,043 | 4.89% |
| 2028 | - | 172,883 | 199,548 | 137,642 | 510,073 | 5.11% |
| 2029 | - | 176,940 | 199,548 | 137,741 | 514,229 | 5.15% |
| 2030 | - | 161,306 | 199,548 | 155,495 | 516,349 | 5.18% |
| 2031 | - | 155,869 | 199,548 | 173,019 | 528,436 | 5.30% |
| 2032 | - | 170,357 | 199,548 | 187,053 | 556,959 | 5.58% |
| 2033 | - | 180,461 | 199,548 | 202,473 | 582,482 | 5.84% |
| 2034 | - | 189,068 | 199,548 | 122,931 | 511,547 | 5.13% |
| 2035 | - | 62,526 | 199,548 | 161,523 | 423,598 | 4.25% |
| 2036 | - | 46,786 | 199,548 | 187,304 | 433,638 | 4.35% |
| 2037 | - | 43,911 | 199,548 | 211,192 | 454,650 | 4.56% |
| 2038 | - | 64,467 | 199,548 | 231,094 | 495,109 | 4.96% |
| 2039 | - | 77,449 | 199,548 | 253,930 | 530,926 | 5.32% |
| 2040 | - | 88,837 | 199,548 | 277,151 | 565,536 | 5.67% |
| 2041 | - | 95,454 | 199,548 | 302,093 | 597,095 | 5.98% |
| 2042 | - | 79,162 | 199,548 | 332,406 | 611,116 | 6.13% |
| 2043 | - | 75,742 | 199,548 | 360,957 | 636,246 | 6.38% |
| 2044 | - | 100,301 | 199,548 | 384,748 | 684,598 | 6.86% |
| 2045 | - | 115,815 | 199,548 | 411,211 | 726,574 | 7.28% |
| 2046 | - | 129,228 | 199,548 | 389,451 | 718,226 | 7.20% |
| 2047 | - | 137,217 | 199,548 | 402,710 | 739,475 | 7.41% |
| 2048 | - | 118,179 | 199,548 | 438,827 | 756,554 | 7.58% |
| 2049 | - | 114,549 | 199,548 | 472,831 | 786,928 | 7.89% |
| 2050 | - | 144,341 | 199,548 | 501,150 | 845,039 | 8.47% |
|      | (9,977,398) | 3,679,443 | 6,386,366 | 7,423,099 | 7,511,510 | |

Cash on Cash Internal Rate of Return        3.45%

*Priority Returns for each year will be paid during January of the following year.  Cash distributions and special tax distributions will be paid during April of the following year.

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048565

**1501 Washington**

## CALCULATION OF HISTORIC TAX CREDITS

|  | Federal Credit | State Credit |
|---|---|---|
| Eligible Costs | 43,818,174 | 43,818,174 |
| Credit Rate | 20.00% | 25.00% |
| Total Calculated Credit | 8,763,635 | 10,954,544 |
| | | |
| Allocation to U.S. Bancorp Community Development Corporation | 99.00% | 100.00% |
| Rate Per Credit | 1.150 | 0.940 |
| | | |
| Total Paid | 9,977,398 | 10,297,271 |

See Summary of Significant Assumptions and Accountant's Report

Confidential

**1501 Washington**

**LAST HOTEL F&B, LLC PROJECTED CASH FLOW**

| Year | Catering Revenue | Rooftop Bar Revenue | Restaurant Revenue | Food & Beverage Revenue | Catering Expense | Rooftop Bar Expense | Restaurant Expense | Food & Beverage Expense | Food & Beverage NOI | Sublease Payment to Last Hotel Master Tenant, LLC* | Distributable Cash Flow |
|------|------|------|------|------|------|------|------|------|------|------|------|
| 2019 | 615,898 | 629,607 | 1,035,016 | 2,280,520 | (554,308) | (566,646) | (931,514) | (2,052,468) | 228,052 | (225,000) | 3,052 |
| 2020 | 900,701 | 707,194 | 1,143,630 | 2,751,526 | (789,810) | (620,127) | (1,002,831) | (2,412,768) | 338,758 | (335,000) | 3,758 |
| 2021 | 1,028,281 | 742,589 | 1,158,028 | 2,928,898 | (876,069) | (632,666) | (986,610) | (2,495,345) | 433,553 | (430,000) | 3,553 |
| 2022 | 1,061,589 | 766,643 | 1,195,539 | 3,023,771 | (902,351) | (651,646) | (1,016,208) | (2,570,205) | 453,566 | (450,000) | 3,566 |
| 2023 | 1,093,437 | 789,642 | 1,231,405 | 3,114,484 | (929,421) | (671,196) | (1,046,694) | (2,647,311) | 467,173 | (465,000) | 2,173 |
| 2024 | 1,126,240 | 813,331 | 1,268,347 | 3,207,919 | (957,304) | (691,332) | (1,078,095) | (2,726,730) | 481,188 | (478,950) | 2,238 |
| 2025 | 1,160,027 | 837,731 | 1,306,398 | 3,304,156 | (986,023) | (712,071) | (1,110,438) | (2,808,532) | 495,624 | (493,319) | 2,306 |
| 2026 | 1,194,828 | 862,863 | 1,345,590 | 3,403,281 | (1,015,604) | (733,434) | (1,143,751) | (2,892,788) | 510,493 | (508,118) | 2,375 |
| 2027 | 1,230,673 | 888,749 | 1,385,957 | 3,505,380 | (1,046,072) | (755,437) | (1,178,063) | (2,979,572) | 525,808 | (523,362) | 2,446 |
| 2028 | 1,267,593 | 915,412 | 1,427,536 | 3,610,541 | (1,077,454) | (778,100) | (1,213,405) | (3,068,959) | 541,582 | (539,062) | 2,519 |
| 2029 | 1,305,621 | 942,874 | 1,470,362 | 3,718,857 | (1,109,778) | (801,443) | (1,249,807) | (3,161,028) | 557,829 | (555,234) | 2,595 |
| 2030 | 1,344,790 | 971,160 | 1,514,473 | 3,830,423 | (1,143,071) | (825,486) | (1,287,302) | (3,255,859) | 574,564 | (571,891) | 2,673 |
| 2031 | 1,385,133 | 1,000,295 | 1,559,907 | 3,945,336 | (1,177,363) | (850,251) | (1,325,921) | (3,353,534) | 591,801 | (589,048) | 2,753 |
| 2032 | 1,426,687 | 1,030,304 | 1,606,704 | 4,063,696 | (1,212,684) | (875,758) | (1,365,698) | (3,454,141) | 609,555 | (606,720) | 2,836 |
| 2033 | 1,469,488 | 1,061,213 | 1,654,905 | 4,185,606 | (1,249,065) | (902,031) | (1,406,669) | (3,557,765) | 627,842 | (624,921) | 2,921 |
| 2034 | 1,513,573 | 1,093,049 | 1,704,553 | 4,311,175 | (1,286,537) | (929,092) | (1,448,869) | (3,664,498) | 646,677 | (643,669) | 3,008 |
| 2035 | 1,558,980 | 1,125,841 | 1,755,689 | 4,440,510 | (1,325,133) | (956,965) | (1,492,336) | (3,774,433) | 666,077 | (662,979) | 3,099 |
| 2036 | 1,605,749 | 1,159,616 | 1,808,360 | 4,573,725 | (1,364,887) | (985,673) | (1,537,106) | (3,887,666) | 686,060 | (682,868) | 3,191 |
| 2037 | 1,653,922 | 1,194,405 | 1,862,611 | 4,710,937 | (1,405,833) | (1,015,244) | (1,583,219) | (4,004,296) | 706,641 | (703,354) | 3,287 |
| 2038 | 1,703,539 | 1,230,237 | 1,918,489 | 4,852,265 | (1,448,008) | (1,045,701) | (1,630,715) | (4,124,424) | 727,841 | (724,455) | 3,386 |
| Total | 25,646,752 | 18,762,755 | 29,353,499 | 73,763,005 | (21,856,773) | (16,000,297) | (25,035,251) | (62,892,321) | 10,870,684 | (10,812,950) | 57,734 |

*Sublease Payment escalates at 3% annually beginning after 2023

Confidential                    USBCDC00048567

**1501 Washington**

**DFQ MANAGEMENT, LLC SOURCES AND USES OF FUNDS**

| Description | Closing | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | Jun-18 | Total |
|---|---|---|---|---|---|---|---|---|
| Equity Contribution | | | | | | | | |
| Octagon Bridge Loan | 5,230,769 | 1,961,538 | 1,961,538 | 1,961,538 | 1,961,538 | 1,961,538 | 1,961,538 | 17,000,000 |
| Octagon Mezz Loan | 2,769,231 | 1,038,462 | 1,038,462 | 1,038,462 | 1,038,462 | 1,038,462 | 1,038,462 | 9,000,000 |
| Master Tenant Loan | 2,993,219 | - | - | - | - | - | - | 2,993,219 |
| Total Sources: | 10,993,219 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 28,993,219 |
| | | | | | | | | |
| Loan to QALICB (Octagon Bridge Loan) | 2,897,853 | 1,961,538 | 1,961,538 | 1,961,538 | 1,961,538 | 1,961,538 | 1,961,538 | 14,667,081 |
| Loan to QALICB (Octagon Mezz Loan) | 2,769,231 | 1,038,462 | 1,038,462 | 1,038,462 | 1,038,462 | 1,038,462 | 1,038,462 | 9,000,003 |
| Leverage Loan | 5,326,135 | - | - | - | - | - | - | 5,326,135 |
| Total Uses: | 10,993,219 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 28,993,219 |

See Summary of Significant Assumptions and Accountant's Report

12/29/2017

Page  87

USBCDC00048568

**1501 Washington**

### DFQ MANAGEMENT, LLC PROJECTED CASH FLOW

| Year | Leverage Loan Payment Receipts | Priority Return from QALICB for Payment of Mezz Loan Extended Term Interest | Master Tenant Loan Debt Service | Distributable Cash Flow |
|---|---|---|---|---|
| 2017 | 799 | - | - | 799 |
| 2019 | 143,806 | 372,000 | (452,817) | 62,989 |
| 2020 | 143,806 | 668,000 | (785,560) | 26,245 |
| 2021 | 143,806 | - | (143,806) | - |
| 2022 | 143,806 | - | (143,806) | - |
| 2023 | 143,806 | - | (143,806) | - |
| 2024 | 143,806 | - | (143,806) | - |
| 2025 | 143,806 | - | (143,806) | - |
| 2026 | 330,205 | - | (330,205) | - |
| 2027 | 330,205 | - | (330,205) | - |
| 2028 | 330,205 | - | (330,205) | - |
| 2029 | 330,205 | - | (330,205) | - |
| 2030 | 330,205 | - | (330,205) | - |
| 2031 | 330,205 | - | (330,205) | - |
| 2032 | 330,205 | - | (330,205) | - |
| 2033 | 330,205 | - | (330,205) | - |
| 2034 | 330,205 | - | (330,205) | - |
| 2035 | 330,205 | - | (330,205) | - |
| 2036 | 330,205 | - | (330,205) | - |
| 2037 | 330,205 | - | (330,205) | - |
| 2038 | 330,205 | - | (330,205) | - |
| 2039 | 330,205 | - | (330,205) | - |
| 2040 | 330,205 | - | (330,205) | - |
| 2041 | 330,205 | - | (330,205) | - |
| 2042 | 330,205 | - | (330,205) | - |
| 2043 | 330,205 | - | (330,205) | - |
| 2044 | 330,205 | - | (330,205) | - |
| 2045 | 330,205 | - | (330,205) | - |
| 2046 | 330,205 | - | (330,205) | - |
| 2047 | 82,551 | - | (82,551) | (0) |
| 2048 | - | - | - | - |
| 2049 | - | - | - | - |
| 2050 | - | - | - | - |
| Total | 8,024,294 | 1,040,000 | (8,974,261) | 90,033 |

See Summary of Significant Assumptions and Accountant's Report

Confidential

USBCDC00048569



Independent Member of Nexia International

cohnreznick.com

Confidential

USBCDC00048570

EXHIBIT D

ARCHITECT'S CERTIFICATE

Exhibit D

Confidential



**ARCHITECT'S CERTIFICATION OF COMPLIANCE**

December 14, 2017

U.S. Bancorp Community Development Corporation
1307 Washington Avenue, Suite 300
St. Louis, Missouri 63103
Attn:  Director of Asset Management – HTC
Project Reference No. 24586

Last Hotel Master Tenant LLC
216 West Ohio Street, 5th Floor
Chicago, IL 60654

Re:     The Last Hotel – 1501 Washington Avenue, St. Louis, Missouri
        Historic Tax Credit Requirements

The undersigned, an architect duly licensed and registered in the State of Missouri, has prepared for 1501 Washington St. Louis, LLC, a Delaware limited liability company ("Owner"), plans, working drawings, and specifications dated October 18, 2017 (the "Plans and Specifications"), in connection with the rehabilitation of the building located at 1501 Washington Avenue, St. Louis, Missouri 63103 known as the International Shoe building (the "Building").

The undersigned understands that: (1) U.S. Bancorp Community Development Corporation, a Minnesota corporation ("USBCDC"), is about to become an investor member in Last Hotel Master Tenant LLC, a Missouri limited liability company ("Master Tenant"), and (2) Master Tenant will lease the rehabilitated Building from Owner (collectively, (1) and (2) above are referred to as the "Transaction").

In order to induce USBCDC and Master Tenant to enter into the Transaction, the undersigned hereby certifies that:

1.      <u>Plans and Specifications; Historic Rehabilitation</u>. The Plans and Specifications comply with and conform to the requirements of law, have been or will be duly filed with and have been or are expected to be approved by the local or municipal department of buildings or such other department, board, or agency having similar functions, and governmental and municipal authorities having jurisdiction thereover, and are in compliance with known applicable zoning, building, fire, health, and other governmental laws, ordinances, rules, regulations,

Last Hotel - Architect's Certificate of Compliance
#8383550

ARCHITECTURE & DESIGN
500 Washington Avenue South Suite 1080
Minneapolis, MN 55415 p 612.339.5508
www.esgarchitects.com

USBCDC00048572

U.S. Bancorp Community Development Corporation
Last Hotel Master Tenant
December 14, 2017

Page 2

restrictions, and requirements, and the requirements of the underwriters laboratories (UL) or other similar body acting in and for the locality in which the Building is located.  In addition, the Plans and Specifications comply with the requirements, guidelines, and recommendations of the State Historic Preservation Office of the State of Missouri and the National Park Service, and have received an unconditional determination of approval (collectively, the "Part 2 Approval") from the National Park Service pursuant to Part 2 of the Historic Preservation Certification Application for the Building (as may be amended, the "Federal Certification Application") and pursuant to the Missouri Department of Economic Development Historic Preservation Tax Credit Program Preliminary Approval Form 1 – Part 1A and Part 1B and the Plans and Specifications are consistent with the historic character of the Building and meet the Standards for Rehabilitation established by the Secretary of the Interior (the "Secretary") as set forth at 36 C.F.R. 67.7 (the "Secretary's Standards").

2.    Building Permits.  Valid building permits have been or will be issued by the applicable governmental authorities of the City of St. Louis, Missouri, for the rehabilitation of the Building, and valid occupancy permits are in place for occupied buildings.

3.    Certificate of Occupancy.  In the opinion of the undersigned, upon completion of the rehabilitation of the Building, substantially in accordance with the Plans and Specifications, all of the preconditions will have been met justifying the issuance of (a) new permanent certificates of occupancy for the Building, and (b) such other necessary approvals, certificates, permits, and licenses that may be required by the local or municipal fire, health, safety, buildings, housing, environmental, zoning, and planning boards, agencies, or departments and other governmental authorities having jurisdiction thereover.

4.    Compliance with Laws.  In the opinion of the undersigned, (i) the proposed rehabilitation of the Building is, and the condition of the Building after completion of rehabilitation substantially in accordance with the Plans and Specifications will be, in compliance with known current applicable zoning, environmental, building, fire, health, and other governmental laws, ordinances, rules, regulations, restrictions, the Secretary's Standards and the Part 2 Approval, and (ii) known existing building, and other municipal violations filed or noted against the Building, if any, will be corrected upon completion of the construction substantially in accordance with the Plans and Specifications.  In addition, it is the opinion of the undersigned that after completion of rehabilitation of the Building substantially in accordance with the Plans and Specifications, the Building will constitute a "certified rehabilitation" as that term is used in Part 3 of the Federal Certification Application.

5.    Utilities.  Necessary gas, electric, water, and sewer services and other utilities will be available to the Building upon completion of the Building substantially in accordance with the Plans and Specifications, and all such systems are independent systems and do not rely upon systems in other buildings or improvements.

Last Hotel - Architect's Certificate of Compliance
#8383550

Confidential

U.S. Bancorp Community Development Corporation
Last Hotel Master Tenant
December 14, 2017

Page 3

6.    <u>Substantial Completion</u>.  As of the date hereof, the rehabilitation of the Building is not substantially completed.  The undersigned will issue an AIA certificate of substantial completion for the Building at such future date as the Building is substantially completed and placed in service.

7.    <u>Cost Respecting New Construction</u>.  The undersigned hereby certifies that (i) none of its costs and expenses are attributable to design and inspection work respecting new construction and (ii) no construction costs are anticipated to be incurred by the general contractor and subcontractors attributable to any new construction in the Building.

The undersigned acknowledges that the failure of the completed Building to meet the Secretary's Standards and/or to be consistent with the work described in Part 2 of the Federal Certification Application, as approved by the National Park Service, could result in the loss of certain economic and tax benefits including the Federal historic rehabilitation tax credit to Master Tenant.  The undersigned agrees to provide professional services, as required, in order to assist the Owner in acquiring approvals in conformance with the Secretary's Standards.  Notwithstanding the foregoing, the undersigned agrees not to prepare or recommend change orders to, or to authorize changes in, the Plans and Specifications unless the Secretary's approval of such changes has been obtained, if and to the extent such approval is required by 36 C.F.R. 67.6(d).

Very truly yours,

ELNESS  SWENSON  GRAHAM  ARCHITECTS, INC., a Wyoming corporation

By:  _____
Name: Terry Gruenhagen
Title:   Principal

Last Hotel - Architect's Certificate of Compliance
#8383550

Confidential

EXHIBIT E

DISCLOSURE OF CHANGE ORDER CERTIFICATION

Exhibit E

[_____], 201[___]

U.S. Bancorp Community Development Corporation
1307 Washington Avenue, Suite 300
St. Louis, Missouri 63103
Project Reference: 24586
Attn: Director of Asset Management – HTC
Facsimile:  (314) 335-2601

To Whom It May Concern:

The undersigned hereby certify that the following is true and correct in all material respects and not misleading on and as of the date hereof:

There are no changes orders or potential change orders, pending or otherwise, other than those listed below [Note: You may reference the PCO log or similar document and attach it as an exhibit to this document - a PCO log is used to track Potential Change Orders and the status thereof (approved/presented/proposed)] and that the current construction budget is sufficient to complete the Project in accordance with the current plans and specifications.

**[SIGNATURES BEGIN ON THE FOLLOWING PAGE]**

IN WITNESS WHEREOF, the undersigned has executed this certification as of this [____] day of [_____], 201[__].

**MASTER LANDLORD:**

**1501 WASHINGTON ST. LOUIS, LLC**, a Delaware limited liability company

By:    DFQ Management LLC, a Delaware limited liability company, its manager

        By:     _____
        Name: Michael S. Qualizza
        Title:  Authorized Signatory


**GENERAL CONTRACTOR**:

**PARIC CORPORATION**, a Missouri corporation

By:     _____
Name: _____
Title: _____


**ARCHITECT**:

**ELNESS SWENSON GRAHAM ARCHITECTS, INC.**, a Wyoming corporation

By:     _____
Name: _____
Title: _____

Confidential

USBCDC00048577

EXHIBIT F

FORM OF AMENDMENT

Exhibit F

Project No. 24586

Confidential

[FIRST] AMENDMENT TO
OPERATING AGREEMENT OF
LAST HOTEL MASTER TENANT LLC

THIS [FIRST] AMENDMENT TO OPERATING AGREEMENT OF LAST HOTEL MASTER TENANT LLC ("Amendment") is dated as of [_____], 201[__], by and between DFQ Management LLC, a Delaware limited liability company, as the managing member ("Managing Member"), and U.S. Bancorp Community Development Corporation, a Minnesota Corporation, as the investor member ("Investor Member").

## RECITALS:

The following Recitals are a material part of this Amendment:

A.      Managing Member and Investor Member entered into that certain Operating Agreement of Last Hotel Master Tenant LLC dated as of December 29, 2017 (as amended, the "Agreement").

B.      Managing Member and Investor Member desire to amend the Agreement on the terms and conditions set forth herein.

Any and all capitalized terms not otherwise defined herein shall have the meaning given to them in the Agreement.

**NOW, THEREFORE**, in consideration of the foregoing recitals, which are hereby incorporated into the terms of this Amendment, the parties hereby mutually agree as follows:

1.      The Agreement is amended as follows:

a.      Schedule A of the Agreement is hereby deleted in its entirety and replaced with Schedule A attached hereto

b.      [Amendments to Article 5, if any]

c.       [Other amendments, if any]

2.      It is understood and agreed that, except as specifically amended herein, all of the terms, conditions, provisions and covenants contained in the Agreement remain unchanged and in full force and effect, and are hereby ratified and affirmed.

3.      The covenants and agreements contained in this Amendment shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, personal representatives, successors and permitted assigns.

4.      The Managing Member may not assign this Agreement without the Consent of the Investor Member.

First Amd Operating Agreement                                                  Project No. 24586
Last Hotel Master Tenant LLC

5.      This Amendment may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.  Facsimile or other electronic execution of this Amendment shall be valid and binding for all purposes.

6.      This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

7.      This Amendment shall be construed and enforced in accordance with the laws of the State of Missouri, without regard to principles of conflicts of laws.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**[SIGNATURE PAGE FOLLOWS]**

First Amd Operating Agreement
Last Hotel Master Tenant LLC

Project No. 24586

**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment as of the day and year last above written.

**MANAGING MEMBER:**

**DFQ MANAGEMENT LLC**,
a Delaware limited liability company


By: _____
     [Name], [Title]



**INVESTOR MEMBER:**

**U.S. BANCORP COMMUNITY DEVELOPMENT CORPORATION**,
a Minnesota corporation


By: _____
     [Name], [Title]

Signature Page

First Amd Operating Agreement
Last Hotel Master Tenant LLC

Project No. 24586

USBCDC00048581

SCHEDULE A

Members, Capital Contributions and Company Interests

|  | Capital Contribution | Company Interest |
|---|---|---|
| Investor Member<br><br>U.S. Bancorp Community Development Corporation<br>1307 Washington Avenue, Suite 300<br>St. Louis, Missouri 63103<br>Project Reference:  24586<br>Attn: Director of Asset Management – HTC<br>Facsimile:  (314) 335-2601 | $[_____]* | 99.00% (until the Flip Date)<br><br>20.00% (from and after the Flip Date) |
| Managing Member<br><br>DFQ Management LLC<br>216 W Ohio Street, Floor 5<br>Chicago, IL 60654<br>Attn: Michael S. Qualizza | $[_____]* | 1.00% (until the Flip Date)<br><br>80.00% (from and after the Flip Date) |

*Payable as and when provided in this Agreement, subject to adjustment as provided for in this Agreement.

Schedule A

EXHIBIT G

FORM OF PRELIMINARY COST CERTIFICATION

#8370189 Operating Agreement
Last Hotel Master Tenant LLC

Project No. 24586

Confidential

USBCDC00048583

| | Actual Costs Incurred Through _____, 20__ | | | Estimated Costs From _____, 20__ Through Project Completion | | | Estimated Grand Total Costs | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total Costs | Qualified Rehabilitation Expenditures | Nonqualified Rehabilitation Expenditures | Total Costs | Qualified Rehabilitation Expenditures | Nonqualified Rehabilitation Expenditures | Total Costs | Qualified Rehabilitation Expenditures | Nonqualified Rehabilitation Expenditures |
| Land | | | | | | | | | |
| Building Acquisition | | | | | | | | | |
| Construction Contract | | | | | | | | | |
| Abatement | | | | | | | | | |
| Tenant Improvements | | | | | | | | | |
| Land Improvements | | | | | | | | | |
| Personal Property | | | | | | | | | |
| Development Fee | | | | | | | | | |
| Architecture | | | | | | | | | |
| Engineering | | | | | | | | | |
| Construction Consultant | | | | | | | | | |
| Insurance | | | | | | | | | |
| Real Estate Taxes | | | | | | | | | |
| Interest | | | | | | | | | |
| Legal | | | | | | | | | |
| Cost Certification | | | | | | | | | |
| Audit, Tax | | | | | | | | | |
| Marketing | | | | | | | | | |
| Loan Fees | | | | | | | | | |
| Appraisal | | | | | | | | | |
| Recording and Disbursing | | | | | | | | | |
| Other Professional Fees | | | | | | | | | |
| Total | | | | | | | | | |
| Federal Historic Tax Credit Percentage | | 20% | | | 20% | | | 20% | |
| Federal Historic Tax Credit | | | | | | | | | |

#8370189 Preliminary Cost Certification                                   Project No. 24586
Last Hotel Master Tenant LLC

EXHIBIT H

FORM OF ANNUAL INVESTOR MEMBER REPORT

| **Annual Investor Member Report** |
| --- |

Reporting Year _____

**Estimate of the Investor Member's Share of the following:**

Federal Historic Tax Credits $_____

Profits or Losses $_____

**Net Cash Flow Calculation:**

Add:

Operating Income*

Other Funds**

Less:

Operating Expenses*** $_____

**Net Cash Flow** $_____

**Anticipated Payment of Net Cash Flow:**

1  To Investor Member for any outstanding Credit Recovery Loans and interest $_____
2  To Investor Member for any outstanding Priority Return $_____
3  To Investor Member for any outstanding Special Tax Distribution $_____
4  To Funding the Replacement Reserve $_____
5  To Repayment of any IM Loans, including interest $_____
6  To Repayment of any Subordinated Loans pari passu $_____
7  To Payment of Supplemental Rent _____
8  Balance to the Members in accordance with their Membership Interest $_____

**Net Cash Flow** $_____

\* As defined in the MTOA.

\*\*Per the MTOA, other funds deemed available for distribution by the Managing Member with the approval of the Lenders, if required (excluding loans, condemnation and casualty proceeds, tenant security deposits, and interest thereon, unless forfeited to the Company).

\*\*\*As defined in the MTOA. Per the MTOA, includes Debt Service and all other cash expenditures (whether or not such expenditures are deducted, amortized or capitalized for tax purposes).

Exhibit H

EXHIBIT I

FORM OF SYNDICATION ASSIGNMENT AND ASSUMPTION AGREEMENT

Exhibit I

Confidential

## ASSIGNMENT AND ASSUMPTION AGREEMENT

For good and valuable consideration U.S. BANCORP COMMUNITY DEVELOPMENT CORPORATION, a Minnesota corporation ("Assignor"), the holder of the Investor Member interest (the "Interest") in **Last Hotel Master Tenant LLC**, a Missouri limited liability company (the "Company"), under that certain Operating Agreement dated as of December 29, 2017 (the "Operating Agreement"), between DFQ Management LLC, a Delaware limited liability company, as the Managing Member, and Assignor as Investor Member, effective as of the Effective Date, as defined below, hereby assigns, transfers, and conveys to [Name of Fund], [a Fund Company Type] ("Assignee"), all of Assignor's right, title, and interest in and to the Interest and the Company, free and clear of all liens, claims, encumbrances, or restrictions of any kind except those arising under the Operating Agreement.

Assignor and Assignee each state their intent that, as of [_____], 20[__] (the "Effective Date"), Assignee shall become a Substitute Member in the Company in Assignor's place.  In the event that, for any reason whatsoever, Assignee is not recognized as a Substitute Member, Assignor agrees to exercise its voting rights and other rights under the Operating Agreement as directed by Assignee.

As of the Effective Date, Assignee hereby assumes all of the obligations of Assignor as investor member under the Operating Agreement, Assignee hereby accepts all of the terms and provisions of the Operating Agreement, and Assignee agrees to become a Substituted Member in the Company in Assignor's place; provided, however, (i) any distributions or payments from the Company, the Managing Member, the Guarantor or their respective Affiliates in connection with a shortfall, loss or recapture of Federal Historic Tax Credits allocable to Assignor with respect to the period on or before the date of the Effective Date shall be the sole and exclusive property of Assignor, (ii) any distributions or payments from the Company, the Managing Member, the Guarantor or their respective Affiliates in connection with a shortfall, loss or recapture of Federal Historic Tax Credits allocable to Assignee with respect to the period after the Effective Date shall be the sole and exclusive property of Assignee, (iii) distributions of Net Cash Flow and [net proceeds of liquidation] from the Company for the [20__] Fiscal Year shall be prorated between Assignor and Assignee based upon the number of days each held the Interest during [20__] regardless of when such distributions are actually made by the Company, (iv) Assignee shall be liable for the payment to the Company of any scheduled capital contributions due under the Operating Agreement after the Effective Date and shall have the right in its sole discretion to accelerate the payment of all or any portion of such capital contributions, and (v) the transferred Interest shall not include the right of Assignor and/or its Affiliates to be paid fees by the Company as provided in the Operating Agreement and related investment documents (regardless of whether such fees are payable after the Effective Date or accrued as of the Effective Date) and to be repaid loans and other advances made by Assignor and/or its Affiliates, including interest and penalties (if any) thereon.

This Assignment and Assumption Agreement shall be governed by and construed in accordance with the laws of the State of Missouri.

This Assignment and Assumption Agreement may be executed by the parties in one or more counterparts, each such counterpart shall be deemed an original, and all such counterparts taken together shall constitute one and the same instrument.

Capitalized terms not defined in this Assignment and Assumption Agreement will have the same meanings in this Assignment and Assumption Agreement as in the Operating Agreement.

This Assignment and Assumption Agreement is dated and effective as of the Effective Date.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, the parties hereto have executed this Assignment and Assumption Agreement as of the Effective Date.

ASSIGNOR:

**U.S. BANCORP COMMUNITY DEVELOPMENT CORPORATION**, a Minnesota corporation

By: _____
Name: _____
Title: _____

ASSIGNEE:

**[FUND NAME]**

By:    U.S. Bancorp Community Development
       Corporation, a Minnesota corporation, its [_____]

       By: _____
       Name: _____
       Title: _____

Confidential

EXHIBIT J

FORM OF SYNDICATION OPERATING AGREEMENT AMENDMENT

Exhibit J

[FIRST] AMENDMENT TO
OPERATING AGREEMENT OF
LAST HOTEL MASTER TENANT LLC


THIS [FIRST] AMENDMENT TO OPERATING AGREEMENT OF LAST HOTEL MASTER TENANT LLC (this "Amendment") is dated as of [_____], 201[__], by and between DFQ Management LLC, a Delaware limited liability company, as the managing member ("Managing Member"), [Name of Fund], [Fund Company Type] (the "Assignee"), and U.S. Bancorp Community Development Corporation, a Minnesota Corporation, as the investor member ("Withdrawing Member").

## RECITALS

The following Recitals are a material part of this Amendment:

A.      Managing Member and Withdrawing Member entered into that certain Operating Agreement of Last Hotel Master Tenant LLC dated as of December 29, 2017 (as amended, the "Agreement").

B.      Managing Member and Withdrawing Member desire to amend the Agreement to reflect Withdrawing Member's assignment of its entire Company Interest in the Company to the Assignee, the withdrawal of Withdrawing Member as the Investor Member of the Company, and the admission of the Assignee as a Substitute Investor Member of the Company.

Any and all capitalized terms not otherwise defined herein shall have the meaning given to them in the Agreement.

NOW, THEREFORE, in consideration of the foregoing, of the mutual promises of the parties hereto, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally to be bound, hereby agree as follows:

1.      Effective as of [DATE], Withdrawing Member hereby assigns, grants, transfers and sets over to the Assignee all of Withdrawing Member's rights, title and interest as the Investor Member of the Company and withdraws from the Company as its Investor Member and the Assignee hereby assumes all of such right, title and interest, and all duties and obligations of the Investor Member arising from and after the date hereof, including, without limitation, the obligation to pay all unpaid Capital Contributions, as and when payable under the Agreement, as amended hereby; provided, however, that Withdrawing Member shall remain liable for the amount of its unpaid Capital Contribution obligations to the extent the Assignee does not make said Capital Contributions and all indemnifications in its favor set forth in the Agreement, as amended hereby, shall survive the withdrawal of the Withdrawing Member pursuant to this Amendment and may be enforced directly by the Withdrawing Member following such withdrawal.  The Assignee is hereby admitted to the Company as the Substitute Investor Member pursuant to Article IX of the Agreement and shall have the Interest specified on Exhibit A, and further provided that Withdrawing Member hereby retains its right, title and interest to:  (i) all

Confidential

asset management fees payable to the Withdrawing Member under the Agreement, whether payable following the date hereof or accrued and unpaid as of the date hereof, and (ii) to repayment of all amounts payable to the Withdrawing Member from loans and other advances (but not Capital Contributions) made to the Company prior to the date hereof.  The Assignee hereby agrees to be bound by all the terms and provisions of the Agreement, as amended by this Amendment, to the same extent and on the same terms as Withdrawing Member.  The Managing Member hereby consents to such assignment and admission of the Assignee as the Substitute Investor Member.

2.      The definition of the term "Investor Member" in Section 2.1 of the Agreement is hereby amended to read as follows:

"Investor Member" means [Name of Fund], [Fund Company Type], and its successors and assigns, and in the event of more than one Investor Member, Investor Member means, collectively, all such Investor Members.

3.      The name and address of the Withdrawing Member in Article XVI of Schedule B of the Agreement is hereby deleted in its entirety and the following is substituted therefor:

> [Name of Fund]
> ℅ U.S. Bancorp Community Development
> Corporation
> 1307 Washington Avenue, Suite 300
> Mail Code:  SL MO RMCD
> St. Louis, MO  63103
> Attn.:  Director of Syndication
> Phone:  (314) 335-2600
> Fax:  (314) 335-2601
>
> with a copy to:
>
> U.S. Bancorp Community Development Corporation
> 1307 Washington Avenue, Suite 300
> Mail Code:  SL MO RMCD
> St. Louis, MO  63103
> Attn.:  Director of Asset Management
> Phone:  (314) 335-2600
> Fax:  (314) 335-2601
>
> and
>
> **[counsel]**

4.      Schedule A of the Agreement is hereby deleted in its entirety and replaced with Schedule A attached hereto

.

Confidential

5.     Upon the request of the Assignee, the Managing Member agrees to elect under Sections 743 and 754 of the Code to adjust the basis of the Company's property with respect to the Company's taxable year ending as of the date hereof.

6.     Withdrawing Member hereby agrees to pay the Managing Member's reasonable incurred legal fees and costs incurred as a direct result of the transfer of the Interest to the Assignee, upon Withdrawing Member's receipt of evidence of such fees and costs, which evidence may include but is not limited to invoices for such fees and costs.

7.     It is understood and agreed that, except as specifically amended herein, all of the terms, conditions, provisions and covenants contained in the Agreement remain unchanged and in full force and effect, and are hereby ratified and affirmed.

8.     The covenants and agreements contained in this Amendment shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, personal representatives, successors and permitted assigns.

9.     The Managing Member may not assign this Agreement without the Consent of the Withdrawing Member.

10.     This Amendment may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.  Facsimile or other electronic execution of this Amendment shall be valid and binding for all purposes.

11.     This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

12.     This Amendment shall be construed and enforced in accordance with the laws of the State of Missouri, without regard to principles of conflicts of laws.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**[SIGNATURE PAGE FOLLOWS]**

Confidential

**IN WITNESS WHEREOF**, the parties hereto have executed this Amendment as of the day and year last above written.

**MANAGING MEMBER:**

**DFQ MANAGEMENT LLC**,
a Delaware limited liability company

By: _____
       [Name], [Title]

**ASSIGNEE:**

**[NAME OF FUND]**,
[Fund Company Type]

By: _____
       [Name], [Title]

**WITHDRAWING MEMBER:**

**U.S. BANCORP COMMUNITY DEVELOPMENT CORPORATION**,
a Minnesota corporation

By: _____
       [Name], [Title]

Confidential

USBCDC00048594

By **[his/its/their]** signature**[s]** below, **[NAME]**, **[each]** as guarantor (the "*Guarantor*") **[(individually and collectively, jointly and severally)],** hereby consents to the execution of this Amendment and to the admission of the Assignee as a Substitute Investor Member of the Company and acknowledges and agrees that **[his/its/their]** obligations as Guarantor are hereby ratified and confirmed, and remain valid and in full force and effect in accordance with the terms of the Guaranty dated **[DATE]** and that for purposes of such Guaranty, the term "Master Tenant Operating Agreement" shall include the Agreement, as amended by all of the terms and provisions of this Amendment.

GUARANTOR:

_____
**[NAME]**
Guarantor's SSN _____

**[individual]**

STATE OF                           )
                                   ) ss.
COUNTY OF                          )

The foregoing instrument was acknowledged before me this___ day of _____, 20__ by **[NAME]**, as Guarantor.  [He/She/It] is personally known to me or has produced a driver's license as identification.

_____
Notary Public

_____
Print Name

My commission expires:

_____

**[or corporate]**

STATE OF                           )
                                   ) ss.
COUNTY OF                          )

On this _____ day of _____, 20__, before me appeared _____ to me personally known, who, being by me duly sworn, did say that _____ is the _____ of _____, a _____ of the State of _____, and that said instrument was signed in behalf of said corporation, by authority

Confidential

of its _____; and said _____ acknowledged said instrument to be the free act and deed of said _____.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal in the location aforesaid, the day and year first above written.

_____
Notary Public

_____
Print Name

My commission expires:

_____

First Amd Operating Agreement
Last Hotel Master Tenant LLC

Project No. 24586

SCHEDULE A

<u>Members, Capital Contributions and Company Interests</u>

|  | Capital Contribution | Company Interest |
|---|---|---|
| <u>Investor Member</u><br><br>[Name of Fund]<br>°/o U.S. Bancorp Community Development Corporation<br>1307 Washington Avenue, Suite 300<br>St. Louis, Missouri 63103<br>Project Reference:  24586<br>Attn: Director of Asset Management – HTC<br>Facsimile:  (314) 335-2601 | $[_____]* | 99.00% (until the Flip Date)<br><br>20.00% (from and after the Flip Date) |
| <u>Managing Member</u><br><br>DFQ Management LLC<br>216 W Ohio Street, Floor 5<br>Chicago, IL 60654<br>Attn: Michael S. Qualizza | $[_____]* | 1.00% (until the Flip Date)<br><br>80.00% (from and after the Flip Date) |

*Payable as and when provided in this Agreement, subject to adjustment as provided for in this Agreement.

EXHIBIT K

FORM OF WORKING CAPITAL RESERVE WITHDRAWAL REQUEST

_____, ____

U.S. Bancorp Community Development Corporation
1307 Washington Avenue, Suite 300
St. Louis, Missouri 63103
Attention: Asset Management – HTC

     Re:    Last Hotel Master Tenant LLC, #24586 (the "Project")

We are submitting to you a request to withdraw funds from the Working Capital Reserve for the following amount, due as noted below in accordance with the Operating Agreement of Last Hotel Master Tenant LLC, dated as of December 29, 2017 (the "Operating Agreement").

Total Working Capital Reserve Withdrawal: $[_____]

Wiring Instructions:

                                  Best Regards:

                                  **DFQ MANAGEMENT LLC**, a Delaware limited liability company

                                  By_____
                                  Name _____
                                  Title_____

#8370189 Operating Agreement
Last Hotel Master Tenant LLC

Project No. 24586

Confidential

USBCDC00048598