# EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF MISSOURI
 2                       EASTERN DIVISION

 3

 4   U.S. BANK, National Association,   )
                                        )
 5     Plaintiff,                       )
                                        ) Case No.
 6            vs.                       ) 4:21-cv-00120
                                        )
 7   MICHAEL QUALIZZA, NEIL D. FREEMAN, )
     TIMOTHY DIXON,                     )
 8                                      )
       Defendants and Counterclaimants, )
 9                                      )
                and                     )
10                                      )
     DFQ MANAGEMENT LLC, and            )
11   1501 WASHINGTON ST. LOUIS, LLC,    )
                                        )
12     Counterclaimants,                )
                                        )
13            vs.                       )
                                        )
14   U.S. BANCORP COMMUNITY             )
     DEVELOPMENT CORPORATION, and       )
15   U.S. BANK, NATIONAL ASSOCIATION,   )
                                        )
16     Counterclaim Defendants.         )

17

18

19              VIDEO-RECORDED DEPOSITION OF
                     STEPHEN C. KRAMER
20
                 TAKEN ON BEHALF OF THE
21           DEFENDANTS AND COUNTERCLAIMANTS
22                   JUNE 30, 2022
23

24      (Starting time of the deposition:  8:59 a.m.)

25
```

STEPHEN KRAMER  6/30/2022

```
 1              And -- and then in 2010 moved into
 2    business development and been in various capacities
 3    there in business development since 2010, various
 4    territories, switched territories, switched products
 5    a couple times, but yeah.
 6         Q.   In your position at CDC in business
 7    development, who have you reported to?
 8         A.   Let's see.  Initially Mark Hirshman and
 9    then Matt Philpott, and since 2015 Laura Vowell.
10              MR. BENNETT:  Okay.  Why don't we --
11    are we squared away on the Zoom or not?
12              MR. AMPLEMAN:  No.
13              MR. BENNETT:  Okay.  Why don't we take
14    a minute and see if we can do that before I get into
15    more detail?  I think Mike would like to hear.
16              VIDEOGRAPHER:  We're going off the
17    record.  The time is 9:06.  This ends media unit
18    number one.
19              (WHEREIN, a recess was taken.)
20              VIDEOGRAPHER:  We're going back on the
21    record.  The time is 9:16.  This begins media unit
22    number two.
23         Q.   (By Mr. Bennett)  Mr. Kramer, when did
24    you first work with any of the developers of The
25    Last Hotel on any project?
```

```
 1            A.   So I first met Mike Qualizza probably

 2    2005, 2006 time frame when he was just starting.  He

 3    had been at National Equity Fund and was starting

 4    his own community development entity, UDF, and we

 5    were one of the initial investors in that -- in that

 6    entity.  And Neil Freeman was affiliated with that

 7    as their sponsoring entity, but I knew Neil but

 8    really worked with Mike from going back to them.

 9            Tim Dixon, we did the Iron Horse Hotel

10    in Milwaukee.  Oh, boy.  I don't remember the time

11    frame on that.  Around 2010, 2011 I think is when we

12    met Tim.  He was also affiliated with a development

13    that we did -- he partnered with another developer

14    customer of ours, Perry Motels, on a development

15    in -- in Minneapolis and worked with them on that as

16    well.

17            Q.   Great.  Prior to The Last Hotel deal,

18    how many transactions were you involved in that

19    involved Mr. Qualizza?

20            A.   I couldn't tell you.  It was a lot.

21            Q.   More than what?

22            A.   I mean, more than 15 probably, yeah.

23    Never as a developer, but as a community development

24    entity.

25            Q.   Got it.  Do you remember any of those
```

1           Q.   So turning to this particular project,
2    when did you first learn about it?
3           A.   I'm sorry.  I'm trying to remember the
4    time frame of going back.  It's probably about 2016
5    I think when Mike and Tim Dixon first started
6    talking about acquiring that building and, you know,
7    doing this project.
8           Q.   Who approached about it, Mike?
9           A.   Probably.  I can't remember if it was
10   Mike or Tim or both, but I, you know, had contact
11   with both of them.
12          Q.   What was your reaction when you heard
13   about the opportunity?
14          A.   I thought, you know, it was something
15   that would be nice for the neighborhood.  I thought
16   it would be a challenge given, you know, that
17   building.  There had been other attempts to
18   redevelop that building, but it was something that,
19   you know, we as a resident, you know, as a neighbor,
20   our office is a block away, we were definitely in
21   support of and wanted to see happen.
22          Q.   And that's the old -- us from St. Louis
23   would call that the old International Shoe Building?
24          A.   That's correct, yes.
25          Q.   And had it been broken down for some

1    time at that point?

2            A.   Yes.  Yeah, it was vacant for -- for a

3    while.  There had been a charter school in there

4    that closed or relocated, and I don't remember the

5    timing, but it had been a couple years.

6            **Q.   So once the idea of redeveloping the**

7    **International Shoe Building comes to you, what --**

8    **what's your involvement in the time period between**

9    **learning about it and when the deal documents all**

10   **got signed later in 2017?**

11           A.   So I mean, our -- our involvement is

12   helping to find sources to complete -- financing to

13   complete the redevelopment.  My role, as I

14   mentioned, just that of equity, providing equity in

15   exchange for federal tax credit programs.  I have a

16   relationship or had a relationship at the time with

17   the St. Louis Development Corporation, their new

18   markets group.  They had an interest in seeing that

19   project done.  So working with the representative

20   from there and helping to convince them to put their

21   allocation in and make it available for us to invest

22   in.

23           **Q.   Did you talk to other parts of the bank**

24   **regarding things like providing the loan?**

25           A.   So yes.  At the time we did not --

 1          **Q.    And was that Husch in this deal?**

 2          A.    Yes.  Yes, it was Husch.

 3          **Q.    Ms. Swallow; is that right?**

 4          A.    Husch Blackwell.

 5          **Q.    Husch Blackwell?**

 6          A.    Yeah.  Yeah.

 7          **Q.    Do you remember the individual lawyer**

 8  **involved?**

 9          A.    So Steve McCandless is generally --

10  he's the partner relationship manager for us and

11  that's who I usually talk to, but generally there

12  are associates that actually do the day-to-day work

13  on it, yeah.  I don't recall who those were on this

14  one.

15          **Q.    So the financial model -- what's the**

16  **purpose of the financial model, to make sure that**

17  **the project is viable, can meet its obligations**

18  **going forward?**

19          A.    For us that's one -- that is one, but

20  more importantly in order for us to claim the tax

21  credits we have to have an opinion, a tax opinion

22  from our attorney that says we have done all the

23  things that we need to do to be considered a partner

24  in this entity and the other entities, the community

25  development entities, in order to receive the tax

1   credits.

2          Q.   I got it.  So do you have to have money

3   at risk?

4          A.   We do, yes.  Yeah.

5          Q.   Yeah.  In order -- in order to get the

6   tax benefits?

7          A.    In order to be considered -- yes, in

8   order to be considered an owner of the entity that

9   ultimately receives tax credits, we have to have an

10  opinion that -- you know, tax opinion that that is

11  in fact the case.

12         Q.   Yeah.  And how you described what the

13  bank needs to be in order to get those tax credits

14  is essentially a partner?

15         A.   Partner --

16              MR. BARTOLACCI:  Object --

17         A.   -- owner, yeah.

18         Q.   Got it.

19              MR. BARTOLACCI:  Object -- I didn't

20  finish my objection, but I was going to ask you to

21  answer anyway.  Just object to the form of the

22  question.

23              THE WITNESS:  Yeah.

24              MR. BARTOLACCI:  To the extent it has

25  legal connotations.

```
 1   funding was accurate and recommending funding of the
 2   -- of the draw request.
 3          Q.   Did Capital Consultants have people
 4   that visited the site?
 5          A.   I assume so.
 6          Q.   Okay.  Has the bank historically relied
 7   on Capital Consultants?
 8          A.   Yes.
 9          Q.   When the issue of the Paric dispute
10   came up, what was Capital Consultants telling you
11   about the merits of Paric's claim versus the merits
12   of the developer's defenses?
13          A.   I don't -- I don't have any knowledge
14   of what Capital Consultants -- I didn't -- I never
15   saw a report from them or talked to them directly or
16   recall anyone in the -- in our construction
17   management group discussing what the recommendation
18   was.
19          Q.   So your -- part of your job was to go
20   talk to Mr. Freeman and Mr. Qualizza about resolving
21   Paric, right?
22          A.   Yes.
23          Q.   You understood that they thought they
24   had a good case and didn't want to pay them more
25   money under the change order, right?
```

```
 1          A.   Yes.
 2          Q.   And you knew that Capital Consultants
 3   would have information about the schedule and the
 4   progress of construction and what Paric was doing,
 5   right?
 6          A.   Yes.
 7          Q.   In terms of evaluating Mr. Freeman and
 8   Mr. Qualizza's statements that they thought that the
 9   Paric case had merit, did anyone at the bank to your
10   knowledge review Capital Consultants' reports or
11   talk to Capital Consultants about the strength of
12   the case?
13          A.   I have to -- I have to assume yes, and
14   you know, we have two separate construction
15   management groups, one for the loan, one for the
16   equity side.  And I'm not sure -- I don't recall --
17   I'm not sure who was in the most direct contact with
18   them at the time.
19          Q.   If Capital Consultants or someone else
20   at the bank had told you actually it looks like
21   Paric has fault here and the defense may have
22   validity, would that have affected what you said to
23   Mr. Qualizza or Mr. Freeman about the issue of the
24   Paric dispute?
25          A.   Well, I have to be very careful not to
```

```
 1    take one side or the other in those sorts of
 2    conversations.  If I had that knowledge, if it would
 3    have impacted how I talked to them, I -- I don't
 4    know.  It's hypothetical.  I didn't have that
 5    knowledge.
 6           Q.   Sure.  But the bottom line is you were
 7    saying -- the bank's position, I know you're passing
 8    along a message in many respects, right?
 9           A.   Uh-huh.  That's right.
10           Q.   Okay.  But the message that you were
11    passing along was regardless of your views of the
12    merits of the Paric dispute, the bank wants this
13    settled?
14           A.   Correct.
15           Q.   Okay.  And the reason the bank wanted
16    it settled was if it got settled, that would be a --
17    one of the things that would allow the bank to fund
18    the remaining amount on the loan?
19           A.   Yeah.  I mean, our -- the potential
20    negative impact on our collateral would no longer
21    exist.
22           Q.   Were you involved -- did you become
23    aware that in the dispute with Paric Mr. Qualizza
24    and Mr. Freeman's groups ultimately tried to get the
25    information that Capital Consultants had about the
```

1    **project through a subpoena?**

2              A.    Yes.  Yes.

3              Q.    **What was the reaction inside the bank**

4    **to that?**

5              A.    I'm trying to remember and maybe you

6    can help me, but there was a subpoena, but it was

7    not related -- was it related to another matter?

8    I --

9              Q.    **Just say what you remember.**

10             A.    Yeah, I -- it was related to another

11   matter outside of Paric, and I don't recall, but I

12   do know that it was not favorably received because

13   there -- you know, any time that a subpoena is

14   received there is additional costs that have to be

15   incurred, additional time that has to be spent, and

16   it is a burden on the bank or, you know, the CDC

17   that we would rather not have.  And so receiving

18   that was not well-received.

19             Q.    **By who?**

20             A.    By generally --

21             Q.    **Everyone at the bank?**

22             A.    Anyone that had anything -- and there

23   were a lot of people involved in these

24   conversations, everyone from myself and the folks

25   that I report to, our asset management group,

STEPHEN KRAMER  6/30/2022

 1  construction management, etc.

 2      **Q.   Did you have copies of the consultant's**

 3  **reports?**

 4      A.   No.

 5      **Q.   When you talked about you introducing**

 6  **Mr. Qualizza and Mr. Freeman, Mr. Dixon to the**

 7  **lending side with Fran Doherty, was Mr. Boyers**

 8  **involved in that at all?**

 9      A.   Personally?  Like he would have

10  recommended that we introduce, but he wouldn't have

11  been involved in making the introduction himself

12  personally.

13      **Q.   And did Mr. Boyers recommend it?**

14      A.   Yes.  Yes, he did.

15      **Q.   Okay.  So you -- so then you -- when**

16  **you heard about the opportunity to redevelop this**

17  **vacant, dilapidated building in your own**

18  **neighborhood, did you talk to Mr. Boyers about that**

19  **opportunity?**

20      A.   Yes.

21      **Q.   Okay.  Tell us about that.**

22      A.   I'm actually trying to think if I

23  actually had a conversation or if it was via e-mail.

24      **Q.   Either way.  Just say the gist of your**

25  **communication.**

STEPHEN KRAMER  6/30/2022

1          Q.    -- he -- he says that you reached out
2    after our internal SAG consultation call, right?
3          A.    Yeah.
4          Q.    SAG is what?
5          A.    Special asset group.
6          Q.    So when we're talking here about
7    elevating the matter in the prior e-mail that we
8    looked at and then this e-mail talks about SAG being
9    involved, does that help remind you of --
10          A.    That does help remind me that I suppose
11    we were talking to SAG.  I don't know -- I don't --
12    I don't think I was involved in a call with SAG, but
13    this sounds like there was discussion with SAG among
14    some people internally.
15          Q.    The e-mail that's marked as Exhibit 2
16    says, quote (quote as read):
17                    Steve emphasized that if the change
18                    order dispute is not substantially
19                    resolved in 30 days, then this may be
20                    transferred to SAG, in which case the
21                    beneficial relationship that the
22                    borrowers have with CDC equity will not
23                    be helpful to the borrowers in
24                    resolving the situation with SAG.
25                    Do you see that?

```
 1              A.   I do.
 2              Q.   Is that an accurate description of your
 3     call as far as you can remember?
 4              A.   As far as I can remember, yes.
 5              Q.   So what you told Mr. Qualizza is he
 6     needed to resolve that change order dispute in
 7     30 days or the lending group is going to take over
 8     and the fact that you have this really long history
 9     with CDC on the equity side isn't going to help you
10     anymore?
11              A.   If that's -- if that's what it says, if
12     I said it then something -- I don't know if I would
13     have used those exact words, but yes.  Something to
14     that effect.
15              Q.   Very good.  Exhibit 2 when it talks
16     about you telling Mr. Qualizza that you needed to
17     resolve this in 30 days or this loan is going into
18     SAG and not going to be able to help him anymore,
19     that would be an accurate description of the gist of
20     what you told him?
21              A.   Yes.
22              Q.   Okay.  So in response he committed to
23     try to resolve the change order dispute in 30 days,
24     right?
25              A.   Yes.
```

STEPHEN KRAMER  6/30/2022

```
 1          Q.    And per Exhibit 2 then, if he resolved
 2    it in 30 days he would still be able to take the
 3    beneficial relationship that he had with CDC and
 4    then the bank would continue to work with him?
 5          A.    Yes.  That appears to what --
 6    summarizes what was discussed.
 7          Q.    And you agree then that that would
 8    be the -- if not the exact words that you used, but
 9    the gist of the conversation?
10          A.    I do agree with that, yes.
11          Q.    I assume the 30 days was -- you were
12    looking for something around that time?
13          A.    Yes.
14          Q.    Okay.  Did you understand when you're
15    having this conversation that the need to resolve a
16    lawsuit quickly is something that can affect the
17    leverage or ability to negotiate a more favorable
18    deal on their side?
19          A.    Could you --
20          Q.    Sure.  I'll do it again.
21          A.    Yeah, I just -- you mentioned a lawsuit
22    and I don't know --
23          Q.    No problem.  The Paric change order
24    dispute.
25          A.    Okay.
```

STEPHEN KRAMER  6/30/2022

```
 1   bank.
 2          Q.    So if it goes to SAG, all the --
 3   Mr. Qualizza, Mr. Freeman, are now in a situation of
 4   having to deal with different people than they've
 5   been dealing with the last 15 years for all these
 6   other deals, right?
 7          A.    That's correct.
 8          Q.    And SAG might make -- I mean, sorry,
 9   I'll re-ask it.  SAG would make different decisions
10   on things like waivers and accommodations and
11   flexibility from what you might do as a person who
12   worked with Mr. Qualizza for many years, correct?
13          A.    That's right.
14          Q.    So going to SAG would be a dramatic
15   change in the working relationship between the
16   developers and the bank?
17          A.    It would be.
18          Q.    And that dramatic change of going to
19   SAG would be -- would mean that things were just
20   going to be treated differently than you had over
21   the years?
22          A.    Yes.
23                (WHEREIN, Exhibit 5, 4-18-19 e-mail
24   chain, was marked for identification by the Court
25   Reporter.)
```

STEPHEN KRAMER  6/30/2022

```
 1          A.   Yes.  That's correct.
 2          Q.   She goes on to describe that (quote as
 3    read):
 4               They may not have chosen to invest in
 5               the hotel given the demands of the
 6               sponsors and the expectation to go
 7               above and beyond, and then get berated
 8               for not going far enough.
 9               Correct?
10          A.   I do.
11          Q.   Mr. Qualizza never berated you,
12    correct?
13          A.   No.
14          Q.   Correct?  What I said was correct?
15          A.   What you said is correct.
16          Q.   I have to be careful about the double
17    negatives.
18          A.   Okay, I see.
19          Q.   And then she says (quote as read):
20               There were other factors that went into
21               that decision, though, which assume --
22               You took that to mean the decision to
23    invest in The Last Hotel?
24          A.   Yes.
25          Q.   What were the other factors that went
```

1   This -- this deal is no more challenging or

2   different than every transaction that we do.  That

3   is what we do.  We do investments in blighted areas

4   that have challenge -- that have difficulty getting

5   traditional financing.  So we go into every deal

6   expecting that it's going to be a challenge.

7          **Q.    (By Mr. Bennett)  You suggest that**

8   **anybody who has a relationship with Mr. Qualizza**

9   **should sit down and discuss the situation of future**

10  **opportunities, right?**

11         A.   Yes.  That is what I said, yes.

12         **Q.    What were you hoping to accomplish by**

13  **that?**

14         A.   I think what I was hoping to accomplish

15  was to preserve the relationship that we had prior

16  to this transaction, which was a mutually beneficial

17  and friendly relationship so that as Laura pointed

18  out there are future opportunities that we know of

19  at this time that we would like to continue to

20  pursue under the status of the relationship prior to

21  this transaction.

22             (WHEREIN, Exhibit 7, 8-30-19 e-mail

23  chain, was marked for identification by the Court

24  Reporter.)

25             MR. BENNETT:  I'm handing you what

STEPHEN KRAMER  6/30/2022

```
 1              A.    Yeah.
 2              Q.    Okay.  It's the same day.  It's just
 3     earlier that day, right?
 4              A.    Uh-huh.  Yes.
 5              Q.    Yes?
 6              A.    Yes.  I'm checking the time, yes.
 7              Q.    Okay.  So earlier in the day you learn
 8     that reasons for denying the waiver are the lien for
 9     the demo contractor and the fact that there had been
10     a lawsuit that named U.S. Bank and U.S. Bank CDE as
11     the defendant, right?
12              A.    Yes.
13              Q.    And then that afternoon you're informed
14     that in fact GenCorp was going to release its lien,
15     right?
16              A.    Yes.
17              Q.    And that would result in the dismissal
18     of the lien and also dismissal of the U.S. Bank
19     entities as defendants as well, right?
20              A.    I don't -- I don't know about the
21     dismissal of the lawsuit where USB entities are
22     involved.
23              Q.    So did you go back and say, hey, we
24     should talk about this again now that the lien is
25     gone and U.S. Bank isn't going to be a party
```

STEPHEN KRAMER  6/30/2022

```
 1          A.    Okay.

 2          Q.    -- and I think we'll confirm that.

 3          A.    Okay.

 4          Q.    Was the downward adjuster waived?

 5          A.    It appears that it was not.

 6          Q.    Why?

 7          A.    I don't know.  Well, if I read, James

 8    sent it back with some questions that are -- that

 9    are in this e-mail from James Robertson.

10          Q.    Okay.  Well, let's look at your input

11    on the first page of Exhibit 8.  You write an e-mail

12    on September 16th, 2019 to Darren Van't Hof, right?

13          A.    Here we go.  Yes, I did.

14          Q.    Okay.  And can you just read out loud

15    your summary?

16          A.    (Quote as read):

17                Here's a correspondence with James on

18                the downward adjuster of The Last

19                Hotel, including a link to the WAM.

20          Q.    I'm sorry, sir.  Can you read your

21    second paragraph out loud from your September 16th,

22    2019 e-mail that begins with summary?

23          A.    (Quote as read):

24                Summary.  Construction was delayed by

25                four months due to a variety of
```

1               factors, most outside their control.

2               The downward adjuster would result in

3               450,000 less equity, which would go to

4               paying down the bridge.  Happy to

5               discuss further if you'd like.

6          Q.    **And that's a true statement, right?**

7          A.    That is a true statement.  I did write

8     that.

9          Q.    **And the 450,000 would allow the**

10    **developer to pay down the Octagon loan or whoever**

11    **else was the lender at that time on the project?**

12         A.    Yes.

13         Q.    **You knew that the bridge loans or the**

14    **mezzanine loans carry punitive interest rights,**

15    **right?**

16              MR. BARTOLACCI:  Object to the form.

17         Q.    **(By Mr. Bennett)  Higher?**

18         A.    I knew they were higher interest rates,

19    yes.

20         Q.    **So does Exhibit 8 indicate that you**

21    **recommended waiving the downward adjustment because**

22    **the delays in constructions were outside the control**

23    **of Mr. Qualizza and Mr. Freeman and Mr. Dixon and**

24    **the developers, right?**

25         A.    That is what this says, yes.

STEPHEN KRAMER  6/30/2022

```
 1              Q.   And -- and it says this because you

 2    believed it to be true?

 3              A.   Yes.

 4              Q.   Did Mr. Boyers live by the office?

 5              A.   Does he or did he?

 6              Q.   Did Mr. Boyers have a residence?

 7              A.   He does not now, but he did at the

 8    time, I believe.

 9              Q.   Who were the developers of that

10    apartment?

11              A.   If I could go back.

12              Q.   Sure.

13              A.   He did not live in the --

14              Q.   Apartment?

15              A.   -- the building that was across the

16    street at this time.

17              Q.   Did he have access to an apartment at

18    some point in time in the neighborhood?

19              A.   He did, yes.  I don't remember when he

20    moved from there to another part of downtown.

21              Q.   And who were the developers of that

22    apartment building?

23              A.   The McGowan Brothers Development.

24              Q.   Did you guys do business with the

25    McGowan Brothers?
```

STEPHEN KRAMER  6/30/2022

```
 1     pandemic affected operations of The Last Hotel?

 2            A.    Yes.

 3            Q.    And have you -- were you involved in

 4     decisions by the bank to waive conditions or make

 5     accommodations to your partners in other deals

 6     associated with the pandemic?

 7            A.    Yes.

 8            Q.    Can you describe that for us?

 9            A.    I'm just trying to think back to that

10     time, and specifically hotels --

11            Q.    Or developers is fine.

12            A.    Yeah.

13            Q.    Anybody is fine.

14            A.    Right.  I know that there were a number

15     of requests for -- and I'm thinking back to projects

16     that were generally under construction, requests to

17     basically recognize delays and that they were not

18     going to meet their place in service date because,

19     you know, in a lot of cities construction was

20     completely shut down.  Operationally I'm just -- I

21     don't recall being involved in any conversations on

22     existing operating assets.  Generally that would go

23     to the asset manager.

24            Q.    You would agree that the COVID pandemic

25     would make it impossible for a hotel to meet
```

STEPHEN KRAMER  6/30/2022

 1   whatever obligations it had?

 2          A.   Yes.

 3          Q.   And you would agree that The Last Hotel

 4   is an example of such a hotel, right?

 5          A.   Yes.

 6          Q.   And you would agree that at the time of

 7   contracting when you did this deal at the beginning

 8   that no one could have foreseen that the pandemic

 9   would have that effect, right?

10          A.   What was it about contracting?  I'm

11   sorry.

12          Q.   Sure.  Back in 2017 and '18 when these

13   deals were being made, would you agree that it would

14   have been impossible --

15          A.   Yes.

16          Q.   -- to foresee that COVID would make it

17   impossible for The Last Hotel to perform, correct?

18          A.   Yes.  Correct.

19          Q.   And you do agree that COVID made it

20   impossible for the hotel to perform as projected?

21          A.   Yes.

22          Q.   I mean, in light of COVID and then --

23   and your prior observations that the delays in

24   construction were not due to Mr. Qualizza or

25   Mr. Freeman or Mr. Dixon, were you surprised that

1  conclusion, but you may answer to the best of your

2  knowledge.

3           MR. BENNETT:  Actually, I'll try to ask

4  a question that would not be subject to those

5  objections.

6           **Q.   (By Mr. Bennett)  When you were talking**

7  **to everybody at the bank about how they're going to**

8  **treat Mr. Qualizza and Mr. Freeman, did anybody ever**

9  **bring up the idea that the bank had some obligation**

10  **to act in a way that wouldn't harm Mr. Qualizza or**

11  **Mr. Freeman or the development of the project?**

12           MR. BARTOLACCI:  Object to the form,

13  but you can answer.

14           A.   Did we make our decisions in a manner

15  that would not harm or did we consider that --

16           **Q.   (By Mr. Bennett)  Let me -- I'll try**

17  **again.**

18           A.   Okay.

19           **Q.   This can be subject to the objections**

20  **that were made.**

21           A.   Yeah.

22           MR. BARTOLACCI:  All right.

23           **Q.   (By Mr. Bennett)  You've already told**

24  **me that when the bank's making decisions the bank is**

25  **making those decisions based on what's in its best**

```
 1    interest versus what's in the best interest of

 2    Qualizza, Freeman --

 3              A.    Yes.

 4              Q.    -- and the project, right?

 5              A.    Correct.

 6              Q.    Okay.  Was there any discussion in

 7    those meetings that the bank had some obligation to

 8    look out for in some way Mr. Freeman, Mr. Qualizza,

 9    the project, the development in any way?

10              A.    No.

11              Q.    Okay.  So in Exhibit 21 we just went

12    over, right?

13              A.    Yeah.

14              Q.    Did the bank agree to what Mr. Freeman

15    proposed?

16              A.    I don't know.

17                    (WHEREIN, Exhibit 22, 12-9-19 e-mail

18    chain, was marked for identification by the Court

19    Reporter.)

20              Q.    (By Mr. Bennett)  Handing you what we

21    marked as Exhibit 22.  Exhibit 22 is an e-mail that

22    Mr. Qualizza forwards to you dated November 9, 2019,

23    right?

24              A.    Yes.

25              Q.    It describes his plan of action, right?
```