# EXHIBIT C

```
 1           IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF MISSOURI
 2                    EASTERN DIVISION

 3

 4  U.S. BANK, National Association,    )
                                        )
 5     Plaintiff,                       )
                                        ) Case No.
 6          vs.                         ) 4:21-cv-00120
                                        )
 7  MICHAEL QUALIZZA, NEIL D. FREEMAN,  )
    TIMOTHY DIXON,                      )
 8                                      )
       Defendants and Counterclaimants, )
 9                                      )
              and                       )
10                                      )
    DFQ MANAGEMENT LLC, and             )
11  1501 WASHINGTON ST. LOUIS, LLC,     )
                                        )
12     Counterclaimants,                )
                                        )
13          vs.                         )
                                        )
14  U.S. BANCORP COMMUNITY              )
    DEVELOPMENT CORPORATION, and        )
15  U.S. BANK, NATIONAL ASSOCIATION,    )
                                        )
16     Counterclaim Defendants.         )

17

18

19          VIDEO-RECORDED DEPOSITION OF
                 ROBERT P. ESPELAND
20
             TAKEN ON BEHALF OF THE
21         DEFENDANTS AND COUNTERCLAIMANTS

22                JUNE 28, 2022

23

24   (Starting time of the deposition:  8:59 a.m.)

25
```

1          Q.   Why did you want the state to expedite
2     the process?
3          A.   Well, I mean, I look at it -- I count
4     the developer as a partner.  They're a partner.  So
5     we -- I want to see the credit certificate issued as
6     fast as anybody else, so I mean, we've all got
7     timing and when the certificate is going to get
8     issued.  So it's all -- in everybody's best interest
9     to try to get that certificate issued sooner rather
10    than later.
11         Q.   Tell me what you mean when you say you
12    look at Mr. Qualizza and the others involved in the
13    development as a hotel -- of the hotel as a partner.
14         A.   Is that they -- we signed an agreement
15    with them and we try to -- through all of our
16    efforts try to meet our end goal, which is
17    ultimately in my state credit case get the
18    certificate issued on a timely basis.
19         Q.   And did you believe that you and
20    Mr. Qualizza were partners in getting the hotel, all
21    of the tax credits it was entitled to as fast as
22    possible?
23         A.   My role within that was I was working
24    with the state and working with Mr. Qualizza, I felt
25    like I -- that -- what I was offered to do, correct,

```
 1   yes.
 2        Q.   I take it your relationship with
 3   developers who are developing these historic
 4   properties is something that's important to you and
 5   CDC?
 6        A.   That's customer service, yeah.  It's
 7   important to me, yeah.  That everyone be happy.  So
 8   yeah, that's important to me.  That's part of
 9   growing your business, yeah, in my mind.
10        Q.   And in terms of you acting as a partner
11   with Mr. Qualizza, is that how in your other deals
12   you also interact with the developers?
13        A.   That is correct, yes.
14        Q.   So some of the activity in this -- I
15   mean, I've read your e-mails.  It's fair to say that
16   you were disappointed with the speed of the state's
17   actions?
18        A.   Well, I mean --
19        Q.   It's okay to say yes if that's true.
20        A.   I mean, that's just the way the
21   situation was.  I mean, the state administrative
22   changes, all different things happen, different
23   variables happen.  So we can only go with -- you can
24   only push so hard.  So -- but we have to stay within
25   the state's parameters.  They can only -- you know,
```

```
 1          A.   On the Missouri -- on the Missouri
 2   historic tax credits, yes.
 3          Q.   As a partner of Mr. Qualizza and the
 4   other people involved in The Last Hotel, what did
 5   you view your duties in that regard to be?
 6          A.   To Mr. Qualizza, my duties, if anybody,
 7   is to try to -- once we sign an agreement to
 8   purchase the credits, once the project is completed,
 9   placed in service, then I work with -- if the
10   developer would like me to work with the state to
11   try to get the certificate issued, the state
12   historic certificate issued in a regular -- rather
13   timely basis if possible.
14          Q.   In the Missouri state tax credit world
15   of 2017 through 2020, how many different deals were
16   you responsible for on an annual basis?
17          A.   In Missouri we'll say anywhere from 20
18   to 30 deals on average on new -- new originations.
19          Q.   Have you been to The Last Hotel?
20          A.   I have.
21          Q.   Do you think it's pretty nice?
22          A.   I've been there.  I've had lunch there,
23   yes.  I've not stayed there.  I've been to a pre --
24   conference party there as well, yes.
25          Q.   How many times have you been to the
```

```
 1    property?
 2           A.    Twice.
 3           Q.    When was the first time?
 4           A.    For lunch.
 5           Q.    Just a lunch?
 6           A.    Just a client lunch, yes.
 7           Q.    How was it?
 8           A.    It was very nice.
 9           Q.    Okay.  Great.  Then what was the other
10    event?
11           A.    It was a -- there was a -- prior to the
12    historic conference here in St. Louis, the
13    Novogradac historic annual conference they held in
14    St. Louis.  Again, I believe it was in 2020 -- 2019
15    maybe, they held a gathering on top of the roof of
16    The Last Hotel, yeah.  Not the whole conference,
17    just a certain segment of the conference, yeah.
18           Q.    That rooftop pool and setup there is
19    pretty nice too, right?
20           A.    That is correct, yes.
21           Q.    Did you enjoy it?
22           A.    I did, yes.
23           Q.    Had you seen that property prior to the
24    redevelopment of The Last Hotel?
25           A.    Our office is very close to that, so I
```

1 walked by it multiple times, but never been inside
2 the property, no.
3     Q.   You'd agree that the redevelopment of
4 The Last Hotel is good for that neighborhood?
5     A.   I would, yes.
6     Q.   And do you agree that the development
7 of The Last Hotel was done well based on going in
8 there after the development was done?
9     A.   From my -- what I saw of the hotel,
10 my -- yes, I agree.  I mean, I know there was some
11 questions about some of the costs, you know, the
12 costs that were incurred and really not they get
13 credits for, but that was -- you know, that's
14 between the state and the developer, yeah.
15     Q.   And that would be separate from just
16 the fact that it's -- The Last Hotel has been a
17 major improvement to that block of that street on
18 Washington Avenue, right?
19     A.   I would -- yes.
20     Q.   So the -- you mentioned an issue
21 regarding the ultimate amount of the tax credit that
22 was approved by the state?
23     A.   Yes.
24     Q.   What did you mean by that?
25     A.   Well, there's a -- there's certain

1           Q.    And if the -- and in your experience
2     it's not atypical for a developer to question any
3     reduction in the tax credits, right?
4           A.    I wouldn't know.  My experience --
5     again, I'm not that involved on that aspect.  Again,
6     my involvement is also getting the certificate, and
7     getting it issued.  All the details, that's
8     typically between the applicant and the state and I
9     don't get that involved as far as the individual
10    eligible expenses, yeah.
11          Q.    If you were asked by a developer in
12    2017 how long after occupancy the tax credits would
13    be approved and available, what would you have told
14    them?
15          A.    There's a lot of variables.  I mean,
16    size of the project.
17          Q.    Let's talk about The Last Hotel.  If
18    you had been asked about The Last Hotel project back
19    at the time --
20          A.    Uh-huh.
21          Q.    -- on how long it would take to get the
22    tax credits approved, what would you have said?
23          A.    After placed in service, completed
24    certificate of occupancy, I mean, these days --
25    again, it's too many variables.  I mean, I would say

 1    on average I would -- I would pencil in a year's
 2    time at this point given my history with the state.
 3         Q.   Sure.
 4         A.   But I don't know.  You know, there's
 5    again a lot of variables and --
 6         Q.   I'd like you to just go back in time --
 7         A.   Sure.
 8         Q.   -- to 2017.  Because you say at this
 9    time, you've obviously lived through the reduction
10    in staffing at the department and the state, right?
11         A.   Yeah.
12         Q.   Yeah.  And so I would like you to go
13    back in your shoes to 2017.  If Mr. Qualizza had
14    said to you from occupancy, you know, what -- what
15    can I expect, when can I expect the tax credits to
16    get through the process, what would you have said?
17         A.   I would say you might want to give
18    yourself -- I mean, again, the size of the project
19    and you might want to give -- I mean, on average
20    without any issues with the cost certification,
21    without any issue with the final application support
22    and the cost certification, I mean, in my mind I
23    would probably pencil in a year's time.  A year's
24    time to potentially do that.
25              Now, if they want to challenge the cost

1  certification and challenge a lot of things that
2  went along with it, then you're going to add on time
3  to that, yeah.
4        Q.   Okay.  So you are aware back at the
5  time that this deal was actually signed that
6  there -- that even from the certificate of occupancy
7  it could take a long time before the tax credits
8  would get through the procedure?
9        A.   Again, there's a lot of different
10 things that can happen, you know, a lot of different
11 variables that could happen.  So ...
12       Q.   But you would have said if you had been
13 asked back when the deal closed there's a lot of
14 variables but, you know, there's a new
15 administration, it can be as long as a year and you
16 just never know when it's going to be done.  Is that
17 what you would have said?
18       A.   Right now with the expedited review
19 process we're at least looking at a hundred days.
20 So I mean -- so, I mean, yeah, I would -- my mind I
21 might pencil in a year, nine months to a year.  I
22 mean, it depends on -- again, everything has to line
23 up just right to speed up that process without any
24 issues, without any challenges by the developer to
25 getting the certificate, so a lot of that has to

```
 1            A.   That is correct.
 2            Q.   That arrangement was part of
 3   everybody's understanding of the deal at the time
 4   that it was signed, right?
 5            A.   Well, it's my -- when I sign the
 6   agreement, what my role is try to get the
 7   certificate is to get the certificate so we can pay
 8   -- in this case pay off a bridge loan, yeah.
 9            Q.   And you know --
10            A.   And I wasn't really part of this loan
11   conversation, but yeah.
12            Q.   No problem.
13            A.   Yeah.  Yeah.
14            Q.   When you describe yourself as a partner
15   with the developers and with people like
16   Mr. Qualizza, one way that you can be a good partner
17   is to help them satisfy these bridge loans by buying
18   those tax credits as soon as possible, right?
19            A.   That's correct.
20            Q.   You mentioned the expedited process.
21   Was RubinBrown involved in that?
22            A.   RubinBrown prepared the first cost
23   certification.  And then the state engaged -- once
24   the developer elected to go through the expedited
25   review process, then the state engaged another
```

1  at, which is you understood when this deal was done
2  that there was a bridge loan with Octagon in the
3  amount of $17 million, that that was at a higher
4  interest rate and that the developer was very
5  interested in paying that off through the bank's
6  purchase of the tax credits, right?
7       A.   That would be the intention for --
8  yeah, to get that paid off as soon as it was issued,
9  yes.
10      Q.   Okay.  And so as of December 2017, the
11 date of Exhibit 2, the projection is that the bridge
12 loan repayment would be in March of -- I mean, in
13 May of 2019?
14      A.   May 2019.  That's what it looks like,
15 yes.
16      Q.   And the projected amount of that
17 repayment would be the 13.6 million or so?
18      A.   I see 10.29 here.
19      Q.   Oh, go down.  Okay.  Got it.  There's a
20 U.S. Bank purchase price for the state historic tax
21 credits --
22      A.   Yeah.
23      Q.   -- which is 10.297 million, right?
24      A.   Right.  Correct.
25      Q.   Okay.  So this projection done by Cohn

```
 1    Reznick as of December 29th, 2017 and addressed to
 2    the developers and to the bank entities involved is
 3    projecting that you will under your tax credit
 4    purchase agreement purchase the state historic tax
 5    credits for 10.29 million in May of 2019, right?
 6         A.   That's what is projected, yes.  At time
 7    of closing.
 8         Q.   But of course you didn't review
 9    Exhibit 2 before it was issued, right?
10         A.   That is correct.
11         Q.   And nobody at the bank got you involved
12    in evaluating whether that May of 2019 date was
13    reasonable, correct?
14         A.   That is correct.
15         Q.   And if you had been involved back in
16    December of 2017 and they said, hey, how soon can we
17    actually close on the U.S. Bank purchase of the
18    state historic tax credits, you would have said in
19    the current administration with all the variables,
20    that might be more than a year from -- from
21    occupancy, right?
22         A.   Possibly, yeah.  If things line up, if
23    cost certifications weren't challenged, a lot of
24    variables, but --
25         Q.   Do you know why you weren't consulted
```

```
 1            Q.    The purchase price is going to be that
 2      10.297, right?
 3            A.    Correct.  Correct.
 4            Q.    And that's because you're purchasing
 5      for $0.94 on the dollar?
 6            A.    That's correct, yes.
 7            Q.    Okay.  Great.  So what that shows then
 8      is in your document here, the tax credit purchase
 9      agreement that was drafted by the bank or its
10      counsel, it incorporated the same number as what is
11      in the model in Exhibit 2 for the U.S. Bank purchase
12      price of 10.297 million, right?
13            A.    That's correct.
14            Q.    Okay.  If you go back to the first
15      page.  It says (quote as read):
16                  It's anticipated that the project will
17                  be placed in service on or before
18                  March 1st, 2019.
19                  Right?
20            A.    That's correct.
21            Q.    So at the time that the models and
22      projections were created to close on the deal, all
23      parties, including U.S. Bank and the developer
24      anticipated a March 1st, 2019 placed in service
25      date, right?
```