# EXHIBIT X

Case: 4:21-cv-00120-NAB   Doc. #: 73-24   Filed: 08/03/22   Page: 1 of 14 PageID #: 2144

<u>**EXECUTION COPY**</u>

<u>**TAX CREDIT PURCHASE AGREEMENT**</u>

<u>**by and between**</u>

<u>**1501 WASHINGTON, LLC**</u>

<u>**and**</u>

<u>**U.S. BANK NATIONAL ASSOCIATION**</u>

This **TAX CREDIT PURCHASE AGREEMENT** (the "**Agreement**") is made and entered into as of December 27, 2017 by and between **1501 WASHINGTON, LLC**, a Missouri limited liability company ("**Seller**") and **U.S. BANK NATIONAL ASSOCIATION**, a national banking association ("**Purchaser**").

**WHEREAS,** Seller is making qualifying investments in a project known as the "**The International Shoe Company Building**" or "**The Last Hotel**", located at 1501 Washington Avenue, St. Louis, Missouri 63103 (the "**Project**");

**WHEREAS,** in connection with the Project, Seller is expected to qualify for Missouri (the "**State**") Historic Preservation Tax Credits pursuant to § 253.545 *et. seq.*, RSMo., in the amount of **Ten Million Nine Hundred Fifty-Four Thousand Five Hundred Forty-Three and 50/100 Dollars ($10,954,543.50)** (the "**Credits**"), as such Credits are more specifically described in Seller's amended and restated operating agreement (the "**Operating Agreement**");

**WHEREAS,** it is anticipated that the Project will be placed in service on or before March 1, 2019 and that the Credits will be available for taxes incurred with respect to the 2019 tax year, depending on when final construction costs for the Project are incurred;

**WHEREAS**, pursuant to the Operating Agreement, Seller has received an allocation of 100% of the Credits with respect to the Project;

**WHEREAS**, the Credits are transferable;

**WHEREAS**, Seller wishes to sell, transfer and assign to Purchaser and Purchaser wishes to purchase from, and accept the transfer and assignment from Seller of, one hundred percent (100.0%) of the Credits; and

**WHEREAS**, the parties wish to set forth the terms and conditions regarding the sale and purchase of one hundred percent (100.0%) of the Credits and the transfer and assignment of such Credits from Seller to Purchaser for value, as described more fully herein.

**NOW THEREFORE**, in consideration of the promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement agree as follows:

    1.    <u>**Terms and Conditions -- Credits**</u>.

        (a)    <u>**Amount of Credits Sold and Purchased**</u>**.** Seller hereby sells, transfers and assigns to Purchaser, under the terms and conditions of this Agreement, and Purchaser hereby purchases from, and accepts the transfer and assignment from Seller of, under the terms and conditions of this Agreement, the amount of the Credits estimated by Seller for the calendar year 2019 (the "**Credit**

Confidential
USBCDC00067604

Achievement Year") or **Ten Million Nine Hundred Fifty-Four Thousand Five Hundred Forty-Three and 50/100 Dollars ($10,954,543.50)** (the "**Projected Credits**"), subject to adjustment as set forth in this Agreement, including without limitation **Section 1(c)** below. Such sale, transfer, and assignment are made directly to Purchaser and will be evidenced by a tax credit certificate (the "**Credit Certificate**") reissued to Purchaser in Purchaser's name. Seller's sale, transfer and assignment of the Credits to Purchaser hereunder shall not abridge or negate any obligations of Seller, including without limitation, the delivery of Tax Credit Documentation (as defined in **Section 1(e) below**) as provided for hereunder. All of such Credits (and potentially Additional Credits (as defined in **Section 1(c)(1)** below), to the extent provided for in this Agreement) are hereby are sold, transferred, and assigned to Purchaser under the terms set forth in this Agreement. Seller does hereby agree to take all necessary and appropriate actions, including without limitation, the execution, delivery, and filing (as, when and where appropriate) of all necessary documentation, to cause the State or appropriate department, commission, or agency thereof, to provide to Purchaser all documentation necessary or appropriate for Purchaser to submit to the State in order for the State to vest in Purchaser the Credits.

    **(b)**  **Purchase Price of the Credits.** The purchase price of the Credits (the "**Purchase Price**") is a price equal to Ninety-Four Cents ($0.94) per One Dollar ($1.00) of Credits (the "**Unit Price**") actually delivered to Purchaser in Purchaser's name. Accordingly, the total estimated Purchase Price for the Credits is **Ten Million Two Hundred Ninety-Seven Thousand Two Hundred Seventy-One and no/100 Dollars ($10,297,271.00)**. The Purchase Price shall be paid as provided in **Section 1(d)** below, subject to adjustment as set forth below.

    **(c)**  **Amount of Credits Delivered**. Seller and Purchaser intend for Purchaser's purchase of the Credits hereunder to be a purchase of all of the Projected Credits, subject to adjustment as set forth in **Section 1(c)(i)** or **Section 1(c)(ii)** below. Purchaser agrees that its purchase of the Credits is in consideration of an amount equal to the Unit Price times the amount of the Credits actually delivered to Purchaser in Purchaser's name.

      (i)  To the extent that the Credits available for sale to Purchaser by Seller are *more than* the Projected Credits for the Credit Achievement Year (the "**Additional Credits**"), Purchaser, in its sole discretion, may purchase none, all or any portion of the Additional Credits (with respect to the Credit Achievement Year or any other applicable Credit Achievement Year) under the same Unit Price formula used in determining the Purchase Price set forth in **Section 1(b)** above and on the same terms and conditions as set forth herein. Additional Credits, if any, that Purchaser elects to purchase, shall constitute "Credits" with the meaning of this Agreement.

      (ii)  To the extent that the Credits available for sale to Purchaser by Seller with respect to the Credit Achievement Year or any other applicable Credit Achievement Year are *less than* the Projected Credits, Purchaser shall purchase the full amount of the Credits (with respect to the Credit Achievement Year or any other applicable Credit Achievement Year) under the same Unit Price formula used in determining the Purchase Price set forth in **Section 1(b)** above and on the same terms and conditions as set forth herein.

      (iii)  The Tax Credit Documentation (as defined in **Section 1(e)** below) delivered by Seller to Purchaser shall include any change in the amount of Projected Credits and/or any change in the applicable Credit Achievement Year.

      (iv)  In addition to the foregoing provisions of this **Section 1(c)**, and without limiting their application, if the Credit Commencement Date (as defined below) with respect to the Credits does not occur on or before March 1, 2020, Purchaser may, at its sole option, either terminate its obligation to purchase the Credits or extend the Credit Commencement Date with

Confidential USBCDC00067605

respect to the Credits and purchase the Credits in accordance with the foregoing provisions of this **Section 1**. In such event, Purchaser's obligations to purchase the Credits shall continue in full force and effect until Purchaser provides to Seller written notice of Seller's intent to terminate its obligation to purchase the Credits. For purposes of this Agreement, "**Credit Commencement Date**" shall mean the date on which all prerequisites necessary to evidence Purchaser's receipt of the Credits have been obtained, including without limitation receipt of any and all fully-executed forms required by § 253.545 *et. seq.*, RSMo., as amended, the administrative rules of the State thereunder, or by the Missouri Department of Revenue (the "**DOR**") or the Missouri Department of Economic Development (the "**DED**"), as applicable, to effectuate the transfer of the Credits to Purchaser in Purchaser's name.

   **(d)**  **Payment of Purchase Price**.

    Seller shall deliver the Tax Credit Documentation (as defined in **Section 1(e) below**) to Purchaser no later than five (5) business days following Seller's receipt thereof from the State. Within five (5) business days following Purchaser's receipt of the Tax Credit Documentation, Purchaser shall apply to the relevant State authority to formalize this purchase and sale of the Credits. Within five (5) business days following Purchaser's receipt of the Credit Certificate issued by the State in Purchaser's name, Purchaser shall pay the Purchase Price in full to Seller in accordance with wire instructions provided by Seller. The currently-projected amount of the Purchase Price is **Ten Million Two Hundred Ninety-Seven Thousand Two Hundred Seventy-One and no/100 Dollars ($10,297,271.00)**. However, such payment shall be recalculated (based on the same Unit Price formula as used in determining the Purchase Price set forth in **Section 1(b)** above) in the event that the Credits are more than or less than the Credits actually available for sale to Purchaser by Seller with respect to the Credit Achievement Year (or any other applicable Credit Achievement Year), as described in **Section 1(c)(i)** and **Section 1(c)(ii)** above. Notwithstanding the foregoing, Purchaser will have no obligation to purchase the Credits and make any payment of Purchase Price if any of the following occurs, in which event, all Credits shall remain in the name of Seller:

    (i)  Seller or the managing member thereof becomes subject to any Event of Bankruptcy (as defined below);

    (ii)  any material change occurs in the financial condition of Seller or the managing member thereof which adversely affects the value or use of the Credits;

    (iii)  The Missouri General Assembly, the DED, the Missouri State Historic Preservation Office (the "**SHPO**"), the DOR, or any other State agency or department, makes any changes to the statues, regulations, interpretations, or procedures with respect to any aspect of the Credits specifically or to tax credits in general, which adversely affects the value or use of the Credits; or

    (iv)  the State fails to reissue the Credit Certificate to Purchaser in Purchaser's name.

For purposes of this Agreement, Event of Bankruptcy shall mean, as to a specified person or entity (a "Person"):

    (i)  the entry of a decree or order for relief by a court having jurisdiction in the premises in respect of such Person in an involuntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or

Confidential
USBCDC00067606

other similar law, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator, (or similar official) of such Person or for any substantial part of his property, or ordering the winding-up or liquidation of his affairs such decree or order is not dismissed within sixty (60) calendar days; or

(ii) the commencement by such Person of a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy, insolvency, or other similar law, or the consent by him to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator, (or similar official) of such Person or for any substantial part of his property, or the making by him of any assignment for the benefit of creditors, or the taking of action by the Person in furtherance of any of the foregoing.

(e) **Tax Credit Documentation.** The documentation to be delivered as a condition of payment of the Purchase Price shall include the following: (i) Seller shall deliver to Purchaser the certificate issued by the State in Seller's name (the "**Credit Certificate**") and (ii) any other documentation required by the State in order to vest the Credits in Purchaser (collectively, "**Tax Credit Documentation**"). Seller shall take all actions necessary to effectuate the transfer of the Credits to Purchaser in Purchaser's name, including any required notifications to the State taxing authority or any other taxing or governmental authority (a "**Governmental Authority**").

2. **Indemnifications**. In addition to any indemnifications set forth in the Operating Agreement, the following indemnifications shall apply:

(a) **Seller's Indemnification of Purchaser for Breach of Agreement**. Seller shall indemnify, defend and hold harmless Purchaser and Purchaser's Affiliates and their respective members, partners, directors, officers, employees, and representatives (including without limitation any successor to any of the foregoing) from and against any and all claims, demands, actions, suits and proceedings, and any settlements or compromises, relating thereto and reasonable attorneys' fees and expenses (including costs of collection) in connection therewith, and any losses, liabilities, costs, and expenses relating to, solely resulting from or arising out of (i) any breach by Seller of any of its representations or warranties contained in this Agreement, (ii) any breach by Seller of any covenant contained in this Agreement, or (iii) the failure of Seller to comply with any applicable law in connection with the original award of the Credits to Seller and the subsequent transfer of the Credits from Seller to Purchaser.

(b) **Seller's Indemnification of Purchaser for Reduction of Credits**. If a State agency or court of competent jurisdiction makes a determination that reduces the Credits and requires Purchaser to repay the amount of the reduction, Seller shall indemnify Purchaser as follows:

(i) If the reduction in the actual Credits reflected on the Credit Certificate is due to either a determination based on Purchaser's Missouri tax liability without regard to the Credits or any act or omission of Purchaser, Seller shall not be liable for indemnifying Purchaser.

(ii) If the reduction is due to any other reason, then Seller shall, within ten (10) business days after the State agency or court makes the determination make a payment to Purchaser in an amount equal to the sum of (A) one hundred percent (100%) of the face value of the Credits reduced; (B) any interest and penalties imposed by any Governmental Authority that are attributable to such reduction; and (C) Purchaser's reasonable out of pocket attorneys' fees and expenses (including costs of collection.) Seller, however, shall have the right, before making this payment, to appeal the determination made by the State agency or court as the case may be, at Seller's expense. If Seller is unsuccessful in the appeal, Seller shall make the payment to

Confidential

Purchaser within ten (10) business days after the date on which the final determination is made on the appeal. Notwithstanding anything to the contrary stated in this **Section 2(b)(ii)**, to the extent that Purchaser is required to make any payment to the State in order to preserve its (and, under the terms of this Agreement, Seller's) appeal rights, Seller agrees to make all such payments required by the State to the State when due and owing on Purchaser's behalf and, accordingly, Seller will be entitled to receive any refunds of such payments due as a result a successful appeal. Seller and Purchaser agree to use best efforts to cooperate with each other in the event that any occurrence governed by the provisions of this **Section 2(b)(ii)** becomes operative.

    **(c)**  **Special Damages for Breach of Agreement by Seller**. Under the terms of this Agreement, Seller has agreed to sell to Purchaser the Credits for the Purchase Price according to the delivery dates stated herein. To the extent that DED issues to Seller the Credits with respect to the Project and Seller fails to deliver any or all of the Credits to U.S. Bank (with the sole exception of Additional Credits that Purchaser has not agreed to purchase), Seller will be deemed to be in breach of this Agreement. In the event of such a breach by Seller, Seller has fourteen (14) days to cure the breach ("**Seller's Cure Period**") and deliver the Credits or their equivalent to Purchaser. To the extent that Seller fails to cure the breach by delivering the Credits or their equivalent to Purchaser by the last day of Seller's Cure Period, Seller agrees to pay to Purchaser immediately thereafter an amount equal to six percent (6%) of the total face value of the Credits that Seller has failed to deliver to Purchaser plus all of Purchaser's reasonable attorneys' fees, consultant's fees, and expenses (including costs of collection) necessary to compensate Purchaser for the damages resulting from Seller's breach of this Agreement, in addition to all other rights and remedies that Purchaser may have under law or in equity.

    **(d)**  **Special Damages for Breach of Agreement by Purchaser**. Under the terms of this Agreement, Purchaser has agreed to purchase from Seller the Credits for the Purchase Price according to the delivery dates stated herein. To the extent that DED issues to Seller the Credits and Purchaser fails to accept delivery from Seller of the Credits when tendered to Purchaser (with the sole exception of Additional Credits that Purchaser has not agreed to Purchase), Purchaser will be deemed to be in breach of this Agreement. In the event of such a breach by Purchaser, Purchaser will have fourteen (14) days to cure the breach ("**Purchaser's Cure Period**") and accept delivery of the previously rejected Credits from Seller. To the extent that Purchaser fails to cure the breach by accepting delivery of the Credits or their equivalent from Seller by the last day of Purchaser's Cure Period, Purchaser agrees to pay to Seller immediately thereafter an amount equal to six percent (6%) of the total face value of the Credits that Purchaser has failed to accept delivery of from Seller plus all of Seller's reasonable attorneys' fees, consultant's fees and expenses (including costs of collection) necessary to compensate Seller for the damages resulting from Purchaser's breach of this Agreement, in addition to all other rights and remedies that Seller may have under law or in equity.

    **3.**  **Representations and Warranties of Seller.**

Seller represents and warrants to Purchaser as follows:

    **(a)**  Seller is in good standing under the laws of the State of Missouri and has the authority to enter into this Agreement and carry out the transactions contemplated hereunder.

    **(b)**  The execution, delivery and performance by Seller of this Agreement have been duly authorized and are valid and binding upon, and enforceable against, Seller in accordance with the applicable terms hereof.

Confidential                                                USBCDC00067608

**(c)** No consents or approvals are required from any Governmental Authority or other person for Seller to enter into the documents necessary to implement or consummate the transactions contemplated by this Agreement.

**(d)** The execution and delivery of and the consummation of the transactions contemplated by this Agreement do not conflict with or contravene the provisions of Seller's organizational documents or any agreement or instrument by which Seller or any of its Affiliates is bound or any law, rule, regulation, order or decree to which it, its Affiliates or its or its Affiliates' properties are subject.

**(e)** Seller is or will be entitled to receive the Credits.

**(f)** Seller shall develop, rehabilitate, construct, and operate the Project in such manner so as to not cause the revocation, cancellation, termination or disallowance of the Credits, or to otherwise prevent Buyer from qualifying to receive the Credits transferred pursuant to this Agreement, or which would disqualify the Project from eligibility for the Credits;

**(g)** No (i) order of any court or governmental agency of competent jurisdiction has been issued and is in force by any federal, state, municipal, or other governmental department, commission, board, or agency, or (ii) proceeding before any federal, state, municipal, or other governmental department, commission, board, or agency is pending against Seller or, to Seller's knowledge, threatened against Seller or any of its partners which does, or pursuant to which an unfavorable judgment would, restrain, prohibit, invalidate, set aside, rescind, prevent, or make unlawful either or both of the documents necessary to consummate the transactions contemplated by this Agreement, resulting in a material adverse change in the financial condition or prospects of Seller or its businesses or assets or constitute or result, if true, in a material breach of any representation, warranty, covenant, or agreement set forth in this Agreement, or any instruments related hereto.  To the best of Seller's knowledge, no such proceeding will be instituted.  No attachments, execution proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization, or other proceedings are pending or threatened against Seller or any of its partners or members.  No event of bankruptcy has occurred with respect to Seller or any of its partners or members.

**(h)** Neither Seller nor any of its Affiliates is a party to or bound by, any contract, note, agreement, franchise, lease, mortgage, security agreement, license, commitment, guarantee, or other instrument under which the execution or delivery of the documents necessary to consummate the transactions contemplated by this Agreement would constitute a default, material breach, or violation of or would prohibit or make unduly burdensome the consummation of the transactions contemplated by this Agreement.

**(i)** The Credit Certificate to be issued by the State to Purchaser in Purchaser's name will be freely transferable by Purchaser, will be free and clear of liens, encumbrances, and security interests of any nature up upon delivery, and may be used to offset State income and financial institutions taxes.

**(j)** No default (or event that, with the giving of notice or the passage of time or both, would constitute a default) has occurred and is continuing under any other contract, agreement, or instrument to which Seller is subject which would constitute a default, material breach, or violation of or would prohibit or make unduly burdensome the consummation of the transactions contemplated by this Agreement.

Confidential                                                                                                            USBCDC00067609

    **(k)**  Except as otherwise provided in this Agreement, neither Seller nor any of its Affiliates has pledged, assigned, transferred, or otherwise disposed of or encumbered the Credits, or any of its right, title or interest in and to such Credits, and no third party has any right, title, or interest therein.

    **(l)**  Seller is compliance with and agrees to continue to comply with all reporting and other requirements of the Tax Credit Accountability Act of 2004, § 135.085, RSMo. with respect to the Project.

For purposes of this Agreement, "**Affiliate**" shall mean, with respect to a specified person or entity (a "**Person**"), (i) any Person directly or indirectly controlling, controlled by or under common control with the Person specified, (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting securities or beneficial interests of the Person specified, (iii) any officer, director, partner, trustee or member of the immediate family of the Person specified, (iv) if the Person specified is an officer, director, general partner or trustee, any corporation, partnership or trust for which that Person acts in that capacity or (v) any Person who is an officer, director, general partner, trustee or holder of ten percent (10%) or more of outstanding voting securities or beneficial interests of any Person described in clauses (i) through (iv) hereof. The term "**control**" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

    **4.**  **Representations and Warranties of Purchaser.** Purchaser represents and warrants to Seller as follows:

    **(a)**  Purchaser is in good standing under the laws of the State of Minnesota and has the authority to enter into this Agreement and carry out the transactions contemplated hereunder.

    **(b)**  The execution, delivery and performance by Purchaser of this Agreement have been duly authorized and are valid and binding upon, and enforceable against, Purchaser in accordance with the applicable terms hereof.

    **(c)**  No consents or approvals are required from any Governmental Authority or other person for Purchaser to enter into the documents necessary to implement or consummate the transactions contemplated by this Agreement.

    **(d)**  The execution and delivery of and the consummation of the transactions contemplated by this Agreement do not conflict with or contravene the provisions of Purchaser's organizational documents or any agreement or instrument by which Purchaser or any of its Affiliates is bound or any law, rule, regulation, order or decree to which it, its Affiliates or its or its Affiliates' properties are subject.

    **(e)**  No (i) order of any court or governmental agency of competent jurisdiction has been issued and is in force by any federal, state, municipal or other governmental department, commission, board, or agency, or (ii) proceeding before any federal, state, municipal, or other governmental department, commission, board, or agency is pending against Purchaser or, to Purchaser's knowledge, threatened against Purchaser which does, or pursuant to which an unfavorable judgment would, restrain, prohibit, invalidate, set aside, rescind, prevent or make unlawful the documents necessary to consummate the transactions contemplated by this Agreement, resulting in a material adverse change in the financial condition or prospects of Purchaser or its businesses or assets or constitute or result, if true, in a material breach of any representation, warranty, covenant, or agreement set forth in this Agreement, or any instruments related hereto. To the best of Purchaser's knowledge, no such proceeding will be

Confidential  USBCDC00067610

instituted. No attachments, execution proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization, or other proceedings are pending or threatened against Purchaser. No event of bankruptcy has occurred with respect to Purchaser.

**(f)** Neither Purchaser nor any of its Affiliates is a party to or bound by, any contract, note, agreement, franchise, lease, mortgage, security agreement, license, commitment, guarantee, or other instrument under which the execution or delivery of the documents necessary to consummate the transactions contemplated by this Agreement would constitute a default, material breach ,or violation of or would prohibit or make unduly burdensome the consummation of the transactions contemplated by this Agreement.

**(g)** No default (or event that, with the giving of notice or the passage of time or both, would constitute a default) has occurred and is continuing under any other contract, agreement, or instrument to which Purchaser is subject which would constitute a default, material breach or violation of or would prohibit or make unduly burdensome the consummation of the transactions contemplated by this Agreement.

**(h)** Neither Purchaser, any Affiliate of Purchaser, or Person owning an interest in Purchaser (i) has received or shall receive any financial advisory, investment or any other services of a similar nature from Seller's partners, members, or Affiliates; or (ii) has paid or shall pay any fees to Seller's partners, members, or Affiliates in connection with the purchase of the Credits from Seller.

5.  **Other Terms and Conditions.**

    **(a)** **Professional Fees.** Except as otherwise provided in this Agreement, each party to this Agreement shall pay its own legal and accounting fees and other costs pursuant hereto or in any way associated with this Agreement and related documentation with respect to the transaction contemplated by this Agreement.

    **(b)** **Professional Advice.** Each of Seller and Purchaser acknowledge to the other that it has sought its own tax advice from qualified tax professionals; and that it has not relied upon any documents, summaries, projections or other information directly or indirectly provided by the other party in regard to the tax implications of the transactions contemplated hereunder.

    **(c)** **Termination.** This Agreement shall be terminated upon the payment by Purchaser of the Purchase Price for all purchased Credits and may be terminated by Purchaser as set forth in **Section 1(c)(iv)**. This Agreement may be terminated by either Seller or Purchaser without liability or any further obligation at any time prior to the delivery of the Purchase Price for all Credits in the event of any amendment to any applicable provision of State tax law or regulation which would cause a disallowance or recapture of Credits or otherwise make the Credits unusable against State personal and corporate income taxes (except for withholding taxes) under Chapter 143, RSMo., or financial institutions taxes under Chapter 148, RSMo., for any State taxpayer, in which event all Credits shall remain in the name of Seller.

    **(d)** **Confidentiality.** The parties agree as follows:

        (1) Seller and Purchaser hereby agree that neither Seller or Purchaser shall disclose either orally or in writing any of the terms or conditions of the sale of Credits from Seller to Purchaser, including without limitation such terms or conditions set forth in this Agreement and other documentation delivered in connection with the closing of the sale of Credits from Seller to Purchaser (collectively, the "**Confidential Information**"), except as permitted by this

Confidential
USBCDC00067611

Agreement. Seller and Purchaser each shall advise its representatives that such representatives shall not disclose either orally or in writing any of the Confidential Information, and in connection therewith, Seller and Purchaser, as applicable, shall provide a copy of this Agreement to such representatives.

(2) If it is legally compelled (including, without limitation, by interrogatories, requests for information or documents, subpoena, criminal or civil investigative demand or similar process) to disclose any of the Confidential Information, Seller and/or Purchaser, as applicable (i) shall provide the other of such parties with prompt written notice thereof, and (ii) to the extent reasonably practicable, furnish only that portion of the Confidential Information which is legally required, and (iii) exercise commercially reasonable efforts in notifying the requesting entity that such Confidential Information should be afforded confidential treatment and handling.

(3) Notwithstanding anything in this Agreement to the contrary, Seller and Purchaser may disclose to any and all persons the U.S. federal income tax treatment and tax structure of its investment in the Credits, including those materials (including opinions or other tax analyses) that have been provided relating to such tax treatment and tax structure. For this purpose, "tax structure" is limited to facts relevant to the U.S. federal income tax treatment of Purchaser's investment in the Credits.

(e) **Notices.** All notices and other communication permitted or required hereunder shall be in writing and shall be delivered (i) by depositing same in the mail, as registered or certified mail, postage prepaid; (ii) by personal delivery; or (iii) by facsimile, to a party at its address set forth below, or to such other address as the party may specify by notice given to the other party in the manner prescribed and shall be effective upon sending.

If to Seller:

>1501 Washington, LLC
>c/o Urban Development Fund, LLC
>216 West Ohio Street, 5th Floor
>Chicago, Illinois
>Attn: Mr. Michael Qualizza, COO

with a copy to (which copy shall not be notice):

>Ginsberg Jacobs LLC
>300 South Wacker Drive, Suite 2750
>Chicago Illinois 60606
>Attn: Darryl P. Jacobs, Esq.

If to Purchaser:

>U.S. Bank National Association
>1307 Washington Ave., Suite 300
>St. Louis, MO 63103
>Attention: Robert P. Espeland, Vice President

9

With a copy to (which copy shall not be notice):

    Thompson Coburn LLP
    One U.S. Bank Plaza
    St. Louis, MO 63101
    Attention: Janette M. Lohman, Esq.

**(f)** **Entire Agreement; Termination of Prior Purchase Agreements.** This Agreement, together with the provisions of the Operating Agreement referenced herein, contains the entire agreement between the parties with respect to the subject matter hereof, and any representation, inducement, promise or agreement between the parties with respect to the subject matter of this Agreement that is not embodied herein shall be null and void and of no further force or effect. This Agreement shall survive the closing of the sale, transfer, and assignment of the Credits hereunder. By execution of this Agreement, Seller and Purchaser hereby acknowledge and agree that any and all prior purchase agreements between Seller and Purchaser with respect to the purchase of the Credits and/or an award thereof, hereby are deemed to be null and void and superseded by this Agreement.

**(g)** **Governing Law.** The validity of this agreement, the construction, interpretation, and enforcement hereof, and the rights of the parties hereto with respect to all matters arising hereunder or related hereto shall be determined under, governed by, and construed in accordance with the laws of the state of Missouri (without giving effect to conflict or choice of law principals).

**(h)** **Dispute Resolution.** To the extent permitted by law, each party hereby irrevocably waives trial by jury in any action related to this agreement and agrees that all disputes of any kind arising under or related to this agreement, including the issue of arbitration itself, shall be settled in a confidential manner by arbitration at a mutually agreeable location in the State of Missouri, City of Saint Louis, before a single arbitrator pursuant to the commercial arbitration rules of the American Arbitration Association. The arbitration procedure is the exclusive means for resolving disputes covered by this agreement. All of the parties to this agreement expressly waive any right to resolve any dispute of any kind arising under or related to this agreement through any other means, including by filing a lawsuit in a court of law. The parties shall share equally in the cost of the administrative fees and costs of the arbitration. Each party shall pay for its own costs and attorneys' fees, if any, except as otherwise provided in the arbitration pursuant to the terms of this agreement.

**(i)** **DED Fees.** Seller agrees to pay all fees imposed by the DED and/or any other State agency to effectuate the issuance of the Credits to Seller, and for Seller to sell, transfer and assign the Credit Certificate to Purchaser in Purchaser's name. If Seller has not paid such fees, Purchaser has the right, but not the obligation, to pay such fees on behalf of Seller and deduct any such fees paid on behalf of Seller from the Purchase Price.

**(j)** **Amendment and Assignment.** This Agreement may not be modified, amended or otherwise altered except by written agreement executed by Purchaser and Seller. Seller may assign its rights under this Agreement as collateral to a lender of Seller and may otherwise freely assign its rights under this Agreement, provided that the assignee agrees to be bound by all provisions herein, and, upon such assignment, Seller shall provide written notice thereof to Purchaser within five (5) business days of such assignment. **For the avoidance of doubt, Seller and Purchaser agree that Purchaser shall not be made a party to any assignment by Seller of Seller's right to receive all or any portion of the Purchase Price.**

**(k)** **Time is of the Essence.** The parties acknowledge and agree that time is of the essence with respect to all of the terms of this Agreement.

Confidential USBCDC00067613

**(l)** **Counterparts and Electronic Signatures.** This Agreement and any amendments hereof may be executed in counterpart, each of which when so executed and delivered shall be an original, and all of which together shall constitute one instrument. This Agreement may be executed by PDF, facsimile or other electronic means and any such PDF, facsimile or other electronic signature shall be deemed an original.

**(m)** **Lien Releases.** Seller shall provide to Purchaser proof acceptable to Purchaser that any security interests by any of Seller's lenders with respect to the Credits have been released concurrent with Purchaser's payment of the Purchase Price in accordance with this Agreement.

**[SIGNATURE PAGE FOLLOWS]**

Confidential              USBCDC00067614

## SIGNATURE PAGE
## TAX CREDIT PURCHASE AGREEMENT

### by and between

### 1501 WASHINGTON, LLC

### and

### U.S. BANK NATIONAL ASSOCIATION

IN WITNESS WHEREFORE, the undersigned have executed this Agreement as of the day and year first above written.

**PURCHASER**

**U.S. BANK NATIONAL ASSOCIATION,**
a national banking association

By: _____
Robert P. Espeland
Vice President

**SELLER**

**1501 WASHINGTON, LLC**
a Missouri limited liability company

By: _____
    Name: _____
    Title: _____

12

Confidential

**SIGNATURE PAGE**
**TAX CREDIT PURCHASE AGREEMENT**
**by and between**
**1501 WASHINGTON, LLC**
**and**
**U.S. BANK NATIONAL ASSOCIATION**

**IN WITNESS WHEREFORE**, the undersigned have executed this Agreement as of the day and year first above written.

**PURCHASER**

**U.S. BANK NATIONAL ASSOCIATION**,
a national banking association


By: _____
    Robert P. Espeland
    Vice President


**SELLER**

**1501 WASHINGTON ST. LOUIS, LLC**,
a Delaware limited liability company


By:   DFQ Management LLC,
      a Delaware limited liability company,
      its manager

By: _____
Name: Michael S. Qualizza
Its:    Authorized Signatory

12