## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| U.S. BANCORP COMMUNITY DEVELOPMENT CORPORATION and U.S. BANK NATIONAL ASSOCIATION, | ) ) ) ) | |
| Plaintiff/Judgment Creditor, | ) ) | |
| v. | ) ) | |
| MICHAEL QUALIZZA, | ) ) | Case No: |
| Defendant/Judgment Debtor, | ) ) | 4:21-cv-00120-MTS |
| -Post-Judgment Garnishment Proceedings | ) | |

### DEFENDANT MICHAEL S. QUALIZZA'S APPLICATION
### FOR TEMPORARY RESTRAINING ORDER AND
### INJUNCTIVE RELIEF TO PROTECT EXEMPT PROPERTY

**Defendant Michael S. Qualizza**, appearing pro se for the limited purpose of these post-judgment garnishment proceedings pursuant to his Motion for Pro Se Limited Appearance (**Docs. 299-300, filed July 6, 2026**), respectfully submits this Application for Temporary Restraining Order and Injunctive Relief to Protect Exempt Property. In support of this Application, Qualizza relies upon the accompanying Memorandum of Law, the Exhibits filed herewith **(Exhibits A through HH),** the Declarations of Michael S. Qualizza and Kimberly H. Qualizza filed herewith, and the companion Exhibit Index and Timeline filed separately.

### I. INTRODUCTION

Defendant Michael S. Qualizza respectfully applies for a temporary restraining order staying all garnishment proceedings against his financial accounts pending the Court's resolution of the fully briefed motions to quash **(Docs. 285 and 286)**. On May 26, 2026, U.S. Bank National Association ("USB") filed applications for writs of garnishment directed to four financial institutions: Charles Schwab, JPMorgan Chase, Raymond James, and T. Rowe Price. The practical effect has been to

Page 1 -  REDACTED VERSION

freeze virtually every financial account Qualizza holds, despite the fact that the overwhelming majority of those accounts consist of retirement funds (401(k), SEP IRA, IRA, and Roth IRA) that are categorically exempt from garnishment under Mo. Rev. Stat. § 513.430.1(10)(f), and because Qualizza is a Texas domiciliary whose accounts are held in Texas, Tex. Prop. Code § 42.0021(a)-(b). To the extent any account is an ERISA-qualified employer-sponsored plan, the federal anti-alienation provision, 29 U.S.C. § 1056(d)(1), independently bars garnishment. These exemptions govern in this Court: under Federal Rule of Civil Procedure 69(a)(1), federal garnishment proceedings follow state procedure and honor state exemption law. Only $XXXXXX in non-exempt assets belonging to Qualizza exists across all four institutions. The T. Rowe Price account is funded entirely with the premarital assets of Qualizza's wife, Kimberly H. Qualizza; Qualizza was added to the account title in 2012 solely for estate-planning purposes and has contributed nothing to it in more than eighteen years **(Exhibit AB)**.

Qualizza has had no employment or measurable income for approximately seven years, while incurring significant Hotel operations costs, interest, and legal fees. The confirmed freeze of his Charles Schwab accounts (as of June 25, 2026) and the imminent threat of seizure of his JPMorgan Chase accounts, which hold $XXXXX ($XXXXX in checking and $XXXXXX in savings) and constitute his sole remaining source of funds for mortgage payments, utilities, insurance, food, transportation, and legal defense in active multi-jurisdiction litigation, have left Qualizza on the verge of total financial deprivation. Immediate relief is required to prevent irreparable harm.

The deficiency USB seeks to collect is itself disputed on the face of the parties' own written agreements. The Amendment to Settlement Agreement dated February 3, 2026, the instrument that authorized USB to release its lien for less than full payment and thereby produced the claimed $990,813.49 deficiency, was never signed by Qualizza in any counterpart, and Section 30 of the original Settlement Agreement expressly requires the signature of all Parties for any modification to be effective **(Exhibits O, P, Q).**

The documentary record raises genuine factual questions that warrant preserving the status quo. Three versions of the same closing statement reflect payoff figures ranging from $13,299,435.43 to $14,250,000 **(Exhibits T, U, V),** a discrepancy approaching $1 million that has never been explained. USB's own payment demand **(Exhibit G)** was addressed to the borrower entity (the

"Borrower"), not to Qualizza individually, yet USB now seeks to garnish Qualizza's personal retirement accounts. USB's opposition **(Exhibit X)** characterized Qualizza's motion to quash as "nearly incomprehensible" and devoted its lead argument to pro se standing rather than addressing these substantive issues. That threshold objection is now resolved: Qualizza has filed a Motion for Pro Se Limited Appearance (**Docs. 299-300)** entering his individual appearance for these post-judgment garnishment proceedings. The facts in the exhibit record are neither incomprehensible nor frivolous, and they deserve the Court's consideration before USB is permitted to reach exempt property. The pressure is not static: on July 6, 2026, three days before this filing, USBCDC took control of Last Hotel Master Tenant LLC based on the same contested sale, while these garnishments remain in place (**Exhibit HH**).

## II. STATEMENT OF FACTS

### A. The Consent Judgment and the Settlement Framework

1. **On October 15, 2025**, this Court entered a Consent Judgment **(ECF No. 257)** in the amount of $14,250,000, jointly and severally against Qualizza, Freeman, and Dixon, with a Stay Termination Date of February 28, 2026, and interest accruing at 9% per annum thereafter.

2. The judgment arises out of financing for The Last Hotel, 1501 Washington Avenue, St. Louis, Missouri (the "Hotel" or the "Property"), which was owned and operated through 1501 Washington St. Louis, LLC, Last Hotel Master Tenant, LLC, and DFQ Management LLC, entities in which Qualizza is a Co-Manager. Qualizza is also the sole Manager of TLH F&B STL LLC, a separate limited liability company that operated the food, beverage, and hospitality services at the Hotel. Co-judgment-debtor Neil D. Freeman held no governance role in TLH F&B STL LLC.

3. The sale of the Hotel was structured under a Purchase and Sale Agreement dated **September 8, 2025**, executed by Qualizza as Co-Manager of 1501 Washington St. Louis, LLC and Last Hotel Master Tenant LLC, for a purchase price of Sixteen Million Five Hundred Thousand Dollars ($16,500,000.00) **(Exhibit R)**.

4. The original Settlement Agreement, dated **October 15, 2025 (Exhibit O)**, was signed by all parties, although <u>Qualizza's signature was not notarized.</u> It was premised on the $16.5M sale structure, under which USB was to receive a Reduced U.S. Bank Indebtedness payoff of Fourteen Million Two Hundred Fifty Thousand Dollars ($14,250,000.00) at closing. Section 30 of the Settlement Agreement expressly provides that "the terms of this Agreement may not be altered, changed, amended or modified except by written agreement signed by all Parties hereto."

**B. The Hotel Closure and the Pre-Sale Period**

5. **On March 6, 2025**, the Hotel was closed by co-judgment-debtor Freeman and property manager Maverick Hospitality without notice to Qualizza, Hotel staff, or booked guests. All employees were terminated and all guest reservations cancelled. Qualizza had arranged for staff continuity under his management: on March 4, 2025, a Maverick Hospitality representative told former TEAMQ LLC assistant manager Michael Evanoff to return at 4:00 p.m. on March 7, but Maverick instead closed the Hotel at 1:00 p.m. CST on March 6.

6. From **March 8, 2025**, forward, the Hotel remained unguarded, unlocked, and unmaintained. It was repeatedly broken into and looted. Essential utilities (power, water, gas) were disrupted, causing additional property damage, including flooding and a vehicle strike to the front door affecting fire equipment. Qualizza personally paid former Hotel security personnel to conduct random surveillance shifts at his own expense.

7. From **March 2025 through 2026**, Qualizza worked to preserve value in the Property, including engaging the City of St. Louis regarding potential use of the Hotel to house victims of a tornado that had heavily damaged the city. No workable arrangement was reached.

8. The March 6, 2025, closure also terminated TLH F&B STL LLC's operations, resulted in the firing of its employees, the cancellation of its guest reservations, the disruption of its vendor and licensing relationships, and the destruction of its business goodwill. Qualizza, as sole Manager of TLH F&B STL LLC, was the only person with authority to make those decisions, and he did not authorize them.

## C. The Unsigned Amendment to Settlement Agreement

9. Between the execution of the original Settlement Agreement and the closing of the sale, the purchase price was reduced from $16,500,000.00 to Fourteen Million Dollars ($14,000,000.00), a reduction of Two Million Five Hundred Thousand Dollars ($2,500,000.00). This reduction was memorialized in the Amendment to Settlement Agreement dated **February 3, 2026 (Exhibits P, Q)**, which Qualizza never signed.

10. Two counterpart versions of the Amendment exist: one signed by Neil D. Freeman **(Exhibit P)** and one signed by Timothy Dixon via Docusign, Envelope ID D080E12F-CDF8-4815-88D5-886710B7F718, dated February 4, 2026 **(Exhibit Q).** No counterpart signed by Michael Qualizza exists or has ever been produced, and no Docusign envelope for the Amendment was ever sent to Qualizza for execution.

11. The Amendment changed two material terms: (a) it allowed USB to release its lien on the Hotel even if net sale proceeds were insufficient to satisfy the Reduced U.S. Bank Indebtedness, with the shortfall to be "addressed following the sale"; and (b) it extended the 135-day stay period to 165 days **(Exhibits P, Q).**

12. The price reduction and the circumstances that produced it are independently confirmed by co-judgment-debtor Freeman's own filing in this Court (Doc. 285, Exhibit S, at ¶¶ 3-5), in which Freeman admits: (a) that the original sale price was $16,500,000.00; (b) that the Settlement Agreement contemplated a $14,250,000.00 payoff at that sale price; and (c) that the price was subsequently reduced to $14,000,000.00.

13. Freeman's filing further documents Five Hundred Twenty-Eight Thousand Thirty-Seven Dollars ($528,037) in operational expenses paid during the interval between the execution of the original Settlement Agreement and the closing **(Exhibit S; Doc. 285-2),** including payments to Pro Clean Restoration for flood remediation, Everon for post-break-in camera installation, and multiple insurance premiums arising from damage to the Property. These expenses, combined with the $2.5M price reduction, materially altered the economic terms Qualizza had originally approved. Qualizza was not in control of the Property during this interval and did not approve, authorize, or agree to absorb these costs into personal liability.

14. Qualizza's refusal to sign the Amendment is properly understood in light of his separate role as sole Manager of TLH F&B STL LLC. Signing the Amendment would have foreclosed his ability to pursue claims on behalf of TLH F&B STL LLC for the unauthorized shutdown and destruction of its operations. The deficiency USB now seeks to enforce arose in part from a closing structure that also compromised Qualizza's standing to pursue those distinct claims.

**D. The March 5, 2026, Closing and the Closing-Statement Discrepancy**

15. **On March 5, 2026**, the Hotel was sold to SIG Capital Group, LLC for $14,000,000. The Closing Binder for the sale **(Exhibit W)** documents that Freeman executed all Seller-side closing documents as sole signatory for 1501 Washington St. Louis, LLC, Last Hotel Master Tenant, LLC, and DFQ Management LLC, including the Amendment and Second Amendment to the Membership Interest Purchase Agreement, the Bill of Sale, the Assignment and Assumption of Contracts, the FIRPTA Affidavit, the Owner's Affidavit, the Gap Indemnity, the 1099-S Certification, the Written Consents of Members for all three entities, the Seller Closing Statement, and the Post-Closing Escrow Agreement. Qualizza did not sign any closing document, did not execute any Written Consent of Members, and did not authorize the closing structure that generated the deficiency USB now seeks to collect against him.

16. The Chicago Title closing file for Escrow 25-10959CHE contains three separate versions of the Seller's Closing Statement for the same March 5, 2026, settlement **(Exhibits T, U, V)**. Version 5 **(printed March 2, 2026, 12:05:19 p.m., Exhibit U)** shows a U.S. Bank payoff of $14,250,000.00 and a Balance Due FROM Seller of $1,118,131.30. Version 7 **(printed March 5, 2026, 12:47:06 p.m., Exhibit V)** shows the same $14,250,000.00 payoff, a REF Capital reimbursement of $221,986 (REF Capital being an entity controlled by Freeman), additional Spencer Fane attorney fees are not present in the signed version, and a Balance Due FROM Seller of $1,188,675.57. The executed version **(printed March 5, 2026, 3:54:37 p.m., Exhibit T)** shows a payoff of $13,299,435.43 and a Balance Due TO Seller of $0.00.

17. This nearly $1 million discrepancy has never been explained. The deficiency USB now seeks to collect from Qualizza arises from the numerical structure reflected only in the unsigned versions. Qualizza did not authorize the changes reflected **in Exhibits U and V.**

18. USB's Payment Statement dated March 5, 2026 **(Exhibit G)** demands $13,299,435.43 from the Borrower entity, 1501 Washington St. Louis, LLC. The Payment Statement was addressed to the Borrower and its counsel, not to Qualizza individually.

19. Qualizza has previously placed Chicago Title Insurance Company and Spencer Fane LLP on written notice regarding the circumstances of the March 5, 2026, closing and the unauthorized lien release, and reserves all claims and defenses arising from the closing structure that produced the disputed deficiency. Mr. Qualizza never approved the release of his signature pages from escrow for the closing **(Exhibit CC).** In fact, Mr. Qualizza had no notice that the Hotel sale had occurred until SIG Capital reached out to him, thanking him for his help in getting the transaction closed. Many structural issues remain that were not properly addressed during the closing process **(Exhibit DD),** including almost $1 million in unpaid Missouri state sales tax and St. Louis employee tax **(Exhibit EE).**

**E. Partial Satisfaction and the Claimed Balance**

20. On April 29, 2026, USB filed a Partial Satisfaction **(ECF No. 259)** crediting $13,299,435.43 and stating a remaining principal balance of $971,646.76.

21. As of May 26, 2026, USB claims a remaining balance of $990,813.49 ($971,646.76 principal plus $19,166.73 interest), with per diem interest of $239.58 **(Exhibit D).**

22. The claimed $990,813.49 deficiency is the arithmetic product of the $2.5M price reduction ($16.5M $\rightarrow$ $14M) and the operational expenses documented in **Exhibit S**, all of which occurred during an interval in which Qualizza was not in control of the Property and did not approve the underlying transactions. The Amendment **(Exhibits P, Q)** was structured to shift these losses onto Qualizza as personal deficiency liability without his signature or consent.

### F. Post-Settlement Conduct by U.S. Bank

23. **On April 30, 2026**, U.S. Bancorp Community Development Corporation ("USBCDC") sent DFQ Management LLC (attention Qualizza) a Notice of Put regarding USBCDC Investment Fund 228, LLC, exercising an option requiring DFQ to purchase USBCDC's interest. The same date, USB's counsel sent a Notice of Default invoking operating agreement, settlement agreement, tax-return, books-and-records, and unwind obligations **(Exhibits L, M).**

24. The record accordingly reflects that USB is simultaneously pursuing post-settlement transactional remedies and obligations while seeking broad garnishment relief against third-party financial institutions, underscoring the need for clarification of the precise scope, basis, and amount of any present execution.

### G. The Garnishment Writs

25. **On May 26, 2026**, USB filed applications for writs of garnishment directed to Charles Schwab & Co., Inc. **(Doc. 263),** JPMorgan Chase Bank, N.A. **(Doc. 265),** Raymond James & Associates, Inc. **(Doc. 267),** and T. Rowe Price Associates, Inc. **(Doc. 268),** together with a Summons to Garnishee **(Doc. 264)** and Interrogatories Directed to Garnishee **(Exhibits C, E, H, I, J, K).** The Writ of Garnishment **(Exhibit D)** claims a balance of $990,813.49.

26. **On June 25, 2026**, Charles Schwab notified Qualizza by email that his accounts were restricted due to garnishment. Schwab restricted cash and securities, prohibited new buy orders and withdrawals, disabled online access, and stated it may be required to turn over available assets up to the full amount demanded **(Exhibits A, B).**

27. The Notice of Garnishment to Judgment Debtor was served via email on June 26, 2026, to Qualizza's counsel of record Robert Barnes at Barnes Law LLP **(Exhibit F).**

28. As of the filing of this Application, the JPMorgan Chase accounts have not yet been frozen; the writ has issued and service on Chase is imminent. Once served, Chase will be required to freeze and potentially turn over the only liquid funds available to Qualizza for basic living expenses.

**H. The Garnished Accounts: Detailed Breakdown**

29. **$XXXXXXX Total: Charles Schwab (CONFIRMED FROZEN as of June 25, 2026)**

    **$XXXXXXX** - SEP IRA (...627): EXEMPT retirement funds (Mo. Rev. Stat. § 513.430.1(10)(f); ERISA; Tex. Prop. Code § 42.0021(a));

    **$XXXXXX** - Roth IRA (...820):  EXEMPT retirement funds;

    **$XXXXXX** - Custodial Brokerage (...858):  non-debtor property (daughter's custodial account);

    **$XXXX** - Joint Tenant Brokerage (...815): non-exempt;

    **$0.00** - Rollover IRA (...579):  EXEMPT retirement account;

    **$0.00** - Individual Brokerage (...416):  non-exempt.

30. **$XXXXXX Total: JPMorgan Chase (NOT YET FROZEN - writ issued, service imminent)**

    **$XXXXXX** - CPC Checking (...0436): non-exempt; sole source of Qualizza's living expenses;

    **$XXXXX** - CPC Savings (...5895): non-exempt.

31. **$XXXXXX Total - Raymond James (status unknown)** The Raymond James statement is addressed to "Qualizza M&K" and lists Kimberly H. Qualizza not Michael Qualizza  as the primary account holder. Three of the four Raymond James accounts belong exclusively to Kimberly H. Qualizza, a non-judgment-debtor spouse against whom USB holds no judgment:

    **$XXXXXXX** Kimberly TOD (XXXX9222):  non-debtor property;

    **$XXXXXXX** Kimberly IRA (XXXX1766): non-debtor property and EXEMPT retirement funds;

    **$XXXXXXX** Kimberly Roth IRA (XXXX1813):  non-debtor property and EXEMPT retirement funds;

**$XXXXXX** Michael IRA (XXXX2054): EXEMPT retirement funds (the only account belonging to the judgment debtor, and it is an individual retirement account exempt as a matter of law).

32. **Approximately $XXXXXX Total - T. Rowe Price (status unknown)** per the June 27, 2026, holdings statement **(Exhibit AB)**.

**Approximately $XXXXXX** - The account is jointly titled (Kimberly H. Qualizza and Michael Qualizza, Joint Tenant), with a companion Joint TOD registration (Kimberly H. Qualizza and Karen D. Levy). The joint titling dates to a 2012 estate-planning change made when Kimberly's mother, the prior joint holder, fell ill; a beneficiary designation was intended, and a joint tenancy was recorded. All funds in the account are Kimberly H. Qualizza's premarital assets, originating in gifts from her father, and no contributions have been made in more than eighteen years.

**Approximately $XXXXXX** of the T. Rowe Price total is Rebecca A. Qualizza's and is non-debtor property. Mr. Qualizza does not claim any of the T. Rowe Price assets as his individual property.

33. **Summary of targeted assets:** total Michael Qualizza non-exempt assets across all institutions: **$XXXXXX;** total exempt retirement assets (Michael's): **$XXXXXXX;** total non-debtor property (Kimberly's and daughter's): approximately $XXXX; USB's claimed balance: **$990,813.49. Approximately 97.5% of all targeted assets are either exempt from execution as a matter of law or do not belong to Michael Qualizza, the judgment debtor.**

## I. Qualizza's Financial Circumstances

34. Qualizza has had no employment or measurable income for approximately seven years, while incurring significant Hotel operations costs, interest, and legal fees. The **$XXXXX** held at Chase constitutes his sole remaining source of funds for mortgage payments, utilities, insurance, food, transportation, and legal defense in active multi-jurisdiction litigation. Continued enforcement will force liquidation of tax-qualified retirement

accounts, causing irreversible tax consequences, early-withdrawal penalties, and permanent loss of tax-qualified status.

## J. Procedural Posture and Conferral

35. **On June 9, 2026**, Missouri counsel Elkin Kistner of Kistner, Hamilton, Elam & Martin, LLC contacted Brian W. Hockett and Caleb S. Crahan of Thompson Coburn LLP by email and voicemail, identifying himself as a representative of Qualizza and requesting a call regarding the garnishments **(Exhibit BB; see also USB's own Doc. 297-1)**. No substantive conferral followed.

36. Qualizza's Motion to Quash, Dissolve, or Modify Writs of Garnishment **(Doc. 286, filed June 18, 2026; Exhibit N)** and Freeman's Motion to Set Aside and **Quash (Doc. 285, filed June 16, 2026; Exhibit Z**) are fully briefed and pending. USB filed oppositions to both on **June 30, 2026 (Docs. 296, 297; Exhibits Y, X).**

37. On July 1-2, 2026, Qualizza filed a Petition for Declaratory Judgment, Application for Temporary Restraining Order and Temporary Injunction, and Verified Petition to Protect Exempt Property in the District Court of Travis County, Texas **(Cause No. 116888046),** concerning the same Texas-held accounts. That related proceeding is disclosed for the Court's complete information; this Application does not ask this Court to adjudicate any issue pending in the Texas action.

38. **On July 6, 2026**, Qualizza filed a Motion for Pro Se Limited Appearance **(Docs. 299-300, Exhibit AA),** resolving USB's threshold objection regarding pro se standing.

39. By letter dated July 6, 2026, and received July 9, 2026, Husch Blackwell LLP, on behalf of USBCDC as Investor Member of Last Hotel Master Tenant LLC, confirmed the removal of DFQ Management LLC, Qualizza's management entity, as Managing Member of the Company and designated USBCDC itself as successor Managing Member, effective immediately **(Exhibit HH)**. The stated grounds are (i) the sale of the Property, the same closing Qualizza never authorized **(Exhibits CC, FF, GG)**, which the notice declares an uncurable default, and (ii) the failure to deliver Company tax returns that Qualizza, who is not the Tax Matters Partner, has no ability to produce. The notice issued while USBCDC

and USB simultaneously maintain garnishments freezing substantially all of Qualizza's and his family's accounts.

### III. LEGAL STANDARD

A temporary restraining order is an extraordinary remedy designed to preserve the status quo pending a full hearing on the merits. Tumey v. Mycroft AI, Inc., 27 F.4th 657, **664 (8th Cir. 2022)**. In the Eighth Circuit, the standard governing issuance of a TRO is the same four-factor test applied to preliminary injunctions, as set forth by the en banc court in Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981).

Under Dataphase, the Court considers:

    (a) The threat of irreparable harm to the movant absent injunctive relief;

    (b) The likelihood that the movant will succeed on the merits;

    (c) The balance between the harm to the movant if relief is denied and the harm to the opposing party if relief is granted; and

    (d) The public interest.

Dataphase, 640 F.2d at 114. No single factor is determinative; the Court weighs all four together. The movant bears the burden of establishing that each factor favors the requested relief. Id.

To demonstrate irreparable harm, the movant must show injury that is "certain and great and of such imminence that there is a clear and present need for equitable relief." Roudachevski v. All-Am. Care Ctrs., Inc., 648 F.3d 701, 706 (8th Cir. 2011). The harm must be beyond remediation through an award of monetary damages. Id.

As set forth below, each of the four Dataphase factors weighs in favor of granting the requested TRO to preserve the status quo while the fully briefed motions to quash **(Docs. 285 and 286)** await the Court's ruling.

## IV. ARGUMENT

The four Dataphase factors, considered together, support entry of a temporary restraining order. Qualizza's garnished accounts consist almost entirely of retirement funds that are categorically exempt under Missouri law and the exemption law of Texas, where Qualizza is domiciled and where the accounts are held. USB has already recovered over 93% of the Consent Judgment, yet it has cast garnishment writs across four financial institutions, freezing assets it cannot lawfully reach, including the separate property of Qualizza's wife and daughter, non-debtors against whom USB holds no judgment. The motions to quash **(Docs. 285 and 286)** are fully briefed and pending before this Court. A TRO preserving the status quo until the Court rules on those motions is both appropriate and necessary.

USB's opposition **(Exhibit X)** characterized Qualizza's Motion to Quash as **"nearly incomprehensible**" and an **"unnecessary drain on judicial resources."** The documentary record tells a different story: three versions of the same closing statement with a nearly $1 million payoff discrepancy **(Exhibits T, U, V),** a payment demand addressed to the Borrower entity rather than to Qualizza **(Exhibit G),** a closing binder showing Freeman signed every seller-side document without Qualizza's knowledge or consent **(Exhibit W),** and an Amendment to Settlement Agreement, the very instrument that created the claimed deficiency, that Qualizza never signed **(Exhibits O, P, Q).** These are not incomprehensible allegations. They are documented facts supported by exhibits already before the Court.

USB devoted the first three pages of its eight-page opposition to arguing that the Court should not entertain Qualizza's motion because he was **"currently represented by counsel."** That threshold objection is now moot following **Qualizza's filing of a Motion for Pro Se Limited Appearance (Docs. 299-300, Exhibit AA)**. The remaining five pages of USB's opposition do not address the closing statement discrepancy, the payment demand directed to the Borrower, the unsigned Amendment, or the fact that substantially all garnished assets are exempt retirement funds or non-debtor property. Each of the four Dataphase factors is addressed in turn below.

## A. IRREPARABLE HARM

The garnishment writs filed by USB on May 26, 2026, have frozen or imminently threaten virtually all of Qualizza's financial accounts at four institutions: Charles Schwab, JPMorgan Chase,

Raymond James, and T. Rowe Price. The overwhelming majority of these accounts consist of exempt retirement funds, including SEP IRA, IRA, and Roth IRA accounts, that are categorically protected from attachment and execution, in this federal proceeding no less than in state court (Fed. R. Civ. P. 69(a)(1)), under Mo. Rev. Stat. § 513.430.1(10)(f) and Tex. Prop. Code § 42.0021(a)-(b). Only $XXXXXX in non-exempt assets belonging to Qualizza exists across all four institutions. USB has nonetheless cast a dragnet across every institution where Qualizza holds accounts, sweeping up retirement savings that are beyond the reach of garnishment as a matter of law, together with the separate property of his wife and daughter.

The threat to Qualizza's ability to meet basic living needs is immediate. Qualizza has had no employment or measurable income for approximately seven years. The $XXXXXX held at JPMorgan Chase constitutes his sole remaining source of funds for mortgage payments, utilities, insurance, food, transportation, and legal defense in active multi-jurisdiction litigation. The Chase writ has issued and service is imminent; once served, Chase will be required to freeze and potentially turn over these funds, leaving Qualizza with no means of meeting basic living needs. Continued enforcement will also force liquidation of tax-qualified retirement accounts, causing irreversible tax consequences, early-withdrawal penalties, and permanent loss of tax-qualified status. No monetary remedy can restore these losses.

**The T. Rowe Price account (Exhibits I, AB) is funded entirely with the premarital assets of Kimberly H. Qualizza, a non-debtor. Qualizza was added to the account title in 2012 solely for estate-planning purposes and no contributions of any kind have been made to the account in more than eighteen years. Turnover or liquidation of that account would impair non-debtor separate property in satisfaction of a judgment to which its owner is a stranger.**

The urgency is underscored by USBCDC's own escalation in the week of this filing. By letter dated July 6, 2026, USBCDC took control of Last Hotel Master Tenant LLC effective immediately, expressly preserved DFQ Management LLC's continuing liabilities, and reserved additional remedies under the Operating Agreement and the October 15, 2025, Settlement Agreement **(Exhibit HH)**. Each step in the sequence to date, the default notices, the garnishment writs, and now the removal, has issued without judicial supervision. The garnished accounts are the last assets

not yet within USBCDC's control, and only this Court's intervention stands between the outstanding writs and turnover.

The harm caused by this freeze is certain, great, and imminent within the meaning of Roudachevski v. All-Am. Care Ctrs., Inc., 648 F.3d 701, 706 (8th Cir. 2011). Qualizza is unable to access his retirement savings or meet ordinary living expenses while the garnishment writs remain in effect. This deprivation is ongoing and compounds with each passing day. The Supreme Court has long recognized the inherent severity of this type of harm: a garnishment that freezes a person's financial resources "may as a practical matter drive a wage-earning family to the wall." Sniadach v. Family Fin. Corp., 395 U.S. 337, 341-42 (1969). The Court subsequently extended that principle beyond wages, holding that "the probability of irreparable injury" from an unjustified garnishment "is sufficiently great" that procedural safeguards are constitutionally required. North Georgia Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601, 606-08 (1975). Monetary damages cannot remedy the wrongful seizure of exempt property, because the injury is not merely financial; it is the denial of a statutory right to retain assets that the legislature has placed beyond the reach of creditors. Continued enforcement will also force liquidation of tax-qualified retirement securities, triggering irreversible tax consequences and early-withdrawal penalties that no subsequent court order can undo. The motions to quash **(Docs. 285 and 286)** are fully briefed and pending. Absent a TRO preserving the status quo, Qualizza faces continued irreparable injury to rights that, once violated, cannot be made whole after the fact.

### B. LIKELIHOOD OF SUCCESS ON THE MERITS

Qualizza is likely to succeed on the pending motions to quash on multiple independent grounds.

**First, the garnished accounts are almost entirely exempt.** Qualizza's accounts at Charles Schwab, JPMorgan Chase, Raymond James, and T. Rowe Price consist predominantly of retirement funds **(SEP IRA, IRA, and Roth IRA accounts)** that are categorically exempt from garnishment under Mo. Rev. Stat. § 513.430.1(10)(f). To the extent any account is an ERISA-qualified employer-sponsored plan, the federal anti-alienation provision, 29 U.S.C. § 1056(d)(1), independently bars garnishment. See Guidry v. Sheet Metal Workers Nat'l Pension Fund, 493 U.S. 365, 376 (1990). Under Fed. R. Civ. P. 69(a)(1), federal garnishment follows state procedure, and Missouri law places these assets beyond USB's reach. The same result obtains under the law of

Texas, where Qualizza is domiciled and where the accounts are held: Tex. Prop. Code § 42.0021(a)-(b) exempts qualified retirement accounts from attachment, execution, and seizure. See Hawk v. Engelhart (In re Hawk), 871 F.3d 287, 291-92 (5th Cir. 2017) (recognizing that funds held in a retirement account are an "unconditionally exempted interest" under § 42.0021, while amounts withdrawn become only conditionally exempt). Whichever state's exemption law governs, the retirement accounts are exempt; no choice-of-law dispute alters the outcome. **Only $XXXXXXX in non-exempt assets belonging to Qualizza exists across all four institutions.**

**Second, the writs reach substantial non-debtor property.** Three of the four Raymond James accounts belong exclusively to Kimberly H. Qualizza, a non-judgment-debtor spouse against whom USB holds no judgment; the Raymond James statement itself lists her as the primary account holder. The T. Rowe Price account is funded entirely with Kimberly's premarital assets; Qualizza was added to the title in 2012 solely for estate-planning purposes, no contributions have been made in more than eighteen years, and approximately $XXXXX is held for the Qualizzas' daughter, Rebecca Qualizza. **(Exhibit AB).** The Schwab custodial account ($XXXXX) likewise belongs to the Qualizzas' daughter. Third-party property is not garnishable in satisfaction of Qualizza's judgment debt; Missouri procedure expressly recognizes third-party claims to garnished property and provides for notice to and intervention by such claimants. Mo. Sup. Ct. R. 90.09.

**Third, the deficiency itself is disputed on the face of the parties' own written agreements.** The Amendment to Settlement Agreement dated February 3, 2026, the instrument that authorized USB to release its lien for less than full payment and thereby created the claimed **$990,813.49** deficiency, was never executed by Mr. Qualizza in any counterpart, and no Docusign envelope was ever sent to him **(Exhibits P, Q).** Section 30 of the original Settlement Agreement expressly requires a written agreement signed by all Parties for any modification to be effective **(Exhibit O, § 30)**. Freeman's own filing in this Court **(Doc. 285, Exhibit S, ¶¶ 3-5)** admits the $2.5M price reduction and documents $528,037 in operational expenses that produced the shortfall, all during an interval in which Qualizza did not control the Property and was being boxed out of the Hotel sale closing process. Because Qualizza never signed the Amendment, the deficiency is disputed as to him on the face of the parties' own written agreements and the independent admissions of his co-judgment-debtor.

**Fourth, the closing that generated the deficiency was never authorized by Qualizza.** The Closing Binder **(Exhibit W)** documents that Freeman executed every Seller-side closing document including the Written Consents of Members for all three Seller entities, without Qualizza's signature or documented consent, even though Qualizza is a Co-Manager of each entity. Three versions of the same closing statement **(Exhibits T, U, V)** show payoff figures ranging from **$13,299,435.43 to $14,250,000**, with the unsigned versions containing REF Capital charges of **$221,986** payable to an entity controlled by Freeman and additional attorney fees are not present in the executed version. USB's own Payment Statement **(Exhibit G)** demands payment from the Borrower entity, not from Qualizza individually. On the day of closing, Qualizza objected in writing to any fees being paid to John Perkaus ("I absolutely do not approve of John Perkaus receiving any fees"); the closing agent's outgoing wire list nonetheless shows that Perkaus & Farley was wired from Seller proceeds the following day, along with $70,240.45 to Spencer Fane LLP **(Exhibits FF, GG)**. These documented inconsistencies have never been explained despite the multiple Demand Letters sent to Spencer Fane and Chicago Title.

**Fifth, the writs are overbroad.** Garnishment is a harsh, purely statutory remedy requiring strict compliance. The writs target every account at every institution where Qualizza holds any interest, without distinguishing exempt from non-exempt assets or debtor from non-debtor property. A writ that sweeps in a non-debtor spouse's premarital IRA, a daughter's custodial account, and over $XX XXXX in tax-qualified retirement funds to collect a disputed $990,813.49 balance is not a properly tailored execution device.

Sixth, USB's opposition does not engage the merits. USB's opposition **(Exhibit X)** devoted its lead argument to pro se standing, an objection now moot following the limited appearance (Docs. 299-300) and characterized Qualizza's motion as "nearly incomprehensible." The documentary record speaks for itself. The remaining pages of USB's opposition do not address the closing statement discrepancy, the payment demand directed to the Borrower, the unsigned Amendment, or the fact that substantially all garnished assets are exempt retirement funds or non-debtor property.

Seventh, USBCDC's own most recent conduct confirms that the garnishments are one arm of a broader enforcement campaign rather than a narrow collection effort. By letter dated July 6, 2026, three days before this Application, USBCDC confirmed the removal of DFQ Management LLC

as Managing Member of Last Hotel Master Tenant LLC under Section 8.11(b) of the Operating Agreement, invoking as an uncurable default the very sale that produced the disputed deficiency, and designated itself as successor Managing Member **(Exhibit HH).** The letter expressly reserves all rights under the Operating Agreement, and the Settlement Agreement dated October 15, 2025. USBCDC has thus taken control of the Company on the basis of the contested sale while its garnishment writs continue to freeze Qualizza's retirement accounts and his family's property, a sequence that underscores the need for judicial supervision before any assets are turned over.

### C. BALANCE OF HARMS

The balance of harms tips decisively in Qualizza's favor. On one side, Qualizza faces the immediate freeze of retirement accounts that constitute virtually all of his financial assets, the imminent seizure of his only source of living funds, and the potential impairment of his wife's and daughter's separate property. The exempt accounts, consisting of SEP IRA, IRA, and Roth IRA holdings, are protected from garnishment as a matter of law under Mo. Rev. Stat. § 513.430.1(10)(f) and Tex. Prop. Code § 42.0021(a)-(b). The freeze deprives Qualizza of access to retirement savings he cannot replace, causing concrete and ongoing harm for which no adequate legal remedy exists.

On the other side, USB has already recovered $13,299,435.43 of a $14,250,000 consent judgment, representing over 93% of the total amount. The remaining claimed balance of $990,813.49 (plus accruing interest), which is itself disputed because it arises from an Amendment Qualizza never signed, is not at risk. A TRO preserving the status quo pending resolution of the fully briefed motions to quash **(Docs. 285 and 286)** would impose, at most, a brief delay in USB's pursuit of the remaining balance from non-exempt assets. That delay is measured in weeks, not months, given that both motions are fully briefed and awaiting the Court's ruling.

USB's own filing confirms that a representative of Qualizza attempted to confer before the Motion to Quash was filed. On June 9, 2026, Mr. Elkin Kistner contacted Thompson Coburn by email and voicemail, identified himself as Qualizza's representative, and requested a call. **(Exhibit BB; see also Doc. 297-1.)** No substantive conferral followed. USB now asks this Court to deny relief on procedural grounds while it declined the opportunity to resolve these issues informally. USB's procedural objection also seeks to compel Mr. Qualizza to provide information that is not in his

possession; in any event, Mr. Qualizza is not the Tax Matters Partner. Mr. Freeman is. USBCDC's July 6, 2026, removal notice underscores the point: it faults Qualizza's management entity for undelivered Company tax returns while USBCDC's own garnishments deny him the resources to respond **(Exhibit HH)**.

The disproportion is plain. USB cannot lawfully garnish exempt retirement funds or non-debtor property regardless of the outcome of this application. A TRO therefore costs USB nothing it is legally entitled to collect, while its absence costs Qualizza continued deprivation of property that the Missouri and Texas legislatures and Congress have placed beyond the reach of judgment creditors and threatens third parties who owe USB nothing at all. Where, as here, only $XXXXXX in non-exempt assets belonging to the judgment debtor exists across all four garnished institutions, and approximately 97.5% of all targeted assets are exempt or belong to non-debtors, the breadth of USB's garnishment dragnet bears no reasonable relationship to the collectible balance. The equities favor temporary relief.

### D. PUBLIC INTEREST

The fourth Dataphase factor, the public interest, weighs in favor of granting the requested relief.

Missouri's statutory exemption for retirement accounts, Mo. Rev. Stat. § 513.430.1(10)(f), reflects a deliberate legislative judgment that retirement savings qualified under I.R.C. §§ 401(a), 403(a), 403(b), 408, 408A, and 409 must be shielded from the claims of creditors. The Texas legislature reached the same judgment in Tex. Prop. Code § 42.0021(a)-(b), and Congress reinforced these protections through ERISA's anti-alienation provision, 29 U.S.C. § 1056(d)(1), which prohibits the assignment or alienation of benefits under qualified employer-sponsored plans. See Patterson v. Shumate, 504 U.S. 753, 760 (1992) (holding ERISA's anti-alienation provision constitutes an enforceable restriction excluding pension plan interests from creditor attachment). Federal Rule of Civil Procedure 69(a)(1) makes the state exemptions fully operative in this Court. These protections exist precisely for circumstances like this one: a judgment creditor seeking to satisfy a money judgment by sweeping up every account a debtor holds and accounts the debtor does not hold without regard to whether those accounts are legally reachable.

Permitting USB to maintain garnishment freezes on accounts that are categorically exempt would effectively nullify these statutory protections during the pendency of the motions to quash. The

public interest is not served by allowing a judgment creditor that has already recovered over **93% of a $14,250,000** judgment to freeze a debtor's retirement savings that it cannot, as a matter of law, reach. A contrary result would discourage individuals from saving for retirement in the very vehicles that federal and state law designate as protected and would reward the kind of dragnet garnishment practice at issue here, where writs are filed against every known financial institution without any effort to distinguish exempt from non-exempt assets or debtor from non-debtor property.

The public interest is best served by preserving the status quo, enforcing the exemption statutes as written, and allowing the Court to resolve the pending motions to quash on their merits before any funds are disbursed.

## V. NO BOND SHOULD BE REQUIRED

Under Federal Rule of Civil Procedure 65(c), the Court may issue a temporary restraining order "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The amount of the bond rests within the sound discretion of the district court, which may set a nominal bond or dispense with security where the restrained party faces no realistic likelihood of harm.

No bond should be required here, or the bond should be set at a nominal amount. The requested TRO merely preserves the status quo as to property that USB cannot lawfully reach: exempt retirement funds and the separate property of non-debtors. The garnished funds remain frozen at the garnishee institutions; nothing is dissipated by a brief stay pending the Court's ruling on the fully briefed motions to quash. USB therefore faces no cognizable damages from the requested relief.

Qualizza has had no employment or measurable income for approximately seven years. The $XXXXX in his Chase accounts, his sole remaining source of funds, is imminently threatened. He cannot post a substantial bond. The amount of the bond rests within the sound discretion of the district court. Stockslager v. Carroll Elec. Coop. Corp., 528 F.2d 949, 951 (8th Cir. 1976). Courts in this Circuit have waived the bond requirement where the damages resulting from a wrongful issuance of an injunction have not been shown. Richland/Wilkin Joint Powers Auth. v. U.S. Army

Corps of Eng'rs, 826 F.3d 1030, 1043 (8th Cir. 2016). Here, USB faces no cognizable damages from the requested relief because the TRO merely preserves the status quo as to property USB cannot lawfully reach, and USB has already recovered over 93% of the Consent Judgment amount. Both conditions for waiver are satisfied: Qualizza demonstrates inability to pay, and the risk of harm to USB is speculative. Qualizza respectfully requests that the Court waive the bond requirement entirely or, in the alternative, set the bond at a nominal amount of $100.00.

## VI. RELIEF REQUESTED

**WHEREFORE**, Defendant Michael S. Qualizza respectfully requests that this Court enter a Temporary Restraining Order granting the following relief. The core, time-sensitive relief is the stay of the garnishment proceedings, the preservation directives to the garnishees, and the limited carve-out permitting ordinary living expenses from the Chase accounts; the remaining items may be deferred to the preliminary-injunction stage should the Court prefer a narrower initial order:

(a) Staying all garnishment proceedings against Qualizza's accounts at Charles Schwab & Co., Inc., JPMorgan Chase Bank, N.A., Raymond James & Associates, Inc., and T. Rowe Price Associates, Inc., pending the Court's resolution of the fully briefed Motions to Quash **(Docs. 285 and 286);**

(b) Directing the garnishees (Charles Schwab & Co., Inc., JPMorgan Chase Bank, N.A., Raymond James & Associates, Inc., and T. Rowe Price Associates, Inc.) to preserve the status quo and refrain from releasing, transferring, disbursing, liquidating, or offsetting any funds to U.S. Bank National Association pending further order of this Court, and to preserve all records relating to account ownership, source of funds, account history, beneficiary or estate-planning designations, restraints, holds, and communications concerning the writs;

(c) Staying enforcement of the writ of garnishment directed to JPMorgan Chase Bank, N.A., and directing that the funds held there ($XXXXXX in checking account ending 0436 and $XXXXXX in savings account ending 5895) remain available to Qualizza for basic living expenses (mortgage payments, utilities, insurance, food, transportation, and legal defense) pending resolution of the Motions to Quash, given that these non-

exempt funds are Qualizza's sole remaining source of living expenses and are dwarfed by the exempt and non-debtor assets swept up in the writs;

(d) Prohibiting any turnover, liquidation, transfer, disbursement, offset, or impairment of T. Rowe Price assets unless and until USB establishes, after notice and hearing, that the specific assets sought are owned by Qualizza individually and are legally subject to garnishment;

(e) Directing each garnishee to file sworn disclosures identifying account title, ownership, account type, source of funds, beneficiary designations, restrictions, balances, holds, restraints, and any communications with U.S. Bank or its counsel regarding the writs;

(f) Directing U.S. Bank National Association to provide a detailed accounting of the remaining judgment balance, including a full reconciliation of the closing statement discrepancy reflected in **Exhibits T, U, and V**, which show payoff figures ranging from $13,299,435.43 to $14,250,000 on the same escrow transaction, and an explanation of the basis on which the claimed deficiency is asserted against Qualizza notwithstanding the unsigned Amendment **(Exhibits O, P, Q);**

(g) Dissolving or modifying the writs of garnishment to exclude exempt property and non-debtor property;

(h) Setting this matter for an expedited hearing on Qualizza's application for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65, within fourteen (14) days of entry of the TRO;

(i) Waiving the bond requirement pursuant to Federal Rule of Civil Procedure 65(c) or, in the alternative, setting bond at a nominal amount of $100.00; and

(j) Granting such other and further relief as the Court deems just and proper.

Qualizza requests that the Court act on this application without delay. The garnishment writs have frozen accounts consisting almost entirely of exempt retirement funds and non-debtor property, and the motions to quash raising these exemptions have been fully briefed since June 30, 2026. A TRO preserving the status quo will prevent irreparable harm to exempt property while imposing no cognizable burden on USB, which has already recovered over 93% of the Consent Judgment

amount. This Temporary Restraining Order should issue and, per Federal Rule of Civil Procedure 65(b)(2), remain in effect for fourteen (14) days unless extended by the Court for good cause.

## VII. VERIFICATION

I, Michael S. Qualizza, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct:

(a) I am the Defendant/Judgment Debtor in the above-captioned action and the applicant in this Application for Temporary Restraining Order and Injunctive Relief to Protect Exempt Property.

(b) I have personal knowledge of the facts stated in this Application, except were stated on information and belief, and if called as a witness I could and would competently testify to the same.

(c) The facts set forth in this Application are true and correct to the best of my knowledge, information, and belief.

(d) The exhibits referenced in this Application and filed in support hereof **(Exhibits A through HH)** are true and correct copies of the documents they purport to be.

(e) The accounts held at Charles Schwab & Co., Inc., JPMorgan Chase Bank, N.A., and Raymond James & Associates, Inc. that are the subject of the garnishment writs consist almost entirely of retirement accounts (**SEP IRA, IRA, and Roth IRA**) that are exempt from garnishment under Missouri, Texas, and federal law. Only $XXXXX in non-exempt assets belonging to me exists across all four garnished institutions.

(f) The account held at T. Rowe Price Associates, Inc. that is the subject of the garnishment writ is jointly titled in the names of my wife, Kimberly H. Qualizza, and me. I was added to the account in 2012 solely for estate-planning purposes when the prior joint holder, Kimberly's mother, fell ill. All funds in the account are Kimberly's premarital assets; I have contributed nothing to the account in more than eighteen years, and I do not claim its assets as my individual property.

(g) I did not authorize Neil D. Freeman to execute the seller-side closing documents identified in the Closing Binder Index **(Exhibit W)** on my behalf, and I did not consent to his doing so.

(h) I signed the original Settlement Agreement dated October 15, 2025 **(Exhibit O)**. I did not sign the Amendment to Settlement Agreement dated February 3, 2026, in any counterpart **(Exhibits P, Q)**. I was never asked to execute a Docusign envelope for the Amendment, and no Docusign envelope, physical signature page, or other execution instrument bearing my signature on the Amendment has ever been presented to me or produced by any party.

(i) I have had no employment or measurable income for approximately seven years. The funds held at JPMorgan Chase Bank, N.A. are my sole remaining source of funds for basic living expenses and legal defense.

(j) I am the sole Manager of TLH F&B STL LLC. I did not authorize the March 6, 2025, closure of the Hotel, the termination of TLH F&B STL LLC's employees, or the cancellation of its guest reservations.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on **July 9, 2026**, in Austin, Texas.

Respectfully submitted,

**/s/ Michael S. Qualizza**
Michael S. Qualizza
Pro Se
1220 Marly Way
Austin, Texas 78733
Telephone: (773) 960-1181
Email: mqualizza@yahoo.com

## CERTIFICATE OF CONFERENCE

*Pursuant to Federal Rule of Civil Procedure 65(b)(1)(B), the undersigned certifies as follows:*

Prior to filing this Application, Defendant, through Elkin Kistner of Kistner, Hamilton, Elam & Martin, LLC (who has represented Defendant on Last Hotel matters for years but has not entered an appearance in this post-judgment garnishment proceeding), made a good faith attempt to confer with Brian W. Hockett and Caleb S. Crahan of Thompson Coburn LLP. On June 9, 2026, Mr. Kistner contacted both attorneys by email and voicemail, identifying himself as Defendant's representative and requesting a substantive call. (**Exhibit BB; see also Doc. 297-1.**)

Mr. Kistner has a long-term relationship representing Mr. Qualizza with matters related to The Last Hotel STL. He has not entered an appearance in this case in any capacity.

Based on his prior dealings with Thompson Coburn, Mr. Qualizza determined that a conferral through a neutral third party would have the best chance of success. USB's reply pleading nonetheless asserted that Mr. Kistner was acting as Mr. Qualizza's legal representation in this case, although the docket shows that Mr. Kistner has not entered an appearance of any kind in this case. For reference, Mr. Barnes is Mr. Qualizza's lawyer of record for the case and has an appearance on file for the complete case, not the post-settlement process. Mr. Barnes is in the process of withdrawing.

**Therefore,** the undersigned has been unable to resolve the issues presented in this Application without Court intervention. The USB Parties' refusal to confer necessitates the filing of this Application for Temporary Restraining Order on an expedited basis.

**/s/ Michael S. Qualizza**
Michael S. Qualizza

## CERTIFICATE OF SERVICE

I hereby certify that on **July 9, 2026**, I filed the foregoing Application for Temporary Restraining Order and Injunctive Relief to Protect Exempt Property, together with all supporting exhibits and declarations, with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record in this matter.

I further certify that on the same date, I caused a true and correct copy of the foregoing Application and all supporting exhibits and declarations to be served by United States Mail, first class, postage prepaid, upon the following:

**THOMPSON COBURN LLP**

**Brian W. Hockett, 52984MO**
**Caleb S. Crahan, 76111MO**

**One U.S. Bank Plaza**
**St. Louis, MO 63101**
**P: 314 552 6000**

**bhockett@thompsoncoburn.com**

**ccrahan@thompsoncoburn.com**

Attorneys for Judgment Creditor U.S. Bank National Association and Counterclaim Defendant U.S. Bancorp Community Development Corporation

Respectfully submitted,

**/s/ Michael S. Qualizza**
Michael S. Qualizza
Pro Se
1220 Marly Way
Austin, Texas 78733
Telephone: (773) 960-1181
Email: mqualizza@yahoo.com

**Dated:** July 9, 2026